# EXHIBIT 3

27 January 2021

| | |
|---|---|
| CONTINENTAL TOWERS LATAM HOLDINGS LIMITED<br>Commerce House, Wickhams Cay 1<br>P.O. Box 3140<br>Road Town,<br>Tortola<br>British Virgin Islands, VG1110<br>Attention: John Ranieri, Howard Mandel, Alberto Arzu, Jorge Hernandez, Andrew Swapp | |
| Latam Towers, LLC<br>86 West Street<br>Chagrin Falls, Ohio 44022<br>Email: rlepene@peppertreecapital.com<br>Attn: Ryan Lepene<br><br>Telecom Business Solution, LLC<br>86 West Street<br>Chagrin Falls, Ohio 44022<br>Email: rlepene@peppertreecapital.com<br>Attn: Ryan Lepene | AMLQ Holdings (Cay) Ltd.<br>Goldman, Sachs & Co.<br>200 West Street<br>New York, NY  10281<br>Email:  ryan.flanagan@gs.com<br>Attention:  Ryan Flanagan<br><br>and<br><br>Goldman, Sachs & Co.<br>6011 Connection Drive<br>Irving, Texas 75039<br>Email:  ben.nale@gs.com<br>Attention:  Ben Nale |

*Re:     Binding Offer to Redeem B and C Shares*

Gentlemen:

    Enclosed is a Written Resolution of Shareholders whereby the Initial A Shareholders propose to cause Continental Towers LATAM Holdings Limited (the "Company") to finance the redemption of all the Class B Shares owned by LATAM Towers, LLC and Telecom Business Solution, LLC (collectively, "Peppertree") and all the Class C Shares owned by AMLQ Holdings (Cay) Ltd. ("Goldman") which sets forth the proposed terms of such Financing and Redemption as between the Shareholders of the Company (the "Redemption Resolution"). Also enclosed is a Binding Offer between the Company on the one hand and Peppertree and Goldman on the other hand outlining the terms of the proposed

Redemption as between the Company and the Initial B Shareholders and Initial C Shareholder (the Binding Offer, and collectively, the Redemption Resolution and the Binding Offer, the "<u>Proposed Redemption</u>").  **The Initial A Shareholders have secured binding commitments to finance the Proposed Redemption from international financial institutions and are in a position to proceed to close both the Financing and the Redemption on an expedited basis.**

I. **Background**

For the purposes herein, capitalized terms not otherwise defined have the meanings given them in the Shareholders Agreement, Subscription and Contribution Agreement, Development Agreement or the Offshore EPC Contract (collectively, the "<u>Governing Documents</u>") as applicable. The Initial A Shareholders are also herein jointly referred to as "<u>Terra</u>."

Pursuant to Section 8.14 of the Shareholders Agreement, Section 8.10 of the Subscription and Contribution Agreement, Section 3.4 of the Development Agreement and Section 7.1.1 of the Offshore EPC Contract, the Initial A Shareholders, on their own account and on behalf of the Company, provided Terra's Notice of Dispute dated October 23, 2020 and gave notice of the existence of controversies, claims and disputes arising under and in connection with the Governing Documents (the "<u>Notice of Dispute</u>"). In their capacity as the Initial B Shareholders of the Company, Peppertree acknowledged receipt of Terra's Notice of Dispute dated October 23, 2020 and provided their own cross Notice of Dispute on November 5, 2020 subsequent to a Proposed Sale Notice dated November 4, 2020 for the purchase and sale of all the issued and outstanding shares of the Company to Torrecom Partners LP (the "<u>Proposed Offer</u>"). In its capacity as the Initial C Shareholder of the Company, Goldman acknowledged receipt of Terra's Notice of Dispute dated October 23, 2020 and provided a response thereto on November 20, 2020.

By way of further response, the Initial A Shareholders filed a supplemental Notice of Dispute dated November 24, 2020 on their behalf and on behalf of the Company (the "<u>Supplemental Notice of Dispute</u>"). Additionally, the Initial A Shareholders on November 24, 2020, pursuant to Section 5.04(b)(i) of the Shareholders Agreement provided Notice of Objecting Shareholders rejecting the Proposed Offer by attaching an opinion of UBS, an independent and reputable investment bank with experience in the industry and a cross-border practice, opining that the value of the proposed transaction was materially less than comparable transactions in the industry and the Territory.

The parties met on December 3rd and 7th, 2020 in an effort to pursue resolution of their various disputes. The deadline to negotiate a settlement as a precondition to the filing of a demand for arbitration by the Initial A Shareholders was December 7th.  The deadline for the Company to appoint an investment bank pursuant to Section 5.04(b)(i) of the Shareholders Agreement was December 4th (assuming the 30-day period upon receipt of the Proposed Offer was even triggered, which the Initial A Shareholders maintain was not because the Proposed Offer was not a bona fide offer).  Nonetheless, in an effort to facilitate settlement discussions, the parties agreed to toll the deadline of the Company to appoint an investment bank through December 7th. At the meeting held on December 7th, the parties agreed to pursue the proposed redemption herein subject to the Initial A Shareholder being able to obtain committed financing from an investment bank on behalf of the Company.  To that end, the parties again agreed to toll the deadline for the Company to appoint an investment bank to December 11th to allow the Initial B Shareholders and the Initial C Shareholder to negotiate the terms of the proposed redemption.  Counsel for the Initial A Shareholders thereafter transmitted on December 9th a proposed Shareholder Resolution

