# EXHIBIT 4


You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement.

Name of Respondent:  Terra Towers Corp.; (see ¶¶ 21-30 of the Statement of Claims, attached hereto as Exhibit A, for all Respondents)

Address:  Commerce House, Wickhams Cay 1, PO Box 3140; (see Ex. A at ¶¶ 21-30 for all Respondents' addresses)

| City:  Road Town, Tortola, British Virgin Islands, VG1110 | State: | Zip Code: |
|---|---|---|
| Phone No.:  (305) 372-7474 | Fax No.: | |

Email Address:  jrodriguez@careyrodriguez.com; (see Ex. A at ¶¶ 21-30 for the email addresses of all Respondents and Respondents' counsel)

Name of Representative (if known):  Juan J. Rodriguez; (see Ex. A at ¶¶ 30-31 for all Respondents' counsel)

Name of Firm (if applicable):  Carey Rodriguez Milian Gonya, LLP; (see Ex. A at ¶¶ 30-31 for all Respondents' counsel)

Representative's Address:  1395 Brickell Ave., Suite 700; (see Ex. A at ¶¶ 30-31 for all Respondents' counsel)

| City:  Miami | State:  Florida | Zip Code:  33131 |
|---|---|---|
| Phone No.:  (305) 372-7474 (see Ex. A at ¶¶ 30-31) | Fax No.: | |

Email Address:  jrodriguez@careyrodriguez.com (see Ex. A at ¶¶ 30-31 for all Respondents' counsel)

The named claimant, a party to an arbitration agreement which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

Brief Description of the Dispute:

The Statement of Claims, attached hereto as Exhibit A, provides a detailed account of Claimants' claims and a description of the dispute.  (See generally Ex. A).  Similarly, pursuant to Section 8.15 of the governing Shareholders Agreement (attached to the Statement of Claims), the parties agreed that the Commercial Arbitration Rules apply to this dispute.

Dollar Amount of Claim: $ Amount to be proven at arbitration (in excess of $190 million USD)

Other Relief Sought: ☑ Attorneys Fees  ☑ Interest  ☑ Arbitration Costs  ☐ Punitive/Exemplary
☑ Other:  Claimants expressly reserve the right to seek additional relief including, but not limited to, injunctive relief.

Amount enclosed: $  30,000

In accordance with Fee Schedule: ☐ Flexible Fee Schedule ☑ Standard Fee Schedule

Please describe the qualifications you seek for arbitrator(s) to be appointed to hear this dispute:

Pursuant to Section 8.15 of the governing Shareholders Agreement (attached to the Statement of Claims), each party will appoint an arbitrator, and the party-appointed arbitrators will then appoint an arbitrator to serve as the chair of the arbitration panel.  Claimants' party-appointed arbitrator is Richard F. Ziegler.  (See Ex. A at ¶ 160).  The third arbitrator, the chair, must be neutral, independent, familiar with cross-border joint ventures/transactions, familiar with New York law, experienced in high-stakes/high-value commercial litigation, and familiar with the AAA Commercial Rules.

Hearing locale:  New York, NY

*(check one)* ☐ Requested by Claimant ☑ Locale provision included in the contract

| Estimated time needed for hearings overall: | | hours  or  **5-10** | days |
|---|---|---|---|


**COMMERCIAL ARBITRATION RULES
DEMAND FOR ARBITRATION**

| | | |
|---|---|---|
| Type of Business: | | |
| Claimant: Communications infrastructure | | Respondent: Communications infrastructure |

Are any parties to this arbitration, or their controlling shareholder or parent company, from different countries than each other?
Yes

| Signature (may be signed by a representative): <br> /s/ Michael N. Ungar | Date: <br> 2/2/2021 |
|---|---|

Name of Claimant: Telecom Business Solution, LLC and LATAM Towers, LLC (Ex. A at ¶¶ 19-20)

Address (to be used in connection with this case): c/o Ulmer & Berne LLP, attn: Michael Ungar, 1660 West 2nd Street, Suite 1100

| City: Cleveland | State: Ohio | Zip Code: 44113 |
|---|---|---|
| Phone No.: (216) 583-7002 | Fax No.: (216) 583-7001 | |

Email Address: mungar@ulmer.com

Name of Representative: Michael N. Ungar

Name of Firm (if applicable): Ulmer & Berne LLP

Representative's Address: 1660 West 2nd Street, Suite 1100

| City: Cleveland | State: Ohio | Zip Code: 44113 |
|---|---|---|
| Phone No.: (216) 583-7002 | Fax No.: (216) 583-7001 | |

Email Address: mungar@ulmer.com; also, please copy mcrick@ulmer.com and counsel identified on the signature block Exhibit A.

To begin proceedings, **please file online at www.adr.org/fileonline.** You will need to upload a copy of this Demand and the Arbitration Agreement, and pay the appropriate fee.

# Exhibit A –
# Statement of Claims

ARBITRATION PURSUANT TO
THE COMMERCIAL ARBITRATION RULES OF
THE AMERICAN ARBITRATION ASSOCIATION

---

TELECOM BUSINESS SOLUTION, LLC, on its
own behalf and derivatively, on behalf of
CONTINENTAL TOWERS LATAM HOLDINGS
LIMITED,

       and

LATAM TOWERS, LLC, on its own behalf and
derivatively, on behalf of CONTINENTAL
TOWERS LATAM HOLDINGS LIMITED,

       Claimants,

       vs.

TERRA TOWERS CORP., TBS MANAGEMENT,
S.A., DT HOLDINGS INC., JORGE
HERNANDEZ and ALBERTO ARZÚ,

       Respondents,

       and

CONTINENTAL TOWERS LATAM HOLDINGS
LIMITED,

       Nominal
       Respondent,

       and

AMLQ HOLDINGS (CAY) LTD.,

       Notice Party.

AAA Case No.

# DEMAND FOR ARBITRATION AND STATEMENT OF CLAIMS

Claimants TELECOM BUSINESS SOLUTION, LLC and LATAM TOWERS, LLC (collectively, "Peppertree" or "Claimants"), each on their own behalf and jointly and derivatively, on behalf of CONTINENTAL TOWERS LATAM HOLDINGS LIMITED (the "Company"), by and through counsel, hereby submit this Demand for Arbitration and Statement of Claims against Respondents TERRA TOWERS CORP. ("Terra Towers"), TBS MANAGEMENT, S.A. ("Terra TBS," and together with Terra Towers, collectively, "Terra"), DT HOLDINGS, INC. ("DTH"), JORGE HERNANDEZ ("Hernandez"), and ALBERTO ARZÚ ("Arzú" and together with Terra, DTH, and Hernandez, collectively, "Respondents"), and the Company, as a nominal respondent, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Claimants and Respondents are referred to collectively herein as the "Parties."

## PRELIMINARY STATEMENT

### Summary of the Dispute

1.      This dispute arises from a straightforward business deal between the Parties. As is often the case, the Parties entered into this transaction hoping for the best yet, contractually speaking, made plans for "safety valves" and an "exit" if things did not work out. With more than $2 billion in assets under management, Peppertree Capital Management, Inc. ("Peppertree Investor") is a private equity firm and one of the most successful and experienced investors in the communication infrastructure industry in the United States. Peppertree Investor has participated in more than one hundred (100) communication infrastructure investments since 2004, most of which involve the development or acquisition of wireless communication towers (like the transaction in dispute).

2

2.　　Terra and DTH, owned and controlled by Respondent Hernandez, have a local presence in the communication infrastructure industry in South America and Central America, where they build towers and other communication infrastructure in the region.

3.　　At the core of this dispute is a deal that was relatively simple and had the potential to be lucrative and beneficial for all parties involved. In a series of transactions in 2014 and 2015 (more fully described below), Peppertree joined Terra as shareholders of the Company. Peppertree[1] provided necessary capital as well as its vast experience in the telecom infrastructure industry, and Terra and DTH provided the local presence and construction know-how.

4.　　Peppertree, Terra, and DTH are sophisticated entities and were represented by experienced counsel, as reflected in the governing documents. As one might expect in this type of situation, Peppertree and Terra agreed that the Company would be controlled by a four-person Board of Directors (the "Board"), consisting of two Directors appointed by each side; *i.e.*, two appointed by Peppertree and two by Terra (Respondents Hernandez and Arzú, and F. Howard Mandel and Ryan D. Lepene[2], both of Peppertree). As intended by the parties and as evidenced by the governing documents, virtually all Company actions require Board approval. If the Board is deadlocked and the majority of the Board does not approve a certain action, then that action cannot be taken—one of the aforementioned "safety valves."

5.　　In addition, even though Peppertree and Terra were optimistic that the Company would be successful and profitable, to confront the realities of potentially differing viewpoints, the Parties also agreed on a normal business solution if the business relationship did not work out: the

---

[1] Claimants each were formed to invest in and become shareholders of the Company. Prior to their formation, Peppertree Investor engaged in negotiations with Respondents related to Claimants' investment. For ease of reference, Claimants will use the term Peppertree to include Peppertree Investor up to the time of Claimants' creation and investment in the Company.

[2] Subsequently, Peppertree appointed John Ranieri in place of Mr. Lepene.

governing documents mandate that if, after five (5) years, **either** Peppertree or Terra elected to part ways, then the Company would be sold, and the proceeds would be distributed to the shareholders.

6.      In this regard, although Peppertree has exercised its right under the governing documents to sell the Company and secured an offer for the Company at a purchase price in excess of $400,000,000[3], Respondents rejected the contemplated transaction out of hand and then obstructed and prevented the continuation of the contractually mandated sales process in complete derogation of both the governing documents and their duties thereunder, costing Peppertree and the Company's other shareholder, an affiliate of Goldman Sachs & Co., LLC, **more than $185,000,000.**

7.      Additionally, both prior and subsequent to Peppertree's decision to sell the Company, in cases where the Board has **rejected** proposed Company actions, Respondents have repeatedly violated the governing documents by causing the Company to take unilateral, unapproved actions to benefit Respondents and their affiliates.

8.      As set forth in detail below, Respondents have ignored their basic, fundamental contractual commitments and have, instead, engaged in wrongful and self-serving conduct, including brazen self-dealing, misappropriation, and embezzlement, which not only constitutes repeated breaches of the Company's governing documents and breaches of their fiduciary duties to the Company and its shareholders, but is also in contravention of good faith business practices and applicable New York law.

9.      Respondents have also asserted a baseless and self-serving purported repudiation of the governing Shareholders Agreement solely to provide themselves with a clear path to

---

[3] All dollar amounts set forth herein are in USD.

continue their course of unlawful conduct in contravention of the Shareholders Agreement. If permitted to continue, this conduct will irreparably harm the Company and its shareholders, including Peppertree. As a result, Claimants are forced to bring this arbitration pursuant to the Company's governing documents, seeking damages and declaratory relief, as well as, in the alternative, specific performance (including the contractually required sale of the Company), and interim injunctive relief to prevent Respondents from continuing to take these wrongful actions that are highly injurious and detrimental to the Company, as well as to Peppertree.

## Background Regarding the Business Transaction at Issue

10.     Upon information and belief, Respondent Hernandez and his family have been in the construction industry in South America for many years. At some point they began to focus their efforts on building towers and other communication infrastructure in South America and Central America. As part of these efforts, in 2008, Hernandez established the Company through entities he owns and controls, including Terra. In 2014, Hernandez met representatives of Peppertree and discussed the possibility of having it provide its expertise and capital as part of the expansion of Hernandez's and Terra's business in Latin America. Ultimately, Peppertree agreed to do so. As a result, in 2014, Peppertree and Terra entered into a business deal by which they became investors in an affiliate of the Company. In 2015, that transaction was expanded to include the Company; the original investments were contributed, and additional capital was invested by Peppertree and by an affiliate of Goldman Sachs & Co., LLC. Various governing documents, including a Shareholders Agreement and Development Agreement (defined further below), were heavily negotiated by these sophisticated Parties and their counsel.

11.     The governing documents established the aforementioned four-person Board, as well as a development committee (the "Development Committee"[4]), to make decisions related to the development of sites.  As is the case in virtually all of the transactions of Peppertree Investor, Board and/or Development Committee approval is required before the Company may take virtually any actions, including, without limitation, building each telecommunication tower, entering into contracts, or making distributions.  These approval requirements were purposeful and mandated by Peppertree to ensure that neither party was permitted to take unilateral action on behalf of the Company because the Company's interests may not always align with those of Hernandez, Arzú, and Terra.

12.     The primary purpose of the Parties' business relationship was to develop and operate telecommunications towers in certain agreed locations in a manner that was profitable to the Company and its shareholders.  The Company was **not** in the construction field and was not responsible for constructing the telecommunications towers.  Rather, pursuant to the governing documents, the Parties agreed that Respondent DTH, which is owned and controlled by Hernandez, would construct the approved towers.  For each Board-approved tower project, DTH would receive upfront capital, regardless of the long-term profitability of the project to the Company and/or whether the project was completed and/or whether the tower ever became operational.  Thus, approval and construction of **all** sites is desirable for DTH and Hernandez, especially from a cash flow perspective.  However, the same is **not** true for the Company, which only profits if the projects in which it invests are completed, operational, and profitable in the long-

---

[4] The Development Committee is defined in Section 4.04(b) of the governing Shareholders Agreement, which is defined below.  Any capitalized terms that are not defined herein have the same meaning as in the Governing Documents (set forth and defined in Paragraph 39 below).

term.  Thus, Peppertree's ability to reject projects was crucial to its investment process.  That "safety valve" was fully-understood by all Parties and was heavily negotiated.

## Respondents' Self-Dealing and Other Wrongful Conduct

13.     After the Parties negotiated and entered into the governing documents, the Company began to identify and develop sites.  However, Respondents began to take actions in contravention of the governing documents and the approvals required therein.  By way of example, Respondents took no less than the following actions, which began to increase in both frequency and severity in late 2020:

- **Failure to Honor Contractual Offset Right:**  As early as 2017, Respondents failed to apply funds owed to the Company through an offset credit for the development and construction of future sites.  These amounts now total approximately **$6.58 million**.  The governing documents require that if the Board (or Development Committee) approves any projects that are later not completed for any reason, including situations that would fall within a customary definition of force majeure, any funds the Company provided for development of those project sites must then be used for the development of future sites (i.e., the offset credit) for the benefit of the Company.  This was an important and heavily negotiated term of the Parties' agreement because in the communication infrastructure industry, especially in Latin America, there is a substantial risk that an approved tower project may not reach completion and may, thus, provide no value to the Company.  Respondents agreed to bear that risk because Peppertree agreed that the Company would pay DTH $175,000 for each approved site even though the development and construction cost for building the average tower at issue was materially less.  Despite the clear agreement to the offset credit, Respondents have repeatedly and systematically failed and refused to apply it to the development and construction of future sites, resulting in approximately $6.58 million owed to the Company.

- **Self-Dealing for Old Sites #1:**  In August 2020, the Company, through Terra, presented certain sites in Colombia for Development Committee approval, all of which were **rejected**.  On October 30, 2020, Peppertree learned[5] that payment for four (4) of these rejected sites in the amount of **$700,000** (i.e., $175,000 x 4) had been sent to an affiliate of Terra.  In addition to violating the governing documents and self-dealing resulting in the payment of $700,000 which it was not otherwise entitled to make, Terra concealed the fact that these were not new sites to be

---

[5] The Company used to distribute a "Cash Availability Report" on a weekly basis, but recently began to do so less frequently despite Peppertree's objections.  Peppertree was able to discern the facts described by analyzing such a report.

developed by the Company; rather, they had already been built by Terra's affiliates in or about 2019. Upon information and belief, Respondents only conceived of and crafted this transaction in an effort to address their immediate cash liquidity needs, which drove the unauthorized and unlawful purchase and development.

- **Unauthorized Cash Distribution:** On or about October 25, 2020, without seeking the required Board approval, Terra caused **$5.4 million** in unauthorized cash distributions to be made to the shareholders.[6]

- **Self-Dealing for Old Sites #2:** The self-dealing set forth above was repeated just three months later. In November 2020, Terra once again caused the Company to acquire three (3) sites in Columbia from an affiliate of Terra. This proposed transaction had been **rejected** by the Development Committee, but on or about December 1, 2020, Terra caused the Company to pay **$525,000** for the rejected sites to one of its affiliates. Not only did the Respondents violate the governing documents and self-deal, they concealed the fact that these were not new sites to be developed by the Company, but, rather, Terra's affiliates had built these sites in **2015**. What had started as a "joint venture" for the Company to develop new sites had turned into an unlawful garage sale of Respondents' existing assets for Respondents' sole benefit at the expense of both Peppertree and the Company.

- **Embezzling Funds Prior to Milestones:** As more fully described, below, Terra is not entitled to receive any development or construction payments before certain, specific milestones are met. In December 2020, Terra notified the Board[7] that approximately **$625,000** was prepaid to Terra's affiliates for three (3) sites in Peru **before any required development and construction milestones were met**, again in direct contravention of the governing documents.

- **Self-Dealing for Old Sites #3:** On December 23, 2020, Terra proposed a Corporate Business Opportunity ("CBO") for multiple sites in Columbia, Nicaragua, and Panama. The CBO was formally **rejected** by the Development Committee pursuant to the Shareholders Agreement. Once again, these sites were not new development opportunities, but, rather, were previously built by Respondents' affiliates, some as early as **2015**. Ignoring the formal **rejection** of the Development Committee, on or about December 28, 2020, Respondents presented notice that **$2.8 million** in Company funds for sixteen (16) of these sites had been sent to an affiliate of Terra.

---

[6] Peppertree and Goldman objected to these unauthorized distributions but ultimately received and retained their respective allocations to preserve them and ensure that Terra did not misappropriate this portion of the funds as well.

[7] This embezzlement was further documented in the Company's December 11, 2020 "Cash Availability Report."

- **Obstruction of Required Sale of the Company:** Terra, led by Hernandez, failed to meet its contractual obligations under the Shareholders Agreement to sell the Company, and, in fact, obstructed the sales process. Specifically, the governing documents require that after October 22, 2020, at either Peppertree or Terra's request, the Company be sold. On or about November 4, 2020, Peppertree delivered to respondents a Notice of Approved Sale, by which the Company would be sold for $407.8 million (the "Proposed Sale"), approximately **$185 million** of which would go to Peppertree and the Goldman Sachs affiliate. This was an extremely lucrative sale for all shareholders of the Company. Respondents, however, rejected the Proposed Sale. Upon such a rejection, the Shareholders Agreement and other governing documents required (a) the parties to engage an investment bank to sell the Company and (b) Terra to make up any shortfall between the $185 million and the amount that Peppertree and the Goldman Sachs affiliate might receive from a subsequent sale. Respondents failed to do so by stonewalling and repeatedly delaying the process, including, without limitation, by failing to hire an investment bank as required.

14. These actions are highly injurious to the Company and its shareholders, including Peppertree. As shown by these examples, and as will be demonstrated at arbitration, Respondents' actions were taken for one primary purpose: to use the Company as a cash cow in order to provide a steady source of cash flow to Respondents and their related entities by any means possible. Not only are Respondents' actions self-dealing, but they were taken in bad faith and in intentional and direct contravention of both the governing documents and New York law. Moreover, they have deprived Peppertree of the benefit of its bargain, its negotiated voice in the management of the Company, and the important ability to manage the Company according to its governing documents.

15. In addition, on or about December 22, 2020, Respondents claimed that the Shareholders Agreement, which requires Board approval for many relevant actions on behalf of the Company, was "repudiated" and the Board was "effectively defunct." Relying on these unfounded claims, Respondents have effectively announced that they no longer intend to abide by the terms of the Shareholders Agreement or seek the required Board approvals, and that they may take any unilateral actions on behalf of the Company they see fit, thereby depriving Peppertree of its contractually mandated voice in the management of the Company. Respondents' new claims

pose a substantial and immediate threat to Claimants. Should Respondents be permitted to flout the purposeful and agreed protections of Board approval, there will be no restraint on their continued unlawful conduct, which will likely include further looting of the Company via additional improper distributions and developing multiple, unapproved sites with no prospects of long-term profitability, for the sole benefit of Terra and DTH.

16. Likewise, Respondents will likely enter into a Master Licensing Agreement ("MLA") with a specific wireless carrier, which the Board has already **rejected**, to enrich themselves at the Company's expense. The MLA includes harmful terms that will decrease the long-term value of the Company and make it more difficult to sell; yet, the MLA will fund Respondents' liquidity needs by permitting them to develop additional, unapproved sites at $175,000 per site. To be clear, when the Company is sold as required by the governing documents, there is no need whatsoever for this MLA.

17. Although Peppertree has put Respondents on written notice that these unauthorized and unlawful activities must stop immediately, Respondents have failed and refused to cease this wrongful conduct. Not only does this harm the Company, it also diminishes the value of the Company and, if such conduct continues, could have the effect (intended by Respondents) of delaying a sale of the Company or preventing it altogether.

18. Accordingly, Claimants are initiating this arbitration in order to compel Respondents to abide by the terms of the governing documents, including the required sale of the Company, and to prevent continued injury to the Company. Claimants also intend to seek interim injunctive relief to preserve the *status quo*; to prevent Respondents from taking any additional, wrongful unilateral actions without Board or Development Committee approvals, in contravention

of the governing documents and their fiduciary duties to the Company and its other shareholders; and to prevent continued irreparable harm to the Company and its shareholders.

## THE PARTIES

### Claimants

19.     Claimant **Telecom Business Solution, LLC** ("Peppertree TBS"), is a limited liability company organized under the laws of Delaware, and brings this arbitration on its own behalf and on behalf of the Company in the nature of a derivative action.  Peppertree TBS is a shareholder of the Company.

20.     Claimant **LATAM Towers, LLC** ("Peppertree Latam," and together with Peppertree TBS, "Peppertree") is a limited liability company organized under the laws of the State of Delaware, and brings this arbitration on its own behalf and on behalf of the Company in the nature of a derivative action.  Peppertree Latam is a shareholder of the Company.

### Respondents

21.     Respondent **Terra Towers Corp.** ("Terra Towers") is a company incorporated in the British Virgin Islands, with registered number 1375181, whose registered office is at Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands. Terra Towers is a shareholder of the Company.

22.     Respondent **TBS Management, S.A.** ("Terra TBS," and, collectively with Terra Towers, "Terra"), is a *sociedad anónima* organized under the laws of Panama.  Terra TBS is a shareholder of the Company.

23.     Respondent **DT Holdings Inc.** ("DTH") is a company incorporated in the Republic of Panama.

24.     Upon information and belief, Terra Towers has an ownership interest in both Terra TBS and DTH.

25.     DTH, Terra Towers, and Terra TBS are collectively referred to herein as the "Terra Entities."

26.     Respondent **Jorge Hernandez** ("Hernandez") owns and controls the Terra Entities, a group of interrelated entities.  Hernandez is a Director of the Company.

27.     Respondent **Alberto Arzú** ("Arzú") is the Company's Chief Executive Officer and was also appointed by Hernandez (through Hernandez's dominion and control over Terra Towers and Terra TBS) as a Director of the Company.  Arzú and Hernandez are long-time friends.

28.     Together, Hernandez and Arzú comprise 50% of the Company's Board.

29.     Hernandez and Arzú are joined here as Respondents in their capacities as Directors of the Company.

30.     Upon information and belief, DTH, Terra Towers, Terra TBS, Hernandez and Arzú are represented by:

> Juan J. Rodriguez, Esq.
> Carey Rodriguez Milian Gonya, LLP
> Brickell Arch
> 1395 Brickell Avenue
> Suite 700
> Miami, FL 33131
> Tel.  (305) 372-7474
> Email:  JRodriguez@careyrodriguez.com
>
> Danielle Jasmin Kirby, Esq.
> Illumination Technologies, LLC
> Miami, FL
> Tel.: (901) 849-3734
> Email: dkirby@illuminationtechnologies.com
>
> Rafael Briz, Esq.

Mayora & Mayora, S.C
15 calle, 1-04 zona 10, 01010
Edificio Céntrica Plaza, tercer nivel, oficina 301
Ciudad de Guatemala, Guatemala
Tel: Guatemala (502) 2223-6868
Fax: Guatemala (502) 236-625-40
Email: rbriz@mayora-mayora.com

**Nominal Respondent and Notice Person**

31.     Nominal Respondent **Continental Towers LATAM Holdings Limited** (the "Company") is a company incorporated in the British Virgin Islands, with registered number 1882295, whose registered office is at Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands.

32.     The Company has engaged the following independent counsel in connection with this proceeding and the disputes set forth herein:

Charles J. Falletta, Esq.
Sills Cummis & Gross P.C.
One Riverfront Plaza
Newark, NJ 07102
Tel: (973)643-5926
Email: cfalletta@sillscummis.com

33.     In addition to the Parties, pursuant to the notice provisions in the Shareholders Agreement (defined below), the Parties shall provide notice of this Arbitration to certain notice persons, including, among others **AMLQ Holdings (Cay) Ltd.** ("Goldman Investor"):

Goldman, Sachs & Co.
200 West Street
New York, NY 10282
Email: Michael.McGinn@gs.com
Attention: Mike McGinn

and

Goldman, Sachs & Co.
6011 Connection Drive
Irving, Texas 75039

13

E-mail: ben.nale@gs.com
Attention: Ben Nale

with a copy to:

Jonathan P. Gill, Esq.
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
E-mail: Jonathan.Gill@ropesgray.com

## FACTUAL BACKGROUND

### History and Governing Documents

34.     Upon information and belief, Hernandez and his family have been in the construction industry in South America for many years.  At some point in time, Hernandez began to focus his efforts on building towers and other communication infrastructure in the countries of South America and Central America.  Eventually, as part of these efforts, Hernandez caused the Company to be established in 2008 by entities he owns and controls, including Terra.

35.     In 2014, Hernandez met representatives of Peppertree, which had a successful history in investing in communication infrastructure ventures, and discussed the possibility of having Peppertree invest in the expansion of Hernandez's and Terra's business in Latin America.

36.     Accordingly, through a series of transactions in 2014 and 2015, Peppertree joined Terra as a shareholder of the Company.

37.     In the 2015 transaction, Peppertree increased its investment and the Goldman Investor, an affiliate of Goldman Sachs & Co. LLC, also became a shareholder.

38.     The following reflects the shareholders' investments in the Company:

| Shareholders | % Ownership |
|---|---|
| Terra Towers Corp. (Terra) | 45.98% |
| TBS Management, S.A. (Terra) | 8.47% |

| | |
|---|---|
| LATAM Towers, LLC (Peppertree) | 23.73% |
| Telecom Business Solution, LLC (Peppertree) | 8.47% |
| AMLQ Holdings (Cay) Ltd. (Goldman Investor) | 13.35% |
| **TOTAL** | **100.00%** |

39.     The 2015 transaction was reflected in the following agreements, along with other related documents, including those defined in the Subscription Agreement as Governing Documents (collectively and as amended, the "<u>Governing Documents</u>")[8]:

A.     On or about October 22, 2015, the Company, Peppertree Latam, the Goldman Investor, and Terra Towers entered into a Subscription and Contribution Agreement (the "<u>Subscription Agreement</u>").[9]

B.     On or about October 22, 2015, the Company, Peppertree Latam, Peppertree TBS, the Goldman Investor, Terra Towers, and Terra TBS entered into a Shareholders Agreement (the "<u>Shareholders Agreement</u>").[10]

C.     On or about October 22, 2015, the Company, Terra Towers, Terra TBS, and DTH entered into a Development Agreement (as amended, the "<u>Development Agreement</u>").[11]

D.     On or about October 22, 2015, the Company and DTH entered into an Offshore Turnkey Engineering, Procurement and Management Contract (as amended, the "<u>EPC Contract</u>").[12]

---

[8] Capitalized terms not defined herein have the meaning given to them in the Governing Documents.
[9] The Subscription Agreement is attached hereto as **Exhibit A**.
[10] The Shareholders Agreement is attached hereto as **Exhibit B**.
[11] The Development Agreement is attached hereto as **Exhibit C**.
[12] The EPC Contract is attached hereto as **Exhibit D**.

40.     The Governing Documents are explicitly governed by and construed under New York law.

41.     Under the Governing Documents, the Company is governed by the Board, consisting of four (4) directors (the "Directors"), two appointed by Terra and two by Peppertree.

### The Company's Business

42.     The Company is a communication infrastructure company in the business of developing, acquiring, and operating wireless communication towers and other wireless communication sites in Central America and South America.

43.     The Company develops tower sites through contractual agreements with the Terra Entities.

44.     Specifically, pursuant to the Development Agreement and the EPC Contract, Respondents Terra and DTH perform the on-the-ground work of identifying new tower sites; obtaining regulatory permissions; applying and receiving local zoning approvals, permits, and licenses; constructing and maintaining the towers; and providing back-office services for the Company.

45.     The Company generates income by leasing space on the towers to wireless carriers.

46.     The development of a tower site begins when, under the Development Agreement, Terra identifies a potential new tower site (a "Proposed Site") and proposes it to the Company's Development Committee, which is comprised of the Company's four Directors.  Development Agreement § 1.1(a).

47.     The Company's Development Committee decides whether to approve a potential tower site and is not required to approve any site.  This "safety valve" is a customary term in tower development financing arrangements and is standard in Peppertree Investor documentation.  It

16

allows the Development Committee to prevent the expenditure of funds where, in the business judgment of Peppertree, it would be imprudent to do so. Regrettably, that was the case here, where management was dishonest and where management's judgment was poor, ineffective, and at times irresponsible and/or where, in the judgment of Peppertree, the proposed projects were undesirable from an economic perspective. Nevertheless, in the ordinary course, where potential sites that were likely to be profitable to the Company were presented to the Development Committee, such sites were often approved, notwithstanding Peppertree's growing distrust of the Respondents.

48. To be clear, all projects *are desirable* from DTH's perspective because it receives upfront revenue for the development and construction activities, regardless of the long-term profitability of the towers to the Company. Hernandez often ignores the reality that what may be good for DTH or him may be neutral or negative for the Company.[13] Again, there were specific safeguards included within the Governing Documents to protect against this obvious conflict of interest.

49. Terra agreed in the Development Agreement that Terra must provide certain information regarding the Proposed Site to the Development Committee, and the Development Committee may "request such reasonable additional information regarding a Proposed Site as it deems necessary or appropriate, such request to not cause unreasonable delay." *Id.*

50. If a Proposed Site is approved by the Development Committee, it becomes an "Approved Site." *Id.* § 1.1(c).

---

[13] For example, on February 28, 2017, a number of Hernandez' lieutenants signed a letter (apparently ghost written for them) in which they purportedly calculated the value of the Company's "lost opportunity" for specific rejected sites as $175,000 multiplied by the number of rejected sites. In reality, that calculation was DTH's "lost opportunity," not the Company's.

51.     However, if, within two days of receiving all of the information that it has requested about a Proposed Site, the Development Committee does not accept the Proposed Site by delivering a Site Acceptance Notice to Terra, Terra may develop such site **outside of the Company and without use of the Company's funds**:

> If the Development Committee has not delivered a Site Acceptance Notice within an additional two (2) Business Days following receipt of the notice from Terra…then Terra or any of its Affiliates (other than the Company Subsidiaries and GTSL) may acquire and/or develop the Proposed Site **at their cost and without the participation of the Company**.

*Id.* (emphasis added).

52.     If a Proposed Site is approved, the Company issues a purchase order to DTH.  For each purchase order issued, the Company (and its subsidiaries) pays $175,000 per Approved Site to DTH (and its subsidiaries), subject to certain conditions.  EPC Contract § 2.1.1.1.

53.     The $175,000 price is paid to DTH (and its subsidiaries) in stages as the development of the site reaches certain milestones (the "Milestones") and progresses toward completion, as follows:

> a.  10% upon receipt of a purchase order from a wireless carrier requesting that the DTH Subsidiary obtain all permits, licenses or authorizations required to begin construction on the Approved Site;
>
> b.  40% upon the DTH Subsidiary's receipt of all permits, licenses or authorizations required to begin construction on the Approved Site;
>
> c.  25% upon the DTH Subsidiary commencing construction of a tower on the Approved Site;
>
> d.  20% upon the DTH Subsidiary's completion of construction of a tower on the Approved Site and delivery to the Company Subsidiary of all permits, licenses,

authorizations or agreements required to allow the Company Subsidiary to use and commercialize such Approved Site or reasonably requested by the Company Subsidiary to evidence its rights in the Approved Site; and

e. 5%, upon installation of equipment and the beginning of rental payments by a wireless carrier tenant.

*Id.* § 2.1.2.

## The Company's Offset Right

54. After development of a tower site begins, it may stall temporarily, or permanently, due to a variety of factors, including local political and economic issues.

55. One of the inducements to Peppertree, and likely the Goldman Investor, for investing in the Company was Respondents' proclaimed ability to navigate the myriad physical, administrative, zoning, political, and social difficulties in developing telecommunications sites in Latin America.

56. Thus, the risk that the development of a site might stall was specifically contemplated by the Parties during their original negotiations in 2014 and 2015. As such, provisions that contemplate and allocate these risks were included in the original documents and also specifically included again in the Governing Documents.

57. Indeed, since Hernandez and Respondents would control the local operations regarding the development and commercial exploitation of sites, it was important that the risks and rewards be carefully delineated and agreed upon. Thus, Peppertree, together with the Goldman Investor, and ultimately the Company, negotiated to obtain a fair allocation of the risk that results when the Company invests up-front funds in a tower site that later stalls or is abandoned.

58.     Specifically, if the development of a tower site stalls <u>for any reason</u> such that it does not move forward to the next scheduled Milestone within twelve (12) months of reaching the prior Milestone, the Governing Documents provide that the Company is to receive an "offset" (i.e., a credit, the "<u>Offset Right</u>") whereby payments the Company has made to DTH (and its subsidiaries) toward the development of the stalled or abandoned site are credited toward the development of future sites.

59.     However, to compensate DTH for the risk of stalled tower sites (which in many instances, it alone can anticipate or prevent), the Company agreed to pay DTH a per-tower fee that significantly exceeds the cost of developing and constructing a tower site.[14]   In this way, the cost of stalled sites is built into the overall fees paid by the Company to DTH.  This *quid pro quo* was a heavily-negotiated, key point in this transaction:  in order to eliminate any future debates about stalled sites, or causes for stalled sites, Peppertree agreed to allow the Company to "overpay" for completed sites in exchange for DTH absorbing the costs associated with all stalled sites, expressly including situations that would fall within a customary definition of force majeure.  DTH was so confident it could perform that it was willing to accept the risk—and, of course, was likewise happy to accept the overpayments.

60.     In the EPC Contract, DTH agreed that the payment of the $175,000 for each Approved Site "is to be made by the Company . . . subject to (x) satisfaction of each of the conditions precedent set forth in [Section 2.1.2, including the Milestones] and (y) **any offset of prior payments by the Company or a Company Subsidiary pursuant to such section**." *Id.* § 2.1.1.1 (emphasis added).

---

[14] Under the Governing Documents, DTH is paid $175,000 for a completed tower, well above the actual cost of approximately $65,000 - $100,000.

61.     DTH further agreed that

For the . . . avoidance of doubt, if at any time [DTH] fails to complete any of the milestones set forth in Section 2.1.2.1 – 2.1.2.5 above within 12 months of completion of the previous milestone, (i) Company shall not be responsible for any further payments or distributions with regard to such Approved Site and (ii) **Company** and the Company Subsidiary **shall be entitled to offset any payments made to [DTH] for such Approved Site pursuant to this Section 2.1.2 and the applicable Onshore EPC against any amounts otherwise due to [DTH] for later Approved Sites (the "Offset Right")**.

EPC Contract § 2.1.2.5 (emphasis added).

62.     Similarly, in the Development Agreement, DTH and Terra agreed to the Offset Right, expressly including "event[s] of force majeure." Development Agreement § 1.1(d).

63.     Thus, under the plain terms of the Governing Documents, if any Approved Site does not advance to the next Milestone within twelve (12) months of meeting the prior Milestone, the Company shall have the right to offset any payments made to DTH for that Approved Site against the construction costs of a future Approved Site.

## Respondents' Failure to Obtain Agreed-Upon Financing

64.     The Offset Right became critical to the Company's continued financial stability and growth because Respondents breached the provisions in the Governing Documents concerning the Company's intent to fund its growth with appropriate financing.

65.     All shareholders—Terra, Peppertree, and the Goldman Investor—have paid in full all required equity payments to the Company.

66.     A crucial selling point for Peppertree when entering into the Governing Documents was that the Company would **not** require any additional equity investments after the initial payments. The oral and written representations made by Hernandez and his investment bankers, including those set forth in the Confidential Information Memorandum, dated March 2015 (the "Offering Memorandum"), specifically described this business plan and reflected a credit facility

growing to in excess of $800 million over four years: "Use of leverage to fund future tower builds … No additional equity investment contemplated to fulfill current plan."

67.     Moreover, in the Governing Documents, the Parties agreed that, after the initial equity payments were made, the Company would obtain financing to enable it to continue to develop new towers.

68.     Specifically, in the Shareholders Agreement § 6.05, the "Shareholders agree[d] to use commercially reasonable efforts to assist the Company in obtaining any credit facilities as the Board determines are required to facilitate the growth of the Company."

69.     At the time that they entered into the Shareholders Agreement, the Parties expected that the Company would enter into a credit facility with a major United States or European lender (the "Anticipated Credit Facility") to provide the Company with sufficient financing to fund future and continuing development of tower sites.

70.     At the time the Parties entered into the Shareholders Agreement, Terra (represented by Hernandez) indicated to Peppertree and the Goldman Investor that it expected and intended that the Company would enter into the Anticipated Credit Facility.

71.     Yet when an affiliate of the Goldman Investor was prepared to provide the anticipated financing on customary terms, Hernandez obstructed and impaired the Company's entry into the Anticipated Credit Facility.

72.     In April 2016, the Anticipated Credit Facility had not been finalized due to obstruction by Hernandez.  His conduct in not allowing the Company to enter into the Anticipated Credit Facility was in direct contravention of the representations and understandings in the Offering Memorandum under which Peppertree invested.  Not only was it irrational—as it is the

proximate cause of the Company not having capital—it represented the first major break in the investors' confidence in Hernandez's reliability as both a partner and manager.

73.     Hernandez soon realized that the effect of his irrational decision was that the Company did not have capital.  He then urged the shareholders to provide a bridge loan to the Company to provide cash flow (and fund the Company's payments to Hernandez's company DTH) while the Anticipated Credit Facility was being finalized.  Hernandez represented that he would facilitate the Company's entry into the Anticipated Credit Facility soon after the bridge loan was complete.

74.     In April 2016, Peppertree and Terra each provided $5 million for a total of $10 million in bridge financing, with the understanding it was truly a "bridge" to getting the Anticipated Credit Facility done as represented by Hernandez.  The vast majority of this bridge loan was used to pay DTH for tower construction.

75.     In October 2016, Hernandez pressed the shareholders to provide an additional bridge loan of $4.5 million.  Goldman Investor joined Terra in doing so.  These funds again were used to pay DTH.

76.     After these bridge loans were made by the shareholders in advance of the Anticipated Credit Facility, Hernandez and Arzú then refused again to honor their commitment to support the Company's entry into the Anticipated Credit Facility and caused the Company to reject it.

77.     Peppertree viewed this as the last straw:  Hernandez had taken capital twice via material misrepresentations about his promised cooperation with a major credit facility, once with respect to the initial equity investment and once with respect to the bridge loan financings.

78. Hernandez and Arzú urged Peppertree and the Goldman Investor to instead consider financing agreements with local banks and investors in Central and South America.

79. The financing advocated by Respondents was piecemeal and confined to certain territories and would not be sufficient to repay the bridge loans and/or to complete much else. Hernandez and Arzú acknowledged this point by suggesting that the bridge loans lose their "bridge" status and become permanent. Even if the investors were willing to forego repayment on their bridge loans (after being misled by Hernandez), the financing advocated by Hernandez would have only allowed the Company to start construction on a few new tower sites—which would result in cash flow to DTH—before additional financing would immediately need to be sought.

80. In any event, the piecemeal financing advocated by Respondents never materialized. Whether or not Respondents understood that the draft term sheets they presented lacked any evidence of a true commitment by any lender, Peppertree, sophisticated in such matters, certainly understood that no commitments were being made by any lender and/or no significant credit facilities were likely to close.

81. Because Respondents refused to proceed with the agreed-upon Anticipated Credit Facility, the Company could not fund the development of new tower sites without the Offset Right.

## Respondents' Refusal to Recognize the Offset Right

82. To date, the Company has an Offset Right valued at approximately $6.58 million.

83. This $6.58 million Offset Right arises from Approved Sites for which DTH failed to complete a Milestone within twelve (12) months of completion of the previous Milestone. In some cases, Approved Sites have been stalled for years with no activity whatsoever.

84.     Under the Governing Documents, Respondents are required to propose and develop appropriate future sites for the Company at their sole cost (with a development value of $175,000 per site) until the $6.58 million offset has been depleted.

85.     Notwithstanding their contractual and fiduciary obligations to do so, the Terra Entities have failed and refused to satisfy their Offset Right obligations to acquire and develop such later Approved Sites for the benefit of the Company and its business.

86.     Instead, the Terra Entities continue to demand additional payments from the Company for each new tower site.

87.     In their capacity as shareholders and through their appointed Directors, Peppertree has demanded that the Offset Right be recognized and that the Terra Entities continue to identify and develop tower sites without receiving additional payment by the Company.  Respondents have failed and refused to accede to these demands or to recognize the Company's Offset Rights.

88.     The Terra Entities have not provided any recognizable or legitimate justification for this failure and refusal.

89.     Pursuant to Section 6.06 of the Shareholders Agreement, Terra may not participate in any telecom infrastructure business opportunity (as further defined in the Shareholders Agreement, a "Corporate Opportunity"[15]) unless the opportunity has been presented to the Company so that the Board may consider whether the Company should participate in the Corporate Opportunity.  Terra may pursue the opportunity on its own behalf only if the Company declines to participate by rejecting the Corporate Opportunity.

---

[15] In their correspondence, the Parties frequently use the term "Corporate Business Opportunity" or "CBO" to refer to a Corporate Opportunity pursuant to the Shareholders Agreement.

90.    Terra has flooded the Company with ostensible Corporate Opportunities in which Terra knew the Company was financially unable to participate at the time.  Instead of abiding by its contractual obligations of honoring the Offset Right, Terra presented the Corporate Opportunities, refused to apply the Offset Right in violation of the governing agreements and then built these sites outside of the Company.  Respondents should have satisfied their Offset Right obligations to the Company and built approximately thirty-eight (38) of these sites for the benefit of the Company and its shareholders.

### Respondents' Interests are Served Through Hernandez's Control and Direction of the Board and the Company's Management Team

91.    Hernandez's interests are served by members of the Board and the management team ("Management Team") who are beholden to Hernandez and act at his direction.

92.    None of the Company's Management Team is actually employed by the Company.  Instead, Hernandez has appointed individuals employed by the Terra Entities and other close associates to the Company's Management Team.

93.    These include Respondent Arzú, whom Hernandez appointed as the Company's CEO and a Director; Juan Francisco Quisquinay, the Company's CFO; Danny Barrios, the Company's Treasurer; Danielle Kirby, Esq., the Company's General Counsel; Alejandro Sagastume, the Director of Terra TBS and Terra Towers; and Kristha Pineda, Portfolio Manager to the Colombian and Peruvian subsidiaries of the Company.

94.    Specifically, Respondents, through their control of members of the Management Team, prevent Peppertree from obtaining a clear and accurate picture of the Company's finances and prevent Peppertree from timely learning of Respondents' unauthorized transactions and self-dealing.

**Respondents' Recent Acts of Self-Dealing, Misappropriation and Embezzlement**

95.     In recent months, Peppertree has learned that Respondents are misappropriating Company funds and disbursing them to themselves and their affiliates in self-dealing transactions that they hide from Peppertree.

96.     It is also noteworthy that when Peppertree has detected a disturbing and alarming pattern whereby whenever Respondents appear to have engaged in activities which are unauthorized or impermissible, Peppertree's attempts to obtain operational or financial information about these activities are thwarted.  For example, "Cash Availability Reports" which used to be distributed every Friday are now distributed less frequently, notwithstanding Peppertree's demand for the weekly information.   This obstruction and obfuscation prevents Peppertree from learning about Respondents' self-dealing until after the funds are already disbursed.

*Self-Dealing for Old Sites #1*

97.     For example, on August 12, 2020, Respondents presented certain tower sites in Colombia for approval to the Development Committee.  On August 17 and 18, 2020, respectively, these proposed sites were **rejected** in separate letters to Alejandro Sagastume (from Peppertree) and to Kristha Pineda (from the Development Committee).   Notwithstanding the rejection, on October 30, 2020, Peppertree discovered via the analysis of a Cash Availability Report that four of these **rejected** sites (TBS08062, TBS08063, TBS08064 and TBS08065) had nonetheless been developed and funded in the amount of $700,000 (i.e. $175,000 x 4).  This act was a violation of the Governing Documents and an act of self-dealing as Terra's affiliates received the payment. Moreover, contrary to Respondents' misrepresentations when they were presented, these sites had been previously constructed by Respondents' affiliate in 2019 and were not actually new sites to

be developed by the Company.  Rather, Respondents' affiliates sold old sites to the Company for $175,000 per site so that Respondents could pocket $700,000 to which they were not entitled.

<em><strong>Unauthorized Cash Distribution</strong></em>

98.     Distributions of cash to shareholders can only be accomplished with Board approval.  Nonetheless, Respondents sent a letter dated October 25, 2020, whereby they admitted to unilaterally and wrongfully instructing their agents to distribute $5.4 million belonging to the Company, purportedly as "Excess Cash Flow."[16]

<em><strong>Self-Dealing for Old Sites #2</strong></em>

99.     In what may be the most egregious example of misrepresentation and self-dealing due to the actual age of the sites, on November 25, 2020, Respondents' agent, Alejandro Sagastume, sent a CBO proposal for the Company, ostensibly to develop three (3) new sites in Colombia.  This CBO was **formally rejected** by the Development Committee, per its express right to do so pursuant to Section 6.06 of the Shareholders Agreement.  In reality, these sites were not new development projects, as misrepresented by the Respondents, but rather had been built by Respondents' Colombia affiliate **in 2015**.  Notwithstanding the Development Committee's **rejection**, and notwithstanding the material misrepresentation about the age of the sites, Respondents caused the Company to buy those sites for $175,000 per site.  (As though the foregoing was not enough, the $525,000 Hernandez caused the Company to pay his affiliate implies a 25x tower cash flow purchase price multiple – an exorbitantly high price for towers in Colombia, especially towers with these characteristics.)

---

[16] Peppertree and the Goldman Investor objected to these unauthorized distributions but ultimately received and retained their respective allocations to preserve them and ensure that Terra did not misappropriate this portion of the funds as well.

100.    As part of that rejection, the Development Committee was clear in that "the Referring Shareholder and its Affiliates are free to pursue this opportunity on their own and outside of the Company."[17]    In no uncertain terms, and to eliminate any doubt, the Development Committee reiterated that "these 3 Colombia CBO sites were not authorized to be included in the Company portfolio at any time, and no funds are authorized by the Board for the development of this site."  To prevent any ambiguity regarding how such potential payments might be mishandled, the Development Committee further warned that no "DT employees or representatives direct Company Management to use Company funds to pay DT or other 3rd party providers for these sites.  Doing so will be another blatant violation and additional evidence in what has become a pattern of abuse and misappropriation of Company funds being systematically perpetrated by the A Shareholders against the B & C Shareholders."

101.    Ignoring the rejection and warnings, on December 1, 2020, Kristha Pineda presented notice to the Board that the Company had used $525,000 for precisely those same three (3) rejected sites.

102.    On December 7, 2020, Mr. Ranieri, one of Peppertree's Directors, wrote to Respondents as follows:

> Jorge Hernandez and Alberto:
>
> This message is directed to you both, as Company Directors, in order to have you exercise your authority to stop this pattern of behavior and blatant disregard of the written, contractual agreements among the Shareholders that govern the disbursement of Company funds for tower development and funding.
>
> **Rejected Sites:**  As you can all see from the attached **November 28th** email to Alejandro Sagastume, these 3 sites in Colombia were proposed to the Company in  a November 25th CBO from Alejandro (according to **Section 6.06 – Corporate Opportunities** of the

---

[17] In the interests of economy, Claimants have not attached all of the relevant dispute correspondence and other key documents quoted or otherwise referenced herein; however, such documents will be offered as exhibits at arbitration.

Shareholders Agreement) and were formally <u>rejected</u> (many of you were copied on that message). I was very clear in that "*the Referring Shareholder and its Affiliates are free to pursue this opportunity <u>on their own</u> and <u>outside</u> of the Company. For the avoidance of doubt, these 3 Colombia CBO sites are <u>not authorized</u> to be included in the Company portfolio at any time, and <u>no funds</u> are authorized by the Board for the development of this site.*" According to Alejandro's communications, these sites are being built at approximately **25x TCF**[18] and serve only to provide liquidity for DT because DT will collect the $175,000 per site upfront.

***Do not, under any circumstance***, have DT employees or representatives direct Company Management to use Company funds to pay DT or other 3rd party providers for these sites. Doing so will be another blatant violation and additional evidence in what has become a pattern of abuse and misappropriation of Company funds being systematically perpetrated by the A Shareholders against the B & C Shareholders.

**<u>Final Note for Kristha:</u>** For the past 2 years, you have fully acknowledged and communicated with me as a Director of the Company, sending me numerous messages across a variety of topics. In recent weeks, it seems that you have attempted to avoid (or delay) my prompt knowledge of attempted activities to disburse Company funds for unauthorized projects and, in doing so, have sent incomplete notices to us. Stop this immediately and resume sending me the messages that are directed to the Board.

### *Embezzling Funds Prior to Milestones*

103.    As the foregoing examples illustrate, this warning (like others before it) had no deterrent effect on Respondents' wrongful activities. On December 1, Kristha Pineda notified a the Board, and confirmed in the December 11, 2020 Cash Availability Report, that three (3) site relocations in Peru – totaling approximately $625,000 – were pre-paid to Respondents' affiliates *prior to* any evidence that any Milestone had been achieved.

### *Self-Dealing for Old Sites #3*

104.    On December 23, 2020, Terra proposed a CBO for sites in Columbia, Nicaragua, and Panama. The CBO was formally rejected by the Development Committee pursuant to the

---

[18] TCF refers to "Tower Cash Flow," which, pursuant to the Shareholders Agreement, "means, with respect to a Tower (i) recurring ordinary rent payments with respect to Tower Space Licenses <u>minus</u> (ii) expenses directly associated with the operation and maintenance of such Tower (including any insurance expenses or recurring ordinary rent payments) accrued or paid by the Company and the Company Subsidiaries, with each component of the [sic] such calculation consistently applied every time a determination of Tower Cash Flow for such Tower is made." Shareholder Agreement, Article I.

Shareholders Agreement. These sites were not new development opportunities; rather, they were previously built by Respondents' affiliates, some as early as **2015**. This was not development; it was misappropriation of funds. Ignoring the formal rejection of the Development Committee, on or about December 28, 2020, Respondents presented notice of the use of $2.8 million in Company funds for sixteen (16) of these sites. To reiterate: Respondents had caused the Company to pay $2.8 million to the Respondents' affiliates for sites that were formally rejected.

105. As the evidence will demonstrate, the Board and/or Development Committee, utilizing their discretion and applying reasonable business judgment, rejected proposed sites for multiple reasons, all reasonable and appropriate, including, but not limited to, the following:

- Certain proposed sites lacked permitting, municipal licenses, tenant leases, ground leases, or other documentation required for approvals.

- Certain proposed sites were rejected due to poor economics for the Company, including, without limitation, acquisition multiples as high as 25 times Tower Cash Flow (TCF); sites with minimal to no chance of adding tenants to justify cost; contracts with carriers that were short-term or halfway through the existing contractual term; and other economic factors, all of which would render the value of the rejected sites below the price mandated by Respondents.

- As early as 2014, the Parties understood that Peppertree was not interested in, and did not agree to, build sites in countries where the revenue would be predominantly in local currencies (i.e., non-USD), yet, subsequently,Terra started proposing such sites.

- Certain proposed sites had non-assignable tenant contracts between the carriers and the regional Terra affiliate, which meant that the Company could not obtain the necessary title to the tenant leases.

- Certain proposed sites had ground agreements on municipal property through a third party representative and not the municipality; therefore, the Company could not be assured ground rights.

- The Company had insufficient capital because Hernandez would not permit the Company to enter into the Anticipated Credit Facility.

- The Company had insufficient capital because Respondents did not apply the contractually mandated Offset Right. In fact, because Respondents did not apply

the Offset Right, the Company was, in essence, overpaying for all sites, making the continued approval of sites at $175,000 not in the best interests of the Company.

- The negotiated price of $175,000 was for *towers*. Hernandez showed bad faith by refusing to charge less than $175,000 for certain types of non-tower sites (e.g., rooftops or billboards), even though the development and construction cost for such sites is roughly $35,000.

- As set forth in this Statement of Claims, Respondents, including, specifically, Hernandez, proved themselves to be untrustworthy and repeatedly acted in bad faith, irrationally, and in contravention of the Governing Documents, including, without limitation, by failing to enter into the Anticipated Credit Facility, failing to lower rooftop pricing from $175,000 as anticipated, failing to apply the Offset Right as required, causing the Company to take various unapproved actions, and otherwise engaging in self-dealing and embezzlement. As a result, Claimants used their contractual "safety valve," set forth in the Governing Documents, as designed, in order to protect the interests of the Company, Peppertree, and Peppertree's investors.

106. These acts of self-dealing, misappropriation, misrepresentation, and outright embezzlement have recently occurred and, together with the additional conduct set forth in Paragraph 13 above, provide just some examples, without limitation, of Respondents' known, unlawful conduct to date. As a result, as outlined below, Peppertree has exercised its right to have the Company sold.

## Refusal to Sell the Company

107. The Governing Documents were specifically negotiated to permit either Peppertree or Terra the right to require the sale of the Company through a specified process after the fifth anniversary of the execution of the Governing Documents, such five-year period being defined in the Shareholders Agreement as the "Lock Up Period."

108. This too was a heavily negotiated provision specifically put in place to permit any one of the Peppertree or Terra to exit the investment for any reason, or no reason at all, after the Lock Up Period ended (there are other triggers for allowing the shareholders to demand a sale as

well) – but particularly where that shareholder felt that the other shareholder(s) in the investment was no longer a suitable or trustworthy partner.

109. Specifically, the Shareholders Agreement provides:

(b) <u>Approved Sale</u>.  Following the earlier of (i) the expiration of the Lock-Up Period [i.e., October 22, 2020], . . . then within ninety (90) calendar days of such event, (A) either the Initial A Shareholders [Terra] or the Initial B Shareholders [Peppertree] in the case of sub-section (i) . . . (such shareholders, the "**Proposing Shareholders**") may request, upon written notice to the other Initial Shareholders and the Company (the "**Proposed Sale Notice**"), a sale of all or substantially all of the Company's assets or all or substantially all of the Shares in the Company (in one or more transactions) to an unaffiliated Third Party Purchaser (an "**Approved Sale**").

(i) If the Proposing Shareholders have already procured or received an offer from an unaffiliated Third Party Purchaser to purchase the assets or Shares of the Company (a "**Proposed Offer**"), the Proposed Sale Notice shall disclose in reasonable detail the identity of the prospective purchaser and the proposed terms and conditions of the Proposed Offer.  The Initial A Shareholders or the Initial B Shareholders, as applicable, (the "**Objecting Shareholders**") may reject such Proposed Offer within thirty (30) calendar days of delivery of the Proposed Sale Notice by providing the Company with an opinion from an independent and reputable investment bank with experience in the industry and a cross-border practice (an "**Investment Bank**"), retained at the sole expense of the Objecting Shareholders, stating that the value of the proposed transaction is materially less than comparable transactions in the industry and the Territory; *provided that*, if such opinion is provided, the provisions of <u>Section 5.04(b)(ii)</u> shall apply.  In the event that no such opinion is provided by the expiration of such 30 day period, each Shareholder shall vote for, consent to and raise no objections against such Approved Sale and take all necessary and reasonable actions in connection with the consummation of the Approved Sale as requested by the Proposing Shareholders.

(ii) If the Proposing Shareholders have not already procured an offer from an unaffiliated Third Party Purchaser or if an opinion has been provided by an Objecting Shareholder pursuant to <u>Section 5.04(b)(i)</u>, the Company shall, within thirty (30) calendar days of receipt of a Proposed Sale Notice, retain an Investment Bank to facilitate an Approved Sale and each Shareholder shall vote for, consent to and raise no objections against such Approved Sale and take all necessary and reasonable actions in connection with the consummation of the Approved Sale as requested by the Proposing Shareholders. In the event that the consideration to be received for the Shares or assets of the Company upon the consummation of such Approved Sale is less than the Proposed Offer provided by the Third Party Purchaser pursuant to <u>Section 5.04(b)(i)</u>, the difference between the amount of the Proposed Offer and the purchase price of the Approved Sale shall be deducted from the proceeds otherwise due to the Objecting Shareholders.

* * *

(c)     In the event that any proposed Approved Sale is not consummated, for any reason or no reason, both the Initial A Shareholders and the Initial B Shareholders shall retain the right to request an Approved Sale in the future pursuant to the terms of this Section 5.04(b).

Shareholders Agreement § 5.04(b)-(c).

110.     The Lock Up Period expired on October 22, 2020.

111.     As evidenced by the above history, well in advance of the expiration of the Lock Up Period, it was clear to Peppertree that Respondents were neither suitable partners nor trustworthy.

112.     Accordingly, on November 4, 2020, Peppertree delivered to Respondents a Notice of Proposed Approved Sale ("Notice of Proposed Approved Sale") requesting "the sale of all of the issued and outstanding Class A, Class B and Class C shares of the Company (the 'Shares') pursuant to Section 5.04(b)(i) of the Shareholders Agreement."

113.     Pursuant to Section 5.04(b)(i) of the Shareholders Agreement, attached to the Notice of Proposed Approved Sale was "an offer from an unaffiliated Third Party Purchaser to purchase the . . . Shares of the Company" for a specified sum (the "Proposed Offer").

114.     The Proposed Offer satisfied all of the requirements of Section 5.04(b) of the Shareholders Agreement.

115.     Pursuant to Section 5.04(b)(i) of the Shareholders Agreement and Article 17.1(i) of the Articles of Association (the "Articles") of the Company dated July 15, 2015 and approved October 20, 2015, Terra only had two choices: either (a) accept the Proposed Offer; or (b) reject the Proposed Offer, initiate the hiring of an Investment Bank to sell the Company, and guaranty that Peppertree and the Goldman Investor would receive no less than in the Proposed Offer.

116.     By Notice of Rejection of the Proposed Offer dated November 24, 2020 ("Notice of Rejection"), Terra, as Objecting Shareholders, rejected the Proposed Offer by tendering

documents purporting to be an "opinion from an independent and reputable investment bank with experience in the industry and a cross-border practice" which stated that the value of the proposed transaction is materially less than comparable transactions in the industry and the Territory. In the Notice of Rejection, Terra also asserted without basis that the Proposed Offer was "not a bona fide offer and is thus rejected." (It is noteworthy that the Proposed Offer was not merely a letter of intent which was all that was required to make it "bona fide"; rather, it was a heavily negotiated purchase agreement in a form that Peppertree was willing to sign.)

117. In the Notice of Rejection, Terra acknowledged that "[a]ccording to Section 5.04(b)(ii) of the SHA, the Company shall within thirty (30) calendar days of receipt of a Proposed Sale Notice retain an Investment Bank to facilitate an Approved Sale. Accordingly, the deadline for the Company to appoint an Investment Bank to facilitate an Approved Sale is December 4, 2020. Given that time is of the essence, Terra proposes convening a Board meeting in the next ten (10) days in order to discuss proposals for the retention of an Investment Bank by the Company and consider the conditions under which the Board could approve such retention."

118. The Parties convened a meeting (via Zoom) to discuss the process of engaging an Investment Bank on December 3, 2020. However, during that meeting, the Respondents made certain proposals to Peppertree and the Goldman Investor that they wished to be considered. Specifically, Terra urged a delay in proceeding with the sale process pursuant to Section 5.04 of the Shareholders Agreement while it attempted to raise funds to achieve a redemption of the shares of Peppertree and the Goldman Investor. While Peppertree was skeptical as Hernandez had failed in a similar attempt before, Peppertree wished to provide him with the opportunity to redeem the shares. Accordingly, the Parties agreed to extend the time within which the Company must hire

an Investment Bank until December 7, 2020. Thereafter, the Parties entered into additional agreements to further extend the deadline to December 15, 2020.

119. However, in the interim, Peppertree learned of the additional actions by Respondents in violation of the Governing Documents and which constituted brazen self-dealing, misappropriation, and embezzlement outlined above.

120. In light of these discoveries, on December 15, 2020, Peppertree's counsel attempted to schedule a Zoom meeting with Respondents to discuss the situation, but Terra's counsel declined.

121. Given this response from Respondents, as a follow up to his December 7, 2020 email to Respondents, Mr. Ranieri again wrote to Respondents on December 16, 2020 as follows:

All:

_Self-dealing and Misappropriation of Funds in Colombia_

1. As evidenced by the chain of messages below, Alejandro Sagastume presented a Corporate Business Opportunity proposal on November 25, 2020, for the Company to acquire 3 sites in Colombia. Contrary to the A Shareholder's attempt at deception, these sites were not being newly-developed, but rather had been built by an affiliate of the A Shareholder _in 2015_.

2. As further evidenced by the emails below, _the Development Committee formally rejected this proposal_ in accordance with Section 6.06 – Corporate Opportunities of the Shareholders Agreement.

3. As part of that rejection, I was clear in that "_the Referring Shareholder and its Affiliates are free to pursue this opportunity on their own and outside of the Company._" In no uncertain terms, and for the avoidance of doubt, I reiterated that "_these 3 Colombia CBO sites were not authorized to be included in the Company portfolio at any time, and no funds are authorized by the Board for the development of these sites._" To prevent any ambiguity regarding how such potential payments might be effected, I stated that no "_DT employees or representatives [were to] direct Company Management to use Company funds to pay DT or other 3rd party providers for these sites. Doing so will be another blatant violation and additional evidence in what has become a pattern of abuse and misappropriation of Company funds being systematically perpetrated by the A Shareholders against the B & C Shareholders._"

4. *Notwithstanding the rejection of the proposal in accordance with our agreements, the A Shareholders, through an act of self-dealing and embezzlement, transferred these sites to the Company for $525,000.* (Not only did the A Shareholders self-deal, they caused the Company to pay an absurdly high 25x tower cash flow multiple for that illegal transaction.)

…

In summary, you have once again proven that you cannot be trusted to act as financial fiduciaries of the Company's resources. These continued and serious contractual violations of the SHA and other governing documents will add to the body of evidence a third-party will evaluate, eventually weighing these material breaches against a laughable "business purposes"[19] argument that pales in comparison to what you have perpetrated. We expect that your actions are rooted in an intentional trade off to generate immediate liquidity at the risk of committing and being held accountable for financial fraud. As I conveyed in previous messages, we were open to entertaining legitimate ways to resolve your financial situation, but you chose not to seek a collaborative route that could have avoided your actions.

122.     Additionally, on December 16, 2020, Peppertree responded through counsel, in relevant part, as follows:

[T]he B Shareholders [i.e., Peppertree] became aware of additional concerns regarding the management of the company, including apparent actions which proceeded without necessary board approval. After reviewing the draft documents, and considering the foregoing issues, the B and C Shareholders [i.e., Peppertree and the Goldman Investor] believe that it is in the parties' best interests to proceed with the mandated sale process under Section 5.04 of the SHA. Thus, the B and C Shareholders demand that the process required by Section 5.04(b)(ii) of the SHA immediately proceed unabated.

To that end, below is a list of proposed investment banks that meet the criteria required by the SHA:

[omitted]

If you would like to add others that meet the criteria in the SHA, please do.

---

[19] Respondents have previously argued that because Section 3.01 of the Shareholders Agreement states the "purpose of the Company is to develop… Towers," and the Development Committee rejected multiple opportunities to develop towers after Respondents had acted in bad faith, those rejections violate the "purposes clause." In so doing, not only do the Respondents misunderstand that a "purposes clause" does not impose any affirmative requirements to approve sites or opportunities, they have also ignored the specific requirements of the Governing Documents, including the heavily negotiated Board/Development Committee approval requirements, and their obligations thereunder.

We then suggest that, by 5:00pm (Eastern) on Thursday of this week, each side's Directors should strike a set number of names in order to limit the pool. The Directors will then jointly interview the remaining candidates and choose an investment banker to be retained by the Company before Christmas. In order to provide the parties with the requisite time to complete this process, we are amenable to further extending the deadline contained in the SHA for the Company to select a banker pursuant to Section 5.04(b)(ii) through that date.

123.    On December 22, 2020, Danielle Kirby, on behalf of Respondents, responded by again claiming that the Proposed Offer "was not a bona fide offer" and "it is a moot point to be discussing the appointment of an Investment Banker."[20]

124.    Respondents' failure and refusal to permit the Company to retain an Investment Bank for purposes of effectuating a sale of the Company is a violation of a critical, heavily negotiated provision of the Shareholders Agreement which was a key driver in Peppertree's decision to make the investment in the Company in the first instance.

125.    Respondents' actions in this regard are causing irreparable injury to the Company and to Peppertree even while Respondents are, at the same time, engaging in clear acts of misappropriation and embezzlement. Respondents have refused to abide by the requirement to have the Company governed by the Board and have essentially eviscerated all safeguards that Peppertree negotiated at the outset of this investment, depriving it of its contractual and financial rights, as well as its voice in the management of the Company and the opportunity to manage the Company.

126.    Peppertree is entitled to an award of compensatory damages caused by Respondents' conduct in rejecting the Proposed Sale and subsequently failing to move forward

---

[20] Ms. Kirby also suggests that the parties "conduct a formal process" to select an Investment Banker, even though Peppertree's proposed process already complied with the requirements set forth in the Shareholders Agreement. Ms. Kirby's suggestion was merely another obvious delay tactic to obstruct the required sale of the Company.

with the required process for sale of the Company pursuant to Section 5.04(b) of the Shareholders Agreement, including, without limitation, the amount to which Peppertree would have been entitled from the Proposed Sale.

127.     Given that Respondents have a history of breaching provisions in the Governing Documents or ignoring them altogether, Peppertree is doubtful that Respondents would comply with an award directing specific performance of Respondents' obligations under the Governing Documents.  However, in the alternative and to the extent that Peppertree does not receive full compensatory damages resulting from Respondents' failure to sell the Company as required, Peppertree is entitled to an award directing specific performance of the provisions of Section 5.04(b) of the Shareholders Agreement related to sale of the Company.

**Respondents' Baseless Representation That the
Shareholders Agreement Has Been "Repudiated"**

128.     On December 21, 2020, Respondents sent correspondence to Peppertree and the Board, seeking, *inter alia*, that the Company enter into a new MLA with a wireless carrier in Peru.

129.     The Board had already rejected entering into this new MLA because it included harmful terms that would decrease the long-term value of the Company and make it more difficult to sell.  However, if the Company were to enter into the new MLA, it would be attractive to Respondents' affiliates because it would provide another avenue to misappropriate funds for additional, unapproved sites at $175,000 per site.

130.     On December 22, 2020, Peppertree and its Board members responded to the request advising Respondents that they did **not** have authority to enter into the MLA without Board approval and that Respondents did not have such Board approval.

131.    Subsequently, on or about December 22, 2020, Respondents claimed that the Shareholders Agreement, which required Board approval for various actions on behalf of the Company, was somehow "repudiated" and that the Board was "effectively defunct."

132.    In so doing, Respondents have effectively announced that they no longer intend to abide by the terms of the Shareholders Agreement or seek the required Board approvals, and that they may take any unilateral actions they see fit, thereby depriving Peppertree of its contractually mandated voice in the management of the Company.  This poses a substantial and immediate threat to both the Company and Claimants.

133.    Should Respondents be permitted to flout the purposeful and agreed protections of Board approval, there will be no restraint on their continued unlawful conduct, which will likely include looting the Company through continuing to make improper distributions and developing multiple, unapproved sites with no prospects of long-term profitability, for the sole benefit of Respondents.

134.    Likewise, Respondents will likely enter into the MLA, which the Board has already rejected, to further enrich themselves at the Company's expense.

## Other Issues

135.    Claimants bring this arbitration proceeding specifically to address, *inter alia*, Respondents' failure to fund the Offset Right, acts of financial infidelity, and refusal to abide by the sale requirements of Section 5.04(b) of the Shareholders Agreement.

136.    However, additional issues have arisen in connection with the Company which are recited for purposes of giving the panel a full picture of the relationships among the Parties.

137.     The rejection of the Proposed Offer has resulted in Peppertree and the Goldman Investor failing to receive in excess of **$185,000,000** from the sale.  The proceeds from the Proposed Sale would have been distributed as follows:

| PRO RATA PROCEEDS FROM PROPOSED SALE OF COMPANY | | |
|---|---|---|
| **Shareholders** | **% Ownership** | **Pro Rata Share of Offer** |
| Terra Towers Corp. (Terra) | 45.98% | $185,506,440 |
| TBS Management, S.A. (Terra) | 8.47% | $34,540,660 |
| LATAM Towers, LLC (Peppertree) | 23.73% | $96,770,940 |
| Telecom Business Solution, LLC (Peppertree) | 8.47% | $34,540,660 |
| AMLQ Holdings (Cay) Ltd. (Goldman Investor) | 13.35% | $54,441,300 |
| **TOTAL** | **100.00%** | **$407,800,800** |

138.     The Shareholders Agreement provides that Terra will be responsible to Peppertree and the Goldman Investor for any loss they suffer as a result of Respondents' rejection of the Proposed Offer.  Shareholders Agreement § 5.04(b)(ii).

139.     Peppertree has no confidence that Terra will honor its obligation set forth in the Shareholder Agreement, and, therefore, specifically reserves the right to add such a claim in these proceedings to the extent that there is any subsequent sale of the Company for an amount that is less than that in the Proposed Sale, or Respondents' conduct has obstructed, delayed, and/or otherwise made the sale of the Company impossible.

140.     By bringing this proceeding to address the above-referenced disputes, Peppertree does not waive any of its other claims or rights under the Governing Documents, at law, or in equity, all such rights and remedies being fully and expressly reserved.

# AGREEMENT TO ARBITRATE

## Arbitration Agreements in Governing Documents

141.    The Governing Documents contain the following arbitration agreements:

142.    Sections 8.14 and 8.15 of the Shareholders Agreement (the "<u>Shareholders Agreement Arbitration Provision</u>") state:

**Section 8.14   Dispute Resolution.**    The parties agree that any controversy, claim or dispute arising out of or relating to or in connection with this Agreement including, without limitation, any dispute regarding its breach, termination, enforceability or validity hereof (each, a "**Dispute**") should be regarded as a business problem to be resolved promptly through business-oriented negotiations before resorting to arbitration pursuant to Section 8.15.  The parties therefore agree to attempt in good faith to resolve any Dispute promptly by negotiation between the executives of the parties who have authority to settle the Dispute.  Such negotiations shall commence upon the mailing of a notice (the "**Dispute Notice**") from the appropriate executive of the requesting party to an appropriate executive of the responding party.  If the Dispute has not been resolved by these Persons within forty-five (45) days of the date of the Dispute Notice, then such Dispute will be settled pursuant to binding arbitration pursuant to Section 8.15.  All negotiations pursuant to this Section 8.14 will be confidential and will be treated as compromise and settlement negotiations for purposes of applicable rules of evidence and not be used for, or admitted in, any arbitration or court proceedings under this Agreement.

**Section 8.15   Arbitration.**    Subject to Section 8.12, any Dispute that has not been resolved pursuant to Section 8.14 will be finally settled by binding arbitration.  The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association in effect at the time of the arbitration, except as they may be modified herein or by mutual agreement of the parties.  The seat of the arbitration shall be New York, New York.  The arbitration shall be conducted by three arbitrators.  The party initiating arbitration (the "**Claimant**") shall appoint its arbitrator in its request for arbitration (a "**Request**").  The other party (the "**Respondent**") shall appoint its arbitrator within thirty (30) calendar days of receipt of the Request and shall notify the Claimant of such appointment in writing.  If the Respondent fails to appoint an arbitrator within such thirty (30) day period, the arbitrator named in the Request shall decide the Dispute as the sole arbitrator.  Otherwise, the two arbitrators appointed by the parties shall appoint a third arbitrator within thirty (30) calendar days after the Respondent has notified the Claimant of the appointment of the Respondent's arbitrator.  When the arbitrators appointed by the parties have appointed a third arbitrator and the third arbitrator has accepted the appointment, the two arbitrators shall promptly notify the parties of such appointment.  If the two arbitrators appointed by the parties fail or are unable to appoint a third arbitrator, then the third arbitrator shall be appointed by the President of the American Arbitration Association which shall promptly notify the parties of the appointment of the third arbitrator.  The third arbitrator shall act as chairman of the panel.  The arbitration

award shall be in writing and shall be final and binding on the parties. The award may include an award of costs, including reasonable attorney's fees and disbursements. Judgment upon award may be entered by any court having jurisdiction thereof or having jurisdiction over the parties or their assets. The Initial A Shareholders hereby designate, appoint and empower Corporation Service Company, (the "**Process Agent**") with offices as of the date of this Agreement at Corporation Service Company, 1180 Avenue of the Americas, Suite 210, New York, NY 10036 as their authorized agent to receive for and on their behalf service of summons or other legal process in any action commenced under this Section 8.15 or otherwise related to this Agreement or the related investments and transactions in accordance with the Acceptance of Appointment Letter, substantially as attached hereto as Exhibit B. Such service may be made by mailing or delivering a copy of such process to either or both of the Initial A Shareholders in care of the Process Agent at the Process Agent's above address, and the Initial A Shareholders hereby authorize and direct the Process Agent to accept such service on their behalf. The Initial A Shareholders acknowledge and agree that they shall not revoke the appointment of such Process Agent unless they have appointed another agent for service of process and have received the written consent of the other Shareholders to such appointment.

143. Sections 8.10 and 8.11 of the Subscription Agreement (the "<u>Subscription Agreement Arbitration Provision</u>") state:

**Section 8.10 Dispute Resolution**. The parties agree that any controversy, claim or dispute arising out of or relating to or in connection with this Agreement including, without limitation, any dispute regarding its breach, termination, enforceability or validity hereof (each, a "**Dispute**") should be regarded as a business problem to be resolved promptly through business-oriented negotiations before resorting to arbitration pursuant to Section 8.10. The parties therefore agree to attempt in good faith to resolve any Dispute promptly by negotiation between the executives of the parties who have authority to settle the Dispute. Such negotiations shall commence upon the mailing of a notice (the "**Dispute Notice**") from the appropriate executive of the requesting party to an appropriate executive of the responding party. If the Dispute has not been resolved by these Persons within forty-five (45) days of the date of the Dispute Notice, then such Dispute will be settled pursuant to binding arbitration pursuant to Section 8.11. All negotiations pursuant to this Section 8.10 will be confidential and will be treated as compromise and settlement negotiations for purposes of applicable rules of evidence and not be used for, or admitted in, any arbitration or court proceedings under this Agreement.

**Section 8.11 Arbitration.** Subject to Section 8.10, any Dispute that has not been resolved pursuant to Section 8.10 will be finally settled by binding arbitration. The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association in effect at the time of the arbitration, except as they may be modified herein or by mutual agreement of the parties. The seat of the arbitration shall be New York, New York. The arbitration shall be conducted by three arbitrators. The party initiating arbitration (the "**Claimant**") shall appoint its arbitrator in its request for arbitration (a "**Request**"). The other party (the "**Respondent**") shall appoint its arbitrator

within thirty (30) calendar days of receipt of the Request and shall notify the Claimant of such appointment in writing. If the Respondent fails to appoint an arbitrator within such thirty (30) day period, the arbitrator named in the Request shall decide the Dispute as the sole arbitrator. Otherwise, the two arbitrators appointed by the parties shall appoint a third arbitrator within thirty (30) calendar days after the Respondent has notified the Claimant of the appointment of the Respondent's arbitrator. When the arbitrators appointed by the parties have appointed a third arbitrator and the third arbitrator has accepted the appointment, the two arbitrators shall promptly notify the parties of such appointment. If the two arbitrators appointed by the parties fail or are unable to appoint a third arbitrator, then the third arbitrator shall be appointed by the President of the American Arbitration Association which shall promptly notify the parties of the appointment of the third arbitrator. The third arbitrator shall act as chairman of the panel. The arbitration award shall be in writing and shall be final and binding on the parties. The award may include an award of costs, including reasonable attorney's fees and disbursements. Judgment upon award may be entered by any court having jurisdiction thereof or having jurisdiction over the parties or their assets. Terra hereby designates, appoints and empowers Corporation Service Company, (the "**Process Agent**") with offices as of the date of this Agreement at Corporation Service Company, 1180 Avenue of the Americas, Suite 210, New York, NY 10036 as its authorized agent to receive for and on its behalf service of summons or other legal process in any action commenced under this Section 8.11 or otherwise related to this Agreement or the related investments and transactions in accordance with the Acceptance of Appointment Letter, substantially as attached hereto as Exhibit I. Such service may be made by mailing or delivering a copy of such process to Terra in care of the Process Agent at the Process Agent's above address, and Terra hereby authorizes and directs the Process Agent to accept such service on its behalf. Terra acknowledges and agrees that it shall not revoke the appointment of such Process Agent unless it has appointed another agent for service of process and has received the written consent of the Buyers to such appointment.

144.     Section 3.4 of the Development Agreement (the Development Agreement Arbitration Provision") states:

Dispute Resolution; Arbitration. In the event of any dispute between or among any of the Parties relating to the terms of this Agreement or the transactions contemplated hereby, the Parties agree to abide and comply at all times with the dispute resolutions and arbitration provisions of Section 8.14 and Section 8.15 of the Shareholders' Agreement, which sections shall be deemed incorporated herein by reference.

145.     Section 7.1 of the Offshore EPC Contract (the "EPC Contract Arbitration Provision") states:

7.1 Dispute Resolution.

7.1.1 The parties agree that any controversy, claim or dispute arising out of or relating to or in connection with this Agreement including, without limitation, any dispute regarding

its breach, termination, enforceability or validity hereof (each, a "**Dispute**") should be regarded as a business problem to be resolved promptly through business-oriented negotiations before resorting to arbitration pursuant to Section 7.1.2. The parties therefore agree to attempt in good faith to resolve any Dispute promptly by negotiation between the executives of the parties who have authority to settle the Dispute. Such negotiations shall commence upon the mailing of a notice (the "**Dispute Notice**") from the appropriate executive of the requesting party to an appropriate executive of the responding party. If the Dispute has not been resolved by these persons within forty-five (45) calendar days of the date of the Dispute Notice, then such Dispute will be settled pursuant to binding arbitration pursuant to Section 7.1.2. All negotiations pursuant to this Section 7.1.1 will be confidential and will be treated as compromise and settlement negotiations for purposes of applicable rules of evidence and not be used for, or admitted in, any arbitration or court proceedings under this Agreement.

7.1.2 Any Dispute that has not been resolved pursuant to Section 7.1.1 will be finally settled by binding arbitration. The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association in effect at the time of the arbitration, except as they may be modified herein or by mutual agreement of the parties. The seat of the arbitration shall be New York, New York and each party agrees to service of process of any action commenced under this Section 7.1.2 by FedEx overnight delivery, with such service of process addressed to such party to be served at the addresses set forth in Section 4.1. The arbitration shall be conducted by three arbitrators. The party initiating arbitration (the "**Claimant**") shall appoint its arbitrator in its request for arbitration (a "**Request**"). The other party (the "**Respondent**") shall appoint its arbitrator within thirty (30) calendar days of receipt of the Request and shall notify the Claimant of such appointment in writing. If the Respondent fails to appoint an arbitrator within such thirty (30) day period, the arbitrator named in the Request shall decide the Dispute as the sole arbitrator. Otherwise, the two arbitrators appointed by the parties shall appoint a third arbitrator within thirty (30) calendar days after the Respondent has notified the Claimant of the appointment of the Respondent's arbitrator. When the arbitrators appointed by the parties have appointed a third arbitrator and the third arbitrator has accepted the appointment, the two arbitrators shall promptly notify the parties of such appointment. If the two arbitrators appointed by the parties fail or are unable to appoint a third arbitrator or to notify the parties of such appointment, then the third arbitrator shall be appointed by the President of the American Arbitration Association which shall promptly notify the parties of the appointment of the third arbitrator. The third arbitrator shall act as chairman of the panel. The arbitration award shall be in writing and shall be final and binding on the parties. The award may include an award of costs, including reasonable attorneys' fees and disbursements. Judgment upon award may be entered by any court having jurisdiction thereof or having jurisdiction over the parties or their assets.

7.1.3 The arbitration panel may consolidate an arbitration arising out of or relating to this Agreement with any arbitration arising out of or relating to one or more of the Onshore EPCs if the subject matter of the Disputes arises out of or relates to essentially the same facts or transactions. Such consolidated arbitration shall be determined by the arbitral panel appointed for the arbitration proceeding that was commenced first in time.

146.     Pursuant to the Shareholders Agreement Arbitration Provision and the EPC Contract Arbitration Provision, an arbitration award resolving a dispute under the Governing Documents may include an award of costs, including reasonable attorney's fees and disbursements.

### Notices of Dispute

147.     On October 23, 2020, Respondents sent to Peppertree (and the Goldman Investor) a Notice of Dispute (the "October 23 Notice of Dispute") giving notice of the disputes described therein and stating that if the disputes were not resolved within forty-five days, Respondents would commence binding arbitration.

148.     On November 5, 2020, Peppertree sent to Respondents a Notice of Dispute (the "November 5 Notice of Dispute") giving notice of the disputes described therein and stating that if the disputes were not resolved within forty-five days, Peppertree would take all actions to protect its rights and seek redress for such wrongful conduct, including but not limited to filing proceedings immediately against Respondents to seek specific performance, injunctive or other equitable relief, and to recover damages occasioned by Respondents' conduct to the fullest extent of the law.  The November 5 Notice of Dispute also responded to the assertions in the October 23 Notice of Dispute and further reserved all rights with respect to such other disputes as would arise during the 45-day negotiation period and beyond.

149.     Thereafter, the Parties exchanged a number of additional notices and responses with respect to the ongoing disputes between the Parties and otherwise reserved all rights with respect thereto.

150.     Peppertree and Terra both appointed executive representatives to meet and attempt to resolve the ongoing disputes between the Parties.

151. On December 3, 2020, the Parties' authorized executive representatives met (via Zoom) to attempt to resolve the disputes. These efforts were unsuccessful.

152. More than 45 days has elapsed since the Parties began the negotiation process required by the Governing Documents, and no resolution has been achieved, notwithstanding Peppertree's best efforts and good faith.

153. Accordingly, this Demand for Arbitration is timely.

<u>**Derivative and Demand Futility Allegations**</u>

154. Peppertree brings this action on behalf of itself and derivatively in the right of and for the benefit of the Company and its shareholders to redress injuries suffered by the Company as a direct result of the violations of law, breaches of fiduciary duty, corporate mismanagement, self-dealing, embezzlement, and abuse of control, as well as the aiding and abetting thereof, of Respondents.

155. Peppertree will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting their rights.

156. Peppertree has not made any formal demand on the Board to institute this action since such demand would be a futile and useless act for no less than the following reasons:

  a. Demand is futile because two out of the Company's four Directors, Respondents Hernandez and Arzú, participated in, approved of, and/or benefitted from the wrongful acts set forth herein, including, but not limited to (i) initiating, developing and/or continuing to develop sites without the required Board or Development Committee approvals and/or without applying the required Offset Right; (ii) making or causing to be made unauthorized cash distributions; and (iii) seeking to enter into

contracts, such as the MLA, on behalf of the Company without Board approval.  Specifically, Hernandez and Arzú will benefit from such conduct because it will result in an influx in cash not only to themselves but to DTH, which is owned and controlled by Hernandez, and to other entities related to Terra.

b.      Demand is also futile because Terra is owned and controlled by Hernandez, who is personally benefitting from the wrongful conduct set forth herein.

c.      Demand is further futile because, as set forth above, there has been significant dispute correspondence between Peppertree and its two Directors, on the one hand, and Respondents, on the other hand, related to the wrongful conduct set forth herein.  In that correspondence, Peppertree already advised Respondents that their conduct was wrongful and in contravention of the Governing Documents and demanded that Respondents cease taking such self-serving, wrongful actions, including, but not limited to:  (i) initiating, developing and/or continuing to develop sites without the required Board or Development Committee approvals and/or without applying the required Offset Right; (ii) making or causing to be made unauthorized cash distributions; and (iii) seeking to enter into contracts, such as the MLA, on behalf of the Company without Board approval.  Despite these demands, Respondents have repeatedly failed and refused to comply with—and, in fact, have continued to take actions in

contravention of—their obligations under the Governing Documents and applicable New York law.

157.    It is clear that at least a majority of the Board could not properly respond to a demand and would not agree to initiate legal proceedings against themselves and entities that they own, control, or in which they otherwise have an interest.  Accordingly, further demand upon the Board would have been futile.

## Demand for Arbitration

158.    Peppertree hereby demands arbitration of its disputes with Respondents pursuant to the Shareholders Agreement Arbitration Provision, the Subscription Agreement Arbitration Provision, the Development Agreement Arbitration Provision, and the EPC Contract Arbitration Provision.

159.    The arbitration shall be governed by New York law pursuant to Subscription Agreement § 8.07, Shareholders Agreement § 8.10, Development Agreement § 3.2, and Offshore EPC Agreement § 9.4.

160.    The Seat of the arbitration shall be New York, New York, pursuant to the relevant arbitration provisions of the Governing Documents.

## Designation of Party Appointed Arbitrator

161.    Pursuant to the provisions of the Governing Documents, Claimants hereby designate **RICHARD F. ZIEGLER** as their party appointed arbitrator:

> Richard F. Ziegler
> Acumen ADR LLC
> 16 Madison Square East, Ste. 1200
> New York, NY  10010
> Tel:  (347) 686-8385
> Email:  rziegler@acumenadr.com

**CLAIMS**

**Breach of Contract - Damages**
**(Sale of Company)**

162.    Claimants incorporate all preceding paragraphs as though fully set forth herein.

163.    The Governing Documents are valid and binding contracts, enforceable against Respondents according to their clear and unambiguous terms.

164.    The Governing Documents specifically provide that Respondents are contractually obligated to permit and cause the Company to hire an Investment Bank within thirty (30) calendar days of receipt of the Notice of Proposed Approved Sale to facilitate an Approved Sale and to vote for, consent to, and raise no objections against such Approved Sale, and take all necessary and reasonable actions in connection with the consummation of the Approved Sale as requested by Peppertree.

165.    Claimants have fulfilled all of their duties and obligations under the Governing Documents and are not in material breach or derogation of any term or condition thereof.

166.    Respondents' breaches of the Governing Documents have directly and proximately caused, and will continue to directly and proximately cause, damage to Claimants.

167.    That no issue of fact is present on this claim is established by the admission of Respondents in their Notice of Rejection:

> According to Section 5.04(b)(ii) of the SHA, the Company shall within thirty (30) calendar days of receipt of a Proposed Sale Notice retain an Investment Bank to facilitate an Approved Sale. Accordingly, the deadline for the Company appoint an Investment Bank to facilitate an Approved Sale is December 4, 2020. Given that time is of the essence, Terra proposes convening a Board meeting in the next ten (10) days in order to discuss proposals for the retention of an Investment Bank by the Company and consider the conditions under which the Board could approve such retention.

168.    Claimants are entitled to recover their full damages caused by Respondents' wrongful conduct in an amount to be proved at the arbitration, including, without limitation, the

more than $185 million to which Peppertree and the Goldman Investor were entitled as the result of the Proposed Sale, to be distributed to Peppertree and the Goldman Investor, and their pro rata share of any Company funds that would have remained after the Proposed Sale.

169.     In addition, Peppertree is entitled to recover the costs and expenses associated with this proceeding, including all filing and administrative fees, arbitrator compensation and reasonable attorneys' fees. *See* Shareholders Agreement § 8.15; Subscription Agreement § 8.11; EPC Contract § 7.1.12; Development Agreement § 3.4 (providing that Section 8.15 of the Shareholders Agreement applies).

### Declaratory Relief
### (Sale of Company)

170.     Claimants incorporate all preceding paragraphs as though fully set forth herein.

171.     A genuine dispute and actual controversy exist between the Parties with respect to the sale of the Company, as provided for in the Governing Documents, including, without limitation, pursuant to Section 5.04 of the Shareholders Agreement.

172.     Respondents have breached their obligations under the Governing Documents by refusing to abide by their obligations pursuant to Section 5.04 of the Shareholders Agreement to hire an Investment Bank and effectuate a sale of the Company.

173.     Hernandez and Arzú as Directors, and Terra Towers and Terra TBS, as Shareholders, have all prevented the Company from being sold pursuant to the provisions of Section 5.04(b). Upon Respondents' rejection of the Proposed Offer, they should have caused and permitted the Company to hire an Investment Bank within thirty (30) days of receipt of the Proposed Offer, or in the additional time agreed to by the Parties. In preventing and refusing to do so, each has engaged in self-dealing and conflicts of interest, and each has breached his contractual and fiduciary duties to the Company and its shareholders.

174.     Claimants have a clear and enforceable right to have the Company hire an Investment Bank and to have the Company sold.

175.     Accordingly, Claimants respectfully request that the Panel issue a declaration that Respondents are contractually obligated to permit and cause the Company to hire an Investment Bank to facilitate an Approved Sale, and to vote for, consent to, and raise no objections against such Approved Sale, take all necessary and reasonable actions in connection with the consummation of the Approved Sale as requested by Claimants, and not add conditions to or obstruct the Approved Sale.

176.     Moreover, Claimants are entitled to a declaration that in the event the consideration to be received for the Shares or assets of the Company upon the consummation of an Approved Sale is less than the Proposed Offer (here, the Proposed Sale), pursuant to Section 5.04(b)(i) of the Shareholders Agreement, the difference between the amount of the Proposed Offer and the purchase price of the Approved Sale shall be deducted from the proceeds otherwise due to Respondents.

### Breach of Contract – Specific Performance
#### (Sale of Company)

177.     Claimants incorporate all preceding paragraphs as though fully set forth herein.

178.     In the alternative, Claimants seek specific performance of the provisions of the Governing Documents requiring sale of the Company, including Section 5.04 of the Shareholders Agreement.

179.     The Governing Documents are valid and binding contracts, enforceable against Respondents according to their clear and unambiguous terms.

180.     The Governing Documents specifically provide that Respondents are contractually obligated to permit and cause the Company to hire an Investment Bank within thirty (30) calendar

days of receipt of the Notice of Proposed Approved Sale to facilitate an Approved Sale and to vote for, consent to, and raise no objections against such Approved Sale, and take all necessary and reasonable actions in connection with the consummation of the Approved Sale as requested by Peppertree.

181. Claimants have fulfilled all of their duties and obligations under the Governing Documents and are not in material breach or derogation of any term or condition thereof.

182. Claimants are ready, willing, and able to perform their remaining obligations under the Governing Documents with respect to the sale of the Company and otherwise.

183. The Shareholders Agreement provides that the Parties shall be entitled to specific performance of its terms. Section 8.12 states:

> **Specific Performance.** The parties hereto agree that irreparable damage would occur in the event any provision of this Agreement was not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at Law or in equity. Therefore, each party hereto consents to the issuance of an injunction or the enforcement of other equitable remedies against him at the suit of an aggrieved party without the posting of any bond or other security, to compel specific performance of all of the terms hereof and to prevent any disposition of Shares in contravention of any terms of this Agreement.

184. Respondents' breaches of the Governing Documents have caused and will continue to cause Claimants irreparable injury.

185. That no issue of fact is present on this claim is established by the admission of Respondents in their Notice of Rejection:

> According to Section 5.04(b)(ii) of the SHA, the Company shall within thirty (30) calendar days of receipt of a Proposed Sale Notice retain an Investment Bank to facilitate an Approved Sale. Accordingly, the deadline for the Company appoint an Investment Bank to facilitate an Approved Sale is December 4, 2020. Given that time is of the essence, Terra proposes convening a Board meeting in the next ten (10) days in order to discuss proposals for the retention of an Investment Bank by the Company and consider the conditions under which the Board could approve such retention.

186. By reason of Respondents' failures and refusals to perform their obligations as set forth above, Claimants are entitled to an award of specific performance, requiring Respondents to perform their obligations under the Governing Documents, including but not limited to, hiring an Investment Bank to facilitate an Approved Sale and to vote for, consent to, and raise no objections against such Approved Sale, take all necessary and reasonable actions in connection with the consummation of the Approved Sale as requested by Claimants, and not add conditions to or obstruct the Approved Sale.

187. Claimants are also entitled to an award of specific performance, requiring that, if the consideration to be received for the Shares or assets of the Company upon the consummation of an Approved Sale is less than the Proposed Offer (here, the Proposed Sale), pursuant to Section 5.04(b)(i) of the Shareholders Agreement, the difference between the amount of the Proposed Offer and the purchase price of the Approved Sale shall be deducted from the proceeds otherwise due to Respondents.

## Breach of Contract - Damages
### (Offset Right)

188. Claimants incorporate all preceding paragraphs as though fully set forth herein.

189. The Governing Documents are valid and binding contracts, enforceable against Respondents according to their clear and unambiguous terms.

190. The Governing Documents specifically provide that Terra and DTH must recognize the Offset Right by proposing new tower site projects and developing Approved Sites to the full extent and dollar value of the Offset Right.

191. Claimants have fulfilled all of their duties and obligations under the Governing Documents and are not in breach or derogation of any material term or condition thereof.

192.     Respondents have breached their obligations under the Governing Documents by refusing to recognize and apply the Offset Right.

193.     Hernandez and Arzú, as Directors, and Terra, as shareholders, have all prevented the Company from pursuing its contractual right to have towers sites developed by DTH (owned and controlled by Respondents) at DTH's expense as a credit against the Offset Right.  In doing so, each has engaged in self-dealing and conflicts of interest, and each has breached his or its contractual and fiduciary duties to the Company.

194.     As a direct and proximate result of Respondents' breach of the Governing Documents in failing to recognize and apply the Offset Right, the Company has been damaged in an amount to be determined at the hearing of this matter, but not less than $6.58 million, plus applicable interest.

195.     The Company's damages include, but are not limited to, the full value of payments made by the Company for Approved Sites for which DTH failed to complete a Milestone within twelve (12) months of completion of the previous Milestone.

196.     In addition, Claimants are entitled to recover the costs and expenses associated with this proceeding, including all filing and administrative fees, arbitrator compensation, and reasonable attorneys' fees.  *See* Shareholders Agreement § 8.15; Subscription Agreement § 8.11; EPC Contract § 7.1.12; Development Agreement § 3.4 (providing that Section 8.15 of the Shareholders Agreement applies).

## **Declaratory Relief**[21]
### **(Offset Right)**

197.     Claimants incorporate all preceding paragraphs as though fully set forth herein.

198.     A genuine dispute and actual controversy exist between the Parties with respect to the Offset Right set forth in the Governing Documents.

199.     Respondents have breached their obligations under the Governing Documents by refusing to recognize and apply the Offset Right.

200.     Hernandez and Arzú, as Directors, and Terra, as shareholders, have all prevented the Company from pursuing its contractual right to have towers sites developed by DTH (owned and controlled by Respondents) at DTH's expense as a credit against the Offset.  In doing so, each has engaged in self-dealing and conflicts of interest, and each has breached his or its contractual and fiduciary duties to the Company.

201.     The Company has a clear and enforceable right to have sites developed against the Offset Right.

202.     Accordingly, in the event the Company is not sold, Claimants respectfully request that the Panel issue a declaration that Respondents are contractually obligated to recognize and apply the Offset Right by proposing new tower site projects and developing only Approved Sites to the full extent and to the full dollar value of the Offset Right.

203.     The dollar value of the Offset Right owed to the Company will be determined at the hearing of this matter but is currently estimated at $6.58 million.

---

[21] Declaratory Relief is a weak alternative with regard to the Offset Right; the Claimants' main concern is receiving value with respect to the contractually required sale of the Company, not the continuation of its operations.

56

## Breach of Contract – Specific Performance[22]
### (Offset Right)

204. Claimants incorporate all preceding paragraphs as though fully set forth herein.

205. In the alternative, Claimants seek specific performance of the provisions of the Governing Documents related to the Offset Right.

206. The Governing Documents are valid and binding contracts, enforceable against Respondents according to their clear and unambiguous terms.

207. The Governing Documents specifically provide that Terra and DTH must recognize the Offset Right by proposing new tower site projects and developing Approved Sites to the full extent and dollar value of the Offset Right.

208. Claimants have fulfilled all of their duties and obligations under the Governing Documents and are not in breach or derogation of any material term or condition thereof.

209. Claimants are ready, willing, and able to perform their remaining obligations under the Governing Documents with respect to the Offset Right and otherwise.

210. Respondents have breached their obligations under the Governing Documents by refusing to recognize and apply the Offset Right.

211. Hernandez and Arzú, as Directors, and Terra, as shareholders, have all prevented the Company from pursuing its contractual right to have towers sites developed by DTH (owned and controlled by the other Respondents) at DTH's expense as a credit against the Offset. In doing so, each has engaged in self-dealing and conflicts of interest, and each has breached his or its contractual and fiduciary duties to the Company.

---

[22] Again, specific performance is a weak alternative with regard to the Offset Right; the Claimants' main concern is receiving value with respect to the contractually required sale of the Company, not the continuation of its operations.

212.     The Shareholders Agreement provides that the Parties shall be entitled to specific performance of its terms.  Section 8.12 states:

> **Specific Performance.**  The parties hereto agree that irreparable damage would occur in the event any provision of this Agreement was not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at Law or in equity.  Therefore, each party hereto consents to the issuance of an injunction or the enforcement of other equitable remedies against him at the suit of an aggrieved party without the posting of any bond or other security, to compel specific performance of all of the terms hereof and to prevent any disposition of Shares in contravention of any terms of this Agreement.

213.     Respondents' breaches of the Governing Documents have caused and will continue to cause the Company irreparable injury.

214.     By reason of Respondents' failures and refusals to perform their obligations as set forth above, Claimants are entitled to judgment requiring Respondents to perform specifically their obligations under the Governing Documents, including but not limited to, recognition and application of the Offset Right by proposing new tower site projects and developing only Approved Sites to the full extent and full dollar value of the Offset Right owed to the Company, which will be determined at the arbitration but is currently estimated at $6.58 million.

### Breach of Contract – Damages
### (Self-Dealing, Misappropriation, and Embezzlement)

215.     Claimants incorporate all preceding paragraphs as though fully set forth herein.

216.     The Governing Documents are valid and binding contracts, enforceable against Respondents according to their clear and unambiguous terms.

217.     Claimants have fulfilled all of their duties and obligations under the Governing Documents and are not in material breach or derogation of any term or condition thereof.

218.     As set forth above, Respondents have engaged in numerous instances of self-dealing, misappropriation, and embezzlement, in violation of the Governing Documents.

219.     These instances of self-dealing, misappropriation, and embezzlement have directly and proximately caused damage to Claimants and the Company.

220.     Among other things, Respondents have disbursed funds to themselves and their affiliates without Board approval, have otherwise expended Company resources in order to build and/or develop unapproved sites, and have sought to enter into the MLA without Board approval.

221.     Claimants are currently unaware of the full measure of the damage that Respondents have inflicted—and continue to inflict—upon Claimants and the Company, and reserve the right to take discovery in these proceedings and to prove the full extent of the damages at the arbitration.

222.     In addition, Claimants are entitled to recover the costs and expenses associated with this proceeding, including all filing and administrative fees, arbitrator compensation and reasonable attorneys' fees.  *See* Shareholders Agreement § 8.15; Subscription Agreement § 8.11; EPC Contract § 7.1.12; Development Agreement § 3.4 (providing that Section 8.15 of the Shareholders Agreement applies).


## Breach of Fiduciary Duty

223.     Claimants incorporate all preceding paragraphs as though fully set forth herein.

224.     As Directors of the Company, Hernandez and Arzú owe fiduciary duties to both the Company and its shareholders, including, without limitation, a duty to act in the best interests of the Company.  Arzú also owes fiduciary duties of loyalty and care to both the Company and its shareholders by virtue of his role as Chief Executive Officer of the Company.

225.     As shareholders of the Company, Terra Towers and Terra TBS owe fiduciary duties to both the Company and its shareholders.

226.    Hernandez and Arzú breached their fiduciary duties to both the Company and its other shareholders, including Peppertree, by engaging in, and/or causing Terra to engage in, the self-dealing, misappropriation, and embezzlement set forth herein, including, without limitation, failing to apply the Offset Right, proceeding with the purchase and/or development of unauthorized sites, and making, or caused to be made, unauthorized and unapproved payments and/or distributions of Company funds.

227.    Terra Towers and Terra TBS breached their fiduciary duties to both the Company and its other shareholders, including Peppertree, by engaging in the self-dealing, misappropriation, and embezzlement set forth herein, including, without limitation, failing to apply the Offset Right, proceeding with the purchase and/or development of unauthorized sites, and making, or caused to be made, unauthorized and unapproved payments and/or distributions of Company funds.

228.    As a direct and proximate result of Hernandez's, Arzú's, Terra Towers's and Terra TBS's breaches of their fiduciary duties, Claimants and the Company have been damaged in an amount to be proven at the hearing.

229.    Hernandez, Arzú, Terra Towers, and Terra TBS breached their fiduciary duties to the Company and its shareholders intentionally, maliciously, and in bad faith. As a result, Claimants and the Company are entitled to an award of punitive damages and attorneys' fees.

## Accounting

230.    Claimants incorporate all preceding paragraphs as though fully set forth herein.

231.    The damages and injuries suffered by Claimants and the Company as the result of Respondents' wrongful conduct, including, without limitation, that set forth herein, cannot be determined or assessed without a thorough and complete accounting, from 2015 to the present, of the books and records of the Company, including, without limitation, each and every transaction

by which Respondents have directed that Company funds be used to pay themselves, their subsidiaries, and/or affiliates, or be used for the development of unauthorized Sites.

232.    Accordingly, Claimants are entitled to and request such an accounting and that Respondents provide all supporting documentation to fully disclose how Company funds were used during that period, including, without limitation, any Company funds that were used to pay Respondents, their subsidiaries, and/or their affiliates, or were used for the development of unauthorized Sites.

233.    Claimants and/or the Company are also entitled to the recoupment of any Company funds that were embezzled, misappropriated, or otherwise wrongfully and unlawfully disbursed or converted by Respondents, as revealed by the accounting.

**Reservation of Rights**

234.    Because Respondents have concealed their wrongful activities from Peppertree and because Respondents' wrongful conduct is ongoing, Peppertree reserves the right to amend or add claims in these proceedings upon discovery of further wrongful acts of Respondents in the course of discovery in this matter or otherwise.

**RELIEF SOUGHT**

WHEREFORE, Claimants respectfully request that the Panel:

**A.  Sale of the Company**

i.        Issue an award granting to Claimants their full compensatory damages caused by Respondents' wrongful conduct in an amount to be proved at the arbitration, including, without limitation, (a) the over $185 million to which Peppertree and the Goldman Investor should have been entitled from the Proposed Sale, distributed as follows:  (a) $131,311,600 to Peppertree; and

(b) $54,441,300 to the Goldman Investor; and (b) their pro rata share of any Company funds that would have remained after the Proposed Sale.

ii.        Issue an award declaring the Parties' rights and obligations under the Governing Documents, including a declaration that pursuant to Section 5.04(b)(ii) of the Shareholders Agreement (a) Respondents must cause or permit the Company to retain an Investment Bank to facilitate an Approved Sale and to vote for, consent to, and raise no objections against such Approved Sale and take all necessary and reasonable actions in connection with the consummation of the Approved Sale"; and (b) in the event that the consideration to be received upon the consummation of an Approved Sale is less than that from the Proposed Sale, Terra must deduct the difference from its proceeds from the Approved Sale and pay such difference to Peppertree and the Goldman Investor;

iii.        In the alternative, issue an award ordering specific performance by Respondents of the provisions of the Governing Documents which require Respondents to (a) agree to the retention of an Investment Bank to facilitate an Approved Sale, (b) vote for, consent to, and raise no objections against such Approved Sale, (c) take all necessary and reasonable actions in connection with the consummation of the Approved Sale, including refraining from adding conditions to or obstructing such Approved Sale in any way; and issue an award ordering specific performance by Terra of the provisions of the Governing Documents that, in the event that the consideration received upon the consummation of an Approved Sale is less than that from the Proposed Sale, require Terra to deduct the difference from its proceeds from the Approved Sale and pay such difference to Peppertree and the Goldman Investor.  Also issue an award ordering that Respondents deposit $10,000,000.00, or any other sum as determined by the Panel to secure specific performance, with the Panel, which sum will be paid to Claimants, or as otherwise directed by the

Panel, if Respondents refuse to comply with the award ordering specific performance and/or refuse to cooperate in the sale of the Company as required by the Governing Documents.

**B. Offset Right**

i.        Issue an award directing Respondents jointly and severally to pay compensatory damages to the Company and/or Claimants in an amount to be determined at the hearing of this matter, but not less than $6.58 million, plus interest at the statutory rate of 9%;

ii.        Issue an award declaring the Parties' rights and obligations under the Governing Documents, including a declaration that Respondents must recognize the Offset Right, including by proposing and developing new tower sites to the full extent and dollar value of the Offset Right (to be determined at the hearing of this matter, but currently valued at approximately $6.58 million); and

iii.        In the alternative, issue an award ordering specific performance by Respondents of the provisions of the Governing Documents related to recognition of the Offset Right and development of Approved Sites to the full extent and to the full dollar value of the Offset Right (to be determined at the hearing of this matter, but currently valued at approximately $6.58 million). Also issue an award ordering that Respondents deposit $1,000,000.00, or any other sum as determined by the Panel to secure specific performance, with the Panel, which sum will be paid to Claimants, or as otherwise directed by the Panel, if Respondents refuse to comply with the award ordering specific performance and/or refuse to recognize or apply the Offset Right as required by the Governing Documents.

**C. Self-Dealing, Misappropriation, and Embezzlement**

i.        Issue an award granting to the Company and/or Claimants full compensatory damages caused by Respondents' wrongful conduct in an amount to be proved at the arbitration.

D. **Breach of Fiduciary Duty**

i.        Issue an award granting Claimants and/or the Company full damages caused by Respondents' wrongful breaches of fiduciary duties, in an amount to be proved at the arbitration; and

ii.        Issue an award of punitive damages and attorneys' fees to Claimants and/or the Company.

E. **Accounting**

i.        Issue an award ordering a thorough and complete accounting, from 2015 to the present, of the books and records of the Company, including, without limitation, an accounting of each and every transaction by which Respondents have directed that Company funds be used to pay themselves, their subsidiaries, and/or affiliates, or be used for the development of unauthorized Sites;

ii.        Issue an award ordering that Respondents provide all supporting documentation to fully disclose how Company funds were used from 2015 to the present, including, without limitation, any Company funds that were used to pay Respondents, their subsidiaries, and/or their affiliates, or were used for the development of unauthorized Sites; and

iii.        Issue an award ordering that Respondents pay to Claimants and/or the Company any Company funds that were embezzled, misappropriated, or otherwise wrongfully and unlawfully disbursed or converted by Respondents, as revealed by the accounting.

F. **Costs of Proceedings, Arbitrator Fees, Legal Fees and Other Relief**

i.        Issue an award granting to Claimants and/or the Company the costs and expenses associated with this proceeding, including all filing and administrative fees, arbitrator

compensation and other forum fees, and reasonable attorneys' fees, together with such other and further relief as the arbitration panel deems just and proper.

Dated: February 2, 2021

Respectfully submitted,

/s/ Katherine M. Poldneff
David A. Landman
(NY Registration No. 4403993)
Katherine M. Poldneff
(NY Registration No. 4361259)
**ULMER & BERNE LLP**
420 Lexington Avenue, Ste. 2733
New York, NY 10170
Tel: (917) 262-0470
Fax: (917) 262-0480
dlandman@ulmer.com
kpoldneff@ulmer.com

/s/ Michael N. Ungar
Michael N. Ungar
(Ohio Bar No. 0016989)
Gregory C. Djordjevic
(Ohio Bar No. 0095943)
**ULMER & BERNE LLP**
1660 W. 2nd St., Ste. 1100
Cleveland, Ohio 44113
Tel: (216) 583-7000
Fax: (216) 583-7001
mungar@ulmer.com
gdjordjevic@ulmer.com

# Exhibit A – Subscription Agmt

**SUBSCRIPTION AND CONTRIBUTION AGREEMENT**

by and among

**TERRA TOWERS CORP.,**

**LATAM TOWERS, LLC,**

**AMLQ HOLDINGS (CAY) LTD.**

**and**

**CONTINENTAL TOWERS LATAM HOLDINGS LIMITED**

Dated as of October 22, 2015

# TABLE OF CONTENTS

Page

**ARTICLE I.** **SUBSCRIPTION AND ISSUANCE OF SHARES; CONTRIBUTION; CLOSING** ..................................................................................................3

Section 1.01 **Subscription and Issuance of Acquired Investor Shares** .......................3

Section 1.02 **Purchase Price** ...........................................................................................3

Section 1.03 **Subscription and Issuance of Acquired Class A Shares; Contributions by Terra**3

Section 1.04 **Closing** ........................................................................................................3

Section 1.05 **Deliveries at Closing** .................................................................................3

**ARTICLE II.** **REPRESENTATIONS AND WARRANTIES OF TERRA WITH RESPECT TO TERRA** ...................................................................................5

Section 2.01 **Organization, Qualification, and Corporate Power** ..............................5

Section 2.02 **Authorization of Transactions** ...............................................................5

Section 2.03 **Non-Contravention** ...................................................................................5

Section 2.04 **Litigation** ...................................................................................................5

Section 2.05 **Brokers' Fees** .............................................................................................6

**ARTICLE III.** **REPRESENTATIONS AND WARRANTIES OF TERRA WITH RESPECT TO THE TARGET COMPANY AND THE TARGET SUBSIDIARIES** ..................................................................................................6

Section 3.01 **Organization, Qualification, and Corporate Power** ..............................6

Section 3.02 **Authorization of Transactions** ...............................................................6

Section 3.03 **Non-Contravention** ...................................................................................7

Section 3.04 **Capitalization of the Target Company** ...................................................7

Section 3.05 **Capitalization of the Holding Subsidiaries** ...........................................7

Section 3.06 **Capitalization of the Operating Subsidiaries and the Newco Subsidiaries** ..........8

Section 3.07 **Financial Statements and Undisclosed Liabilities** ................................9

Section 3.08 **Absence of Certain Changes, Events and Conditions** .........................10

Section 3.09 **Compliance with Laws; Permits** ...........................................................11

Section 3.10 **Legal Proceedings; Governmental Orders** ...........................................12

Section 3.11 **Tax Matters** ..............................................................................................12

Section 3.12 **Business Assets** .........................................................................................14

Section 3.13 **Real Property** ............................................................................................15

Section 3.14 **Intellectual Property** ...............................................................................16

Section 3.15 **Material Business Contracts** ...................................................................17

Section 3.16 **Labor and Employment** ...........................................................................17

EXHIBIT A

| | | |
|---|---|---|
| Section 3.17 | Insurance | 19 |
| Section 3.18 | Brokers' Fees | 19 |
| Section 3.19 | Disclaimer of Other Representations and Warranties | 20 |
| **ARTICLE IV.** | ***REPRESENTATIONS AND WARRANTIES OF BUYERS.*** | ***20*** |
| Section 4.01 | Organization, Qualification, and Corporate Power | 20 |
| Section 4.02 | Authorization of Transactions | 20 |
| Section 4.03 | Non-Contravention | 20 |
| Section 4.04 | Litigation | 20 |
| Section 4.05 | Brokers' Fees | 21 |
| Section 4.06 | Permitted Buyer | 21 |
| Section 4.07 | Investment | 21 |
| Section 4.08 | Inspection; No Other Representations | 21 |
| **ARTICLE V.** | ***COVENANTS*** | ***21*** |
| Section 5.01 | Press Releases and Public Announcements | 22 |
| Section 5.02 | Tax Covenants | 22 |
| Section 5.03 | Pre-Closing Tax Periods | 22 |
| Section 5.04 | Capitalization of Debt | 22 |
| Section 5.05 | Cooperation | 22 |
| Section 5.06 | Issue Sites | 23 |
| Section 5.07 | Payment of Supplier Creditors. | 24 |
| Section 5.08 | Compliance Policies | 24 |
| Section 5.09 | Further Assurances | 25 |
| **ARTICLE VI.** | ***CONDITIONS TO OBLIGATION TO CLOSE.*** | ***25*** |
| Section 6.01 | General Conditions | 25 |
| Section 6.02 | Conditions to the Obligation of the Buyers | 25 |
| Section 6.03 | Conditions to the Obligation of Terra and the Target Company | 27 |
| **ARTICLE VII.** | ***INDEMNIFICATION*** | ***28*** |
| Section 7.01 | Survival | 28 |
| Section 7.02 | Indemnification by Terra | 28 |
| Section 7.03 | Indemnification by each of the Buyers | 28 |
| Section 7.04 | Notice of Claims | 29 |
| Section 7.05 | Third Party Claims | 29 |
| Section 7.06 | Certain Limitations | 30 |
| Section 7.07 | Determination of Losses | 31 |

| | | |
|---|---|---|
| **Section 7.08** | **Payment** | 31 |
| **Section 7.09** | **Exclusive Remedy** | 31 |
| **Section 7.10** | **Mitigation** | 31 |
| ***ARTICLE VIII.*** | ***MISCELLANEOUS*** | *31* |
| **Section 8.01** | **No Third-Party Beneficiaries** | 31 |
| **Section 8.02** | **Entire Agreement** | 32 |
| **Section 8.03** | **Succession and Assignment** | 32 |
| **Section 8.04** | **Counterparts** | 32 |
| **Section 8.05** | **Headings** | 32 |
| **Section 8.06** | **Notices** | 32 |
| **Section 8.07** | **Governing Law** | 33 |
| **Section 8.08** | **Specific Performance** | 33 |
| **Section 8.09** | **WAIVER OF JURY TRIAL** | 33 |
| **Section 8.10** | **Dispute Resolution** | 33 |
| **Section 8.11** | **Arbitration** | 34 |
| **Section 8.12** | **Amendments and Waivers** | 34 |
| **Section 8.13** | **Severability** | 34 |
| **Section 8.14** | **Expenses** | 34 |
| **Section 8.15** | **Interpretation and Construction** | 35 |
| **Section 8.16** | **Incorporation of Recitals, Exhibits, Annexes, and Schedules** | 35 |
| **Section 8.17** | **Governing Language** | 35 |

EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit A | Pre-Closing Capitalization of the Target Company and the Target Subsidiaries |
| Exhibit B | Post-Closing Capitalization of the Target Company and the Target Subsidiaries |
| Exhibit C | List of CTHC Subsidiary Trusts |
| Exhibit D | Amended CTHC Subsidiary Trust Beneficiaries at Closing |
| Exhibit E | Identified Issues and Issue Sites |
| Exhibit F | Supplier Creditors |
| Exhibit G | Recipient of Share Pledge Agreements and Share Trust Agreements at Closing |
| Exhibit H | Pro Rata Share |
| Exhibit I | Process Agent Acceptance of Appointment Letter |
| | |
| Schedule 1.02 | Flow of Funds |

EXHIBIT A

## SUBSCRIPTION AND CONTRIBUTION AGREEMENT

This Subscription and Contribution Agreement (this "Agreement") is entered into as of this 22nd day of October, 2015, by and among Terra Towers Corp., a company incorporated in the British Virgin Islands, with registered number 1375181, whose registered office is at Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands ("Terra"), CONTINENTAL TOWERS LATAM HOLDINGS LIMITED, a company incorporated in the British Virgin Islands, with registered number 1882295, whose registered office is at Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands (the "Target Company"), LATAM Towers, LLC, a limited liability company organized under the laws of the State of Delaware ("Peppertree"), and AMLQ Holdings (Cay) Ltd., a Cayman Island Exempted Company Limited by Shares ("Goldman" and, together with Peppertree, the "Buyers").  Terra, the Target Company and the Buyers are referred to collectively in this Agreement as the "Parties."

## RECITALS

**WHEREAS**, Terra directly owns one hundred percent (100%) of the issued and outstanding shares in the Target Company;

**WHEREAS**, Terra directly owns one hundred percent (100%) of the issued and outstanding shares in (a) Continental Towers Holding Corp., a company incorporated in the British Virgin Islands, with registered number 1461793, whose registered office is at Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands ("CTHC"), (b) Collocation Holding Ltd., a company incorporated in the British Virgin Islands, with registered number 1859157, whose registered office is at Level 1, Palm Grove House, Wickham's Cay 1, Road Town, Tortola, British Virgin Islands ("Collocation Holding"), (c) Continental Enterprises Holdings Ltd., a company incorporated in the British Virgin Islands, with registered number 1859161, whose registered office is at Level 1, Palm Grove House, Wickham's Cay 1, Road Town, Tortola, British Virgin Islands  ("Continental Enterprises"), and (d) Continental Towers South America & Caribbean Corp., a company incorporated in the British Virgin Islands, with registered number 1730290, whose registered office is at Level 1, Palm Grove House, Wickham's Cay 1, Road Town, Tortola, British Virgin Islands ("CT South America" and, together with CTHC, Collocation Holding and Continental Enterprise, collectively, the "Holding Subsidiaries");

**WHEREAS**, CTHC operates, directly or indirectly, as set forth on Exhibit A, all of the following regional operational Subsidiaries in Central America: (a) Continental Towers de Guatemala, Sociedad Anónima, a *sociedad anónima* organized under the laws of Guatemala, and Colocation Technologies, Sociedad Anónima, a *sociedad anónima* organized under the laws of Guatemala (collectively, the "Guatemalan CT Subsidiaries"); (b) Continental Towers El Salvador, S.A. de C.V., a *sociedad anónima de capital variable* organized under the laws of El Salvador, and Collocation Technologies El Salvador, S.A. de C.V., a *sociedad anónima de capital variable* organized under the laws of El Salvador (collectively, the "Salvadoran CT Subsidiaries"); (c) Continental Towers Nicaragua, S.A., a *sociedad anónima* organized under the laws of Nicaragua, and Collocation Technologies Nicaragua, S.A., a *sociedad anónima* organized under the laws of Nicaragua (collectively, the "Nicaraguan CT Subsidiaries"); (d) Continental Towers de Honduras, S.A., a *sociedad anónima* organized under the laws of Honduras, and Colocation Technologies de Honduras, S.A., a *sociedad anónima* organized under the laws of Honduras (collectively, the "Honduran CT Subsidiaries"); (e) Continental Towers Costa Rica, S.A., a *sociedad anónima* organized under the laws of Costa Rica, and Collocation Technologies Costa Rica, S.A., a *sociedad anónima* organized under the laws of Costa Rica (collectively, the "Costa Rican CT Subsidiaries"); and (f) Continental Towers de Panama, S.A., a *sociedad anónima* organized under the laws of the Republic of Panama, and Collocation Technologies de Panama, S.A., a *sociedad anónima* organized under the laws of the Republic of Panama (collectively, the "Panamanian CT Subsidiaries", and the Panamanian CT Subsidiaries together with the

Guatemalan CT Subsidiaries, the Salvadoran CT Subsidiaries, the Nicaraguan CT Subsidiaries, the Honduran CT Subsidiaries, and the Costa Rican CT Subsidiaries, collectively, the "CTHC Subsidiaries");

**WHEREAS**, CT South America owns, directly or indirectly, as set forth on Exhibit A, all of the following regional operational Subsidiaries in South America: Continental Towers Peru, S.A., a *sociedad anónima* organized under the laws of Peru and Collocation Technologies Peru, S.A., a *sociedad anónima* organized under the laws of Peru (collectively, the "CT South America Subsidiaries"). The CTHC Subsidiaries and the CT South America Subsidiaries shall hereinafter be referred to, collectively, as the "Operating Subsidiaries";

**WHEREAS**, collectively, Collocation Holding and Continental Enterprises own, directly, as set forth on Exhibit A, all of the outstanding equity of Continental Telecommunications Corp. Guatemala, Ltda., a *sociedad de responsabilidad limitada* organized under the laws of Guatemala, Continental Corp. El Salvador, Ltda. De C.V. a *sociedad de responsabilidad limitada de capital variable* organized under the laws of El Salvador, Telecom Business Solution Honduras, S. de R.L. a *sociedad de responsabilidad limitada* organized under the laws of Honduras, Continental Corp. Nicaragua y Compañía Limitada, a *sociedad de responsabilidad limitada* organized under the laws of Nicaragua, Costa Rican Business Solution CRBS, SRL. a *sociedad de responsabilidad limitada* organized under the laws of Costa Rica, and Continental Corp. Panamá S. de R.L. a *sociedad de responsabilidad limitada*, organized under the laws of the Republic of Panama (collectively, the "Newco Subsidiaries" and the Newco Subsidiaries together with the Operating Subsidiaries and the Holding Subsidiaries, collectively, the "Target Subsidiaries");

**WHEREAS**, the Target Company is in the business of acquiring, financing, building, installing, leasing and/or possessing wireless communication, broadcast or other transmission tower and other communication infrastructure sites, whether directly or through the Target Subsidiaries, in Costa Rica, El Salvador, Guatemala, Honduras, Nicaragua, Panama and Peru (the "Business");

**WHEREAS**, this Agreement contemplates a transaction in which (a) Peppertree will subscribe for, and the Target Company will issue to Peppertree, 23,253.35 Class B Shares representing, following such issuance, collectively 27.04% of the outstanding shares in the Target Company (the "Acquired Class B Shares"); (b) Goldman will subscribe for, and the Target Company will issue to Goldman 13,080.01 Class C Shares representing, following such issuance, collectively 15.21% of the outstanding shares in the Target Company (the "Acquired Class C Shares" and, collectively with the Acquired Class B Shares, the "Acquired Investor Shares"); (c) the Target Company will loan a portion of the proceeds of the subscriptions by Peppertree and Goldman on Terra (the "Subscription Loan") to allow Terra to satisfy all of the outstanding indebtedness of Terra, CTHC and the CTHC Subsidiaries (collectively, the "Existing Indebtedness"); and (d) Terra will contribute, substantially concurrently with the Closing, one hundred percent (100%) of the issued and outstanding shares in each Holding Subsidiary (the "Holding Subsidiary Shares") to the Target Company in satisfaction of the Subscription Loan and as consideration for the 50,000 Class A Shares that it currently holds, representing collectively 57.92% of the outstanding shares in the Target Company (the "Acquired Class A Shares"); and

**WHEREAS**, immediately following the transactions contemplated herewith, Telecom Business Solution, LLC, a limited liability company organized under the laws of Delaware ("Peppertree TBS"), TBS Management, S.A., a *sociedad anónima* organized under the laws of Panama ("Terra TBS") and the Target Company plan to enter into that certain Contribution Agreement, (the "Contribution Agreement") pursuant to which (i) Peppertree TBS will contribute to the Target Company 50% of the issued and outstanding shares of Telecom Business Solution, Limited, a company incorporated in the British Virgin Islands, with company number 1829796, whose registered office is at Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands ("TBS") in exchange for 9,215.23 Class B Shares, representing, following such issuance, collectively 8.0% of the outstanding shares in the Target Company,

and (ii) Terra TBS will contribute to the Target Company 50% of the issued and outstanding shares of TBS in exchange for 9,215.23 Class A Shares, representing, following such issuance, collectively 8.0% of the outstanding shares in the Target Company.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises made in this Agreement, and in consideration of the representations, warranties, and covenants contained in this Agreement, the Parties agree as follows.

Unless otherwise defined herein, capitalized terms used in this Agreement will have the meanings specified in Appendix A.

### ARTICLE I.
### SUBSCRIPTION AND ISSUANCE OF SHARES; CONTRIBUTION; CLOSING

**Section 1.01    Subscription and Issuance of Acquired Investor Shares.**  Upon the terms and subject to the conditions of this Agreement, at the Closing, (i) Peppertree shall subscribe for, and the Target Company shall issue to Peppertree, the Acquired Class B Shares in exchange for the Peppertree Purchase Price (as defined below) and (ii) Goldman shall subscribe for, and the Target Company shall issue to Goldman, the Acquired Class C Shares in exchange for the Goldman Purchase Price (as defined below).

**Section 1.02    Purchase Price.**  The aggregate purchase price for the Acquired Investor Shares shall be $112,633,413.65 (the "Purchase Price"), $72,085,384.10 of which will be payable by Peppertree (the "Peppertree Purchase Price") and $40,548,028.55 of which will be payable by Goldman (the "Goldman Purchase Price").  The Company has instructed Peppertree and Goldman to pay the Purchase Price as follows: (i) in order to facilitate the repayment of the Existing Indebtedness, Peppertree shall pay $ 60,557,861.23 and Goldman shall pay $40,548,028.55 (collectively, the "Repayment Amount") at Closing, to IFC, Credit Suisse, FMO and each Other Bank Creditor on behalf of Terra, CTHC and the CTHC Subsidiaries; (ii) Peppertree shall pay $3,577,599.58 (the "DT Cash Amount") at Closing to DTH in satisfaction of obligations incurred by DTH in connection with the provision of services to the Target Subsidiaries, and (iii) Peppertree shall pay $7,949,923.29 (the "Target Company Cash Amount") at Closing to the Target Company.  All payments made by Peppertree and Goldman pursuant to this Section 1.02 shall be made in the manner set forth in Schedule 1.02.

**Section 1.03    Subscription and Issuance of Acquired Class A Shares; Contributions by Terra.**  Upon the terms and subject to the conditions of this Agreement, at the Closing, immediately and automatically upon receipt by CTHC, each applicable CTHC Subsidiary and Collocation Colombia of the Payoff Letters, Terra shall have contributed to the Target Company all Holding Subsidiary Shares as consideration for the Acquired Class A Shares and the satisfaction of the Subscription Loan.

**Section 1.04    Closing.**  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place by conference call and facsimile (or other electronic transmissions of signature pages (*e.g.*, emails of PDFs)), concurrently with the execution and delivery of this Agreement by the Parties (the "Closing Date").

**Section 1.05    Deliveries at Closing.**  Subject to the terms and conditions of this Agreement, at the Closing:

(a)    the Buyers shall deliver (i) the Repayment Amount to IFC, Credit Suisse, FMO and each Other Bank Creditor, (ii) the DT Cash Amount to DTH and (iii) the Target Company Cash Amount to the Target Company;

**EXHIBIT A**

(b)     Terra and the Target Company, as applicable, shall deliver to each of the Buyers the various certificates, instruments, and documents referred to in <u>Section 6.02</u> below;

(c)     the Buyers shall deliver to Terra the various certificates, instruments, and documents referred to in <u>Section 6.03</u> below;

(d)     Terra shall deliver (or procure the delivery of) the following documents to the Target Company:

(i)     a signed share transfer form for the share in each Holding Subsidiary in favor of the Target Company;

(ii)     a certified copy of each Holding Subsidiary's register of shareholders showing the transfer of the share or shares in that Holding Subsidiary to the Target Company;

(iii)     if a Holding Subsidiary has filed a copy of its register of shareholders with the BVI Registry of Corporate Affairs, evidence that it has filed a notice electing to cease registering changes to the register under section 231(3) of the BVI Business Companies Act 2004;

(iv)     resignation letters from the directors of the Holding Subsidiaries referred to in <u>Section 1.05(d)(vi)</u> below;

(v)     a certified copy of member resolutions of CTHC approving the appointment of Alberto Arzu, Ryan D. Lepene and F. Howard Mandel as directors of CTHC;

(vi)     a certified copy of director resolutions of each Holding Subsidiary (1) approving the transfer of the shares in such Holding Subsidiary to the Target Company and the making of all necessary entries in its register of shareholders, (2) approving an indemnity for a lost share certificate, if applicable and (3)(A) solely with respect to CT South America, acknowledging the resignations of Jose Alejandro Sagastume Figueroa and Jorge Alberto Gaitán Castro as directors of CT South America and approving the appointment of Alberto Arzu, Ryan D. Lepene and F. Howard Mandel as directors of CT South America and (B) solely with respect to each of Collocation Holding and Continental Enterprises, acknowledging the resignations of Jorge Leonel Gaitan Paredes, Jose Alejandro Sagastume Figueroa and Hugo Rene Ortiz Gaitan as directors of each of Collocation Holding and Continental Enterprises and approving the appointment of Jorge Hernandez Ortiz, Alberto Arzu, Ryan D. Lepene and F. Howard Mandel as directors of each of Collocation Holding and Continental Enterprises;

(vii)     a letter of instruction from the client of record of the registered agent of each of Collocation Holding, Continental Enterprises and CT South America in form and substance acceptable to the Target Company;

(viii)     a letter of acknowledgement from the registered agent of each of Collocation Holding, Continental Enterprises and CT South America in form and substance acceptable to the Target Company; and

(ix)     a letter from each Holding Subsidiary to the Target Company confirming that that Holding Subsidiary has not granted any powers of attorney or, if it has, that each power of attorney granted by it has been revoked and each attorney has been notified of the revocation; and

(e)     the Target Company shall deliver to Terra a share certificate for the Acquired Class A Shares in the name of Terra, duly completed and executed on behalf of the Target Company, and a certified copy of the Target Company's register of shareholders showing the issue of the Acquired Class A Shares to Terra.

## ARTICLE II.
## REPRESENTATIONS AND WARRANTIES OF TERRA
## WITH RESPECT TO TERRA

Terra hereby represents and warrants to the Buyers, with respect to itself, as of the date hereof (except as otherwise provided in this Article II), as set forth in this Article II, as supplemented by and subject to the exceptions expressly set forth in the disclosure schedules delivered by Terra to the Buyers on the date of this Agreement (the "CT Disclosure Schedules"):

**Section 2.01     Organization, Qualification, and Corporate Power.**  Terra is a company duly incorporated, validly existing, and in good standing under the laws of the British Virgin Islands.  Terra is duly authorized to conduct business and is in good standing under the laws of each jurisdiction where such qualification is required.  Terra has full corporate power and authority to carry on the business in which it is engaged and to own and use the properties owned and used by it.

**Section 2.02     Authorization of Transactions.**  Terra has full power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement and the other Transaction Documents to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by Terra of this Agreement and the other Transaction Documents to which it is a party and the consummation by Terra of the transactions contemplated hereby and thereby have been duly and validly authorized by Terra's board of directors (or equivalent governing body) and no other corporate proceeding on the part of Terra is necessary to authorize this Agreement or the other Transaction Documents to which it is a party or to consummate the transactions contemplated hereby and thereby.  This Agreement and each of the other Transaction Documents to which Terra is a party have been duly and validly executed and delivered by Terra and constitute the legal, valid and binding obligations of Terra, enforceable against Terra in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a Proceeding in equity or at law).

**Section 2.03     Non-Contravention.**  The execution, delivery and performance by Terra of this Agreement and the other Transaction Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby, do not and will not (a) conflict with or result in a violation or breach of, or default under, any provision of the Governing Documents of Terra; (b) conflict with or result in a violation or breach of any provision of any Applicable Law or Governmental Order applicable to Terra; (c) conflict with, result in a breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of obligations under, create in any party any right to terminate, modify or cancel, or require any notice, Consent or waiver under, any contract or instrument to which Terra is a party or by which Terra is bound or to which any of its assets or properties are subject (including any Material Business Contract); (d) result in the creation or imposition of any Encumbrance on any of the Acquired Investor Shares; or (e) require any Consent, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority or other Person.

**Section 2.04     Litigation.**  There is no Proceeding pending or, to the Knowledge of Terra, threatened, against Terra and Terra is not subject to any outstanding Governmental Order that, in either

case, would, individually or in the aggregate, prevent or materially delay performance by Terra of any of its material obligations under this Agreement or any other Transaction Document to which it is party.

Section 2.05  **Brokers' Fees.**  Except as set forth in Section 2.05 of the CT Disclosure Schedules, there is no arrangement, liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which Terra, any of Terra's Affiliates or the Buyers would be liable following the Closing.  With the exception of the brokerage fee payable to UBS Securities LLC by the Company, Terra shall be solely responsible for all fees or commissions set forth in Section 2.05 of the CT Disclosure Schedules.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES OF TERRA
## WITH RESPECT TO THE TARGET COMPANY AND THE TARGET SUBSIDIARIES

Terra hereby represents and warrants to each of the Buyers, with respect to the Target Company and the Target Subsidiaries, as of the date hereof (except as otherwise provided in this Article III), as set forth in this Article III, as supplemented by and subject to the exceptions expressly set forth in the CT Disclosure Schedules:

Section 3.01  **Organization, Qualification, and Corporate Power**.  The Target Company and each of the Target Subsidiaries is a corporation (or other entity) duly incorporated or organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation (or other formation). The Target Company and each of the Target Subsidiaries is duly authorized to conduct business and is in good standing under the laws of each jurisdiction where such qualification is required.  The Target Company and each of the Target Subsidiaries has full corporate or other entity power and authority to carry on the business in which it is engaged and to own and use the properties owned and used by it.  Neither the Target Company nor any of the Holding Subsidiaries is (i) insolvent within the meaning of Section 8 of the BVI Insolvency Act 2003 or (ii) has carried on a "regulated activity" under a "financial services enactment" (each as defined in the BVI Regulatory Code 2009).  Neither the Target Company nor any of the Holding Subsidiaries or the Target Subsidiaries has (x) an interest in any land located in the British Virgin Islands or (y) shares, debt obligations or other securities in any company which has an interest in any land located in the British Virgin Islands.

Section 3.02  **Authorization of Transactions**.  The Target Company and each of the Target Subsidiaries has full power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement and the other Transaction Documents to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by the Target Company of this Agreement and by the Target Company and the Target Subsidiaries of the other Transaction Documents to which each is a party, as applicable, and the consummation by the Target Company and the Target Subsidiaries of the transactions contemplated hereby and thereby have been duly and validly authorized by each such entity's board of directors (or equivalent governing body) and no other corporate proceeding on the part of the Target Company or any of the Target Subsidiaries is necessary to authorize this Agreement or to consummate the transactions contemplated hereby and thereby.  This Agreement and each of the other Transaction Documents to which the Target Company or any of the Target Subsidiaries is a party have been duly and validly executed and delivered by the Target Company and the relevant Target Subsidiaries and constitute the legal, valid and binding obligations of the Target Company and the relevant Target Subsidiaries, enforceable against the Target Company and the relevant Target Subsidiaries in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a Proceeding in equity or at law).

**Section 3.03    Non-Contravention.**  The execution, delivery and performance by the Target Company of this Agreement and by the Target Company and the Target Subsidiaries of the other Transaction Documents to which each is a party, as applicable, and the consummation of the transactions contemplated hereby and thereby, do not and will not (a) conflict with or result in a violation or breach of, or default under, any provision of the Governing Documents of the Target Company or the Target Subsidiaries; (b) conflict with or result in a violation or breach of any provision of any Applicable Law or Governmental Order applicable to the Target Company or the Target Subsidiaries; (c) conflict with, result in a breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of obligations under, create in any party any right to terminate, modify or cancel, or require any notice, Consent or waiver under, any contract or instrument to which the Target Company or any Target Subsidiary is a party or by which the Target Company or any Target Subsidiary is bound or to which any of their assets or properties are subject (including any Material Business Contract); (d) result in the creation or imposition of any Encumbrance other than Permitted Encumbrances on any of the properties or assets of the Target Company or the Target Subsidiaries; or (e) require any Consent, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority or other Person by or with respect to the Target Company or the Target Subsidiaries.

**Section 3.04    Capitalization of the Target Company.**

(a)    <u>Pre-Closing Capitalization of the Target Company</u>.

(i)    Immediately prior to the transactions contemplated by this Agreement, the Target Company is authorized to issue an unlimited number of Class A Shares, of which fifty thousand (50,000) are issued and outstanding, an unlimited number of Class B Shares, of which none are issued and outstanding, and an unlimited number of Class C Shares, of which none are issued and outstanding (the Class A Shares, the Class B Shares and the Class C Shares, collectively, the "<u>Target Company Shares</u>").  All issued and outstanding Target Company Shares have been duly authorized, validly issued, are fully paid and non-assessable and held of record by Terra.

(ii)    There are no outstanding or authorized options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any character relating to the Target Company Shares or obligating Terra or the Target Company to issue or sell any Target Company Shares, or any other interest in, the Target Company.  The Target Company does not have outstanding and has not authorized any share appreciation, phantom shares, profit participation or similar rights. Except for the Target Company's memorandum and articles of association and the Transaction Documents, there are no documents or arrangements in force governing the relationship between the shareholders of the Target Company, the management of the Target Company or the subscription, issue, purchase, transfer or ownership of shares in the Target Company.  Other than as may be set forth in the Transaction Documents, the Target Company Shares are not subject to any restriction or prohibition on transfer which would restrict or prohibit any transfer by the Buyers (or any nominee of the Buyers).

(b)    <u>Post-Closing Capitalization of the Target Company</u>.  The Acquired Investor Shares, upon issuance to each of the Buyers by the Target Company and the payment by each of the Buyers of the relevant portion of the Purchase Price, will be validly issued, fully paid, and non-assessable.  Immediately following the Closing and subject to and upon satisfaction of the conditions set forth in this <u>Section 3.04(b)</u>, all issued and outstanding Target Company Shares will be held of record by Terra and the Buyers as set forth on <u>Exhibit B</u> attached hereto.

**Section 3.05    Capitalization of the Holding Subsidiaries.**    Immediately prior to the transactions contemplated by this Agreement, Terra is the legal and beneficial owner of all of the Holding

Subsidiary Shares, each of which is duly authorized, validly issued and fully paid and non-assessable. Immediately following the Closing and subject to and upon satisfaction of the conditions of this Agreement, all issued and outstanding Holding Subsidiary Shares will be legally and beneficially owned by the Target Company. The numbers of issued and outstanding shares in each Holding Subsidiary are set forth (i) immediately prior to the transactions contemplated by this Agreement, on <u>Exhibit A</u> and (ii) immediately following the Closing, but prior to the Contribution Agreement, on <u>Exhibit B</u>. There are no outstanding or authorized options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any character relating to the Holding Subsidiary Shares or obligating Terra or any Holding Subsidiary to issue or sell any Holding Subsidiary Shares, or any other interest in, any Holding Subsidiary. The Holding Subsidiaries do not have outstanding and have not authorized any share appreciation, phantom shares, profit participation or similar rights. Except for the Governing Documents of each Holding Subsidiary, there are no documents or arrangements in force governing the relationship between the shareholders of any Holding Subsidiary, the management of any Holding Subsidiary or the subscription, issue, purchase, transfer or ownership of shares in any Holding Subsidiary. The Holding Subsidiary Shares are not subject to any restriction or prohibition on transfer which would restrict or prohibit any transfer to or by the Target Company (or any nominee of the Target Company).

**Section 3.06     Capitalization of the Operating Subsidiaries and the Newco Subsidiaries.**

(a)     <u>CTHC Subsidiaries</u>. Immediately prior to the transactions contemplated by this Agreement, certain issued and outstanding equity of the CTHC Subsidiaries (the "<u>CTHC Subsidiary Equity</u>") is held in those certain CTHC Subsidiary Trusts as set forth on <u>Exhibit A</u>. All issued and outstanding CTHC Subsidiary Equity not held in trust is held of record by CTHC or other CTHC Subsidiary as set forth on <u>Exhibit A</u>. Immediately following the Closing and subject to and upon satisfaction of the conditions of this Agreement, all issued and outstanding CTHC Subsidiary Equity will be duly authorized, validly issued and fully paid and non-assessable and held of record by CTHC or the CTHC Subsidiaries as set forth on <u>Exhibit B</u> attached hereto.

(b)     <u>CT South America Subsidiaries</u>. All of the issued and outstanding equity of the CT South America Subsidiaries (the "<u>CT South America Subsidiary Equity</u>") is duly authorized, validly issued and fully paid and non-assessable and held of record by CT South America or the CT South America Subsidiaries as set forth on <u>Exhibit A</u> attached hereto.

(c)     <u>Newco Subsidiaries</u>. All of the issued and outstanding participation quotas of the Newco Subsidiaries (the "<u>Newco Subsidiary Equity</u>" and, together with the CT South America Subsidiary Equity and the CTHC Subsidiary Equity, the "<u>Subsidiary Equity</u>") are duly authorized, validly issued and fully paid and non-assessable and held of record by Collocation Holding and Continental Enterprises as set forth on <u>Exhibit A</u>.

(d)     <u>Subsidiary Equity</u>. There are no outstanding or authorized options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any character relating to the Subsidiary Equity or obligating any of the Holding Subsidiaries, the Operating Subsidiaries or the Newco Subsidiaries to issue or sell any Subsidiary Equity, or any other interest in, any of the Operating Subsidiaries or Newco Subsidiaries. The Operating Subsidiaries and the Newco Subsidiaries do not have outstanding and have not authorized any stock appreciation, phantom stock, profit participation or similar rights. Except for the Governing Documents of each Operating Subsidiary and Newco Subsidiary, there are no documents or arrangements in force governing the relationship between the shareholders of any Operating Subsidiary or Newco Subsidiary, the management of any Operating Subsidiary or Newco Subsidiary or the subscription, issue, purchase, transfer or ownership of equity interests in any Operating Subsidiary and Newco Subsidiary. The Subsidiary Equity is not subject to any restriction or prohibition on transfer which

would restrict or prohibit any transfer by the Holding Subsidiaries (or any nominee of the Holding Subsidiaries).

**Section 3.07     Financial Statements and Undisclosed Liabilities.**

(a)     <u>Financials and Liabilities of the CTHC Group Companies</u>.

(i)     The following financial statements and notes (collectively, the "<u>CTHC Group Financial Statements</u>") are attached hereto in <u>Section 3.07(a)(i)</u> of the CT Disclosure Schedules: (a) the audited balance sheet of CTHC and the consolidated CTHC Subsidiaries (the "<u>CTHC Group Companies</u>") for the fiscal years ended as of December 31 in each of the years 2013 and 2014 and the audited statements of income, changes in equity and cash flows for the fiscal years ended as of December 31 in each of the years 2013 and 2014, together with the notes thereto, accompanied by the reports thereon of the CTHC Group Companies' independent auditors; and (b) the unaudited consolidated balance sheet of the CTHC Group Companies as of July 31, 2015 (the "<u>CTHC Interim Balance Sheet</u>"), and the related unaudited statements of income, changes in equity and cash flows of the CTHC Group Companies for the seven months then ended, together with the notes thereto (collectively, the "<u>CTHC Interim Financial Statements</u>");

(ii)     Except as described in the notes thereto, the CTHC Group Financial Statements (i) are based on the books and records of the CTHC Group Companies, (ii) have been prepared in accordance with the Accounting Standards consistently applied throughout the periods indicated, subject to normal and recurring period end adjustments that are not material individually or in the aggregate, and (iii) fairly present, in all material respects, the financial condition, results of operations, changes in shareholders' equity and cash flows of the CTHC Group Companies as of the respective dates and for the respective periods indicated therein.

(iii)     As of the date of this Agreement, there are no Liabilities of the CTHC Group Companies of any kind, other than: (i) Liabilities reflected or reserved against in the CTHC Group Financial Statements or the notes thereto; (ii) Liabilities not required under Accounting Standards to be shown on the CTHC Interim Balance Sheet for reasons other than the contingent nature thereof or the difficulty of determining the amount thereof; (iii) Liabilities disclosed in, related to or arising under any agreements instruments or other matters disclosed in this Agreement or the Disclosure Schedules, to the extent such Liabilities are not required under the Accounting Standards to be shown on the CTHC Group Financial Statements or the CTHC Interim Balance Sheet; and (iv) Liabilities incurred since the date of the CTHC Interim Balance Sheet in the Ordinary Course of Business of the CTHC Subsidiaries and which are not, individually or in the aggregate, material in amount.

(b)     <u>Financials and Liabilities of CT South America and the CT South America Subsidiaries</u>.

(i)     The following financial statements and notes (collectively, the "<u>CT South America Financial Statements</u>") are attached hereto in <u>Section 3.07(b)(i)</u> of the CT Disclosure Schedules: (a) the unaudited statements of financial position of the CT South America Subsidiaries for the fiscal years ended as of December 31 in each of the years 2013 and 2014 and the unaudited statements of income, changes in equity and cash flows for the fiscal years ended as of December 31 in each of the years 2013 and 2014, together with the notes thereto; and (b) the unaudited statements of financial position of the CT South America Subsidiaries as of July 31, 2015 (the "<u>CT South America Interim Balance Sheet</u>"), and the related unaudited statements of income, results of operations, changes in equity and cash flows of the CT South America Subsidiaries for the seven

EXHIBIT A

months then ended, together with the notes thereto (collectively, the "CT South America Interim Financial Statements");

(ii)     Except as described in the notes thereto, the CT South America Financial Statements (i) are based on the books and records of the CT South America Subsidiaries, (ii) have been prepared in accordance with the Accounting Standards consistently applied throughout the periods indicated, subject to normal and recurring period end adjustments that are not material individually or in the aggregate, and (iii) fairly present, in all material respects, the financial condition, results of operations, changes in equity and cash flows of the CT South America Subsidiaries as of the respective dates and for the respective periods indicated therein.

(iii)     There are no Liabilities of the CT South America Subsidiaries of any kind, other than: (i) Liabilities reflected or reserved against in the CT South America Financial Statements or the notes thereto; (ii) Liabilities not required under Accounting Standards to be shown on the CT South America Interim Balance Sheet for reasons other than the contingent nature thereof or the difficulty of determining the amount thereof; (iii) Liabilities disclosed in, related to or arising under any agreements instruments or other matters disclosed in this Agreement or the CT Disclosure Schedules, to the extent such Liabilities are not required under the Accounting Standards to be shown on the CT South America Financial Statements or the CT South America Interim Balance Sheet; and (iv) Liabilities incurred since the date of the CT South America Interim Balance Sheet in the Ordinary Course of Business of the CT South America Subsidiaries and which are not, individually or in the aggregate, material in amount.

(iv)     No financial statements have been prepared or currently exist for CT South America.

(v)     There are no Liabilities of CT South America.

(c)     Financials and Liabilities of the Newco Group Companies.

(i)     No financial statements have been prepared or currently exist for Collocation Holding, Continental Enterprises and the consolidated Newco Subsidiaries (collectively, the "Newco Group Companies").

(ii)     There are no Liabilities of the Newco Group Companies.

**Section 3.08     Absence of Certain Changes, Events and Conditions.**

(a)     Except as set forth in Section 3.08(a) of the CT Disclosure Schedules, other than as contemplated by this Agreement, since December 31, 2014 (with respect to or by any CTHC Group Company, CT South America or any CT South America Subsidiaries) and since the date of organization (with respect to the Newco Group Companies and the Target Company) there has not been any:

(i)     event, occurrence, fact, condition or change that is materially adverse to the business, results of operations, financial condition or assets of the Target Company or any Target Subsidiary;

(ii)     material amendment of its Governing Documents;

(iii)     split, combination or reclassification of any of its equity;

10

(iv)     issuance, sale or other disposition of any of its equity, or grant of any option, warrant or other right to purchase or obtain (including upon conversion, exchange or exercise) any of its equity;

(v)     declaration or payment of any dividends or other distributions on or in respect of any of its equity or redemption, purchase or acquisition of its equity;

(vi)     incurrence, assumption or guarantee of any indebtedness for borrowed money;

(vii)     transfer, assignment, sale or other disposition of any of its assets or cancellation of any debts or entitlements;

(viii)     imposition of any Encumbrance upon its equity;

(ix)     any capital investment in, or any loan to, any other Person;

(x)     any material capital expenditure;

(xi)     loan to, or entry into any other transaction with, any of its equity holders or current or former directors or officers or their Affiliates or Related Entities;

(xii)     purchase, lease or other acquisition of the right to own, use or lease any property or assets;

(xiii)     adoption of any plan of merger, consolidation, reorganization, liquidation or dissolution or filing of an application for its liquidation under any provision of the Laws of its jurisdiction or consent to the filing of any insolvency application against it under any similar Law;

(xiv)     material damage, destruction or loss (whether or not covered by insurance) to any assets or properties held by it;

(xv)     acceleration, termination, material modification to or cancellation of any Material Business Contract to which the Target Company or any Target Subsidiary is a party or by which it is bound or to which any of its assets or properties are subject;

(xvi)     imposition of any Encumbrance upon any of the assets or properties held by it, tangible or intangible; or

(xvii)     agreement to do any of the foregoing, or any action or omission that would result in any of the foregoing.

**Section 3.09    Compliance with Laws; Permits**.

(a)     Except for the missing permits set forth in  Exhibit E, to the Knowledge of Terra, the Target Company and each of the Target Subsidiaries has in all respects complied, and is currently in compliance, with all Applicable Laws relating to it, its properties and assets, and the Business, including without limitation, the U.S. Foreign Corrupt Practices Act of 1977, as amended.  None of the Target Company or the Target Subsidiaries, nor, to the Knowledge of Terra, any of their respective officers, directors, managers, agents or employees, in each case acting on behalf of the Target Company or any Target Subsidiaries, has taken any action which would cause it to be in violation of the Foreign Corrupt Practices Act of 1977, as amended or any other applicable foreign anti-bribery or anti-corruption law (collectively, "Anti-Bribery

Laws"). None of the Target Company or the Target Subsidiaries has made or plans to make any disclosures to any Governmental Authority for potential violations of Anti-Bribery Laws.

(b)    (i) except as set forth in Exhibit E, to the Knowledge of Terra, the Target Subsidiaries have all Permits that are required to conduct the Business, (ii) all such Permits are valid and in full force and effect and free of any conditions that would limit the full operation of the Business Towers in the manner in which such Business Towers are currently being operated; (iii) all fees and charges with respect to such Permits as of the date hereof have been paid in full (iv) each of the Target Subsidiaries has performed or complied with all the terms and provisions of the Permits; and (v) except as set forth in Section 3.09(b) of the CT Disclosure Schedules, no Proceedings are pending or, to the Knowledge of Terra, threatened which may result in the revocation, modification, non-renewal or suspension of any Permits, the denial of any pending Permit, the issuance of a cease and desist order or the imposition of any administrative penalty or sanction. If any of the Target Subsidiaries' Permits for the construction of any Business Towers have expired by their terms and are no longer valid and in full force and effect, except as set forth in Exhibit E attached hereto, to the Knowledge of Terra, each of the Target Subsidiaries performed or complied with all the terms and provisions of such Permits while they were valid and in full force and effect, including (if applicable) the construction of such Business Towers within the timeframe and subject to the conditions set forth in such Permits.

Section 3.10    **Legal Proceedings; Governmental Orders.** Except as set forth in Section 3.10 of the CT Disclosure Schedules, there is no Proceeding pending or, to the Knowledge of Terra, threatened, relating to the Target Company or any Target Subsidiary or any material assets, properties or rights relating to the Business or the transactions contemplated by this Agreement or any of the other Transaction Documents. None of the Proceedings set forth in Section 3.10 of the CT Disclosure Schedules would, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Target Company or any Target Subsidiary or their ability to consummate the transactions contemplated by this Agreement or any of the other Transaction Documents. There is no Governmental Order and no unsatisfied judgments to which Terra, the Target Company, any Target Subsidiary, or the Acquired Investor Shares is subject.

Section 3.11    **Tax Matters.**

(a)    The Target Company and each of the Target Subsidiaries has timely filed true, correct and complete versions of all Tax Returns that it is required to file, and has paid all Taxes due (regardless if shown to be due on any Tax Return).

(b)    Section 3.11(b) of the CT Disclosure Schedules lists all Tax Returns filed with respect to the Target Company or any Target Subsidiary for taxable periods ended on or after January 1, 2011, indicates those Tax Returns that have been audited, and indicates those Tax Returns that currently are the subject of audit. Terra has delivered to the Buyers correct and complete copies of all Tax Returns, examination reports, and statements of deficiencies assessed against or agreed to by the Target Company or any of the Target Subsidiaries since January 1, 2011.

(c)    Neither the Target Company nor any of the Target Subsidiaries has waived any statute of limitations in respect of Income Taxes or agreed to any extension of time with respect to an Income Tax assessment or deficiency.

(d)    Neither the Target Company nor any of the Target Subsidiaries (i) is a party to any Income Tax allocation, indemnity or sharing agreement or (ii) has granted any power of attorney with respect to any Tax matter which currently is in effect.

**EXHIBIT A**

(e)     Except as set forth on <u>Section 3.11(e)</u> of the CT Disclosure Schedules, there are no Proceedings, including audits, by any Tax authority against the Target Company or any of the Target Subsidiaries and neither the Target Company nor any of the Target Subsidiaries have received any notice of commencement of an audit by any Tax authority.  The Target Company and the Target Subsidiaries have complied with all material record keeping obligations required to allow them to comply with their Tax obligations and to provide evidence of such compliance to any Tax authority.

(f)     There are no Tax obligations of the Target Company or any of the Target Subsidiaries pending which are related to independent contractors, employees, owners creditors or Third Parties, including any Taxes required to be withheld and paid to any Tax authority with respect to, or paid or owing to, any of such employees, independent contractors, creditors, owners or Third Parties.

(g)     There are no Tax liens on any properties or assets of the Target Company or any Target Subsidiary other than those for Taxes not yet due and payable.

(h)     To the Knowledge of Terra, no claim has been made by any Tax authority in a jurisdiction where the Target Company or a Target Subsidiary does not file Tax Returns that such Target Company or Target Subsidiary was, is, or may be subject to taxation by, or required to file a Tax Return in, that jurisdiction.

(i)     Neither the Target Company nor any of the Target Subsidiaries is subject to any private ruling of, or agreement with, any Tax authority.  The consummation of the transactions contemplated by this Agreement will not result in the loss of any Tax holiday, Tax abatement or similar Tax benefit.

(j)     The Peruvian CT Subsidiaries are not jointly liable for any capital gains tax as contained in Article 68 of the Peruvian Income Tax Law (and its regulations), including any derived from the transactions contemplated by this Agreement.

(k)     <u>Section 3.11(k)</u> of the CT Disclosure Schedules sets forth the classification as of the date of this Agreement of the Target Company and each of the Target Subsidiaries for U.S. federal income tax purposes.

(l)     The unpaid Taxes of  the Target Company and the Target Subsidiaries (i) did not as of the most recent applicable financial statements exceed the reserve for Taxes (excluding any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the most recent applicable balance sheet (rather than in any notes thereto) and (ii) will not exceed that reserve as adjusted for the passage of time through the Closing Date  in accordance with the past custom and practice of the Target Company and the Target Subsidiaries.

(m)     Except as set forth on <u>Section 3.11(m)</u> of the CT Disclosure Schedules, neither the Target Company nor any Target Subsidiary has ever been a member of an Affiliated Group.  Neither the Target Company nor any Target Subsidiary is a party to any contractual obligation relating to Tax sharing or Tax allocation.  Neither the Target Company nor any Target Subsidiary has any liability for the Taxes of any person  under Treasury Regulations section 1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor, by contract or other Applicable Law.

(n)     Neither the Target Company nor any Target Subsidiary is required to make any adjustment pursuant to Section 481(a) of the Code or any similar provision of state, local or foreign tax law by reason of any change in any accounting methods, and will not be required to make such an adjustment as a result of the transactions contemplated by this Agreement, and there is no application pending with any Tax authority requesting permission for any changes in any of the accounting methods of the Target Company

or any Target Subsidiary for Tax purposes. To Terra's knowledge, no Tax authority has proposed any such adjustment or change in accounting method.

(o)     Neither the Target Company nor any Target Subsidiary will be required to include any amount in taxable income or exclude any item of deduction or loss from taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of (a) any "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or foreign Income Tax law) executed on or prior to the Closing Date, (b) any deferred intercompany gain or excess loss account described in Treasury Regulations under Code section 1502 (or any corresponding or similar provision or administrative rule of federal, state, local or foreign law), (c) any installment sale or open transaction disposition made on or prior to the Closing Date, or (d) any prepaid amount received on or prior to the Closing Date.

(p)     Neither the Target Company nor any Target Subsidiary owns any property of a character, the indirect transfer of which, pursuant to this Agreement, would give rise to any documentary, stamp, or other transfer Tax.

### Section 3.12     Business Assets.

(a)     All of the Business Towers owned by the CTHC Group Companies are set forth in <u>Section 3.12(a)</u> of the CT Disclosure Schedules. Immediately prior to the transactions contemplated by this Agreement, all of such Business Towers are held in the CTHC Subsidiary Trusts as set forth on <u>Exhibit C</u> attached hereto, except as set forth in <u>Section 3.12(a)</u> of the CT Disclosure Schedules. Following the Closing, all of the assets, including the Business Towers, used by the CTHC Group Companies in the operation of the Business will (i) except as set forth in <u>Section 3.12(a)</u> of the CT Disclosure Schedules, continue to be held in the amended CTHC Subsidiary Trusts, with a CTHC Subsidiary as the sole beneficiary of each CTHC Subsidiary Trust, as set forth on <u>Exhibit D</u> attached hereto; (ii) in the case of assets not held in the amended CTHC Subsidiary Trusts, be owned by the relevant CTHC Subsidiary free and clear of all encumbrances, except Permitted Encumbrances; and (iii) in the case of assets held in the CTHC Subsidiary Trusts, but for the existance of the CTHC Subsidiary Trusts, would be owned free and clear of all Encumberances, except Permitted Encumberances.

(b)     All of the Business Towers owned by the CT South America Subsidiaries are set forth in <u>Section 3.12(b)</u> of the CT Disclosure Schedules. Immediately prior to the transactions contemplated by this Agreement, the CT South America Subsidiaries, taken as a whole, have ownership of or administrative use, leashold interest, license to use or usufruct in all of the assets, including the Business Towers, used by the CT South America Subsidiaries in the operation of the Business (including all books and records) free and clear of all Encumbrances, except Permitted Encumbrances. Following the Closing, CT South America Subsidiaries, taken as a whole, will have ownership of the assets, including the towers, used by the CT South America Subsidiaries in the operation of the Business (including all books and records) free and clear of all Encumbrances, except Permitted Encumbrances.

(c)     CT South America and the Newco Group Companies do not own any assets.

(d)     Except as set forth in <u>Exhibit E</u>, (i) all of the assets, including the Business Towers, referred to in <u>Sections 3.12(a)</u>, <u>(b)</u> and <u>(c)</u> (the "<u>Business Assets</u>") that are tangible are structurally sound, are in good operating condition and repair (save for wear and tear resulting from their use in the Ordinary Course of Business), and are adequate for the uses to which they are being put, and none of the tangible Business Assets, including the Business Towers, are in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost and (ii) the Business Assets are sufficient for the full operation of the Business Towers in substantially the same manner as conducted up to the date of

this Agreement and constitute all of the rights, property and assets necessary to operate the Business Towers in the manner in which such Business Towers were operated up to the date of this Agreement. Neither the Target Company nor any Target Subsidiary has an ownership or leasehold interest in any assets other than the Business Assets. Section 3.12(d) of the CT Disclosure Schedules sets forth all tangible personal property included in the Business Assets (excluding Business Towers).

**Section 3.13    Real Property.**

(a)    Section 3.13(a) of the CT Disclosure Schedules lists all Real Property owned by any of the Target Subsidiaries as of the date of this Agreement (the "Owned Real Property"). With respect to such Owned Real Property:

(i)    except to the extent held in any of the CTHC Subsidiary Trusts, the Target Subsidiaries have good and marketable fee simple title, free and clear of all Encumbrances, except Permitted Encumbrances;

(ii)    no Owned Real Property has been leased to any Person and no Person has been granted the right to use or occupy any of the Owned Real Property or any portion thereof; and

(iii)    there are no outstanding options, rights of first offer or rights of first refusal to purchase such Owned Real Property or any portion thereof or interest therein;

(iv)    the Target Subsidiaries have (a) direct access from each parcel of Owned Real Property to a public right of way and utilities or (b) good and valid easement rights providing all necessary access and utilities to and from each parcel of Owned Real Property; and

(v)    there are no: (i) applications, ordinances, petitions, resolutions or other matters pending before any Governmental Authority having jurisdiction to act on zoning changes that would prohibit or make nonconforming the use or operation of any of the Business Towers or the Owned Real Property; (ii) pending or threatened condemnation or eminent domain proceedings, or proposed sale in lieu thereof, related to any of the Business Towers or the Owned Real Property; or (iii) improvements installed or planned by any Governmental Authority with respect to any of the Business Towers or the Owned Real Property, any part of the cost of which might be assessed against the Target Company, any Target Subsidiary, the Buyers or the Owned Real Property.

(b)    Section 3.13(b) of the CT Disclosure Schedules lists each parcel of Real Property used in the operation of the Business to which the Target Company or a Target Subsidiary is a party or a beneficiary as of the date of this Agreement (the "Leased Real Property"), including all Leases regarding the use of such Leased Real Property. Terra has delivered to the Buyers a true and complete copy of each such Lease.. The Leases for the Leased Real Property are in full force and effect. There is no default on the part of Terra, the Target Company or any Target Subsidiary nor, to the Knowledge of Terra, any other party, and no event has occurred or failed to occur that with the giving of notice, the passage of time, or both, would constitute a default by Terra, the Target Company or any Target Subsidiary, or, to the Knowledge of Terra, any other party, under any of the Leases for the Leased Real Property. To the Knowledge of Terra, none of the Leases for the Leased Real Property is subject to any impending cancellation or breach, nor has there been any amendment, renewal or extension of any Lease for the Leased Real Property except as disclosed on Section 3.13(b) of the CT Disclosure Schedules and Exhibit E. Except as disclosed on Section 3.13(b) of the CT Disclosure Schedules and Exhibit E, the Leases for Leased Real Property have been registered or filed with the appropriate Governmental Authorities in each relevant jurisdiction. Except as disclosed on Section 3.13(b) of the CT Disclosure Schedules, all lessors on the Leases for Leased Real Property have clean title to such Leased Real Property.

(c)      (i) No Target Subsidiary has received any written notice, report or other information regarding any actual or alleged violation of Environmental, Health, and Safety Requirements or any Liabilities or potential Liabilities, including any remedial or corrective obligations arising under Environmental, Health, and Safety Requirements, in each case arising out of or relating to the operation of the Business, the Leased Real Property or the Owned Real Property; (ii) the Target Subsidiaries have materially complied and are in material compliance with all applicable Environmental, Health, and Safety Requirements, and have obtained, and are in compliance with, all Permits required with respect to the operation of the Business, the Leased Real Property or the Owned Real Property under applicable Environmental, Health, and Safety Requirements; and (iii) there are no Proceedings, by any Governmental Authority or other Person or entity pending, or, to the Knowledge of Terra, threatened, against any Target Subsidiary under any Environmental, Health, and Safety Requirement with respect to the operation of the Business, the Leased Real Property or the Owned Real Property. The Buyers acknowledge that the representations and warranties contained in this Section 3.13(c) are the only representations and warranties being made with respect to compliance with or Liability under Environmental, Health, and Safety Requirements and no other representation contained in this Agreement shall apply to any such matters and no other representation or warranty, express or implied, is being made with respect thereto.

(d)      Section 3.13(d) of the CT Disclosure Schedules sets forth all agreements pursuant to which the Target Company or any Target Subsidiary, as lessor or licensor, leases or licenses space on the Business Towers (each, a "Tower Space License") and Terra has delivered to the Buyers a true and complete copy of each such agreement. Section 3.13(d) of the CT Disclosure Schedules identifies all of the Tower Space Licenses, together with any pending or prospective Tower Space Licenses being negotiated or prepared. No equipment occupies space on the Business Towers, except as stated in Section 3.13(d) of the CT Disclosure Schedules. There are no options or rights to renew or terminate the Tower Space Licenses or expand any leased or licensed premises, except as shown in Section 3.13(d) of the CT Disclosure Schedules. In addition, (i) the Tower Space Licenses are in full force and effect and no payments or other deposits are held by Terra or any of its Affiliates or Related Entities (other than the Target Company or the Target Subsidiaries); (ii) as of the Closing Date, no rents due under, or other interest in, any of the Tower Space Licenses will have been assigned or prepaid to any party other than to a Target Subsidiary or pledged or subject to any Encumbrance in any way; (iii) neither Terra nor any Target Subsidiary nor, to the Knowledge of Terra, any lessee or licensee is in default under any Tower Space Licenses; (iv) Terra, the Target Company and the Target Subsidiaries and their respective officers and directors have no business relationship with any lessee or licensee other than that of lessor and lessee or licensor and licensee; and (v) to the Knowledge of Terra, no Tower Space Licenses are subject to any impending cancellation or breach, nor has there been any amendment, renewal or extension of any Tower Space License.

### Section 3.14      Intellectual Property.

(a)      Section 3.14(a) of the CT Disclosure Schedules sets forth a true and complete list of all Intellectual Property used in the operation of the Business (whether registered or unregistered) that is owned or leased by any Target Subsidiary (excluding licenses for commercial off-the-shelf software that are generally available on nondiscriminatory pricing terms) (collectively, the "Business IP"). None of the Business IP is licensed to, or permitted to be used by, any Person other than the Target Subsidiaries, except as set forth in Section 3.14(a) of the CT Disclosure Schedules. The Target Subsidiaries own or have the right to use all Intellectual Property rights material to conduct the Business as and where conducted on the date of this Agreement and, to the Knowledge of Terra, no Target Subsidiary uses any material Intellectual Property which is not Business IP owned by the Target Subsidiaries or licensed under an agreement set forth on Section 3.14(a) of the CT Disclosure Schedules.

(b)      To the Knowledge of Terra, the use of the Business IP does not infringe, violate, misappropriate or misuse the Intellectual Property rights of any Third Party. The Business IP is not subject

16

to any Governmental Order adversely affecting the Target Subsidiaries' use thereof or rights thereof as currently used by the Target Subsidiaries in the Business. There is no Proceeding pending or, to the Knowledge of Terra, threatened against any Target Subsidiary that the use or exploitation by such Target Subsidiary of the Business IP infringes or otherwise violates the Intellectual Property of any Third Party.

(c)     Neither the Target Company nor any Target Subsidiary has made any claim of a violation, infringement, misuse or misappropriation by any Third Party (including any current, former or retired employee of any Target Subsidiary) of its rights to, or in connection with, any Business IP, which claim is pending.

### Section 3.15     Material Business Contracts.

(a)     Other than the Leases and the Tower Space Licenses (collectively, the "Operating Contracts"), Section 3.15(a) of the CT Disclosure Schedules lists all written agreements used in or related to the operation of the Business to which the Target Company or any Target Subsidiary is a party (i) that provide for payment or receipt of more than $50,000 per year; (ii) granting or evidencing an Encumbrance on any of its assets or properties, other than a Permitted Encumbrance; (iii) involving a material future disposition of any of its assets or properties (excluding this Agreement and the transactions contemplated hereby); (iv) providing for indemnification by the Target Company or any Target Subsidiary of any Person or the assumption of any Tax, environmental or other Liability of any Person; (v) that relate to the acquisition or disposition of any business, a material amount of shares or assets of any other Person or any Owned Real Property (whether by merger, sale of shares or of assets or otherwise); (vi) that are with any Governmental Authority; (vii) that limit or purport to limit the ability of the Target Company or any Target Subsidiary to compete in any line of business or with any Person or in any geographic area or during any period of time; (viii) that provide for any joint venture, partnership or similar arrangement by the Target Subsidiary (other than the Transaction Documents); (ix) relating to indebtedness (including, without limitation, guarantees) of the Target Company or any Target Subsidiary (other than those relating to trade receivables); or (x) that are with an Affiliate or Related Entity of Terra or its shareholders (collectively, together with the Leases and the Operating Contracts, the "Material Business Contracts").

(b)     Each Material Business Contract is valid and in full force and effect, and enforceable by the applicable Target Subsidiary, in accordance with its terms. No Target Subsidiary, or, to the Knowledge of Terra, any Third Party, is in breach of, or default under, any Material Business Contract, and no event has occurred or facts exist which, upon passage of time or giving of notice, or both, would result in any such breach or default or prevent the applicable Target Subsidiary from obtaining the benefits thereunder. True and complete copies all Material Business Contracts have been made available to the Buyers by Terra.

(c)     Except as set forth in Section 3.15(c) of the CT Disclosure Schedules, no Target Subsidiary has received notice of cancellation or termination of any Material Business Contract, nor has there been any amendment, renewal or extension of any Material Business Contract.

### Section 3.16     Labor and Employment.

(a)     Labor and Employment Laws.

(i)     Neither the Target Company nor any Target Subsidiary is now, nor has ever been, a party to or otherwise bound by a labor union or collective bargaining agreement with any labor organization. Neither the Target Company nor any Target Subsidiary has conducted negotiations with respect to any future contract with or commitment to any labor union or association and there have been no threatened attempts within the past three years and, to the Knowledge of Terra, currently are no threatened attempts to organize or establish any labor union or association or

17

employee association with respect to the Target Company or any Target Subsidiary. Neither the Target Company nor any Target Subsidiary is now involved in nor, to the Knowledge of Terra, threatened in writing with any collective labor dispute, strike, picketing, slowdown or work stoppage involving a group of employees.

(ii)　　The Target Company and each of the Target Subsidiaries is currently in compliance with and has complied in all material respects with all Applicable Laws relating to its employees arising from statutes relating to wages, hours, overtime, severance, vacations, paid time off, unemployment insurance, worker's compensation, collective bargaining, pensions, social security, fringe benefits, apprentices, profit sharing, compensation for time of services, payment and withholding of Taxes, payments to third party benefit providers, equal employment opportunity, age and disability discrimination, hiring of foreign employees, immigration permits and notices, occupational health, work safety, industrial security, and hygiene.

(iii)　　Except as set forth in Section 3.16(a)(iii) of the CT Disclosure Schedules, there are no current or threatened Proceedings involving the current or former employees (or employees' successors) of the Target Company or any Target Subsidiary (including any Proceedings relating to wages, salary, bonus, vacation time or pay, or hours) or under any Laws relating to employment, labor, social security or occupational health and work safety matters, including but not limited to any provisions thereof relating to wages, hours, overtime, severance, vacations, paid time off, unemployment insurance, worker's compensation, collective bargaining, pensions, social security, fringe benefits, apprentices, profit sharing, compensation for time of services, payment and withholding of Taxes, payments to third party benefit providers, equal employment opportunity, age and disability discrimination, hiring of foreign employees, immigration permits and notices, occupational health, work safety, industrial security, and hygiene, and no conditions or circumstances exist that could reasonably be expected to (with or without notice or the lapse of time) directly or indirectly give rise to or serve as a basis for any of the foregoing.

(b)　　　Employment and Contractor Relations.

(i)　　Section 3.16(b)(i) of the CT Disclosure Schedules sets forth a complete and correct list of the names, titles and the current salaries, bonus and other cash compensation of all officers, directors, employees, consultants and agents of the Target Company and any Target Subsidiary as of the date of this Agreement.

(ii)　　Except as set forth in Section 3.16(b)(ii) of the CT Disclosure Schedules, (A) neither the Target Company nor any Target Subsidiary has any current and enforceable employment, advisory or consulting agreements with any Person, (B) the employment of each officer and employee of the Target Company and each Target Subsidiary is terminable at the will of the respective Target Company or Target Subsidiary, as applicable, and (C) neither the Target Company nor any Target Subsidiary has entered into any oral or written agreements with any of its current or former officers, directors, employees, consultants and agents that give rise to any obligations with regard to severance or termination pay or acceleration of the time of payment or vesting of, or increase the amount of, compensation or benefits due to any such individual (x) resulting from the transactions contemplated by this Agreement or any of the other Transaction Documents or (y) following the Closing Date.

(iii)　　Neither the Target Company nor any of the Target Subsidiaries has a services agreement or any other relationship with any Person (other than an employee of the Target Company or any of the Target Subsidiaries) who, under Applicable Law, could be considered an employee of the Target Company or any of the Target Subsidiaries. Neither the Target Company

nor any of the Target Subsidiaries has hired any Person who has rendered services to the Target Company or any of the Target Subsidiaries through a *cooperativa* or any other legal entity that does not have its own administrative autonomy. Neither the Target Company nor any of the Target Subsidiaries has any current or past Liability with respect to an employee of any other Person, including any affiliate, independent contractor, agent, consultant, former employer, or any other third party.

(c)     <u>Employee Benefits</u>.

(i)     <u>Section 3.16(c)</u> of the CT Disclosure Schedules sets forth a list of all Benefit Plans in effect as of the date hereof at the Target Company or any Target Subsidiary.

(ii)     Each such Benefit Plan (and each related trust, insurance contract or fund) complies in all material respects in form and in operation and administration with Applicable Law. The Target Company and each Target Subsidiary has performed all material obligations, whether arising by operation of Law or by terms of any Benefit Plan or other contract, required to be performed by any of them in connection with the Benefit Plans. There are no inquiries or Proceedings, pending or threatened by any Governmental Authority or by any participant or beneficiary against any of the Benefit Plans, the assets of any of the trusts under such Benefit Plans or the Benefit Plan sponsor or the Benefit Plan administrator, or against any fiduciary of any of such Benefit Plans with respect to the design or operation of the Benefit Plans, other than routine claims for benefits. Terra has delivered to the Buyers true and correct copies of (i) all plan documents and summary plan descriptions for each Benefit Plan listed in <u>Section 3.16(c)</u> of the CT Disclosure Schedules; (ii) all current trust agreements and insurance contracts relating to the funding or payment of benefits under any Benefit Plan; and (iii) all currently effective contracts relating to each Benefit Plan, including service provider agreements and record keeping agreements. Except to the extent prohibited by Law, the Target Company and each Target Subsidiary has the right at any time to amend in any manner or terminate any Benefit Plan to which it is a party. Neither the Target Company nor any Target Subsidiary maintains retiree life or retiree health plans providing for continuing coverage for any employee or any beneficiary of an employee after the employee's termination of employment, and no Benefit Plan or employment agreement provides, or has any liability to provide, health care, disability, severance, or death benefit coverage upon or following retirement or termination of employment.

(iii)     No Benefit Plan contains any provision that could prohibit the transactions contemplated hereby. The execution of this Agreement and the consummation of the transactions contemplated hereby will not constitute an event under any Benefit Plan that (either alone or upon the occurrence of any additional or subsequent event) would result in any payment, acceleration, vesting or increase in benefits to any Person.

**Section 3.17     Insurance**. Each of the Target Company and the Target Subsidiaries maintains insurance policies of the type and in the amounts customarily carried by Persons conducting a business similar to the Target Company and the Target Subsidiaries that are sufficient for compliance with all Applicable Laws and Material Business Contracts to which the relevant company is a party or by which it is bound.

**Section 3.18     Brokers' Fees.** Except as set forth in <u>Section 3.18</u> of the CT Disclosure Schedules, there is no arrangement, liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which the Target Company, any Target Subsidiary or the Buyers would be liable following the Closing.

**Section 3.19     Disclaimer of Other Representations and Warranties.**  Except as expressly set forth in Article II and this Article III, Terra makes no representation or warranty, express or implied, at law or in equity, in respect of itself, the Target Company, the Target Subsidiaries, or any of the assets or properties of the Target Subsidiaries, including with respect to merchantability or fitness for any particular purpose, and any such other representations or warranties are hereby expressly disclaimed.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF BUYERS.

Each Buyer hereby severally, and not jointly, and only with respect to itself, represents and warrants to Terra, as of the date hereof (except as otherwise provided in this Article IV), as set forth in this Article IV.

**Section 4.01     Organization, Qualification, and Corporate Power.**  Such Buyer (i) is a corporation (or other entity) duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation (or other formation); (ii) is duly authorized to conduct business and is in good standing under the laws of each jurisdiction where such qualification is required; and (iii) has full corporate (or other entity) power and authority to carry on the business in which it is engaged and to own and use the properties owned and used by it.

**Section 4.02     Authorization of Transactions.**  Such Buyer has full power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement and the other Transaction Documents to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by such Buyer of this Agreement and the other Transaction Documents to which it is a party and the consummation by such Buyer of the transactions contemplated hereby and thereby have been duly and validly authorized by such Buyer's board of directors (or other governing body) and no other corporate (or other entity) proceeding on the part of such Buyer is necessary to authorize this Agreement or to consummate the transactions contemplated hereby and thereby.  This Agreement and each of the other Transaction Documents to which such Buyer is a party have been duly and validly executed and delivered by such Buyer and constitute the legal, valid and binding obligation of such Buyer, enforceable against such Buyer in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a Proceeding in equity or at law).

**Section 4.03     Non-Contravention.**  The execution, delivery and performance by such Buyer of this Agreement and the other Transaction Documents to which such Buyer is a party, and the consummation of the transactions contemplated hereby and thereby, do not (a) conflict with or result in a violation or breach of, or default under, any provision of the Governing Documents of such Buyer; (b) conflict with or result in a violation or breach of any provision of any Applicable Law or Governmental Order applicable to such Buyer; (c) conflict with, result in breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of obligations under, create in any party any right to terminate, modify or cancel, or require any notice, Consent or waiver under, any contract or instrument to which such Buyer is a party or by which such Buyer is bound or to which any of its respective assets or properties are subject; or (d) require any Consent, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority or other Person.

**Section 4.04     Litigation.** There is no Proceeding pending or, to the actual knowledge, without further investigation, of an officer or director of such Buyer, threatened in writing, against such Buyer and such Buyer is not subject to any outstanding Governmental Order that, in either case, would, individually

EXHIBIT A

or in the aggregate, prevent or materially delay performance by such Buyer of any of its material obligations under this Agreement or any other Transaction Document to which it is party.

Section 4.05    **Brokers' Fees.**  Such Buyer has no arrangement, liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement.

Section 4.06    **Permitted Buyer.**  Neither such Buyer nor any of its Affiliates is a Person that either (i) is named on (A) the lists promulgated by the United Nations Security Council or its committees pursuant to resolutions issued under Chapter VII of the United Nations Charter, (B) the World Bank Listing of Ineligible Firms, or (C) the lists of persons, groups or entities which are subject to financial sanctions of the United Nations, European Union, France, Germany or another jurisdiction; or (ii) is a Prohibited Party.

Section 4.07    **Investment.**  Such Buyer acknowledges and understands that the Acquired Investor Shares are not required to be, have not been, and will not be, registered under the Securities Act. Such Buyer acknowledges and understands that the Target Company has no obligation to register or qualify the Acquired Investor Shares for resale and such Buyer is acquiring the Acquired Investor Shares for its own account for investment purposes only and not with a view to, or for resale in connection with, any distribution thereof.

(a)    Such Buyer is able to bear the economic risk of holding the Acquired Investor Shares for an indefinite period (including total loss of its investment), and (either alone or together with its representatives) has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment.

(b)    Such Buyer is an "accredited investor" within the meaning of Regulation D promulgated under the Securities Act and such Buyer acknowledges and agrees that the Acquired Investor Shares may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of without registration under the Securities Act and any applicable state securities Laws, except pursuant to an exemption from such registration under the Securities Act and such Laws.

Section 4.08    **Inspection; No Other Representations.**  Each of the Buyers is an informed and sophisticated Person, and has engaged expert advisors experienced in the evaluation and acquisition of securities in companies such as the Target Company as contemplated hereunder.  Each of the Buyers has undertaken an independent due diligence investigation and examination of the Target Company and the Target Subsidiaries, and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution and delivery of this Agreement and the other Transaction Documents contemplated hereby and performance of its obligations contemplated hereunder and thereunder.  Each Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, such Buyer has relied solely upon its own investigation and the express representations and warranties of Terra set forth in Article II and Article III of this Agreement; and (b) none of Terra, the Target Company or the Target Subsidiaries or any of their representatives has made any representation or warranty as to the Target Company, any of the Target Subsidiaries or the transactions contemplated by this Agreement, except as expressly set forth in Article II and Article III of this Agreement or as expressly set forth in the other Transaction Documents.

## ARTICLE V.
## COVENANTS

**EXHIBIT A**

**Section 5.01     Press Releases and Public Announcements**.  Unless otherwise required by Applicable Law, no Party will make public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other Parties (which consent shall not be unreasonably withheld or delayed), and the Parties shall cooperate as to the timing and contents of any such announcement.

**Section 5.02     Tax Covenants.**  All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with the sale of the Acquired Investor Shares to the Buyers (the "Transfer Taxes") will be borne by the Target Company.  The Target Company shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees.  The Target Company shall also be responsible for all other Taxes resulting from the sale and purchase of the Acquired Investor Shares, including any Income Taxes.

**Section 5.03     Pre-Closing Tax Periods.**  Terra shall be responsible for all Taxes of the Target Company and the Target Subsidiaries for all tax periods or portions thereof ending on or before the Closing Date.  Terra shall discharge such responsibility as instructed by the Target Company either by paying any such Tax directly to the applicable Tax authority on behalf of the Target Company or the applicable Target Subsidiary or by transferring an amount equal to the amount of any such Tax to the Target Company or the applicable Target Subsidiary at least five (5) Business Days before such Tax is due.  For a taxable period that begins on or before the Closing Date and ends after the Closing Date (a "Straddle Period"), the portion of the Taxes imposed on the Target Company or any Taxable Subsidiary, as the case may be, attributable to the portion of a Straddle Period ending on the Closing Date shall equal:  (a) with respect to Taxes imposed on or measured by sales, use, value-added, income, receipts, profits or payment of wages, the portion of such Tax that would have been due had the Straddle Period ended on and included the Closing Date; and (b) with respect to all other Taxes, an amount equal to the Tax multiplied by a fraction, the numerator of which is the number of days in the portion of the Straddle Period ending on and including the Closing Date, and the denominator of which is the number of days in the entire Straddle Period.

**Section 5.04     Capitalization of Debt.**  The parties contemplate that, within ninety (90) days of the Closing Date: (i) intercompany debt owed by certain Target Subsidiaries to CTHC will be capitalized in favor of CTHC and (ii) debt owed by the CT South American Subsidiaries will be transferred to CT South America and, subsequent to such transfer, capitalized in favor of CT South America.  Any Taxes resulting from the use and capitalization of any such debt as contemplated by this Section 5.04 shall be the sole responsibility of Terra, including, without limitation, any registration fee and stamp duty imposed by Honduras, and any registration fee imposed by Nicaragua.

**Section 5.05     Cooperation.**

(a)      With regard to the Target Company and those Target Subsidiaries (as set forth in Section 5.05(a) of the CT Disclosure Schedules) that are "eligible entities" described in Treasury Regulation Section 301.7701-3, the parties acknowledge that elections have been made to treat the Target Company and each such Target Subsidiary (other than Interco Latam Limited) as a disregarded entity for U.S. federal income tax purposes, which elections became effective before the Closing Date.  No Party shall take any action to cause any such election to not continue to be in effect after the Closing Date.  With regard to Interco Latam Limited, the Tax Matters Partner (as defined in the Shareholders Agreement) shall cause Interco Latam Limited to make an election to be treated as a disregarded entity for U.S. federal income tax purposes, which election shall be effective before the Closing Date and shall continue in effect after the Closing Date, and upon the instruction of the Tax Matters Partner any other Party will cooperate to execute such election.

(b)      The Tax Matters Partner (as defined in the Shareholders Agreement) shall cause any Target Subsidiary that is not an eligible entity (the "Conversion Entities" – set forth in Section 5.05(b) of the CT

Disclosure Schedules) to convert to an eligible entity as soon as practicable after the Closing Date, and upon the instruction of the Tax Matters Partner (as defined in the Shareholders Agreement) any other Party will cooperate to execute any such conversion, and, immediately upon such Conversion Entity becoming an eligible entity, the Tax Matters Partner (as defined in the Shareholders Agreement) shall cause such Conversion Entity to elect to be treated as a disregarded entity or partnership for U.S. federal income tax purposes, and any such election shall be effective on the date that is 75 days prior to the date of such election, but in no event earlier than the date of the conversion of such Target Subsidiary to an eligible entity, and upon the instruction of the Tax Matters Partner (as defined in the Shareholders Agreement) any other Party will cooperate to effect any such conversion or to execute any such election.

**Section 5.06     Issue Sites.**

(a)     After the Closing Date, Terra shall use reasonable commercial efforts to assist the Target Subsidiaries in remedying each of the Business Tower-related issues set forth on Exhibit E (such issues set forth on Exhibit E, the "Identified Issues" and each Business Tower site listed on Exhibit E, an "Issue Site"). All costs and expenses associated with remedying all Identified Issues shall be borne by the Target Company.

(b)     Following the Closing Date, Terra shall provide Replacement Towers for (i) Issue Sites for which any Identified Issue results in the termination of such Issue Site's Lease or any of its Tower Space Licenses or such Issue Site otherwise becoming unable to generate cash flow for the Target Company (collectively, "TCF Sites"), (ii) any Business Towers for which the Company receives advice of its internal or external legal advisers, accountants, compliance officers or other similar officers, auditors or consultants recommending any Issue Site be disposed of on account of Anti-Bribery Laws (collectively, "Compliance Sites") or (iii) any Business Towers for which the Company receives notice of a Proceeding or threatened Proceeding by any Governmental Authority with respect to any Business Tower under any Anti-Bribery Laws (collectively, "Proceeding Sites" and, together with the TCF Sites and the Compliance Sites, the "Lost Sites"); *provided, that* Terra's obligation to provide Replacement Towers for Lost Sites shall be limited to (x) the forty-two (42) Issue Sites set forth on Section 5.06(b) of the CT Disclosure Schedules (the "Relocation Sites") and (y) up to a maximum of fifty (50) additional Business Towers (the "Additional Sites" and, collectively with the Relocation Sites, the "Guaranteed Sites"). Upon the occurrence of any event requiring the replacement of a Guaranteed Site (each, a "Replacement Event"), the Target Company shall use commercially reasonable efforts to assign to Terra or its designee(s), or to cause the relevant Target Subsidiaries to assign to Terra or its designees, to the extent permissible, such Guaranteed Site.

(c)     Terra shall use commercially reasonable efforts to replace, within one hundred and twenty (120) calendar days after a Replacement Event, each Lost Site with a Replacement Tower that is approved by the Development Committee. Upon approval by the Development Committee, each Replacement Site shall be delivered pursuant to the terms of the Development Agreement and EPC Contracts; provided, that all costs and expenses associated with providing Replacement Towers, including all payments due by the Target Company and the Target Subsidiaries under the EPC Contracts, applicable Taxes and reasonable attorneys' fees, shall be borne by Terra. In the alternative and within the same one hundred and twenty (120) day period following the Replacement Event, Terra may opt to (i) contribute to the Target Company cash in an amount equal to the Tower Cash Flow for such Business Tower at the Closing Date, as set forth on Section 3.12(a) of the CT Disclosure Schedules (the "Closing Tower Cash Flow"), *multiplied* by seventeen (17) or (ii) have an amount equal to the Closing Tower Cash Flow *multiplied* by seventeen (17) deducted from Terra's portion of the proceeds from an Approved Sale. If Terra fails to provide a Replacement Tower or otherwise notify the Target Company of its desire to pursue the alternatives set forth in Sections 5.06(c)(i) – (ii) by the end of the 120 day period, an amount equal to the Closing Tower Cash Flow *multiplied* by seventeen (17) shall be deducted from Terra's portion of the proceeds from an Approved Sale. For the avoidance of doubt, in no event will any amounts paid by Terra with regard to Replacement

Towers be considered a Capital Contribution by Terra under the Shareholders Agreement or increase Terra's Equity Interests.

(d)    In the event that, upon the occurrence of an Approved Sale, there have been fewer than ninety-two (92) Lost Sites (the positive value, if any, of 92 minus the number of Lost Sites, the "Remaining Guaranteed Sites") and the Third Party Purchaser opts: (i) not to purchase one or more Issue Sites or (ii) to reduce the value of any Issue Sites, calculated based on the purchase price for the Approved Sale, as a result of any Identified Issue related to such Issue Site (the Issue Sites referred to in Section 5.06(d)(i) and Section 5.06(d)(ii), collectively, the "Rejected Sites"), (A) the Target Company shall use commercially reasonable efforts to assign to Terra or its designee(s), or to cause the relevant Target Subsidiaries to assign to Terra or its designees, to the extent permissible, the number of such Rejected Sites equal to the lesser of (i) the number of Remaining Guaranteed Sites or (ii) the number of Rejected Sites (collectively, the "Deducted Sites") and (B) the value of such Deducted Sites, each calculated based on the Closing Tower Cash Flow for such Issue Sites, *multiplied* by seventeen (17), shall be deducted from Terra's portion of the proceeds from the Approved Sale.  For the avoidance of doubt, the value of a Deducted Site shall be deducted from Terra's proceeds of the Approved Sale regardless of whether the Target Company or the relevant Target Subsidiary is able to assign such Deducted Site to Terra.

(e)    For the purposes of this Section 5.06, the assignment of any Relocation Sites, Additional Sites or Deducted Sites shall include the assignment of any Business Tower, Permits, Leases, Tower Space Licenses and other assets solely associated with such Relocation Site, Additional Site or Deducted Site, *provided, that* nothing in this Section 5.06 shall require the Target Company or any Target Subsidiary to (i) make any assignment to the extent such assignment (A) would materially affect the ability of the Target Company or any Target Subsidiary to own and operate the Business Towers, either at the moment of such assignment or at any point in the future, (B) would materially affect the value of the assets or equity of the Target Company or any Target Subsidiary upon a sale to a Third Party Purchaser, or (C) is prohibited by the terms of the relevant Permit, Lease or Tower Space License, including where assignment is prohibited without the consent of a third party or (ii) take any action in violation of Applicable Law.

(f)    The parties further agree and acknowledge that this Section 5.06 and Section 7.02(c) set forth the exclusive remedy for Losses relating to or arising from the Identified Issues.

**Section 5.07    Payment of Supplier Creditors**.  The Target Company will use reasonable commercial efforts to satisfy all of the obligations set forth on Exhibit F within three (3) months of Closing, using cash generated from aggregate Tower Cash Flow of the Business Towers owned by the Target Subsidiaries.

**Section 5.08    Compliance Policies**.  Promptly following the Closing, the Target Company will adopt and implement, and will cause the Target Subsidiaries to adopt and implement compliance policies regarding the U.S. Foreign Corrupt Practices Act of 1977, as amended and the Office of Foreign Asset Control of the U.S. Department of Treasury.

**Section 5.09    Registration of Foreign Investment**.  Within sixty (60) days of the Closing Date, Terra shall ensure that the Colombian Former Subsidiaries: (i) undertake all necessary and appropriate actions to complete the registration and/or substitution of foreign investment in such entities with regard to the current and past ownership of their respective shares, so as ensure that all such foreign investment registrations are completed in accordance with Applicable Law; (ii) give written notice to the Colombian Central Bank in connection with the registration and/or substitution of foreign investment in accordance with clause (i) above; and (iii) obtained evidence of receipt in substance and form reasonable satisfactory to Peppertree of the filing of such notices with the Colombian Central Bank.

**Section 5.10     Further Assurances**.  Following the Closing, each of the Parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

**ARTICLE VI.**
**CONDITIONS TO OBLIGATION TO CLOSE.**

**Section 6.01     General Conditions.**  The obligations of each Party to consummate the transaction shall be subject to no Governmental Authority having enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the transaction contemplated hereunder illegal, otherwise restraining or prohibiting consummation of the transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

**Section 6.02     Conditions to the Obligation of the Buyers.**  The obligations of the Buyers to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by the Buyers in the Buyers' sole discretion:

(a)     Payment of Existing Indebtedness.  CTHC and each applicable CTHC Subsidiary have received duly executed Payoff Letters, where applicable, and all other necessary documentation to provide satisfactory evidence to the Buyers that, upon receipt of the Repayment Amount, (i) CTHC and each applicable CTHC Subsidiary will be released from all payments and other obligations in respect of the Existing Indebtedness held by IFC, FMO, Credit Suisse and each Other Bank Creditor and (ii) all collateral securing such Existing Indebtedness of CTHC and each applicable CTHC Subsidiary be released, in each case including any necessary documents evidencing the termination and/or release of all Encumbrances securing such Existing Indebtedness.

(b)     Contribution.  Terra shall have contributed all Holding Subsidiary Shares to the Target Company.

(c)     Termination or Amendment of CTHC Subsidiary Trusts.  All CTHC Subsidiary Trusts shall have been (i) terminated or (ii) amended to remove IFC as a beneficiary (and party) and to appoint CTHC and/or the corresponding CTHC Subsidiary as the sole beneficiaries of all CTHC Subsidiary Trusts as set forth in Exhibit D.

(d)     Return and Termination of Shares.  Each of the share pledge agreements and share trust agreements signed in favor of IFC or a trustee in connection with the IFC Loan Agreement with respect to shares of the CTHC Subsidiaries shall have been terminated or amended and the CTHC Subsidiary Shares returned to the original holder of such shares as set forth in Exhibit G.

(e)     Terra Closing Deliveries.  Terra shall have delivered to the Buyers:

(i)     the counterpart signature pages duly executed by Terra and the Target Company of this Agreement;

(ii)     the counterpart signature pages duly executed by Terra, Terra TBS and the Target Company of that certain Shareholders Agreement to be executed by and among the Target Company, Terra, Terra TBS, Peppertree TBS and the Buyers (the "Shareholders Agreement");

25

(iii)    the counterpart signature pages duly executed by each of Terra, Terra TBS, the Target Company and/or the relevant Target Subsidiary of all other Transaction Documents to which each entity is a party;

(iv)    copies of all duly executed Payoff Letters and related documentation;

(v)    executed agreements terminating each Existing EPC Contract and the DT Agreements, to be effective upon Closing, in form and substance satisfactory to the Buyers;

(vi)    a certificate of a director of Terra certifying (A) that attached thereto are true and complete resolutions adopted by the board of directors (or equivalent governing body) of Terra authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transaction contemplated hereunder and thereunder and (B) that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereunder and (C) the names and signatures of the officers of Terra authorized to sign this Agreement and the other Transaction Documents to be delivered hereunder and thereunder;

(vii)    a certificate of the registered agent of the Target Company and each Holding Subsidiary dated no more than two (2) Business Days prior to the Closing; and

(viii)    (A) a certificate of incorporation, or its equivalent, and certificate(s) of good standing and/or existence of each Target Subsidiary, certified by an appropriate authority of the applicable Governmental Authority issuing such certificate in the jurisdiction of each entity's creation, formation, or organization and dated no more than two (2) Business Days prior to the Closing, and (B) resolutions of the directors or shareholders of each of the relevant Target Subsidiaries authorizing (x) the execution, delivery and performance of the relevant EPC Contract by such Target Subsidiary, (y) amendment or termination of the relevant CTHC Subsidiary Trust and related share pledge agreement by such Target Subsidiary and (z) all other relevant transactions contemplated hereunder.    In lieu of resolutions of the directors or shareholders of a Target Subsidiary, Terra may deliver powers of attorney sufficient to permit the taking of the actions contemplated by this Section 6.02(viii)(b)(x) – (z) on behalf of such Target Subsidiary, if permitted by Applicable Law.

(f)    Target Company Closing Deliveries. The Target Company shall have delivered to the Buyers:

(i)    in the case of Peppertree, a share certificate for the Acquired Class B Shares in the name of Peppertree, duly completed and executed on behalf of the Target Company, and a certified copy of the Target Company's register of shareholders showing the issue of the Acquired Class B Shares to Peppertree;

(ii)    in the case of Goldman, a share certificate for the Acquired Class C Shares in the name of Goldman, duly completed and executed on behalf of the Target Company, and a certified copy of the Target Company's register of shareholders showing the issue of the Acquired Class C Shares to Goldman;

(iii)    a certificate of a director of the Target Company certifying (A) that attached thereto are true and complete copies of the amended and restated memorandum and articles of association in form and substance satisfactory to each Buyer (the "New Articles") bearing the stamp of the BVI Registry of Corporate Affairs and all resolutions adopted by (1) the sole shareholder of the Target Company authorizing the Target Company's adoption of the New Articles and (2) the board of directors (I) authorizing the execution, delivery and performance of this Agreement and the other

Transaction Documents and the consummation of the transaction contemplated hereunder and thereunder (including the issuance of the Acquired Investor Shares to the applicable Buyer and the making of all necessary entries in its register of shareholders), and (II) acknowledging the resignation of Jose Alejandro Sagastume Figueroa as a director of the Target Company and approving the appointment of Alberto Arzu, Ryan D. Lepene and F. Howard Mandel as new directors of the Target Company, (B) that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereunder, (C) that attached thereto is a copy of a resignation letter from Jose Alejandro Sagastume Figueroa as director of the Target Company, and (D) the names and signatures of the officers of the Target Company authorized to sign this Agreement and the other Transaction Documents to be delivered hereunder and thereunder; and

(iv) a letter confirming (A) all powers of attorney currently granted by the Target Company and (B) that all previous powers of attorney granted by it have been revoked and each attorney has been notified of the revocation.

**Section 6.03 Conditions to the Obligation of Terra and the Target Company.** The obligations of Terra and the Target Company to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by Terra in its sole discretion:

(a) Delivery of the Purchase Price. Each Buyer shall, as provided under Section 1.02, have effected payment to (i) IFC, Credit Suisse, FMO and each Other Bank Creditor of the relevant portion of the Repayment Amount, (ii) DTH of the DT Cash Amount and (iii) the Target Company of the Target Company Cash Amount.

(b) Buyer Closing Deliveries. Each Buyer shall have delivered to Terra, in form and substance reasonably satisfactory to Terra:

(i) the counterpart signature pages duly executed by such Buyer of this Agreement;

(ii) the counterpart signature pages duly executed by such Buyer of the Shareholders Agreement and, in the case of Peppertree, by Peppertree TBS;

(iii) the counterpart signature pages duly executed by each Buyer and, in the case of Peppertree, by Peppertree TBS, of all other Transaction Documents to which such entity is a party;

(iv) a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of each Buyer certifying (A) that attached thereto are true and complete copies of all resolutions adopted by the board of directors (or equivalent governing body) of such Buyer authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents, the consummation of the transaction contemplated hereunder and thereunder, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereunder and (B) the names and signatures of the officers of such Buyer authorized to sign this Agreement and the other Transaction Documents to be delivered hereunder and thereunder; and

(v) a certificate of organization, or its equivalent, and certificate(s) of good standing and/or existence of each Buyer, certified by an appropriate authority of the applicable Governmental Authority issuing such certificate in the jurisdiction of such Buyer's creation, formation, or organization.

## ARTICLE VII.
## INDEMNIFICATION

**Section 7.01    Survival.** Subject to the applicable provisions of Section 7.06 (*Certain Limitations*) below, the representations, warranties and covenants of Terra and the Buyers under this Agreement shall survive from and after the Closing as follows:

(a)    Survival of Representations and Warranties.  Unless otherwise stated in this Agreement, all representations and warranties contained in this Agreement will survive the Closing for a period of 12 months.  Notwithstanding the foregoing, the expiration period set forth in this Section 7.01(a) shall not apply to (i) any Fundamental Representations (as defined in Section 7.06(c)) or the representations and warranties set forth in Section 3.09(a) or Section 3.13(c), all of which shall survive the Closing through the later of 12 months or the expiration of the statute of limitations period applicable to the underlying subject matter of such representation or warranty or (ii) any Losses based on Fraud, which shall survive the Closing indefinitely.

(b)    Survival of Covenants.

(i)    All covenants that specify a time period shall survive from and after the Closing until the earliest of (A) the expiration of the applicable time period specified; (B) waiver by the Party receiving the benefit of such covenant and (C) mutual termination in writing by the Parties; and

(ii)    All covenants that do not specify a time period, shall survive from and after the Closing until the earliest of (A) such covenant being fully performed (B) the expiration of the applicable statute of limitations, (C) waiver by the Party receiving the benefit of such covenant and (D) mutual termination in writing by the Parties.

**Section 7.02    Indemnification by Terra.** Subject to the applicable provisions of Section 7.06 (*Certain Limitations*) below, from and after the Closing Date, Terra will indemnify each of the Buyers together with their respective officers, directors, employees and agents (collectively, the "Buyer Indemnitees"), and hold them harmless from and against, any and all Losses which they or any of them may suffer or incur, regardless of when suffered or incurred and, except in the case of Section 7.02(c), whether or not involving a claim by a Third Party, which arise or result from (without duplication under this or any other provision of this Agreement):

(a)    any breach of a representation or warranty of Terra in this Agreement (except for representations and warranties that relate to Identified Issues, the remedies for which are exclusively provided in Section 5.06);

(b)    any breach of a covenant, agreement or undertaking of Terra in this Agreement (including for avoidance of doubt Section 5.03 of this Agreement) or in any other Transaction Document, certificate or other instrument delivered in connection herewith;

(c)    any Fraud by Terra, the Target Company or any Target Subsidiary, to the extent such Fraud occurred prior to the Closing Date; and

(d)    any of the matters set forth in Section 7.02(d) of the CT Disclosure Schedules.

**Section 7.03    Indemnification by each of the Buyers**.  Subject to the applicable provisions of Section 7.06 (*Certain Limitations*) below, from and after the Closing Date, each of the Buyers will, severally and not jointly, indemnify Terra, the Target Company, and each of their respective officers, directors, employees and agents (collectively, the "CT Indemnitees"), and hold them harmless from and

28

against, any and all Losses which they or any of them may suffer or incur, regardless of when suffered or incurred and whether or not involving a claim by a Third Party, which arise or result from:

(a)  any breach of a representation or warranty by such Buyer in this Agreement;

(b)  any breach of a covenant, agreement or undertaking of such Buyer in this Agreement or in any other Transaction Document, certificate or other instrument delivered in connection herewith; and

(c)  any Fraud by such Buyer, to the extent such Fraud occurred prior to the Closing Date.

**Section 7.04    Notice of Claims.**  If any Buyer Indemnitee or CT Indemnitee (an "Indemnified Party") believes that it has suffered or incurred any Losses for which it is entitled to indemnification under this Article VII, such Indemnified Party shall so notify the Party from whom indemnification is being claimed (the "Indemnifying Party") with reasonable promptness and reasonable particularity in light of the circumstances then existing.  If any Proceeding is instituted by or against a Third Party with respect to which any Indemnified Party intends to claim indemnification under this Article VII ("Third Party Claim"), such Indemnified Party shall promptly notify the Indemnifying Party of such claim.  The notice provided by the Indemnified Party to the Indemnifying Party shall describe the claim (the "Asserted Liability") in reasonable detail and shall indicate the amount (or an estimate) of the Losses that have been or may be suffered by the Indemnified Party.  The failure of an Indemnified Party to give any notice required by this Section 7.04 shall not affect any of the Indemnified Party's rights under this Article VII or otherwise, except and to the extent that such failure materially prejudices the defenses or other rights available to the Indemnifying Party with respect to such Third Party Claim.

(a)  In the event a notice of claim for indemnification is delivered in accordance with this Agreement before expiration of the applicable survival period pursuant to Section 7.01 (*Survival*) above, then (notwithstanding such survival period), the representation, warranty or covenant applicable to such claim shall survive after the expiration of the otherwise applicable survival period until, and only for the purpose of, the final resolution and satisfaction of such claim.

(b)  The Indemnifying Party will have thirty (30) calendar days after receipt of the indemnification notice to notify the Indemnified Party in writing of any objections thereto, specifying in reasonable detail the nature of and basis for each objection.  To the extent that the Indemnifying Party fails to timely object to all or part of an indemnification claim, the Indemnifying Party will be deemed to have irrevocably accepted liability for the claim.  To the extent that the Indemnifying Party timely objects to all or part of an indemnification claim, the Indemnifying Party and the Indemnified Party will negotiate in good faith to resolve the dispute within thirty (30) calendar days thereafter.  If the Indemnified Party and the Indemnifying Party are unable to resolve the dispute within that thirty (30) day period, then either of them may proceed to litigate the dispute subject to the provisions of this Agreement.

(c)  No Proceeding by an Indemnified Party to determine the extent of an indemnified liability, including voluntary disclosure to any Governmental Authority or potential claimants, will in any way affect a Party's right to indemnification under this Agreement.

**Section 7.05    Third Party Claims**.

(a)  Defending Third Party Claims.  The Indemnifying Party shall be entitled: (i) to participate in any Proceeding relating to a Third Party Claim and (ii) to elect, by written notice delivered to the Indemnified Party within thirty (30) calendar days after the Indemnifying Party's receipt of notice of the Asserted Liability, to defend, compromise or settle such Proceeding (subject to Section 7.05(b) below and the other provisions of this Article VII).  The Indemnified Party shall cooperate with respect to any such participation, defense, settlement or compromise.  The Indemnified Party shall have the right to employ its

29

own counsel in any such case and shall be reimbursed for all reasonable costs and expenses (including reasonable attorneys' fees). After payment of any Asserted Liability by the Indemnifying Party, the Indemnified Party, if requested by the Indemnifying Party, shall assign to the Indemnifying Party all rights the Indemnified Party may have against any applicable account debtor or other responsible Person in respect of the Asserted Liability. If the Indemnifying Party chooses to defend any Asserted Liability, the Indemnified Party shall cooperate with the Indemnifying Party to make available any books, records or other documents within its control that are reasonably necessary or appropriate for such defense

(b)     <u>Settlement of Third Party Claims</u>. The Indemnifying Party shall not settle or compromise any Proceeding or consent to the entry of a judgment without the written consent of the Indemnified Party (which shall not be unreasonably withheld). The Indemnifying Party shall not be liable for any settlement of any Proceeding effected without its written consent unless the Indemnifying Party fails to assume the defense of such Proceeding after notice thereof.

### Section 7.06     Certain Limitations.

(a)     Notwithstanding anything in this <u>Article VII</u> to the contrary, (i) no Indemnified Party shall be entitled to indemnification under this Agreement, and no Losses shall be counted against the Basket or the Cap, unless and until the aggregate amount of the Losses incurred by the Indemnified Party for which indemnification is available under this <u>Article VII</u> exceeds an amount equal to $1,100,000 (the "<u>Basket</u>"), and then, subject to the other limitations and exclusions contained in this <u>Article VII</u>, the Indemnified Party shall be entitled to the benefit of the indemnity under <u>Section 7.02</u> or <u>Section 7.03</u>, as applicable, for the aggregate amount of such Losses in excess of the Basket.

(b)     Notwithstanding anything in this Agreement to the contrary:

(i)     the aggregate amount of Terra's liability arising out of, relating to, or based upon any inaccuracy, misrepresentation or breach of representation, warranty, covenant or other agreement or claims arising out of this Agreement or any other Transaction Document or the transactions contemplated hereby and thereby and Losses relating to Terra's obligations under <u>Section 5.06</u> shall not exceed the Purchase Price (the "<u>Terra Cap</u>"); and

(ii)     the aggregate amount of each Buyer's liability arising out of, relating to, or based upon any inaccuracy, misrepresentation or breach of representation, warranty, covenant or other agreement or claims arising out of this Agreement or any other Transaction Document or the transactions contemplated hereby and thereby shall not exceed such Buyer's Pro Rata Share of the Purchase Price (each a "<u>Buyer Cap</u>" and together with the Terra Cap, the "<u>Cap</u>").

(c)     Notwithstanding the limitations set forth in <u>Section 7.06(a)</u> and <u>Section 7.06(b)</u> above, the Basket will not apply with respect to (i) Losses based on (A) any breach of the representations and warranties of Terra contained in <u>Section 2.01</u> (*Organization, Qualification, and Corporate Power*), <u>Section 2.02</u> (*Authorization of Transactions*), <u>Section 2.03</u> (*Non-Contravention*) or <u>Section 2.05</u> (*Brokers' Fees*); (B) any breach of the representations and warranties of Terra contained in <u>Section 3.01</u> (*Organization, Qualification, and Corporate Power*), <u>Section 3.02</u> (*Authorization of Transactions*), <u>Section 3.03</u> (*Non-Contravention*), <u>Section 3.04</u> (*Capitalization of the Target Company*), <u>Section 3.05</u> (*Capitalization of the Holding Subsidiaries*), or <u>Section 3.06</u> (*Capitalization of the Operating Subsidiaries and the Newco Subsidiaries*); <u>Section 3.11</u> (*Tax Matters*), <u>Section 3.16</u> (*Labor and Employment*) or (C) any breach of the representations and warranties of the Buyers contained in <u>Section 4.01</u> (*Organization, Qualification, and Corporate Power*), <u>Section 4.02</u> (*Authorization of Transactions*) or <u>Section 4.06</u> (*Permitted Buyer*) (the representations and warranties described in (A), (B) and (C), collectively, the "<u>Fundamental</u>

Representations"); (ii) any claims for indemnification arising out of Section 7.02(b), Section 7.02(c), Section 7.02(d), Section 7.03(b) or Section 7.03(c).

### Section 7.07    Determination of Losses.

(a)     The amount of any indemnification payments payable under this Article VII by the Indemnifying Party shall be net of any (i) amounts recovered by the Indemnified Party under applicable insurance policies or from any other Person alleged to be responsible therefor, and (ii) Tax savings actually realized by the Indemnified Party arising from the incurrence or payment of any such indemnification payment.  If the Indemnified Party receives any amounts under applicable insurance policies, or from any other Person alleged to be responsible for any Losses, subsequent to the relevant indemnification payment by the Indemnifying Party, then such Indemnified Party shall promptly reimburse the Indemnifying Party for any payment made or expense incurred by such Indemnifying Party in connection with providing such indemnification payment up to the amount received by the Indemnified Party, net of any expenses incurred by such Indemnified Party in collecting such amount.

(b)     The Indemnifying Party shall not be liable under this Article VII for any consequential, incidental, punitive, special or indirect damages.

(c)     All indemnification payments under this Article VII shall be deemed adjustments to the Purchase Price for Tax purposes, unless otherwise required by Applicable Law.

### Section 7.08    Payment.  Any indemnification pursuant to this Article VII shall be effected by wire transfer of immediately available funds to accounts designated by the Indemnified Party within thirty (30) calendar days after the final determination thereof, whether pursuant to a final judgment, final non-appealable arbitration award, settlement or agreement among the Parties.

### Section 7.09    Exclusive Remedy.  Each of the Buyers and Terra acknowledge and agree that the foregoing indemnification provisions in this Article VII, along with the provisions of Section 5.06, shall be the exclusive remedies of the Buyers, Terra and the Target Company with respect to any misrepresentation, breach of representation, warranty, covenant or other agreement or claims arising out of this Agreement or the transactions contemplated hereby.  In furtherance of the foregoing, the Buyers, Terra and the Target Company hereby waive, effective upon the occurrence of the Closing, to the fullest extent permitted by Applicable Law, any and all other rights, claims and causes of action (including rights of contribution, if any, and claims for rescission) known or unknown, foreseen or unforeseen, which exist or may arise in the future, that it may have against any member of the board of directors (or equivalent governing entity) of the Target Company or any of the Target Subsidiaries, Terra or any of the Buyers or any of their representatives, as the case may be, arising under or based upon any Law (including any such Law arising under or based upon any Environmental, Health, and Safety Requirement, securities law, common law or otherwise) for any breach of the representations and warranties or covenants and agreements contained in this Agreement.

### Section 7.10    Mitigation.  Each Party shall take all commercially reasonable steps to mitigate Losses for which indemnification may be claimed by such Party pursuant to this Agreement upon and after becoming aware of any event that could reasonably be expected to give rise to any such Losses.

### ARTICLE VIII.
### MISCELLANEOUS.

### Section 8.01    No Third-Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

**Section 8.02    Entire Agreement.**  This Agreement (including the documents referred to in this Agreement) constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

**Section 8.03    Succession and Assignment.**  Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise, by any Party without the prior written consent of the other Parties, and any such assignment without such prior written consent shall be null and void.  Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective successors and permitted assigns.

**Section 8.04    Counterparts.**  This Agreement may be executed in one or more counterparts (including by means of facsimile or other electronic transmissions), each of which shall be deemed an original but all of which together will constitute one and the same instrument.

**Section 8.05    Headings.**  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 8.06    Notices.**  All notices, requests, demands, claims, and other communications hereunder shall be in writing.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient, (ii) 1 Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid) or (iii) 1 Business Day after being sent to the recipient by facsimile transmission or electronic mail:

| | |
|---|---|
| *If to Terra or the Target Company:* | Commerce House, Wickhams Cay 1<br>P.O. Box 3140<br>Road Town, Tortola<br>British Virgin Islands, VG1110<br>E-mail: jhernandez@continentaltowerscorp.com<br>Attention: Jorge Hernandez |
| | *With copy, which shall not constitute notice, to:* |
| | Holland & Knight LLP<br>31 W 52nd Street<br>New York, NY 10019<br>Email: stephen.double@hklaw.com<br>Attn. Stephen J. Double |
| *If to Peppertree:* | 86 West Street<br>Chagrin Falls, Ohio 44022<br>Email: rlepene@peppertreecapital.com<br>Attention: Ryan Lepene |
| | *With copy, which shall not constitute notice, to:* |
| | Thompson Hine LLP<br>335 Madison Avenue<br>New York, New York  10017<br>E-mail:  Garrett.Evers@Thompsonhine.com |

**EXHIBIT A**

Attention:  Garrett Evers

|                    |                                      |
|--------------------|--------------------------------------|
| *If to Goldman:*   | Goldman, Sachs & Co.                 |
|                    | 6011 Connection Drive                |
|                    | Irving, Texas 75039                  |
|                    | E-mail: ben.nale@gs.com              |
|                    | Attention:  Ben Nale                 |

*with a copy (which copy shall not constitute notice) to*:

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
E-mail: Jonathan.Gill@ropesgray.com
Attention:  Jonathan P. Gill

Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties notice in the manner set forth in this Agreement.

**Section 8.07**    **Governing Law.**  This Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by, and construed in accordance with, the internal Laws of the State of New York without giving effect to any choice or conflict of law provision or rule.

**Section 8.08**    **Specific Performance**.  The parties hereto agree that irreparable damage would occur in the event any provision of this Agreement was not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at Law or in equity.  Therefore, each party hereto consents to the issuance of an injunction or the enforcement of other equitable remedies against it at the suit of an aggrieved party without the posting of any bond or other security, to compel specific performance of all of the terms of this Agreement.

**Section 8.09**    **WAIVER OF JURY TRIAL**.    EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY AND FOR ANY COUNTERCLAIM THEREIN.

**Section 8.10**    **Dispute Resolution**.  The parties agree that any controversy, claim or dispute arising out of or relating to or in connection with this Agreement including, without limitation, any dispute regarding its breach, termination, enforceability or validity hereof (each, a "**Dispute**") should be regarded as a business problem to be resolved promptly through business-oriented negotiations before resorting to arbitration pursuant to Section 8.10.  The parties therefore agree to attempt in good faith to resolve any Dispute promptly by negotiation between the executives of the parties who have authority to settle the Dispute.  Such negotiations shall commence upon the mailing of a notice (the "**Dispute Notice**") from the appropriate executive of the requesting party to an appropriate executive of the responding party.  If the Dispute has not been resolved by these Persons within forty-five (45) days of the date of the Dispute Notice, then such Dispute will be settled pursuant to binding arbitration pursuant to Section 8.11.  All negotiations pursuant to this Section 8.10 will be confidential and will be treated as compromise and settlement negotiations for purposes of applicable rules of evidence and not be used for, or admitted in, any arbitration or court proceedings under this Agreement.

**Section 8.11    Arbitration**.  Subject to Section 8.10, any Dispute that has not been resolved pursuant to Section 8.10 will be finally settled by binding arbitration.  The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association in effect at the time of the arbitration, except as they may be modified herein or by mutual agreement of the parties.  The seat of the arbitration shall be New York, New York.  The arbitration shall be conducted by three arbitrators.  The party initiating arbitration (the "**Claimant**") shall appoint its arbitrator in its request for arbitration (a "**Request**").  The other party (the "**Respondent**") shall appoint its arbitrator within thirty (30) calendar days of receipt of the Request and shall notify the Claimant of such appointment in writing.  If the Respondent fails to appoint an arbitrator within such thirty (30) day period, the arbitrator named in the Request shall decide the Dispute as the sole arbitrator.  Otherwise, the two arbitrators appointed by the parties shall appoint a third arbitrator within thirty (30) calendar days after the Respondent has notified the Claimant of the appointment of the Respondent's arbitrator.  When the arbitrators appointed by the parties have appointed a third arbitrator and the third arbitrator has accepted the appointment, the two arbitrators shall promptly notify the parties of such appointment.  If the two arbitrators appointed by the parties fail or are unable to appoint a third arbitrator, then the third arbitrator shall be appointed by the President of the American Arbitration Association which shall promptly notify the parties of the appointment of the third arbitrator.  The third arbitrator shall act as chairman of the panel.  The arbitration award shall be in writing and shall be final and binding on the parties.  The award may include an award of costs, including reasonable attorney's fees and disbursements.  Judgment upon award may be entered by any court having jurisdiction thereof or having jurisdiction over the parties or their assets.  Terra hereby designates, appoints and empowers Corporation Service Company, (the "**Process Agent**") with offices as of the date of this Agreement at Corporation Service Company, 1180 Avenue of the Americas, Suite 210, New York, NY 10036 as its authorized agent to receive for and on its behalf service of summons or other legal process in any action commenced under this Section 8.11 or otherwise related to this Agreement or the related investments and transactions in accordance with the Acceptance of Appointment Letter, substantially as attached hereto as Exhibit I.  Such service may be made by mailing or delivering a copy of such process to Terra in care of the Process Agent at the Process Agent's above address, and Terra hereby authorizes and directs the Process Agent to accept such service on its behalf.  Terra acknowledges and agrees that it shall not revoke the appointment of such Process Agent unless it has appointed another agent for service of process and has received the written consent of the Buyers to such appointment.

**Section 8.12    Amendments and Waivers**.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the Parties hereto.  No waiver by any Party of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

**Section 8.13    Severability.**  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

**Section 8.14    Expenses.**  The Target Company (i) shall pay on behalf of Peppertree and Terra (or shall reimburse Peppertree and/or Terra for) all costs and expenses (including legal, accounting and brokerage fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby and (ii) shall pay on behalf of Goldman (or reimburse Goldman for) costs and expenses (including legal, accounting and brokerage fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby in an amount not to exceed $20,000.  Without limiting the generality of

the foregoing, the Target Company shall pay the brokerage fee owed to UBS set forth in <u>Section 2.05</u> of the CT Disclosure Schedules.

**Section 8.15    Interpretation and Construction.**  For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole; and (d) the word "indefinitely" used in connection with survival of any representations, warranties, covenants and other rights or obligations under this Agreement shall be deemed a "time period".  Unless the context otherwise requires, references herein: (x) to Articles, Sections, CT Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.  This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.  The CT Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.  Any reference to any federal, state, local, or foreign statute or Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

**Section 8.16    Incorporation of Recitals, Exhibits, Annexes, and Schedules.**  The Recitals, Exhibits, Annexes, and Schedules identified in this Agreement are incorporated by reference in this Agreement and made a part hereof.

**Section 8.17    Governing Language.**  This Agreement has been negotiated and executed by the Parties in English.  In the event any translation of this Agreement is prepared for convenience or any other purpose, the provisions of the English version shall prevail.

* * * * *

**EXHIBIT A**

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

TERRA TOWERS CORP.

_____

Jorge Hernandez
Director

CONTINENTAL TOWERS LATAM
HOLDINGS LIMITED.

By: _____
Name: Jorge Hernandez
Title: Director

LATAM TOWERS, LLC

By: _____
Name:
Title:

AMLQ HOLDINGS (CAY) LTD.

By: _____
Name:
Title:

**EXHIBIT A**

# Exhibit B – Shareholders Agmt

_____

**SHAREHOLDERS AGREEMENT**

_____

**Among**

**LATAM TOWERS, LLC**

**TELECOM BUSINESS SOLUTION, LLC**

**TBS MANAGEMENT, S.A.**

**TERRA TOWERS CORP.**

**AMLQ HOLDINGS (CAY) LTD.**

**and**

**CONTINENTAL TOWERS LATAM HOLDINGS LIMITED**

**Dated as of October 22, 2015**

**SHAREHOLDERS AGREEMENT**, dated as of October 22, 2015 (the "**Effective Date**"), among CONTINENTAL TOWERS LATAM HOLDINGS LIMITED, a company incorporated in the British Virgin Islands, with registered number 1882295, whose registered office is at Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands (the "**Company**"), LATAM Towers, LLC, a limited liability company organized under the laws of the State of Delaware ("**Peppertree Latam**"), Telecom Business Solution, LLC, a limited liability company organized under the laws of Delaware ("**Peppertree TBS**"), AMLQ Holdings (Cay) Ltd., a Cayman Island Exempted Company Limited by Shares ("**Goldman**"), Terra Towers Corp., a company incorporated in the British Virgin Islands, with registered number 1375181, whose registered office is at Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands ("**Terra**"), TBS Management, S.A., a *sociedad anónima* organized under the laws of Panama ("**Terra TBS**") and, together with Terra, Peppertree Latam, Peppertree TBS and Goldman, the "**Initial Shareholders**"), and each other Person who after the Effective Date acquires shares in the Company and becomes a party to this Agreement by executing a joinder agreement (such Persons, collectively with the Initial Shareholders, the "**Shareholders**").

**WHEREAS**, Terra, Peppertree Latam, Goldman and the Company have entered into that certain Subscription and Contribution Agreement, dated as of the Effective Date (the "**Subscription and Contribution Agreement**"), pursuant to which (i) Peppertree Latam subscribed for, and the Company issued 23,253.35 Class B Shares; (ii) Goldman subscribed for, and the Company issued, 13,080.01 Class C Shares; and (iii) as consideration for the 50,000 Class A Shares that it currently holds and in satisfaction of the Subscription Loan, Terra contributed to the Company 100% of the issued and outstanding shares of each of (A) Continental Towers Holding Corp., a company incorporated in the British Virgin Islands, with registered number 1461793, whose registered office is at Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands ("**CT Holding**"), (B) Collocation Holding Ltd., a company incorporated in the British Virgin Islands, with registered number 1859157, whose registered office is at Level 1, Palm Grove House, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands ("**Collocation Holding**"), (C) Continental Enterprises Holdings Ltd., a company incorporated in the British Virgin Islands, with registered number 1859161, whose registered office is at Level 1, Palm Grove House, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands ("**CT Enterprises**") and (D) Continental Towers South America & Caribbean Corp., a company incorporated in the British Virgin Islands, with registered number 1730290, whose registered office is at Level 1, Palm Grove House, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands ("**CT SA&C**" and, together with CT Holding, Collocation Holding and CT Enterprises, the "**CT BVI Subsidiaries**");

**WHEREAS**, the CT BVI Subsidiaries, together, own, directly or indirectly, 100% of the issued and outstanding equity of each of the CT Subsidiaries;

**WHEREAS**, the Company owns 100% of the issued and outstanding shares of Interco Latam Limited, a company incorporated in the British Virgin Islands, with registered number 1892833, whose registered office is at Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands ("**Interco BVI**");

**WHEREAS**, Peppertree TBS, Terra TBS and the Company have entered into that certain Contribution Agreement, dated as of the Effective Date (the "**Contribution Agreement**") pursuant to which (i) in exchange for 9,215.23 Class B Shares, Peppertree TBS contributed to the Company 50% of the issued and outstanding shares of Telecom Business Solution, Limited, a company incorporated in the British Virgin Islands, with company number 1829796, whose registered office is at Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands ("**TBS**") and (ii) in exchange for 9,215.23 Class A Shares, Terra TBS contributed to the Company 50% of the issued and outstanding shares of TBS;

**WHEREAS**, TBS owns, directly or indirectly, 100% of the issued and outstanding equity of each of the TBS Subsidiaries;

**WHEREAS**, as of the Effective Date, the Company plans to make capital contributions to Interco BVI of all of the issued and outstanding shares of (i) TBS and (ii) the CT BVI Subsidiaries; and

**WHEREAS**, in connection with the consummation of the transactions contemplated by the Subscription and Contribution Agreement and the Contribution Agreement (the "**Transactions**"), the parties are entering into this Agreement to set forth their respective rights and obligations with respect to the Company and the Shares (whether issued or acquired hereafter, including all Shares or other Equity Interests in the Company issuable upon the exercise, conversion or exchange of warrants, options or other securities or rights to acquire Shares or other Equity Interests in the Company or upon the conversion or exchange of any security).

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

**ARTICLE I**
**DEFINITIONS**

**Certain Defined Terms.** As used in this Agreement, the following terms have the following meanings:

"**A Shareholder**" means a Person who is recorded in the Company's register of shareholders as the holder of one or more Class A Shares.

"**Accounting Standards**" means International Financial Reporting Standards ("**IFRS**") promulgated by the International Accounting Standards Board ("**IASB**") (which include standards and interpretations approved by the IASB and International Accounting Standards issued under previous constitutions), together with its pronouncements thereon from time to time, and applied on a consistent basis.

"**Affiliate**" when used with respect to any Person, means (i) any other Person which, directly or indirectly, controls or is controlled by or is under common control with such Person; (ii) any Person that is an officer of, partner in or trustee of, or serves in a similar capacity with respect to, such Person or of which such Person is an officer, partner or trustee, or with respect to

2

which such Person serves in a similar capacity; and (iii) any Person that, directly or indirectly, is the beneficial owner of more than 50% of any class of Equity Interests in such Person or of which such Person is directly or indirectly the beneficial owner of more than 50% of any class of Equity Interests. For purposes of this definition, "control" (including the correlative terms "controlling," "controlled by" and "under common control with"), with respect to any Person, shall mean possession, directly or indirectly, of the power, to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"**Agreement**" means this Shareholders Agreement, dated as of the Effective Date, and all amendments hereto made in accordance with the provisions of <u>Section 8.09</u>.

"**Annual Budget**" has the meaning set forth in <u>Section 4.07(b)</u>.

"**Annual Business Plan**" has the meaning set forth in <u>Section 4.07(b)</u>.

"**Approved Sale**" has the meaning set forth in <u>Section 5.04(b)</u>.

"**Articles**" has the meaning set forth in <u>Section 2.01</u>.

"**Assignee**" has the meaning set forth in <u>Section 3.02(e)</u>.

"**Authorization Date**" has the meaning set forth in <u>Section 5.03(a)</u>.

"**B Shareholder**" means a Person who is recorded in the Company's register of shareholders as the holder of one or more Class B Shares.

"**Board**" has the meaning set forth in <u>Section 4.01</u>.

"**Board Observer**" has the meaning set forth in <u>Section 4.02(a)</u>.

"**Breaching Shareholder**" has the meaning set forth in <u>Section 6.03(b)(i)</u>.

"**Business Day**" means any day that is not a Saturday, a Sunday or other day on which banks or stock exchanges are required or authorized by Law to be closed in Panama City, Panama, Guatemala City, Guatemala, Cleveland, Ohio or Tortola, British Virgin Islands.

"**Capital Contribution**" means, in relation to any Shareholder, the total amount of any cash and the agreed value of any contribution of property or services contributed or agreed to be contributed by that Shareholder to the Company or any Company Subsidiary as set forth in the books and records of the Company or any such Company Subsidiary, including any payment made or required to be made by such Shareholder pursuant to <u>Section 3.02</u>.

"**Cash Contribution**" has the meaning set forth in <u>Section 3.02(a)</u>.

"**Chairman**" has the meaning set forth in <u>Section 4.02(e)</u>.

"**Claimant**" has the meaning set forth in <u>Section 8.15</u>.

"**Class A Shares**" means Class A shares of no par value in the Company.

"**Class B Shares**" means Class B shares of no par value in the Company.

"**Class C Shares**" means Class C shares of no par value in the Company.

"**Collocation Holding**" has the meaning set forth in the Preamble.

"**Colombian CT Subsidiaries**" means Continental Towers Colombia, S.A.S., a *sociedad por acciones simplificada* organized under the laws of Colombia, and Collocations Technologies Colombia, S.A.S, a *sociedad por acciones simplificada* organized under the laws of Colombia.

"**Colombian TBS Subsidiary**" means Telecom Business Solution Ltda., a *sociedad de responsabilidad limitada* organized under the laws of Colombia.

"**Company**" has the meaning set forth in the Preamble.

"**Company Subsidiary**" means any of Interco BVI, the CT BVI Subsidiaries, the CT Subsidiaries, TBS, the TBS Subsidiaries or any other entity that in the future may become a Subsidiary of the Company.

"**Confidential Information**" has the meaning set forth in Section 6.03(a).

"**Constitutional Documents**" has the meaning set forth in Section 2.01.

"**Contributing B Shareholder**" means Peppertree TBS.

"**Contribution Agreement**" has the meaning set forth in the Preamble.

"**Contribution Notice**" has the meaning set forth in Section 3.02(a)(i).

"**Corporate Opportunity**" has the meaning set forth in Section 6.06.

"**Credit Facilities**" has the meaning set forth in Section 6.05.

"**C Shareholder**" means a Person who is recorded in the Company's register of shareholders as the holder of one or more Class C Shares.

"**CT Contributing A Shareholder**" means Terra.

"**CT BVI Subsidiaries**" has the meaning set forth in the Preamble.

"**CT Enterprises**" has the meaning set forth in the Preamble.

"**CT Holding**" has the meaning set forth in the Preamble.

"**CT SA&C**" has the meaning set forth in the Preamble.

"**CT Subsidiaries**" means, collectively, (a) Continental Towers de Guatemala, S.A., a *sociedad anónima* organized under the laws of Guatemala, Colocation Technologies Guatemala, S.A., a *sociedad anónima* organized under the laws of Guatemala and Continental Telecommunications Corp. Guatemala, LTDA., a *sociedad de responsabilidad limitada* organized under the laws of Guatemala (the "**Guatemalan CT Subsidiaries**"); (b) Continental Towers El Salvador, S.A. de C.V., a *sociedad anónima de capital variable* organized under the laws of El Salvador, Collocation Technologies El Salvador, S.A. de C.V., a *sociedad anónima de capital variable* organized under the laws of El Salvador and Continental Corp. El Salvador, Ltda. de C.V., a *sociedad de responsabilidad limitada de capital variable* organized under the laws of El Salvador (the "**Salvadoran CT Subsidiaries**"); (c) Continental Towers Nicaragua, S.A., a *sociedad anónima* organized under the laws of Nicaragua, Collocation Technologies Nicaragua, S.A., a *sociedad anónima* organized under the laws of Nicaragua, and Continental Corp. Nicaragua y Compañia Limitada, a *sociedad de responsabilidad limitada* organized under the laws of Nicaragua (the "**Nicaraguan CT Subsidiaries**"); (d) Continental Towers de Honduras, S.A., a *sociedad anónima* organized under the laws of Honduras, Colocation Technologies de Honduras, S.A., a *sociedad anónima* organized under the laws of Honduras and Telecom Business Solution Honduras, S. de R.L., a *sociedad de responsabilidad limitada* organized under the laws of Honduras (the "**Honduran CT Subsidiaries**"); (e) Continental Towers Costa Rica, S.A., a *sociedad anónima* organized under the laws of Costa Rica, Collocation Technologies Costa Rica, S.A., a *sociedad anónima* organized under the laws of Costa Rica and Costa Rican Business Solution SRBS, SRL, a *sociedad de responsabilidad limitada* organized under the laws of Costa Rica (the "**Costa Rican CT Subsidiaries**"); (f) Continental Towers de Panama, S.A., a *sociedad anónima* organized under the laws of the Republic of Panama, Collocation Technologies de Panama, S.A., a *sociedad anónima* organized under the laws of the Republic of Panama and Continental Corp. Panama S. de R.L., a *sociedad de responsabilidad limitada* organized under the laws of the Republic of Panama (the "**Panamanian CT Subsidiaries**"); and (g) Continental Towers Peru, S.A., a *sociedad anónima* organized under the laws of Peru and Collocations Technologies Peru, S.A., a *sociedad anónima* organized under the laws of Peru (the "**Peruvian CT Subsidiaries**").

"**Deducted Issue Sites**" has the meaning set forth in the Subscription and Contribution Agreement.

"**Defaulting Shareholder**" has the meaning set forth in Section 3.02(d).

"**Development Agreement**" means that certain agreement by and among the Company, the Initial A Shareholder and DTH, dated as of the Effective Date.

"**Development Committee**" has the meaning set forth in Section 4.04(b).

"**Director**" means a director of the Company.

"**Disclosing Party**" has the meaning set forth in Section 6.03(a).

"**Dispute**" has the meaning set forth in Section 8.14.

"**Dispute Notice**" has the meaning set forth in Section 8.14.

"**DTH**" means DT Holdings, Inc., a company incorporated in the Republic of Panama.

"**DTH Entity**" means DT de Guatemala, S.A., Desarrollos Terrestres Colombia, S.A.S., Desarrollos Terrestres Honduras, S.A. de C.V., Desarrollos Terrestres (Nicaragua), S.A., Desarrolladora de Tierras Costa Rica Responsabilidad Limitada, Tierras Nacionales Ltd. de C.V., Desarrollos Terrestres de Panamá, S.A. and Desarrollos Terrestres Peru, S.A. and any Affiliate and/or Related Entity of DTH that in the future may enter into an EPC Contract with a Company Subsidiary.

"**DTI**" has the meaning set forth in <u>Section 6.10(a)</u>.

"**DT Side Letter**" means that certain side letter, entered into as of the Effective Date, by and among the Company, DTH, certain DTH Entities, Peppertree, Peppertree TBS, Terra, Terra TBS and TBS.

"**Effective Date**" has the meaning set forth in the Preamble.

"**Encumbrance**" means (a) any lien, pledge, mortgage, deed of trust, security interest, charge, claim, easement, encroachment or other similar encumbrance, or (b) any option, right of pre-emption, "usufruct" or other third party interest or right of any kind.

"**EPC Contracts**" means those certain Engineering, Procurement and Construction Contracts (i) entered into or amended and restated as of the Effective Date (A) by and between DTH and the Company, and (B) a DTH Entity and a Company Subsidiary; and (ii) as may be entered into between a DTH Entity and any other entity that in the future may become a Subsidiary of the Company.

"**Equity Interests**" means, with respect to any Person, all of the shares (or other ownership or profit interests) in such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares (or other ownership or profit interests) in such Person, all of the securities (including loans, notes, debentures or other debt instruments) convertible into or exchangeable for shares (or other ownership or profit interests) in such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including, without limitation, partnership, member or trust interests therein), whether voting or non-voting. Unless otherwise specified, the term "Equity Interests" as used herein shall mean Equity Interests of the Company.

"**Excess Cash Flow**" means, with respect to the Company and the Company Subsidiaries on a consolidated basis, for each Fiscal Quarter, (a)(i) recurring ordinary rent payments collected during such Fiscal Quarter with respect to Tower Space Licenses <u>minus</u> (ii) expenses directly associated with the operation and maintenance of the Towers to which such Tower Space Licenses relate (including any insurance expenses or recurring ordinary rent payments, but excluding SG&A) accrued or paid by the Company and the Company Subsidiaries during such Fiscal Quarter, <u>minus</u> (b) interest expense accrued or paid by the Company and the Company Subsidiaries during such Fiscal Quarter, <u>minus</u> (c) taxes accrued or paid by the Company and the Company Subsidiaries during such Fiscal Quarter, <u>minus</u> (d) the aggregate principal amount of

scheduled payments on any indebtedness of the Company or any Company Subsidiary made during such Fiscal Quarter, <u>minus</u> (e) SG&A paid during such Fiscal Quarter, <u>minus</u> (f) any other expenses accrued but not yet payable by the Company and the Company Subsidiaries for such Fiscal Quarter.

"**Executive Team**" means the Chief Executive Officer and Chief Financial Officer of the Company.

"**Family Group Member**" means, with respect to any natural person, such natural person's spouse, parent, sibling, descendant (including any descendant by adoption or marriage) or the spouse of any such parent, sibling or descendant.

"**Financial Statements**" means, with respect to any Fiscal Year, true and complete copies of the audited consolidated balance sheet of the Company and the Company Subsidiaries as of the last day of such Fiscal Year and the related audited consolidated statements of income, retained earnings, shareholders' equity and cash flow of the Company and the Company Subsidiaries for such Fiscal Year, together with all related notes and schedules thereto, prepared in accordance with the Accounting Standards (except as noted therein), accompanied by the report thereon of the Company's independent certified public accountants.

"**Fiscal Quarter**" means, for financial accounting purposes, each three-month period ending March 31, June 30, September 30 and December 31, unless otherwise required by applicable Law.

"**Fiscal Year**" means, for financial accounting purposes, January 1 to December 31, unless otherwise required by applicable Law.

"**Funded Tower**" has the meaning set forth in <u>Section 6.11(b)</u>.

"**FY16 Annual Budget**" has the meaning set forth in <u>Section 4.07(a)</u>.

"**General Ledger Trial Balance**" means, with respect to a given Fiscal Year, the general ledger trial balance for the Company and the Company Subsidiaries as of December 31 of such Fiscal Year, listing accounts and account balances for assets, liabilities, equity, revenues and expenses.

"**Goldman**" has the meaning set forth in the Recitals.

"**Governmental Authority**" means, in any applicable jurisdiction, any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**GS**" has the meaning set forth in Section 5.01(b).

"**GS Deal Team**" has the meaning set forth in Section 6.09.

"**GTSL**" means Global Tower Sites Limited, a company incorporated in the British Virgin Islands, with registered number 1878299, whose registered office is at Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands.

"**Guaranteed Annual Amount**" has the meaning set forth in Section 6.10(b).

"**Initial Business Plan**" has the meaning set forth in Section 4.07(a).

"**Initial Shareholders**" has the meaning set forth in the Preamble.

"**Initial A Shareholders**" means Terra and Terra TBS. For the purposes of this Agreement, any action to be taken by the Initial A Shareholders may be taken by the holders of a majority of the Class A Shares.

"**Initial B Shareholders**" means Peppertree Latam and Peppertree TBS. For the purposes of this Agreement, any action to be taken by the Initial B Shareholders may be taken by the holders of a majority of the Class B Shares.

"**Initial C Shareholder**" means Goldman.

"**Initial Class C Capital Contribution**" has the meaning set forth in Section 3.01(a).

"**Initial Investor Shareholder Capital Contribution**" has the meaning set forth in Section 3.01(a).

"**In Kind Contribution**" means any contribution made by a Shareholder to the Company other than in cash, including without limitation Towers or other assets.

"**Interco BVI**" has the meaning set forth in the Preamble.

"**Interco Transfer**" has the meaning set forth in Section 6.15.

"**Interim Annual Financial Statements**" means, with respect to a given Fiscal Year, true and complete copies of the unaudited consolidated balance sheet of the Company and the Company Subsidiaries as at the last day of such Fiscal Year and the related unaudited consolidated statements of income, retained earnings, shareholders' equity and cash flows of the Company and the Company Subsidiaries for such Fiscal Year, together with all related notes and schedules thereto, if any, prepared in accordance with the Accounting Standards (except as noted therein).

"**Interim Quarterly Financial Statements**" means, with respect to a given Fiscal Quarter, true and complete copies of the unaudited consolidated balance sheet of the Company and the Company Subsidiaries as at the last day of such Fiscal Quarter and the related unaudited consolidated statements of income, retained earnings, shareholders' equity and cash flows of the

Company and the Company Subsidiaries for such quarter, together with all related notes and schedules thereto, if any, prepared in accordance with the Accounting Standards (except as noted therein).

"**Investment Bank**" has the meaning set forth in <u>Section 5.04(b)</u>.

"**Investor B Shareholder**" means Peppertree Latam.

"**Investor B Shareholder Capital Contribution**" has the meaning set forth in <u>Section 3.01(a)</u>.

"**Investor Group**" has the meaning set forth in <u>Section 5.04(b)(ii)</u>.

"**Investor Group Companies**" has the meaning set forth in <u>Section 5.04(b)(ii)</u>.

"**Issue Sites**" has the meaning set forth in the Subscription and Contribution Agreement.

"**LATAM TBS Subsidiaries**" means Telecom Business Solution, Limitada de Capital Variable, a *Sociedad de Responsabilidad Limitada de Capital Variable* organized under the laws of El Salvador; Telecom Business Solution Panama S de RL, a *Sociedad de Responsabilidad Limitada* organized under the laws of the Republic of Panama and Telecom Business Solution Guatemala Limitada, a *Sociedad de Responsabilidad Limitada* organized under the laws of Guatemala.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Leases**" means all leases, subleases, licenses, concessions and other agreements (written or oral), including all amendments, extensions, renewals, guaranties, and other agreements with respect thereto, pursuant to which any Person holds any interest in Real Property. For the avoidance of doubt, Leases include (i) all agreements regarding easements, rights of use or usufruct interests in Real Property and (ii) all licenses, concessions or other agreements with municipalities or associations of municipalities regarding the use of Real Property owned by such municipalities, including but not limited to Permits allowing construction on public premises.

"**Lock-up Period**" means the period of five (5) years starting on the Effective Date and ending on the fifth anniversary of the Effective Date.

"**Management Team**" means (i) the Executive Team and (ii) the senior managers of the Company and senior management of the Company Subsidiaries.

"**Memorandum of Association**" has the meaning set forth in <u>Section 2.01</u>.

"**Municipal Agreement**" means those certain agreements executed by and between certain Company Subsidiaries and certain municipalities or associations of municipalities within the Territory.

"**Net Cash**" means any amounts distributed other than Excess Cash Flow, including but not limited to net proceeds from the sale of assets of the Company or the Company Subsidiaries.

"**New Market**" has the meaning set forth in Section 6.07.

"**Non-Managing Shareholder**" means each of the Initial B Shareholders and the Initial C Shareholder, separately, and, together, the "Non-Managing Shareholders."

"**Non-Transferring Shareholders**" has the meaning set forth in Section 5.03(a).

"**Objecting Shareholder**" has the meaning set forth in Section 5.04(b)(i).

"**Offset Agreement**" has the meaning set forth in Section 6.10(a).

"**Payment Period**" has the meaning set forth in Section 6.10(b).

"**Peppertree Latam**" has the meaning set forth in the Preamble.

"**Peppertree TBS**" has the meaning set forth in the Preamble.

"**Percentage Interest**" means a percentage corresponding to a fraction (A) the numerator of which is the number of Shares held by a Shareholder, and (B) the denominator of which is the sum of Shares held by all Shareholders. The initial Percentage Interests of the Initial Shareholders shall be as set forth in Exhibit A.

"**Permit**" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from any Governmental Authority.

"**Permitted Transfer**" means a Transfer of any Shares by any Shareholder to a Permitted Transferee.

"**Permitted Transferee**" means (a) with respect to any Person that is an entity, any Affiliate of such Person, and (b) with respect to any Person who is a natural person, (i) a trust or a private interest foundation, under which the distribution of shares or other Equity Interests may be made only to such Person and/or any Family Group Member of such Person, (ii) a charitable remainder trust, the income from which will be paid to such Person during his life, (iii) a corporation, partnership or limited liability company, the shareholders, partners or members of which are only such Person and/or Family Group Members of such Person or (iv) by will or by the laws of intestate succession, to such Person's executors, administrators, testamentary trustees, legatees or beneficiaries.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Peruvian TBS Subsidiary**" means Telecom Business Solution SRL, a *Sociedad de Responsabilidad Limitada* organized under the laws of Peru.

"**Prohibited Transferee**" means (i) any Person that, directly or indirectly through its Subsidiaries and Affiliates, engages in the Tower Business and (ii) any Person with a current controlling equity interest in any Person that, directly or indirectly through its Subsidiaries or Affiliates, engages in the Tower Business as of the time of such Transfer; *provided, that* (x) with the exception of mobile phone operators, such Person's engagement in the Tower Business represents a material portion of such Person's (including its Subsidiaries' and Affiliates') business activities, taken as a whole, and (y) the Tower Business of the Company and its Subsidiaries shall be disregarded for purposes of determining whether a Person is a Prohibited Transferee.

"**Proposed Offer**" has the meaning set forth in Section 5.04(b)(i).

"**Proposed Sale**" has the meaning set forth in Section 5.04(b).

"**Proposed Sale Notice**" has the meaning set forth in Section 5.04(b).

"**Proposing Shareholders**" has the meaning set forth in Section 5.04(b).

"**Real Property**" means any parcel or tract of land, including any and all buildings, structures, fixtures and improvements located thereon, including those under construction, and all privileges, rights, usufructs, easements and appurtenances belonging to or for the benefit thereof.

"**Receiving Party**" has the meaning set forth in Section 6.03(a).

"**Rejected Colombia Towers**" has the meaning set forth in Section 6.10(b).

"**Rejected Corporate Opportunity**" has the meaning set forth in Section 6.06(b).

"**Related Entity**" when used with respect to any Person, means any other Person that is related to such Person through some type of control or ownership. For the avoidance of doubt, investors in Peppertree Latam not otherwise affiliated with Peppertree Capital Management, Inc. shall not be deemed Related Entities of Peppertree Latam for purposes of this Agreement.

"**Removed Tower**" has the meaning set forth in Section 6.11(b).

"**Representative**" has the meaning set forth in Section 6.03(a).

"**Request**" has the meaning set forth in Section 8.15.

"**Reserves**" means, with respect to any fiscal period, funds set aside or amounts allocated during such period to reserves which shall be maintained in amounts which the Board deems sufficient for working capital, contingencies, to pay taxes, insurance, debt service or other costs, operating expenses, capital improvements or replacements or liabilities incident to the ownership or operation of the Company's business.

"**Restricted Period**" has the meaning set forth in Section 6.09.

**EXHIBIT B**

"**Respondent**" has the meaning set forth in <u>Section 8.15</u>.

"**Sale Notice**" has the meaning set forth in <u>Section 5.03(a)</u>.

"**SCP Package**" has the meaning set forth in the Development Agreement.

"**Securities Act**" means the United States Securities Act of 1933, as amended, or any successor federal statute, and the rules and regulations thereunder, which shall be in effect at the time.

"**SG&A**" means all direct and indirect selling, general and administrative expenses classified as such under the Accounting Standards <u>plus</u> all personnel or consulting costs or commissions that would be capitalized under the Accounting Standards <u>less</u> any transaction-related legal or accounting fees and expenses.

"**Shareholder**" has the meaning set forth in the Preamble.

"**Shares**" means Class A Shares, Class B Shares or Class C Shares issued, or to be issued, by the Company.

"**Strategic Business Information**" has the meaning set forth in <u>Section 6.02</u>.

"**Subscription and Contribution Agreement**" has the meaning set forth in the Recitals.

"**Subscription Loan**" has the meaning set forth in the Subscription and Contribution Agreement.

"**Subsidiary**" means, with respect to any Person, any other Person in which a majority of the outstanding shares or other Equity Interests having the power to vote for directors or comparable managers are owned, directly or indirectly, by the first Person.

"**Tag-Along Closing**" has the meaning set forth in <u>Section 5.06(a)(i)</u>.

"**Tag-Along Notice**" has the meaning set forth in <u>Section 5.06(a)</u>.

"**Tag-Along Participation Notice**" has the meaning set forth in <u>Section 5.06(b)</u>.

"**Tag-Along Pro Rata Amount**" has the meaning set forth in <u>Section 5.06(c)</u>.

"**Tag-Along Right**" has the meaning set forth in <u>Section 5.06(b)</u>.

"**Tag-Along Shareholder**" has the meaning set forth in <u>Section 5.06(a)(ii)</u>.

"**TBS**" has the meaning set forth in the Preamble.

"**TBS Contributing A Shareholder**" means Terra TBS.

"**TBS Subsidiaries**" means the LATAM TBS Subsidiaries, the Colombian TBS Subsidiary and the Peruvian TBS Subsidiary.

"**Terra**" has the meaning set forth in the Preamble.

"**Terra TBS**" has the meaning set forth in the Preamble.

"**Terra Group**" has the meaning set forth in <u>Section 5.04(b)(ii)</u>.

"**Terra Group Companies**" has the meaning set forth in <u>Section 5.04(b)(ii)</u>.

"**Territory**" means those initial jurisdictions set forth on <u>Exhibit C</u>, as well as any new jurisdictions as may be agreed by the Board.

"**Third Party Purchaser**" has the meaning set forth in <u>Section 5.03(a)</u>.

"**Total Cash Contribution**" has the meaning set forth in <u>Section 3.02(a)</u>.

"**Tower**" means any wireless communication, broadcast or other transmission tower and other communication infrastructure sites.

"**Tower Business**" means the business of purchasing, selling, development, owning or managing Towers.

"**Tower Space License**" means a lease or license of space on a Tower.

"**Tower Cash Flow**" means, with respect to a Tower (i) recurring ordinary rent payments with respect to Tower Space Licenses <u>minus</u> (ii) expenses directly associated with the operation and maintenance of such Tower (including any insurance expenses or recurring ordinary rent payments) accrued or paid by the Company and the Company Subsidiaries, with each component of the such calculation consistently applied every time a determination of Tower Cash Flow for such Tower is made.

"**Transactions**" has the meaning set forth in the Recitals.

"**Transfacil Guatemala**" has the meaning set forth in <u>Section 6.10(a)</u>.

"**Transfacil Panama**" has the meaning set forth in <u>Section 6.10(a)</u>.

"**Transfer**" means any sale, assignment, transfer, pledge, Encumbrance, donation or other disposition of Shares or of any interest in Shares, including the grant of an option or put in respect of Shares or of any interest in Shares, or other right therein, whether voluntarily or by operation of law, and whether for or without consideration. The word "Transfer," when used as a noun, shall mean any Transfer transaction.

"**Transferred Fiber Assets**" has the meaning set forth in <u>Section 6.11</u>.

"**Transferee**" has the meaning set forth in <u>Section 4.09</u>.

"**Transferring Shareholder**" has the meaning set forth in <u>Section 5.03(a)</u>.

"**Unfunded Towers**" has the meaning set forth in <u>Section 6.11(c)</u>.

# ARTICLE II
## ORGANIZATIONAL DOCUMENTS;
## REPRESENTATIONS AND WARRANTIES

**Section 2.01     Memorandum of Association, Articles and Constitutional Documents**.  Attached as <u>Schedule 1</u> hereto, are (i) the amended and restated memorandum of association of the Company (the "**Memorandum of Association**"), (ii) the amended and restated articles of association of the Company (the "**Articles**") and (iii) the constitutional documents of each of the Company Subsidiaries (collectively, the "**Constitutional Documents**") as in effect on the Effective Date.  The Shareholders and the Company agree to take all necessary action to ensure that the above-mentioned organizational documents are modified to reflect the matters set out in this Agreement (to the extent that such action has not been taken at the Effective Date).

**Section 2.02     Representations and Warranties of the Shareholders**.  Each Shareholder, as of the date it becomes a party hereto, severally and not jointly, represents and warrants to the Company and each other Shareholder that:

(a)     It is duly incorporated or organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization and has all necessary power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby.  The execution and delivery by such Shareholder of this Agreement, the performance by it of its obligations hereunder and the consummation by it of the transactions contemplated hereby have been duly authorized by all requisite action on its part. This Agreement constitutes the valid and binding obligation of such Shareholder, enforceable against it in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).  The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, require no action by or in respect of, or filing with, any Governmental Authority.

(b)     The execution, delivery and performance of this Agreement by such Shareholder does not (i) violate, conflict with or result in the breach of any provision of its memorandum of association or articles of association (or equivalent constitutional documents), (ii) conflict with or violate any Law or Governmental Order applicable to it or any of its assets, properties or businesses, or (iii) require any consent or other action by any Person under any provision of any material agreement or other instrument to which such Shareholder is a party.

(c)     Except for this Agreement (and with respect to the Initial Shareholders, the Subscription and Contribution Agreement or the Contribution Agreement), such Shareholder has not entered into or agreed to be bound by any other agreements or arrangements of any kind with any other party with respect to Shares, including agreements or arrangements with respect to the acquisition or disposition of Shares or any interest therein or the voting of Shares (whether or not such agreements and arrangements are with the Company or any other Person) other than, in the

**EXHIBIT B**

case of the Initial Shareholders, agreements among the Initial Shareholders or agreements with such Shareholders' investors and co-investors.

## ARTICLE III
## CAPITAL CONTRIBUTIONS; DISTRIBUTIONS

**Section 3.01**     **Purpose; Initial Capital Contributions**.

(a)     The purpose of the Company is to develop, own, acquire and operate, directly or indirectly through the Company Subsidiaries, Towers in the Territory.  The parties stipulate and agree that the value of the equity in the Company Subsidiaries that are being contributed by (i) the CT Contributing A Shareholder pursuant to the Subscription and Contribution Agreement is One Hundred Fifty-Five Million United States Dollars ($155,000,000), following the satisfaction of the Subscription Loan; (ii) the Contributing B Shareholder pursuant to the Contribution Agreement is Twenty-Eight Million Five Hundred and Sixty Seven Thousand and One Hundred Ninety Nine United States Dollars ($28,567,199) and (iii) the TBS Contributing A Shareholder pursuant to the Contribution Agreement is Twenty-Eight Million Five Hundred and Sixty Seven Thousand and One Hundred Ninety Nine United States Dollars ($28,567,199).

(b)     The Investor B Shareholder has made an initial Capital Contribution to the Company of Seventy Two Million Eighty Five Thousand Three Hundred Eighty Four United States Dollars ($72,085,384) (the "**Investor B Shareholder Capital Contribution**") and the Initial C Shareholder has made an initial Capital Contribution to the Company of Forty Million Five Hundred and Forty Eight Thousand and Twenty Nine United States Dollars ($40,548,029) (the "**Initial C Shareholder Capital Contribution**" and, together with the Initial Investor B Shareholder Contribution, the "**Initial Investor Shareholder Capital Contributions**").

**Section 3.02**     **Additional Contributions**.  The Initial Shareholders shall make additional Capital Contributions in accordance with the terms as set forth below:

(a)     <u>Non-Managing Shareholders Contributions in Exchange for Equity Interests</u>.  The Non-Managing Shareholders shall make one or more additional contributions to the Company in an aggregate amount equal to the difference between (i) One Hundred and Twenty Five Million United States Dollars ($125,000,000) *minus* (ii) the Initial Investor Shareholder Capital Contributions, at such times as requested by the Board in exchange for Equity Interests in the Company in accordance with the terms set forth below (each, a "**Cash Contribution**" and, together, the "**Total Cash Contribution**"):

(i)     Subject to the satisfaction or waiver of the conditions set forth in <u>Section 3.02(c)</u> and upon receipt of written notice from the Company acting upon the approval of the Board pursuant to <u>Section 4.04(a)</u> (the "**Contribution Notice**"), the Non-Managing Shareholders shall make additional Cash Contributions to the Company.  The amount of each Non-Managing Shareholder's Cash Contribution set forth in such Shareholder's Contribution Notice will correspond to such Shareholder's proportional share of the aggregate Cash Contribution due from all Non-Managing Shareholders, as set forth on <u>Exhibit A</u> under the heading "Cash Contribution Participation Percentage".  The Company shall issue to the Initial B Shareholders the number of Class B Shares and the

Initial C Shareholder the number of Class C Shares equal in value to the amount of the Cash Contributions set forth in the Contribution Notices, utilizing the same pricing terms set forth in the Subscription and Contribution Agreement. The number of Shares issued to the Non-Managing Shareholders upon each Cash Contribution shall increase the Percentage Interest of each of the Investor Shareholders on an incremental basis, up to an amount not to exceed the percent specified on Exhibit A under the heading "Post-Cash Contribution Percentage Interest".

        (ii)      Following consummation of the Total Cash Contribution pursuant to this Section 3.02(a), the Non-Managing Shareholders will own Equity Interests in the Company, representing, collectively, 45.55% of all of the outstanding Shares in the Company.

        (b)      Subsequent Capital Contributions. Other than the additional Capital Contributions required to be made by the Non-Managing Shareholders pursuant to Section 3.02(a) above, no Shareholder shall be required to make any other additional Capital Contributions to the Company. Notwithstanding the foregoing, in the event any Corporate Opportunity is approved by the Board in accordance with Section 6.06 and the funding of such Corporate Opportunity exceeds the funds available under the Credit Facilities, if any, then in place or the Board determines that the Corporate Opportunity should not be funded with the funds available under the Credit Facilities, each Shareholder, upon receipt of a Contribution Notice, shall make an additional Capital Contribution to the Company in the amount set forth in the Contribution Notice in exchange for a number of Shares of such Shareholders' existing class of Shares equal in value to the amount of such Shareholder's Capital Contribution in accordance with Section 3.02(c). The amount of each Shareholder's Cash Contribution set forth in such Shareholder's Contribution Notice will correspond to such Shareholder's proportional share of the aggregate Cash Contribution due from all Shareholders, as determined by such Shareholder's Percentage Interest.

        (c)      Contribution Closing. Once the Board has authorized the call for a Capital Contribution pursuant to Section 3.02(b), each Shareholder shall within ten (10) Business Days, or within such other time as determined by the Board, after receipt of the Contribution Notice transfer to the Company such amount in immediately available funds as set forth in such Shareholder's Contribution Notice. In consideration for such Capital Contribution the Company will issue share certificates corresponding to such number of Class A Shares, Class B Shares or Class C Shares, as applicable, equal in value to the amount of such Shareholder's Capital Contribution. The Board may agree to issue the corresponding share certificates on a consolidated quarterly basis.

        (d)      Failure to Make a Capital Contribution. The Company shall be entitled to enforce the obligations of each Shareholder to make the additional Capital Contributions as set forth in Section 3.02(a) and Section 3.02(b), and the Company shall have all remedies available at law or in equity in the event any such Capital Contribution is not so made. In the event that any Shareholder fails to make a Capital Contribution when required (a "**Defaulting Shareholder**"), then the Board may, in its sole discretion, elect to charge such Shareholder interest at an annual rate equal to the lesser of (i) twenty percent (20%) per annum and (ii) the highest rate permitted by applicable Law on the amount due from the date such amount became due until the date on

which such payment is received by the Company. In addition to the other rights provided in this Section 3.02(d), and to the extent not inconsistent with such other rights, no part of any distribution shall be paid to any Defaulting Shareholder from which there is then due and owing to the Company, at the time of such distribution, any amount required to be paid to the Company. At the election of the Board, the Company may either (i) apply all or part of any such withheld distribution in satisfaction of the amount then due to the Company from such Defaulting Shareholder or (ii) withhold such distribution until all amounts then due are paid to the Company by such Defaulting Shareholder. Upon payment of all amounts due to the Company (by application of withheld distributions or otherwise), the Board shall distribute any unapplied balance of any such withheld distribution to such Defaulting Shareholder. No interest shall be payable on the amount of any distribution withheld by the Company pursuant to this Section 3.02(d). Whenever the consent or decision of a Shareholder or of the Shareholders is required or permitted pursuant to this Agreement or by Law, a Defaulting Shareholder shall not be entitled to participate in such consent or to make such decision. The Board may, in its discretion, permit any Shareholder (other than a Defaulting Shareholder) to fund all or any portion of any Capital Contribution that one or more other Defaulting Shareholders have failed to make.

(e)     Assignment of Capital Contribution Rights and Obligations. Each Shareholder may assign its rights and obligations to make additional Capital Contributions and purchase Shares pursuant to Section 3.02(a) and Section 3.02(b) in whole or in part, to any Permitted Transferee or any other holder of the same class of Shares (an "**Assignee**") by providing to the Company written notice signed by the Shareholder and such Assignee prior to the relevant Contribution Date which notice shall indicate the total number of Shares to be purchased by the Assignee. Upon receipt of such notice by the Company, any Assignee that is not already a Shareholder shall be deemed to be a Shareholder for purposes of the previous and subsequent Sections and, following the relevant Contribution Closing (and execution of this Agreement by the Assignee), the Assignee shall be a Shareholder for all purposes hereunder.

**Section 3.03     Distributions**.

(a)     Upon approval of the Board and in the manner determined by the Board, subject to Section 3.03(c), within thirty (30) calendar days following the end of each Fiscal Quarter, the Company shall distribute the Excess Cash Flow, if any, and Net Cash, if any, to each of the Shareholders according to their respective Percentage Interests.

(b)     The Company may offset (and re-allocate to the other Shareholders) any amount otherwise distributable to a Shareholder by any amounts owed to the Company by such Shareholder pursuant to Section 3.02.

(c)     No distribution shall be declared and paid unless the assets of the Company and the Company Subsidiaries are in excess of all liabilities of the Company and the Company Subsidiaries, on a consolidated basis.

(d)     No Shareholder shall be entitled to interest on its Capital Contribution or to a return of its Capital Contribution, except as otherwise specifically provided for herein.

**EXHIBIT B**

(e)     The Shareholders hereby agree to evaluate and establish appropriate and cost efficient mechanisms to distribute any Excess Cash Flow generated by the Company Subsidiaries to the Company and the Shareholders, taking into consideration tax, corporate, exchange controls and other regulations to which the Company Subsidiaries may be subject under any applicable Law of their respective jurisdictions.

# ARTICLE IV
## CORPORATE GOVERNANCE

**Section 4.01     Board of Directors, Powers**.  The Company will be managed by a board of directors (the "**Board**"), which will have the power and authority to exercise all the powers of the Company and to take all actions that are not required to be exercised or done by the Shareholders by Law or under this Agreement, the Memorandum of Association or the Articles.

**Section 4.02     Composition of the Board**.

(a)     For as long as the Initial Shareholders or their Permitted Transferees are the only Shareholders of the Company and otherwise until this Agreement is properly amended as provided herein, unless the Shareholders decide otherwise by a resolution of Shareholders, the Board shall consist of four (4) Directors, (i) two (2) of which may be appointed (and removed) by the Initial A Shareholders (or their Permitted Transferees) by giving notice to the Company and each other Initial Shareholder and (ii) two (2) of which may be appointed (and removed) by the Initial B Shareholders (or their Permitted Transferees) by giving notice to the Company and each other Initial Shareholder.

(b)     The Initial C Shareholder may appoint an individual to attend meetings of the Board and any committee thereof, on its behalf (the "**Board Observer**"), for as long as the Initial Shareholders are the only Shareholders of the Company and the Initial C Shareholder holds at least 10% of the total number of issued Shares; *provided*, *however*, that, in the event any matter relating to or in connection with Strategic Business Information comes before the Board, at the joint request of the Initial A Shareholder and the Initial B Shareholder, the Board Observer shall withdraw from such meeting as necessary or portion thereof prior to and throughout the duration of any discussions relating to and in connection with such Strategic Business Information.  The Initial C Shareholder shall have the right to remove and replace any Board Observer by giving notice to the Company and each other Initial Shareholder.  For the avoidance of doubt, the Board Observer shall not be (i) entitled to vote on any matter or (ii) considered a Director for the purposes of this Agreement.

(c)     The Initial Shareholders agree to appoint and remove Directors in order to ensure that, at any given time, each Initial Shareholder has appointed the full number of Directors that such Initial Shareholder is entitled to appoint pursuant to the terms of this Section 4.02.

(d)     A Director may only be removed by the Shareholder that appointed such Director (or its Permitted Transferees).  If a Director is removed, resigns, or is otherwise unable or unwilling to fulfill his duties as a Director, the Shareholder that appointed such Director (or its Permitted Transferees) has the sole right to fill the vacancy created thereby.

(e)     The chairman of the Board (the "**Chairman**") will be Jorge Hernandez for the remainder of 2015 and 2016.  Thereafter, so long as the Initial A Shareholders and/or their Permitted Transferees hold collectively, at least fifty percent (50%) of the total number of issued Shares, the Chairman will be a Director appointed by the Initial A Shareholders and/or their Permitted Transferees.  The Initial A Shareholders will appoint the Chairman by giving notice to the Company and each other Shareholder.  The Chairman will not have a casting vote at any meeting of the Board.  If the Chairman is unable to attend any meeting of the Board, the Shareholder who appointed him will be entitled to appoint another Director to act as Chairman at the meeting.  The Chairman may instruct any Director or other Person present at a meeting of the Board to record and file minutes of the meeting.

(f)     The first Board will be comprised as follows:

| Appointed by: | Name: | Position |
|---|---|---|
| The Initial A Shareholders | Alberto Arzu | Director |
| The Initial A Shareholders | Jorge Hernandez | Director and initial Chairman |
| The Initial B Shareholders | F. Howard Mandel | Director |
| The Initial B Shareholders | Ryan D. Lepene | Director |

(g)     The composition of the board of directors of each of the Company Subsidiaries shall be identical to the composition of the Board, unless otherwise approved by the Board; provided, that, where permitted by applicable Law, the CT Subsidiaries and TBS Subsidiaries shall instead be managed by a sole administrator appointed by the shareholders of each such Subsidiary and each such sole administrator shall be granted only such powers as are expressly determined by the shareholders of the respective Subsidiary.

**Section 4.03     Meetings**.

(a)     The meeting schedule of the Board shall be determined by the Board.  Meetings of the Board may also be called by or at the request of any two (2) Directors.  Directors may participate in and hold meetings by or through the use of any means of electronic communication by which each of the following occurs:   (i) all Directors participating in the meeting can simultaneously hear each other and (ii) all communication during the meeting is immediately transmitted to all Directors participating in the meeting.  At each meeting held in such a way, each Director's identity shall be verified prior to voting on any matter by each Director stating his or her name as it appears on the records of the Company.  Participation by a Director in a meeting by such a means of communication shall constitute presence in person at the meeting, except where a Director participates in the meeting for the sole and express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(b)     Notice of each meeting of the Board shall be given not less than 24 hours prior to the time of the meeting.  Such notice shall be deemed to have been given (i) when delivered by hand (with written confirmation of receipt); (ii) when received by the relevant Director if sent by an internationally recognized courier (receipt requested); (iii) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if received before 5:00 PM. at the place of receipt, and on the next Business Day at the place of receipt if received after that time; or (iv) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Whenever any notice of a meeting of the Board is required to be given to any Director under this Agreement or any provision of Law, a waiver of that requirement in writing signed at any time, whether before or after the meeting, by that Director shall be deemed equivalent to the giving of such notice.  The attendance of a Director at a meeting constitutes a waiver of notice of that meeting, except where a Director attends a meeting and objects at such meeting to the transaction of any business because the meeting is not lawfully called or convened.  A Director of the Company who is present at a meeting of the Board at which action on any matter is taken shall be presumed to have assented to the validity of the meeting unless the Director objects at the beginning of the meeting, or promptly upon his or her arrival, to holding the meeting or transacting business at the meeting.

(c)     A notice of any meeting of the Board shall indicate (i) the date, time and place of the meeting, (ii) (if it is anticipated that not all of the Directors will participate in the meeting from the same place) the means by which they will communicate with each other during the meeting; and (iii) the general nature of the business to be conducted at the meeting.

(d)     All the Directors must be present in person, by alternate or by electronic means at any meeting of the Board in order to constitute a quorum for the transaction of business at such meeting.  A Director may only appoint another Director as his alternate.  A notice addressed to the Board by the Director appointing an alternate shall be sufficient for the effectiveness of such appointment and the Board shall not be required to take further action for such purpose. Each Director will have one vote at each meeting of the Board.  The Board will take all actions (i) by an affirmative vote of a majority of the Directors (whether present in person, by electronic means or represented by an alternate) at a duly called meeting at which a quorum is present or (ii) in lieu of a meeting, by the unanimous written consent of all Directors.  A signed consent has the effect of a meeting vote and may be so described in any document.  Any proposal that does not receive either an affirmative vote by a majority of Directors or the unanimous written consent of all Directors will be deemed to have been rejected by the Board.

(e)     The Company shall reimburse the reasonable and properly documented out-of-pocket expenses incurred by each Director in connection with such Director's service on the Board and Subsidiary boards (such as travel expenses related to out-of-town Board meetings attended by such Director).  Except for such reimbursement, the Directors shall not receive compensation for their services as members of the Board.  These expenses shall be included in the Annual Business Plans and Annual Budgets.

(f)     Subject to applicable Law, no Director and no officer or agent appointed by the Board, individually or severally, shall be liable, responsible or accountable in damages or otherwise to the Company or to any Shareholder for any acts performed or omitted by him while serving as a Director or an officer or agent of the Company.  Subject to applicable Law and the

**EXHIBIT B**

Articles, each Director and each officer or other agent appointed by the Board shall be indemnified and held harmless by the Company, to the extent of the Company's assets, against obligations and liabilities arising or resulting from or incidental to the management of the Company's affairs.

**Section 4.04      Action by the Board**.

(a)      Except as otherwise expressly provided in this Agreement, the Memorandum of Association or the Articles, or under applicable Law, the Board shall have the authority to manage the Company and is authorized to make any and all contracts and decisions, enter into transactions and make and obtain any commitments on behalf of the Company to conduct or further its business, including but not limited to the following (each of which shall require the approval of the Board):

(i)      any requirement that the Shareholders make an additional Capital Contribution pursuant to Section 3.02(a) and Section 3.02(b);

(ii)      any decision to accept an In Kind Contribution (including the determination of the value of such In Kind Contribution);

(iii)      the financing or refinancing (or amendments thereto) of, or the granting of any liens over, on the property or rights of the Company or any of its Company Subsidiaries, including, without limitation, any external financing or securitization or the granting of any Encumbrance, guarantee or indemnity by the Company or any of its Company Subsidiaries in relation thereto and the voluntary prepayment of any indebtedness in accordance with the terms of any financing or refinancing arrangements;

(iv)      the setting of a dividend policy or the declaration or payment of any dividend or other distribution by the Company in respect of Equity Interests in the Company (including a distribution of Excess Cash Flow and Net Cash) or any change to any policy regarding the payment of dividends or the making of other distributions;

(v)      any amendment to the Company's or any Company Subsidiary's respective constitutional documents;

(vi)      the hiring or firing and compensation of members of the Management Team, including the Executive Team;

(vii)      the commencement, settlement, payment, discharge or satisfaction of any unaffiliated third-party litigation, claim, liability or obligation (absolute, accrued, asserted or unasserted, contingent or otherwise);

(viii)      the commencement, settlement, payment, discharge or satisfaction of any litigation, claim, liability or obligation (absolute, accrued, asserted or unasserted, contingent or otherwise) involving (A) DTH or any of the DTH Entities under the EPC Contracts; (B) the Company, the Initial A Shareholders or DTH under the Development Agreement or (C) the Company or any Company Subsidiary and any Shareholder or any

21

Affiliate or Related Entity of a Shareholder pursuant to any other agreement, arrangement or transaction;

(ix)     the approval of Annual Budgets and Annual Business Plans including any material waiver or amendment thereto;

(x)     the appointment or removal of the Company's auditors or any change to the accounting methods or policies of the Company (other than as required by the Accounting Standards);

(xi)     the approval of any capital expenditure by the Company not included in the approved Annual Budget for any given Fiscal Year;

(xii)     entry by the Company or any Company Subsidiary into any agreement, arrangement or transaction with any Shareholder or Affiliate or Related Entity of a Shareholder (or the later amendment or termination of such agreement or the terms of such arrangement or transaction) or the amendment of the terms or termination of any existing agreement with any Shareholder or Affiliate or Related Entity of a Shareholder in place as of the Effective Date;

(xiii)     the acquisition of any asset or business by the Company or any Company Subsidiary not included in the Annual Budget for any given Fiscal Year or, in the case of Towers, approved by the Development Committee;

(xiv)     the transfer, in a single transaction or series of transactions, of assets or receivables of the Company or any Company Subsidiary, except as provided in <u>Section 5.04</u> or <u>Section 6.15</u>;

(xv)     the (A) merger of the Company or any Company Subsidiary into or with any other person, the consolidation of the Company or any Company Subsidiary with any person, or the sale, reorganization or restructuring of the Company or any Company Subsidiary (or any similar transaction) except as provided in <u>Section 6.15</u> or (B) transfer, in a single transaction or series of transactions, of substantially all of the Company's or any Company Subsidiary's assets, including in each of (A) and (B) the proposed sale of all or substantially all the Shares or assets of the Company to a Third-Party Purchaser, except as provided in <u>Section 5.04</u>;

(xvi)     the formation, winding up, liquidation or dissolution of the Company or any Company Subsidiary; the adoption of a plan of liquidation for the Company or any Company Subsidiary;

(xvii)     any action by the Company or any Company Subsidiary to commence any suit, case, proceeding or other action (A) under any existing or future law of any jurisdiction relating to bankruptcy, insolvency, reorganization or relief of debtors seeking to have an order for relief entered with respect to the Company or any Company Subsidiary, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to the Company or any Company Subsidiary or (B) seeking appointment of a

receiver, trustee, custodian or other similar official for the Company or any Company Subsidiary, or for all or any part of its assets, or making a general assignment for the benefit of the creditors of the Company or any Company Subsidiary;

(xviii) entry by the Company or a Company Subsidiary into any agreement, or the consummation by the Company or a Company Subsidiary of any transaction (whether in one transaction or series of related transactions), not included in the Annual Budget;

(xix)   any material change in the nature or scope of the business, purpose or corporate strategy of the Company or entry by the Company into a joint venture or similar strategic alliance by it with any Person;

(xx)    the (A) issuance or sale of Shares or other Equity Interests in the Company to any Person or (B) entry by the Company into, or the effecting by the Company of, any transaction or series of related transactions involving the repurchase, redemption or other acquisition of Shares from any Person, in each case, except as otherwise contemplated by the terms of this Agreement;

(xxi)   the approval of a proposed investment by the Company or any Company Subsidiaries not included in the Annual Budget;

(xxii)  the amendment or termination of the DT Side Letter, the Development Agreement and/or EPC Contract by and between DTH and the Company dated as of the Effective Date;

(xxiii) the amendment or termination of any of the EPC Contracts executed by and between a DTH Entity and a Company Subsidiary dated as of the Effective Date, including any of the amended and restated EPC Contracts between a DTH Entity and a TBS Subsidiary;

(xxiv) the entry into any agreement for engineering, procurement and construction services substantially similar to the services provided under the EPC Contracts, other than the EPC Contracts dated as of the Effective Date or the later amendment or termination of such agreement;

(xxv)   the approval of any expansion of the Territory into a New Market;

(xxvi)  the approval of any Transfer of an Equity Interest in the Company by (A) the Initial A Shareholder or the Initial B Shareholder prior to the expiration of the Lock-up Period or (B) the Initial C Shareholder to a Prohibited Transferee; and

(xxvii) the approval of any loans by the Company to GTSL.

(b)     Development Committee.  A committee (the "**Development Committee**") shall be established to review and approve the SCP Packages for Tower opportunities presented to the Company pursuant to the Development Agreement.  The initial members of the Development Committee will be the Directors.  The Board may establish procedures for voting, appointing, removing and replacing additional and/or alternate individuals to the Development Committee.

Unless and until the Development Committee establishes a contrary procedure, decisions of the Development Committee will be made by the Board. At its discretion, the Board may delegate any of the duties of the Development Committee to a sub-committee of the Board or the Development Committee.

**Section 4.05**     **Action by Shareholders**.

(a)     <u>Meetings</u>. Shareholders' meetings will be held (i) in accordance with the Articles, (ii) when action by the Shareholders is required by Law, the Memorandum of Association or the Articles or (iii) if called by the Board to obtain any approval.

(b)     <u>Quorum</u>. A quorum is present at a meeting of Shareholders if at least the Initial A Shareholders and at least the Initial B Shareholders are present in person or by proxy. The Shareholders shall take reasonable steps to ensure that each meeting of Shareholders is quorate throughout.

(c)     <u>Voting</u>. The Shareholders may take action (i) by a vote of Shareholders present, or represented by proxy, and entitled to vote at a duly convened meeting of the Shareholders at which a quorum is present, provided that the relevant action receives the affirmative vote of Shareholders representing at least seventy-five percent (75%) of the issued Shares, or (ii) in lieu of a meeting, by the written consent of Shareholders representing at least the number of issued Shares that would be required to authorize such action at a meeting of Shareholders contemplated by the previous subsection (i).

(d)     <u>Reimbursement</u>. The Company will reimburse each Shareholder or its representative for all reasonable expenses incurred by that Shareholder or representative in connection with attending a Shareholders meeting.

(e)     <u>Redemption of Minority Shares</u>. Section 176 of the BVI Business Companies Act, 2004 shall not apply to the Company.

**Section 4.06**     **Management Team**.

(a)     The Executive Team shall be appointed by the Board (except that the initial Chief Executive Officer shall be Jorge Gaitán Castro and the initial Chief Financial Officer shall be Juan Francisco Quisquinay). The Executive Team shall, in general, supervise and control all of the business and affairs of the Company, subject to the oversight of the Board. For the avoidance of doubt, the Executive Team shall not have authority to take any action set forth in <u>Section 4.04</u> without the approval of the Board.

(b)     Subject to approval by the Board, the Chief Executive Officer shall nominate the remaining senior managers of the Company and senior management of the Company Subsidiaries.

**Section 4.07**     **Business Plans and Annual Budgets**.

(a)     Within the two (2) months of the Effective Date, the Management Team shall present to the Board the Annual Budget of the Company and Company Subsidiaries for Fiscal

**EXHIBIT B**

Year 2016 (the "**FY16 Annual Budget**") and forecasts for the next three (3) years (the "**Initial Business Plan**").

(b)      Prior to the end of each Fiscal Year, and in no event fewer than thirty (30) days prior to the end of such Fiscal Year, the Management Team must submit to the Board for approval:  (i) an annual budget of the Company and the Company Subsidiaries for the subsequent Fiscal Year substantially in the form of the FY16 Annual Budget (the "**Annual Budget**") and (ii) updated forecasts for the next three (3) years substantially in the form of the Initial Business Plan (the "**Annual Business Plan**").  The Board shall approve an Annual Business Plan and an Annual Budget for such subsequent Fiscal Year no later than ten (10) Business Days prior to the start of such subsequent year.  In the event of a deadlock on the approval by the Board of the Annual Budget relating to any given Fiscal Year, the Annual Budget approved for the preceding Fiscal Year will be deemed approved again and be implemented by the Board and the Management Team until such time as a new Annual Budget is approved by the Board.  For the avoidance of doubt, approval of an Annual Budget or Annual Business Plan will not be deemed an approval of the projected Capital Contributions or any specific Tower opportunities described therein.

**Section 4.08      Accounting Matters**.

(a)      The parties also agree that the Company will keep its books in accordance with the Accounting Standards and will prepare its consolidated Financial Statements in accordance with the Accounting Standards unless applicable Law requires any of the Company or its Company Subsidiaries to use a different accounting system.  The initial auditors of the Company will be mutually agreed upon by the Shareholders.  Each calendar year the Board must vote to appoint auditors for the Company.  In the event that the Board fails to agree on the auditors, the auditors that are presently serving as auditors for the Company will continue to serve as auditors.

(b)      The accounting records of the Company must be maintained by accountants to be mutually agreed upon by the Shareholders.  From the Effective Date through December 31, 2015, within fifteen (15) Business Days of the end of each month and commencing on January 1, 2016, within ten (10) Business Days of the end of each month, such accountants must provide a monthly report to the Board regarding the expenditures and cash flows of the Company as compared to planned operational expenses of the Company pursuant to Annual Budgets and Annual Business Plans.  The Company shall provide such accountants with all access, information assistance it may reasonably require to prepare such monthly reports.

**Section 4.09      Transferability of Governance Rights**.  In connection with the Transfer by any Shareholder of all of its Shares to any Person (a "**Transferee**") in accordance with <u>ARTICLE V</u>, the corporate governance rights of such Shareholder as set forth in this <u>ARTICLE IV</u> will be Transferred to the Transferee.

**ARTICLE V**
**PREEMPTIVE RIGHTS; RESTRICTIONS ON TRANSFER**

**Section 5.01      General Restrictions**.

EXHIBIT B

(a)     Neither the Initial A Shareholders nor the Initial B Shareholders may Transfer any Equity Interest in the Company during the Lock-up Period other than (i) to a Permitted Transferee, (ii) with the approval of the Board.  The Initial C Shareholder may Transfer some or all of its Equity Interests in the Company (A) to any Person other than a Prohibited Transferee at any time (including during the Lock-up Period) and (B) to a Prohibited Transferee upon the approval of the Board.  Both before and after the Lock-up Period, any Transfer of Equity Interests by a Shareholder shall be made in accordance with the provisions of this Agreement, including but not limited to the provisions set forth in this ARTICLE V.

(b)     A Shareholder desiring to make a Transfer, including a Permitted Transfer, shall give to the Company and the Board thirty (30) calendar days' prior written notice of such proposed Transfer; *provided*, *that*, with respect to the Initial C Shareholder, no such notice shall be required prior to a Transfer (i) to a wholly-owned Affiliate of the Initial C Shareholder's parent entity, Goldman, Sachs & Co. ("**GS**") or (ii) at the request or order of any Governmental Authority.  Any Transfer in violation of this Section 5.01 shall be ineffective.  As a condition of any Transfer, each transferee shall execute and deliver a counterpart to this Agreement and agree to be bound by the terms and conditions herein.  Notwithstanding any other provision of this Agreement, no Shareholder will be entitled to Transfer its Shares if such Transfer would violate any applicable Law.  In the event of a purported Transfer by a Shareholder of any Shares in violation of the provisions of this Agreement, such purported Transfer will be null and void, and the Company will not give effect to such Transfer.

(c)     Any Permitted Transferee who becomes a Shareholder pursuant to any Transfer of Shares from an Initial Shareholder shall for purposes of this Agreement be deemed an Initial Shareholder and shall succeed to the rights and obligations of the Initial Shareholder from whom the Shares were transferred; *provided that*, the transferor Shareholder shall remain liable for its obligations, if any, under this Agreement, the Subscription and Contribution Agreement, the Contribution Agreement and any other Transaction Document (as defined in the Subscription and Contribution Agreement) and such Permitted Transferee shall assume the transferor Shareholder's obligations under this Agreement, the Subscription and Contribution Agreement and any other Transaction Document, if any.

(d)     No Shareholder shall avoid the provisions of this Article V by making one or more Transfers to one or more Permitted Transferees and then disposing of all or any portion of such party's interest in any such Permitted Transferee or (ii) by allowing the Transfer of any securities of any entity holding (directly or indirectly) Equity Interests.  Notwithstanding the foregoing, the parties agree and acknowledge that Jorge Hernandez may transfer his shares in the Initial A Shareholders to a Permitted Transferee at any time and such transfer shall not constitute a violation of any provision of this Agreement.

**Section 5.02     Legends**.  In addition to any other legend that may be required by Law, each certificate for Shares will bear a legend in substantially the following form:  THE SHARES EVIDENCED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AS SET FORTH IN THE COMPANY'S ARTICLES OF ASSOCIATION.

**Section 5.03    Right of First Refusal**.

(a)    In the event that after expiration of the Lock-up Period, any Shareholder(s) (the "**Transferring Shareholder**") desire(s) to Transfer any Shares to any Person other than to a Permitted Transferee (a "**Third Party Purchaser**"), such Transferring Shareholder(s) shall offer to sell all (but not less than all) of the Shares proposed for Transfer to the Company and the other Shareholders (the "**Non-Transferring Shareholders**") by giving written notice of the same (the "**Sale Notice**") to the Company and the Non-Transferring Shareholders. The Sale Notice will disclose in reasonable detail the identity of the prospective transferee(s), the number and type of Shares to be Transferred and the terms and conditions of the proposed Transfer. The Transferring Shareholder(s) may not consummate any Transfer until the earlier of (A) ninety (90) days after the Sale Notice has been given to the Company and each Non-Transferring Shareholder and (B) the day on which the Transferring Shareholder(s) receive(s) written notice that neither the Company nor the Non-Transferring Shareholders elect to purchase all of the Shares specified in the Sale Notice pursuant to this <u>Section 5.03(a)</u> (the date of the first to occur of such events is referred to herein as the "**Authorization Date**"). The Company may elect to purchase some or all of the Shares to be transferred upon the same terms and conditions as those set forth in the Sale Notice by delivering a written notice of such election to the Transferring Shareholder(s) and each Non-Transferring Shareholder within twenty (20) days after the Sale Notice has been given to the Company. If the Company has elected not to purchase all of the Shares to be Transferred, each Non-Transferring Shareholder may elect to purchase all (but not less than all) of the Shares that the Company has elected not to purchase upon the same terms and conditions as those set forth in the Sale Notice by giving written notice of such election to the Transferring Shareholder(s) within twenty-five (25) days of the date that each Non-Transferring Shareholder received written notice from the Company of its election. If the Non-Transferring Shareholders elect to purchase the Shares to be Transferred, the Shares to be sold shall be allocated among the Non-Transferring Shareholders pro rata according to the relative Percentage Interests of the Non-Transferring Shareholders or as otherwise agreed by them. If the Non-Transferring Shareholders, acting together, do not elect to purchase all Shares to be Transferred, other than the Shares the Company has elected to purchase, the provisions of <u>Section 5.03(b)</u> will apply.

(b)    In the event that the Company or the Non-Transferring Shareholders, in the aggregate, shall have exercised their respective rights to purchase all, and not less than all, of the Shares proposed to be Transferred by the Transferring Shareholder(s) pursuant to this <u>Section 5.03(a),</u> then the Transferring Shareholder(s) shall sell such Shares to the Company and/or the Non-Transferring Shareholders, as applicable, and the Company and/or the Non-Transferring Shareholders, as applicable, shall purchase such Shares, within forty five (45) calendar days following the Authorization Date. The Company and each Shareholder shall take all actions as may be reasonably necessary to consummate the sale contemplated by this <u>Section 5.03(a)</u>, including, without limitation, entering into agreements and delivering certificates and instruments and consents as may be deemed necessary or appropriate. At the closing of any sale and purchase pursuant to this <u>Section 5.03(b)</u>, the Transferring Shareholder(s) shall deliver to the Company or the Non-Transferring Shareholders, as applicable, certificates (if any) representing the Shares to be sold, free and clear of any Encumbrances, accompanied by evidence of Transfer and stamps affixed, if necessary, and do all things necessary under applicable Law to properly effect the Transfer of the Shares to the Company and/or the Non-Transferring Shareholders, as

EXHIBIT B

applicable, against receipt of the purchase price therefor from the Company or the Non-Transferring Shareholders, as applicable, by certified or official bank check or by wire transfer of immediately available funds.

(c)     If the Company and the Non-Transferring Shareholders do not elect to purchase all of the Shares specified in the Sale Notice, the Transferring Shareholder(s) may Transfer the Shares specified in the Sale Notice at a price and on terms no more favorable to the transferee(s) thereof than specified in the Sale Notice during the ninety (90) calendar day period immediately following the Authorization Date.  Any Shares not Transferred within such ninety (90) calendar day period will be subject to the provisions of this ARTICLE V upon subsequent Transfer.

**Section 5.04      Sale of the Company**.

(a)     <u>Tower Transfer</u>.

(i)     During the Lock-up Period, the parties agree that:

(A)     all development and acquisitions of Towers in the LATAM TBS Subsidiaries and the Peruvian CT Subsidiaries shall cease and all Corporate Opportunities shall be undertaken exclusively by the Guatemalan CT Subsidiaries, the Salvadoran CT Subsidiaries, the Nicaraguan CT Subsidiaries, the Honduran CT Subsidiaries, the Costa Rican CT Subsidiaries, the Panamanian CT Subsidiaries, the Colombian TBS Subsidiary and Peruvian TBS Subsidiary;

(B)     the Company shall use commercially reasonable efforts to assign, or ensure that the relevant Company Subsidiary assigns, all Towers from (y) the LATAM TBS Subsidiaries to the Guatemalan CT Subsidiaries, the Salvadoran CT Subsidiaries and the Panamanian Subsidiaries, as applicable and (z) the Peruvian CT Subsidiaries to the Peruvian TBS Subsidiary.

(ii)     The parties further agree that, at the request of the Initial B Shareholders based on a good faith determination and advice from local counsel, the CT Subsidiaries and the TBS Subsidiaries in which development and acquisition of Towers will cease and in which Corporate Opportunities will be undertaken pursuant to <u>Section 5.04(a)(i)</u> will be adjusted and this <u>Section 5.04(a)(ii)</u> revised, as required to (A) more readily facilitate the assignment of assets and an Approved Sale and (B) reflect the intention of the parties to maximize the Towers that may be assigned to the Investor Group (as defined below) and minimize the Towers remaining in the Terra Group (as defined below).

(iii)     For the purposes of this <u>Section 5.04</u> the assignment of any Towers shall include the assignment of any Permits, Leases, Tower Space Licenses and other assets associated with such Tower, to the extent (A) such assignment is not prohibited by the terms of such Permits, Leases or Tower Space Licenses or applicable Law and (B) if the consent of a third party is required to permit such assignment, such consent has been obtained.

(b)     <u>Approved Sale</u>.  Following the earlier of (i) the expiration of the Lock-Up Period, (ii) the transfer by Jorge Hernandez of his shares in either of the Initial A Shareholders to any

**EXHIBIT B**

Person other than a Permitted Transferee or (iii) such time, if any, as Jorge Hernandez dies or becomes permanently disabled and (x) prior to such time the Initial A Shareholders has not proposed, and the Board has not accepted, a succession plan or (y) the other Initial Shareholders are unable to come to an agreement with his heirs and/or the Company's Management Team regarding the continued operation of the Company, then within ninety (90) calendar days of such event,(A) either the Initial A Shareholders or the Initial B Shareholders in the case of sub-section (i) or (B) the Initial B Shareholder in the case of sub-section (ii) – (iii) (such shareholders, the "**Proposing Shareholders**") may request, upon written notice to the other Initial Shareholders and the Company (the "**Proposed Sale Notice**"), a sale of all or substantially all of the Company's assets or all or substantially all of the Shares in the Company (in one or more transactions) to an unaffiliated Third Party Purchaser (an "**Approved Sale**").

       (i)      If the Proposing Shareholders have already procured or received an offer from an unaffiliated Third Party Purchaser to purchase the assets or Shares of the Company (a "**Proposed Offer**"), the Proposed Sale Notice shall disclose in reasonable detail the identity of the prospective purchaser and the proposed terms and conditions of the Proposed Offer. The Initial A Shareholders or the Initial B Shareholders, as applicable, (the "**Objecting Shareholders**") may reject such Proposed Offer within thirty (30) calendar days of delivery of the Proposed Sale Notice by providing the Company with an opinion from an independent and reputable investment bank with experience in the industry and a cross-border practice (an "**Investment Bank**"), retained at the sole expense of the Objecting Shareholders, stating that the value of the proposed transaction is materially less than comparable transactions in the industry and the Territory; *provided that*, if such opinion is provided, the provisions of Section 5.04(b)(ii) shall apply. In the event that no such opinion is provided by the expiration of such 30 day period, each Shareholder shall vote for, consent to and raise no objections against such Approved Sale and take all necessary and reasonable actions in connection with the consummation of the Approved Sale as requested by the Proposing Shareholders.

       (ii)     If the Proposing Shareholders have not already procured an offer from an unaffiliated Third Party Purchaser or if an opinion has been provided by an Objecting Shareholder pursuant to Section 5.04(b)(i), the Company shall, within thirty (30) calendar days of receipt of a Proposed Sale Notice, retain an Investment Bank to facilitate an Approved Sale and each Shareholder shall vote for, consent to and raise no objections against such Approved Sale and take all necessary and reasonable actions in connection with the consummation of the Approved Sale as requested by the Proposing Shareholders. In the event that the consideration to be received for the Shares or assets of the Company upon the consummation of such Approved Sale is less than the Proposed Offer provided by the Third Party Purchaser pursuant to Section 5.04(b)(i), the difference between the amount of the Proposed Offer and the purchase price of the Approved Sale shall be deducted from the proceeds otherwise due to the Objecting Shareholders.

       (iii)    In connection with the Approved Sale, the Company Subsidiaries shall be divided into two groups (the "**Terra Group**" and the "**Investor Group**"): (A) the Investor Group shall include all assets as well as all issued and outstanding shares of the Guatemalan CT Subsidiaries, the Salvadoran CT Subsidiaries, the Panamanian CT Subsidiaries, the Honduran CT Companies, the Costa Rican CT Companies, the

Nicaraguan CT Subsidiaries, the Peruvian TBS Subsidiary and the Colombian TBS Subsidiary (the "**Investor Group Companies**"); and (B) the Terra Group shall include all assets as well as all issued and outstanding shares of the LATAM TBS Subsidiaries and the Peruvian CT Subsidiaries (the "**Terra Group Companies**").

(iv)     The Company shall sell or cause to be sold all issued and outstanding equity interests in, or assets of, the Investor Group Companies to the Third Party Purchaser and the proceeds of such sale shall be distributed among the Shareholders in accordance with their respective Percentage Interests, subject to the conditions set forth in Section 5.04(b)(ii) and Section 5.04(b)(iv)(B) and Section 5.04(b)(iv)(D) and transfer or cause to be transferred all of the issued and outstanding equity interests in the Terra Group Companies to the Initial A Shareholders (or their designees).  The Shareholders agree that the Approved Sale shall be subject to the following additional conditions:

(A)     the names of the Investor Group Companies shall be changed, within sixty (60) calendar days following the date of the closing of the transactions contemplated by the Approved Sale, to any other name that does not include the words "continental towers" or "collocation technologies" or any variation thereof and that the Investor Group Companies shall thereafter cease use of the name "continental towers" or "collocation technologies";

(B)     the cash proceeds distributed to the Initial A Shareholders (or their Permitted Transferees) from the Approved Sale shall be reduced by the value of: (w) any Towers owned by the Terra Group Companies upon the closing of the transaction contemplated by the Approved Sale, with the value of such Towers calculated based on Tower Cash Flow for such Towers as of immediately prior to the closing of such transaction and the multiple of Tower Cash Flow implied by the final purchase price of the transactions contemplated by the Approved Sale; (x) any Unfunded Towers pursuant to the terms of Section 6.11(c)(i); (y) any Rejected Colombia Towers pursuant to the terms of Section 6.11(c)(ii); and (z) any Deducted Sites pursuant to the terms of Section 5.06 of the Subscription and Contribution Agreement;

(C)     no Shareholder shall be required to transfer or sell any of its Shares if the consideration for the Approved Sale is other than cash or registered securities listed on an established U.S. or foreign securities exchange or traded on the NASDAQ National Market or foreign established over-the-counter trading system.  The consideration to be received by each Shareholder shall be the same form and amount of consideration per Share.  No Shareholder shall be liable (as a result of post-closing indemnification obligations or otherwise) for amounts greater than the amount received by such Shareholder in connection with such Approved Sale, all representations and warranties shall be made severally and not jointly and any indemnification obligation shall be pro rata based on the Percentage Interests of the Shareholders.  No Shareholder shall be subject to post-sale restrictive covenants; and

(D)     each Shareholder shall bear its pro rata allocation (based upon the proceeds to be received) of the costs of any sale of Shares pursuant to an Approved Sale to the extent such costs are incurred for the benefit of all Shareholders and are not otherwise paid by the Company or the acquiring party. Costs incurred by Shareholders on their own behalf shall not be considered costs of the transaction hereunder.

(v)     In the event that any proposed Approved Sale is not consummated, for any reason or no reason, both the Initial A Shareholders and the Initial B Shareholders shall retain the right to request an Approved Sale in the future pursuant to the terms of this Section 5.04(b).

**Section 5.05**     **Preemptive Rights**.

(a)     Except for the issuance of the Shares referenced in Section 3.02 above, if the Company authorizes the issuance of any Shares or other Equity Interests in the Company or any of the Company Subsidiaries, the Company shall, or shall (to the extent that it is able to do so under applicable Law) cause such Company Subsidiary to, first offer to issue to each Initial Shareholder a portion of such Shares or other Equity Interests equal to the quotient determined by dividing (1) the number of Shares held by such Initial Shareholder by (2) the total number of issued Shares. Each such Initial Shareholder shall be entitled to purchase such Shares or other Equity Interests at the same price and on the same terms as such Shares or Equity Interests are to be offered to others.

(b)     In order to exercise its preemptive rights pursuant to this Section 5.05, a Shareholder must, no later than fifteen (15) Business Days after receipt of a written notice from the Company describing in reasonable detail the Shares or other Equity Interests being offered, the purchase price thereof, the payment terms and the such Shareholder's percentage entitlement to the Shares or other Equity Interests being offered, deliver a written notice to the Company stating the number of Shares or other Equity Interests that it wishes to purchase or that it does not wish to purchase any Shares or other Equity Interests.

(c)     Upon the expiration of the offering period described above, the Company or any relevant Company Subsidiary shall be entitled to issue such Shares or other Equity Interests which the Shareholders have not elected to purchase during the one hundred eighty (180) days following such expiration on terms and conditions no more favorable to the purchasers thereof than those offered to the Shareholders. Any Shares or other Equity Interests proposed to be offered or sold by the Company or any of the Company Subsidiaries after such one hundred eighty (180) day period must be reoffered to the Shareholders pursuant to the terms of this Section 5.05.

(d)     Any Initial Shareholder may assign its rights under this Section 5.05, in whole or in part, to any of its Affiliates, any of its limited partners and/or any institutional investor.

(e)     Each Share issued to:

(i)     an A Shareholder under this Section 5.05 shall be a Class A Share;

(ii)     a B Shareholder under this Section 5.05 shall be a Class B Share; and

(iii)     a C Shareholder under this Section 5.05 shall be a Class C Share.

**Section 5.06     Tag Along Rights**.

(a)     In the event that, after expiration of the Lock-up Period and other than pursuant to Section 5.04(b), one or more Shareholder(s) desires to Transfer for value to a Third Party Purchaser Shares representing at least (fifty) 50% of the Equity Interests in the Company (including all Equity Interests previously Transferred by such Shareholder(s) to such Third Party Purchaser), following the actions required by Section 5.03(a), that Shareholder or those Shareholders shall give to the Company and each other Shareholder at least ninety (90) calendar days' advance written notice (a "**Tag-Along Notice**") of such proposed Transfer.  The Tag-Along Notice shall:

(i)     state the number of Shares proposed to be Transferred, the proposed transferee, the purchase price, and the other material purchase terms including the time and place for consummation (the "**Tag-Along Closing**"); and

(ii)     state that each other Shareholder (a "**Tag-Along Shareholder**") shall have the right, if permitted by Law, to participate in such Transfer by Transferring its Tag-Along Pro Rata Amount (as hereinafter defined) of Shares on the purchase terms set forth in the Tag-Along Notice.

(b)     For a period of thirty (30) calendar days after the provision of the Tag-Along Notice, if permitted by Law, each Tag-Along Shareholder shall have the right to elect to sell at the Tag-Along Closing up to such Shareholder's Tag-Along Pro Rata Amount to the proposed transferee (a "**Tag-Along Right**") exercisable by giving written notice to the Transferring Shareholder(s) and the Company (a "**Tag-Along Participation Notice**").  The offer of a Tag-Along Shareholder set forth in a Tag-Along Participation Notice shall be irrevocable, and, to the extent such offer is accepted, such Tag-Along Shareholder shall be bound and obligated to sell in the proposed sale on the terms and conditions set forth in this Section 5.06.

(c)     For purposes of this Agreement, a Shareholder's "**Tag-Along Pro Rata Amount**" with respect to the Shares owned by such Shareholder shall be equal to (i) the total number of Shares owned by such Shareholder, multiplied by (ii) a fraction, the numerator of which is the aggregate number of Shares which the Transferring Shareholder(s) propose(s) to Transfer and the denominator of which is the aggregate number of Shares owned of record by the Transferring Shareholder(s).  At the Tag-Along Closing, the Shareholders desiring to exercise their Tag-Along Rights hereunder and who have properly given notice thereof shall be required to participate in the closing of any such Transfer on the purchase terms set forth in the Tag Along Notice, including making any deliveries in connection with the sale of their Shares provided therein.

(d)     The Transferring Shareholder(s) shall use commercially reasonable efforts to include in the proposed sale to the proposed transferee all of the Shares that the Tag-Along Shareholder(s) have requested to have included pursuant to the applicable Tag-Along

Participation Notices, it being understood that the proposed transferee shall not be required to purchase Shares in excess of the number set forth in the Tag-Along Notice. In the event the proposed transferee elects to purchase less than all of the Shares sought to be sold by the Tag-Along Shareholder(s), the number of Shares to be sold to the proposed transferee by the Transferring Shareholder(s) and each Tag-Along Shareholder shall be reduced so that each such Shareholder is entitled to sell its pro rata portion of the number of Shares the proposed transferee elects to purchase (which in no event may be less than the number of Shares set forth in the Tag-Along Notice).

(e)     If, following the delivery of a Tag-Along Participation Notice and prior to a Tag-Along Closing, the terms of the proposed Transfer as set forth in the Tag-Along Notice are amended in a manner that materially affects the transaction with respect to a Tag-Along Shareholder or such Transfer is not closed within thirty (30) calendar days of the Tag-Along Closing date set out in the Tag-Along Notice, any previously delivered Tag-Along Participation Notice shall be deemed void and the Transferring Shareholder(s) shall repeat the process set forth in this Section 5.06 prior to completing the proposed Transfer.

(f)     If a Tag-Along Shareholder breaches its obligations in connection with a Tag-Along Closing, or in the event that any representation or warranty of the Tag-Along Shareholder given in any agreement executed and delivered in connection with the proposed Transfer is not true and correct as of the date made or as of the proposed closing date, or if such Tag-Along Shareholder shall breach or fail to perform any covenant, agreement or obligation contained in any document executed in connection with the Tag-Along Closing, and if such misrepresentation, breach or failure to perform results in the nonsatisfaction of a condition precedent to such Tag-Along Closing (which is not waived by the transferee), the Transferring Shareholder(s) shall be free to sell its/their Shares to the Third Party Purchaser and such Transfer shall not limit or waive in any respect any claim, right or cause of action that the Company, the Shareholder(s) or the Third Party Purchaser may have against such Tag-Along Shareholder in respect of such misrepresentation, breach or failure to perform.

**Section 5.07     Conversion of Shares**. Where a Share is Transferred to a Shareholder in accordance with this Agreement and that Share is of a different class to the Shares held by that Shareholder, that Share will, immediately before the Transfer is recorded in the Company's register of shareholders, be automatically converted to a Share of the class held by that Shareholder.

## ARTICLE VI
## COVENANTS

**Section 6.01     Financial Statements and Information**.

(a)     The Company shall:

(i)     prepare and deliver to each Shareholder (A) Interim Quarterly Financial Statements for each Fiscal Quarter within forty-five (45) calendar days of the end of each Fiscal Quarter with the first Interim Quarterly Financial Statement to be delivered within forty-five (45) calendar days following December 31, 2015; (B) Interim Annual Financial

Statements within forty-five (45) calendar days of the end of each Fiscal Year with the first Interim Annual Financial Statement to be delivered within forty-five (45) calendar days following December 31, 2015; (C) a General Ledger Trial Balance to be delivered within sixty (60) calendar days of the end of each Fiscal Year, with the first General Ledger Trial Balance to be delivered within sixty (60) calendar days following December 31, 2015, and (D) Financial Statements within one hundred and twenty (120) calendar days of the end of each fiscal year with the first annual Financial Statement to be delivered one hundred and twenty (120) calendar days following December 31, 2015;

(ii)     promptly inform the Shareholders of any Governmental Order or the Company's notice of any pending investigation or action by any Governmental Authority involving the Company, including, but not limited to, any investigations relating to compliance with Law; and

(iii)    provide any Shareholder with information as may reasonably be required to allow such Shareholder to comply with reporting obligations to its investors or any Governmental Authority.

**Section 6.02     Access to Information**.  From and after the Effective Date, the Company and each of the Company Subsidiaries will provide and/or will permit Representatives (as defined below) of the Initial A Shareholders and the Initial B Shareholders, at the Company's expense and upon reasonable notice, to obtain (including, without limitation, by providing access to relevant premises and full audit rights) all documents and other information in the possession of the Company and any Company Subsidiary as may reasonably be requested by the Initial A Shareholders or Initial B Shareholders in order to enable such Shareholders to monitor their investment in the Company, monitor and comply with their obligations under applicable regulatory regimes and exercise its rights under this Agreement; *provided*, *however* that any release of Confidential Information will be subject to the provisions of Section 6.03 and the approval of the Board.  The Company will maintain, at its expense, an online data room to store all information reasonably requested by the Initial A Shareholders and the Initial B Shareholders. The Initial B Shareholders shall provide the Initial C Shareholder with all documents and information provided by the Company and its Subsidiaries to the Initial B Shareholders and/or the Directors appointed by the Initial B Shareholders, including, without limitation, Board reports and customary Tower-level information such as the Company's Tower master file; *provided*, *that* certain personally identifiable information or other information relating to the Company's operations that could reasonably be expected to facilitate a third party's attempt to compete directly with the interests of the Company (including without limitation, status of and techniques for the negotiation of certain ground leases and Municipal Agreements) and the identity of landlords under Leases, contacts of the Company, its Affiliates and Related Entities with municipalities, Governmental Authorities or other public authorities and external advisors (collectively, the "**Strategic Business Information**") may be redacted from the information provided to the Initial C Shareholder, *provided, that* the Initial A Shareholders and the Initial B Shareholders shall use their commercially reasonable good faith efforts to include supplementary or aggregated information reflecting the Strategic Business Information so redacted and *provided*, *further*, that nothing herein shall limit the provision of information pursuant to Section 6.01.

**Section 6.03    Confidential Information**.

(a)    Nondisclosure of Confidential Information.  During the term of this Agreement, each Shareholder (the "**Receiving Party**") agrees that it will not disclose any Confidential Information disclosed to it by another Shareholder or the Company (the "**Disclosing Party**") to any Person (other than its Representatives to whom disclosure is required), *provided, that* each Shareholder agrees that it will not be a breach of this Section 6.03(a) for the Initial Shareholders to disclose Confidential Information to an unrelated third party (i) with the consent of the Disclosing Party; or (ii) in connection with a bona fide intent to Transfer Shares pursuant to the terms of Article V or in connection with an Approved Sale pursuant to Section 5.04(b); *provided further that* in either such case, such third party is bound by a nondisclosure agreement with terms at least as restrictive as those in this Section 6.03.  For the avoidance of doubt, a Receiving Party may disclose Confidential Information to its Affiliates, officers, directors, lenders, employees, investors, professional advisers and consultants (the "**Representatives**"), *provided, that* the Receiving Party shall be responsible for any breach of this Section 6.03(a) by its Representatives.  The term "**Confidential Information**" means, with respect to a Shareholder, an Affiliate of a Shareholder, the Company or any Company Subsidiary, trade secrets, proprietary information, information concerning business plans, business processes, know-how, operating practices and methods, material terms of commercial agreements, expansion plans, strategic plans and marketing plans, that the Disclosing Party treats as confidential and which were disclosed to the Receiving Party by the Disclosing Party as a result of this Agreement or the Subscription and Contribution Agreement; *provided, that* Confidential Information shall not include any information that (A) is or becomes generally available to the public (other than as a result of a disclosure by the Receiving Party or its Representatives in breach of this Section 6.03(a)), (B) is or becomes available to the Receiving Party or its Representatives on a non-confidential basis from a third-party source that is not and was not prohibited from disclosing such Confidential Information, (C) the Receiving Party or its Representatives is required or requested, pursuant to Law, regulation, legal process or regulatory authority to disclose, (D) is developed independently by the Receiving Party or its Representatives and is not based on or derived from Confidential Information previously disclosed by the Disclosing Party, or (E) is known to the Receiving Party or its Representatives prior to its disclosure by the Disclosing Party.  For the avoidance of doubt, any disclosure of the existence and general terms of this Agreement, the Subscription and Contribution Agreement, the Contribution Agreement, the Development Agreement, the DT Side Letter or the EPC Contracts or the fact that the Company and the Company Subsidiaries develop, own, acquire and operate Towers in the Territory shall not be considered a breach of this Section 6.03(a).

(b)    Remedies/Liquidated Damages.

(i)    Each Shareholder acknowledges that the Confidential Information has unusual and extraordinary value, and that a breach by such Shareholder of its obligations under Section 6.03(a) (as such, a "**Breaching Shareholder**") will cause the Disclosing Party great and irreparable harm, for which remedies available at law are inadequate. Therefore, without the necessity of proving actual damages or posting any bond, the Disclosing Party shall be entitled to injunctive and other equitable relief, including, but not limited to, specific performance, to prevent a breach, continued breach or threatened

breach of Section 6.03(a).  No remedy or election in this Section 6.03 shall be deemed exclusive but shall be cumulative with all other remedies available at law or in equity.

(ii)    Any Breaching Shareholder will (and each Shareholder hereby agrees, if found a Breaching Shareholder by a court of competent jurisdiction to) pay Disclosing Party liquidated damages in the amount of One Million United States Dollars ($1,000,000) for such breach of its obligations under Section 6.03(a).  The amount of such liquidated damages is agreed by the Parties as a reasonable amount to compensate Disclosing Party for losses incurred in the event of breach of Section 6.03(a).

**Section 6.04    Use of Name**.  None of the Company, the Company Subsidiaries, the Shareholders or their respective Affiliates or Related Entities shall use the name of any other Shareholder or its Affiliates or Related Entities in any press release, published notice or other publication without such Shareholder's prior written approval.  For the avoidance of doubt, the Company, the Company Subsidiaries, the Shareholders or their respective Affiliates or Related Entities shall not, without the Shareholder's prior written consent in each case, (i) use in advertising, publicity or otherwise the name of such Shareholder or its Affiliates or Related Entities or (ii) represent directly or indirectly, that any product or any service provided by the Company, the Company Subsidiaries, the Shareholders or their respective Affiliates or Related Entities has been approved or endorsed by the Shareholder or its Affiliates.

**Section 6.05    Credit Facility**.  The Shareholders agree to use commercially reasonable efforts to assist the Company in obtaining any credit facilities as the Board determines are required to facilitate the growth of the Company (the "**Credit Facilities**").  If, in connection with such Credit Facilities, a lender requires that all or substantially all Shareholders pledge or charge their Shares as security for the repayment of such funds, then all Shareholders shall, and each does hereby agree to, execute the form of pledge or charge agreement approved by the Board, acting in good faith, *provided however* that in no event shall a Shareholder be required to execute a form of pledge or charge agreement that provides for any liability to such Shareholder other than (i) the loss of such Shareholder's actual Shares, (ii) customary miscellaneous costs and expenses, including costs and expenses associated with executing upon such pledge or charge agreement, and (iii) any liability associated with misrepresentations by such Shareholder regarding its own Shares.

**Section 6.06    Corporate Opportunities**.  Neither the Initial A Shareholders, the Initial B Shareholders, nor any of their respective Affiliates or Related Entities may collectively, individually, or through any other Person (whether as an officer, director, manager, member, owner, employee, partner, consultant, lessor, holder of equity or debt investment, lender, agent, or in any other manner or capacity) engage in, participate in or invest in any telecom infrastructure transaction, investment or business opportunity (including without limitation the development and acquisition of Towers, fiber and small cells, but excluding the management of Towers and related assets on behalf of telecommunications operators, provided the Company receives a management fee on the same terms as set forth in Section 6.06(b) and that such management opportunity would not have otherwise been available to the Company or the Company Subsidiaries) that is or will be located primarily in any jurisdiction in the Territory (as such term is defined at the time of such engagement, participation or investment), unless such Shareholder (or such Shareholder's Affiliate or Related Entity) has first presented such

opportunity to the Company (each such business opportunity hereinafter referred to as a "**Corporate Opportunity**") subject to the following terms and conditions:

(a)       Participation by the Company in any Corporate Opportunity shall require the approval of the Board in accordance with <u>Section 4.04(a)</u>.  Any Corporate Opportunity shall be referred promptly to the Board by the Shareholder contemplating participation in such Corporate Opportunity (the "**Referring Shareholder**") and the Board shall consider the Corporate Opportunity within no more than fifteen (15) Business Days after the Corporate Opportunity is referred to it, or, if there are deadlines imposed by the Corporate Opportunity, sufficiently in advance of their expiration to enable the Company to pursue the Corporate Opportunity or, in the alternative, to enable the Referring Shareholder and its respective Affiliates to pursue the Corporate Opportunity, in the event the Corporate Opportunity is not approved by the Board. Upon approval of such Corporate Opportunity by the Board, all Shareholders shall be required to fund the Company's participation in such Corporate Opportunity pro rata in accordance with their respective Percentage Interests and shall be entitled to share in the profits derived from the Company's participation in such Corporate Opportunity pro rata in accordance with their respective Percentage Interests, in accordance to <u>Section 3.02(d)</u> of this Agreement.

(b)       The parties acknowledge and agree that neither (i) the ongoing processes to acquire Towers and other assets from Entel in Chile and Peru and from Telefonica in Peru and Colombia by the CT Contributing A Shareholder through any of its Affiliates or Related Entities as previously disclosed to the Initial B Shareholders nor (ii) the management and operation in the ordinary course of business of telecommunications infrastructure and related assets owned by the Initial A Shareholders, their Affiliates and Related Entities as of the Effective Date, shall be deemed a Corporate Opportunity.  Each other Shareholder consents to the continued involvement of the Initial A Shareholders (or any of their Affiliates or Related Entities) in such business opportunities for themselves, provided, however, the parties agree that (A) the Company shall charge a management fee in an amount not to exceed three (3) times the aggregate cost of managing the assets associated with each such business opportunity as invoiced by DTH, and (B) the Initial B Shareholders may require the Initial A Shareholders or their Affiliates or Related Entities, as applicable, to contribute all or part of their Equity Interests in such business opportunity to the Company, to the extent permissible, so long as the Non-Managing Shareholders make a Capital Contribution in cash to the Company in an amount equal to the value of the equity interest contributed to the Company by the Initial A Shareholders as determined by the Board.

(c)       In the event the Board does not approve the Company's participation in a Corporate Opportunity as contemplated by <u>Section 6.06(a)</u> or any Shareholder (other than the Referring Shareholder) is unable to fund its pro rata share based on its respective Percentage Interest of the Company's participation in such Corporate Opportunity, the Referring Shareholder and its Affiliates or Related Entities shall have the right to pursue such Corporate Opportunity on its own behalf separate from its interest in the Company (each such Corporate Opportunity, hereinafter referred to as a "**Rejected Corporate Opportunity**").  In the event that participation in a Rejected Corporate Opportunity by an Initial A Shareholder or any of such Initial A Shareholder's Affiliates or Related Entities is subject to the rights granted by a Municipal Agreement, such Initial A Shareholder will present a proposal to the Board as to how the Company or the applicable Company Subsidiary may (i) partially assign such Municipal

Agreement or (ii) otherwise grant a right of use regarding such Municipal Agreement to such Initial A Shareholders or any of its Affiliates or Related Entities. Upon approval by the Board, the Company shall authorize the applicable Company Subsidiary to partially assign the Municipal Agreement to such Initial A Shareholder or any of its Affiliates or Related Entities. For the avoidance of doubt, nothing in this Section 6.06(c) shall require the Company or any Company Subsidiary to (i) assign all or any part of a Municipal Agreement to the extent such assignment (A) would materially affect the ability of the Company or any Company Subsidiary to own and operate its Towers, either at the moment of such assignment or at any point in the future, (B) would materially affect the value of the assets or equity of the Company or any Company Subsidiary upon a sale to a Third Party Purchaser, or (C) is prohibited by the terms of such Municipal Agreement, including where assignment is prohibited without the consent of a third party; (ii) assign any Towers, permits, licenses or other assets owned by the Company or any Company Subsidiary or (iii) take any action in violation of applicable Law. The Initial Shareholders agree that any such assignment or grant of right of use will not require the payment of any consideration by the relevant Initial A Shareholder; *provided, that*, the relevant Initial A Shareholder shall be responsible for all expenses incurred by the Company or any Company Subsidiary in connection with such assignment, including, but not limited to, reasonable attorneys' fees.

(d)     The parties acknowledge and agree that the Company shall have no interest or expectation in any Rejected Corporate Opportunity, and no Director, Shareholder nor any Affiliate or Related Entity of such Director or Shareholder, to the fullest extent permitted by law, shall be liable to the Company or any of its Affiliates or Shareholders for breach of any duty (fiduciary or otherwise) as a Director, Shareholder or Affiliate or Related Entity of a Director or Shareholder by reason of the fact that any such Director, Shareholder, Affiliate or Related Entity acquires, creates, develops or seeks such Rejected Corporate Opportunity for itself or directs such Rejected Corporate Opportunity to another Person or entity. The Company and each Shareholder, to the fullest extent permitted by Law, waives and renounces any claims that any Rejected Corporate Opportunity constitutes a Corporate Opportunity of the Company. The provisions of this Agreement, to the extent that they restrict the duties (including fiduciary duties) and liabilities of a Director or Shareholder otherwise existing at law or in equity or by operation of this Section 6.06, are agreed by the Shareholders to replace such duties and liabilities of such Director or Shareholder.

**Section 6.07     New Markets**. As of the Effective Date, the scope of the Company's operations is confined to the Territory (any jurisdiction outside of the Territory, as defined on the Effective Date, hereinafter referred to as a "**New Market**"). The parties acknowledge and agree that each Initial Shareholder shall have the right (either itself, or through its Affiliates, Subsidiaries or Related Entities) to pursue any business opportunity in any New Market on its own behalf separate from its interest in the Company. For the avoidance of doubt, the Initial Shareholders are under no obligation to pursue any business opportunities in a New Market with the Company; however, they may refer any such business opportunities for participation by the Company to the Board and the participation of the Company in any such business opportunity must be approved in accordance with Section 4.04(a). In the event the Board approves entry by the Company into any New Market in which either or both of the Initial A Shareholders or any of their Affiliates or Related Entities are already present, the Non-Managing Shareholders, either directly or through the Company, as agreed by the parties, will reimburse the Initial A

Shareholders or such Affiliate or Related Entity, as applicable, for the Non-Managing Shareholders' proportionate share of reasonable and documented expenses incurred by the Initial A Shareholders in connection with their entry into the New Market; *provided, that*, prior to the Board's approval of the Company's entrance into such New Market, the Initial A Shareholders (i) informed the Board (including all Directors appointed by the Initial B Shareholders) of (A) the fact that they (or any of their Affiliates or Related Entities) were already present in such New Market; (B) the exact amount of all expenses incurred by them (or any of its Affiliates or Related Entities) in connection with their entry into such New Market for which they would seek reimbursement from the Non-Managing Shareholders or the Company; and (C) all of the Initial A Shareholders' equity interests and/or Tower assets (and any related liabilities) in such New Market (other than any information related to such assets which is subject to an applicable non-disclosure, confidentiality or similar agreement); and (ii) has agreed to contribute to the Company or any Company Subsidiary such equity interests and/or Tower assets as may have been agreed with the Board in consideration of such reimbursement. The parties acknowledge that as of the Effective Date, the expenses incurred by the CT Contributing A Shareholder in connection with its market entry into Mexico are equal to Five Million United States Dollars ($5,000,000) and that the expenses incurred by the CT Contributing A Shareholder in connection with its market entry into the Dominican Republic are equal to One Million United States Dollars ($1,000,000).

**Section 6.08     No Competition**.

(a)     Notwithstanding the provisions of <u>Section 6.06</u>, the Initial B Shareholders hereby agree that they will not, either directly or indirectly:

(i)     during the time either owns Equity Interests in the Company, make any equity investments in any other Person that engages in the development, ownership, acquisition and operation of Towers in the Territory (as defined at the time of any such equity investment); and

(ii)     for a period of one (1) year following termination of this Agreement, make any equity investments in any other Person that as a primary business model engages in the development, ownership, acquisition and operation of Towers in the Territory (as defined at the time of any such equity investment) through the use of municipal agreements that grant the right of use of public spaces to any other Person in exchange for multipurpose poles that incorporate security cameras and lighting devices as part of a municipal or government security program; *provided that* (A) the Agreement was terminated as a result of an Approved Sale proposed by the Initial B Shareholders, (B) the closing of the transactions contemplated by the Approved Sale occurred within six months following the Board's receipt of the Proposed Sale Notice, and (C) both the Initial A Shareholders and the Initial B Shareholders have used commercially reasonable efforts to effect the consummation of the Approved Sale within such six month period.

(b)     For the avoidance of doubt, the limitations in this <u>Section 6.8</u> shall not apply to any equity investments by the Initial B Shareholders in GTSL and its Subsidiaries.

**EXHIBIT B**

**Section 6.09    Non-Solicitation**.   In light of each party's access to Confidential Information, each of the Initial A Shareholders, the Initial B Shareholders and the Private Capital Investing and Specialty Lending Group Desks of the Americas Goldman Sachs Special Situations Group within GS ("**GS Deal Teams**") agrees that, throughout the term of this Agreement and for a period of one (1) year following the earlier of (a) with respect to each party, the Transfer of all Shares held by such party in accordance with the provisions of this Agreement or (b) the termination of this Agreement for any reason (the "**Restricted Period**"), such party shall not, (i) directly, in the case of the GS Deal Teams or (ii) directly or indirectly through one or more of any of its Affiliates, in the case of the Initial A Shareholders or the Initial B Shareholders, hire or solicit, or encourage any other Person to hire or solicit, any individual who is or was employed by any other party or its Affiliates, whether such individual is or was engaged by such other party or its Affiliates as an employee, independent contractor, partner, or in any other capacity.   This Section 6.09 shall not prevent a party from hiring or soliciting any employee or former employee of another party who responds to a general solicitation that is a public solicitation of prospective employees and not directed specifically to any employee.   This Section 6.09 shall survive the expiration or termination of this Agreement.

**Section 6.10    Transfacil Offset**

(a)    On or prior to the Effective Date, Desarollos Terrestres, Inc., a company limited by shares organized under the laws of the British Virgin Islands ("**DTI**") will sell to CT Holding, and CT Holding will acquire from DTI, fiber assets and poles with an aggregate book value of Seven Million Two Hundred Thousand United States Dollars ($7,200,000) (the "**Transferred Fiber Assets**").   The parties agree and acknowledge that, pursuant to that certain Off-Set Agreement, dated April 30, 2015, by and among DTI, Transfacil Pagos de Centroamérica S.A., a company organized under the laws of the Republic of Panamá ("**Transfacil Panamá**") and CT Holding (the "**Offset Agreement**"), CT Holding has assigned to DTI, as payment for the Transferred Fiber Assets, CT Holding's right to receive certain payments from Transfacil Panamá pursuant to the terms of that certain Master Lease Agreement, dated October 21, 2010, by and between Transfacil Pagos de Centroamérica, Sociedad Anónima, a company organized under the laws of the Republic of Guatemala ("**Transfacil Guatemala**") and Collocation Technologies, Sociedad Anónima, a company organized under the laws of the Republic of Guatemala; as assigned on March 8, 2012 to Transfacil Panamá and to CT Holding pursuant to the terms of that certain "Cesión de Contrato de Arrendamiento de Espacio en Postes Multiusos para la Instalación y Ubicación de Equipos de Comunicaciones (the "**Transfacil Agreement**").

(b)    In accordance with the terms of the Off-Set Agreement, (i) prior to the Effective Date, Transfacil Panamá will have made a payment on behalf of CT Holding to DTI in the amount of One Million Eight Hundred Thousand United States Dollars ($1,800,000) (the "**Guaranteed Annual Amount**") and (ii) for the three (3) years following the Effective Date (the "**Payment Period**"), Transfacil Panamá will make a payment equal to the Guaranteed Annual Amount each year to DTI on behalf of CT Holding.   Each annual payment contemplated by Section 6.10(b) shall be made within (ninety) 90 calendar days of January 1st of such year. For the avoidance of doubt, (x) during the Payment Period all annual amounts due to CT Holding by Transfacil Panamá pursuant to the Transfacil Agreement that are in excess of the Guaranteed Annual Amount shall continue to be paid by Transfacil Panamá to CT Holding and (y) following

the Payment Period, Transfacil Panamá will make no further payments to DTI on behalf of CT Holding.

(c)     If, during the Payment Period, Transfacil Panamá fails to make any of the annual payments contemplated by <u>Section 6.10(b)(ii)</u>, in whole or in part, the Initial A Shareholders shall pay to CT Holding the difference between the Guaranteed Annual Amount and the actual amount, if any, paid by Transfacil Panamá to DTI on behalf of CT Holding in such year.  If, in the fourth and fifth years following the Effective Date, Transfacil Panamá fails to pay at least the Guaranteed Annual Amount per year to CT Holding pursuant to the terms of the Transfacil Agreement, the Initial A Shareholders shall pay CT Holding the difference between the Guaranteed Annual Amount and the actual amount, if any, paid by Transfacil Panamá to CT Holding in such year.  Such payments will be made by the Initial A Shareholders within thirty (30) calendar days of written notice from the Initial B Shareholders.

(d)     The Initial A Shareholders agree and acknowledge that, (i) notwithstanding the fact that DT Inc. is an Affiliate, the transfer of the Transferred Fiber Assets to CT Holding will not be considered an In Kind Contribution by the Initial A Shareholders and will not increase the Initial A Shareholders' Equity Interests and (ii) no payments made to CT Holdings by the Initial A Shareholders pursuant to <u>Section 6.10(c)</u> will be considered Capital Contributions or increase the Initial A Shareholders' Equity Interests.

**Section 6.11     Colombian Exchange**.

(a)     Immediately prior to the transactions contemplated by this Agreement and the Subscription and Contribution Agreement, CT SA&C caused the transfer to Maintenance and Services Sociedad Anónima de Capital Variable, and Maintenance and Services Sociedad Anónima de Capital Variable accepted, all of its issued and outstanding shares in the Colombian CT Subsidiaries.

(b)     In consideration for the forty two (42) Towers owned by the Colombian CT Subsidiaries (collectively, the "**Removed Towers**") and the agreement of the Investor B Shareholder and the Initial C Shareholder to not reduce (i) the value attributed to the assets contributed by the CT Contributing A Shareholder pursuant to <u>Section 3.02(a)</u> or (ii) the amount of the Initial Investor Capital Contributions to reflect the Removed Towers, the CT Contributing A Shareholder agrees that it will finance the development, construction or acquisition of forty two (42) of the first eighty four (84) Towers approved by the Development Committee in any jurisdiction following the Effective Date (collectively, the "**Funded Towers**").  All costs and expenses associated with providing Funded Towers, including all payments due by the Company and the Company Subsidiaries under the EPC Contracts and applicable Taxes, shall be borne by the CT Contributing A Shareholder.  In no event will any amounts paid by the CT Contributing A Shareholder with regard to Funded Towers be considered a Capital Contribution by the CT Contributing A Shareholder or increase the CT Contributing A Shareholder's Equity Interests.

(c)     In the event that, upon the occurrence of an Approved Sale, (i) the CT Contributing A Shareholder has not satisfied its obligation to finance all of the Funded Towers (any such unfinanced Towers, the "**Unfunded Towers**"), the value of such Unfunded Towers calculated based on the number of Unfunded Towers multiplied by One Hundred and Seventy

Five Thousand United States Dollars ($175,000) shall be deducted from the Initial A Shareholders' portion of the proceeds from the Approved Sale; or (ii) the proposed buyer is unwilling to purchase the Tower assets owned by the Colombian TBS Subsidiary, including by an acquisition of the Equity Interests of the Colombia TBS Subsidiary (such Towers, the "**Rejected Colombia Towers**"), (x) the value of such Rejected Colombia Towers calculated based on Tower Cash Flow for such Towers as of immediately prior to the closing of the Approved Sale and the multiple of Tower Cash Flow implied by the final purchase price of the transactions contemplated by the Approved Sale, shall be deducted from the Initial A Shareholders' portion of the proceeds from the Approved Sale and (y) the Company shall transfer to the Initial A Shareholders (or their designees), and the Initial A Shareholders (or their designees) shall accept, the Equity Interests of the Colombia TBS Subsidiary.

**Section 6.12    Designation of Tax Matters Partner**.  The parties acknowledge that an election has been (or will be made) to treat the Company as a disregarded entity of the CT Contributing A Shareholder for U.S. federal income tax purposes effective before the closing date of the Subscription and Contribution Agreement and this Agreement.  The parties further acknowledge that upon the closing of the Subscription and Contribution Agreement, the Company will be treated as a partnership for U.S. federal income tax purposes.  Solely for U.S. federal income tax purposes, the parties designate the Investor B Shareholder as the tax matters partner (within the meaning of Section 6231(a)(7) of the U.S. Internal Revenue Code of 1986) of the Company.  The Investor B Shareholder, in its capacity as tax matters partner, may make any tax elections in furtherance of such tax classification.   Attached as the Appendix to this Agreement are provisions relating primarily to U.S. partnership tax matters, relevant to the Initial B Shareholders and the Initial C Shareholder.  In the event any Initial A shareholder should at any time after the Effective Date become subject to taxation in the United States, all actions taken by the Investor B Shareholder in its capacity as tax matters partner shall be subject to the consent of the Initial A Shareholders, which consent shall not be unreasonably withheld or denied.

**Section 6.13    Report on Tax Policies and Procedures; Ongoing Tax Review**.  Promptly following the Effective Date, the Company shall retain Deloitte LLP or any other internationally recognized accounting firm to prepare and deliver, no later than ninety (90) calendar days after the Effective Date, a written report on overall tax compliance by the Company and the Company Subsidiaries in all relevant tax jurisdictions, including regarding the material policies and practices of the Company and the Company Subsidiaries with respect to income and non-income taxes and transfer pricing, and including any recommendations to ensure that the Company and the Company Subsidiaries are compliant with all applicable laws and rules relating to such matters.  The Company shall deliver a complete copy of a draft of such report to the Shareholders for their review promptly after receiving any draft, and the Company shall consider in good faith and shall communicate to Deloitte LLP or such other accounting firm, as the case may be, any and all comments provided by the Shareholders on such draft.  Thereafter, the Company shall deliver a complete copy of the final version of such report to the Shareholders promptly after receiving such final version, and the Company shall cause its and the Company Subsidiaries' tax policies and practices to comply, within ninety (90) days of receiving such reports, with any recommendations provided in each such report (including, to the extent required by law, by amending tax returns of the Company and/or its subsidiaries).  For avoidance of doubt, such report shall include a transfer pricing study regarding transactions between and

among one or more of the Company, Interco BVI, the CT BVI Subsidiaries, TBS, the CT Subsidiaries and the TBS Subsidiaries. At all times after the Effective Time, the Company will engage Deloitte LLP (or another independent internationally recognized accounting firm) to review and approve any non-U.S. tax returns and any other non-U.S. tax reporting required to be filed by the Company or any of its subsidiaries. All fees, expenses and taxes incurred in connection with the Company's compliance with this <u>Section 6.13</u> shall be borne by the Company.

**Section 6.14     Subscription to GTSL**. The Shareholders acknowledge and agree that, as soon as practicable following the completion of the additional capital contributions required by <u>Section 3.02</u>, the CT Contributing A Shareholder, the Investor B Shareholder and the Class C Shareholder shall, in exchange for nominal consideration, subscribe for shares of GTSL, in proportion to the Percentage Interests of such Shareholders in the Company at the time of such subscription. Concurrent with such subscription, the parties shall enter into a shareholders agreement (as well as an amended and restated memorandum of association and amended and restated articles of association) setting forth the rights and obligations of the shareholders of GTSL. Such shareholders agreement shall be substantially similar to this Agreement, with such amendments as may be agreed between the parties, including but not limited to those contemplated by the last sentence of this <u>Section 6.14</u>. The Shareholders further acknowledge and agree that it is the current intent of the Shareholders that (i) the working capital of GTSL will be provided by loans from the Company, issued from time to time on approval of the Board, rather than by capital contributions of its shareholders and (ii) GTSL will participate in any Approved Sale along with the Investor Group.

**Section 6.15     Contribution of TBS and CT BVI Subsidiaries**. The Shareholders acknowledge and agree that (i) on the Effective Date, the Company shall transfer to Interco BVI all of the issued and outstanding shares of (A) TBS and (B) the CT BVI Subsidiaries (the "**Interco Transfer**") and (ii) each Shareholder and the Company shall execute and deliver, and take all actions necessary to cause the Company and any of the Company Subsidiaries to execute and deliver, such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to complete the Interco Transfer.

**ARTICLE VII**
**TERMINATION**

**Section 7.01     Termination**.

(a)     The rights and obligations of the parties to this Agreement shall terminate upon: (i) the unanimous agreement of the Shareholders; or (ii) the dissolution or liquidation of the Company; *provided that* termination of this Agreement will not relieve a party with respect to obligations incurred prior to the date of such termination.

(b)     A Person who ceases to hold any Shares in the Company will cease to be a party and will have no further rights and obligations under this Agreement, except as provided herein or with respect to the rights and obligations that such Person may have hereunder or by reason of such Party's prior breach of this Agreement.

(c)     Upon dissolution, an accounting shall be made by either the Company or the Company's independent accountants, as determined by the Board, of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution.

**Section 7.02     Distributions upon Termination.**  If the Company is dissolved while it is solvent and its affairs are to be wound up, the Board shall:

(a)     sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Shareholders and the Board may unanimously determine to distribute any assets to the Shareholders in kind according to their respective Percentage Interests);

(b)     discharge all liabilities of the Company, other than liabilities to Shareholders for distributions, and establish such Reserves as may be reasonably necessary to provide for contingent or other liabilities of the Company; and

(c)     distribute the remaining assets of the Company to the Shareholders according to their respective Percentage Interests.  If any non-cash assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be calculated based on the fair market value of the Company as a whole as determined by independent appraisal.  No non-cash assets of the Company shall be distributed to the Initial C Shareholder without the prior written consent of the Initial C Shareholder.

# ARTICLE VIII
# MISCELLANEOUS

**Section 8.01     Conflict with Memorandum of Association or Articles**.  In the event that any provision of this Agreement conflicts with any provision of the Memorandum of Association or the Articles, the terms of this Agreement will prevail between the Shareholders only, and each Shareholder shall vote all of the Shares that it holds of record, and take all actions necessary, to ensure that at all times that the Memorandum of Association and the Articles do not conflict with any provision of this Agreement.

**Section 8.02     Expenses**.  Except as otherwise specified in this Agreement all reasonable and documented out-of-pocket costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred by the Shareholders in connection with the ordinary course of operations of the Company will be reimbursed by the Company to the shareholders from time to time.

**Section 8.03     Notices**.  All notices, requests, consents, claims, demands, waivers and other communications hereunder must be in writing and shall be deemed delivered as follows: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by an internationally recognized courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if received before 5:00 p.m. at the place of receipt, and on the next business day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail,

EXHIBIT B

return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses.

    (a)      Terra Towers Corp.
              Commerce House, Wickhams Cay 1
              P.O. Box 3140
              Road Town, Tortola
              British Virgin Islands, VG1110
              E-mail: jhernandez@continentaltowerscorp.com
              Attention: Jorge Hernandez

              *with a copy (which copy shall not constitute notice) to*:

              Mayora & Mayora, S.C
              15 calle, 1-04 zona 10, 01010
              Edificio Céntrica Plaza, tercer nivel, oficina 301
              Ciudad de Guatemala, Guatemala
              E-mail: rbriz@mayora-mayora.com
              Attention: Rafael Briz

              *with a copy (which copy shall not constitute notice) to*:

              Holland & Knight LLP
              31 West 52nd St
              New York, NY 10019
              Facsimile: 212-385-9010
              E-mail: stephen.double@hklaw.com
              Attention: Stephen Double, Esq.

    (b)      TBS Management, S.A.
              2da calle 8-01 zona 14, 01014
              Edificio Las Conchas, séptimo nivel
              Ciudad de Guatemala, Guatemala
              E-mail: jgaitan@continentaltowerscorp.com
              Attention: Jorge Gaitán

              *with a copy (which copy shall not constitute notice) to*:

              Mayora & Mayora, S.C
              15 calle, 1-04 zona 10, 01010
              Edificio Céntrica Plaza, tercer nivel, oficina 301
              Ciudad de Guatemala, Guatemala
              E-mail: rbriz@mayora-mayora.com
              Attention: Rafael Briz

              *with a copy (which copy shall not constitute notice) to*:

**EXHIBIT B**

Holland & Knight LLP
31 West 52nd St
New York, NY 10019
Facsimile: 212-385-9010
E-mail: stephen.double@hklaw.com
Attention: Stephen Double, Esq.

(c)     LATAM Towers, LLC:
        86 West Street
        Chagrin Falls, Ohio 44022
        Email: rlepene@peppertreecapital.com
        Attention: Ryan Lepene

        *with a copy (which copy shall not constitute notice) to*:

        Thompson Hine LLP
        335 Madison Avenue
        New York, New York  10017
        Facsimile:  212-344-6101
        E-mail:  Garrett.Evers@Thompsonhine.com
        Attention:  Garrett Evers

(d)     Telecom Business Solution, LLC
        86 West Street
        Chagrin Falls, Ohio 44022
        Email: rlepene@peppertreecapital.com
        Attention: Ryan Lepene

        *with a copy (which copy shall not constitute notice) to*:

        Thompson Hine LLP
        335 Madison Avenue
        New York, New York  10017
        Facsimile:  212-344-6101
        E-mail:  Garrett.Evers@Thompsonhine.com
        Attention:  Garrett Evers

(e)     Goldman, Sachs & Co.
        200 West Street
        New York, NY 10282
        Email:  Michael.McGinn@gs.com
        Attention:  Mike McGinn

        and

        Goldman, Sachs & Co.
        6011 Connection Drive

EXHIBIT B

Irving, Texas 75039
E-mail: ben.nale@gs.com
Attention: Ben Nale

*with a copy (which copy shall not constitute notice) to*:

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
E-mail: Jonathan.Gill@ropesgray.com
Attention: Jonathan P. Gill

(f)     CONTINENTAL TOWERS LATAM HOLDINGS LIMITED
Commerce House, Wickhams Cay 1
P.O. Box 3140
Road Town, Tortola
British Virgin Islands, VG1110
E-mail: andrew.swapp@conyerdill.com
Attention: Andrew Swapp

*with a copy (which copy shall not constitute notice) to*:

Holland & Knight LLP
31 West 52nd St
New York, NY 10019
Facsimile: 212-385-9010
E-mail: stephen.double@hklaw.com
Attention: Stephen Double, Esq.

*with a copy (which copy shall not constitute notice) to*:

Thompson Hine LLP
335 Madison Avenue
New York, New York  10017
Facsimile:  212-344-6101
E-mail:  Garrett.Evers@Thompsonhine.com
Attention:  Garrett Evers

Section 8.04     **Headings**.  The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.05     **Severability**.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law, governmental regulation or public policy, all other terms and provisions of this Agreement nevertheless will remain in full force and effect as long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such determination that any

EXHIBIT B

term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

Section 8.06 **Entire Agreement**. This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the parties with respect to the subject matter hereof.

Section 8.07 **Assignment**. This Agreement may not be assigned without the express written consent of the parties (which consent may be granted or withheld in the sole discretion of any party), except that any Shareholder may assign its rights hereunder in connection with a Transfer of Shares permitted under ARTICLE V hereof and as permitted pursuant to Section 3.02(e), and any assignment in violation of this provision made without such prior written consent shall be null and void.

Section 8.08 **No Third Party Beneficiaries**. This Agreement will be binding upon and inure solely to the benefit of the parties hereto and their permitted assigns and successors and nothing herein, express or implied, is intended to or will confer upon any other person or entity, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 8.09 **Amendment**. This Agreement may not be amended or modified, except by an instrument in writing signed by, or on behalf of, each of the parties bound by, entitled to the benefits of, or subject to the provision to be amended or modified and any amendment that materially adversely and disproportionately affects any Shareholder shall require the consent of such Shareholder.

Section 8.10 **Governing Law**. This Agreement will be governed by and construed in accordance with the Laws of the State of New York, United States without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction).

Section 8.11 **Counterparts**. This Agreement may be executed and delivered in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed and deemed to be an original but all of which taken together constitute one and the same agreement.

Section 8.12 **Specific Performance**. The parties hereto agree that irreparable damage would occur in the event any provision of this Agreement was not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at Law or in equity. Therefore, each party hereto consents to the issuance of an injunction or the enforcement of other equitable remedies against him at the suit of an aggrieved party without the posting of any bond or other security, to

**EXHIBIT B**

compel specific performance of all of the terms hereof and to prevent any disposition of Shares in contravention of any terms of this Agreement.

Section 8.13     **WAIVER OF JURY TRIAL**.  EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY AND FOR ANY COUNTERCLAIM THEREIN.

Section 8.14     **Dispute Resolution**.  The parties agree that any controversy, claim or dispute arising out of or relating to or in connection with this Agreement including, without limitation, any dispute regarding its breach, termination, enforceability or validity hereof (each, a "**Dispute**") should be regarded as a business problem to be resolved promptly through business-oriented negotiations before resorting to arbitration pursuant to Section 8.15.  The parties therefore agree to attempt in good faith to resolve any Dispute promptly by negotiation between the executives of the parties who have authority to settle the Dispute.  Such negotiations shall commence upon the mailing of a notice (the "**Dispute Notice**") from the appropriate executive of the requesting party to an appropriate executive of the responding party.  If the Dispute has not been resolved by these Persons within forty-five (45) days of the date of the Dispute Notice, then such Dispute will be settled pursuant to binding arbitration pursuant to Section 8.15.  All negotiations pursuant to this Section 8.14 will be confidential and will be treated as compromise and settlement negotiations for purposes of applicable rules of evidence and not be used for, or admitted in, any arbitration or court proceedings under this Agreement.

Section 8.15     **Arbitration**.  Subject to Section 8.12, any Dispute that has not been resolved pursuant to Section 8.14 will be finally settled by binding arbitration.  The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association in effect at the time of the arbitration, except as they may be modified herein or by mutual agreement of the parties.  The seat of the arbitration shall be New York, New York.  The arbitration shall be conducted by three arbitrators.  The party initiating arbitration (the "**Claimant**") shall appoint its arbitrator in its request for arbitration (a "**Request**").  The other party (the "**Respondent**") shall appoint its arbitrator within thirty (30) calendar days of receipt of the Request and shall notify the Claimant of such appointment in writing.  If the Respondent fails to appoint an arbitrator within such thirty (30) day period, the arbitrator named in the Request shall decide the Dispute as the sole arbitrator.  Otherwise, the two arbitrators appointed by the parties shall appoint a third arbitrator within thirty (30) calendar days after the Respondent has notified the Claimant of the appointment of the Respondent's arbitrator.  When the arbitrators appointed by the parties have appointed a third arbitrator and the third arbitrator has accepted the appointment, the two arbitrators shall promptly notify the parties of such appointment.  If the two arbitrators appointed by the parties fail or are unable to appoint a third arbitrator, then the third arbitrator shall be appointed by the President of the American Arbitration Association which shall promptly notify the parties of the appointment of the third arbitrator.  The third arbitrator shall act as chairman of the panel.  The arbitration award shall be in writing and shall be final and binding on the parties.  The award may include an award of costs, including reasonable attorney's fees and disbursements.  Judgment upon award may be entered by any court having jurisdiction thereof or having jurisdiction over the parties or their

assets.  The Initial A Shareholders hereby designate, appoint and empower Corporation Service Company, (the "**Process Agent**") with offices as of the date of this Agreement at Corporation Service Company, 1180 Avenue of the Americas, Suite 210, New York, NY 10036 as their authorized agent to receive for and on their behalf service of summons or other legal process in any action commenced under this <u>Section 8.15</u> or otherwise related to this Agreement or the related investments and transactions in accordance with the Acceptance of Appointment Letter, substantially as attached hereto as <u>Exhibit B</u>.  Such service may be made by mailing or delivering a copy of such process to either or both of the Initial A Shareholders in care of the Process Agent at the Process Agent's above address, and the Initial A Shareholders hereby authorize and direct the Process Agent to accept such service on their behalf.  The Initial A Shareholders acknowledge and agree that they shall not revoke the appointment of such Process Agent unless they have appointed another agent for service of process and have received the written consent of the other Shareholders to such appointment.

[Signature Page Follows]

EXHIBIT B

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized signatories thereunto duly authorized as of the date first written above.

**CONTINENTAL TOWERS LATAM HOLDINGS LIMITED**

By: _____
    Name: Jorge Hernandez
    Title: Director

**Terra Towers Corp.**

By: _____
    Name: Jorge Hernandez
    Title: Director

**LATAM Towers, LLC**

By _____
    Name:
    Title:

**AMLQ Holdings (Cay) Ltd.**

By _____
    Name:
    Title:

**TBS Management, S.A.**

By _____
    Name:
    Title:

**Telecom Business Solution, LLC**

By _____
    Name:
    Title:

**EXHIBIT B**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized signatories thereunto duly authorized as of the date first written above.

**CONTINENTAL TOWERS LATAM HOLDINGS LIMITED**

By: _____
    Name:
    Title:

**Terra Towers Corp.**

By: _____
    Name:
    Title:

**LATAM Towers, LLC**

By _____
    Name: Ryan D. Lepene
    Title: President and Chief Executive Officer

**AMLQ Holdings (Cay) Ltd.**

By _____
    Name:
    Title:

**TBS Management, S.A.**

By _____
    Name:
    Title:

**Telecom Business Solution, LLC**

By _____
    Name: Ryan D. Lepene
    Title: President

**EXHIBIT B**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized signatories thereunto duly authorized as of the date first written above.

CONTINENTAL TOWERS LATAM
HOLDINGS LIMITED

By: _____
    Name:
    Title:

Terra Towers Corp.

By: _____
    Name:
    Title:

LATAM Towers, LLC

By _____
    Name:
    Title:

AMLQ Holdings (Cay) Ltd.

By _____ *d.d.*
    Name: Milton Keillman
    Title: President

TBS Management, S.A.

By _____
    Name:
    Title:

Telecom Business Solution, LLC

By _____
    Name:
    Title:

[Signature Page to Shareholders Agreement]

# Exhibit C – Development Agmt

## DEVELOPMENT AGREEMENT

**THIS DEVELOPMENT AGREEMENT** (this "**Agreement**"), dated October 22, 2015 (the "**Effective Date**"), is executed by and among CONTINENTAL TOWERS LATAM HOLDINGS LIMITED, a company incorporated in the British Virgin Islands, with registered number 188295, whose registered office is at Commerce House Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands (the "**Company**"), Terra Towers Corp., a company incorporated in the British Virgin Islands, with registered number 1375181, whose registered office is at Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands ("**Terra Towers**"), TBS Management, S.A., a *sociedad anónima* organized under the laws of Panama ("**Terra TBS**"), and DTH Holdings Inc., a company incorporated in the Republic of Panama ("**DTH**"). The Company, DTH, Terra Towers and Terra TBS are each sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**." References herein to "**Terra**" refer to Terra Towers and/or Terra TBS, as the context requires. Unless otherwise defined in this Agreement, all capitalized terms shall have the same meaning as that given in the Shareholders' Agreement (as defined below).

WHEREAS, Terra Towers, Terra TBS, Peppertree Latam, Peppertree TBS and Goldman are the owners of all of the issued and outstanding Equity Interests of the Company;

WHEREAS, Terra Towers, Terra TBS and their respective Affiliates and Related Entities, including but not limited to DTH and the DTH Entities, are, *inter alia*, in the business of building and acquiring telecommunication infrastructure;

WHEREAS, the purpose (the "**Business**") of the Company is to acquire, finance, build, install, lease and/or possess wireless communication, broadcast or other transmission tower and communication infrastructure sites (each, a "**Site**"), whether directly or through the Company Subsidiaries, in Costa Rica, El Salvador, Guatemala, Honduras, Nicaragua, Panama, Colombia and Peru (the "**Territory**"), as well as such other jurisdictions as may be later agreed;

WHEREAS, on this even date, the Company, Terra Towers, Terra TBS, Peppertree Latam, Peppertree TBS and Goldman have executed and delivered a shareholders' agreement to regulate the governance of the Company (the "**Shareholders' Agreement**"); and

WHEREAS, the Parties wish to regulate in greater detail their respective obligations in connection with the development of the Business.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE 1
## DEVELOPMENT OPPORTUNITIES; DESCRIPTION OF SERVICES

Section 1.1 <u>Site Evaluation Procedure</u>.

(a) <u>SCP Package</u>. Terra will provide the Development Committee with a Site Candidate Profile (each, an "**SCP Package**") for each proposed Site presented to the Company (each, a "**Proposed Site**") and the proposed terms and conditions of the items and agreements

**EXHIBIT C**

that will be delivered in accordance with Section 2.1 below. Each SCP Package will contain such information (including estimates and proposed items based upon Terra's knowledge at the time of delivery) regarding the Proposed Site as is customary, including (to the extent known) site name, information regarding land ownership, location (both jurisdiction and latitude/longitude coordinates), tracker status (including zoning status), height and type of tower, estimated elevation data, ground lease metrics, tenant lease metrics, market analysis, competing or nearby structure maps, anticipated modifications from the standard tenant lease for such jurisdiction agreed by the Development Committee and/or from the standard ground lease for such jurisdiction agreed by the Development Committee, development and construction budgets, foreseeable budget overrun items, financial projections and estimated time schedule to develop and construct the Proposed Site. The Development Committee may, within the two (2) Business Days following presentation of a SCP Package, request such reasonable additional information regarding a Proposed Site as it deems necessary or appropriate, such request to not cause unreasonable delay. For the purposes of this Agreement, "**Business Day**" shall mean any day except a Saturday, a Sunday or any other day on which commercial banks in Cleveland, Ohio, Guatemala City, Guatemala, or in the jurisdiction where the Proposed Site is located are required or authorized to close.

(b)    Accuracy of Information.  All information delivered to the Development Committee shall be accurate in all material respects at the time of the presentation of such information to the Development Committee.  Any material changes in such information or the occurrence of any subsequent material events, non-events, changes in circumstance or "change orders" shall be communicated to the Development Committee, in writing, as soon as reasonably possible following such change.

(c)    Site Acceptance.  Within two (2) Business Days following receipt of the SCP Package relating to a Proposed Site (or, if the Development Committee requests additional information regarding the Proposed Site pursuant to Section 1.1(a) or receives additional information pursuant to Section 1.1(b), within two (2) Business Days following receipt of such additional information), the Development Committee will notify Terra and the relevant Subsidiary of DTH whether the Proposed Site will be developed by the Company (a "**Site Acceptance Notice**" and any Proposed Site that receives a Site Acceptance Notice, an "**Approved Site**").  If the Development Committee fails to deliver a Site Acceptance Notice within the relevant two (2) Business Day period referenced above, Terra will give written notice to the Company of such failure.  If the Development Committee has not delivered a Site Acceptance Notice within an additional two (2) Business Days following receipt of the notice from Terra (or if the Development Committee notifies Terra in writing that the Company rejects the Proposed Site), then Terra or any of its Affiliates (other than the Company Subsidiaries and GTSL) may acquire and/or develop the Proposed Site at their cost and without the participation of the Company.  Terra shall not take any direct interest (ownership or otherwise) in any Proposed Site (including any ground lease option) prior to the date that the Development Committee rejects or is deemed to have rejected the Proposed Site, and Terra shall not allow any Company Subsidiary to take any such interest prior to the date the Development Committee delivers a Site Acceptance Notice as provided above. For the avoidance of doubt, any lease or grant of rights, title or interest in, or the right of use to, the ground area for any Approved Site pursuant to a ground lease agreement, usufruct, right of use agreement, Municipal Agreement or any other agreement, shall be direct from the owner of the relevant property, and in no event shall such lease or grant be from Terra or any Affiliate of Terra.

2

EXHIBIT C

(d)    Force Majeure.  If, in the event of force majeure or for any other causes beyond Terra's control (including the failure of an Approved Site to comply with applicable licensure or other requirements or the inability of DTH to deliver and procure any of the materials contemplated by Article 2 below), Terra is unable to deliver an Approved Site, Terra shall have the right to propose a new Proposed Site within the Territory to substitute for such Approved Site, subject to such new Proposed Site's submission to the Development Committee and receipt of a Site Acceptance Notice pursuant to Section 1.1(a) – (c) above.  In the alternative, the Company shall have the right to offset any payments made to DTH or any DTH Entity for such Approved Site pursuant to the terms of Section 2.1.2 of the EPC Contract between the Company and DTH and the corresponding provision in the EPC Contract between the relevant Company Subsidiary and the relevant DTH Entity.

(e)    EPC Contractors.  In connection with each Approved Site, DTH, directly or through the DTH Entities in each jurisdiction in the Territory, shall oversee such Approved Site's search, development and construction, all in accordance with applicable laws and regulations and in a commercially reasonable manner consistent with standard practices in the industry.  Any development or construction services shall be provided pursuant to the terms of the EPC Contracts.

(f)    Premises and Equipment.  DTH will provide, or will ensure that the DTH Enities provide, sufficient office space, office equipment, phone, internet, utilities and other necessary or appropriate items for the "back-office" activities of the Company and the Company Subsidiaries, including but not limited to bookkeeping, marketing/leasing and related Site visits, tower data "library" maintenance, tenant and ground lessor relations and monitoring / maintenance relations (the "**SG&A Services**").  In consideration of, and subject to, DTH's provision of the SG&A Services, the Company will pay DTH a monthly amount of $400,000, which may be adjusted from time to time upon approval of the Board.  Promptly following the Effective Date, (i) DTH will cause each of the DTH Entities to enter into and (ii) the Company will cause each of the Company Subsidiaries to enter into, services agreements (each a "**Services Agreement**") governing the provision of such back-office activities from each DTH Entity to the corresponding Company Subsidiary in its jurisdiction.  The parties acknowledge and agree that such Services Agreements will contain standard representations and warranties by the relevant DTH Entity regarding the services to be provided by such entity, including but not limited to representations and warranties as to such DTH Entity's compliance with all applicable laws and the compliance policies of the Company Subsidiary.  In addition, DTH and its Affiliates and Related Entities will work with the Company and Peppertree Latam in setting up and maintaining an online data room to store all Site related documents.

## ARTICLE 2
## DELIVERABLES

Section 2.1    Upon receipt of a Site Acceptance Notice for an Approved Site and prior to the delivery of such Approved Site, DTH shall ensure that each DTH Entity shall deliver and procure (on behalf of the relevant Company Subsidiary) the following items or, in the case of agreements, documentation evidencing the binding obligation of the third party to such agreements to execute and deliver such agreement in favor of the Company Subsidiary:

3

EXHIBIT C

(a)     either (i) a deed, substantially in the form customary for the jurisdiction in which the Site is located, pursuant to which the owner of the real estate transfers to the Company Subsidiary in good and marketable condition the title to the real estate necessary or appropriate for the Approved Site (the "**Deed**"), or (ii) a ground lease agreement, usufruct, right of use agreement or Municipal Agreement, substantially in the standard form to be agreed by the Development Committee for the relevant jurisdiction (in consultation with the relevant Company Subsidiary), pursuant to which the owner of the real estate has directly leased all of its right, title and interest in, or otherwise granted the required right of use to, the ground area necessary or appropriate for the Approved Site;

(b)     satisfactory evidence that, whether or not required by the laws of the relevant jurisdiction, (i) the proper ownership of the Approved Site by the relevant lessor, grantor or seller of the ground area for the Approved Site has been registered with the appropriate Governmental Authorities; and (ii) the transfer of the property agreement, ground lease agreement, usufruct agreement, or right of use agreement entered into by the relevant Company Subsidiary has been registered with the appropriate Governmental Authorities, in each case unless such registration is not permitted by the laws of the relevant jurisdiction; provided, however, that the registration process of the property transfer, ground lease, usufruct or right of use may be completed after delivery of an Approved Site, as long as DTH has delivered to the Development Committee satisfactory evidence that the registration process has been initiated, including the corresponding form duly stamped by the appropriate Governmental Authority evidencing that the Deed has been filed;

(c)     the tenant lease(s), substantially in the standard form to be agreed by the Development Committee for the relevant jurisdiction (in consultation with the relevant Company Subsidiary), and any other expressions of interest, options, applications or commitments executed by one or more wireless carriers and the Company Subsidiary to license or lease part of the tower to be constructed on the Approved Site; and

(d)     such other documents, certificates, licenses, permits and agreements as the Company or the Company Subsidiary may reasonably request to evidence the Company Subsidiary's rights in such Approved Site, including satisfactory evidence of appropriate title searches for the ground area necessary for the Approved Site, if not already provided to the Development Committee as part of the SCP Package.

## ARTICLE 3
## MISCELLANEOUS

Section 3.1     Anti-Bribery. DTH shall not, and shall cause each of the DTH Entities not to, directly or indirectly, offer, pay, give, promise to pay or give, or authorize the payment or giving of, money or anything of value to any foreign official, while knowing or having reason to know that all or a portion of such money or thing of value will be used in order to obtain or retain business for or to facilitate the business of Terra or the Company. As used in this Section 3.1(a), the term "foreign official" means (i) any officer or employee of any government or any department, agency, or instrumentality of any such government, (ii) any person acting in official capacity for or on behalf of such government or department, agency or instrumentality, (iii) any member of a foreign political party or international organization, or (iv) any person related to or affiliated with the foregoing.

EXHIBIT C

(b)     DTH shall not, and shall cause each of the DTH Entities not to, obtain or attempt to obtain any order or contract, or obtain any license or permit, for Terra's or the Company's products or services by use of influence or payments, direct or indirect, which induces or tends to induce consideration or action by any employee or officer of a customer or prospective customer, public or private, on any basis other than the merits of Terra's or the Company's products or services.

(c)     DTH agrees that in its performance under this Agreement, it will fully comply with and observe, and cause each of the DTH Entities to fully comply with and observe, all applicable anti-bribery laws, rules and regulations, including the laws of the countries within which it or they are operating on Terra's or the Company's behalf.

Section 3.2     Governing Law. This Agreement will be governed by and construed in accordance with the Laws of the State of New York, United States without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction).

Section 3.3     WAIVER OF JURY TRIAL.     EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY AND FOR ANY COUNTERCLAIM THEREIN.

Section 3.4     Dispute Resolution; Arbitration.  In the event of any dispute between or among any of the Parties relating to the terms of this Agreement or the transactions contemplated hereby, the Parties agree to abide and comply at all times with the dispute resolutions and arbitration provisions of Section 8.14 and Section 8.15 of the Shareholders' Agreement, which sections shall be deemed incorporated herein by reference.

Section 3.5     Confidentiality.  During the term of this Agreement, each Party agrees that it will not disclose any Confidential Information disclosed to it by another Party to any Person; *provided, that* each Party may disclose such Confidential Information to the same extent as a Receiving Party under Section 6.03 of the Shareholders' Agreement, subject to the terms and conditions thereof.

Section 3.6     Notices.  All notices, requests, consents, claims, demands, waivers and other communications hereunder must be in writing and shall be deemed received by the relevant recipient as follows:  (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by an internationally recognized courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if received before 5:00 p.m. at the place of receipt, and on the next Business Day if received after such time; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective parties at the following addresses.

If to Terra Towers Corp:

2da calle 8-01 zona 14, 01014
Edificio Las Conchas, séptimo nivel

5

EXHIBIT C

Ciudad de Guatemala, Guatemala
E-mail: jgaitan@continentaltowerscorp.com /
jhernandez@continentaltowerscorp.com
Attention: Jorge Gaitán / Jorge Hernandez

*with a copy (which copy shall not constitute notice) to*:

Mayora & Mayora, S.C
15 calle, 1-04 zona 10, 01010
Edificio Céntrica Plaza, tercer nivel, oficina 301
Ciudad de Guatemala, Guatemala,
E-mail: rbriz@mayora-mayora.com
Attention: Rafael Briz

If to TBS Management, S.A.
2da calle 8-01 zona 14, 01014
Edificio Las Conchas, séptimo nivel
Ciudad de Guatemala, Guatemala
E-mail: jgaitan@continentaltowerscorp.com
Attention: Jorge Gaitán

*with a copy (which copy shall not constitute notice) to*:

Mayora & Mayora, S.C
15 calle, 1-04 zona 10, 01010
Edificio Céntrica Plaza, tercer nivel, oficina 301
Ciudad de Guatemala, Guatemala
E-mail: rbriz@mayora-mayora.com
Attention: Rafael Briz

If to DTH Holdings Inc.:

2da calle 8-01 zona 14, 01014
Edificio Las Conchas, séptimo nivel
Ciudad de Guatemala, Guatemala
E-mail: jgaitan@continentaltowerscorp.com /
jhernandez@continentaltowerscorp.com
Attention: Jorge Gaitán / Jorge Hernandez

*with a copy (which copy shall not constitute notice) to*:

Mayora & Mayora, S.C
15 calle, 1-04 zona 10, 01010
Edificio Céntrica Plaza, tercer nivel, oficina 301
Ciudad de Guatemala, Guatemala,
E-mail: rbriz@mayora-mayora.com
Attention: Rafael Briz

6

EXHIBIT C

If to Continental Towers LATAM Holdings Limited:

> 2da calle 8-01 zona 14, 01014
> Edificio Las Conchas, séptimo nivel
> Ciudad de Guatemala, Guatemala
> E-mail: jgaitan@continentaltowerscorp.com /
> jhernandez@continentaltowerscorp.com
> Attention: Jorge Gaitán / Jorge Hernandez

*with a copy (which copy shall not constitute notice) to*:

> 86 West Street
> Chagrin Falls, Ohio 44022
> E-mail: RyanLepene@peppertree.com
> Attention: Ryan D. Lepene

This Agreement may be executed in counterparts, each of which will be deemed an original but all of which shall together constitute but one and the same instrument.

Section 3.7    Successors and Assigns.   This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors. Nothing in this Agreement, express or implied, is intended to confer upon any person not a party to this Agreement any rights or remedies under or by reason of this Agreement. This Agreement and the rights and obligations hereunder shall not be assignable or transferable by any Party without the prior written consent of the other Parties; except in connection with any assignment of Capital Contribution rights and obligations or Transfer of Shares permitted by Section 3.02(f) and Article V, respectively,  of the Shareholders' Agreement. Any attempted assignment in violation of this Section 3.6 shall be void.

Section 3.8    Indemnity.   Each Party acknowledges and agrees that it shall be liable for, and hold the other Parties harmless for and against, (a) any personal injury to any of its employees, agents or consultants suffered in connection with carrying out any of its obligations hereunder and (b) any property damage caused by its employees, agents or consultants in connection with carrying out any of its obligations hereunder.

Section 3.9    Termination.   This Agreement may be terminated by:

(a)    the Company (i) if Terra (or any Affiliate thereof) defaults on any material obligation in (x) this Agreement or (y) the Shareholders' Agreement; and (ii) if such default is curable, thirty (30) calendar days have lapsed following notice and such default remains uncured, or, if Terra (or any Affiliate thereof) has provided evidence of a good faith effort to cure the default (as reasonably determined by the Company) during such initial thirty (30) calendar day period, sixty (60) calendar days have lapsed following notice and such default remains uncured;

(b)    the Company (i) if DTH (or any of its Affiliates or Related Entities) defaults on any material obligation in (x) this Agreement or (y) an EPC Contract; and (ii) if such default is curable, thirty (30) calendar days have lapsed following notice and such default remains uncured, or, if DTH (or any Affiliate or Related Entity thereof) has provided evidence of

7

EXHIBIT C

a good faith effort to cure the default (as reasonably determined by the Company) during such initial thirty (30) calendar day period, sixty (60) calendar days have lapsed following notice and such default remains uncured;

(c)    Terra (a) if the Company defaults on any material obligation in (x) this Agreement or (y) the Shareholders' Agreement; and (b) if such default is curable, thirty (30) calendar days have lapsed following notice and such default remains uncured, or, if the Company has provided evidence of a good faith effort to cure the default (as reasonably determined by Terra) during such initial thirty (30) calendar day period, sixty (60) calendar days have lapsed following notice and such default remains uncured;

(d)    DTH (a) if the Company defaults on any material obligation in this Agreement and (b) if such default is curable, thirty (30) calendar days have lapsed following notice and such default remains uncured, or, if the Company has provided evidence of a good faith effort to cure the default (as reasonably determined by DTH) during such initial thirty (30) calendar day period, sixty (60) calendar days have lapsed following notice and such default remains uncured;

(e)    Terra and DTH upon three (3) months' written notice to the Company if Terra Towers, Terra TBS and their Permitted Transferees cease to be shareholders of Company; or

(f)    the Company upon sixty (60) calendar days' written notice to Terra and DTH.

*[Remainder of page intentionally left blank]*

EXHIBIT C

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the Effective Date.

TERRA TOWERS CORP.:

By: _____
  Name: José Alejandro Sagastume Figueroa
  Title:  Director

TBS MANAGEMENT, S.A.:

By: _____
Name:
Title: Director

DTH HOLDINGS INC.:

By: _____
Name:
Title: Director

CONTINENTAL TOWERS LATAM
HOLDINGS LIMITED:

By: _____
Name: _____
Title: Director

**EXHIBIT C**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

TERRA TOWERS CORP.:

By: _____
  Name: José Alejandro Sagastume Figueroa
  Title: Director

TBS MANAGEMENT, S.A.:

By: _____
Name: JOSE ALEJANDRO SAGASTUME FIGUEROA
Title: Director

DTH HOLDINGS INC.:

By: _____
Name: Danny David Barrios Garcia
Title: Director


CONTINENTAL TOWERS LATAM
HOLDINGS LIMITED:

By: _____
Name:
Title: Director

EXHIBIT C

# Exhibit D – EPC Contract

CONTINENTAL TOWERS LATAM HOLDINGS LIMITED

- AND -

DT HOLDINGS INC.

OFFSHORE TURNKEY

ENGINEERING, PROCUREMENT

AND

MANAGEMENT CONTRACT

OCTOBER 22, 2015

FOR

ENGINEERING, PROCUREMENT AND MANAGEMENT OF TELECOMMUNICATIONS
TOWERS

**OFFSHORE TURNKEY ENGINEERING, PROCUREMENT AND MANAGEMENT CONTRACT**

THIS OFFSHORE TURNKEY ENGINEERING, PROCUREMENT AND MANAGEMENT CONTRACT (this "**Agreement**") is made and entered into as of October 22, 2015 (the "**Effective Date**") by and between CONTINENTAL TOWERS LATAM HOLDINGS LIMITED, a company incorporated in the British Virgin Islands, with registered number 1882295, whose registered office is at Commerce House Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands ("**Company**"), and DT Holdings, Inc.., a company incorporated in the Republic of Panama ("**Contractor**").

**WHEREAS:**

A. Company acquires, finances, builds, installs, leases and/or possesses wireless communication, broadcast or other transmission tower and communication infrastructure sites (each a "**Site**" and, together, the "**Sites**") in Guatemala, El Salvador, Honduras, Nicaragua, Costa Rica, Panama, Colombia and Peru (each, a "**Jurisdiction**" and together the "**Jurisdictions**") and other jurisdictions as may be agreed;

B. Pursuant to the terms of that certain Development Agreement, dated as of October 22, 2015, by and among Terra Towers Corp., a company incorporated in the British Virgin Islands, with registered number 1375181, whose registered office is at Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands ("**Terra Towers**"), TBS Management, S.A., a *sociedad anónima* organized under the laws of Panama ("**Terra TBS**"), Company and Contractor (the "**Development Agreement**"), Terra Towers and Terra TBS have agreed to work with Company and the subsidiaries of Company in the Jurisdictions (the "**Company Subsidiaries**") to develop and acquire Sites in the Jurisdictions and Contractor has agreed to provide post-acceptance services to Company and the Company Subsidiaries;

C. In addition to the services to be provided pursuant to the Development Agreement, Contractor has agreed to provide certain engineering and design services and know-how to the Company for any Sites that receive a Site Acceptance Notice from Company (the "**Approved Sites**"); and

D. The subsidiaries of Contractor (or, if applicable, certain entities controlled by the Contractor) in the Jurisdictions (the "**Contractor Subsidiaries**", which term, for the avoidance of doubt, shall include Tierras Nacionales, Ltd. De C.V. and Desarrollos Terrestres (Nicaragua), S.A.) and the Company Subsidiaries have each executed, as of the Effective Date, an agreement (each, an "**Onshore EPC**") pursuant to which each Contractor Subsidiary will provide the services described in Exhibit A to the Company Subsidiary operating in the same Jurisdiction (the "**Subsidiary Services**").

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt of which is hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows. Unless otherwise defined in this Agreement, all capitalized terms shall have the same meaning as that given in the Development Agreement.

**ARTICLE 1**
**RESPONSIBILITIES OF CONTRACTOR**

1.1     Contractor Obligations.

        Pursuant to the terms and conditions of this Agreement, Contractor shall provide Company with the services described in Exhibit B for any Approved Site (the "**Contractor Services**", and together with the Subsidiary Services, the "**Services**").

**ARTICLE 2**
**PAYMENT TERMS**

2.1     Payment Terms.

        2.1.1     Payment Price.

                2.1.1.1 Following the Effective Date, each of the Company Subsidiaries may issue, from time to time, purchase orders to the relevant Contractor Subsidiary regarding the provision of the Subsidiary Services to an Approved Site or Approved Sites in a specific Jurisdiction.  Each time a purchase order is issued by a Company Subsidiary and accepted by a Contractor Subsidiary, Company shall: (i) pay Contractor up to **ONE HUNDRED AND TEN THOUSAND U.S. DOLLARS (US$110,000.00)** plus the applicable Value Added Tax (VAT) per each Approved Site included in such purchase order, in consideration of Contractor's provision of the Contractor Services and (ii) distribute to the relevant Company Subsidiary up to **SIXTY-FIVE THOUSAND U.S. DOLLARS (US$65,000.00)** plus the applicable Value Added Tax (VAT) per each Approved Site included in such purchase order, in order to allow such Company Subsidiary to satisfy its obligations to such Contractor Subsidiary pursuant to the relevant Onshore EPC.  The payment and distribution to be made by Company pursuant to this section will be made as set forth in Section 2.1.2 below and will be subject to (x) satisfaction of each of the conditions precedent set forth in such section and (y) any offset of prior payments by the Company or a Company Subsidiary pursuant to such section.  The proportion of the amounts to be paid to the Contractor or distributed to the relevant Company Subsidiary may also be adjusted pursuant to Section 2.1.1.2 below.

                2.1.1.2 The proportion of the payment and distribution to be made by Company pursuant to Section 2.1.1.1(i) and Section 2.1.1.1(ii) above may be adjusted by mutual agreement of Company and Contractor either (i) at the time the purchase order is issued for an Approved Site or (ii) at the time that the Contractor Subsidiary issues its final invoice for an Approved Site; *provided, that* in no event shall the aggregate amount of potential payments to be made by Company and/or the Company Subsidiary exceed US$175,000 for any Approved Site, plus the applicable Value Added Tax (VAT).

                2.1.1.3 In no event shall Company pay or be responsible for any transfer taxes or any taxes imposed on, or with respect to, Contractor's or any Contractor Subsidiary's net income, revenues, gross receipts or assets held by Contractor or any Contractor Subsidiary.

                2.1.1.4 Payments made by Company pursuant to this Section 2.1 shall constitute payment in full for the performance of the Services, and Company shall not be responsible for any other fees, costs or expenses related to such Services.

        2.1.2     Payment Amounts and Schedules.  Company shall pay to Contractor or fund the relevant Company Subsidiary, as applicable, the amounts agreed for an Approved Site pursuant to Section 2.1.1 above as follows:

3

2.1.2.1 10% upon receipt of a purchase order from a wireless carrier requesting that the Contractor Subsidiary obtain all permits, licenses or authorizations required to begin construction on the Approved Site;

2.1.2.2 40% upon the Contractor Subsidiary's receipt of all permits, licenses or authorizations required to begin construction on the Approved Site;

2.1.2.3 25% upon the Contractor Subsidiary commencing construction of a tower on the Approved Site;

2.1.2.4 20% upon the Contractor Subsidiary's completion of construction of a tower on the Approved Site and delivery to the Company Subsidiary of all permits, licenses, authorizations or agreements required to allow the Company Subsidiary to use and commercialize such Approved Site or reasonably requested by the Company Subsidiary to evidence its rights in the Approved Site; and

2.1.2.5 5%, upon installation of equipment and the beginning of rental payments by a broadband-equivalent tenant under a customary tenant lease with respect to such tower, as contemplated by Section 2.1(b) of the Development Agreement. For the avoidance of doubt, the Company may agree to make the 5% payment to the Contractor or fund the relevant Contractor Subsidiary in cases in which a delay in the beginning of rental payments is due to the Development Committee or the Company's Board of Directors approving the deferment of a commercial obligation under the applicable tenant's lease.

For the avoidance of doubt, pursuant to Section 2.1.2.4 above, a Company Subsidiary may request any such documents, certificates, licenses, permits and agreements as the Company or any Company Subsidiary may reasonably request or to which they are otherwise entitled under Article 2 of the Development Agreement. For the further avoidance of doubt, if at any time Contractor or the Contractor Subsidiary fails to complete any of the milestones set forth in Section 2.1.2.1 - 2.1.2.5 above within 12 months of completion of the previous milestone, (i) Company shall not be responsible for any further payments or distributions with regard to such Approved Site and (ii) Company and the Company Subsidiary shall be entitled to offset any payments made to Contractor or the Contractor Subsidiary for such Approved Site pursuant to this Section 2.1.2 and the applicable Onshore EPC against any amounts otherwise due to Contractor or the Contractor Subsidiary for later Approved Sites (the "**Offset Right**"). Company may, in its sole discretion, agree to make payments to Contractor or allow the Company Subsidiary to make payments to the Contractor Subsidiary in advance of the satisfaction of any the conditions precedent to such payments set forth in Sections 2.1.2.1 through 2.1.2.5 above, subject to the same Offset Right if any of such conditions precedent are not subsequently met. Company may also, in its sole discretion, agree to make payments to Contractor or allow the Company Subsidiary to make payments to the Contractor Subsidiary despite the fact that permits, licenses, authorizations and/or ground or tenant leases are not held in the name of the applicable Company Subsidiary, provided that Company may exercise the Offset Right if any such (i) permit is not assigned to the Company Subsidiary or replaced by a new permit in the name of the Company Subsidiary, if such permit is required to allow the Company Subsidiary to use, commercialize or evidence its rights in such Approved Site (other than those permits that are or have been issued in favor of a third party, and are not necessary to be issued in favor of the Company in order to use, commercialize or evidence its rights in such Approved Site) or (ii) licenses, authorizations and/or ground or tenant leases are not subsequently assigned to the Company Subsidiary or replaced with new licenses, authorizations and/or ground or tenant leases in the name of the Company Subsidiary to the satisfaction of Company. The parties further acknowledge and agree that (x) pursuant to Section 5.04(a) of the Shareholders' Agreement, the Company intends to cease development and acquisition of Sites in certain Company Subsidiaries (the "**Set Subsidiaries**"), so that all subsequent Sites will be developed in the remaining Company Subsidiaries (the "**Developing Subsidiaries**") and (y) any

Offset Rights pertaining to a  Set Subsidiary may be applied by the Company to any amounts otherwise due to a Contractor Subsidiary for a later Approved Site developed in a Developing Subsidiary.

**ARTICLE 3**
**TERM AND TERMINATION**

3.1     Term.

This Agreement shall commence as of the Effective Date and shall continue thereafter, until terminated pursuant to Section 3.2 below.

3.2     Termination.

3.2.1     Contractor may terminate this Agreement upon three (3) months' written notice to Company if Terra Towers, Terra TBS and their Permitted Transferees cease to be shareholders of Company.

3.2.2     Company may terminate this Agreement upon sixty (60) calendar days' written notice to Contractor.

3.2.3     Either party may terminate this Agreement, effective upon written notice to the other party (the "**Defaulting Party**"), if the Defaulting Party:

3.2.3.1 (i) materially breaches this Agreement and such breach is incapable of cure, or (ii) with respect to a material breach capable of cure, the Defaulting Party does not cure such breach within thirty (30) calendar days following receipt of written notice of such default, or, if the Defaulting Party has provided evidence of a good faith effort to cure the default during such initial thirty (30) calendar day period (as reasonably determined by the non-Defaulting Party), the Defaulting Party does not cure such breach within sixty (60) calendar days following receipt of written notice of such default; or

3.2.3.2  (i) becomes insolvent or admits its inability to pay its debts generally as they become due; (ii) becomes subject, voluntarily or involuntarily, to any proceeding under any bankruptcy or insolvency law, which is not fully stayed within seven Business Days or is not dismissed or vacated within forty-five (45) calendar days after filing; (iii) is dissolved or liquidated or takes any corporate action for such purpose; (iv) makes a general assignment for the benefit of creditors; or (v) has a receiver, trustee, custodian or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

3.2.4     Upon expiration or termination of this Agreement for any reason:

3.2.4.1  Contractor shall (i) provide reasonable cooperation and assistance to Company in transitioning the Services to an alternate service provider; and (ii) on a pro rata basis, repay all fees and expenses paid in advance for any Services which have not been provided;

3.2.4.2  each party shall (i) return to the other party all documents and tangible materials (and any copies) containing, reflecting, incorporating or based on the other party's Confidential Information and (ii) certify in writing to the other party that it has complied with the requirements of this clause; provided, however, that Company may retain copies of any Confidential Information of Contractor to the extent necessary to allow it to make full use of the Services; and

3.2.4.3  in no event shall Company be liable for termination costs for any employees and permitted sub-contractors ("**Personnel**") arising from the expiration or termination of this Agreement.

**ARTICLE 4**
**NOTICES AND COMMUNICATIONS**

4.1     Notices.

All notices, requests, consents, claims, demands, waivers and other communications hereunder must be in writing and shall be deemed received as follows: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by an internationally recognized courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if received before 5pm at the place of receipt, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective parties at the following addresses.

If to Contractor:

> DT HOLDINGS INC.
> Attention: Jorge Gaitán / Alberto Arzú, Project Managers
> 2da calle 8-01 zona 14, 01014
> Edificio Las Conchas, séptimo nivel
> Ciudad de Guatemala, Guatemala
> E-mail: jgaitan@dt-sa.com

with a copy to:

> Mayora & Mayora, S.C
> Attention: Rafael Briz
> 15 calle, 1-04 zona 10, 01010
> Edificio Céntrica Plaza, tercer nivel, oficina 301
> Ciudad de Guatemala, Guatemala
> E-mail: rbriz@mayora-mayora.com

If to Company:

> Continental Towers LATAM Holdings Limited
> Attention: Ryan D. Lepene, Project Manager
> 86 West Street
> Chagrin Falls, Ohio 44022
> Telephone: 440-528-0328
> Email: rlepene@peppertreecapital.com

with a copy to:

> 2da calle 8-01 zona 14, 01014
> Edificio Las Conchas, séptimo nivel
> Ciudad de Guatemala, Guatemala
> E-mail: jgaitan@continentaltowerscorp.com / jhernandez@mip.com.gt
> Attention: Jorge Gaitán / Jorge Hernandez

6

with a copy to:

Thompson Hine LLP
335 Madison Avenue
New York, New York 10017
Facsimile: 212-344-6101
E-mail: Garrett.Evers@Thompsonhine.com
Attention: Garrett Evers

4.2     Technical Communications.

Each party shall appoint a primary contact with respect to this Agreement, who will have the authority to act on behalf of such party in connection with matters pertaining to this Agreement (each, a "**Project Manager**"). Initially, the Project Managers are as set forth in Section 4.1 above. Contractor's Project Manager shall have knowledge of the Services and be available at all reasonable times for consultation.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES

5.1     Representation and Warranties of Each Party.

Each party represents and warrants to the other party that:

5.1.1     it is duly organized, validly existing and in good standing as a corporation or other entity as represented herein under the laws and regulations of its jurisdiction of incorporation, organization or chartering;

5.1.2     it has the full right, power and authority to enter into this Agreement, to grant the rights and licenses granted hereunder and to perform its obligations hereunder;

5.1.3     the execution of this Agreement by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary action of the party; and

5.1.4     when executed and delivered by such party, this Agreement will constitute the legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms.

5.2     Representations, Warranties and Covenants of Contractor.

Contractor represents, warrants and covenants to the Company that:

5.2.1     it is the sole owner, either directly or indirectly, of each of the Contractor Subsidiaries (except for Tierras Nacionales Ltda de CV and Desarrollos Terrestres (Nicaragua), S.A.) and will remain so for the term of this Agreement;

5.2.2     it shall ensure that Tierras Nacionales Ltda de CV and Desarrollos Terrestres (Nicaragua), S.A. become direct or indirect wholly-owned subsidiaries of Contractor within 30 calendar days of the Effective Date and will remain so for the term of this Agreement;

5.2.3     it shall perform the Contractor Services, and shall ensure that the Contractor Subsidiaries perform the Subsidiary Services, using Personnel of required skill, experience and qualifications and in a

7

professional and workmanlike manner in accordance with generally recognized industry standards for similar services and shall devote, and shall ensure that the Contractor Subsidiaries devote, adequate resources to meet its obligations under this Agreement or the obligations of the Contractor Subsidiaries under the Onshore EPCs;

5.2.4    it shall, and shall cause the Contractor Subsidiaries and all Personnel to, comply with, all rules, regulations and policies of Company that are communicated in writing;

5.2.5    it or the relevant Contractor Subsidiary is responsible for all Personnel and for the payment of their compensation, including, if applicable, withholding of taxes and the provision of benefits;

5.2.6    prior to the date on which the Services commence, it shall, and shall ensure that the Contractor Subsidiaries shall, obtain, and at all times during the term of this Agreement maintain, all necessary licenses and consents applicable to the provision of the Services; and

5.2.7    it is, and shall ensure that the Contractor Subsidiaries are, in compliance with, and shall, and shall ensure that the Contractor Subsidiaries shall, perform the Services in compliance with all applicable law.

## ARTICLE 6
## INDEMNIFICATION; LIMITATION ON LIABILITY

6.1    <u>Indemnification</u>.

6.1.1    Contractor shall defend, indemnify and hold harmless Company, the Company Subsidiaries and their respective affiliates, officers, directors, employees, agents, successors and permitted assigns (each, a "**Company Indemnitee**") from and against all losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers ("**Losses**"), including those arising out of or resulting from any third party claim, suit, action or proceeding (each, an "**Action**") arising out of or resulting from:

6.1.1.1 bodily injury, death of any person or damage to real or tangible, personal property resulting from the willful, fraudulent or negligent acts or omissions of Contractor, the Contractor Subsidiaries or Personnel;

6.1.1.2 breach of any representation, warranty or covenant of Contractor set forth in this Agreement; and

6.1.1.3 any claim by a Contractor Subsidiary that it is owed payment for an Approved Site under an Onshore EPC, other than the amount agreed by Contractor and Company pursuant to Section 2.1 above.

6.1.2    Company shall defend, indemnify and hold harmless Contractor, the Contractor Subsidiaries and their respective affiliates, officers, directors, employees, agents, successors and permitted assigns (each, a "**Contractor Indemnitee**") from and against all Losses, including those arising out of an Action arising out of or resulting from:

6.1.2.1 bodily injury, death of any person or damage to real or tangible, personal property resulting from the willful, fraudulent or negligent acts or omissions of Company or the Company Subsidiaries; and

6.1.2.2 breach of any representation, warranty or covenant of Company set forth in this Agreement.

6.1.3    For the purposes of this Section 6, any Losses incurred or sustained by, or imposed upon any Company Subsidiary or Contractor Subsidiary shall be deemed to have been incurred or sustained by, or imposed on Company or Contractor, as applicable.

6.2    <u>Limitation on Liability</u>.

IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER OR TO ANY THIRD PARTY FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL OR PUNITIVE DAMAGES WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, REGARDLESS OF WHETHER SUCH DAMAGE WAS FORESEEABLE AND WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## ARTICLE 7
## DISPUTE RESOLUTION

7.1    <u>Dispute Resolution</u>.

7.1.1    The parties agree that any controversy, claim or dispute arising out of or relating to or in connection with this Agreement including, without limitation, any dispute regarding its breach, termination, enforceability or validity hereof (each, a "**Dispute**") should be regarded as a business problem to be resolved promptly through business-oriented negotiations before resorting to arbitration pursuant to Section 7.1.2.  The parties therefore agree to attempt in good faith to resolve any Dispute promptly by negotiation between the executives of the parties who have authority to settle the Dispute. Such negotiations shall commence upon the mailing of a notice (the "**Dispute Notice**") from the appropriate executive of the requesting party to an appropriate executive of the responding party.  If the Dispute has not been resolved by these persons within forty-five (45) calendar days of the date of the Dispute Notice, then such Dispute will be settled pursuant to binding arbitration pursuant to Section 7.1.2. All negotiations pursuant to this Section 7.1.1 will be confidential and will be treated as compromise and settlement negotiations for purposes of applicable rules of evidence and not be used for, or admitted in, any arbitration or court proceedings under this Agreement.

7.1.2    Any Dispute that has not been resolved pursuant to Section 7.1.1 will be finally settled by binding arbitration.  The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association in effect at the time of the arbitration, except as they may be modified herein or by mutual agreement of the parties.  The seat of the arbitration shall be New York, New York and each party agrees to service of process of any action commenced under this Section 7.1.2 by FedEx overnight delivery, with such service of process addressed to such party to be served at the addresses set forth in Section 4.1.  The arbitration shall be conducted by three arbitrators.  The party initiating arbitration (the "**Claimant**") shall appoint its arbitrator in its request for arbitration (a "**Request**").  The other party (the "**Respondent**") shall appoint its arbitrator within thirty (30) calendar days of receipt of the Request and shall notify the Claimant of such appointment in writing.  If the Respondent fails to appoint an arbitrator within such thirty (30) day period, the arbitrator named in the Request shall decide the Dispute as the sole arbitrator.  Otherwise, the two arbitrators appointed by the

parties shall appoint a third arbitrator within thirty (30) calendar days after the Respondent has notified the Claimant of the appointment of the Respondent's arbitrator. When the arbitrators appointed by the parties have appointed a third arbitrator and the third arbitrator has accepted the appointment, the two arbitrators shall promptly notify the parties of such appointment. If the two arbitrators appointed by the parties fail or are unable to appoint a third arbitrator or to notify the parties of such appointment, then the third arbitrator shall be appointed by the President of the American Arbitration Association which shall promptly notify the parties of the appointment of the third arbitrator. The third arbitrator shall act as chairman of the panel. The arbitration award shall be in writing and shall be final and binding on the parties. The award may include an award of costs, including reasonable attorneys' fees and disbursements. Judgment upon award may be entered by any court having jurisdiction thereof or having jurisdiction over the parties or their assets.

7.1.3    The arbitration panel may consolidate an arbitration arising out of or relating to this Agreement with any arbitration arising out of or relating to one or more of the Onshore EPCs if the subject matter of the Disputes arises out of or relates to essentially the same facts or transactions. Such consolidated arbitration shall be determined by the arbitral panel appointed for the arbitration proceeding that was commenced first in time.

7.2    <u>Injunctive Relief</u>.

Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement is intended to, nor shall it, prevent either party from seeking injunctive relief at any time as may be available under law or in equity.

**ARTICLE 8**
**CONFIDENTIALITY**

8.1    <u>Confidential Information.</u> During the term of this Agreement, each party agrees that it will not disclose any Confidential Information disclosed to it by the other party to any person; *provided, that* each party may disclose such Confidential Information to the same extent as a Receiving Party under Section 6.03 of the Shareholders' Agreement, subject to the terms and conditions thereof.

**ARTICLE 9**
**MISCELLANEOUS**

9.1    <u>Anti-Bribery</u>.

9.1.1    Contractor shall not, and shall cause each of the Contractor Subsidiaries not to, directly or indirectly, offer, pay, give, promise to pay or give, or authorize the payment or giving of, money or anything of value to any foreign official, while knowing or having reason to know that all or a portion of such money or thing of value will be used in order to obtain or retain business for or to facilitate the business of the Company or any Company Subsidiary. As used in this Section 9.1.1, the term "foreign official" means (i) any officer or employee of any government or any department, agency, or instrumentality of any such government, (ii) any person acting in official capacity for or on behalf of such government or department, agency or instrumentality, (iii) any member of a foreign political party or international organization, or (iv) any person related to or affiliated with the foregoing.

9.1.2    Contractor shall not, and shall cause each of the Contractor Subsidiaries not to, obtain or attempt to obtain any order or contract, or obtain any license or permit, for the Company's or a Company Subsidiary's products or services by use of influence or payments, direct or indirect, which induces or tends to induce consideration or action by any employee or officer of a customer or

10

prospective customer, public or private, on any basis other than the merits of the Company's or a Company Subsidiary's products or services.

9.1.3 Contractor agrees that in its performance under this Agreement, it will fully comply with and observe, and cause each of the Contractor Subsidiaries to fully comply with and observe, all applicable anti-bribery laws, rules and regulations, including the laws of the countries within which it or they are operating on the Company's or a Company Subsidiary's behalf.

9.2 Independent Contractors.

The relationship between the parties hereto is that of independent contractors. Nothing contained in this Agreement shall be construed as creating any agency, partnership, joint venture or other form of joint enterprise, employment or fiduciary relationship between the parties, and neither party shall have authority to contract for or bind the other party in any manner whatsoever.

9.3 Effect of Invalid Provisions.

If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

9.4 Governing Law.

This Agreement, and the rights, obligations and liabilities of the parties hereto will be construed in accordance with the laws of the State of New York, United States.

9.5 Waiver of Jury Trial.

EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND FOR ANY COUNTERCLAIM THEREIN.

9.6 Third Party Beneficiaries.

No third party shall be deemed to be a third-party beneficiary under this Agreement, except as expressly set forth herein.

9.7 Entire Agreement.

This Agreement sets forth and forms the entire agreement between Company and the Contractor. All prior, other and collateral agreements, representations, warranties, promises and conditions by the parties hereto relating to the subject matter of the Agreement are superseded by this Agreement, the Development Agreement and the Onshore EPCs. The table of contents and section headings included in this document are for reference only and do not form a part of this Agreement. No changes, amendments or modifications of this Agreement will be valid unless made pursuant to a written amendment signed by both parties.

9.8     Non-waiver.

Either party's waiver of any breach or failure to enforce any of the terms, covenants, conditions or other provision of this Agreement at any time shall not in any way affect, limit, modify or waive that party's right thereafter to enforce or compel strict compliance with every term, covenant, condition or other provision hereof, any course of dealing or custom of the trade notwithstanding.  All waivers must be in writing and signed on behalf of Company and Contractor.

9.9     Survival.

The provisions of this Agreement which by their nature are intended to survive the termination, cancellation, completion or expiration of this Agreement, including but not limited to any indemnity and any express limitations of or releases from liability, and any payment undertakings with respect to obligations or claims which accrued prior to such termination, cancellation, completion or expiration, shall continue as a valid and enforceable obligation of the relevant party notwithstanding any such termination, cancellation, completion or expiration.

9.10    Successors and Assigns.

9.10.1  This Agreement and every covenant, condition and provision of this Agreement shall work to the benefit of and be binding upon Company and Contractor, and each of their respective partners, heirs, and legal representatives, successors and permitted assigns.  Contractor shall not assign, transfer or sub-contract its interest in or obligations hereunder without the express written consent of Company.

9.10.2  Company shall be permitted to assign this Agreement to its affiliates, subsidiaries, parent companies, or any other related entities.

9.11    Set-Off.

Without prejudice to any other right or remedy it may have, Company reserves the right to set off at any time any amount owing to it by Contractor or the Contractor Subsidiaries against any amount payable by Company to Contractor or the Contractor Subsidiaries.

9.12    Interpretation.

For purposes of this Agreement: (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation" and (b) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole.  Unless the context otherwise requires, references herein: (x) to Sections and Exhibits refer to the Sections of, and Exhibits attached to this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.  This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing an instrument to be drafted.

9.13    Exhibits.

All exhibits referenced in this Agreement and attached hereto shall be incorporated into this Agreement by such reference and shall be deemed to be an integral part of this Agreement.

9.14    <u>Counterparts</u>.

This Agreement may be executed in counterparts each of which shall be deemed an original and all of which shall be deemed one and the same Agreement.


[Signature Page Follows]

IN WITNESS WHEREOF, Company and Contractor have made and executed this Agreement as of the day and year first written above.

**CONTINENTAL TOWERS LATAM HOLDINGS LIMITED**

Signature _____

By

Title   Director   _Jolin Hernandez_

**DT HOLDINGS INC.**

Signature _____

By   _Dagny David Barrios Garcia_

Title   Director

IN WITNESS WHEREOF, Company and Contractor have made and executed this Agreement as of the day and year first written above.

**CONTINENTAL TOWERS LATAM HOLDINGS LIMITED**

Signature_____

By

Title    Director

**DT HOLDINGS INC.**

Signature_____

By   Danny David Barrios Garcia

Title   Director

## <u>EXHIBIT A</u>

Onshore EPC – Subsidiary Services

- Engineering of Civil and Telecommunications Infrastructure

- Planning of Civil and Telecommunications Infrastructure

- Construction of Civil and Telecommunications Infrastructure

- Design of Civil and Telecommunications Infrastructure

- Procurement of Civil and Telecommunications Infrastructure

- Acquisition of Civil and Telecommunications Infrastructure

- Consulting of Civil and Telecommunications Infrastructure

- Supervising of Civil and Telecommunications Infrastructure

- Management of Civil and Telecommunications Infrastructure

- Equipment Installation Services

- Other services related to Telecommunications Infrastructure

- Architectural and Engineering Designs and Drawings

- Personnel Management

- Legal, Municipal and Environmental Permits Procurement

- Lease, License and Authorization Procurement

Offshore EPC – Contractor Services

- Engineering design; and

- Know-how