# EXHIBIT 6

**ARBITRATION PURSUANT TO THE COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCIATION**

TELECOM BUSINESS SOLUTION, LLC, on its own behalf and derivatively, on behalf of CONTINENTAL TOWERS LATAM HOLDINGS LIMITED and LATAM TOWERS, LLC, on its own behalf and derivatively, on behalf of CONTINENTAL TOWERS LATAM HOLDINGS LIMITED,

      Claimants,

v.

TERRA TOWERS CORP., TBS MANAGEMENT, S.A., DT HOLDINGS INC., JORGE HERNANDEZ and ALBERTO ARZU,

      Respondents,

and

CONTINENTAL TOWERS LATAM HOLDINGS LIMITED,

      Nominal Respondent.

Case No. 01-21-0000-4309

---

TERRA TOWERS CORP. and TBS MANAGEMENT, S.A., derivatively and on behalf of CONTINENTAL TOWERS LATAM HOLDINGS LIMITED

      Counterclaimants,

v.

TELECOM BUSINESS SOLUTION, LLC, LATAM TOWERS, LLC, F. HOWARD MANDEL, JOHN RANIERI, RYAN LEPENE, and AMLQ HOLDINGS (CAY), LTD.,

      Counter-Respondents.

and

CONTINENTAL TOWERS LATAM HOLDINGS LIMITED,

      Nominal Counter-Respondent.

**TERRA TOWERS CORP. AND TBS MANAGEMENT, S.A.'S
ANSWERING STATEMENT, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

Respondents, Terra Towers Corp. ("Terra Towers") and TBS Management, S.A. ("Terra TBS," and together with Terra Towers, collectively, "Terra" or "Respondents"), pursuant to R-5 of the American Arbitration Association's ("AAA") Commercial Arbitration Rules, as modified by the AAA's February 5, 2021 letter, file their Answering Statement, Affirmative Defenses, and Counterclaim to the Demand for Arbitration and Statement of Claims filed by Telecom Business Solution, LLC and Latam Towers, LLC (collectively, "Peppertree" or "Claimants") on February 2, 2021, and allege as follows:

## ANSWER

## PRELIMINARY STATEMENT[1]

### Summary of the Dispute

1.      This dispute arises from a straightforward business deal between the Parties. As is often the case, the Parties entered into this transaction hoping for the best yet, contractually speaking, made plans for "safety valves" and an "exit" if things did not work out. With more than $2 billion in assets under management, Peppertree Capital Management, Inc. ("Peppertree Investor") is a private equity firm and one of the most successful and experienced investors in the communication infrastructure industry in the United States. Peppertree Investor has participated in more than one hundred (100) communication infrastructure investments since 2004, most of which involve the development or acquisition of wireless communication towers (like the

---

[1] For ease of reference, Respondents have used the same headers as Claimants when answering the Statement of Claim, as well as many of the same defined terms. The use of such headers and/or defined terms shall in no way be used for any other purpose, including an admission of liability. Moreover, any allegations of the Statement of Claim not otherwise expressly admitted shall be deemed denied.

transaction in dispute).

**RESPONSE: Admitted insofar as Terra entered into a business deal with Peppertree, which deal speaks for itself. Without knowledge as to the precise number of assets of Peppertree Capital Management, Inc., and the extent of its prior business dealings, and therefore denied. Denied in all other respects.**

2. Terra and DTH, owned and controlled by Respondent Hernandez, have a local presence in the communication infrastructure industry in South America and Central America, where they build towers and other communication infrastructure in the region.

**RESPONSE: Admitted insofar as Terra and DTH, among other things (and generally speaking), build towers and other communication infrastructure in South America and Central America. Denied that Hernandez "own[s] or control[s]" Terra and DTH.**

3. At the core of this dispute is a deal that was relatively simple and had the potential to be lucrative and beneficial for all parties involved. In a series of transactions in 2014 and 2015 (more fully described below), Peppertree joined Terra as shareholders of the Company. Peppertree provided necessary capital as well as its vast experience in the telecom infrastructure industry, and Terra and DTH provided the local presence and construction know-how.

**RESPONSE: Admitted that there is a dispute, denied in all other respects, including that Respondents are liable or at fault in that dispute.**

4. Peppertree, Terra, and DTH are sophisticated entities and were represented by experienced counsel, as reflected in the governing documents. As one might expect in this type of situation, Peppertree and Terra agreed that the Company would be controlled by a four-person Board of Directors (the "Board"), consisting of two Directors appointed by each side; i.e., two appointed by Peppertree and two by Terra (Respondents Hernandez and Arzú, and F. Howard

Mandel and Ryan D. Lepene, both of Peppertree).  As intended by the parties and as evidenced by the governing documents, virtually all Company actions require Board approval.  If the Board is deadlocked and the majority of the Board does not approve a certain action, then that action cannot be taken—one of the aforementioned "safety valves."

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations. Denied in all other respects as well.**

5.      In addition, even though Peppertree and Terra were optimistic that the Company would be successful and profitable, to confront the realities of potentially differing viewpoints, the Parties also agreed on a normal business solution if the business relationship did not work out:  the governing documents mandate that if, after five (5) years, either Peppertree or Terra elected to part ways, then the Company would be sold, and the proceeds would be distributed to the shareholders.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations. Denied in all other respects as well.**

6.      In this regard, although Peppertree has exercised its right under the governing documents to sell the Company and secured an offer for the Company at a purchase price in excess of $400,000,000[2], Respondents rejected the contemplated transaction out of hand and then obstructed and prevented the continuation of the contractually mandated sales process in complete derogation of both the governing documents and their duties thereunder, costing Peppertree and the Company's other shareholder, an affiliate of Goldman Sachs & Co., LLC, **more than $185,000,000.**

---

[2] All dollar amounts set forth herein are in USD.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations. Denied in all other respects as well.**

7.      Additionally, both prior and subsequent to Peppertree's decision to sell the Company, in cases where the Board has rejected proposed Company actions, Respondents have repeatedly violated the governing documents by causing the Company to take unilateral, unapproved actions to benefit Respondents and their affiliates.

**RESPONSE: Denied.**

8.      As set forth in detail below, Respondents have ignored their basic, fundamental contractual commitments and have, instead, engaged in wrongful and self-serving conduct, including brazen self-dealing, misappropriation, and embezzlement, which not only constitutes repeated breaches of the Company's governing documents and breaches of their fiduciary duties to the Company and its shareholders, but is also in contravention of good faith business practices and applicable New York law.

**RESPONSE: Denied.**

9.      Respondents have also asserted a baseless and self-serving purported repudiation of the governing Shareholders Agreement solely to provide themselves with a clear path to continue their course of unlawful conduct in contravention of the Shareholders Agreement.  If permitted to continue, this conduct will irreparably harm the Company and its shareholders, including Peppertree.  As a result, Claimants are forced to bring this arbitration pursuant to the Company's governing documents, seeking damages and declaratory relief, as well as, in the alternative, specific performance (including the contractually required sale of the Company), and interim injunctive relief to prevent Respondents from continuing to take these wrongful actions

that are highly injurious and detrimental to the Company, as well as to Peppertree.

**RESPONSE: Denied.**

## Background Regarding the Business Transaction at Issue

10.     Upon information and belief, Respondent Hernandez and his family have been in the construction industry in South America for many years.  At some point they began to focus their efforts on building towers and other communication infrastructure in South America and Central America.  As part of these efforts, in 2008, Hernandez established the Company through entities he owns and controls, including Terra.  In 2014, Hernandez met representatives of Peppertree and discussed the possibility of having it provide its expertise and capital as part of the expansion of Hernandez's and Terra's business in Latin America.  Ultimately, Peppertree agreed to do so.  As a result, in 2014, Peppertree and Terra entered into a business deal by which they became investors in an affiliate of the Company.  In 2015, that transaction was expanded to include the Company; the original investments were contributed, and additional capital was invested by Peppertree and by an affiliate of Goldman Sachs & Co., LLC.  Various governing documents, including a Shareholders Agreement and Development Agreement (defined further below), were heavily negotiated by these sophisticated Parties and their counsel.

**RESPONSE: Admitted insofar as Hernandez has experience in the construction and communication infrastructure industry in South America. Without knowledge as to who Claimants consider family and therefore denied. Denied that Hernandez "owns and "controls" Terra or the Company. The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations.**

11.     The governing documents established the aforementioned four-person Board, as

well as a development committee (the "Development Committee"[3]), to make decisions related to the development of sites. As is the case in virtually all of the transactions of Peppertree Investor, Board and/or Development Committee approval is required before the Company may take virtually any actions, including, without limitation, building each telecommunication tower, entering into contracts, or making distributions. These approval requirements were purposeful and mandated by Peppertree to ensure that neither party was permitted to take unilateral action on behalf of the Company because the Company's interests may not always align with those of Hernandez, Arzú, and Terra.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations.**

12. The primary purpose of the Parties' business relationship was to develop and operate telecommunications towers in certain agreed locations in a manner that was profitable to the Company and its shareholders. The Company was not in the construction field and was not responsible for constructing the telecommunications towers. Rather, pursuant to the governing documents, the Parties agreed that Respondent DTH, which is owned and controlled by Hernandez, would construct the approved towers. For each Board-approved tower project, DTH would receive upfront capital, regardless of the long-term profitability of the project to the Company and/or whether the project was completed and/or whether the tower ever became operational. Thus, approval and construction of all sites is desirable for DTH and Hernandez, especially from a cash flow perspective. However, the same is not true for the Company, which only profits if the projects in which it invests are completed, operational, and profitable in the long

---

[3] The Development Committee is defined in Section 4.04(b) of the governing Shareholders Agreement, which is defined below. Any capitalized terms that are not defined herein have the same meaning as in the Governing Documents (set forth and defined in Paragraph 39 below).

term. Thus, Peppertree's ability to reject projects was crucial to its investment process. That "safety valve" was fully-understood by all Parties and was heavily negotiated.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations. Also denied in all other respects.**

<u>**Respondents' Self-Dealing and Other Wrongful Conduct**</u>

13. After the Parties negotiated and entered into the governing documents, the Company began to identify and develop sites. However, Respondents began to take actions in contravention of the governing documents and the approvals required therein. By way of example, Respondents took no less than the following actions, which began to increase in both frequency and severity in late 2020:

- **<u>Failure to Honor Contractual Offset Right</u>:** As early as 2017, Respondents failed to apply funds owed to the Company through an offset credit for the development and construction of future sites. These amounts now total approximately **<u>$6.58 million</u>**. The governing documents require that if the Board (or Development Committee) approves any projects that are later not completed for any reason, including situations that would fall within a customary definition of force majeure, any funds the Company provided for development of those project sites must then be used for the development of future sites (i.e., the offset credit) for the benefit of the Company. This was an important and heavily negotiated term of the Parties' agreement because in the communication infrastructure industry, especially in Latin America, there is a substantial risk that an approved tower project may not reach completion and may, thus, provide no value to the Company. Respondents agreed to bear that risk because Peppertree agreed that the Company would pay DTH $175,000 for each approved site even though the development and construction cost for building the average tower at issue was materially less. Despite the clear agreement to the offset credit, Respondents have repeatedly and systematically failed and refused to apply it to the development and construction of future sites, resulting in approximately $6.58 million owed to the Company.

- **<u>Self-Dealing for Old Sites #1</u>:** In August 2020, the Company, through Terra, presented certain sites in Colombia for Development Committee approval, all of

which were **rejected**.  On October 30, 2020, Peppertree learned[4] that payment for four (4) of these rejected sites in the amount of **$700,000** (i.e., $175,000 x 4) had been sent to an affiliate of Terra.  In addition to violating the governing documents and self-dealing resulting in the payment of $700,000 which it was not otherwise entitled to make, Terra concealed the fact that these were not new sites to be developed by the Company; rather, they had already been built by Terra's affiliates in or about 2019.  Upon information and belief, Respondents only conceived of and crafted this transaction in an effort to address their immediate cash liquidity needs, which drove the unauthorized and unlawful purchase and development.

- **Unauthorized Cash Distribution:**  On or about October 25, 2020, without seeking the required Board approval, Terra caused **$5.4 million** in unauthorized cash distributions to be made to the shareholders.[5]

- **Self-Dealing for Old Sites #2:**  The self-dealing set forth above was repeated just three months later.  In November 2020, Terra once again caused the Company to acquire three (3) sites in Columbia from an affiliate of Terra.  This proposed transaction had been **rejected** by the Development Committee, but on or about December 1, 2020, Terra caused the Company to pay **$525,000** for the rejected sites to one of its affiliates.  Not only did the Respondents violate the governing documents and self-deal, they concealed the fact that these were not new sites to be developed by the Company, but, rather, Terra's affiliates had built these sites in **2015**.  What had started as a "joint venture" for the Company to develop new sites had turned into an unlawful garage sale of Respondents' existing assets for Respondents' sole benefit at the expense of both Peppertree and the Company.

- **Embezzling Funds Prior to Milestones:**  As more fully described, below, Terra is not entitled to receive any development or construction payments before certain, specific milestones are met.  In December 2020, Terra notified the Board[6] that approximately **$625,000** was prepaid to Terra's affiliates for three (3) sites in Peru **before any required development and construction milestones were met**, again in direct contravention of the governing documents.

- **Self-Dealing for Old Sites #3:**  On December 23, 2020, Terra proposed a Corporate Business Opportunity ("CBO") for multiple sites in Columbia, Nicaragua, and Panama.  The CBO was formally **rejected** by the Development Committee pursuant to the Shareholders Agreement.  Once again, these sites were not new development opportunities, but, rather, were previously built by Respondents' affiliates, some as

---

[4] The Company used to distribute a "Cash Availability Report" on a weekly basis, but recently began to do so less frequently despite Peppertree's objections.  Peppertree was able to discern the facts described by analyzing such a report.

[5] Peppertree and Goldman objected to these unauthorized distributions but ultimately received and retained their respective allocations to preserve them and ensure that Terra did not misappropriate this portion of the funds as well.

[6] This embezzlement was further documented in the Company's December 11, 2020 "Cash Availability Report."

early as **2015**. Ignoring the formal **rejection** of the Development Committee, on or about December 28, 2020, Respondents presented notice that **$2.8 million** in Company funds for sixteen (16) of these sites had been sent to an affiliate of Terra.

- **Obstruction of Required Sale of the Company:** Terra, led by Hernandez, failed to meet its contractual obligations under the Shareholders Agreement to sell the Company, and, in fact, obstructed the sales process. Specifically, the governing documents require that after October 22, 2020, at either Peppertree or Terra's request, the Company be sold. On or about November 4, 2020, Peppertree delivered to respondents a Notice of Approved Sale, by which the Company would be sold for $407.8 million (the "Proposed Sale"), approximately **$185 million** of which would go to Peppertree and the Goldman Sachs affiliate. This was an extremely lucrative sale for all shareholders of the Company. Respondents, however, rejected the Proposed Sale. Upon such a rejection, the Shareholders Agreement and other governing documents required (a) the parties to engage an investment bank to sell the Company and (b) Terra to make up any shortfall between the $185 million and the amount that Peppertree and the Goldman Sachs affiliate might receive from a subsequent sale. Respondents failed to do so by stonewalling and repeatedly delaying the process, including, without limitation, by failing to hire an investment bank as required.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations. Also denied in all other respects.**

14. These actions are highly injurious to the Company and its shareholders, including Peppertree. As shown by these examples, and as will be demonstrated at arbitration, Respondents' actions were taken for one primary purpose: to use the Company as a cash cow in order to provide a steady source of cash flow to Respondents and their related entities by any means possible. Not only are Respondents' actions self-dealing, but they were taken in bad faith and in intentional and direct contravention of both the governing documents and New York law. Moreover, they have deprived Peppertree of the benefit of its bargain, its negotiated voice in the management of the Company, and the important ability to manage the Company according to its governing documents.

**RESPONSE: Denied.**

15. In addition, on or about December 22, 2020, Respondents claimed that the

Shareholders Agreement, which requires Board approval for many relevant actions on behalf of the Company, was "repudiated" and the Board was "effectively defunct." Relying on these unfounded claims, Respondents have effectively announced that they no longer intend to abide by the terms of the Shareholders Agreement or seek the required Board approvals, and that they may take any unilateral actions on behalf of the Company they see fit, thereby depriving Peppertree of its contractually mandated voice in the management of the Company. Respondents' new claims pose a substantial and immediate threat to Claimants. Should Respondents be permitted to flout the purposeful and agreed protections of Board approval, there will be no restraint on their continued unlawful conduct, which will likely include further looting of the Company via additional improper distributions and developing multiple, unapproved sites with no prospects of long-term profitability, for the sole benefit of Terra and DTH.

**RESPONSE: Respondents' communications speak for themselves. To the extent Claimants misstate or miscite such communications, Respondents deny all such allegations. Also denied in all other respects.**

16. Likewise, Respondents will likely enter into a Master Licensing Agreement ("MLA") with a specific wireless carrier, which the Board has already **rejected**, to enrich themselves at the Company's expense. The MLA includes harmful terms that will decrease the long-term value of the Company and make it more difficult to sell; yet, the MLA will fund Respondents' liquidity needs by permitting them to develop additional, unapproved sites at $175,000 per site. To be clear, when the Company is sold as required by the governing documents, there is no need whatsoever for this MLA.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations. Also denied in**

**all other respects.**

17.     Although Peppertree has put Respondents on written notice that these unauthorized and unlawful activities must stop immediately, Respondents have failed and refused to cease this wrongful conduct.  Not only does this harm the Company, it also diminishes the value of the Company and, if such conduct continues, could have the effect (intended by Respondents) of delaying a sale of the Company or preventing it altogether.

**RESPONSE: Peppertree's communications speak for themselves. To the extent Claimants misstate or miscite such communications, Respondents deny all such allegations. Also denied in all other respects.**

18.     Accordingly, Claimants are initiating this arbitration in order to compel Respondents to abide by the terms of the governing documents, including the required sale of the Company, and to prevent continued injury to the Company.  Claimants also intend to seek interim injunctive relief to preserve the *status quo*; to prevent Respondents from taking any additional, wrongful unilateral actions without Board or Development Committee approvals, in contravention of the governing documents and their fiduciary duties to the Company and its other shareholders; and to prevent continued irreparable harm to the Company and its shareholders.

**RESPONSE: Admitted only insofar as an arbitration has been initiated. Without knowledge with respect to what Claimants intend to do in the arbitration and therefore denied. Denied in all other respects as well.**

## THE PARTIES

### Claimants

19.     Claimant **Telecom Business Solution, LLC** ("Peppertree TBS"), is a limited liability company organized under the laws of Delaware, and brings this arbitration on its own

behalf and on behalf of the Company in the nature of a derivative action. Peppertree TBS is a shareholder of the Company.

**RESPONSE: Admitted that Peppertree TBS has been named as a claimant in this arbitration, and admitted that it is a shareholder of the Company. Denied in all other respects.**

20.     Claimant **LATAM Towers, LLC** ("<u>Peppertree Latam,</u>" and together with Peppertree TBS, "<u>Peppertree</u>") is a limited liability company organized under the laws of the State of Delaware, and brings this arbitration on its own behalf and on behalf of the Company in the nature of a derivative action.  Peppertree Latam is a shareholder of the Company.

**RESPONSE: Admitted that Peppertree Latam has been named as a claimant in this arbitration, and admitted that it is a shareholder of the Company. Denied in all other respects.**

<u>**Respondents**</u>

21.     Respondent **Terra Towers Corp.** ("<u>Terra Towers</u>") is a company incorporated in the British Virgin Islands, with registered number 1375181, whose registered office is at Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands. Terra Towers is a shareholder of the Company.

**RESPONSE: Admitted.**

22.     Respondent **TBS Management, S.A.** ("<u>Terra TBS,</u>" and, collectively with Terra Towers, "<u>Terra</u>"), is a *sociedad anónima* organized under the laws of Panama.  Terra TBS is a shareholder of the Company.

**RESPONSE:** Denied only insofar as Terra TBS is a *Sociedad de Responsabilidad Limitada,* and formerly a *sociedad anonima*, organized under the laws of Panama**.**

23.     Respondent **DT Holdings Inc.** ("<u>DTH</u>") is a company incorporated in the Republic of Panama.

**RESPONSE: Admitted in so far as DTH is a company incorporated in the Republic of Panama. Denied that DTH is properly a Respondent in this Arbitration.**

24.     Upon information and belief, Terra Towers has an ownership interest in both Terra TBS and DTH.

**RESPONSE: Denied.**

25.     DTH, Terra Towers, and Terra TBS are collectively referred to herein as the "<u>Terra Entities</u>."

**RESPONSE: Claimants' collectively defining the "Terra Entities" speaks for itself. Denied for all other purposes.**

26.     Respondent **Jorge Hernandez** ("<u>Hernandez</u>") owns and controls the Terra Entities, a group of interrelated entities.  Hernandez is a Director of the Company.

**RESPONSE: Denied that Hernandez "owns and controls" the Terra Entities. Admitted that Hernandez is a Director of the Company.**

27.     Respondent **Alberto Arzú** ("<u>Arzú</u>") is the Company's Chief Executive Officer and was also appointed by Hernandez (through Hernandez's dominion and control over Terra Towers and Terra TBS) as a Director of the Company.  Arzú and Hernandez are long-time friends.

**RESPONSE: Denied. Arzú was appointed by the A Shareholders, not Hernandez, and does not serve as the Company's Chief Executive Officer.**

28.     Together, Hernandez and Arzú comprise 50% of the Company's Board.

**RESPONSE: Admitted.**

29.     Hernandez and Arzú are joined here as Respondents in their capacities as Directors

of the Company.

**RESPONSE: Admitted only insofar as Hernandez and Arzú have been named as Respondents in this arbitration. Denied in all other respects.**

30.     Upon information and belief, DTH, Terra Towers, Terra TBS, Hernandez and Arzú are represented by:

>Juan J. Rodriguez, Esq.
>Carey Rodriguez Milian Gonya, LLP
>Brickell Arch
>1395 Brickell Avenue
>Suite 700
>Miami, FL 33131
>Tel.  (305) 372-7474
>Email: JRodriguez@careyrodriguez.com
>
>Danielle Jasmin Kirby, Esq.
>Illumination Technologies, LLC
>Miami, FL
>Tel.: (901) 849-3734
>Email: dkirby@illuminationtechnologies.com
>
>Rafael Briz, Esq.
>Mayora & Mayora, S.C
>15 calle, 1-04 zona 10, 01010
>Edificio Céntrica Plaza, tercer nivel, oficina 301
>Ciudad de Guatemala, Guatemala
>Tel: Guatemala (502) 2223-6868
>Fax: Guatemala (502) 236-625-40
>Email: rbriz@mayora-mayora.com

**RESPONSE: Admitted that these entities and/or individuals represent Terra and DTH. Otherwise denied.**

### Nominal Respondent and Notice Person

31.     Nominal Respondent **Continental Towers LATAM Holdings Limited** (the Company") is a company incorporated in the British Virgin Islands, with registered number 1882295, whose registered office is at Commerce House, Wickhams Cay 1, PO Box 3140, Road

Town, Tortola, British Virgin Islands.