to effectuate the proposed redemption along with a proposed Tolling Agreement (the "Initial Redemption Offer"). At the request of Peppertree, the Initial A Shareholders again agreed to toll the deadline for the Company to select an investment bank through Tuesday, December 15, 2020 to allow the Initial B Shareholders and the Initial C Shareholder additional time to provide comments to the Initial Redemption Offer. The Initial B Shareholders and Initial C Shareholder, however, failed to respond prior to the mutually agreed expiration of the tolling deadline on December 15th. In fact the Initial B and C Shareholders requested an additional extension of the deadline for the Company to appoint an investment bank on December 15, the exact day on which the prior agreed extension was to expire rather than providing any comments on the Initial Redemption Offer or making any further efforts to move the process of negotiating the agreed redemption forward as had been agreed. On December 16, 2020 the Initial B Shareholders and Initial C Shareholder requested the initiation of a process for the Company to appoint an investment bank. By that time, the deadline for the Company to appoint an investment bank pursuant to Section 5.04(b)(i) of the Shareholders Agreement had expired. The 45-day settlement negotiation period, which is a condition precedent to the filing of a demand for arbitration by the Initial A Shareholders, expired on December 7th.

## II. Redemption Offer

The Proposed Redemption contemplates a purchase price, without further adjustments, of US$150,000,000. At the meetings held on December 3rd and 7th, the Initial A Shareholders proposed to cause the Company to redeem all Class B Shares and all Class C Shares owned by the Initial B Shareholders and the Initial C shareholders, respectively, following the terms and conditions the Initial B Shareholders negotiated with Torrecom Partners LP ("Torrecom") which culminated in the Proposed Offer. The Proposed Offer provided for a Base Purchase Price equivalent to 17x Tower Cash Flow. Yet the fine print of the proposed Share Purchase Agreement with Torrecom (the "Torrecom SPA") called for further reductions of the Base Purchase Price:

- First the Base Purchase Price is reduced to the Estimated Purchase Price. The Torrecom SPA defines "Estimated Purchase Price" as the "*amount equal to: (i) the Base Purchase Price; plus (ii) Cash of the Transferred Companies as of the Effective Time; minus (iii) Indebtedness of the Transferred Companies as of the Effective Time; minus (iv) Transaction Expenses of the Transferred Companies as of the Effective Time; minus (v) the TCF Adjustment Amount, if such amount is a negative number; minus (vi) the Closing Proration Amount; and minus (vii) the Distributed Subsidiaries Final Asset Value. Each component of the Estimated Purchase Price shall be as estimated by Seller Representative in the Closing Statement delivered by Seller Representative pursuant to Section 2.3.*"

- Pursuant to Section 2.2(a) of the Torrecom SPA, Torrecom would pay "*an amount equal to the Estimated Purchase Price, minus the Adjustment Escrow Amount; minus the Indemnity Escrow Amount; minus the Sellers' Escrow Amount; minus the Representative Expense Amount; minus any Transfer Taxes pursuant to Section 6.9, as determined pursuant to Section 2.3, to the account(s) specified by Seller Representative in writing no later*

*than two (2) Business Days prior to the Closing Date.*"

Had the Proposed Offer with Torrecom been accepted, the Transfer Taxes alone would have been in excess of US$30,000,000 and the escrow holdbacks would have been close to US$100,000,000 with no certainty of being fully recoverable under terms of the Torrecom SPA. Conversely, under the Proposed Redemption the Transfer Taxes associated with such transaction have already been deducted from the purchase price and the recovery and distribution of the escrow holdbacks, upon the expiration of the escrow period, is largely within the control of the Initial B Shareholders and the Initial C Shareholder as it is dependent mainly upon the compliance of the Initial B Shareholders and Initial C Shareholder with their obligations under the redemption agreement.

- The Torrecom SPA defined the Base Purchase Price as "*the TCF Target multiplied by the Multiple*" but left the definition of Multiple bracketed and undetermined, which indicates a common practice of a buyer reserving the right to lower the purchase price as a result of its findings during due diligence of alleged contingencies or deficiencies of the portfolio. The Proposed Redemption does not include such provision.

- Finally the Torrecom SPA provided that "*the Seller Representative shall take any and all actions that he believes are necessary or appropriate under this Agreement or any other Transaction Documents for and on behalf of Sellers, as fully as such Sellers were acting on their own behalf and all actions taken by Seller Representative under this Agreement and any other Transaction Documents shall be binding upon all Sellers and their successors as if expressly confirmed and ratified in writing by each of them*"

Given the aforementioned deductions considered within the Torrecom SPA, which was acceptable to you, had the Proposed Offer been accepted, the Initial B Shareholders and Initial C Shareholder would have received far less than the $150 million considered by the Proposed Redemption. Moreover, the Torrecom SPA included additional open-ended provisions for further deductions based on assignability of assets to the Transferred Companies (as defined in the Torrecom SPA), a factor which is not within the control of the Company or the Shareholders.