**RESPONSE: Admitted that Company has been named as a nominal respondent in this arbitration and that it is incorporated and has a registered office as alleged.**

32.    The Company has engaged the following independent counsel in connection with this proceeding and the disputes set forth herein:

> Charles J. Falletta, Esq.
> Sills Cummis & Gross P.C.
> One Riverfront Plaza
> Newark, NJ 07102
> Tel:  (973)643-5926
> Email:  cfalletta@sillscummis.com

**RESPONSE: Denied.**

33.    In addition to the Parties, pursuant to the notice provisions in the Shareholders Agreement (defined below), the Parties shall provide notice of this Arbitration to certain notice persons, including, among others AMLQ Holdings (Cay) Ltd. ("Goldman Investor"):

> Goldman, Sachs & Co.  200
> West Street
> New York, NY 10282
> Email: Michael.McGinn@gs.com
> Attention: Mike McGinn
>
> and
>
> Goldman, Sachs & Co.
> 6011 Connection Drive
> Irving, Texas 75039
> E-mail: ben.nale@gs.com
> Attention: Ben Nale
>
> with a copy to:
>
> Jonathan P. Gill, Esq.
> Ropes & Gray LLP
> 1211 Avenue of the Americas
> New York, NY 10036
> E-mail: Jonathan.Gill@ropesgray.com

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations.**

## FACTUAL BACKGROUND

### History and Governing Documents

34.     Upon information and belief, Hernandez and his family have been in the construction industry in South America for many years.  At some point in time, Hernandez began to focus his efforts on building towers and other communication infrastructure in the countries of South America and Central America.  Eventually, as part of these efforts, Hernandez caused the Company to be established in 2008 by entities he owns and controls, including Terra.

**RESPONSE: Admitted insofar as Hernandez has experience in the construction and communication infrastructure industry in South America. Without knowledge as to who Claimants consider family and therefore denied. Denied that Hernandez individually owns the Company, and further denies that he "control[s]" Terra. Denied in all other respects as well.**

35.     In 2014, Hernandez met representatives of Peppertree, which had a successful history in investing in communication infrastructure ventures, and discussed the possibility of having Peppertree invest in the expansion of Hernandez's and Terra's business in Latin America.

**RESPONSE: Admitted insofar as Terra had negotiations with Peppertree, which negotiations speaks for themselves. Without knowledge as to how Claimants define "successful history" and therefore denied.**

36.     Accordingly, through a series of transactions in 2014 and 2015, Peppertree joined Terra as a shareholder of the Company.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants**

**misstate or miscite such agreements, Respondents deny all such allegations.**

37.    In the 2015 transaction, Peppertree increased its investment and the Goldman Investor, an affiliate of Goldman Sachs & Co. LLC, also became a shareholder.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations.**

38. The following reflects the shareholders' investments in the Company:

| Shareholders | % Ownership |
|---|---|
| Terra Towers Corp. (Terra) | 45.98% |
| TBS Management, S.A. (Terra) | 8.47% |
| LATAM Towers, LLC (Peppertree) | 23.73% |
| Telecom Business Solution, LLC (Peppertree) | 8.47% |
| AMLQ Holdings (Cay) Ltd. (Goldman Investor) | 13.35% |
| **TOTAL** | **100.00%** |

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations.**

39.    The 2015 transaction was reflected in the following agreements, along with other related documents, including those defined in the Subscription Agreement as Governing Documents (collectively and as amended, the "<u>Governing Documents</u>") [7]:

A.    On or about October 22, 2015, the Company, Peppertree Latam, the Goldman Investor, and Terra Towers entered into a Subscription and

---

[7] Capitalized terms not defined herein have the meaning given to them in the Governing Documents.

Contribution Agreement (the "<u>Subscription Agreement</u>").[8]

B.     On or about October 22, 2015, the Company, Peppertree Latam, Peppertree TBS, the Goldman Investor, Terra Towers, and Terra TBS entered into a Shareholders Agreement (the "<u>Shareholders Agreement</u>").[9]

C.     On or about October 22, 2015, the Company, Terra Towers, Terra TBS, and DTH entered into a Development Agreement (as amended, the "<u>Development Agreement</u>").[10]

D.     On or about October 22, 2015, the Company and DTH entered into an Offshore Turnkey Engineering, Procurement and Management Contract (as amended, the "<u>EPC Contract</u>").[11]

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations.**

40.     The Governing Documents are explicitly governed by and construed under New York law.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations.**

41.     Under the Governing Documents, the Company is governed by the Board, consisting of four (4) directors (the "<u>Directors</u>"), two appointed by Terra and two by Peppertree.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants**

---

[8] The Subscription Agreement is attached hereto as **Exhibit A**.
[9] The Shareholders Agreement is attached hereto as **Exhibit B**.
[10] The Development Agreement is attached hereto as **Exhibit C**.
[11] The EPC Contract is attached hereto as **Exhibit D**.

**misstate or miscite such agreements, Respondents deny all such allegations.**

<u>The Company's Business</u>

42.     The Company is a communication infrastructure company in the business of developing, acquiring, and operating wireless communication towers and other wireless communication sites in Central America and South America.

**RESPONSE: Admitted.**

43.     The Company develops tower sites through contractual agreements with the Terra Entities.

**RESPONSE: Admitted insofar as the Towers are built by DTH, or its subsidiaries**.

44.     Specifically, pursuant to the Development Agreement and the EPC Contract, Respondents Terra and DTH perform the on-the-ground work of identifying new tower sites; obtaining regulatory permissions; applying and receiving local zoning approvals, permits, and licenses; constructing and maintaining the towers; and providing back-office services for the Company.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations.**

45.     The Company generates income by leasing space on the towers to wireless carriers.

**RESPONSE: Admitted.**

46.     The development of a tower site begins when, under the Development Agreement, Terra identifies a potential new tower site (a "<u>Proposed Site</u>") and proposes it to the Company's Development Committee, which is comprised of the Company's four Directors.  Development Agreement § 1.1(a).

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants**

**misstate or miscite such agreements, Respondents deny all such allegations.**

47. The Company's Development Committee decides whether to approve a potential tower site and is not required to approve any site. This "safety valve" is a customary term in tower development financing arrangements and is standard in Peppertree Investor documentation. It allows the Development Committee to prevent the expenditure of funds where, in the business judgment of Peppertree, it would be imprudent to do so. Regrettably, that was the case here, where management was dishonest and where management's judgment was poor, ineffective, and at times irresponsible and/or where, in the judgment of Peppertree, the proposed projects were undesirable from an economic perspective. Nevertheless, in the ordinary course, where potential sites that were likely to be profitable to the Company were presented to the Development Committee, such sites were often approved, notwithstanding Peppertree's growing distrust of the Respondents.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations. Denied in all other respects.**

48. To be clear, all projects *are desirable* from DTH's perspective because it receives upfront revenue for the development and construction activities, regardless of the long-term profitability of the towers to the Company. Hernandez often ignores the reality that what may be good for DTH or him may be neutral or negative for the Company.[12] Again, there were specific safeguards included within the Governing Documents to protect against this obvious conflict of interest.

---

[12] For example, on February 28, 2017, a number of Hernandez' lieutenants signed a letter (apparently ghost written for them) in which they purportedly calculated the value of the Company's "lost opportunity" for specific rejected sites as $175,000 multiplied by the number of rejected sites. In reality, that calculation was DTH's "lost opportunity," not the Company's.

**RESPONSE: Denied.**

49.　Terra agreed in the Development Agreement that Terra must provide certain information regarding the Proposed Site to the Development Committee, and the Development Committee may "request such reasonable additional information regarding a Proposed Site as it deems necessary or appropriate, such request to not cause unreasonable delay." *Id.*

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations.**

50.　If a Proposed Site is approved by the Development Committee, it becomes an "Approved Site." *Id.* § 1.1(c).

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations.**

51.　However, if, within two days of receiving all of the information that it has requested about a Proposed Site, the Development Committee does not accept the Proposed Site by delivering a Site Acceptance Notice to Terra, Terra may develop such site **outside of the Company and without use of the Company's funds**:

> If the Development Committee has not delivered a Site Acceptance Notice within an additional two (2) Business Days following receipt of the notice from Terra…then Terra or any of its Affiliates (other than the Company Subsidiaries and GTSL) may acquire and/or develop the Proposed Site **at their cost and without the participation of the Company**.

*Id*. (emphasis added).

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations.**

52.　If a Proposed Site is approved, the Company issues a purchase order to DTH.　For each purchase order issued, the Company (and its subsidiaries) pays $175,000 per Approved Site

to DTH (and its subsidiaries), subject to certain conditions. EPC Contract § 2.1.1.1.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations.**

53.     The 175,000 price is paid to DTH (and its subsidiaries) in stages as the development of the site reaches certain milestones (the "<u>Milestones</u>") and progresses toward completion, as follows:

a.  10% upon receipt of a purchase order from a wireless carrier requesting that the DTH Subsidiary obtain all permits, licenses or authorizations required to begin construction on the Approved Site;

b.  40% upon the DTH Subsidiary's receipt of all permits, licenses or authorizations required to begin construction on the Approved Site;

c.  25% upon the DTH Subsidiary commencing construction of a tower on the Approved Site;

d.  20% upon the DTH Subsidiary's completion of construction of a tower on the Approved Site and delivery to the Company Subsidiary of all permits, licenses, authorizations or agreements required to allow the Company Subsidiary to use and commercialize such Approved Site or reasonably requested by the Company Subsidiary to evidence its rights in the Approved Site; and

e.  5%, upon installation of equipment and the beginning of rental payments by a wireless carrier tenant.

*Id.* § 2.1.2.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations.**

## The Company's Offset Right

54. After development of a tower site begins, it may stall temporarily, or permanently, due to a variety of factors, including local political and economic issues.

**RESPONSE: Without sufficient knowledge as to the "variety of factors" that Claimants are referring to and therefore denied.**

55. One of the inducements to Peppertree, and likely the Goldman Investor, for investing in the Company was Respondents' proclaimed ability to navigate the myriad physical, administrative, zoning, political, and social difficulties in developing telecommunications sites in Latin America.

**RESPONSE: Without knowledge and, therefore, denied.**

56. Thus, the risk that the development of a site might stall was specifically contemplated by the Parties during their original negotiations in 2014 and 2015. As such, provisions that contemplate and allocate these risks were included in the original documents and also specifically included again in the Governing Documents.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations.**

57. Indeed, since Hernandez and Respondents would control the local operations regarding the development and commercial exploitation of sites, it was important that the risks and rewards be carefully delineated and agreed upon. Thus, Peppertree, together with the Goldman Investor, and ultimately the Company, negotiated to obtain a fair allocation of the risk that results when the Company invests up-front funds in a tower site that later stalls or is abandoned.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations.**

58.     Specifically, if the development of a tower site stalls <u>for any reason</u> such that it does not move forward to the next scheduled Milestone within twelve (12) months of reaching the prior Milestone, the Governing Documents provide that the Company is to receive an "offset" (i.e., a credit, the "<u>Offset Right</u>") whereby payments the Company has made to DTH (and its subsidiaries) toward the development of the stalled or abandoned site are credited toward the development of future sites.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations.**

59.     However, to compensate DTH for the risk of stalled tower sites (which in many instances, it alone can anticipate or prevent), the Company agreed to pay DTH a per-tower fee that significantly exceeds the cost of developing and constructing a tower site.[13]  In this way, the cost of stalled sites is built into the overall fees paid by the Company to DTH.  This *quid pro quo* was a heavily-negotiated, key point in this transaction:  in order to eliminate any future debates about stalled sites, or causes for stalled sites, Peppertree agreed to allow the Company to "overpay" for completed sites in exchange for DTH absorbing the costs associated with all stalled sites, expressly including situations that would fall within a customary definition of force majeure.  DTH was so confident it could perform that it was willing to accept the risk—and, of course, was likewise happy to accept the overpayments.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations.**

60.     In the EPC Contract, DTH agreed that the payment of the $175,000 for each

---

[13] Under the Governing Documents, DTH is paid $175,000 for a completed tower, well above the actual cost of approximately $65,000 - $100,000.

Approved Site "is to be made by the Company . . . subject to (x) satisfaction of each of the conditions precedent set forth in [Section 2.1.2, including the Milestones] and (y) **any offset of prior payments by the Company or a Company Subsidiary pursuant to such section**." *Id.* § 2.1.1.1 (emphasis added).

      **RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations.**

      61.    DTH further agreed that

> For the . . . avoidance of doubt, if at any time [DTH] fails to complete any of the milestones set forth in Section 2.1.2.1 – 2.1.2.5 above within 12 months of completion of the previous milestone, (i) Company shall not be responsible for any further payments or distributions with regard to such Approved Site and (ii) **Company** and the Company Subsidiary **shall be entitled to offset any payments made to [DTH] for such Approved Site pursuant to this Section 2.1.2 and the applicable Onshore EPC against any amounts otherwise due to [DTH] for later Approved Sites (the "Offset Right")**.

EPC Contract § 2.1.2.5 (emphasis added).

      **RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations.**

      62.    Similarly, in the Development Agreement, DTH and Terra agreed to the Offset Right, expressly including "event[s] of force majeure." Development Agreement § 1.1(d).

      **RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations.**

      63.    Thus, under the plain terms of the Governing Documents, if any Approved Site does not advance to the next Milestone within twelve (12) months of meeting the prior Milestone, the Company shall have the right to offset any payments made to DTH for that Approved Site against the construction costs of a future Approved Site.

      **RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations.**

**Respondents' Failure to Obtain Agreed-Upon Financing**

64.     The Offset Right became critical to the Company's continued financial stability and growth because Respondents breached the provisions in the Governing Documents concerning the Company's intent to fund its growth with appropriate financing.

**RESPONSE: Denied.**

65.     All shareholders—Terra, Peppertree, and the Goldman Investor—have paid in full all required equity payments to the Company.

**RESPONSE: Admitted.**

66.     A crucial selling point for Peppertree when entering into the Governing Documents was that the Company would **<u>not</u>** require any additional equity investments after the initial payments.  The oral and written representations made by Hernandez and his investment bankers, including those set forth in the Confidential Information Memorandum, dated March 2015 (the "Offering Memorandum"), specifically described this business plan and reflected a credit facility growing to in excess of $800 million over four years:  "Use of leverage to fund future tower builds … No additional equity investment contemplated to fulfill current plan."

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations. Also, without knowledge as to Claimants' internal thought processes and therefore denied. Denied in all other respects as well.**

67.     Moreover, in the Governing Documents, the Parties agreed that, after the initial equity payments were made, the Company would obtain financing to enable it to continue to develop new towers.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants**

misstate or miscite such agreements, Respondents deny all such allegations.

68.     Specifically, in the Shareholders Agreement § 6.05, the "Shareholders agree[d] to use commercially reasonable efforts to assist the Company in obtaining any credit facilities as the Board determines are required to facilitate the growth of the Company."

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations.**

69.     At the time that they entered into the Shareholders Agreement, the Parties expected that the Company would enter into a credit facility with a major United States or European lender (the "Anticipated Credit Facility") to provide the Company with sufficient financing to fund future and continuing development of tower sites.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations.**

70.     At the time the Parties entered into the Shareholders Agreement, Terra (represented by Hernandez) indicated to Peppertree and the Goldman Investor that it expected and intended that the Company would enter into the Anticipated Credit Facility.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations.**

71.     Yet when an affiliate of the Goldman Investor was prepared to provide the anticipated financing on customary terms, Hernandez obstructed and impaired the Company's entry into the Anticipated Credit Facility.

**RESPONSE: Denied.**

72.     In April 2016, the Anticipated Credit Facility had not been finalized due to obstruction by Hernandez. His conduct in not allowing the Company to enter into the Anticipated

Credit Facility was in direct contravention of the representations and understandings in the Offering Memorandum under which Peppertree invested. Not only was it irrational—as it is the proximate cause of the Company not having capital—it represented the first major break in the investors' confidence in Hernandez's reliability as both a partner and manager.

**RESPONSE: Denied.**

73.     Hernandez soon realized that the effect of his irrational decision was that the Company did not have capital. He then urged the shareholders to provide a bridge loan to the Company to provide cash flow (and fund the Company's payments to Hernandez's company DTH) while the Anticipated Credit Facility was being finalized. Hernandez represented that he would facilitate the Company's entry into the Anticipated Credit Facility soon after the bridge loan was complete.

**RESPONSE: Denied.**

74.     In April 2016, Peppertree and Terra each provided $5 million for a total of $10 million in bridge financing, with the understanding it was truly a "bridge" to getting the Anticipated Credit Facility done as represented by Hernandez. The vast majority of this bridge loan was used to pay DTH for tower construction.

**RESPONSE: Admitted only insofar as Peppertree and Terra each provided $5 million to the Company in April 2016 but denied in all other respects.**

75.     In October 2016, Hernandez pressed the shareholders to provide an additional bridge loan of $4.5 million. Goldman Investor joined Terra in doing so. These funds again were used to pay DTH.

**RESPONSE: Admitted only insofar as an additional $4.5 million was paid to the Company but denied in all other respects.**

76.     After these bridge loans were made by the shareholders in advance of the Anticipated Credit Facility, Hernandez and Arzú then refused again to honor their commitment to support the Company's entry into the Anticipated Credit Facility and caused the Company to reject it.

**RESPONSE: Denied.**

77.     Peppertree viewed this as the last straw:  Hernandez had taken capital twice via material misrepresentations about his promised cooperation with a major credit facility, once with respect to the initial equity investment and once with respect to the bridge loan financings.

**RESPONSE: Denied.**

78.     Hernandez and Arzú urged Peppertree and the Goldman Investor to instead consider financing agreements with local banks and investors in Central and South America.

**RESPONSE: Admitted only insofar as Hernandez and Arzú presented another lender. Denied in all other respects.**

79.     The financing advocated by Respondents was piecemeal and confined to certain territories and would not be sufficient to repay the bridge loans and/or to complete much else. Hernandez and Arzú acknowledged this point by suggesting that the bridge loans lose their "bridge" status and become permanent.  Even if the investors were willing to forego repayment on their bridge loans (after being misled by Hernandez), the financing advocated by Hernandez would have only allowed the Company to start construction on a few new tower sites—which would result in cash flow to DTH—before additional financing would immediately need to be sought.

**RESPONSE: Denied.**

80.     In any event, the piecemeal financing advocated by Respondents never materialized.  Whether or not Respondents understood that the draft term sheets they presented

lacked any evidence of a true commitment by any lender, Peppertree, sophisticated in such matters, certainly understood that no commitments were being made by any lender and/or no significant credit facilities were likely to close.

**RESPONSE: Denied.**

81.    Because Respondents refused to proceed with the agreed-upon Anticipated Credit Facility, the Company could not fund the development of new tower sites without the Offset Right.

**RESPONSE: Denied.**

### Respondents' Refusal to Recognize the Offset Right

82.    To date, the Company has an Offset Right valued at approximately $6.58 million.

**RESPONSE: Denied.**

83.    This $6.58 million Offset Right arises from Approved Sites for which DTH failed to complete a Milestone within twelve (12) months of completion of the previous Milestone. In some cases, Approved Sites have been stalled for years with no activity whatsoever.

**RESPONSE: Denied.**

84.    Under the Governing Documents, Respondents are required to propose and develop appropriate future sites for the Company at their sole cost (with a development value of $175,000 per site) until the $6.58 million offset has been depleted.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations.**

85.    Notwithstanding their contractual and fiduciary obligations to do so, the Terra Entities have failed and refused to satisfy their Offset Right obligations to acquire and develop such later Approved Sites for the benefit of the Company and its business.

**RESPONSE: Denied.**

86.     Instead, the Terra Entities continue to demand additional payments from the Company for each new tower site.

**RESPONSE: Denied.**

87.     In their capacity as shareholders and through their appointed Directors, Peppertree has demanded that the Offset Right be recognized and that the Terra Entities continue to identify and develop tower sites without receiving additional payment by the Company. Respondents have failed and refused to accede to these demands or to recognize the Company's Offset Rights.

**RESPONSE: Peppertree's demands speak for themselves. Denied in all other respects, including that Peppertree is owed offset rights.**

88.     The Terra Entities have not provided any recognizable or legitimate justification for this failure and refusal.

**RESPONSE: Denied.**

89.     Pursuant to Section 6.06 of the Shareholders Agreement, Terra may not participate in any telecom infrastructure business opportunity (as further defined in the Shareholders Agreement, a "Corporate Opportunity"[14]) unless the opportunity has been presented to the Company so that the Board may consider whether the Company should participate in the Corporate Opportunity. Terra may pursue the opportunity on its own behalf only if the Company declines to participate by rejecting the Corporate Opportunity.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations.**

90.     Terra has flooded the Company with ostensible Corporate Opportunities in which

---

[14] In their correspondence, the Parties frequently use the term "Corporate Business Opportunity" or "CBO" to refer to a Corporate Opportunity pursuant to the Shareholders Agreement.

Terra knew the Company was financially unable to participate at the time. Instead of abiding by its contractual obligations of honoring the Offset Right, Terra presented the Corporate Opportunities, refused to apply the Offset Right in violation of the governing agreements and then built these sites outside of the Company. Respondents should have satisfied their Offset Right obligations to the Company and built approximately thirty-eight (38) of these sites for the benefit of the Company and its shareholders.

**RESPONSE: Denied.**

## Respondents' Interests are Served Through Hernandez's Control and Direction of the Board and the Company's Management Team

91. Hernandez's interests are served by members of the Board and the management team ("Management Team") who are beholden to Hernandez and act at his direction.

**RESPONSE: Denied.**

92. None of the Company's Management Team is actually employed by the Company. Instead, Hernandez has appointed individuals employed by the Terra Entities and other close associates to the Company's Management Team.

**RESPONSE: Admitted that the parties outsourced employment. Denied in all other respects.**

93. These include Respondent Arzú, whom Hernandez appointed as the Company's CEO and a Director; Juan Francisco Quisquinay, the Company's CFO; Danny Barrios, the Company's Treasurer; Danielle Kirby, Esq., the Company's General Counsel; Alejandro Sagastume, the Director of Terra TBS and Terra Towers; and Kristha Pineda, Portfolio Manager to the Colombian and Peruvian subsidiaries of the Company.