Finally, the Proposed Offer lacked the commitments of debt and equity financing to fully-fund Torrecom's purchase price. Conversely, the Initial A Shareholders have secured committed financing for the totality of the purchase price for this Proposed Redemption from international lenders which are prepared to proceed to closing on an expedited basis. Accordingly, the Redemption Offer provides $135,000,000 in cash upon closing and $15,000,000 in cash within 18 months after closing with next to no uncertainty.

Moreover, there can be no genuine objection to the redemption price. To borrow from your own letter of November 28th, 2020 where you rejected the opinion of UBS Securities LLC ("UBS"), you professed to have "tested the market" and had concluded that "UBS is wrong." You therefore stood by the Proposed

Offer which you negotiated with Torrecom. For these purposes, the Initial A Shareholders propose to redeem your **minority stake** following the terms of the Proposed Offer, a control-transfer transaction which you accepted and vehemently supported. The enclosed Redemption Offer, as was the Proposed Offer from Torrecom, is non-negotiable.

The Initial B Shareholders provided a Notice of Proposed Sale dated January 19, 2021 wherein Peppertree again requests a sale of all or substantially all of the Company's assets or all or substantially all of the Shares of the Company. Pursuant to Section 5.04(b)(ii) of the Shareholders Agreement, the Company would ordinarily be required to appoint an Investment Bank to facilitate the Approved Sale. The Company, however, can only act through its Board. For the last five years, the Initial B Shareholders have intentionally and in bad faith deadlocked the Board to inhibit growth. It is therefore hard to fathom that a Board which you have intentionally deadlocked for years will now be able to agree on the appointment of an Investment Bank. Terra does not trust the Initial B Shareholder to act in the best interests of the Company or to protect Terra's shareholder interests in the event of an Approved Sale. The directors appointed by Terra will not likely be inclined to approve an Investment Bank proposed by Peppertree and much less will they approve John Ranieri as a "Seller Representative." With a deadlocked Board, the Company will be unable to appoint an Investment Bank to facilitate an Approved Sale. The Proposed Redemption is consistent with the busines divorce we have been proposing although the next paragraph more clearly outlines your options.

In sum, in connection with the Proposed Redemption, the Initial B Shareholders and Initial C Shareholder stand to receive in cash, without any further adjustment, $150,000,000, an amount exceeding the net proceeds the Initial B Shareholders and Initial C Shareholder would have received under the Proposed Offer and an amount which represents better than fair value if we were to accept the premise of your November 28th letter. To borrow again from your letter of November 28th, "we have nothing to lose" and "you have everything to lose." You have a "calculable net amount" you will receive for your Shares without adjustments or the inherent risk of holdbacks dependent on conditions outside your control and financing contingencies which is better than the best deal you negotiated for the sale of the Company to Torrecom.

The consequence of rejecting this offer or allowing this offer to expire without response by February 2, 2021 will cost you more than $150,000,000, as Terra is fully prepared to pursue damages against Peppertree and Goldman, jointly and severally, for the numerous allegations outlined in our Notice of Dispute and Supplemental Notice of Dispute, including, without limitation, the full amount of the depressed value of the Company caused by the Initial B Shareholders' intentional restriction in bad faith of the Company's growth for five years and the Initial B Shareholders' sabotage of the sale of the Company in 2018.

Terra reserves all rights with respect to any failure by you to accept the Proposed Redemption. This notice is not intended as and may not be construed as a waiver of any rights which Terra may have now or may hereafter have under the Governing Documents or applicable law. All of Terra's rights and remedies, at law or in equity, are expressly reserved.

Sincerely,

TBS MANAGEMENT S. DE. R.L.

By: _____
      Name:  José Alejandro Sagastume Figueroa
      Title:  Director

TERRA TOWERS CORP.

By: _____
      Name:  Jose Alejandro Sagastume Figueroa
      Title:  Director

cc:

Rafael Briz (Mayora & Mayora, S.C.)
Garrett Evers (Thompson Hine LLP)
Jonathan P. Gill (Ropes & Gray LLP)

Alberto Arzu
Jorge Hernandez
John Ranieri
Howard Mandel

**CONTINENTAL TOWERS LATAM HOLDINGS LIMITED**
**Written Resolutions of the Shareholders**

The undersigned, being the holders of all of the issued and outstanding shares of Continental Towers LATAM Holdings Limited, a company incorporated in the British Virgin Islands (the "***Company***"), acting pursuant to Section 38.1(b) of the Amended and Restated Memorandum of Association and Articles of Association of the Company (the "***Governing Documents***"), hereby adopt the following resolutions by written consent in lieu of a meeting, effective as of January 27, 2020:

Any capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Shareholders Agreement of the Company (the "***Shareholders Agreement***").

**1.      Background**

The Initial A Shareholders desire to cause the Company to obtain financing in order to effect the redemption of 100% of the Class B Shares held by the Initial B Shareholders and 100% of the Class C Shares held by the Initial C Shareholder upon the terms and conditions as set forth in the Binding Offer attached hereto and incorporated herein by reference as Exhibit A.