**RESPONSE: Denied that Arzú serves as the Company's CEO. Admitted only insofar as the other individuals are officers of the Company. Denied in all other respects.**

94.     Specifically, Respondents, through their control of members of the Management Team, prevent Peppertree from obtaining a clear and accurate picture of the Company's finances and prevent Peppertree from timely learning of Respondents' unauthorized transactions and self-dealing.

**RESPONSE: Denied.**

### Respondents' Recent Acts of Self-Dealing, Misappropriation and Embezzlement

95.     In recent months, Peppertree has learned that Respondents are misappropriating Company funds and disbursing them to themselves and their affiliates in self-dealing transactions that they hide from Peppertree.

**RESPONSE: Denied.**

96.     It is also noteworthy that when Peppertree has detected a disturbing and alarming pattern whereby whenever Respondents appear to have engaged in activities which are unauthorized or impermissible, Peppertree's attempts to obtain operational or financial information about these activities are thwarted.  For example, "Cash Availability Reports" which used to be distributed every Friday are now distributed less frequently, notwithstanding Peppertree's demand for the weekly information.  This obstruction and obfuscation prevents Peppertree from learning about Respondents' self-dealing until after the funds are already disbursed.

**RESPONSE: Denied.**

### *Self-Dealing for Old Sites #1*

97.     For example, on August 12, 2020, Respondents presented certain tower sites in Colombia for approval to the Development Committee.  On August 17 and 18, 2020, respectively, these proposed sites were **rejected** in separate letters to Alejandro Sagastume (from Peppertree)

and to Kristha Pineda (from the Development Committee). Notwithstanding the rejection, on October 30, 2020, Peppertree discovered via the analysis of a Cash Availability Report that four of these **rejected** sites (TBS08062, TBS08063, TBS08064 and TBS08065) had nonetheless been developed and funded in the amount of $700,000 (i.e. $175,000 x 4). This act was a violation of the Governing Documents and an act of self-dealing as Terra's affiliates received the payment. Moreover, contrary to Respondents' misrepresentations when they were presented, these sites had been previously constructed by Respondents' affiliate in 2019 and were not actually new sites to be developed by the Company. Rather, Respondents' affiliates sold old sites to the Company for $175,000 per site so that Respondents could pocket $700,000 to which they were not entitled.

**RESPONSE: Denied.**

### Unauthorized Cash Distribution

98.      Distributions of cash to shareholders can only be accomplished with Board approval. Nonetheless, Respondents sent a letter dated October 25, 2020, whereby they admitted to unilaterally and wrongfully instructing their agents to distribute $5.4 million belonging to the Company, purportedly as "Excess Cash Flow."[15]

**RESPONSE: Respondents' October 26, 2020 letter speaks for itself. To the extent Claimants misstate or miscite such letter, Respondents deny all such allegations. Denied in all other respects.**

### Self-Dealing for Old Sites #2

99.      In what may be the most egregious example of misrepresentation and self-dealing due to the actual age of the sites, on November 25, 2020, Respondents' agent, Alejandro

---

[15] Peppertree and the Goldman Investor objected to these unauthorized distributions but ultimately received and retained their respective allocations to preserve them and ensure that Terra did not misappropriate this portion of the funds as well.

Sagastume, sent a CBO proposal for the Company, ostensibly to develop three (3) new sites in Colombia. This CBO was **formally rejected** by the Development Committee, per its express right to do so pursuant to Section 6.06 of the Shareholders Agreement. In reality, these sites were not new development projects, as misrepresented by the Respondents, but rather had been built by Respondents' Colombia affiliate **in 2015**. Notwithstanding the Development Committee's **rejection**, and notwithstanding the material misrepresentation about the age of the sites, Respondents caused the Company to buy those sites for $175,000 per site. (As though the foregoing was not enough, the $525,000 Hernandez caused the Company to pay his affiliate implies a 25x tower cash flow purchase price multiple – an exorbitantly high price for towers in Colombia, especially towers with these characteristics.)

  **RESPONSE: Denied.**

  100. As part of that rejection, the Development Committee was clear in that "the Referring Shareholder and its Affiliates are free to pursue this opportunity on their own and outside of the Company."[16] In no uncertain terms, and to eliminate any doubt, the Development Committee reiterated that "these 3 Colombia CBO sites were not authorized to be included in the Company portfolio at any time, and no funds are authorized by the Board for the development of this site." To prevent any ambiguity regarding how such potential payments might be mishandled, the Development Committee further warned that no "DT employees or representatives direct Company Management to use Company funds to pay DT or other 3rd party providers for these sites. Doing so will be another blatant violation and additional evidence in what has become a pattern of abuse and misappropriation of Company funds being systematically perpetrated by the

---

[16] In the interests of economy, Claimants have not attached all of the relevant dispute correspondence and other key documents quoted or otherwise referenced herein; however, such documents will be offered as exhibits at arbitration.

A Shareholders against the B & C Shareholders."

**RESPONSE: Denied.**

101.    Ignoring the rejection and warnings, on December 1, 2020, Kristha Pineda presented notice to the Board that the Company had used $525,000 for precisely those same three (3) rejected sites.

**RESPONSE: The notice speaks for itself. To the extent Claimants misstate or miscite such notice, Respondents deny all such allegations. Denied in all other respects.**

102.    On December 7, 2020, Mr. Ranieri, one of Peppertree's Directors wrote to Respondents as follows:

Jorge Hernandez and Alberto:

This message is directed to you both, as Company Directors, in order to have you exercise your authority to stop this pattern of behavior and blatant disregard of the written, contractual agreements among the Shareholders that govern the disbursement of Company funds for tower development and funding.

**Rejected Sites:**  As you can all see from the attached **November 28th** email to Alejandro Sagastume, these 3 sites in Colombia were proposed to the Company in  a November 25th

CBO from Alejandro (according to **Section 6.06 – Corporate Opportunities** of the Shareholders Agreement) and were formally <u>rejected</u> (many of you were copied on that message).  I was very clear in that "*the Referring Shareholder and its Affiliates are free to pursue this opportunity <u>on their own</u> and <u>outside</u> of the Company.  For the avoidance of doubt, these 3 Colombia CBO sites are <u>not authorized</u> to be included in the Company portfolio at any time, and <u>no funds</u> are authorized by the Board for the development of this site.*"  According to Alejandro's communications, these sites are being built at approximately **25x TCF**[17] and serve only to provide liquidity for DT because DT will collect the $175,000 per site upfront.

---

[17] TCF refers to "Tower Cash Flow," which, pursuant to the Shareholders Agreement, "means, with respect to a Tower (i) recurring ordinary rent payments with respect to Tower Space Licenses <u>minus</u> (ii) expenses directly associated with the operation and maintenance of such Tower (including any insurance expenses or recurring ordinary rent payments) accrued or paid by the Company and the Company Subsidiaries, with each component of the [sic] such calculation consistently applied every time a determination of Tower Cash Flow for such Tower is made."  Shareholder Agreement, Article I.

***Do not, under any circumstance***, have DT employees or representatives direct Company Management to use Company funds to pay DT or other 3rd party providers for these sites. Doing so will be another blatant violation and additional evidence in what has become a pattern of abuse and misappropriation of Company funds being systematically perpetrated by the A Shareholders against the B & C Shareholders.

**Final Note for Kristha:** For the past 2 years, you have fully acknowledged and communicated with me as a Director of the Company, sending me numerous messages across a variety of topics. In recent weeks, it seems that you have attempted to avoid (or delay) my prompt knowledge of attempted activities to disburse Company funds for unauthorized projects and, in doing so, have sent incomplete notices to us. Stop this immediately and resume sending me the messages that are directed to the Board.

**RESPONSE: The December 7, 2020 correspondence speaks for itself. To the extent Claimants misstate or miscite such correspondence, Respondents deny all such allegations. Denied in all other respects.**

### *Embezzling Funds Prior to Milestones*

103.    As the foregoing examples illustrate, this warning (like others before it) had no deterrent effect on Respondents' wrongful activities. On December 1, Kristha Pineda notified a the Board, and confirmed in the December 11, 2020 Cash Availability Report, that three (3) site relocations in Peru – totaling approximately $625,000 – were pre-paid to Respondents' affiliates *prior to* any evidence that any Milestone had been achieved.

**RESPONSE: The December 11, 2020 Cash Availability Report speaks for itself. To the extent Claimants misstate or miscite such report, Respondents deny all such allegations. Denied in all other respects.**

### *Self-Dealing for Old Sites #3*

104.    On December 23, 2020, Terra proposed a CBO for sites in Columbia, Nicaragua, and Panama. The CBO was formally rejected by the Development Committee pursuant to the Shareholders Agreement. These sites were not new development opportunities; rather, they were

previously built by Respondents' affiliates, some as early as **2015**. This was not development; it was misappropriation of funds. Ignoring the formal rejection of the Development Committee, on or about December 28, 2020, Respondents presented notice of the use of $2.8 million in Company funds for sixteen (16) of these sites. To reiterate: Respondents had caused the Company to pay $2.8 million to the Respondents' affiliates for sites that were formally rejected.

**RESPONSE: The communications speak for themselves. To the extent Claimants misstate or miscite such communications, Respondents deny all such allegations. Denied in all other respects.**

105. As the evidence will demonstrate, the Board and/or Development Committee, utilizing their discretion and applying reasonable business judgment, rejected proposed sites for multiple reasons, all reasonable and appropriate, including, but not limited to, the following:

- Certain proposed sites lacked permitting, municipal licenses, tenant leases, ground leases, or other documentation required for approvals.

- Certain proposed sites were rejected due to poor economics for the Company, including, without limitation, acquisition multiples as high as 25 times Tower Cash Flow (TCF); sites with minimal to no chance of adding tenants to justify cost; contracts with carriers that were short-term or halfway through the existing contractual term; and other economic factors, all of which would render the value of the rejected sites below the price mandated by Respondents.

- As early as 2014, the Parties understood that Peppertree was not interested in, and did not agree to, build sites in countries where the revenue would be predominantly in local currencies (i.e., non-USD), yet, subsequently,Terra started proposing such sites.

- Certain proposed sites had non-assignable tenant contracts between the carriers and the

regional Terra affiliate, which meant that the Company could not obtain the necessary title to the tenant leases.

- Certain proposed sites had ground agreements on municipal property through a third party representative and not the municipality; therefore, the Company could not be assured ground rights.

- The Company had insufficient capital because Hernandez would not permit the Company to enter into the Anticipated Credit Facility.

- The Company had insufficient capital because Respondents did not apply the contractually mandated Offset Right. In fact, because Respondents did not apply the Offset Right, the Company was, in essence, overpaying for all sites, making the continued approval of sites at $175,000 not in the best interests of the Company.

- The negotiated price of $175,000 was for towers. Hernandez showed bad faith by refusing to charge less than $175,000 for certain types of non-tower sites (e.g., rooftops or billboards), even though the development and construction cost for such sites is roughly $35,000.

- As set forth in this Statement of Claims, Respondents, including, specifically, Hernandez, proved themselves to be untrustworthy and repeatedly acted in bad faith, irrationally, and in contravention of the Governing Documents, including, without limitation, by failing to enter into the Anticipated Credit Facility, failing to lower rooftop pricing from $175,000 as anticipated, failing to apply the Offset Right as required, causing the Company to take various unapproved actions, and otherwise engaging in self-dealing and embezzlement. As a result, Claimants used their contractual "safety valve," set forth in the Governing Documents, as designed, in order

to protect the interests of the Company, Peppertree, and Peppertree's investors.

**RESPONSE: Denied.**

106.     These acts of self-dealing, misappropriation, misrepresentation, and outright embezzlement have recently occurred and, together with the additional conduct set forth in Paragraph 13 above, provide just some examples, without limitation, of Respondents' known, unlawful conduct to date.  As a result, as outlined below, Peppertree has exercised its right to have the Company sold.

**RESPONSE: Denied.**

## Refusal to Sell the Company

107.     The Governing Documents were specifically negotiated to permit either Peppertree or Terra the right to require the sale of the Company through a specified process after the fifth anniversary of the execution of the Governing Documents, such five-year period being defined in the Shareholders Agreement as the "Lock Up Period."

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations.**

108.     This too was a heavily negotiated provision specifically put in place to permit any one of the Peppertree or Terra to exit the investment for any reason, or no reason at all, after the Lock Up Period ended (there are other triggers for allowing the shareholders to demand a sale as well) – but particularly where that shareholder felt that the other shareholder(s) in the investment was no longer a suitable or trustworthy partner.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations. Denied in all other respects.**

109.    Specifically, the Shareholders Agreement provides:

(b) <u>Approved Sale</u>.  Following the earlier of (i) the expiration of the Lock-Up Period [i.e., October 22, 2020], . . . then within ninety (90) calendar days of such event, (A) either the Initial A Shareholders [Terra] or the Initial B Shareholders [Peppertree] in the case of sub-section (i) . . . (such shareholders, the "**Proposing Shareholders**") may request, upon written notice to the other Initial Shareholders and the Company (the "**Proposed Sale Notice**"), a sale of all or substantially all of the Company's assets or all or substantially all of the Shares in the Company (in one or more transactions) to an unaffiliated Third Party Purchaser (an "**Approved Sale**").

(i)  If the Proposing Shareholders have already procured or received an offer from an unaffiliated Third Party Purchaser to purchase the assets or Shares of the Company (a "**Proposed Offer**"), the Proposed Sale Notice shall disclose in reasonable detail the identity of the prospective purchaser and the proposed terms and conditions of the Proposed Offer. The Initial A Shareholders or the Initial B Shareholders, as applicable, (the "**Objecting Shareholders**") may reject such Proposed Offer within thirty (30) calendar days of delivery of the Proposed Sale Notice by providing the Company with an opinion from an independent and reputable investment bank with experience in the industry and a cross-border practice (an "**Investment Bank**"), retained at the sole expense of the Objecting Shareholders, stating that the value of the proposed transaction is materially less than comparable transactions in the industry and the Territory; *provided that*, if such opinion is provided, the provisions of <u>Section 5.04(b)(ii)</u> shall apply.  In the event that no such opinion is provided by the expiration of such 30 day period, each Shareholder shall vote for, consent to and raise no objections against such Approved Sale and take all necessary and reasonable actions in connection with the consummation of the Approved Sale as requested by the Proposing Shareholders.

(ii) If the Proposing Shareholders have not already procured an offer from an unaffiliated Third Party Purchaser or if an opinion has been provided by an Objecting Shareholder pursuant to <u>Section 5.04(b)(i)</u>, the Company shall, within thirty (30) calendar days of receipt of a Proposed Sale Notice, retain an Investment Bank to facilitate an Approved Sale and each Shareholder shall vote for, consent to and raise no objections against such Approved Sale and take all necessary and reasonable actions in connection with the consummation of the Approved Sale as requested by the Proposing Shareholders.  In the event that the consideration to be received for the Shares or assets of the Company upon the consummation of such Approved Sale is less than the Proposed Offer provided by the Third Party Purchaser pursuant to <u>Section 5.04(b)(i)</u>, the difference between the amount of the Proposed Offer and the purchase price of the Approved Sale shall be deducted from the proceeds otherwise due to the Objecting Shareholders.

* * *

(c)  In the event that any proposed Approved Sale is not consummated, for any reason or no reason, both the Initial A Shareholders and the Initial B Shareholders shall retain the right to request an Approved Sale in the future pursuant to the terms of this <u>Section 5.04(b)</u>.

Shareholders Agreement § 5.04(b)-(c).

**RESPONSE: The parties' agreements speak for themselves. To the extent misstate or miscite such agreements, Respondents deny all such allegations.**

110. The Lock Up Period expired on October 22, 2020.

**RESPONSE: Admitted.**

111. As evidenced by the above history, well in advance of the expiration of the Lock Up Period, it was clear to Peppertree that Respondents were neither suitable partners nor trustworthy.

**RESPONSE: Denied.**

112. Accordingly, on November 4, 2020, Peppertree delivered to Respondents a Notice of Proposed Approved Sale ("Notice of Proposed Approved Sale") requesting "the sale of all of the issued and outstanding Class A, Class B and Class C shares of the Company (the 'Shares') pursuant to Section 5.04(b)(i) of the Shareholders Agreement."

**RESPONSE: The Notice of Proposed Approved Sale speaks for itself. To the extent Claimants misstate or miscite such notice, Respondents deny all such allegations.**

113. Pursuant to Section 5.04(b)(i) of the Shareholders Agreement, attached to the Notice of Proposed Approved Sale was "an offer from an unaffiliated Third Party Purchaser to purchase the . . . Shares of the Company" for a specified sum (the "Proposed Offer").

**RESPONSE: The parties' agreements and notices speak for themselves. To the extent Claimants misstate or miscite such agreements and notices, Respondents deny all such allegations.**

114. The Proposed Offer satisfied all of the requirements of Section 5.04(b) of the Shareholders Agreement.

**RESPONSE: Denied.**

115.     Pursuant to Section 5.04(b)(i) of the Shareholders Agreement and Article 17.1(i) of the Articles of Association (the "Articles") of the Company dated July 15, 2015 and approved October 20, 2015, Terra only had two choices:  either (a) accept the Proposed Offer; or (b) reject the Proposed Offer, initiate the hiring of an Investment Bank to sell the Company, and guaranty that Peppertree and the Goldman Investor would receive no less than in the Proposed Offer.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations. Denied in all other respects.**

116.     By Notice of Rejection of the Proposed Offer dated November 24, 2020 ("Notice of Rejection"), Terra, as Objecting Shareholders, rejected the Proposed Offer by tendering documents purporting to be an "opinion from an independent and reputable investment bank with experience in the industry and a cross-border practice" which stated that the value of the proposed transaction is materially less than comparable transactions in the industry and the Territory.  In the Notice of Rejection, Terra also asserted without basis that the Proposed Offer was "not a bona fide offer and is thus rejected."  (It is noteworthy that the Proposed Offer was not merely a letter of intent which was all that was required to make it "bona fide"; rather, it was a heavily negotiated purchase agreement in a form that Peppertree was willing to sign.)

**RESPONSE: The notice speaks for itself. To the extent Claimants misstate or miscite such notice, Respondents deny all such allegations. Denied in all other respects.**

117.     In the Notice of Rejection, Terra acknowledged that "[a]ccording to Section 5.04(b)(ii) of the SHA, the Company shall within thirty (30) calendar days of receipt of a Proposed Sale Notice retain an Investment Bank to facilitate an Approved Sale. Accordingly, the deadline for the Company to appoint an Investment Bank to facilitate an Approved Sale is December 4,

2020. Given that time is of the essence, Terra proposes convening a Board meeting in the next ten (10) days in order to discuss proposals for the retention of an Investment Bank by the Company and consider the conditions under which the Board could approve such retention."

**RESPONSE: The notice speaks for itself. To the extent Claimants misstate or miscite such notice, Respondents deny all such allegations. Denied in all other respects.**

118.     The Parties convened a meeting (via Zoom) to discuss the process of engaging an Investment Bank on December 3, 2020.  However, during that meeting, the Respondents made certain proposals to Peppertree and the Goldman Investor that they wished to be considered. Specifically, Terra urged a delay in proceeding with the sale process pursuant to Section 5.04 of the Shareholders Agreement while it attempted to raise funds to achieve a redemption of the shares of Peppertree and the Goldman Investor.  While Peppertree was skeptical as Hernandez had failed in a similar attempt before, Peppertree wished to provide him with the opportunity to redeem the shares.  Accordingly, the Parties agreed to extend the time within which the Company must hire an Investment Bank until December 7, 2020.  Thereafter, the Parties entered into additional agreements to further extend the deadline to December 15, 2020.

**RESPONSE: Admitted only insofar as there was a meeting. Denied in all other respects.**

119.     However, in the interim, Peppertree learned of the additional actions by Respondents in violation of the Governing Documents and which constituted brazen self-dealing, misappropriation, and embezzlement outlined above.

**RESPONSE: Denied.**

120.     In light of these discoveries, on December 15, 2020, Peppertree's counsel attempted to schedule a Zoom meeting with Respondents to discuss the situation, but Terra's counsel

declined.

**RESPONSE: The December 15, 2020 communication speaks for itself. To the extent Claimants misstate or miscite such notice, Respondents deny all such allegations. Denied in all other respects.**

121.   Given this response from Respondents, as a follow up to his December 7, 2020 email to Respondents, Mr. Ranieri again wrote to Respondents on December 16, 2020 as follows:

All:

_Self-dealing and Misappropriation of Funds in Colombia_

1.   As evidenced by the chain of messages below, Alejandro Sagastume presented a Corporate Business Opportunity proposal on November 25, 2020, for the Company to acquire 3 sites in Colombia.  Contrary to the A Shareholder's attempt at deception, these sites were not being newly-developed, but rather had been built by an affiliate of the A Shareholder _in 2015_.

2.   As further evidenced by the emails below, _the Development Committee formally rejected this proposal_ in accordance with Section 6.06 – Corporate Opportunities of the Shareholders Agreement.

3.   As part of that rejection, I was clear in that "_the Referring Shareholder and its Affiliates are free to pursue this opportunity on their own and outside of the Company._"  In no uncertain terms, and for the avoidance of doubt, I reiterated that "_these 3 Colombia CBO sites were not authorized to be included in the Company portfolio at any time, and no funds are authorized by the Board for the development of these sites._"  To prevent any ambiguity regarding how such potential payments might be effected, I stated that no "_DT employees or representatives [were to] direct Company Management to use Company funds to pay DT or other 3rd party providers for these sites.  Doing so will be another blatant violation and additional evidence in what has become a pattern of abuse and misappropriation of Company funds being systematically perpetrated by the A Shareholders against the B & C Shareholders._"

4.   _Notwithstanding the rejection of the proposal in accordance with our agreements, the A Shareholders, through an act of self-dealing and embezzlement, transferred these sites to the Company for $525,000._  (Not only did the A Shareholders self-deal, they caused the Company to pay an absurdly high 25x tower cash flow multiple for that illegal transaction.)

…

46

In summary, you have once again proven that you cannot be trusted to act as financial fiduciaries of the Company's resources. These continued and serious contractual violations of the SHA and other governing documents will add to the body of evidence a third-party will evaluate, eventually weighing these material breaches against a laughable "business purposes"[18] argument that pales in comparison to what you have perpetrated. We expect that your actions are rooted in an intentional trade off to generate immediate liquidity at the risk of committing and being held accountable for financial fraud. As I conveyed in previous messages, we were open to entertaining legitimate ways to resolve your financial situation, but you chose not to seek a collaborative route that could have avoided your actions.