**2.      Authorizations**

**The Shareholders hereby agree** as follows:

    a.   **Redemption**.

        i.   The Initial B Shareholders and the Initial C Shareholder (hereinafter collectively, the "***Selling Shareholders***") agree to sell 100% of their Class B Shares and 100% of their Class C Shares, respectively, to the Company pursuant to the terms of a definitive Redemption Agreement to be mutually agreed among the Shareholders (the "***Redemption***") in accordance with the terms and conditions as set forth in the Binding Offer attached hereto and incorporated herein by reference as Exhibit A (the "***Redemption Offer***"), .

        ii.   The Initial B Shareholders agree to instruct their appointed directors to approve the Redemption and the execution by the Company of the Redemption Offer and any other related documents, as may be required to effect the Redemption.

        iii.   Each Selling Shareholder agrees to take all necessary and reasonable actions in connection with the consummation of the Redemption as requested by the Initial A Shareholders and agrees to cause its shareholders, investors, directors, officers, as applicable, to vote for, consent to and raise no objections against such Redemption.

    b.   **Financing**:

        i.   The Initial A Shareholders have obtained binding financing commitments from international financial institutions (each a "***Preferred Lender***") on behalf of the Company in order to finance the Redemption (the "***Financing***"). In connection with the Financing, the Initial A Shareholders agree to use commercially reasonable efforts to effect a closing of the Financing on or around April 30, 2021. The Selling Shareholders agree to cooperate, and agree to cause their officers, directors, employees, agents and other representatives to cooperate, with the Initial A Shareholders to effect the Financing.  Such cooperation shall include providing the Initial A Shareholders with any and all information or documentation as requested by the Preferred Lender from time to time, including without limitation, information related to KYC questionnaires and AML background checks.  The Selling Shareholders agree to provide any such requested cooperation within 2 business days after receipt of a written request therefor from the Initial A Shareholders.

PPT-AMLQ Exhibit 17

PPT-AMLQ 000377

ii.   The Initial B Shareholders agree to instruct their appointed directors to approve the Financing and the execution by the Company of the financing agreement and any other related documents, as may be required by the Preferred Lender, in form and substance to be presented to the Board by the Initial A Shareholders. The initial B Shareholders further agree to instruct their appointed directors to take any and all other actions necessary or advisable in connection with the Financing.

iii.   The Selling Shareholders agree to instruct their appointed directors to approve the appointment of Mr. Enrique Canton and Ms. Danielle Kirby to represent the Company in regard to the negotiation and execution of the Financing.

iv.   The Selling Shareholders agree that the Initial A Shareholders shall have the exclusive right to negotiate on behalf of the Company the terms of the Financing with the Preferred Lender. The Initial A Shareholders agree to provide the Selling Shareholders with regular updates of a general nature as to the status of negotiations; provided, however, that until such time as the definitive financing agreement has been finalized and delivered to the Board for final approval and execution, the Initial A Shareholders shall not be obligated to divulge the name of the Preferred Lender(s) to the Selling Shareholders. Each Selling Shareholder agrees that neither it nor any of its officers, directors, employees, agents or other representatives shall directly or indirectly (i) solicit or enter into discussions or negotiations with any other party with respect to a sale of securities or assets of the Company or enter into any agreement, letter of intent, term sheet or similar document relating to any such sale, and (ii) contact the Preferred Lender for any reason related to the Financing or the Redemption whatsoever.

c.   **Tolling Agreement.** The Initial A Shareholders and the Selling Shareholders shall enter into that certain Tolling Agreement attached hereto and incorporated herein by reference as Exhibit B. The Selling Shareholders and the Initial A Shareholders agree that the Tolling Agreement may be terminated immediately upon a breach by any Shareholder of these resolutions upon notice by the non-breaching Shareholder in accordance with the terms set forth therein.

d.   **Expenses.** The Initial B Shareholders agree to instruct their appointed directors to authorize the Company to incur any and all expenses related to the negotiation and closing of the Financing and the Redemption.

e.   **Further actions**: Any Authorized Person is authorized to do (or cause to be done) all other acts and things that Authorized Person considers to be necessary or desirable in connection with the subject matter of these resolutions.

f.   **Ratification**: any action taken by any attorney, director, officer, employee or agent of the Company or the Initial A Shareholders in connection with the subject matter of these resolutions prior to these resolutions being passed is approved, ratified and confirmed in all respects; and

g.   **Interpretation**:  for the purposes of these Shareholder Resolutions:

i.   **Authorized Person** means any director (including any alternate director); and

ii.   each Authorized Person may exercise, or refrain from exercising, any right, power or discretion conferred on that Authorized Person by these resolutions in that Authorized Person's sole and absolute discretion.

**[The signature page follows]**

2

**Terra Towers Corp.**


By: _____
  Name:  Alejandro Sagastume
  Title: Director


**LATAM Towers, LLC**


By _____
  Name:  Ryan D. Lepene
  Title:  President and Chief Executive Officer


**AMLQ Holdings (Cay) Ltd.**


By _____
  Name:
  Title:


**TBS Management, S.A. de C.V.**


By _____
  Name: Alejandro Sagastume
  Title: Director


**Telecom Business Solution, LLC**


By _____
  Name:
  Title

**PPT-AMLQ Exhibit 17**                                              **PPT-AMLQ 000379**

**EXHIBIT A**

**REDEMPTION OFFER**

PPT-AMLQ Exhibit 17

PPT-AMLQ 000380

**CONTINENTAL TOWERS LATAM HOLDINGS LIMITED**

**STRICTLY PRIVATE AND CONFIDENTIAL**

January 27, 2021

TO

**LATAM Towers, LLC**
86 West Street
Chagrin Falls, Ohio 44022
Attention: Ryan Lepene (rlepene@peppertreecapital.com)

**Telecom Business Solution, LLC**
86 West Street
Chagrin Falls, Ohio 44022
Attention: Ryan Lepene (rlepene@peppertreecapital.com)