**RESPONSE: The correspondence speaks for itself. To the extent Claimants misstate or miscite such correspondence, Respondents deny all such allegations. Denied in all other respects.**

122. Additionally, on December 16, 2020, Peppertree responded through counsel, in relevant part, as follows:

[T]he B Shareholders [i.e., Peppertree] became aware of additional concerns regarding the management of the company, including apparent actions which proceeded without necessary board approval. After reviewing the draft documents, and considering the foregoing issues, the B and C Shareholders [i.e., Peppertree and the Goldman Investor] believe that it is in the parties' best interests to proceed with the mandated sale process under Section 5.04 of the SHA. Thus, the B and C Shareholders demand that the process required by Section 5.04(b)(ii) of the SHA immediately proceed unabated.

To that end, below is a list of proposed investment banks that meet the criteria required by the SHA:

[omitted]

If you would like to add others that meet the criteria in the SHA, please do.

_____

[18] Respondents have previously argued that because Section 3.01 of the Shareholders Agreement states the "purpose of the Company is to develop… Towers," and the Development Committee rejected multiple opportunities to develop towers after Respondents had acted in bad faith, those rejections violate the "purposes clause." In so doing, not only do the Respondents misunderstand that a "purposes clause" does not impose any affirmative requirements to approve sites or opportunities, they have also ignored the specific requirements of the Governing Documents, including the heavily negotiated Board/Development Committee approval requirements, and their obligations thereunder.

We then suggest that, by 5:00pm (Eastern) on Thursday of this week, each side's Directors should strike a set number of names in order to limit the pool. The Directors will then jointly interview the remaining candidates and choose an investment banker to be retained by the Company before Christmas. In order to provide the parties with the requisite time to complete this process, we are amenable to further extending the deadline contained in the SHA for the Company to select a banker pursuant to Section 5.04(b)(ii) through that date.

**RESPONSE: The correspondence speaks for itself. To the extent Claimants misstate or miscite such correspondence, Respondents deny all such allegations. Denied in all other respects.**

123.    On December 22, 2020, Danielle Kirby, on behalf of Respondents, responded by again claiming that the Proposed Offer "was not a bona fide offer" and "it is a moot point to be discussing the appointment of an Investment Banker."[19]

**RESPONSE: The correspondence speaks for itself. To the extent Claimants misstate or miscite such correspondence, Respondents deny all such allegations. Denied in all other respects.**

124.    Respondents' failure and refusal to permit the Company to retain an Investment Bank for purposes of effectuating a sale of the Company is a violation of a critical, heavily negotiated provision of the Shareholders Agreement which was a key driver in Peppertree's decision to make the investment in the Company in the first instance.

**RESPONSE: Denied.**

125.    Respondents' actions in this regard are causing irreparable injury to the Company and to Peppertree even while Respondents are, at the same time, engaging in clear acts of misappropriation and embezzlement. Respondents have refused to abide by the requirement to

---

[19] Ms. Kirby also suggests that the parties "conduct a formal process" to select an Investment Banker, even though Peppertree's proposed process already complied with the requirements set forth in the Shareholders Agreement. Ms. Kirby's suggestion was merely another obvious delay tactic to obstruct the required sale of the Company.

have the Company governed by the Board and have essentially eviscerated all safeguards that Peppertree negotiated at the outset of this investment, depriving it of its contractual and financial rights, as well as its voice in the management of the Company and the opportunity to manage the Company.

**RESPONSE: Denied.**

126. Peppertree is entitled to an award of compensatory damages caused by Respondents' conduct in rejecting the Proposed Sale and subsequently failing to move forward with the required process for sale of the Company pursuant to Section 5.04(b) of the Shareholders Agreement, including, without limitation, the amount to which Peppertree would have been entitled from the Proposed Sale.

**RESPONSE: Denied.**

127. Given that Respondents have a history of breaching provisions in the Governing Documents or ignoring them altogether, Peppertree is doubtful that Respondents would comply with an award directing specific performance of Respondents' obligations under the Governing Documents. However, in the alternative and to the extent that Peppertree does not receive full compensatory damages resulting from Respondents' failure to sell the Company as required, Peppertree is entitled to an award directing specific performance of the provisions of Section 5.04(b) of the Shareholders Agreement related to sale of the Company.

**RESPONSE: Denied.**

**Respondents' Baseless Representation That the
Shareholders Agreement Has Been "Repudiated"**

128. On December 21, 2020, Respondents sent correspondence to Peppertree and the Board, seeking, *inter alia*, that the Company enter into a new MLA with a wireless carrier in Peru.

**RESPONSE: The correspondence speaks for itself. To the extent Claimants misstate**

**or miscite such correspondence, Respondents deny all such allegations. Denied in all other respects.**

129.     The Board had already rejected entering into this new MLA because it included harmful terms that would decrease the long-term value of the Company and make it more difficult to sell.  However, if the Company were to enter into the new MLA, it would be attractive to Respondents' affiliates because it would provide another avenue to misappropriate funds for additional, unapproved sites at $175,000 per site.

**RESPONSE: Denied.**

130.     On December 22, 2020, Peppertree and its Board members responded to the request advising Respondents that they did **not** have authority to enter into the MLA without Board approval and that Respondents did not have such Board approval.

**RESPONSE: The correspondence speaks for itself. To the extent Claimants misstate or miscite such correspondence, Respondents deny all such allegations. Denied in all other respects.**

131.     Subsequently, on or about December 22, 2020, Respondents claimed that the Shareholders Agreement, which required Board approval for various actions on behalf of the Company, was somehow "repudiated" and that the Board was "effectively defunct."

**RESPONSE: The correspondence speaks for itself. To the extent Claimants misstate or miscite such correspondence, Respondents deny all such allegations. Denied in all other respects.**

132.     In so doing, Respondents have effectively announced that they no longer intend to abide by the terms of the Shareholders Agreement or seek the required Board approvals, and that they may take any unilateral actions they see fit, thereby depriving Peppertree of its contractually

mandated voice in the management of the Company. This poses a substantial and immediate threat to both the Company and Claimants.

**RESPONSE: Denied.**

133. Should Respondents be permitted to flout the purposeful and agreed protections of Board approval, there will be no restraint on their continued unlawful conduct, which will likely include looting the Company through continuing to make improper distributions and developing multiple, unapproved sites with no prospects of long-term profitability, for the sole benefit of Respondents.

**RESPONSE: Denied.**

134. Likewise, Respondents will likely enter into the MLA, which the Board has already rejected, to further enrich themselves at the Company's expense.

**RESPONSE: Denied.**

<strong><u>Other Issues</u></strong>

135. Claimants bring this arbitration proceeding specifically to address, *inter alia*, Respondents' failure to fund the Offset Right, acts of financial infidelity, and refusal to abide by the sale requirements of Section 5.04(b) of the Shareholders Agreement.

**RESPONSE: Admitted only to the extent that Claimants filed an arbitration proceeding. Denied in all other respects.**

136. However, additional issues have arisen in connection with the Company which are recited for purposes of giving the panel a full picture of the relationships among the Parties.

**RESPONSE: Denied.**

137. The rejection of the Proposed Offer has resulted in Peppertree and the Goldman Investor failing to receive in excess of **$185,000,000** from the sale. The proceeds from the

Proposed Sale would have been distributed as follows:

| PRO RATA PROCEEDS FROM PROPOSED SALE OF COMPANY | | |
|---|---|---|
| **Shareholders** | **% Ownership** | **Pro Rata Share of Offer** |
| Terra Towers Corp. (Terra) | 45.98% | $185,506,440 |
| TBS Management, S.A. (Terra) | 8.47% | $34,540,660 |
| LATAM Towers, LLC (Peppertree) | 23.73% | $96,770,940 |
| Telecom Business Solution, LLC (Peppertree) | 8.47% | $34,540,660 |
| AMLQ Holdings (Cay) Ltd. (Goldman Investor) | 13.35% | $54,441,300 |
| **TOTAL** | **100.00%** | **$407,800,800** |

**RESPONSE: Denied.**

138.     The Shareholders Agreement provides that Terra will be responsible to Peppertree and the Goldman Investor for any loss they suffer as a result of Respondents' rejection of the Proposed Offer.  Shareholders Agreement § 5.04(b)(ii).

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations.**

139.     Peppertree has no confidence that Terra will honor its obligation set forth in the Shareholder Agreement, and, therefore, specifically reserves the right to add such a claim in these proceedings to the extent that there is any subsequent sale of the Company for an amount that is less than that in the Proposed Sale, or Respondents' conduct has obstructed, delayed, and/or otherwise made the sale of the Company impossible.

**RESPONSE: Denied.**

140.     By bringing this proceeding to address the above-referenced disputes, Peppertree does not waive any of its other claims or rights under the Governing Documents, at law, or in

equity, all such rights and remedies being fully and expressly reserved.

**RESPONSE: Denied.**

## AGREEMENT TO ARBITRATE
### Arbitration Agreements in Governing Documents

141.   The Governing Documents contain the following arbitration agreements:

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations. Denied in all other respects.**

142.   Sections 8.14 and 8.15 of the Shareholders Agreement (the "Shareholders Agreement Arbitration Provision") state:

**Section 8.14 Dispute Resolution.**  The parties agree that any controversy, claim or dispute arising out of or relating to or in connection with this Agreement including, without limitation, any dispute regarding its breach, termination, enforceability or validity hereof (each, a "**Dispute**") should be regarded as a business problem to be resolved promptly through business-oriented negotiations before resorting to arbitration pursuant to Section 8.15.  The parties therefore agree to attempt in good faith to resolve any Dispute promptly by negotiation between the executives of the parties who have authority to settle the Dispute.  Such negotiations shall commence upon the mailing of a notice (the "**Dispute Notice**") from the appropriate executive of the requesting party to an appropriate executive of the responding party.  If the Dispute has not been resolved by these Persons within fortyfive (45) days of the date of the Dispute Notice, then such Dispute will be settled pursuant to binding arbitration pursuant to Section 8.15.  All negotiations pursuant to this Section 8.14 will be confidential and will be treated as compromise and settlement negotiations for purposes of applicable rules of evidence and not be used for, or admitted in, any arbitration or court proceedings under this Agreement.

**Section 8.15 Arbitration.**  Subject to Section 8.12, any Dispute that has not been resolved pursuant to Section 8.14 will be finally settled by binding arbitration.  The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association in effect at the time of the arbitration, except as they may be modified herein or by mutual agreement of the parties.  The seat of the arbitration shall be New York, New York.  The arbitration shall be conducted by three arbitrators.  The party initiating arbitration (the "**Claimant**") shall appoint its arbitrator in its request for arbitration (a "**Request**").  The other party (the "**Respondent**") shall appoint its arbitrator within thirty (30) calendar days of receipt of the Request and shall notify the Claimant of such appointment in writing.  If the Respondent fails to appoint an arbitrator within such thirty (30) day period, the arbitrator named in the Request shall decide the Dispute as the sole

arbitrator. Otherwise, the two arbitrators appointed by the parties shall appoint a third arbitrator within thirty (30) calendar days after the Respondent has notified the Claimant of the appointment of the Respondent's arbitrator. When the arbitrators appointed by the parties have appointed a third arbitrator and the third arbitrator has accepted the appointment, the two arbitrators shall promptly notify the parties of such appointment. If the two arbitrators appointed by the parties fail or are unable to appoint a third arbitrator, then the third arbitrator shall be appointed by the President of the American Arbitration Association which shall promptly notify the parties of the appointment of the third arbitrator. The third arbitrator shall act as chairman of the panel. The arbitration award shall be in writing and shall be final and binding on the parties. The award may include an award of costs, including reasonable attorney's fees and disbursements. Judgment upon award may be entered by any court having jurisdiction thereof or having jurisdiction over the parties or their assets. The Initial A Shareholders hereby designate, appoint and empower Corporation Service Company, (the "**Process Agent**") with offices as of the date of this Agreement at Corporation Service Company, 1180 Avenue of the Americas, Suite 210, New York, NY 10036 as their authorized agent to receive for and on their behalf service of summons or other legal process in any action commenced under this Section 8.15 or otherwise related to this Agreement or the related investments and transactions in accordance with the Acceptance of Appointment Letter, substantially as attached hereto as Exhibit B. Such service may be made by mailing or delivering a copy of such process to either or both of the Initial A Shareholders in care of the Process Agent at the Process Agent's above address, and the Initial A Shareholders hereby authorize and direct the Process Agent to accept such service on their behalf. The Initial A Shareholders acknowledge and agree that they shall not revoke the appointment of such Process Agent unless they have appointed another agent for service of process and have received the written consent of the other Shareholders to such appointment.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations. Denied in all other respects.**

143. Sections 8.10 and 8.11 of the Subscription Agreement (the "Subscription Agreement Arbitration Provision") state:

**Section 8.10 Dispute Resolution**. The parties agree that any controversy, claim or dispute arising out of or relating to or in connection with this Agreement including, without limitation, any dispute regarding its breach, termination, enforceability or validity hereof (each, a "**Dispute**") should be regarded as business problem to be resolved promptly through business-oriented negotiations before resorting to arbitration pursuant to Section 8.10. The parties therefore agree to attempt in good faith to resolve any Dispute promptly by negotiation between the executives of the parties who have authority to settle the Dispute. Such negotiations shall commence upon the mailing of a notice (the "**Dispute Notice**") from the appropriate executive of the requesting party to an appropriate executive of the responding party. If the Dispute has not been resolved by these Persons within fortyfive (45)

days of the date of the Dispute Notice, then such Dispute will be settled pursuant to binding arbitration pursuant to Section 8.11. All negotiations pursuant to this Section 8.10 will be confidential and will be treated as compromise and settlement negotiations for purposes of applicable rules of evidence and not be used for, or admitted in, any arbitration or court proceedings under this Agreement.

**Section 8.11 Arbitration.** Subject to Section 8.10, any Dispute that has not been resolved pursuant to Section 8.10 will be finally settled by binding arbitration. The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association in effect at the time of the arbitration, except as they may be modified herein or by mutual agreement of the parties. The seat of the arbitration shall be New York, New York. The arbitration shall be conducted by three arbitrators. The party initiating arbitration (the "**Claimant**") shall appoint its arbitrator in its request for arbitration (a "**Request**"). The other party (the "**Respondent**") shall appoint its arbitrator within thirty (30) calendar days of receipt of the Request and shall notify the Claimant of such appointment in writing. If the Respondent fails to appoint an arbitrator within such thirty (30) day period, the arbitrator named in the Request shall decide the Dispute as the sole arbitrator. Otherwise, the two arbitrators appointed by the parties shall appoint a third arbitrator within thirty (30) calendar days after the Respondent has notified the Claimant of the appointment of the Respondent's arbitrator. When the arbitrators appointed by the parties have appointed a third arbitrator and the third arbitrator has accepted the appointment, the two arbitrators shall promptly notify the parties of such appointment. If the two arbitrators appointed by the parties fail or are unable to appoint a third arbitrator, then the third arbitrator shall be appointed by the President of the American Arbitration Association which shall promptly notify the parties of the appointment of the third arbitrator. The third arbitrator shall act as chairman of the panel. The arbitration award shall be in writing and shall be final and binding on the parties. The award may include an award of costs, including reasonable attorney's fees and disbursements. Judgment upon award may be entered by any court having jurisdiction thereof or having jurisdiction over the parties or their assets. Terra hereby designates, appoints and empowers Corporation Service Company, (the "**Process Agent**") with offices as of the date of this Agreement at Corporation Service Company, 1180 Avenue of the Americas, Suite 210, New York, NY 10036 as its authorized agent to receive for and on its behalf service of summons or other legal process in any action commenced under this Section 8.11 or otherwise related to this Agreement or the related investments and transactions in accordance with the Acceptance of Appointment Letter, substantially as attached hereto as Exhibit I. Such service may be made by mailing or delivering a copy of such process to Terra in care of the Process Agent at the Process Agent's above address, and Terra hereby authorizes and directs the Process Agent to accept such service on its behalf. Terra acknowledges and agrees that it shall not revoke the appointment of such Process Agent unless it has appointed another agent for service of process and has received the written consent of the Buyers to such appointment.

RESPONSE: The parties' agreements speak for themselves. To the extent Claimants

misstate or miscite such agreements, Respondents deny all such allegations. Denied in all

other respects.

144.     Section 3.4 of the Development Agreement (the <u>Development Agreement</u>

<u>Arbitration Provision</u>") states:

> **Dispute Resolution; Arbitration.** In the event of any dispute between or among any of the Parties relating to the terms of this Agreement or the transactions contemplated hereby, the Parties agree to abide and comply at all times with the dispute resolutions and arbitration provisions of Section 8.14 and Section 8.15 of the Shareholders' Agreement, which sections shall be deemed incorporated herein by reference.

> **RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations. Denied in all other respects.**

145.     Section 7.1 of the Offshore EPC Contract (the "<u>EPC Contract Arbitration</u>

<u>Provision</u>") states:

> 7.1 <u>Dispute Resolution</u>.

> 7.1.1     The parties agree that any controversy, claim or dispute arising out of or relating to or in connection with this Agreement including, without limitation, any dispute regarding its breach, termination, enforceability or validity hereof (each, a "**Dispute**") should be regarded as a business problem to be resolved promptly through business-oriented negotiations before resorting to arbitration pursuant to Section 7.1.2. The parties therefore agree to attempt in good faith to resolve any Dispute promptly by negotiation between the executives of the parties who have authority to settle the Dispute. Such negotiations shall commence upon the mailing of a notice (the "**Dispute Notice**") from the appropriate executive of the requesting party to an appropriate executive of the responding party. If the Dispute has not been resolved by these persons within forty-five (45) calendar days of the date of the Dispute Notice, then such Dispute will be settled pursuant to binding arbitration pursuant to Section 7.1.2. All negotiations pursuant to this Section 7.1.1 will be confidential and will be treated as compromise and settlement negotiations for purposes of applicable rules of evidence and not be used for, or admitted in, any arbitration or court proceedings under this Agreement.

> 7.1.2     Any Dispute that has not been resolved pursuant to Section 7.1.1 will be finally settled by binding arbitration. The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association in effect at the time of the arbitration, except as they may be modified herein or by mutual agreement of the parties. The seat of the arbitration shall be New York, New York and each party agrees to service of process of any action commenced under this Section 7.1.2 by FedEx overnight delivery, with such service of process addressed to such party to be served at

the addresses set forth in Section 4.1. The arbitration shall be conducted by three arbitrators. The party initiating arbitration (the "**Claimant**") shall appoint its arbitrator in its request for arbitration (a "**Request**"). The other party (the "**Respondent**") shall appoint its arbitrator within thirty (30) calendar days of receipt of the Request and shall notify the Claimant of such appointment in writing. If the Respondent fails to appoint an arbitrator within such thirty (30) day period, the arbitrator named in the Request shall decide the Dispute as the sole arbitrator. Otherwise, the two arbitrators appointed by the parties shall appoint a third arbitrator within thirty (30) calendar days after the Respondent has notified the Claimant of the appointment of the Respondent's arbitrator. When the arbitrators appointed by the parties have appointed a third arbitrator and the third arbitrator has accepted the appointment, the two arbitrators shall promptly notify the parties of such appointment. If the two arbitrators appointed by the parties fail or are unable to appoint a third arbitrator or to notify the parties of such appointment, then the third arbitrator shall be appointed by the President of the American Arbitration Association which shall promptly notify the parties of the appointment of the third arbitrator. The third arbitrator shall act as chairman of the panel. The arbitration award shall be in writing and shall be final and binding on the parties. The award may include an award of costs, including reasonable attorneys' fees and disbursements. Judgment upon award may be entered by any court having jurisdiction thereof or having jurisdiction over the parties or their assets.

7.1.3   The arbitration panel may consolidate an arbitration arising out of or relating to this Agreement with any arbitration arising out of or relating to one or more of the Onshore EPCs if the subject matter of the Disputes arises out of or relates to essentially the same facts or transactions. Such consolidated arbitration shall be determined by the arbitral panel appointed for the arbitration proceeding that was commenced first in time.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations. Denied in all other respects.**

146.   Pursuant to the Shareholders Agreement Arbitration Provision and the EPC Contract Arbitration Provision, an arbitration award resolving a dispute under the Governing Documents may include an award of costs, including reasonable attorney's fees and disbursements.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations. Denied in all other respects.**

**Notice of Dispute**

147.    On October 23, 2020, Respondents sent to Peppertree (and the Goldman Investor) a Notice of Dispute (the "October 23 Notice of Dispute") giving notice of the disputes described therein and stating that if the disputes were not resolved within forty-five days, Respondents would commence binding arbitration.

**RESPONSE: The notice speaks for itself. To the extent Claimants misstate or miscite such notice, Respondents deny all such allegations. Denied in all other respects.**

148.    On November 5, 2020, Peppertree sent to Respondents a Notice of Dispute (the "November 5 Notice of Dispute") giving notice of the disputes described therein and stating that if the disputes were not resolved within forty-five days, Peppertree would take all actions to protect its rights and seek redress for such wrongful conduct, including but not limited to filing proceedings immediately against Respondents to seek specific performance, injunctive or other equitable relief, and to recover damages occasioned by Respondents' conduct to the fullest extent of the law.  The November 5 Notice of Dispute also responded to the assertions in the October 23 Notice of Dispute and further reserved all rights with respect to such other disputes as would arise during the 45-day negotiation period and beyond.

**RESPONSE: The notice speaks for itself. To the extent Claimants misstate or miscite such notice, Respondents deny all such allegations. Denied in all other respects.**

149.    Thereafter, the Parties exchanged a number of additional notices and responses with respect to the ongoing disputes between the Parties and otherwise reserved all rights with respect thereto.

**RESPONSE:  The notices speak for itself. To the extent Claimants misstate or miscite such notices, Respondents deny all such allegations. Denied in all other respects.**

150. Peppertree and Terra both appointed executive representatives to meet and attempt to resolve the ongoing disputes between the Parties.

**RESPONSE: Admitted.**

151. On December 3, 2020, the Parties' authorized executive representatives met (via Zoom) to attempt to resolve the disputes. These efforts were unsuccessful.

**RESPONSE: Admitted. The parties also had a follow-up meeting to the December 3, 2020 meeting on December 7, 2020 to discuss the disputes.**

152. More than 45 days has elapsed since the Parties began the negotiation process required by the Governing Documents, and no resolution has been achieved, notwithstanding Peppertree's best efforts and good faith.

**RESPONSE:  Denied.**

153. Accordingly, this Demand for Arbitration is timely.

**RESPONSE: Denied.**

### Derivative and Demand Futility Allegations

154. Peppertree brings this action on behalf of itself and derivatively in the right of and for the benefit of the Company and its shareholders to redress injuries suffered by the Company as a direct result of the violations of law, breaches of fiduciary duty, corporate mismanagement, self-dealing, embezzlement, and abuse of control, as well as the aiding and abetting thereof, of Respondents.