AMLQ Holdings (Cay) Ltd.
Goldman, Sachs & Co.
200 West Street
New York, NY 10281
Attention: Ryan Flanagan (ryan.flanagan@gs.com)

RE:     Binding offer letter ("**Binding Offer**") **regarding the redemption by Continental Towers LATAM Holdings Limited of all of the Class B Shares owned directly by each of LATAM Towers, LLC and Telecom Business Solution, LLC and all of the Class C Shares owned directly by AMLQ Holdings (Cay) Ltd.**

Dear Mr. Lepene, Mr. Flanagan:

We are pleased to inform you through this letter that Continental Towers LATAM Holdings Limited (the "**Company**") would like to submit this Binding Offer to redeem all of the Class B Shares owned by each of LATAM Towers, LLC and Telecom Business Solution, LLC (collectively, "**Peppertree**") and all of the Class C Shares owned by AMLQ Holdings (Cay) Ltd. ("**Goldman**", together Peppertree, collectively, the "**Sellers**") subject to the terms presented below (the "**Proposed Offer**"). The Company and the Sellers are each a "**Party**" and collectively the "**Parties**". Capitalized terms used herein but not otherwise defined shall have the applicable meaning ascribed to them in that certain Shareholders Agreement, dated as of October 22, 2015, among the Company, the Sellers, Terra Towers Corp., and TBS Management S. de. R.L. f/k/a TBS Management, S.A. (the "**Shareholders Agreement**")

| | | |
|---|---|---|
| I. | **Description of the Transaction** | Acquisition by the Company from Peppertree of all of the Class B Shares free and clear of all liens, constituting 32.2029% of the issued and outstanding Shares of the Company in the specific Percentage Interests set forth in Annex A and from Goldman of all of the Class C Shares free and clear of all liens, constituting 13.3478% of the issued and outstanding Shares of the Company (the "**Transaction**"). The Class B Shares and the |

Class C Shares are hereinafter referred to as the "**Minority Shares**".

| | |
|---|---|
| **III.  Purchase Price** | The Proposed Offer considers a purchase price for the Minority Shares equal to **US$150,000,000** (the "**Purchase Price**"), without any further adjustment from the Seller for any reason except as set forth in Section XVIII and payable to each of the Sellers in accordance with their Percentage Interests in the amounts set forth in Annex A.  The Purchase Price will be paid as follows: |

- 90% of the Purchase Price to the Sellers at closing of the Transaction; and
- 10% of the Purchase Price into an escrow account at closing of the Transaction (the "**Escrow Amount**") for a period of eighteen (18) months to cover (i) any and all indemnity obligations of the Sellers and (ii) any required post-closing transfer tax adjustment in accordance with Section XVIII.

| | |
|---|---|
| **V.  Terms of this Binding Offer and Redemption Agreement** | This Binding Offer is based on the terms and conditions set out herein and is expressly contingent upon the following: |

- full execution and delivery of the Shareholders Resolution to which this Binding Offer was attached (the "**Redemption Resolution**") and full compliance by the Sellers of the obligations set forth therein;
- execution of any legal conflict waivers requested by the Initial A Shareholders in order to enable Holland & Knight LLP to represent the Company in the Financing and the Transaction;
- the closing, by the Company, of the Financing (as defined below) with a Preferred Lender (as defined below); and
- execution of a mutually agreed definitive redemption agreement by and among the Company and the Sellers (the "**Redemption Agreement**").

The Redemption Agreement will include standard representations and warranties including as to title and ownership of the shares free and clear of all liens.

The Redemption Agreement will further include covenants of non-solicitation and non-circumvention prohibiting the Sellers from directly or indirectly, for itself and its subsidiaries and affiliates (a) requesting, encouraging or causing any employee, customer, supplier, business partner or Preferred Lender to withdraw, curtail or cancel a business

relationship with the Company or the Initial A Shareholders; or (b) otherwise interfering with the relationship between the Company or the Initial A Shareholder, as the case may be, and any such employee, customer, supplier, business partner or the Preferred Lender.

| | | |
|---|---|---|
| **VI.** | **Timing of Completion** | The Company estimates a Transaction closing on or around April 30, 2021, subject to prior execution of this Binding Offer and the Redemption Resolution by the Parties and satisfactory closing of the Financing and compliance with the terms and conditions of the Redemption Agreement. |
| **VII.** | **Due Diligence** | The Parties confirm that no diligence review needs to be conducted in connection with the Transaction. |
| **VIII.** | **Approvals and Conditions Precedent** | Upon execution of the Redemption Resolution, the Company will have received the necessary approvals for this Binding Offer from its Shareholders. The consummation of the Financing and the Transaction as well as the execution of the definitive financing agreement and the Redemption Agreement shall be approved by the Board via a written resolution as required by the Redemption Resolution. |

The closing of the Redemption Agreement will be subject to customary conditions precedent, including without limitation:

- the resignation of the directors appointed by Peppertree;
- the execution by the Sellers of a termination agreement terminating the Sellers rights and obligations under the Shareholders Agreement dated October 22, 2015 by and among the Company, the Initial A Shareholders and the Sellers;
- the closing of the Financing; and
- the approval by the Board of the Redemption and the Redemption agreement as required by the Redemption Resolution.

| | | |
|---|---|---|
| **X.** | **Sources and Structure of Financing** | The Company has secured binding commitments to finance the Transaction from international financial institutions in the form of term loan facilities pursuant to the terms of a definitive financing agreement negotiated by the Initial A Shareholders in accordance with this Section X (the "**Financing**"). The Sellers agree that the Initial A Shareholders, as the sole remaining shareholders following the Transaction, shall lead all negotiations and discussions with the international financial institution selected by the Initial A Shareholder (the "**Preferred Lender**") regarding the Financing and that until such time as the definitive financing agreement has been finalized and delivered to the Board for execution, neither the Company nor the Initial A Shareholders shall be obligated to |

divulge the name of the Preferred Lender to the Sellers. Further, each Seller agrees that once disclosure of the Preferred Lender occurs, neither it nor any of its officers, directors, employees, agents or other representatives shall directly or indirectly contact the Preferred Lender for any reason whatsoever related to the Financing or the Transaction.

| XII. | Exclusivity | Upon execution of this Binding Offer, Sellers agree that, until the earlier of (i) the Execution Date (defined under Section XXII below), and (ii) termination of this Binding Offer in accordance with Section XXII below, they shall, and shall procure that any of their respective subsidiaries, affiliates, officers, directors, employees, agents, representatives and advisors, directly or indirectly, immediately: |

(i)     cease all new, ongoing or lapsed discussions or negotiations with any other potential purchaser or its advisors or representatives in respect of (w) the sale of the Minority Shares, (x) the Transaction, (y) the Financing or (z) any possible alternative transaction similar to, or having the same purpose, as the contemplated Transaction, or relating to the Company, its business, and/or any other business combination transaction involving any of the foregoing, however structured, including the sale of the business or substantially all of the assets of the Company (a "**Competing Transaction**");

(ii)    refrain from entertaining, evaluating, accepting, soliciting, initiating, facilitating or encouraging any aspects of a possible Competing Transaction from any person other than the Company or the Initial A Shareholders or otherwise cooperate with, assist or participate in any inquiry, proposal, approach or offer in connection with, or with a view to, agreeing or implementing any Competing Transaction;

(iii)   refrain from entering into one or more agreements, arrangements or undertakings in respect of any Competing Transaction with any person other than the Company or the Initial A Shareholder; and

(iv)    refrain from (x) providing to any person (other than the Company or the Initial A Shareholders) any information in connection with the Company or its business, (y) affording any access to the business, financial position, properties, assets, or the books and records of the Company or any of its affiliates or subsidiaries to any person (other than the Company or the Initial A Shareholders), or (z) otherwise further cooperating in any way with, or assisting, or participating in, facilitating or encouraging, any effort or attempt by any person (other than the Initial A Shareholders) to do or seek any of the foregoing in respect of, the Transaction, the Company, or its business.

PPT-AMLQ Exhibit 17                                                                                    PPT-AMLQ 000384

| XIII. | **Confidentiality** | This Binding Offer is strictly confidential and the parties agree not to disclose (in oral or written form) to any third party: (i) the existence of this Binding Offer or its content, and (ii) the content of and/or the negotiations of the Redemption Agreement, without first obtaining the prior written consent of the Company and the Initial A Shareholders, except in accordance with the usual exceptions, including disclosure by the parties to their respective group companies and advisors where access to the information is required, and, as the case may be, disclosure to the competent supervisory bodies if this is requested in accordance with applicable law or regulations. Notwithstanding the above, the Company and the Sellers shall nevertheless remain bound by the terms and conditions of the Non-Disclosure Agreement provisions set forth in section 6.03 of the Shareholders Agreement. |
| XIV. | **Standard of Performance** | Each party agrees to use commercially reasonable efforts to fulfil its obligations with respect to this Binding Offer and the Transaction. |
| XV. | **Governing Law** | This Binding Offer shall be governed and construed in accordance with the laws of New York, without giving effect to any choice of law or conflicts of laws or rules of any jurisdiction that would cause the substantive laws of any jurisdiction other than New York. |
| XVI. | **Dispute Resolution** | The Parties shall seek to resolve disputes among them as quickly and inexpensively as possible in connection with this Binding Offer.  The first stage of any dispute among the parties shall be to submit disputes to the senior executives of the parties for friendly resolution by negotiation.  If such negotiation fails to resolve the dispute within thirty (30) business days after the dispute is brought before the senior executives of the parties, the dispute shall finally be settled by arbitration in accordance with Section 8.15 of the Shareholders Agreement. |
| XVII. | **Successors and Assigns** | No party shall have the right to assign its rights and obligations under this Binding Offer, whether expressly or by operation of law, without the prior written consent of the other parties hereto. |
| XVIII. | **Expenses** | Each party shall assume its own costs and expenses in connection with the signature of this Binding Offer and throughout the process of carrying out the Transaction. |
| | | The Initial A Shareholders have conducted a preliminary legal analysis with respect to the transfer taxes applicable in each Territory as a result of the consummation of the Transaction. A preliminary estimate of the transfer taxes applicable in each Territory upon consummation of the Transaction has been conducted by the Initial A Shareholder (this amount, the "**Estimated Tax Amount**"). The Estimated Tax Amount will be assumed by |

the Company. Any amount owed in excess of such Estimated Tax Amount as determined by the Company's accountants following the closing of the Transaction based on the year-end financials of the Company shall be reduced from the Purchase Price and collected from the Escrow Amount.