**RESPONSE: Admitted only insofar as Claimants filed this arbitration. Denied in all other respects.**

155. Peppertree will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting their rights.

**RESPONSE: Denied.**

156.     Peppertree has not made any formal demand on the Board to institute this action since such demand would be a futile and useless act for no less than the following reasons:

   a.   Demand is futile because two out of the Company's four Directors, Respondents Hernandez and Arzú, participated in, approved of, and/or benefitted from the wrongful acts set forth herein, including, but not limited to (i) initiating, developing and/or continuing to develop sites without the required Board or Development Committee approvals and/or without applying the required Offset Right; (ii) making or causing to be made unauthorized cash distributions; and (iii) seeking to enter into contracts, such as the MLA, on behalf of the Company without Board approval.   Specifically, Hernandez and Arzú will benefit from such conduct because it will result in an influx in cash not only to themselves but to DTH, which is owned and controlled by Hernandez, and to other entities related to Terra.

   b.   Demand is also futile because Terra is owned and controlled by Hernandez, who is personally benefitting from the wrongful conduct set forth herein.

   c.   Demand is further futile because, as set forth above, there has been significant dispute correspondence between Peppertree and its two Directors, on the one hand, and Respondents, on the other hand, related to the wrongful conduct set forth herein.   In that correspondence, Peppertree already advised Respondents that their conduct was wrongful and in contravention of the Governing Documents and demanded that Respondents cease taking such self-serving, wrongful actions, including, but not limited to:  (i) initiating, developing and/or continuing to develop sites without the required Board or Development Committee approvals and/or

without applying the required Offset Right; (ii) making or causing to be made unauthorized cash distributions; and (iii) seeking to enter into contracts, such as the MLA, on behalf of the Company without Board approval. Despite these demands, Respondents have repeatedly failed and refused to comply with—and, in fact, have continued to take actions in contravention of—their obligations under the Governing Documents and applicable New York law.

**RESPONSE: Denied.**

157.    It is clear that at least a majority of the Board could not properly respond to a demand and would not agree to initiate legal proceedings against themselves and entities that they own, control, or in which they otherwise have an interest. Accordingly, further demand upon the Board would have been futile.

**RESPONSE: Denied.**

## Demand for Arbitration

158.    Peppertree hereby demands arbitration of its disputes with Respondents pursuant to the Shareholders Agreement Arbitration Provision, the Subscription Agreement Arbitration Provision, the Development Agreement Arbitration Provision, and the EPC Contract Arbitration Provision.

**RESPONSE:  Peppertree's Demand for Arbitration and Statement of Claim speaks for itself. Denied in all other respects.**

159.    The arbitration shall be governed by New York law pursuant to Subscription Agreement § 8.07, Shareholders Agreement § 8.10, Development Agreement § 3.2, and Offshore EPC Agreement § 9.4.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants**

**misstate or miscite such agreements, Respondents deny all such allegations. Denied in all other respects.**

160.     The Seat of the arbitration shall be New York, New York, pursuant to the relevant arbitration provisions of the Governing Documents.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations. Denied in all other respects.**

## Designation of Party Appointed Arbitrator

161.     Pursuant to the provisions of the Governing Documents, Claimants hereby designate **RICHARD F. ZIEGLER** as their party appointed arbitrator:

> Richard F. Ziegler
> Acumen ADR LLC
> 16 Madison Square East, Ste. 1200
> New York, NY  10010
> Tel:  (347) 686-8385
> Email:  rziegler@acumenadr.com

**RESPONSE: Admitted that Claimants have named their party arbitrator. Denied in all other respects.**

## CLAIMS

### Breach of Contract – Damages
### (Sale of Company)

162.     Claimants incorporate all preceding paragraphs as though fully set forth herein.

**RESPONSE:  Respondents reallege and incorporate by reference their responses to the preceding paragraphs as though fully set forth herein.**

163.     The Governing Documents are valid and binding contracts, enforceable against Respondents according to their clear and unambiguous terms.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations. Denied in all other respects.**

164.    The Governing Documents specifically provide that Respondents are contractually obligated to permit and cause the Company to hire an Investment Bank within thirty (30) calendar days of receipt of the Notice of Proposed Approved Sale to facilitate an Approved Sale and to vote for, consent to, and raise no objections against such Approved Sale, and take all necessary and reasonable actions in connection with the consummation of the Approved Sale as requested by Peppertree.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations. Denied in all other respects.**

165.    Claimants have fulfilled all of their duties and obligations under the Governing Documents and are not in material breach or derogation of any term or condition thereof.

**RESPONSE: Denied.**

166.    Respondents' breaches of the Governing Documents have directly and proximately caused, and will continue to directly and proximately cause, damage to Claimants.

**RESPONSE: Denied.**

167.    That no issue of fact is present on this claim is established by the admission of Respondents in their Notice of Rejection:

According to Section 5.04(b)(ii) of the SHA, the Company shall within thirty (30) calendar days of receipt of a Proposed Sale Notice retain an Investment Bank to facilitate an Approved Sale. Accordingly, the deadline for the Company appoint an Investment Bank to facilitate an Approved Sale is December 4, 2020. Given that time is of the essence, Terra proposes convening a Board meeting in the next ten (10) days in order to discuss proposals for the retention of an Investment Bank by the Company and consider the conditions under which the Board could approve such retention.

**RESPONSE: Respondents' notice speaks for itself. To the extent Claimants misstate or miscite such notice, Respondents deny all such allegations. Denied in all other respects.**

168.     Claimants are entitled to recover their full damages caused by Respondents' wrongful conduct in an amount to be proved at the arbitration, including, without limitation, the more than $185 million to which Peppertree and the Goldman Investor were entitled as the result of the Proposed Sale, to be distributed to Peppertree and the Goldman Investor, and their pro rata share of any Company funds that would have remained after the Proposed Sale.

**RESPONSE:  Denied.**

169.     In addition, Peppertree is entitled to recover the costs and expenses associated with this proceeding, including all filing and administrative fees, arbitrator compensation and reasonable attorneys' fees.  *See* Shareholders Agreement § 8.15; Subscription Agreement § 8.11; EPC Contract § 7.1.12; Development Agreement § 3.4 (providing that Section 8.15 of the Shareholders Agreement applies).

**RESPONSE: Denied.**

<u>**Declaratory Relief**</u>
**(Sale of Company)**

170.     Claimants incorporate all preceding paragraphs as though fully set forth herein.

**RESPONSE: Respondents reallege and incorporate by reference their responses to the preceding paragraphs as though fully set forth herein.**

171.     A genuine dispute and actual controversy exist between the Parties with respect to the sale of the Company, as provided for in the Governing Documents, including, without limitation, pursuant to Section 5.04 of the Shareholders Agreement.

**RESPONSE: Denied.**

172.     Respondents have breached their obligations under the Governing Documents by

64

refusing to abide by their obligations pursuant to Section 5.04 of the Shareholders Agreement to hire an Investment Bank and effectuate a sale of the Company.

**RESPONSE: Denied.**

173. Hernandez and Arzú as Directors, and Terra Towers and Terra TBS, as Shareholders, have all prevented the Company from being sold pursuant to the provisions of Section 5.04(b). Upon Respondents' rejection of the Proposed Offer, they should have caused and permitted the Company to hire an Investment Bank within thirty (30) days of receipt of the Proposed Offer, or in the additional time agreed to by the Parties. In preventing and refusing to do so, each has engaged in self-dealing and conflicts of interest, and each has breached his contractual and fiduciary duties to the Company and its shareholders.

**RESPONSE: Denied.**

174. Claimants have a clear and enforceable right to have the Company hire an Investment Bank and to have the Company sold.

**RESPONSE: Denied.**

175. Accordingly, Claimants respectfully request that the Panel issue a declaration that Respondents are contractually obligated to permit and cause the Company to hire an Investment Bank to facilitate an Approved Sale, and to vote for, consent to, and raise no objections against such Approved Sale, take all necessary and reasonable actions in connection with the consummation of the Approved Sale as requested by Claimants, and not add conditions to or obstruct the Approved Sale.

**RESPONSE: Denied.**

176. Moreover, Claimants are entitled to a declaration that in the event the consideration to be received for the Shares or assets of the Company upon the consummation of an Approved

Sale is less than the Proposed Offer (here, the Proposed Sale), pursuant to Section 5.04(b)(i) of the Shareholders Agreement, the difference between the amount of the Proposed Offer and the purchase price of the Approved Sale shall be deducted from the proceeds otherwise due to Respondents.

**RESPONSE: Denied.**

**Breach of Contract – Specific Performance**
**(Sale of Company)**

177. Claimants incorporate all preceding paragraphs as though fully set forth herein.

**RESPONSE: Respondents reallege and incorporate by reference their responses to the preceding paragraphs as though fully set forth herein.**

178. In the alternative, Claimants seek specific performance of the provisions of the Governing Documents requiring sale of the Company, including Section 5.04 of the Shareholders Agreement.

**RESPONSE: Denied.**

179. The Governing Documents are valid and binding contracts, enforceable against Respondents according to their clear and unambiguous terms.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations. Denied in all other respects.**

180. The Governing Documents specifically provide that Respondents are contractually obligated to permit and cause the Company to hire an Investment Bank within thirty (30) calendar days of receipt of the Notice of Proposed Approved Sale to facilitate an Approved Sale and to vote for, consent to, and raise no objections against such Approved Sale, and take all necessary and reasonable actions in connection with the consummation of the Approved Sale as requested by

Peppertree.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations. Denied in all other respects.**

181.    Claimants have fulfilled all of their duties and obligations under the Governing Documents and are not in material breach or derogation of any term or condition thereof.

**RESPONSE: Denied.**

182.    Claimants are ready, willing, and able to perform their remaining obligations under the Governing Documents with respect to the sale of the Company and otherwise.

**RESPONSE: Denied.**

183.    The Shareholders Agreement provides that the Parties shall be entitled to specific performance of its terms.  Section 8.12 states:

**Specific Performance.**  The parties hereto agree that irreparable damage would occur in the event any provision of this Agreement was not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at Law or in equity.  Therefore, each party hereto consents to the issuance of an injunction or the enforcement of other equitable remedies against him at the suit of an aggrieved party without the posting of any bond or other security, to compel specific performance of all of the terms hereof and to prevent any disposition of Shares in contravention of any terms of this Agreement.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations. Denied in all other respects.**

184.    Respondents' breaches of the Governing Documents have caused and will continue to cause Claimants irreparable injury.

**RESPONSE: Denied.**

185.    That no issue of fact is present on this claim is established by the admission of

Respondents in their Notice of Rejection:

> According to Section 5.04(b)(ii) of the SHA, the Company shall within thirty (30) calendar days of receipt of a Proposed Sale Notice retain an Investment Bank to facilitate an Approved Sale. Accordingly, the deadline for the Company appoint an Investment Bank to facilitate an Approved Sale is December 4, 2020. Given that time is of the essence, Terra proposes convening a Board meeting in the next ten (10) days in order to discuss proposals for the retention of an Investment Bank by the Company and consider the conditions under which the Board could approve such retention.

**RESPONSE: The notice speaks for itself. To the extent Claimants misstate or miscite such notice, Respondents deny all such allegations. Denied in all other respects.**

186.　　By reason of Respondents' failures and refusals to perform their obligations as set forth above, Claimants are entitled to an award of specific performance, requiring Respondents to perform their obligations under the Governing Documents, including but not limited to, hiring an Investment Bank to facilitate an Approved Sale and to vote for, consent to, and raise no objections against such Approved Sale, take all necessary and reasonable actions in connection with the consummation of the Approved Sale as requested by Claimants, and not add conditions to or obstruct the Approved Sale.

**RESPONSE: Denied.**

187.　　Claimants are also entitled to an award of specific performance, requiring that, if the consideration to be received for the Shares or assets of the Company upon the consummation of an Approved Sale is less than the Proposed Offer (here, the Proposed Sale), pursuant to Section 5.04(b)(i) of the Shareholders Agreement, the difference between the amount of the Proposed Offer and the purchase price of the Approved Sale shall be deducted from the proceeds otherwise due to Respondents.

**RESPONSE: Denied.**

## Breach of Contract – Damages
### (Offset Right)

188.    Claimants incorporate all preceding paragraphs as though fully set forth herein.

**RESPONSE: Respondents reallege and incorporate by reference their responses to the preceding paragraphs as though fully set forth herein.**

189.    The Governing Documents are valid and binding contracts, enforceable against Respondents according to their clear and unambiguous terms.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations. Denied in all other respects.**

190.    The Governing Documents specifically provide that Terra and DTH must recognize the Offset Right by proposing new tower site projects and developing Approved Sites to the full extent and dollar value of the Offset Right.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations. Denied in all other respects.**

191.    Claimants have fulfilled all of their duties and obligations under the Governing Documents and are not in breach or derogation of any material term or condition thereof.

**RESPONSE: Denied.**

192.    Respondents have breached their obligations under the Governing Documents by refusing to recognize and apply the Offset Right.

**RESPONSE: Denied.**

193.    Hernandez and Arzú, as Directors, and Terra, as shareholders, have all prevented the Company from pursuing its contractual right to have towers sites developed by DTH (owned and controlled by Respondents) at DTH's expense as a credit against the Offset Right.  In doing

so, each has engaged in self-dealing and conflicts of interest, and each has breached his or its contractual and fiduciary duties to the Company.

**RESPONSE: Denied.**

194.    As a direct and proximate result of Respondents' breach of the Governing Documents in failing to recognize and apply the Offset Right, the Company has been damaged in an amount to be determined at the hearing of this matter, but not less than $6.58 million, plus applicable interest.

**RESPONSE: Denied.**

195.    The Company's damages include, but are not limited to, the full value of payments made by the Company for Approved Sites for which DTH failed to complete a Milestone within twelve (12) months of completion of the previous Milestone.

**RESPONSE: Denied.**

196.    In addition, Claimants are entitled to recover the costs and expenses associated with this proceeding, including all filing and administrative fees, arbitrator compensation, and reasonable attorneys' fees. *See* Shareholders Agreement § 8.15; Subscription Agreement § 8.11; EPC Contract § 7.1.12; Development Agreement § 3.4 (providing that Section 8.15 of the Shareholders Agreement applies).

**RESPONSE: Denied.**

## Declaratory Relief
### (Offset Right)

197.    Claimants incorporate all preceding paragraphs as though fully set forth herein.

**RESPONSE: Respondents reallege and incorporate by reference their responses to the preceding paragraphs as though fully set forth herein.**

198.    A genuine dispute and actual controversy exist between the Parties with respect to

the Offset Right set forth in the Governing Documents.

**RESPONSE: Denied.**

199.    Respondents have breached their obligations under the Governing Documents by refusing to recognize and apply the Offset Right.

**RESPONSE: Denied.**

200.    Hernandez and Arzú, as Directors, and Terra, as shareholders, have all prevented the Company from pursuing its contractual right to have towers sites developed by DTH (owned and controlled by Respondents) at DTH's expense as a credit against the Offset.  In doing so, each has engaged in self-dealing and conflicts of interest, and each has breached his or its contractual and fiduciary duties to the Company.

**RESPONSE: Denied.**

201.    The Company has a clear and enforceable right to have sites developed against the Offset Right.

**RESPONSE: Denied.**

202.    Accordingly, in the event the Company is not sold, Claimants respectfully request that the Panel issue a declaration that Respondents are contractually obligated to recognize and apply the Offset Right by proposing new tower site projects and developing only Approved Sites to the full extent and to the full dollar value of the Offset Right.

**RESPONSE: Denied.**

203.    The dollar value of the Offset Right owed to the Company will be determined at the hearing of this matter but is currently estimated at $6.58 million.

**RESPONSE: Denied.**

<u>**Breach of Contract – Specific Performance**</u>
**(Offset Right)**

204. Claimants incorporate all preceding paragraphs as though fully set forth herein.

**RESPONSE: Respondents reallege and incorporate by reference their responses to the preceding paragraphs as though fully set forth herein.**

205. In the alternative, Claimants seek specific performance of the provisions of the Governing Documents related to the Offset Right.

**RESPONSE: The Demand for Arbitration and Statement of Claim speaks for itself. Denied in all other respects.**

206. The Governing Documents are valid and binding contracts, enforceable against Respondents according to their clear and unambiguous terms.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations. Denied in all other respects.**

207. The Governing Documents specifically provide that Terra and DTH must recognize the Offset Right by proposing new tower site projects and developing Approved Sites to the full extent and dollar value of the Offset Right.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations. Denied in all other respects.**

208. Claimants have fulfilled all of their duties and obligations under the Governing Documents and are not in breach or derogation of any material term or condition thereof.

**RESPONSE: Denied.**

209. Claimants are ready, willing, and able to perform their remaining obligations under the Governing Documents with respect to the Offset Right and otherwise.

**RESPONSE: Denied.**

210.     Respondents have breached their obligations under the Governing Documents by refusing to recognize and apply the Offset Right.

**RESPONSE: Denied.**

211.     Hernandez and Arzú, as Directors, and Terra, as shareholders, have all prevented the Company from pursuing its contractual right to have towers sites developed by DTH (owned and controlled by the other Respondents) at DTH's expense as a credit against the Offset.  In doing so, each has engaged in self-dealing and conflicts of interest, and each has breached his or its contractual and fiduciary duties to the Company.

**RESPONSE: Denied.**

212.     The Shareholders Agreement provides that the Parties shall be entitled to specific performance of its terms.  Section 8.12 states:

> **Specific Performance.**  The parties hereto agree that irreparable damage would occur in the event any provision of this Agreement was not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at Law or in equity.  Therefore, each party hereto consents to the issuance of an injunction or the enforcement of other equitable remedies against him at the suit of an aggrieved party without the posting of any bond or other security, to compel specific performance of all of the terms hereof and to prevent any disposition of Shares in contravention of any terms of this Agreement.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations. Denied in all other respects.**

213.     Respondents' breaches of the Governing Documents have caused and will continue to cause the Company irreparable injury.

**RESPONSE: Denied.**

214.     By reason of Respondents' failures and refusals to perform their obligations as set

forth above, Claimants are entitled to judgment requiring Respondents to perform specifically their obligations under the Governing Documents, including but not limited to, recognition and application of the Offset Right by proposing new tower site projects and developing only Approved Sites to the full extent and full dollar value of the Offset Right owed to the Company, which will be determined at the arbitration but is currently estimated at $6.58 million.

**RESPONSE: Denied.**

## Breach of Contract – Damages
### (Self-Dealing, Misappropriation, and Embezzlement)

215.     Claimants incorporate all preceding paragraphs as though fully set forth herein.

**RESPONSE: Respondents reallege and incorporate by reference their responses to the preceding paragraphs as though fully set forth herein.**

216.     The Governing Documents are valid and binding contracts, enforceable against Respondents according to their clear and unambiguous terms.

**RESPONSE: The parties' agreements speak for themselves. To the extent Claimants misstate or miscite such agreements, Respondents deny all such allegations. Denied in all other respects.**

217.     Claimants have fulfilled all of their duties and obligations under the Governing Documents and are not in material breach or derogation of any term or condition thereof.

**RESPONSE: Denied.**

218.     As set forth above, Respondents have engaged in numerous instances of self-dealing, misappropriation, and embezzlement, in violation of the Governing Documents.

**RESPONSE: Denied.**

219.     These instances of self-dealing, misappropriation, and embezzlement have directly and proximately caused damage to Claimants and the Company.

**RESPONSE: Denied.**

220.     Among other things, Respondents have disbursed funds to themselves and their affiliates without Board approval, have otherwise expended Company resources in order to build and/or develop unapproved sites, and have sought to enter into the MLA without Board approval.

221.     Claimants are currently unaware of the full measure of the damage that Respondents have inflicted—and continue to inflict—upon Claimants and the Company, and reserve the right to take discovery in these proceedings and to prove the full extent of the damages at the arbitration.

**RESPONSE: Denied.**

222.     In addition, Claimants are entitled to recover the costs and expenses associated with this proceeding, including all filing and administrative fees, arbitrator compensation and reasonable attorneys' fees.  *See* Shareholders Agreement § 8.15; Subscription Agreement § 8.11; EPC Contract § 7.1.12; Development Agreement § 3.4 (providing that Section 8.15 of the Shareholders Agreement applies).

**RESPONSE: Denied.**

## Breach of Fiduciary Duty

223.     Claimants incorporate all preceding paragraphs as though fully set forth herein.

**RESPONSE: Respondents reallege and incorporate by reference their responses to the preceding paragraphs as though fully set forth herein.**

224.     As Directors of the Company, Hernandez and Arzú owe fiduciary duties to both the Company and its shareholders, including, without limitation, a duty to act in the best interests of the Company. Arzú also owes fiduciary duties of loyalty and care to both the Company and its shareholders by virtue of his role as Chief Executive Officer of the Company.

**RESPONSE: Admitted that certain duties are owed but denied in all other respects.**

225.     As shareholders of the Company, Terra Towers and Terra TBS owe fiduciary duties to both the Company and its shareholders.

**RESPONSE: Admitted.**

226.     Hernandez and Arzú breached their fiduciary duties to both the Company and its other shareholders, including Peppertree, by engaging in, and/or causing Terra to engage in, the self-dealing, misappropriation, and embezzlement set forth herein, including, without limitation, failing to apply the Offset Right, proceeding with the purchase and/or development of unauthorized sites, and making, or caused to be made, unauthorized and unapproved payments and/or distributions of Company funds.

**RESPONSE: Denied.**

227.     Terra Towers and Terra TBS breached their fiduciary duties to both the Company and its other shareholders, including Peppertree, by engaging in the self-dealing, misappropriation, and embezzlement set forth herein, including, without limitation, failing to apply the Offset Right, proceeding with the purchase and/or development of unauthorized sites, and making, or caused to be made, unauthorized and unapproved payments and/or distributions of Company funds.

**RESPONSE: Denied.**

228.     As a direct and proximate result of Hernandez's, Arzú's, Terra Towers's and Terra TBS's breaches of their fiduciary duties, Claimants and the Company have been damaged in an amount to be proven at the hearing.

**RESPONSE: Denied.**

229.     Hernandez, Arzú, Terra Towers, and Terra TBS breached their fiduciary duties to the Company and its shareholders intentionally, maliciously, and in bad faith.  As a result,

Claimants and the Company are entitled to an award of punitive damages and attorneys' fees.