Any taxes on net income, gains or transfer of shares assessed against the Sellers in the BVI or the United States as a result of the Transaction will be the sole responsibility of the Sellers.

| | | |
|---|---|---|
| XIX. | **Binding Principles** | The principles set out in this Binding Offer are intended to be legally binding, and except as may otherwise be set forth herein, the principles set forth herein create an obligation on the part of the Parties. The principles set out in this Binding Offer are not intended to be a comprehensive statement of all the terms and conditions of the Redemption Agreement or any particular provision described herein. Instead, this Binding Offer is intended to outline the terms that may be reflected in and that serve as the basis for negotiating the Redemption Agreement and certain basic points of business understanding around the Transaction. This Binding Offer together with the Redemption Resolution constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior oral or written discussions, agreements or understandings between the Company and the Sellers with respect to the Transaction. |
| XX. | **Counterparts** | This Binding Offer may be executed in one or more counterparts, each of which will be deemed to be an original, but all of which together will constitute one and the same agreement. |
| XXI. | **Expiration of Offer** | This Binding Offer shall expire at 11:59 p.m. EST on February 2, 2021, unless a copy of this Binding Offer is executed and delivered by the Sellers to the Company and a representative of the Initial A Shareholders prior to such time. |
| XXII. | **Term and Termination of Binding Offer** | Upon the full execution of this Binding Offer by the Parties, the term of this Binding Offer shall commence, and the term shall thereafter terminate upon the earlier to occur of the following: |

(i)   full execution and delivery of the Redemption Agreement (the "**Execution Date**");

(ii)  upon written notice to the Company of a breach by the Sellers of the Redemption Resolution;

(iii) at any time by the Company upon written notice to the Sellers prior to April 30, 2021 at the sole discretion of the Company; or

(iv)  upon mutual written agreement of the parties. For the avoidance of doubt, agreement of the Company requires unanimous Board approval.

PPT-AMLQ Exhibit 17

PPT-AMLQ 000386

The rights and obligations of the Parties as described in the Paragraphs entitled Confidentiality, Expenses, Governing Law, and Dispute Resolution shall survive the termination of this Binding Offer and shall continue in full force and effect in accordance with the provisions thereof.

Please indicate your agreement with the foregoing by signing this Binding Offer where provided below. We look forward to working with you on this important Transaction.

(remainder of page intentionally left blank)

(signature pages follow)

Yours Sincerely,

**CONTINENTAL TOWERS LATAM HOLDINGS LIMITED**

By: _____
        Name:    Jorge Hernandez
        Title:     Director

By: _____
        Name:    Alberto Arzu
        Title:     Director

By: _____
        Name:    John Ranieri
        Title:     Director

By: _____
        Name:    Howard Mandel
        Title:     Director

**AGREED AND ACCEPTED**

**LATAM TOWERS, LLC**

By: _____
        Name:  Ryan Lepene
        Title:  Authorized Representative

**TELECOM BUSINESS SOLUTION, LLC**

By: _____
        Name:  Ryan Lepene
        Title:  Authorized Representative

**AMLQ HOLDINGS (Cay) Ltd.**

By: _____
        Name:  Ryan Flanagan
        Title:  Authorized Representative

**ANNEX A**

| Shareholder | Percentage Interest | Percentage of Purchase Price | Portion of Purchase Price |
|---|---|---|---|
| LATAM Towers, LLC | 23.7294% | 52.0945% | US$ 78,141,690.53 |
| Telecom Business Solution, LLC | 8.4735% | 18.6024% | US$ 27,903,619.90 |
| AMLQ Holdings (Cay) Ltd. | 13.3478% | 29.3031% | US$ 43,954,689.57 |
| **TOTAL** | **32.2029%** | **100%** | **US$150,000,000.00** |

PPT-AMLQ Exhibit 17

PPT-AMLQ 000389

**EXHIBIT B**

**TOLLING AGREEMENT**

PPT-AMLQ 000390

## <u>TOLLING AND FORBEARANCE AGREEMENT</u>

THIS TOLLING AND FORBEARANCE AGREEMENT ("Agreement") is entered as of January __, 2021 (the "Effective Date") by and between CONTINENTAL TOWERS LATAM HOLDINGS LIMITED, a company incorporated in the British Virgin Islands, with registered number 1882295, whose registered office is at Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands (the "Company"), LATAM Towers, LLC ("Peppertree Latam"), a limited liability company organized under the laws of the State of Delaware, Telecom Business Solution, LLC ("Peppertree TBS"), a limited liability company organized under the laws of Delaware, AMLQ Holdings (Cay) Ltd., a Cayman Island Exempted Company Limited by Shares, ("Goldman"), Terra Towers Corp. ("Terra Towers"), a company incorporated in the British Virgin Islands, with registered number 1375181, whose registered office is at Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands and TBS Management S. de. R.L. f/k/a TBS Management, S.A. ("Terra TBS"), a *sociedad anónima* organized under the laws of Panama. The foregoing companies are collectively the parties ("Parties") to this Agreement.