**RESPONSE: Denied.**

**Accounting**

230. Claimants incorporate all preceding paragraphs as though fully set forth herein.

**RESPONSE: Respondents reallege and incorporate by reference their responses to the preceding paragraphs as though fully set forth herein.**

231. The damages and injuries suffered by Claimants and the Company as the result of Respondents' wrongful conduct, including, without limitation, that set forth herein, cannot be determined or assessed without a thorough and complete accounting, from 2015 to the present, of the books and records of the Company, including, without limitation, each and every transaction by which Respondents have directed that Company funds be used to pay themselves, their subsidiaries, and/or affiliates, or be used for the development of unauthorized Sites.

**RESPONSE: Denied.**

232. Accordingly, Claimants are entitled to and request such an accounting and that Respondents provide all supporting documentation to fully disclose how Company funds were used during that period, including, without limitation, any Company funds that were used to pay Respondents, their subsidiaries, and/or their affiliates, or were used for the development of unauthorized Sites.

**RESPONSE: Denied.**

233. Claimants and/or the Company are also entitled to the recoupment of any Company funds that were embezzled, misappropriated, or otherwise wrongfully and unlawfully disbursed or converted by Respondents, as revealed by the accounting.

**RESPONSE: Denied.**

## Reservation of Rights

234.     Because Respondents have concealed their wrongful activities from Peppertree and because Respondents' wrongful conduct is ongoing, Peppertree reserves the right to amend or add claims in these proceedings upon discovery of further wrongful acts of Respondents in the course of discovery in this matter or otherwise.

**RESPONSE: Denied.**

## RELIEF SOUGHT

**WHEREFORE**, Respondents, having responded in full to Claimants' Demand for Arbitration and Statement of Claim, hereby demand judgment in their favor and against Claimants, and request attorneys' fees and costs pursuant to Section 8.15 of the Shareholders Agreement and Section 8.11 of the Subscription Agreement, Section 7.1.12 of the EPC Contract, and Section 3.4 of the Development Agreement.

## AFFIRMATIVE DEFENSES

235.     Failure of Condition Precedent. Claimants' claims are barred, in whole or in part, based on their failure to perform a condition precedent under Section 5.04 of the Shareholders Agreement. In particular, due to Claimants' 2020 Proposed Sale Breach and Shareholders Meeting Breach[20], after Terra rejected the Proposed Offer, Claimants failed to properly permit the Company to authorize the retention of the Investment Bank to facilitate the approved sale by not properly convening, much less receiving, board of director approval for such appointment. As such, Claimants are now barred from recovery for their failure to perform a condition precedent under

---

[20] Respondents hereby adopt the definitions set forth in their Counterclaim filed concurrently herewith by Terra Towers, Terra TBS, derivatively, on behalf of the Company of the following terms: GS Credit Facility Breach, Tower Rejection Breach, MLA Breach, 2018 Buyout Breach, 2020 Proposed Sale Breach, Shareholders Meeting Breach, and Excess Cash Breach.

the Shareholders Agreement. Claimants similarly failed to properly appoint independent counsel for the Company in this proceeding as required under the Shareholders Agreement because it did not request, much less receive, board of director approval for the Company to retain such counsel. Claimants' claims are also barred, in whole or in part, based on their failure to perform a condition precedent under Section 7.1.1 of the EPC Contract, by failing to deliver a Dispute Notice relevant to the claims arising under the EPC Agreement prior to commencing this arbitration. As such, this Court lacks jurisdiction to hear these claims.

236. <u>Unclean hands</u>. Claimants' claims are barred, in whole or in part, based on the doctrine of unclean hands. Claimants' committed immoral, unconscionable conduct, which was relied upon and caused damages to Respondents. In particular, Claimants' immoral and unconscionable conduct is illustrated through, among other things, the GS Credit Facility Breach, Tower Rejection Breach, MLA Breach, 2018 Buyout Breach, 2020 Proposed Sale Breach, Shareholders Meeting Breach, and Excess Cash Breach. Moreover, Claimants' claims for specific performance are barred by unclean hands, as Claimants refused a bona fide and good faith offer by Terra to purchase the Company and instead favored the Torrecom sale, which was an affiliated purchaser, as described *infra* in the 2021 Proposed Sale Breach.

237. <u>Repudiation</u>. Claimants' claims are barred, in whole or in part, based on their unequivocal repudiation of the Shareholders Agreement. Claimants made statements that they will commit a material breach of the Shareholders Agreement and/or committed voluntarily affirmative acts which rendered Respondents unable to perform under the Shareholders Agreement. In particular, Claimants materially breached various provisions of the Shareholders Agreement by, among other things, the Tower Rejection Breach, MLA Breach, 2020 Proposed Sale Breach, Shareholders Meeting Breach, and Excess Cash Breach.

238.     _Anticipatory repudiation_. Claimants' claims are barred, in whole or in part, based on their repudiation of the Shareholders Agreement. Claimants' have expressly and absolutely refused to perform, and/or voluntarily acted in a way which rendered it impossible for Respondents to perform under the Shareholders Agreement. In particular, Claimants materially breached various provisions of the Shareholders Agreement and rendered Respondents' performance impossible by, among other things, the Tower Rejection Breach, MLA Breach, 2020 Proposed Sale Breach, Shareholders Meeting Breach, and Excess Cash Breach.

239.     _Waiver_. Claimants' claims are barred, in whole or in part, based on waiver. Claimants' voluntary and intentional abandonment of the purpose of the Company waived their ability to enforce their rights under the Shareholders Agreement.

240.     _Equitable estoppel_. Claimants' claims are barred, in whole or in part, under the doctrine of equitable estoppel. Claimants should not be permitted to reap any benefit from their own misrepresentations as to the purpose of the Company which is anything other than to develop, own, acquire and operate Towers in the Territory.

241.     _Set-Off_. Claimants' sought damages must be set-off by the damages which Claimants caused Respondents to suffer by, among other things, the Tower Rejection Breach, MLA Breach, 2020 Proposed Sale Breach, Shareholders Meeting Breach, and Excess Cash Breach.

242.     _Failure to plead a cause of action_. Claimants' claims are barred, in whole or in part, because they, among other things, have improperly brought direct claims, and engaged in a "shotgun pleading" by commingling all Respondents under one term, thus making it impossible to discern which party is accused of wrongdoing for which act.

# COUNTERCLAIM

Counterclaimants, Terra Towers Corp. ("Terra Towers") and TBS Management, S.A. ("Terra TBS") (collectively, "Counterclaimants" or "Terra"), derivatively, on behalf of Continental Towers LATAM Holdings Limited (the "Company"), hereby assert the following counterclaim against Counter-respondents, Telecom Business Solution, LLC ("Peppertree TBS"), LATAM Towers, LLC ("Peppertree LATAM"), F. Howard Mandel ("Mandel"), John Ranieri ("Ranieri"), Ryan D. Lepene ("Lepene"), AMLQ Holdings (CAY), Ltd. ("Goldman"), and the Company, as a nominal counter-respondent, in accordance with the Commercial Arbitration Rules of the American Arbitration Association.

# INTRODUCTION

1.      Although Peppertree TBS and Peppertree LATAM (collectively, "Peppertree") "raced to the courthouse" to don the moniker of "Claimants," the reality of the parties' dispute paints a far different picture.

2.      At its core, Peppertree—in its role as a shareholder and through its appointed board members—abandoned, and then actively set out to devalue, the Company, in an attempt to purchase the Company in 2020 at a depressed value through what would have been a disguised merger.

3.      The Company was set up in 2015 for the sole purpose of developing, owning, acquiring and operating, wireless communication towers in South and Central America. The Company's core purpose was expressly stated as such in the parties' underlying agreements, including prominently in the parties' shareholder agreement.

4.      In 2016, however, the parties' relationship immediately began to sour when Peppertree attempted to strong arm Terra into accepting its "take it or leave it" Goldman affiliated credit facility to help with the acquisition of new towers. Peppertree's proposed

credit facility, as is explained in great detail below, was not favorable to the Company and was far less favorable than the alternative lending commitments proposed by Terra through reputable and independent Latin American financial institutions.

5. Peppertree was furious at this and, in 2017, retaliated against Terra by expressly advising it that Peppertree, through its appointed board members, would not approve any other credit facility other than the Goldman credit facility nor would it approve the acquisition of any new towers for the Company. And, true to its word, Peppertree rejected nearly 3,000 tower proposals for the Company from 2017 through 2019 for a loss of enterprise value of the Company in the hundreds of millions of dollars.

6. In doing so, Peppertree completely abandoned the purpose of the Company and outright refused to allow the Company to develop, acquire, or operate new towers through South and Central America. Indeed, Peppertree's dereliction of the Company became so bad that in 2019, the Ministry of Transport and Communications of Peru threatened to revoke the operating license of the Company's local Peruvian subsidiary in the country after the Company failed to build any new towers in Peru over a three-year period.

7. Peppertree's failure to abide by the sole purpose of the Company and, worse, its active campaign to obstruct the Company's purpose, is actionable. Peppertree has materially breached the parties' shareholders agreement through its conduct of rejecting towers, and through it, and its appointed board members, willfully breached fiduciary duties of care, loyalty, and candor, to the Company and Terra.

8. Only recently did Terra learn why. Following Terra's 2017 refusal to approve Peppertree's proposed Goldman affiliated credit facility, Peppertree instituted a plan, with the aid and assistance of Goldman, to wrestle control of the Company at a depressed value

as soon as the parties' 2020 "lock-up" period expired under the parties' shareholders agreement.

9.　　Under the shareholders agreement, either party could propose a sale of the Company in 2020 from a proposed "unaffiliated" third party purchaser. On November 4, 2020, a mere 4 days following the expiration of the lock-up period, Peppertree presented Terra with a notice of approved sale to sell the Company to Torrecom Partners LP ("Torrecom"), at an effective rate close to 10x the Company's Tower Cash Flow ("TCF") after various adjustments which Ranieri would determine in his sole discretion as the self-appointed "Seller's Representative"[21]

10.　　This offer, as Terra later learned, was far below fair market value of the Company (even at the depressed value in light of Peppertree's actions) and, in complete violation of the parties' shareholders agreement, was made by an affiliated entity of Peppertree, as Torrecom was financing the offer to purchase the Company through the same Goldman affiliated credit facility that Peppertree had previously attempted to strongarm Terra into accepting in 2017.

11.　　Naturally, Terra objected to the proposed offer and pursuant to the shareholders agreement, Terra provided, within 30 days of Peppertree's notice of proposed sale, an opinion letter from an independent investment bank (UBS) providing that Peppertree's proposed offer was materially less than comparable transactions in the industry and that the valuation of the Company was closer to 22x TCF approximately.

12.　　As a result of this opinion, under the shareholders agreement, the Company was to retain an independent investment bank to facilitate an approved sale. However, in

---

[21] Telecommunications companies are generally valued by a multiple of the TCF.

further violation of the shareholders agreement, Peppertree refused to, among other things, hold a board meeting to facilitate the sale of the Company and, instead, raced to the AAA to institute this arbitration proceeding so that it could falsely set the narrative and claim victim.

13.     For this, and the reasons set forth more fully below, Peppertree has materially breached the shareholders agreement on multiple occasions and, through its appointed board members, has breached its duty of care, loyalty, and candor to the Company and Terra. Additionally, Goldman, as a shareholder of the Company and observing board member, has aided and abetted, and conspired with, Peppertree, in a failed attempt to wrestle control of the Company at a depressed value through a proposed disguised merger.

## PARTIES

### Counterclaimants

14.     Counterclaimant Terra Towers is a company incorporated in the British Virgin Islands, with registered number 1375181, whose registered office is at Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands. Terra Towers is a shareholder of the Company.

15.     Counterclaimant Terra TBS is a *Sociedad de Responsabilidad Limitada,* formerly a *sociedad anonima*, organized under the laws of Panama. Terra TBS is a shareholder of the Company.

### Counter-Respondents

16.     Counter-respondent Peppertree TBS is a limited liability company organized under the laws of Delaware. Peppertree TBS is a shareholder of the Company.

17.     Counter-respondent Peppertree LATAM is a limited liability company organized under the laws of the State of Delaware. Peppertree LATAM is a shareholder of the Company.

18.     Counter-respondent Goldman is a Cayman Island Exempted Company Limited by Shares. Goldman is a shareholder of the Company.  Goldman Sachs & Co. is the parent company and beneficial owner, directly or indirectly, of Goldman.

19.     Counter-respondent Ranieri is a director of the Company appointed by Peppertree.

20.     Counter-respondent Mandel is a director of the Company appointed by Peppertree.

21.     Counter-respondent Lepene is a former director of the Company appointed by Peppertree.

## STATEMENT OF FACTS

### The Origins of Terra

22.     Respondent Jorge Hernández ("Hernandez") is a Guatemalan entrepreneur involved in telecommunications, real estate, services and technology projects.  In 1992, at the age of 19, after his father's death, he started working in his father's construction company. The company, a very well-known and recognized business, built landmark projects such as the United States Embassy in Guatemala. The Hernandez family company developed built-to-suit projects for multinational companies such as Unilever, Shell Oil, British American Tobacco, Maersk Sealand, Kimberly Clark and Walmart. The Hernandez Family then entered the telecommunications industry, which allowed them to expand the group internationally.

23.     In 2006, Hernandez family formed Terra Towers as a site acquisition company and shortly thereafter Terra Towers began constructing built-to-suit solutions for telecommunications operators in Central America, Mexico, Caribbean and South America. In 2008, the Company was formed as Terra Tower's site-operating subsidiary to manage the leasing of space on the acquired and/or constructed communications sites to telecommunications operators and tenants in other industries.

24.     The Company was set up as a holding company to a series of operative companies located in Guatemala, El Salvador, Honduras, Nicaragua, Costa Rica, Panamá, Colombia and Perú, which in turn are the entities that operate, develop and lease leasable spaces in telecommunication towers to different telecommunication carriers.

25.     In 2012, DT Holdings Inc. ("DT Holdings") was formed to support the Company's site leasing business by providing site-related services through arms-length agreements specifically designed to optimize the evaluation, acquisition and development of new sites.

26.     In 2014, Terra Towers, together with the Company and DT Holdings (collectively, together with their respective subsidiaries and affiliates, "Terra Group"), continued its geographic expansion into Peru and Colombia and firmly established its presence in 8 markets in Latin America including Colombia, Costa Rica, El Salvador, Guatemala, Honduras, Nicaragua, Panama, and Peru (the "Core Markets"). Terra, together with DT Holdings, continued to expand into new markets, including Mexico, Philippines, South Africa, and Chile and is currently opening new markets in Europe and Asia.

27.     A fundamental part of Terra Group's success and growth into a market leader has been the unique socially conscious business model which consists of entering into strategic alliances with municipalities by which Terra Group provides such municipalities with smart city security solutions on its towers to make local communities safer. In turn, the municipalities grant Terra Group entities rent-free access to public spaces of strategic importance to telecommunication operators. The positive impact for municipalities is quantifiable by the observed decrease in homicide and other crime rates as a result of improved surveillance. The installation of security cameras, street lighting and sirens on the towers act as a dissuasive element to potential criminals. Additionally, Terra Group's smart city infrastructure improves and expands any municipality's

technology and communications capabilities beyond surveillance.

28.     Over the past several years, the Hernandez family has entrusted the management and operation of Terra Group to a dedicated and exceptional management team with decades of experience in the industry. While Hernandez continues to consult and advise Terra from time to time, and Terra Group on a case-by-case basis, it is this management team coupled with Hernandez's business acumen and entrepreneurial vision, that has driven the Terra Group's growth over the past two decades from a small, local construction company into one of the largest privately held telecommunications infrastructure developers, owners, and operators in Latin America.

29.     A large part of Terra Group's success is due to the direct relationships with municipalities, landowners, and every major telecommunications operator in its Core Markets. These relationships are carefully maintained and nurtured by the local management team. In addition, by being comprised of local talent, the management team is able to stay apprised of local, legal, and business developments that affect the Terra Group's business and that of its clients and partners. This has allowed the Terra Group's local subsidiaries to timely develop and adopt flexible and creative solutions to pending challenges.

30.     The Terra Group's management team has won countless awards, including, to name a few, the "Best Peruvian Company" award in 2018, the "Digital Democracy" Award in 2020, and a civic medal from the municipality of Surco in Peru for its contribution to combating insecurity and crime.

***Peppertree and Terra Join Forces to Create a Company for the Sole Purpose of Acquiring and Building Towers***

31.     It was the Terra Group's reputation that led Peppertree and Goldman in 2015 to negotiate, and then enter into, an agreement with Terra and the Company to, through the Company, acquire, finance, build, install, lease, and/or possess wireless communication, broadcast or other

transmission towers and commission infrastructure sites in, among other jurisdictions, Guatemala, El Salvador, Honduras, Nicaragua, Costa Rica, Panama, Colombia, and Peru.

32. With this in mind, on October 22, 2015, the parties entered into various agreements governing the Company's corporate structure and business operations. These agreements consisted of:

- the Shareholders Agreement between the Company, Peppertree LATAM, Peppertree TBS, AMLQ, Terra Towers, and Terra TBS (the "Shareholders Agreement"). *See* Statement of Claims at Ex. B.

- The Subscription and Contribution Agreement between the Company, Peppertree LATAM, Peppertree TBS, AMLQ, Terra, and Terra TBS (the "Subscription Agreement"). *See id.* at Ex. A.

- The Development Agreement between the Company, Terra Towers, Terra TBS, and DT Holdings (the "Development Agreement"). *See id.* at Ex. C.

- And, lastly, the Offshore Turnkey Engineering, Procurement and Management Contract between the Company and DT Holdings (the "EPC Contract"). *See id.* at Ex. D.[22]

33. Under the Shareholders Agreement, the Company is comprised of 5 shareholders, to wit: Terra Towers, Terra TBS, Peppertree LATAM, Peppertree TBS, and Goldman.

34. Under the ownership structure set forth in the Shareholders Agreement, Terra is the majority "A" shareholder of the Company with a 54.45% ownership interest (Terra Towers owns 45.98%, and Terra TBS owns 8.47%, of the Company).

35. Peppertree, by contrast, is the minority "B" shareholder of the Company with a 32.20% ownership interest (Peppertree LATAM owns 23.73%, and Peppertree TBS's owns 8.47%, of the Company). Together, Peppertree TBS and Peppertree LATAM comprise the

---

[22] There were also various local onshore EPC contracts between a local subsidiary of the Company in the Territory and a local subsidiary of DTH in such Territory.

Company's B Shareholders.

36.     Goldman, as the fifth and sole "C" shareholder, has a 13.35% ownership interest in the Company.

37.     Section 4.02 of the Shareholders Agreement sets forth the composition of the board of directors for the Company (the "Board"), which consists of 4 members: 2 appointed by Terra, and 2 appointed by Peppertree. It also allowed Goldman to appoint a member to the Board who would have an observer role.

38.     Terra appointed Hernandez and Arzu to the Board (the "Terra Directors"), while Peppertree appointed Mandel and Lepene (who was later succeeded by Ranieri) to the Board (the "Peppertree Directors").

39.     The Shareholders Agreement also prominently set forth the purpose of the Company.

40.     The Shareholders Agreement expressly provided that, "[t]he purpose of the Company is to develop, own, acquire and operate, directly or indirectly through the Company subsidiaries, Towers[23] in the Territory[24]." *See* Shareholders Agreement, at § 3.01.

41.     Likewise, the Development Agreement provided that:

[T]he purpose [] of the Company is to acquire, finance, build, install lease and/or possess wireless communication, broadcast or other transmission tower and communication infrastructure sites [], whether directly or through the Company Subsidiaries, in Costa Rica, El Salvador, Guatemala, Honduras, Nicaragua, Panama, Colombia and Peru [], as well as other jurisdictions as may be later agreed[.]

---

[23] "Tower" is defined as "any wireless communication, broadcast or other transmission tower and other communication infrastructure sites." *See* Shareholders Agreement, at 13.

[24] "Territory" is defined as Colombia, Costa Rica, El Salvador, Guatemala, Honduras, Nicaragua, Panama, and Peru. *See* Shareholders Agreement, at Exhibit C.

*See* Development Agreement, at 1.

42. The Development Agreement was entered into by the Company, Terra, and DT Holdings. This agreement regulated, (i) the process by which Terra presented opportunities for the development of telecommunication towers by the Company's local subsidiary. Such process contemplated a development committee consisting of the members of the Company's Board (the "Development Committee"); and (ii) certain outsourcing services rendered by DT Holdings and its local subsidiaries to the Company and its local subsidiaries. These services consisted of providing office equipment, office space, utilities, and back office activities, among other administrative services. In consideration for outsourcing these services, the Company paid a services fee to DT Holdings.

43. With respect to the EPC Contract, it too reiterated the purpose of the Company:

> Company acquires, finances, builds, installs, leases and/or possesses wireless communication, broadcast or other transmission tower and communication infrastructure sites (each a "**Site**" and, together, the "**Sites**") in Guatemala, El Salvador, Honduras, Nicaragua, Costa Rica, Panama, Colombia and Peru (each, a "**Jurisdiction**" and together the "**Jurisdictions**") and other jurisdictions as may be agreed.

EPC Contract, at 2.

44. The Offshore EPC Contract was entered into by the Company and DT Holdings and the Onshore EPC Contracts were each entered into by a local subsidiary of the Company in the various jurisdictions constituting the Territory and a local subsidiary of DTH in such jurisdiction. Under the EPC Contracts, DT Holdings is the contractor that through its local subsidiaries develops, constructs and delivers telecommunication towers to the Company's local subsidiaries. The Company, under this agreement, pays DT Holdings and its applicable subsidiary, a $175,000.00 fee for each telecommunication tower constructed and delivered.

*After Two Years of Operating with the Same EPC Agreement, The Parties' Relationship Begins to Sour when Peppertree Attempts to Strong Arm Terra into Accepting their "Take it or Leave it" Credit Facility*

45.     The Shareholders Agreement contemplated the Company obtaining a credit facility to provide capital to fund the acquisition and development of Towers.

46.     In particular, Section 6.05 of the Shareholders Agreement contemplated that in order to build, acquire, and develop Towers, the shareholders must "use commercially reasonable efforts to assist the Company in obtaining any credit facilities as the Board [of directors] determines are required to facilitate the growth of the Company." Shareholder Agreement, at § 6.05.

47.     In May 2016, Peppertree proposed to the Board a $60 million[25] credit facility from one of Goldman's affiliates – Goldman Sachs Specialty Lending Group, L.P ("GS Lending Group"). To this end, Peppertree provided Terra with a proposed Credit and Guaranty Agreement from GS Lending Group (the "Proposed GS Credit Facility Agreement") and insisted that the proposed agreement was acceptable to the Company.