Whereas, reference is formally made to the following agreements: (a) the Shareholders Agreement dated October 22, 2015 (the "SHA") between the Parties; (b) Subscription and Contribution Agreement (the "SCA"), dated as of October 22, 2015 between the Company, Peppertree Latam, Goldman, and Terra Towers; (c) the Development Agreement dates as of October 22, 2015, as amended, among the Company Terra Towers, Terra TBS, and DT Holdings Inc. ("DTH"), a company incorporated in the Republic of Panama; (d) Offshore Turnkey Engineering. Procurement and Management Contract ("Offshore EPC Contract") dated as of October 22, 2015, as amended, among the Company and DTH, a company incorporated in the Republic of Panama. The forgoing agreements are referred to collectively as the "Governing Documents."

Whereas, the Parties have exchanged the following Notices of Dispute and responses relating to the Governing Documents, including: (a) the October 23, 2020 Notice of Dispute sent by Terra TBS and Terra Towers, (b) the November 4, 2020 Proposed Offer Notice sent by Peppertree Latam and Peppertree TBS; (c) the November 5, 2020 Notice of Dispute sent by Peppertree Latam and Peppertree TBS; (d) the November 24, 2020 Notice of Dispute sent by Terra TBS and Terra Towers; (c) the November 24, 2020 Rejection of Proposed Offer sent on behalf of Terra TBS and Terra Towers; (d) the November 28, 2020 Response to the November 24, 2020 Notice of Dispute sent on behalf of Peppertree Latam, Peppertree TBS, Goldman, and Peppertree Capital Management, Inc. ("Peppertree Management"); (e) the November 28, 2020 Response to Rejection of Proposed Offer sent on behalf of Peppertree TBS and Peppertree Latam; (f) the November 30, 2020 Response to 11/28/20 B Shareholder Response to Notice of Dispute on behalf of Terra TBS and Terra Towers. These correspondences are collectively referred to as "Notices of Disputes."

Whereas, the Parties have ripened disputes and claims arising under the Governing Documents and they seek to enter into this Agreement in order to facilitate further negotiations

between the Parties that may result in the sale of the minority shareholder interests, which would result in a settlement of all the disputes.

Whereas, this Agreement provides that, consistent with New York General Obligations Law § 17-103, any statutes of limitations, repose or laches applicable to claims referenced in the Notices of Disputes shall be tolled until the termination of this Agreement.

IT IS HEREBY AGREED by the Parties, for good and valuable consideration, as follows:

1.  <u>Recitals</u>. The foregoing recitals are true and complete and are hereby incorporated by reference as a term of this Agreement.

2.  <u>Deferral and Tolling of Statutes of Limitations.</u> All applicable statute(s) of limitation relating to any claim under the law or the Governing Documents and related to the Notices of Disputes herein shall be tolled as of January __, 2021 until any of the Parties terminate this Agreement by written notice. The Tolling Agreement shall toll the passage of time under New York law's statute(s) of limitation or the provisions of the Governing Documents. None of the Parties' claims for damages or indemnification arising out of or related to the Notices of Disputes or Governing Documents shall be time barred or subject to any statute of limitation defense if the party or parties brings and commences an action for damages or indemnification.

3.  <u>Forbearance.</u> The Parties agree, with respect to the claims covered by the Notices of Disputes, for the period commencing on the date of this Agreement and ending at the Termination of this Agreement (the "Forbearance Period"), that the Parties shall not assert any claims included in the Notices of Disputes before any tribunal during the Forbearance Period.

4.  <u>Termination</u>. This Agreement shall be terminated by a signed writing notice directed to all of the Parties. Termination shall become effective upon receipt of the written notice by the other Parties pursuant to the relevant notice provisions in the Governing Documents.

5.  <u>Amendment, Modification, and Waiver</u>. This Agreement shall be subject to amendment, modification, and waiver only by a subsequent writing signed by all of the Parties.

6.  <u>Agency Authority for Signatories</u>. The Parties and the signatories signing this Agreement represent that the signatories have actual authority to execute this Agreement on behalf of and to legally bind the respective Parties.

7.  <u>Liability.</u> The parties are not admitting to or commenting on the validity of any claims or disputes. Each party specifically reserves all their rights in that respect.

8.  <u>Dispute Resolution</u>. This Agreement will be governed by and construed in accordance with the Laws of the State of New York, United States without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other

**PPT-AMLQ Exhibit 17**                                        **PPT-AMLQ 000392**

jurisdiction).  This Agreement shall be governed by the Dispute Resolution provisions found in the Governing Documents.

SO AGREED by the Parties intending to be legally bound as evidenced by the signatures of their authorized agents below.

**Terra Towers Corp.**

By: _____
    Name:  Alejandro Sagastume
    Title: Director

**LATAM Towers, LLC**

By _____
    Name:  Ryan D. Lepene
    Title:  President and Chief Executive Officer

**AMLQ Holdings (Cay) Ltd.**

By _____
    Name:
    Title:

**TBS Management, S.A. de C.V.**

By _____
    Name: Alejandro Sagastume
    Title: Director

**Telecom Business Solution, LLC**

By _____
    Name:
    Title

3