48.     To accomplish the signing of the Proposed GS Credit Facility Agreement, and in what can only be described as a blatant attempt to strongarm Terra into agreeing to GS Lending Group without any objective oversight, the Peppertree Directors suggested to have the Company use Peppertree's own counsel at Thompson Hine, LLP ("Thompson Hine") (instead of independent counsel) to, what they described, ensure that the GS Credit Facility was secured "smoothly and quickly."  In light of this, and Peppertree's representation that its counsel had "a good working relationship with [GS Lending Group's] lawyers and [that] he kn[ew] the document very well," Terra agreed to have Thompson Hine represent the Company for the GS Credit Facility transaction.

---

[25]     All amounts described herein are in U.S. dollars.

49. Terra would subsequently learn that Peppertree's counsel did not have the amount of experience or familiarity with the Proposed GS Credit Facility Agreement that Peppertree represented it had.

50. Notwithstanding the Company's use of Peppertree's own counsel to review the Proposed GS Credit Facility Agreement, Terra obtained independent counsel to ensure that the terms presented were favorable to the Company and to *all* of its shareholders.

51. To Terra's surprise, the Proposed GS Credit Facility Agreement included terms that were burdensome in nature and detrimental to the Company and its shareholders. Indeed, the Proposed GS Credit Facility Agreement, among other things, contained:

- Material changes to the Shareholder Agreement, including the removal of Colombia and Nicaragua as approved Territories for the development and/or acquisition of Towers;

- The granting of broad approval rights over various management functions to GS Lending Group.

- Interest rate at approximately 10.5% which was substantially higher than industry standards;

- A request that the Development Agreement and EPC Agreement be amended in form and substance so that it would be satisfactory to GS Lending Group;

- Unrealistic information reporting requirements relating to the use of funds for permitted acquisitions;

- Unworkable financial reporting obligations;

- Audit and financial reporting requirements relating to DT Holdings, which was not a borrower or guarantor under the loan; and

- GS Lending Group's ability to take control of the Company in the event of a default.

52. At that point, it became immediately obvious why Peppertree attempted to circumvent the Company's retention of independent counsel to review the Proposed GS Credit

Facility Agreement. The GS Credit Facility was part of Peppertree and Goldman's scheme to obtain control over the Company as it permitted GS Lending Group, an affiliate of Goldman, to obtain control over the Company if the Proposed GS Credit Facility Agreement was executed, and to obtain full control of the Company if there was a subsequent default under the Proposed GS Credit Facility Agreement.

53.     The Terra Directors thoroughly explained to the Peppertree Directors their concerns with the terms proposed by the Proposed GS Facility Agreement expecting that the Peppertree Directors would understand and agree that the terms were unfavorable to the Company.

54.     Instead, the Peppertree Directors vehemently disagreed and advised Terra that they should stop their "irrational paranoia" because accepting the Proposed GS Facility Agreement would be the "absolutely right thing for the Company." According to Peppertree, the Company would not be able to obtain alternative financing and the Proposed GS Facility Agreement was a "gift."

55.     Critically, Peppertree began to condition Peppertree's approval of business proposals on the Terra Directors' acceptance of the GS Credit Facility. *See e.g.,* July 18, 2016 email from M. Mackey ("We are willing to accept this proposal if the Company closes [on] the [GS Credit Facility] within 30 days of today."); *id.* ("We are willing to cooperate with this plan as long as the company closes [on] the [GS] credit facility within 30 days of today").

56.     In doing so, the Peppertree Directors advanced the interests of GS Lending Group and failed to act in the best interests of the Company or Terra. Indeed, in a May 30, 2016 email to Arzú, Mandel admitted that "[t]his group at Goldman has a long, excellent relationship with *Peppertree*. They are being good partners." (Emphasis added).

57.     Notwithstanding Peppertree's pressure, the Terra Directors rejected the Proposed

GS Facility Agreement and committed themselves to finding an alternative proposal that would serve the Company's interests.

***Terra Proposes Alternative Financing through Interbank and Peppertree Retaliates***

58.     Contrary to Peppertree's assertions that the Company would not be able to obtain alternative financing, in February 2017, Terra obtained an alternative loan commitment for the Company from a reputable Latin American bank, Interbank Peru (the "Interbank Loan").

59.     On March 2, 2017, a letter was sent to the Board, on behalf of the Company's management, presenting Interbank Loan. The letter explained that the loan contained favorable terms for the Company and that financing was necessary to honor the Company's existing commitments.

60.     The Interbank Loan had significantly better terms than the Proposed GS Facility Agreement. Indeed, the Interbank Loan (1) did not require any changes to the business purpose of the Company; (2) did not exclude any of the agreed-upon Territories; (3) accrued interest at 6% per annum, which was substantially less than the 10.5% interest proposed by GS Lending Group; (4) had no cross collateralization of guarantees; and (5) only 8 negative and positive covenants.

61.     Despite the terms being far more favorable to the Company, Peppertree opposed and rejected the terms of the Interbank Loan and incredibly advised the Board that they would oppose and reject *any* other alternative financing other than GS Lending Group. Peppertree went further too. Peppertree, through its director, Mandel, advised Terra on February 7, 2017 that *"[f]urther investment for new site development is not something we will pursue at this time*." (Emphasis added). A month later, Mandel reiterated Peppertree's position in an email to Arzú, where he stated that "*we [the Peppertree Directors] have been clear to you for months that we*

***are not going to approve any new tower builds*** or approve new debt financing." (Emphasis added). There are additional subsequent correspondences from each of the Peppertree Directors specifically stating that they will not approve any credit facility other than the GS Credit Facility.

62.     In other words, because Terra did not agree to Peppertree's "take it or leave it" proposal to have GS Lending Group serve as the Company's credit facility (under far less favorable terms than the Interbank Loan), Peppertree expressly advised Terra that it would frustrate the very purpose of the Company by not agreeing to the acquisition or development of any new Towers.

63.     This, of course, was a material breach of "[t]he purpose of the Company [which] is to ***develop***, own, ***acquire*** and operate, directly or indirectly through the Company Subsidiaries, Towers in the Territory." *See* Shareholders Agreement, at § 3.01 (emphasis added). Moreover, in addition to being a material breach, Peppertree's actions constitute malicious and wanton conduct in contravention of the Company's best interests.

64.     Naturally, Terra and the Terra Directors were shocked by Peppertree's actions given that the Peppertree Directors had not so long ago emphasized the importance of obtaining financing to fund the operations of the business and for the sustainable growth of the Company (i.e., the reason the Peppertree Directors proposed GS Lending Group in the first place!).

65.     Paragraphs 45 through 64 are referred to as the "GS Credit Facility Breach."

**Peppertree Makes Good on Its Threat by Rejecting the Development of New Towers in the Territory**

66.     True to Mandel's 2017 emails that Peppertree would not approve new Towers, the Peppertree Directors continuously and systematically rejected proposals for the construction and

development of new Towers in the Territory.[26]

67.     From 2017 to 2019, Peppertree rejected proposals to construct or develop more than 3,000 Towers in the Territory, primarily by either summarily rejecting the Towers without any justification, or by simply failing to respond to Tower proposals which, under the Development Agreement, resulted in the Towers' rejection.

68.     Indeed, through the rejection of 1,000 Towers in Colombia and 2,000 Towers in Peru, the Company has suffered to an astounding loss in enterprise value of approximately $600,000,000 directly attributed to Peppertree and the Peppertree Directors interference and unreasonably denial of the Company's Tower development.

69.     Again, Peppertree's actions in rejecting these Towers went against the very core of the Company – to **develop**, own, **acquire** and operate, directly or indirectly through the Company Subsidiaries, Towers in the Territory." *See* Shareholders Agreement, at § 3.01 (emphasis added).

70.     In 2019, Peppertree's conduct became so detrimental to the Company that in or about November 2019, the Peruvian government threatened to revoke the operating license of the Company's operating subsidiary in Peru as a result of its failure to build *any* Towers in the entire country of Peru over the prior three years.

71.     It was only then, faced with a threat of having the Company's license to operate in a country within the Territory revoked, that Peppertree's Directors, through Ranieri, finally agreed to fund the construction and development of a measly two Towers per month in Peru and even then, the Peppertree Directors subsequently reneged on that approval to further their breach.

---

[26] In September 2017, moreover, the Company won a lucrative bid, which was placed in 2016 with Board approval, to develop 200 Towers for Telefonica in Central America ("Telefonica Business Plan"). At this time, Telefonica was the only new network being deployed in Central America, and developing the Towers would have solidified the Company's leadership position in Central America. However, Peppertree Director Ranieri unilaterally rejected the Telefonica Business Plan not only jeopardizing the relationship with one of the largest telecommunication companies in the world but also damaging the reputation of the Company in the industry for failing to honor its bid.

72. Moreover, Peppertree, through Ranieri and other lesser employees of Peppertree, have consistently given unilateral instructions regarding rejection of Towers to the management team regarding actions that require Board approval, in many cases without even copying the Directors. These unilateral instructions have occurred over 80 times in Central America (more than 70 by Rosie Varela, a mere employee of Peppertree) and exceed 40 times in Colombia and Peru (more than 10 by Varela).

***Goldman Sachs & Co., LLC Directly Benefitted from Peppertree's Rejection of Towers in Colombia***

73. During this time, Peppertree's Directors systematically rejected each and every Tower proposal in Colombia by baselessly claiming that Colombia was not a lucrative market since Colombian carriers paid rent in Colombian pesos, rather than dollars. This was a pretextual justification. In reality, Peppertree was usurping the Company's interest by systematically rejecting Tower proposals to protect the interest of its partner, Goldman Sachs & Co., LLC ("Goldman Sachs")[27], in a competing telecommunication company, in Colombia.

74. Indeed, in 2019, completely contrary to the Peppertree Director's pretextual justification, Goldman Sachs (through itself or that of one of its subsidiaries) sold its interest in Cell Site Solutions, which is a telecommunication tower company with operations in Brazil, Peru, *and Colombia*, for 22.8x TCF.

75. 22.8x TCF is extremely lucrative in the telecommunication towers market. Such action by Peppertree displays not only a malicious breach of Peppertree and the Peppertree Director's fiduciary duties to the Company and the shareholders by not acquiring Towers in that lucrative region, but worse, displays a breach of their duty of loyalty in favor of Goldman Sachs

---

[27] Goldman Sachs is the parent company to Counter-Respondent Goldman and, upon information and belief, is a direct or indirect shareholder of Peppertree (through itself or one of its subsidiaries), which Peppertree notably referred to it as Peppertree's "good partner[ ]." *See supra,* at ¶ 56.

who—as explained above—profited on the Company not having a stronghold in Colombia.

76.    Paragraphs 66 through 75 are referred to as the "Tower Rejection Breach."

*The 2018 Proposed Buyout*

77.    Clearly, the parties' relationship became nonfunctional due to Peppertree's refusal to allow the Company to operate in accordance with its purpose. In light of this, the parties agreed to a buyout whereby Goldman and Peppertree agreed to sell their shares in the Company at a base price.

78.    Specifically, on December 14, 2017, the shareholders entered into an agreement which granted Terra the exclusive right to disclose confidential information of the Company in order to negotiate the sale of the Company with third party purchasers and investors through December 14, 2018 (the "2018 Confidentiality Agreement"). The 2018 Confidentiality Agreement *only* authorized Terra and its representatives to disclose confidential information, but it did **not** authorize Peppertree or Goldman to do so. That is, under the Shareholders Agreement, Section 6.03 still prevented Peppertree and Goldman from disclosing the Company's confidential information.

79.    Moreover, on the same date, the Board issued a resolution allowing the Company to enter into the 2018 Confidentiality Agreement to disclose confidential information related to the Company "for the purposes of evaluating the purchase of 100% of the Class B Shares held by the Initial B Shareholders and 100% of the Class C Shares held by the Initial C Shareholders" (hereinafter, the "2018 Confidentiality Board Resolution").

80.    The parties agreed that Peppertree's and Goldman's shares could be sold for a fixed price of $200 million, which represented a market price of 19x TCF of Peppertree's and Goldman's equity positions in the Company and that Terra could retain any excess monies if it was able to

sell the shares for over $200 million, provided the sale of the Company was consummated prior to December 31, 2018, the date of expiration of the 2018 Confidentiality Agreement.

81.	In accordance with these agreements, Terra reached out to potential buyers and investors to negotiate the sale of certain of the Company's subsidiaries.

82.	On October 19, 2018, Terra received a Letter of Intent ("LOI") from Phoenix Towers International Development, LLC ("PTI") to acquire (1) the existing and outstanding shares of the Company's Salvadorian, Nicaraguan and Panamanian subsidiaries (2) certain towers owned by DT Holdings' Salvadorian, Nicaraguan, Panamanian, Colombian, and Peruvian subsidiaries, and (3) either the rights that DT Holding's Guatemalan and Salvadorian subsidiaries currently had to purchase 124 towers owned by Telefonica or, subsequent to the purchase of the towers from Telefonica by DT Holdings, the 124 towers from DT Holding's subsidiaries at approximately $421 million.

83.	The deal to acquire the Company, however, never materialized because of Peppertree's and Goldman Sachs' interference.

84.	Specifically, Peppertree Director, Lepene, interfered with the potential buyout by contacting PTI directly, and suggesting that it should postpone the purchase of the Company to 2019. Of course, Peppertree used the expiration of the 2018 Confidentiality Agreement as an excuse to extort an additional $20 million from the sale of the Company. This was clearly its motive in acting in contravention to the Company's best interests.

85.	Peppertree, through Lepene, also contacted PTI in direct contravention of section 6.03 of the Shareholders Agreement, which provides that no Shareholder shall disclose Confidential Information unless they have consent from the disclosing party (the Company or another shareholder) or it is "in connection with a bona fide intent to Transfer shares pursuant to

the terms of <u>Article V</u> or in connection with an Approved Sale pursuant to <u>Section 5.04(b)</u>."

Shareholders Agreement, § 6.03(a). Peppertree did not have the proper Board approval to disclose the Confidential Information and was not making the communication in connection with an intent to transfer shares. As such, this is a clear breach of the Shareholders Agreement.

86.     To compound matters, Goldman Sachs (through itself or one of its subsidiaries) ensured that the transaction did not materialize in 2018 because, according to a PTI employee, Goldman Sachs failed to transfer funds to PTI, which would have financed the buyout.

87.     Importantly, Peru and Colombia had a change in their tax laws which went into effect on January 1, 2019. The change in both countries' laws made it significantly more expensive to sell the Company due to the amount of transfer tax that would be incurred by the sellers as a result of the transaction.  Naturally, these changes also made it more difficult to consummate the transaction after December 31, 2018, as the tax liability to the various local subsidiaries for their indirect sale became substantially more expensive and Peppertree was unwilling to reduce the agreed fixed price of $200 million to account for the increased tax liability to the Company (and consequently Terra) its delay tactics had caused.

88.     Goldman Sachs' and Peppertree's actions not only constituted a breach of the Shareholders Agreement, but they also adversely affected the Company and its shareholders because PTI ended up backing away from the transaction. Peppertree's actions were not only a breach of the Shareholders Agreement, but they were a willful and malicious breach of their fiduciary duties intended to harm the Company and its Shareholders.

89.     Paragraphs 77 through 88 are referred to as the "2018 Buyout Breach."

***Peppertree Refuses to Renew the Master Lease Agreement***

90.     Unfortunately, Peppertree's unlawful conduct did not end there. In 2020, the

Company's Master Lease Agreement ("MLA") in Peru with Telefónica, one of the largest telecommunication companies in the world, expired. Execution of a new MLA was required in order to keep up the existing business with Telefónica, build new Towers for Telefónica, and place more of the telecommunication operator's antennas in the Company's Towers.

91.     When presented with a proposed MLA, the Peppertree Directors refused to approve it stating they had issues with an RAN sharing clause in the proposed MLA (the "Ran Sharing Clause").  RAN Sharing simply means that two or more mobile operators' networks could share the same baseband, radio, and antenna.  Notably, the RAN Sharing Clause was mandated by local law and a non-negotiable term to renew the MLA. Furthermore, RAN sharing provisions have become the market standard in Peru and all major carriers operating in Peru have signed onto MLA with Telefonica that contain these provisions.

92.     As a result of the Peppertree Directors' refusal to proceed with the MLA, the Company's representatives in Peru hired two local independent law firms to obtain legal opinions on the effect the RAN Sharing Clause would have on the Company in the event the MLA was signed.  Both law firms concluded that the Company was in a better position with the RAN Sharing Clause than without it. Notwithstanding, the Peppertree Directors deliberately ignored the legal opinions from independent local counsel and refused to approve the MLA with Telefónica.

93.     Peppertree's willful and malicious refusal to renew the MLA with Telefónica in Peru rapidly turned into the norm, as the Peppertree Directors continued to prohibit the Company's operating subsidiaries from entering into new MLAs with different carriers within the Territory. Such an untenable position was detrimental to the Company as it caused it to lose a significant portion of its market share in the Territory.

94.     Paragraphs 90 through 93 are referred to as the "MLA Breach."

***Peppertree's Plan Becomes Clear – It Actively Sought to Depress the Value of the Company so that it Could Acquire Control of the Company by Selling it to an Affiliated Third-Party at a Subpar Valuation***

95.     Between 2019 and 2020, despite the Company having sufficient capital, Peppertree continued to reject nearly all of the proposals submitted by Terra to build and acquire new Towers within the authorized Territory.

96.     Not surprisingly, Peppertree's actions adversely affected the valuation of the Company. As mentioned, telecommunication tower companies are generally valued by a multiple of the TCF. By failing to develop and acquire new Towers, the Peppertree Directors devalued the Company, and effectively changed the nature of the business from a Company that constructs and develops Towers to a mere holding company.

97.     Soon, Peppertree's true motive for rejecting development of new Towers became clear.

98.     Under the Shareholders Agreement, the Lock-up Period is "the period of five (5) years starting on the Effective Date and ending on the fifth anniversary of the Effective Date." *See* Shareholders Agreement at 9. The Lock-up Period, then, expired on October 22, 2020. Of note, during the Lock-up Period, "neither the Initial A Shareholders nor the Initial B Shareholders may Transfer any Equity Interest in the Company . . . other than (i) to a Permitted Transferee, (ii) with the approval of the Board." *See id.* § 5.01(a).

99.     Following the Lock-up Period, Section 5.04(b) of the Shareholders Agreement provided:

> Following . . . (i) the expiration of the Lock-Up Period [October 22, 2020] . . . then within ninety (90) calendar days of such event, (A) either the Initial A Shareholders [Terra] or the Initial B Shareholders [Peppertree] in case of sub-section (i) . . . (such shareholders, the "**Proposing Shareholders**") may request, upon written notice to the other Initial Shareholders and the Company (the "**Proposed Sale Notice**"), a sale of all or substantially all of the Company's assets or all or substantially all of

the Shares in the Company (in one or more transactions) to an unaffiliated Third Party Purchaser (an "**Approved Sale**").

(i) If the Proposing Shareholders have already procured or received an offer from an unaffiliated Third Party Purchaser to purchase the assets or Shares of the Company (a "**Proposed Offer**"), the Proposed Sale Notice shall disclose in reasonable detail. The identity. Of the prospective purchaser and the proposed terms and conditions of the Proposed Offer. The Initial A Shareholders [Terra] or the Initial B Shareholders [Peppertree], as applicable, (the "**Objecting Shareholders**") may reject such Proposed Offer within thirty (30) calendar days of delivery of the Proposed Sale Notice by providing the Company with an opinion from an independent and reputable investment bank with experience in the industry and a cross-border practice (an "**Investment Bank**"), retained at the sole expense of the Objecting Shareholders, stating that the value of the proposed transaction is materially less than comparable transactions in the industry and the Territory; *provided that*, if such opinion is provided, the provisions of <u>Section 5.04(b)(ii)</u> shall apply. In the event that no such opinion is provided by the expiration of such 30 day period, each Shareholder shall vote for, consent to and raise no objections against such Approved Sale and take all necessary and reasonable actions in connection with the consummation of the Approved Sale as requested by the Proposed Shareholders.

(ii) If the Proposing Shareholders have not already procured an offer from an unaffiliated Third Party Purchaser of if an opinion has been provided by an Objecting Shareholder pursuant to <u>Section 5.04(b)(i)</u>, the Company shall, within thirty (30) calendar days of receipt of a Proposed Sale Notice, retain an Investment Bank to facilitate an Approved Sale and each Shareholder shall vote for, consent to and raise no objections against such Approved Sale and take all necessary and reasonable actions in connection with the consummation of the Approved Sale as requested by the Proposing Shareholders. In the event that the consideration to be received for the Shares or assets of the Company upon the consummation of such Approved Sale is less than the Proposed Offer provided by the Third Party Purchaser pursuant to <u>Section 5.04(b)(i)</u>, the difference between the amount of the Proposed Offer and the purchase price of the Approved Sale shall be deducted from the proceeds otherwise due to the Objecting Shareholders.

Shareholders Agreement at § 5.04(b)(i)-(ii), (v) (emphasis in original).[28]

---

[28] Terra recently learned that, as early as 2019, Peppertree informed Company employees that the Company needed to prepare for due diligence process in preparation of a 2020 sale of the Company. By mid-2020, Peppertree directors continued to reject the development and construction of new Towers proposed by Terra only this time they would claim the Company's future sale process as the reason for the rejection.

100.     Notably, under Section 5.04(b), a Proposed Offer by the Proposing Shareholders could only be made if it was procured or received from an "***unaffiliated*** Third Party Purchaser to purchase the assets or Shares of the Company[.]" (Emphasis added).

101.     Prior to expiration of the Lock-up period, on September 23, 2020, Peppertree surreptitiously entered into a Confidentiality Agreement ("2020 Confidentiality Agreement") with potential buyer Torrecom to negotiate the acquisition of the Company.

102.     Further illustrative of the Peppertree and Goldman's bad faith, the 2020 Confidentiality Agreement was entered without notice to or consent from Terra. Indeed, the entire transaction was hidden from the Company. Peppertree, the Peppertree Directors and Goldman had actual knowledge of the requirement that the Board approve the negotiations with a potential buyer and the disclosure of confidential information related to the Company. In fact, that is exactly what Terra did in 2018 in its attempt to sell the Company to PTI. *See supra* ¶¶ 77–88. Peppertree, the Peppertree Directors, and Goldman knew the proper procedures to negotiate with a third party and wantonly chose to negotiate with Torrecom under cloak and dagger in willful violation of the fiduciary duties they owe to the Company and its shareholders.

103.     Then, once again without seeking Board or shareholder approval, Peppertree and Goldman appointed Peppertree director Ranieri as the sole person in charge of negotiating the Company's sale. Worse, while in negotiations with Torrecom, Peppertree Directors continued to systematically reject all Tower proposals in Colombia and Peru where their intended merger partner, Torrecom, operates.

104.     Moreover, in the Confidentiality Agreement, Thompson Hine served as counsel to represent Peppertree, and Torrecom waived any conflict of interest it may have from past, current, or future representation. There was no appointment of counsel on behalf of the Company.

105. On November 4, 2020, a mere 4 days following the expiration of the Lock-up Period, Peppertree presented Terra with a notice of proposed approved sale (the "Notice of Proposed Approved Sale"), which enclosed Torrecom's share purchase agreement seeking to acquire 100% of the Company's shares for a purported purchase price of $406.8 million at the purported multiple of 17x TCF but with the TCF multiple in the share purchase agreement still in brackets indicating that the TCF multiple and consequently the purchase price was still subject to adjustment (the "Proposed Offer").

106. The Notice of Proposed Approved Sale further provided that the enclosed share purchase agreement provided by the potential buyer, Torrecom, was "not subject to further negotiation by Terra, and Terra must accept or reject such Proposed Offer in its entirety."

107. Critically, the Proposed Offer was subject to transfer taxes and other deductions to be paid by the Seller, which, according to the Company's financials, would have resulted in payment of a 30% tax in Peru amounting to $43.6 million, a 10% tax in Panama amounting to $2.191 million, a 10% tax in Hondurans amounting to $4.264 million, in addition to an adjustment escrow of 1% amounting to approximately $4 million, an indemnity escrow amount of approximately 20% representing $81.55 million, a Seller's Escrow of $10 million and finally, $250,000 for expenses of Ranieri as the seller's representative. After all applicable reductions set forth in the share purchase agreement were applied, the effective purchase price of the Proposed Offer would have reflected a multiple closer to 10x since Ranieri had sole discretion to agree to adjustments and holdbacks as the self-appointed Seller's Representative, with no Board approval. Furthermore, the Proposed Offer was subject to a financing contingency.

108. Indeed, Peppertree director Mandel had previously informed the Company that a potential buyer recognized that 20x TCF is "the floor range" at which the Company should be

valued. Moreover, Goldman knew that the Proposed Offer was substantially less than market value since Goldman Sachs (the parent company of shareholder Goldman) had recently sold a telecommunication tower company at 22.8x TCF (see *supra* ¶ 74). Despite this, Goldman and Peppertree were pressing Terra to accept the "non-negotiable" subpar valuation reflected in the Proposed Offer so that they could obtain control of the Company through their affiliated third-party.

109.    To make matters worse, Peppertree also materially breached Section 5.04(b) of Shareholders Agreement because Torrecom was not an "unaffiliated" Third Party Purchaser, but instead was financing the offer to purchase the Company through Goldman's *affiliate*, GS Lending Group – the same Goldman affiliate that put forth the highly unfavorable GS Credit Facility back in 2017.[29]

110.    Indeed, shortly after the Notice of Proposed Approved Sale was circulated to the shareholders, Terra received an email from Goldman advising that GS Lending Group was "happy to show Torrecom financing thoughts for their potential acquisition" of the Company.  In that same email, Goldman recognized the glaring conflict of interests and disclosed that it had set up a separate team to work with Torrecom and recused itself from all discussions related to the potential sale of the Company.  Worse yet, Torrecom is a small tower company and does not have the assets or revenues to obtain financing to acquire 100% of the equity of the Company.  As such, the proposed Purchase Offer was in effect  an attempted squeeze out merger that would directly harm Terra's share value while benefitting the Counter-respondents as they profited on the back-end, all with Goldman Sachs willing assistance to finance the disguised merger.

---

[29] As mentioned, GS Lending Group was the Goldman affiliate that designed the GS Credit Facility presented by Peppertree in 2017 to Terra on a take it or leave it basis on extremely unfavorable terms and which Peppertree retaliated against the Company by not approving new Towers after Terra offered an alternative, and more favorable, lender.

111. Needless to say, Torrecom was never an "unaffiliated Third Party Purchaser" as required by Section 5.04(b) of the Shareholders Agreement.

112. Naturally, Terra objected to the Proposed Offer and pursuant to Section 5.04(b)(i) of the Shareholders Agreement, Terra provided, within 30 days of the Notice of Proposed Approved Sale, an opinion letter from UBS Bank as an independent and reputable investment bank providing that Proposed Offer was materially less than comparable transactions in the industry and the Territory and that the valuation of the Company was closer to 24x TCF (the "Opinion").[30]

113. As a result of the Opinion, under Section 5.04(b)(ii) of the Shareholders Agreement, the Company was to retain an Investment Bank to facilitate an Approved Sale.

114. Additionally, because the Shareholders Agreement requires the Company to operate through the Board (see Shareholders Agreement at § 4.01), Terra also requested that the Company convene a board meeting so that the Company could facilitate the appointment of the Investment Bank, which never happened.

115. Paragraphs 95 through 114 are referred to as the "2020 Proposed Sale Breach."

### Peppertree and Goldman Refuse to Attend Duly Noticed Meetings

116. Peppertree and Goldman refused to attend a properly noticed Shareholders meetings requested by Terra to address the obstructionism of the Peppertree Directors.

117. On September 18, 2020, Terra properly noticed a Shareholder meeting and provided a detailed agenda of items that would be discussed and that required approval (the "Shareholder Meeting"). These items included:

- The execution of the Telefónica MLA;

- The execution of the Entel MLA;

---

[30] The Company is worth more than 24x TCF, as that is the fair market value of the Company following years of Peppertree's failure to develop new Towers. Terra seeks the full value of these damages in this action.

- The development of towers in Peru;

- The development of 35 towers with the existing Excess Cash Flow;

- The proper method for approval and rejection of towers, agreements and other opportunities by the Development Committee;

- Expiration of the Lock-Up Period.

118.     On September 24, 2020, Peppertree, through Lepene, objected to Terra's notice of a shareholders' meeting (the "Shareholders Meeting"). In addition, Goldman followed suit and also refused to attend the September 2020 Shareholders Meeting.

119.     In doing so, Peppertree refused to attend the Shareholder meeting because it absurdly alleged that (i) the requested "Shareholders Meeting" had not been properly authorized or noticed pursuant to the provision of the Shareholders Agreement and (ii) the specific agenda items identified in the Shareholders Meeting Notice were not actions that could be compelled by Shareholder vote. The Shareholders Agreement provides that "Shareholders' meetings will be held (i) in accordance with the Articles [of Association], []." Article 31 of the Amended and Restated Articles of Association of the Company states that "the Board *shall* call a meeting of Shareholders if requested in writing to do so by Shareholders entitled to exercise at least thirty percent of the voting rights in respect of the matter for which the meeting is being requested." (Emphasis added.) On September 18, 2020 Terra properly sent a request to the Board to call a shareholders meeting. Subsequently thereto, on the same day, Hernandez in his capacity as chairman of the board of the Company and in fulfillment of his obligation to send such notice at Terra's request to do so, sent the Shareholders Notice to all Shareholders. Peppertree incorrectly asserts that in such cases where a Shareholder submits a request to the Board to call a shareholders meeting, Board approval is required. In the same letter, Peppertree deigns to "accommodate Terra's request by having its directors execute the appropriate consent allowing the Board to schedule a Shareholders Meeting"

subject to an endless list of conditions or alternatively deems itself willing to meet with Terra on an informal basis only.

120.     Goldman stated it would not attend the September 2020 Shareholders Meeting because it had no right to vote.  This absurd statement is undermined by Section 4.05(c) of the Shareholders Agreement, which provides that:

> The Shareholders may take action (i) by a vote of Shareholders present, or represented by proxy, and entitled to vote at a duly convened meeting of the Shareholders at which a quorum is present, provided that the relevant action receives the affirmative vote of Shareholders representing at least seventy-five percent (75%) of the issued Shares, or (ii) in lieu of a meeting, by the written consent of Shareholders representing at least the number of issued Shares that would be required to authorize such action at a meeting of Shareholders contemplated by the previous subsection (i).

Shareholders Agreement, at § 4.05(c).

121.     Indeed, both Peppertree's and Goldman's willful refusal to attend the Shareholders Meeting was clear: they could not sit at a Shareholders' meeting to discuss and make decisions about constructing and developing Towers, the expiration of the Lock-up Period, and other issues relating to the Company without having to disclose the fact that they had surreptitiously been negotiating and preparing for the sale of the Company with an affiliated entity, Torrecom, prior to the Lock-up Period, which operated in the same markets that the Company was asking them to consider for new towers. Moreover, the discussions with Torrecom, Peppertree, Goldman and Goldman Sachs had been ongoing for many months prior without disclosure to the Company or Terra as the Company's majority shareholder. Ultimately, Peppertree and Goldman's excuses to not attend a validly noticed Shareholder Meeting were nothing more than desperate attempts to avoid a formal shareholders meeting; a delay tactic intended to procrastinate the discussion and cause intentional harm to the Company and Terra.

122.     Paragraphs 116 through 121 are referred to as the "Shareholder Meeting Breach."

***Terra Attempts to Rescue the Company from further Decline***

123.     In light of Peppertree's systematic repudiation and frustration of the Shareholders Agreement, and Mandel and Ranieri's clear refusal to meet their obligations as Directors, Terra, as majority shareholder, and in an attempt to save the Company from its fast decline, proceeded to make certain decisions that were in the best interest of the Company.

124.     Specifically, in October 2020, Terra authorized the distribution of the Excess Cash Flow to the Company's Shareholders.

125.     Such distribution was expressly authorized by Section 3.03(a) of the Shareholders Agreement, which provided that ". . . within thirty (30) calendar days following the end of each Fiscal Quarter, the Company ***shall*** distribute Excess Cash Flow, if any, and Net Cash, if any, to each of the Shareholders according to their respective Percentage Interests."   Additionally, under Section 3.03(e) of the Shareholders Agreement "[t]he Shareholders [] agree[d] to evaluate an establish appropriate and cost efficient mechanisms to distribute any Excess Cash Flow . . . ."

126.     Despite this, the Peppertree Directors refused to approve any Excess Cash Flow and, accordance with their rights under the shareholders agreement, Terra approved the Excess Cash Flow in 2020.

127.     Peppertree's actions were willful and malicious conduct directly aimed at harming Terra and contrary to the best interests of the Company.

128.     Unsurprisingly though, both Peppertree and Goldman happily retained their allocations.

129.     Through October 2020 until December 2020, in an attempt to end the Company's fast decline, Terra approved the development and construction of Towers in Colombia, Nicaragua and Panama honoring the purpose of the Company to "***develop***, own, ***acquire*** and operate, directly

or indirectly through the Company Subsidiaries, Towers in the Territory." Shareholders Agreement, at § 3.01 (emphasis added).

130. Terra's actions were in the best interests of the Shareholders and Company.

131. Finally, on or about January 26, 2021, in a final attempt to rescue the Company, Terra made a binding offer to redeem the shares of Goldman and Peppertree at a net price of $150 million with committed financing in place (the "Redemption Offer"). The Redemption Offer was made in good faith to resolve these issues and the $150 million effective purchase price of the Redemption Offer was demonstrably more favorable than the effective purchase price of the Proposed Offer. However, rather than respond to this favorable offer, Goldman and Peppertree rushed to the courthouse to begin these proceedings. They did so knowingly and with malicious intent to derail and frustrate the committed financing the Company had obtained to fund the Redemption Offer. The committed financing the Company had obtained was more than three (3) times the amount of the GS Credit Facility, despite Mandel's assertions that the amount of the GS Credit Facility was more than the Company could ever obtain without the help of the Peppertree Directors and Goldman.

132. Paragraphs 123 through 131 are referred to as the "Excess Cash Breach."

***Notice of Disputes***

133. On October 23, 2020, Terra sent Peppertree and Goldman a Notice of Dispute giving notice of the disputes described therein and stating that if the disputes where not resolved within 45 days, Terra would commence binding arbitration.

134. On November 5, 2020, Peppertree sent Terra a Notice of Dispute giving notice of the disputes described therein and stating that if the disputes were not resolved within 45 days, Peppertree would commence binding arbitration.

135. Thereafter, the parties exchanged additional notices and responses with respect to the ongoing disputes and Terra and Peppertree both appointed executive representatives to attempt to resolve the ongoing disputes between the parties.

136. On December 3, 2020, the parties' authorized executive representatives met via Zoom to attempt to resolve the disputes. However, these efforts were unsuccessful.

137. More than 45 days have elapsed since the parties began the negotiation in accordance with the arbitration provisions and no resolution of the Company's disputes have been achieved.

138. All conditions precedent to this action have been met, excused, or waived. As such, this matter is ripe for arbitration.

## ARBITRATION AGREEMENT AND GOVERNING LAW

139. The applicable Shareholder Agreement contains the following arbitration provision:

**Section 8.14 Dispute Resolution.** The parties agree that any controversy, claim or dispute arising out of or relating to or in connection with this Agreement including, without limitation, any dispute regarding its breach, termination, enforceability or validity hereof (each, a "**Dispute**") should be regarded as a business problem to be resolved promptly through business-oriented negotiations before resorting to arbitration pursuant to Section 8.15. The parties therefore agree to attempt in good faith to resolve any Dispute promptly by negotiation between the executives of the parties who have authority to settle the Dispute. Such negotiations shall commence upon the mailing of a notice (the "**Dispute Notice**") from the appropriate executive of the requesting party to an appropriate executive of the responding party. If the Dispute has not been resolved by these Persons within forty-five (45) days of the date of the Dispute Notice, then such Dispute will be settled pursuant to binding arbitration pursuant to Section 8.15. All negotiations pursuant to this Section 8.14 will be confidential and will be treated as compromise and settlement negotiations for purposes of applicable rules of evidence and not be used for, or admitted in, any arbitration or court proceedings under this Agreement.

**Section 8.15 Arbitration.** Subject to Section 8.12, any Dispute that has not been resolved pursuant to Section 8.14 will be finally settled by binding arbitration. The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association in effect at the time of the arbitration, except as they may be modified herein or by mutual agreement of the parties. The seat of the arbitration shall be New York, New York. The arbitration shall be conducted by three arbitrators. The party initiating arbitration (the "**Claimant**") shall appoint its arbitrator in its request for arbitration (a "**Request**"). The other party (the "**Respondent**") shall appoint its arbitrator within thirty (30) calendar days of receipt of the Request and shall notify the Claimant of such appointment in writing. If the Respondent fails to appoint an arbitrator within such thirty (30) day period, the arbitrator named in the Request shall decide the Dispute as the sole arbitrator. Otherwise, the two arbitrators appointed by the parties shall appoint a third arbitrator within thirty (30) calendar days after the Respondent has notified the Claimant of the appointment of the Respondent's arbitrator. When the arbitrators appointed by the parties have appointed a third arbitrator and the third arbitrator has accepted the appointment, the two arbitrators shall promptly notify the parties of such appointment. If the two arbitrators appointed by the parties fail or are unable to appoint a third arbitrator, then the third arbitrator shall be appointed by the President of the American Arbitration Association which shall promptly notify the parties of the appointment of the third arbitrator. The third arbitrator shall act as chairman of the panel. The arbitration award shall be in writing and shall be final and binding on the parties. The award may include an award of costs, including reasonable attorney's fees and disbursements. Judgment upon award may be entered by any court having jurisdiction thereof or having jurisdiction over the parties or their assets. The Initial A Shareholders hereby designate, appoint and empower Corporation Service Company, (the "**Process Agent**") with offices as of the date of this Agreement at Corporation Service Company, 1180 Avenue of the Americas, Suite 210, New York, NY 10036 as their authorized agent to receive for and on their behalf service of summons or other legal process in any action commenced under this Section 8.15 or otherwise related to this Agreement or the related investments and transactions in accordance with the Acceptance of Appointment Letter, substantially as attached hereto as Exhibit B. Such service may be made by mailing or delivering a copy of such process to either or both of the Initial A Shareholders in care of the Process Agent at the Process Agent's above address, and the Initial A Shareholders hereby authorize and direct the Process Agent to accept such service on their behalf. The Initial A Shareholders acknowledge and agree that they shall not revoke the appointment of such Process Agent unless they have appointed another agent for service of process and have received the written consent of the other Shareholders to such appointment.

Shareholders Agreement, §§ 8.14-15 (emphasis in original).

140.     Counter-Respondents, with the exception of Goldman Sachs (*infra*), are parties, and subject to, the Shareholders Agreement.

141.     All conditions precedent to this action have been met, excused, or waived.

**<u>DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS</u>**

142.     Terra brings this action derivatively on behalf of and for the benefit of the Company and its shareholders to redress injuries suffered by the Company as a direct result of the violations of law, breaches of fiduciary duty, self-dealing, frustration of purpose, and breach of the Shareholders Agreement, as well as the aiding and abetting thereof, of Peppertree and Goldman.

143.     Terra will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting their rights.

144.     Terra has not made any formal demand on the Board to institute this action since such demand would be futile for the following reasons:

- Demand is futile because Peppertree initiated this arbitration proceeding and two out of the Company's four directors, Peppertree Directors Ranieri and Mandel, participated and approved the wrongful acts set forth herein, including, but not limited to (i) materially failing to follow the purpose of the Company without Board or shareholder approval; (ii) failing to approve local financing with objectively beneficial terms to the Company; (iii) systematically rejecting the development and acquisition of Towers in authorized Territory; (iv) failing to approve the renewal of MLAs jeopardizing the relationship between the Company and telecommunications carriers; and (v) failing to disclose to the Board that the Company was engaging in negotiations for a potential buyout.

- Moreover, the facts alleged herein against the Peppertree Directors clearly indicate that the Peppertree Directors failed to exercise their business judgement in their business transactions on behalf of the Company and, as such, demand upon the Board would be futile.

145. For these reasons, a majority of the Board could not properly respond to a demand and would not agree to initiate legal proceedings against themselves. Accordingly, demand upon the Board would have been futile.

## CAUSES OF ACTION

### Count I – Breach of Contract
*Against Peppertree and Goldman*

146. Counterclaimants repeat and reallege each and every allegation set forth in paragraphs 1 through 145, as though fully set forth herein.

147. Peppertree, Terra, Goldman and the Company entered into the Shareholders Agreement on October 22, 2015.

148. Peppertree and Goldman materially breached various provisions of the Shareholders Agreement by, among other things, the Tower Rejection Breach, 2018 Buyout Breach, MLA Breach, 2020 Proposed Sale Breach, Shareholders Meeting Breach, and Excess Cash Breach.

149. The Company has been materially damaged by Peppertree and Goldman's material breaches.

### Count II – Breach of Fiduciary Duties of Care, Loyalty and Good Faith
*Against Peppertree, the Peppertree Directors, and Goldman*

150. Counterclaimants repeat and reallege each and every allegation set forth in paragraphs 1 through 145, as though fully set forth herein.

151. Under New York law, Goldman, Peppertree, and the Peppertree Directors owe continuing duties of care, loyalty and good faith directly to Counterclaimants and the Company.

152. Peppertree, the Peppertree Directors, and Goldman breached those fiduciary duties through, among other things, the GS Credit Facility Breach, Tower Rejection Breach, 2018 Buyout Breach, MLA Breach, 2020 Proposed Sale Breach, Shareholders Meeting Breach, and Excess Cash Breach.

153. Peppertree, the Peppertree Directors, and Goldman's various breaches of fiduciary duties damaged the Company and Terra.

154. Peppertree, the Peppertree Directors, and Goldman's breaches of their fiduciary duties to the Company and Terra were intentional, malicious, and in bad faith.

### Count III – Breach of Fiduciary of Duty of Candor
*Against Peppertree, the Peppertree Directors, and Goldman*

155. Counterclaimants repeat and reallege each and every allegation set forth in paragraphs 1 through 145, as though fully set forth herein.

156. Peppertree, the Peppertree Directors, and Goldman have a duty of candor to provide all of the information necessary for the Counterclaimants to make an informed decision regarding the Company.

157. Peppertree, the Peppertree Directors, and Goldman have breached their fiduciary duties of candor to the Company and Counterclaimants through, among other things, the GS Credit Facility Breach, 2018 Buyout Breach, MLA Breach, 2020 Proposed Sale Breach, and Shareholders Meeting Breach.

158. Peppertree, the Peppertree Directors and Goldman's breach of the duty of candor damaged the Company and Terra.

159. Peppertree, the Peppertree Directors, and Goldman's breaches of their duty of

candor to the Company and Terra were intentional, malicious, and in bad faith.

## Count V – Conspiracy to Commit Breach of Fiduciary Duty
*Against All Counter-Respondents*

160.    Counterclaimants repeat and reallege each and every allegation set forth in paragraphs 1 through 145, as though fully set forth herein.

161.    Counter-Respondents had an agreement, and intentionally conspired, to commit breaches of fiduciary duty against Counterclaimants to devalue the company in an attempt to wrestle control of the Company at a depressed value as soon as the parties' 2020 Lock-up Period expired under the Shareholders Agreement with a disguised merger with Torrecom whom they had identified as a partner from as early as 2017.

162.    Counter-Respondents took overt acts in furtherance of this conspiracy through, among other things, their actions in the GS Credit Facility Breach, Tower Rejection Breach, 2018 Buyout Breach, MLA Breach, 2020 Proposed Sale Breach, Shareholders Meeting Breach, and Excess Cash Breach.

163.    The Company has been damaged by this conspiracy.

## RELIEF SOUGHT

1.    Monetary damages provided by law in excess of $186,616,810, including pre-judgment and post-judgment interest, and further including damages to be determined at trial for the loss enterprise value to the Company resulting from approximately 3,000 rejected tower acquisitions.

2.    Punitive Damages as provided by law for Counter-Respondents' above described willful, malicious, and reckless conduct.

3.    Costs and expenses associated with this proceeding, including all filing and

administrative fees, arbitrator compensation and other forum fees, and reasonable attorneys' fees.

Dated: February 19, 2021                    Respectfully submitted,

**CAREY RODRIGUEZ MILIAN, LLP**         **SANCHEZ FISCHER LEVINE, LLP**
1395 Brickell Avenue, Suite 700              1200 Brickell Avenue, Suite 750
Miami, Florida 33131                         Miami, Florida 33131
Telephone: (305) 372-7474                    Telephone: (305) 925-9947

*/s/ Juan J. Rodriguez*                      */s/ David M. Levine*
Juan J. Rodriguez                            David M. Levine
Fla. Bar No. 613843                          Fla. Bar No. 84431
Email: jrodriguez@careyrodriguez.com         New York No. 5079942
Jennifer M. Hernandez                        Email:  dlevine@sfl-law.com
Fla. Bar No. 1018836                         Paola Sanchez Torres
Email: jhernandez@careyrodriguez.com         Fla Bar No. 99639
                                             Email: psanchez@sfl-law.com