# EXHIBIT 9

# ARBITRATION PURSUANT TO THE COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCIATION

TELECOM BUSINESS SOLUTION, LLC, on its own behalf and derivatively, on behalf of CONTINENTAL TOWERS LATAM HOLDINGS LIMITED and LATAM TOWERS, LLC, on its own behalf and derivatively, on behalf of CONTINENTAL TOWERS LATAM HOLDINGS LIMITED,

     Claimants,

v.

TERRA TOWERS CORP., TBS MANAGEMENT, S.A., DT HOLDINGS INC., JORGE HERNANDEZ and ALBERTO ARZU,

     Respondents,

and

CONTINENTAL TOWERS LATAM HOLDINGS LIMITED,

     Nominal Respondent.

Case No. 01-21-0000-4309

---

TERRA TOWERS CORP. and TBS MANAGEMENT, S.A., derivatively and on behalf of CONTINENTAL TOWERS LATAM HOLDINGS LIMITED

     Counterclaimants,

v.

TELECOM BUSINESS SOLUTION, LLC, LATAM TOWERS, LLC, F. HOWARD MANDEL, JOHN RANIERI, RYAN LEPENE, and AMLQ HOLDINGS (CAY), LTD.,

     Counterclaim Respondents,

and

CONTINENTAL TOWERS LATAM HOLDINGS LIMITED,

     Nominal Counterclaim Respondent.

AMLQ HOLDINGS (CAY), LTD.,

     Counterclaimant,

v.

TERRA TOWERS CORP. and TBS MANAGEMENT, S.A.,

Counterclaim Respondents.

## AMLQ HOLDINGS (CAY), LTD.'S ANSWERING
## STATEMENT, AFFIRMATIVE AND OTHER DEFENSES, AND COUNTERCLAIMS

Counterclaim Respondent AMLQ Holdings (Cay), Ltd. ("AMLQ"), by and through its attorneys, respectfully submits its Answering Statement, Affirmative and Other Defenses, and Counterclaims in response to the Counterclaims filed by Terra Towers Corp. ("Terra Towers") and TBS Management, S.A. ("Terra TBS," and together with Terra Towers, "Terra") on March 4, 2021 (the "Terra Counterclaims"),[1] pursuant to R-5 of the American Arbitration Association's ("AAA") Commercial Arbitration Rules.[2]

## ANSWERING STATEMENT[3]

In 2015, AMLQ made an initial equity commitment of over $45 million to acquire an approximately 13% minority equity stake in Continental Towers Latam Holdings Limited (the "Company") through the Company's designated Class C shares. In addition, and concurrently with AMLQ's investment, two other investor groups received designated interests in the Company, those being: (1) Terra, which, upon information and belief, formed the Company in 2008, and has the majority equity stake in the Company through designated Class A shares, with the corollary

---

[1] Although Terra purports to label all of its claims "counterclaims," technically there is no "counterclaim" against AMLQ because AMLQ did not initiate the above-captioned arbitration. Solely for purposes of its Answer, to avoid confusion, and without waiving any rights or defenses, AMLQ refers to Terra's claims against AMLQ herein as "counterclaims."

[2] The Terra Counterclaims reference Goldman Sachs & Co. LLC ("Goldman Sachs") but do not list Goldman Sachs on the caption or apparently assert claims against it. Nor could they. Goldman Sachs is not a party to any of the relevant agreements, nor is there any other basis for arbitral jurisdiction over Goldman Sachs. For the avoidance of doubt, AMLQ advises the panel that its affiliate, Goldman Sachs, has not consented, and does not consent, to the AAA's (or any panel's) jurisdiction over it with respect to the disputes asserted in the Terra Counterclaims, and expressly disclaims any such jurisdiction.

[3] Pursuant to R-5(a) of the AAA Commercial Arbitration Rules, AMLQ denies each and every allegation set forth in the Terra Counterclaims unless otherwise stated. To the extent that the headings, non-numbered statements, and/or footnotes in the Terra Counterclaims contain any allegations, AMLQ denies each and every such allegation.

right to appoint two directors to the Company's four-member Board of Directors (the "Board"); and (2) Telecom Business Solution, LLC and Latam Towers, LLC (collectively, "Peppertree"), which initially invested with Terra in an affiliate of the Company in 2014, and expanded its investment to include approximately one-third of the Company's equity through designated Class B shares in 2015, with the right to appoint the other two directors to the Board. Since investing in the Company, AMLQ has had no right to appoint any directors to the Board,[4] no representation in the Company's management, and no day-to-day operational responsibilities. As such, AMLQ had no involvement in most of the actions about which Terra now complains.

Moreover, contrary to the allegations of the Terra Counterclaims, AMLQ has, with respect to its limited role in the Company, always acted in good faith in dealing with the Company, and the other shareholders, consistent with the common goal of maximizing the investors' returns on their significant investment in the Company. Terra's Counterclaims, which attempt to recast any action or position taken by AMLQ or its affiliates as part of a vague conspiracy with Peppertree to "devalue" the Company, are simply meritless and frankly illogical. They should be swiftly rejected.

Initially, Terra asserts that AMLQ somehow committed a breach of fiduciary duty because, in 2016, an affiliate of Goldman Sachs submitted a proposal letter and term sheet for a proposed operational loan to the Company. To begin, Terra pleads no basis on which AMLQ would owe fiduciary duties to Terra or the Company (there is none). In any event, there is nothing wrong, much less actionably wrong, with an investor affiliate offering financing to the Company. In fact, far from breaching any contractual provision or other obligation, the proposed financing was *expressly contemplated* by the Shareholders Agreement, in which the Company's shareholders

---

[4]     AMLQ is allowed an observer at meetings of the Board or committees thereof, to the extent any such are held, subject to certain exclusions.

agreed to "use commercially reasonable efforts to assist the Company in obtaining any credit facilities as the Board determines are required to facilitate the growth of the Company." Although Terra describes the proposed financing as "burdensome in nature" and part of a "scheme" to gain control over the Company, Terra omits that: (i) Goldman Sachs affiliates were approached and asked to submit the proposal (not the other way around); and (ii) the initial loan proposal letter was signed on behalf of the Company by Alberto Arzú—a Terra-appointed Company director. The proposed financing reflected standard and customary terms, and would have benefitted the Company by helping fund its operations and growth. Nonetheless, Terra, through its Board designees, was free to (and did) ultimately determine not to pursue the financing. Under such circumstances, any assertion of improper conduct by AMLQ is simply irrational and without factual or legal basis.

Further meritless are Terra's allegations that AMLQ somehow attempted to "obtain control of the Company through [an] affiliated third-party" due to the submission, by a Goldman Sachs affiliate, in 2020, of a tentative financing proposal to Torrecom Partners LP ("Torrecom"), a potential acquirer of the Company. Initially, to be clear, AMLQ and Torrecom are not affiliates. Specifically, neither AMLQ nor its affiliates have any known ownership interest in Torrecom (or Peppertree). Furthermore, AMLQ has clearly stated its desire to, consistent with the Shareholders Agreement, *sell* its equity stake in the Company. As such, Terra's suggestion that AMLQ somehow desires to "take control" of the Company is simply false. Terra's allegations also ignore the facts that: (i) AMLQ's representatives responsible for the investment in the Company were excluded from discussions by the Goldman Sachs affiliate with Torrecom regarding the financing

proposal,[5] and (ii) having any major institution, including a Goldman Sachs affiliate, offering to provide financing proposals to potential acquirers of the Company (regarding the potential sales specifically contemplated in the Shareholders Agreement) would have *advanced* the interests of the Company's shareholders by facilitating a sale of the Company at a fair price. And, as with the earlier financing proposal, Terra was free to, and did, reject the proposed sale transaction. Any assertion of improper or actionable conduct by AMLQ is therefore illogical, unsupported by facts, and without any merit.

Terra's remaining counterclaims, to the extent they even mention AMLQ, also amount to nothing more than baseless conspiracy theories, unsupported by any facts. Terra speculates, for example, without any factual support, that Peppertree "systematically" rejected tower development proposals in Colombia to somehow protect the interests of some Goldman Sachs-affiliated fund in Cell Site Solutions, a Brazil-based telecommunications company. Terra also speculates that, "through itself or one of its subsidiaries," Goldman Sachs "interfer[ed]" with a proposed buyout of the Company in 2018 by failing to "transfer funds" which supposedly "would have financed the buyout." All of these allegations are pure fiction without any basis in fact.[6]

In addition to being factually baseless, all of Terra's counterclaims against AMLQ suffer from basic legal defects. Terra asserts a breach of contract claim against AMLQ, but fails to identify any provision of the Shareholders Agreement that AMLQ breached (all sides were

---

[5]     In fact, as Terra is aware, out of an abundance of caution and to prevent even a perceived conflict of interest, an internal wall was created between the debt financing team working on the financing proposal and the AMLQ representatives working on the investment in the Company.

[6]     Terra's counterclaim that AMLQ and Peppertree "refused to attend a properly noticed Shareholders meeting[] requested by Terra" is similarly meritless. The purported "shareholders meeting" was not properly authorized or noticed pursuant to the provision of the Shareholders Agreement, and the specific items identified in Terra's purported shareholders meeting notice were not actions that could be compelled by shareholder vote. Further, Terra does not (and cannot) allege any damages that it suffered from AMLQ declining to attend the purported shareholder meeting.

represented by sophisticated counsel in negotiating the Shareholders Agreement), any action that AMLQ took that could constitute a breach, or any damages that Terra suffered from AMLQ's alleged actions. Simply put, Terra fails to identify a breach by AMLQ because none exists. Similarly, Terra asserts a breach of fiduciary duty claim against AMLQ, but fails to allege (i) any cognizable basis for the existence of fiduciary duties by AMLQ (a minority investor with no Board designees or representation in management), (ii) any conduct by AMLQ that could amount to a breach of fiduciary duty (even if one existed), or (iii) any damages that Terra or the Company suffered from AMLQ's alleged conduct.

In short, Terra's counterclaims as to AMLQ have no basis in fact, logic, or law, and AMLQ denies them (and each and every material allegation asserted by Terra) in their entirety. Terra's Counterclaims should be dismissed, and AMLQ should be awarded its reasonable attorney's fees, costs, and expenses, including those incurred in defending against Terra's Counterclaims.

## AFFIRMATIVE AND OTHER DEFENSES

AMLQ hereby asserts, *inter alia*, the following defenses with respect to the purported causes of action alleged against it in the Terra Counterclaims, without assuming the burden of proof or persuasion where such burden rests on Terra. AMLQ reserves the right to supplement its defenses and/or raise any additional defenses that may become available or appropriate.

1.  The Terra Counterclaims are barred, in whole or in part, because they fail to state a claim upon which relief may be granted.

2.  The Terra Counterclaims are barred, in whole or in part, by Terra's lack of standing to pursue its claims.

3.  The Terra Counterclaims are barred, in whole or in part, by Terra's bad faith.

4.      The Terra Counterclaims are barred, in whole or in part, by the doctrine of unclean hands.

5.      The Terra Counterclaims are barred, in whole or in part, by the doctrine of waiver.

6.      The Terra Counterclaims are barred, in whole or in part, by the doctrine of equitable estoppel.

7.      The Terra Counterclaims are barred, in whole or in part, by the statute of limitations.

8.      The Terra Counterclaims are barred, in whole or in part, by the doctrine of laches.

9.      The Terra Counterclaims are barred, in whole or in part, because AMLQ did not owe Terra or the Company any fiduciary duties.

10.     The Terra Counterclaims are barred, in whole or in part, because at all times, and with respect to all matters at issue herein, AMLQ acted in good faith and exercised reasonable care.

11.     The Terra Counterclaims are barred, in whole or in part, because Terra has not suffered any harm or injury, whether irreparable or otherwise, resulting from any act or omission of AMLQ.

12.     The Terra Counterclaims are barred, in whole or in part, by Terra's own breaches of the Shareholders Agreement.

13.     The damages alleged in the Terra Counterclaims are subject to set-off by the damages Terra caused AMLQ to suffer, including, but not limited to, those set forth in AMLQ's counterclaims in this arbitration.

14.     The Terra Counterclaims are barred, in whole or in part, due to Terra's failure to mitigate its claimed damages.

15.     Terra's requests for punitive damages are barred because such damages are not recoverable pursuant to the agreements on which Terra relies and AMLQ has not acted with the requisite intent, malice, reckless indifference, and/or fraud required for the recovery of such damages.

## COUNTERCLAIMS AGAINST TERRA

Counterclaimant AMLQ Holdings (Cay), Ltd. ("AMLQ"), as and for its counterclaims against Counterclaim Respondents Terra Towers Corp. ("Terra Towers") and TBS Management, S.A. ("Terra TBS," and together with Terra Towers, "Terra"), alleges, upon knowledge as to itself and its own actions, and upon information and belief as to all other matters, as follows:

### PARTIES

#### Counterclaimant

1.      Counterclaimant AMLQ is a Cayman Island Exempted Company Limited by Shares.  AMLQ is a minority shareholder of Continental Towers Latam Holdings Limited (the "Company"), a company incorporated in the British Virgin Islands.  AMLQ owns the Company's Class C shares, representing approximately 13.35% of the Company's equity.

#### Counterclaim Respondents

2.      Counterclaim Respondent Terra Towers is a company incorporated in the British Virgin Islands, with registered number 1375181, whose registered office is at Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands.  Counterclaim Respondent Terra TBS is a *Sociedad de Responsabilidad Limitada*, and formerly a *sociedad anonima*, organized under the laws of Panama.  Together, Terra Towers and Terra TBS own Class A shares representing approximately 54.45% of the Company's equity.

### GENERAL STATEMENT OF COUNTERCLAIM

3.      In 2015, AMLQ made an initial equity commitment of over $45 million to acquire a minority equity stake in the Company, and executed a Shareholders Agreement (the "Shareholders Agreement") with the Company's other shareholders:  Terra, Telecom Business Solution, LLC ("Peppertree TBS"), and Latam Towers, LLC ("Peppertree Latam," and together

with Peppertree TBS, "Peppertree").[7]

4.      The Shareholders Agreement provides both Peppertree and Terra the right to require the sale of the Company within ninety days following the expiration of a five-year lock-up period (the "Lock-up Period"); such period being measured from the October 22, 2015 execution date of the Shareholders Agreement.   The Shareholders Agreement further provides for the proceeds from such a sale to be distributed to all shareholders, including AMLQ, on a pro rata basis based on their respective equity interests in the Company.

5.      To exercise their right to a contractually mandated sale, either Peppertree or Terra may provide written notice requesting a sale of all (or substantially all) of the shares in the Company to an unaffiliated third party purchaser.   This provision was heavily negotiated by these sophisticated parties and their counsel to permit the parties, if desired, to exit their investments in the Company upon the expiration of the five-year Lock-up Period.

6.      If the party proposing a sale has already received an acquisition proposal from a third party before providing the sale notice, the Shareholders Agreement provides the other party with the right to object to the proposal on the grounds that it undervalues the Company.

7.      Critically, however, in order to avoid a gridlock on the proposed sale, the Shareholders Agreement provides that once an objection is made, the Company must go to market for the sale, including hiring an investment bank to pursue and facilitate the sale process.   Under the Shareholders Agreement, the objecting party is prohibited from raising any objections to the Company's pursuit of such a sale process, and if the Company fails to consummate a sale at a higher price than the initial proposal, the objecting shareholder is liable to the other shareholders for the lost proceeds.

---

[7]      Peppertree owns the Company's Class B shares representing, collectively, 32.2% of the Company's equity.   A copy of the Shareholders Agreement is attached hereto as **Exhibit A**.

8.     On November 4, 2020, Peppertree delivered to Terra a notice of proposed sale of all of the shares of the Company to an unaffiliated third party purchaser for $407.8 million (the "Proposed Offer").  Pursuant to the Shareholders Agreement, approximately $222 million of that amount would ultimately be distributed to Terra, $131 million to Peppertree, and $55 million to AMLQ, based on their respective equity stakes.

9.     The Shareholders Agreement offered Terra two choices in response to the Proposed Offer:  it could either (a) accept the Proposed Offer and receive more than $222 million; or (b) reject the Proposed Offer, and thereby trigger the retention of an investment bank for the sale (with the corollary risk to Terra that it would be liable to Peppertree and AMLQ for any proceeds lost by Terra rejecting the Proposed Offer).

10.    Terra chose neither, and instead decided to materially breach the Shareholders Agreement by refusing to proceed with the contractually mandated sale process altogether. Specifically, in numerous correspondence between the parties, as well as in the counterclaims it has filed in this arbitration proceeding, Terra has raised a host of frivolous arguments that the Proposed Offer somehow did not trigger the required sale process set forth in Section 5.04(b) because it supposedly was not "bona fide" and was a "sham" offer.

11.    Although Terra also simultaneously professed a willingness to retain an investment bank to explore an alternative sale, and even acknowledged in writing that "the Company shall within thirty (30) calendar days of receipt of [Peppertree's sale notice] retain an Investment Bank to facilitate an Approved Sale," Terra never had any intention of doing so.  Indeed, despite Peppertree's and AMLQ's explicit demand that Terra proceed with the sale process and retain an investment bank, Terra baselessly maintained that the provision in the Shareholders Agreement requiring the retention of an investment bank "was not [triggered] because the [proposed] offer

was not a bona fide offer," thus making any further discussion of retaining an investment bank "a moot point."

12.     Terra's refusal to comply with the contractually mandated sale process constitutes a breach of Section 5.04(b) of the Shareholders Agreement, and entitles AMLQ to an award of compensatory damages of at least the approximately $55 million amount to which AMLQ would have ultimately received from the Proposed Offer.  In the alternative, AMLQ is entitled to an award directing specific performance of the provisions of Section 5.04(b) of the Shareholders Agreement related to the sale of the Company.

**STATEMENT OF FACTS**

**I.      The Required Sale Provisions of the Shareholders Agreement.**

13.     The procedures, rules, and requirements for a required sale of the Company are set forth in Section 5.04 of the Shareholders Agreement.

14.     The Shareholders Agreement permits either Peppertree or Terra to require the sale of the Company through a contractually mandated process after the fifth anniversary of the execution of the Governing Documents.[8]  Shareholders Agreement, art. 1.

15.     Specifically, Section 5.04(b) of the Shareholders Agreement provides that, within ninety days after the Lock-up Period expires, either Terra or Peppertree (the "Proposing Shareholders") may request, upon written notice to the other shareholders and the Company, "a sale of all or substantially all of the Company's assets or all or substantially all of the Shares in the Company (in one or more transactions) to an unaffiliated Third Party Purchaser"—*i.e.*, an

---

[8]     The "Governing Documents" were all executed on October 22, 2015, and include: (i) the Shareholders Agreement; (ii) the Subscription and Contribution Agreement between the Company, AMLQ, Peppertree Latam, and Terra Towers; (iii) the Development Agreement between the Company, Terra, and DT Holdings Inc. ("DT Holdings"); and (iv) the Offshore Turnkey Engineering, Procurement, and Management Contract between the Company and DT Holdings.

"Approved Sale." If the Proposing Shareholders have already received an offer for an Approved Sale, the proposed sale notice must "disclose in reasonable detail" the identity of the purchaser and the proposed terms and conditions of their offer. Shareholders Agreement § 5.04(b)(i).

16. After receiving a proposed offer, Terra or Peppertree, as applicable, (the "Objecting Shareholders") then have thirty days to reject the proposed offer by providing the Company with an opinion from an independent and reputable investment bank "stating that the value of the proposed transaction is materially less than comparable transactions in the industry and the [relevant territory]." *Id.*

17. If such an opinion is *not* delivered to the Company within the thirty-day objection period, then "each Shareholder shall vote for, consent to and raise no objections against such Approved Sale and take all necessary and reasonable actions in connection with the consummation of the Approved Sale as requested by the Proposing Shareholders." *Id.* Once that Approved Sale is consummated, "the proceeds of such sale shall be distributed among the Shareholders in accordance with their respective" percentage equity interests in the Company. Shareholders Agreement § 5.04(b)(iv).

18. In contrast, if an investment bank opinion *is* timely provided by an Objecting Shareholder, Section 5.04(b)(ii) provides that the Company shall "retain an Investment Bank to facilitate an Approved Sale," and similarly provides that each shareholder "shall vote for, consent to and raise no objections against" and "and take all necessary and reasonable actions in connection with the consummation of" an Approved Sale.

19. Importantly, the Shareholders Agreement explicitly provides that Terra will be responsible to Peppertree and AMLQ for any lost sale proceeds resulting from Terra's rejection of the Proposed Offer. Specifically, Section 5.04(b)(ii) provides that "[i]n the event that the

consideration to be received for the Shares or assets of the Company upon the consummation of such Approved Sale is less than the Proposed Offer . . . the difference between the amount of the Proposed Offer and the purchase price of the Approved Sale shall be deducted from the proceeds otherwise due to the Objecting Shareholders." *Id.*

## II. Terra Breaches the Shareholders Agreement.

20. The Lock-up Period expired on October 22, 2020.

21. Pursuant to Section 5.04(b)(i) of the Shareholders Agreement, on November 4, 2020, Peppertree delivered to Terra (copying AMLQ) a notice of proposed approved sale (the "Notice of Proposed Approved Sale") requesting "the sale of all of the issued and outstanding Class A, Class B and Class C shares of the Company."

22. Attached to the Notice of Proposed Approved Sale was a proposal from Torrecom Partners LP ("Torrecom")—an unaffiliated Third Party Purchaser—to purchase 100% of the equity interests in the Company for $407.8 million.

23. The Proposed Offer satisfied all of the requirements of Section 5.04(b) of the Shareholders Agreement.

24. Had the Proposed Offer been consummated, Terra would have ultimately been entitled to a pro rata share of $222,047,100 of the purchase price; Peppertree to a pro rata share of $131,311,600; and AMLQ to a pro rata share of $54,441,300.

25. Under the plain terms of Section 5.04(b)(i), Terra had two options: it could either (a) accept the Proposed Offer and receive more than $222,000,000, or (b) object to the Proposed Offer, permit and cause the Company to retain an investment bank, take all necessary actions to consummate an alternative Approved Sale, and be liable to Peppertree and AMLQ for any lost sale proceeds resulting from Terra's rejection of the Proposed Offer.

26.     Terra instead decided to breach the Shareholders Agreement by refusing to proceed with the contractually mandated sale process.  Specifically, Terra has repeatedly taken the baseless position that it need not proceed with the sale process—including the retention of an investment bank—because the Proposed Offer was somehow a "not a bona fide offer" and thus did not trigger the sale provision set forth in Section 5.04(b).

27.     For instance, on November 24, 2020, Terra delivered to Peppertree (copying AMLQ) a notice of rejection of the Proposed Offer (the "Notice of Rejection"), claiming that the Proposed Offer was "not a bona fide offer and is thus rejected."

28.     Terra simultaneously sent a notice of dispute to Peppertree and AMLQ in which it again falsely asserted that the "purported" offer was "not a bona fide offer to purchase the entirety of the equity interests in the Company," meaning that the offer did not trigger the sale process under Section 5.04(b).

29.     In its claims against AMLQ and Peppertree in this proceeding, Terra doubles down on this baseless position by complaining that the Proposed Offer was "entered without notice to or consent from Terra," "not subject to further negotiation by Terra," "substantially less than market value," and financed through a "Goldman affiliate."  *See* Terra Countercls. ¶¶ 102, 106, 108-11.

30.     Terra's assertions that the Proposed Offer is not "bona fide" or a "sham" are frivolous.  Nothing in the Shareholders Agreement prevented Peppertree (or Terra) from identifying a potential buyer prior to expiration of the Lock-up Period.  Indeed, the Shareholders Agreement specifically contemplates such activity by requiring Peppertree or Terra to disclose in any proposed sale notice if they "have already procured or received an offer from an unaffiliated Third Party Purchaser."  *See* Shareholders Agreement § 5.04(b)(i).  Terra's complaint that it did not have an opportunity to negotiate the terms of the Proposed Offer before it was presented, and

that the Proposed Offer is "materially less than comparable transactions in the market and the [relevant territory]" has nothing to do with whether the Proposed Offer satisfied the requirements of Section 5.04(b) of the Shareholders Agreement. Peppertree was expressly permitted to bring the Proposed Offer to the shareholders under Section 5.04(b), and Terra was free to reject that offer consistent with the Shareholders Agreement provisions—subject to the contractual consequences of that choice. Finally, that an affiliate of Goldman Sachs submitted a tentative financing proposal to Torrecom for the transaction does not change the fact that Torrecom is, by definition, an "unaffiliated Third Party Purchaser" under the Shareholders Agreement.[9]

31. Moreover, even if there were any merit to Terra's objections to the Proposed Offer (which there is not), Section 5.04 of the Shareholders Agreement expressly provides Terra a remedy, namely, to reject the Proposed Offer, in which case the Company is *still* required to hire an investment bank, and Terra is *still* required to consent to and raise no objections to a sale. Terra's objections to the Proposed Offer are thus not only frivolous, they are a complete red herring.

32. Although Terra's Notice of Rejection purported to express Terra's willingness to retain an investment bank to explore a sale, and explicitly conceded that "[a]ccording to Section 5.04(b)(ii) of the [Shareholders Agreement], the Company shall within thirty (30) calendar days of receipt of a Proposed Sale Notice retain an Investment Bank to facilitate an Approved Sale,"

---

[9] "Third Party Purchaser" is defined in the Shareholders Agreement as "any Person other than to a Permitted Transferee"; "Permitted Transferee" is defined to mean "with respect to any Person that is an entity, any Affiliate of such Person"; and "Affiliate" is defined to mean any Person which (i) controls or is under common control with such Person, (ii) is an officer or partner in or trustee of such Person, or with respect to such Person serves in a similar capacity; or (iii) beneficially owns 50% or more of the equity of such Person or of which such Person beneficially owns more than 50% of the equity. *See* Shareholders Agreement §§ Art. I, 5.03, 5.04(b). Torrecom is not an "Affiliate" of either Peppertree or AMLQ. As a result, Torrecom constitutes an unaffiliated Third Party Purchaser under the plain language of the parties' agreement.

Terra never had any intention of doing so, as evidenced by its repeated assertions (including in this arbitration) that the Proposed Offer was not "bona fide," and thus did not trigger the sale provision under Section 5.04(b). To date, Terra has blocked the Company from retaining an investment bank to facilitate an Approved Sale of the Company.

33. On December 22, 2020, Terra, through counsel, reiterated its position that the provision in the Shareholders Agreement requiring the retention of an investment bank "was not [triggered] because the [Proposed] [O]ffer was not a bona fide offer." Because of this, Terra stated that "it [was] a moot point to be discussing the appointment of an Investment Banker" and failed to respond to a proposed list of potential investment banks or proceed with the sale process. In doing so, Terra once again confirmed that it would not move forward with the sale process or comply with its contractual obligation to effectuate that process.

34. Terra has maintained this position even after Peppertree delivered to Terra (copying AMLQ) a separate proposed sale notice on January 19, 2021, which requested "a sale of all (or substantially all) of the shares in the Company" and which did not attach any proposed offer. There can be no question this notice also triggered the required sale process set forth in Section 5.04(b)(ii), which provides that, "[i]f the Proposing Shareholders have not already procured an offer from an unaffiliated Third Party Purchaser," the Company shall "retain an Investment Bank to facilitate an Approved Sale," and similarly provides that each shareholder "shall vote for, consent to and raise no objections against" and "and take all necessary and reasonable actions in connection with the consummation of" an Approved Sale. Terra had no contractual basis to object to this notice at all, given it was sent within ninety days of the Lock-up Period, and did not attach a proposed offer. Terra, however, has still refused to comply with the required sale process.

35. Terra's actions constitute a breach of the Shareholders Agreement. AMLQ is

entitled to an award of compensatory damages caused by Terra's failure and refusal to abide by the sale process set forth in Section 5.04(b) of the Shareholders Agreement. Such damages include, without limitation, $54,441,300—the amount that AMLQ would have received from the Proposed Offer.

36. In the alternative, and to the extent that AMLQ does not receive its full compensatory damages resulting from Terra's failure to sell the Company as required, AMLQ is entitled to an award directing specific performance of the provisions of Section 5.04(b) of the Shareholders Agreement related to the sale of the Company.

## DEMAND AND AGREEMENT TO ARBITRATE

37. AMLQ hereby demands that the dispute set forth herein between itself and Terra be referred to arbitration before the American Arbitration Association ("AAA"), as provided in the Shareholders Agreement. AMLQ, Terra Towers, and Terra TBS are each a shareholder of the Company and a party to the Shareholders Agreement. The instant dispute is subject to resolution through arbitration pursuant to Sections 8.14 and 8.15 of the Shareholders Agreement.

38. Section 8.14 of the Shareholders Agreement provides, as relevant, that:

> any controversy, claim or dispute arising out of or relating to or in connection with this Agreement including, without limitation, any dispute regarding its breach, termination, enforceability or validity hereof (each, a "**Dispute**") should be regarded as a business problem to be resolved promptly through business-oriented negotiations before resorting to arbitration pursuant to Section 8.15. The parties therefore agree to attempt in good faith to resolve any Dispute promptly by negotiation between the executives of the parties who have authority to settle the Dispute. Such negotiations shall commence upon the mailing of a notice (the "**Dispute Notice**") from the appropriate executive of the requesting party to an appropriate executive of the responding party. If the Dispute has not been resolved by these Persons within forty-five (45) days of the date of the Dispute Notice, then such Dispute will be settled pursuant to binding arbitration pursuant to Section 8.15.

39. Section 8.15 of the Shareholders Agreement provides, as relevant, that:

any Dispute that has not been resolved pursuant to Section 8.14 will be finally settled by binding arbitration. The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association in effect at the time of the arbitration, except as they may be modified herein or by mutual agreement of the parties.

40.     In October and November 2020, Peppertree and AMLQ exchanged certain notices of disputes and responses with Terra with respect to the ongoing disputes that are the subject of this proceeding, including the disputes relating to the sale process.  On December 3, 2020, authorized executive representatives from AMLQ, Peppertree, and Terra met (via Zoom) to attempt to resolve the disputes.  These efforts were unsuccessful.

41.     More than 45 days have elapsed since the parties began the negotiation process required by the Shareholders Agreement, and no resolution has been achieved.

42.     Accordingly, this matter is ripe for arbitration.

43.     The arbitration shall be governed by New York law pursuant to Section 8.10 of the Shareholders Agreement.

## ARBITRATOR

44.     Pursuant to Section 8.15 of the Shareholders Agreement, AMLQ hereby joins Peppertree in designating **RICHARD F. ZIEGLER** as its party appointed arbitrator in the Arbitration:

> Richard F. Ziegler
> Acumen ADR LLC
> 16 Madison Square East, Ste. 1200
> New York, NY 10010
> Tel: (347) 686-8385
> Email: rziegler@acumenadr.com

## RESERVATION OF RIGHTS

45.     AMLQ reserves all of its rights to (i) supplement or amend its counterclaims herein, (ii) commence another arbitration regarding any other disputes with the parties in accordance with

the terms of the Shareholders Agreement, and (iii) bring actions in court that are outside the scope of Sections 8.14 and 8.15 of the Shareholders Agreement.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Breach of Contract: Sale of Company)

46.     AMLQ incorporates by reference all preceding paragraphs as if fully set forth herein.

47.     The Shareholders Agreement is a valid and binding contract, enforceable against Terra according to its clear and unambiguous terms.

48.     The Proposed Offer satisfied all of the requirements of Section 5.04(b) of the Shareholders Agreement.

49.     Section 5.04(b) of the Shareholders Agreement provides that Terra is contractually obligated to either (a) vote for, consent to and raise no objections against the Proposed Offer and take all necessary and reasonable actions in connection with the consummation of the Proposed Offer; or (b) permit and cause the Company to hire an investment bank within thirty days of receipt of the Proposed Offer to facilitate an Approved Sale, and vote for, consent to, and raise no objections against such Approved Sale, and to take all necessary and reasonable actions in connection with the consummation of the Approved Sale.

50.     Terra breached Section 5.04(b) the Shareholders Agreement by refusing to proceed with the contractually mandated sale process.  Specifically, Terra has repeatedly taken the baseless position that it need not proceed with the sale process—including the retention of an investment bank—because the Proposed Offer was somehow a "not a bona fide offer" and thus did not trigger the sale provision set forth in Section 5.04(b).  In addition, Terra has not provided any basis (there is none) for its refusal to appoint an investment bank in response to Terra's January 19, 2021

proposed sale notice. As a result, the Company has not hired an investment bank to facilitate an Approved Sale.

51. Terra's failure and refusal to abide by the sale process set forth in Section 5.04(b) of the Shareholders Agreement has directly and proximately caused, and will continue to directly and proximately cause, damage to AMLQ.

52. AMLQ is entitled to recover its full damages caused by Terra's wrongful conduct in an amount to be proved at the arbitration hearing, including, without limitation, the $54,441,300 that AMLQ would have received from the Proposed Offer.

53. In addition, AMLQ is entitled to recover the costs and expenses associated with this proceeding, including all filing and administrative fees, arbitrator compensation, and reasonable attorney's fees. *See* Shareholders Agreement § 8.15; AAA Commercial Arbitration Rules, R-47(d).

## SECOND CLAIM FOR RELIEF
### (Breach of Contract – Specific Performance: Sale of Company)

54. AMLQ incorporates by reference all preceding paragraphs as if fully set forth herein.

55. In the alternative, AMLQ seeks specific performance of Section 5.04 of the Shareholders Agreement.

56. The Shareholders Agreement is a valid and binding contract, enforceable against Terra according to its clear and unambiguous terms.

57. The Proposed Offer satisfied all of the requirements of Section 5.04(b) of the Shareholders Agreement.

58. Accordingly, Terra is contractually obligated to either (a) vote for, consent to and raise no objections against the Proposed Offer and take all necessary and reasonable actions in

connection with the consummation of the Proposed Offer; or (b) permit and cause the Company to hire an investment bank within thirty days of receipt of the Proposed Offer to facilitate an Approved Sale, and vote for, consent to, and raise no objections against such Approved Sale, and to take all necessary and reasonable actions in connection with the consummation of the Approved Sale.

59.     The Shareholders Agreement further provides that the parties shall be entitled to specific performance of its terms.  Section 8.12 states:

> **Specific Performance.** The parties hereto agree that irreparable damage would occur in the event any provision of this Agreement was not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at Law or in equity. Therefore, each party hereto consents to the issuance of an injunction or the enforcement of other equitable remedies against him at the suit of an aggrieved party without the posting of any bond or other security, to compel specific performance of all of the terms hereof and to prevent any disposition of Shares in contravention of any terms of this Agreement.

60.     Terra breached Section 5.04(b) the Shareholders Agreement by refusing to proceed with the contractually mandated sale process.  Specifically, Terra has repeatedly taken the baseless position that it need not proceed with the sale process—including the retention of an investment bank—because the Proposed Offer was somehow a "not a bona fide offer" and thus did not trigger the sale provisions set forth in Section 5.04(b).  In addition, Terra has not provided any basis (there is none) for its refusal to appoint an investment bank in response to Terra's January 19, 2021 proposed sale notice.  As a result, the Company has not hired an investment bank to facilitate an Approved Sale.

61.     Terra's breaches of the Shareholders Agreement have caused and will continue to cause AMLQ irreparable injury.

62.     By reason of Terra's failures and refusals to perform its obligations as set forth above, AMLQ is entitled to an award of specific performance, requiring Terra to perform its

obligations under the Shareholders Agreement, including but not limited to, hiring an investment bank to facilitate an Approved Sale; voting for, consenting to, and raising no objections against such Approved Sale; taking all necessary and reasonable actions in connection with the consummation of the Approved Sale; and refraining from adding conditions to, interfering with, or obstructing the Approved Sale.

63. AMLQ is also entitled to an award of specific performance, requiring that, if the consideration to be received for the shares or assets of the Company upon the consummation of an Approved Sale is less than the Proposed Offer, pursuant to Section 5.04(b)(ii) of the Shareholders Agreement, the difference between the amount of the Proposed Offer and the purchase price of the Approved Sale shall be deducted from the proceeds otherwise due to Terra.

## REQUEST FOR RELIEF

WHEREFORE, AMLQ respectfully requests that the panel issue an award in its favor and against Terra as follows:

(a) Awarding AMLQ its full compensatory damages caused by Terra's failure to abide by the sale process set forth in Section 5.04(b) of the Shareholders Agreement, including, without limitation, the amount AMLQ would have received from the Proposed Offer;

(b) Awarding AMLQ, in the alternative, specific performance, requiring (i) Terra to perform its obligations under the Shareholders Agreement, including but not limited to, hiring an investment bank to facilitate an Approved Sale; voting for, consenting to, and raising no objections against such Approved Sale; taking all necessary and reasonable actions in connection with the consummation of the Approved Sale; and refraining from adding conditions to, interfering with, or obstructing the Approved Sale; and (ii) that if the consideration to be received for the shares or assets of the Company upon the consummation of an Approved Sale is less than the Proposed

Offer, pursuant to Section 5.04(b)(ii) of the Shareholders Agreement, the difference between the amount of the Proposed Offer and the purchase price of the Approved Sale shall be deducted from the proceeds otherwise due to Terra.

(c)     Awarding AMLQ all costs, expenses, and disbursements it incurred in connection with this proceeding and request for relief, including all reasonable attorney's fees and disbursements pursuant to Section 8.15 of the Shareholders Agreement and R-47(d) of the AAA Commercial Arbitration Rules; and

(d)     Awarding such and other relief as the panel may deem just and proper.

Dated: New York, New York
March 25, 2021

Respectfully submitted,

ROPES & GRAY LLP

By: _/s/ Gregg L. Weiner_
    Gregg L. Weiner
    Christian R. Reigstad
    Ryan M. Royce
    Katherine M. McDonald
    1211 Avenue of the Americas
    New York, New York 10036-8704
    Tel: (212) 596-9000
    Fax: (212) 596-9090
    gregg.weiner@ropesgray.com
    christian.reigstad@ropesgray.com
    ryan.royce@ropesgray.com
    katherine.mcdonald@ropesgray.com

    *Counsel for AMLQ Holdings (Cay), Ltd.*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served via email on March 25, 2021 on all counsel of record, as well as Mr. Luis Martinez and Ms. Ana Lombardia of the ICDR.

*/s/ Christian R. Reigstad*

*Counsel for AMLQ Holdings (Cay), Ltd.*

# EXHIBIT A

_____

**SHAREHOLDERS AGREEMENT**

_____

**Among**

**LATAM TOWERS, LLC**

**TELECOM BUSINESS SOLUTION, LLC**

**TBS MANAGEMENT, S.A.**

**TERRA TOWERS CORP.**

**AMLQ HOLDINGS (CAY) LTD.**

**and**

**CONTINENTAL TOWERS LATAM HOLDINGS LIMITED**

**Dated as of October 22, 2015**

**SHAREHOLDERS AGREEMENT**, dated as of October 22, 2015 (the "**Effective Date**"), among CONTINENTAL TOWERS LATAM HOLDINGS LIMITED, a company incorporated in the British Virgin Islands, with registered number 1882295, whose registered office is at Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands (the "**Company**"), LATAM Towers, LLC, a limited liability company organized under the laws of the State of Delaware ("**Peppertree Latam**"), Telecom Business Solution, LLC, a limited liability company organized under the laws of Delaware ("**Peppertree TBS**"), AMLQ Holdings (Cay) Ltd., a Cayman Island Exempted Company Limited by Shares ("**Goldman**"), Terra Towers Corp., a company incorporated in the British Virgin Islands, with registered number 1375181, whose registered office is at Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands ("**Terra**"), TBS Management, S.A., a *sociedad anónima* organized under the laws of Panama ("**Terra TBS**") and, together with Terra, Peppertree Latam, Peppertree TBS and Goldman, the "**Initial Shareholders**"), and each other Person who after the Effective Date acquires shares in the Company and becomes a party to this Agreement by executing a joinder agreement (such Persons, collectively with the Initial Shareholders, the "**Shareholders**").

**WHEREAS**, Terra, Peppertree Latam, Goldman and the Company have entered into that certain Subscription and Contribution Agreement, dated as of the Effective Date (the "**Subscription and Contribution Agreement**"), pursuant to which (i) Peppertree Latam subscribed for, and the Company issued 23,253.35 Class B Shares; (ii) Goldman subscribed for, and the Company issued, 13,080.01 Class C Shares; and (iii) as consideration for the 50,000 Class A Shares that it currently holds and in satisfaction of the Subscription Loan, Terra contributed to the Company 100% of the issued and outstanding shares of each of (A) Continental Towers Holding Corp., a company incorporated in the British Virgin Islands, with registered number 1461793, whose registered office is at Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands ("**CT Holding**"), (B) Collocation Holding Ltd., a company incorporated in the British Virgin Islands, with registered number 1859157, whose registered office is at Level 1, Palm Grove House, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands ("**Collocation Holding**"), (C) Continental Enterprises Holdings Ltd., a company incorporated in the British Virgin Islands, with registered number 1859161, whose registered office is at Level 1, Palm Grove House, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands ("**CT Enterprises**") and (D) Continental Towers South America & Caribbean Corp., a company incorporated in the British Virgin Islands, with registered number 1730290, whose registered office is at Level 1, Palm Grove House, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands ("**CT SA&C**" and, together with CT Holding, Collocation Holding and CT Enterprises, the "**CT BVI Subsidiaries**");

**WHEREAS**, the CT BVI Subsidiaries, together, own, directly or indirectly, 100% of the issued and outstanding equity of each of the CT Subsidiaries;

**WHEREAS**, the Company owns 100% of the issued and outstanding shares of Interco Latam Limited, a company incorporated in the British Virgin Islands, with registered number 1892833, whose registered office is at Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands ("**Interco BVI**");

WHEREAS, Peppertree TBS, Terra TBS and the Company have entered into that certain Contribution Agreement, dated as of the Effective Date (the "**Contribution Agreement**") pursuant to which (i) in exchange for 9,215.23 Class B Shares, Peppertree TBS contributed to the Company 50% of the issued and outstanding shares of Telecom Business Solution, Limited, a company incorporated in the British Virgin Islands, with company number 1829796, whose registered office is at Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands ("**TBS**") and (ii) in exchange for 9,215.23 Class A Shares, Terra TBS contributed to the Company 50% of the issued and outstanding shares of TBS;

WHEREAS, TBS owns, directly or indirectly, 100% of the issued and outstanding equity of each of the TBS Subsidiaries;

WHEREAS, as of the Effective Date, the Company plans to make capital contributions to Interco BVI of all of the issued and outstanding shares of (i) TBS and (ii) the CT BVI Subsidiaries; and

WHEREAS, in connection with the consummation of the transactions contemplated by the Subscription and Contribution Agreement and the Contribution Agreement (the "**Transactions**"), the parties are entering into this Agreement to set forth their respective rights and obligations with respect to the Company and the Shares (whether issued or acquired hereafter, including all Shares or other Equity Interests in the Company issuable upon the exercise, conversion or exchange of warrants, options or other securities or rights to acquire Shares or other Equity Interests in the Company or upon the conversion or exchange of any security).

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

**Certain Defined Terms.** As used in this Agreement, the following terms have the following meanings:

"**A Shareholder**" means a Person who is recorded in the Company's register of shareholders as the holder of one or more Class A Shares.

"**Accounting Standards**" means International Financial Reporting Standards ("**IFRS**") promulgated by the International Accounting Standards Board ("**IASB**") (which include standards and interpretations approved by the IASB and International Accounting Standards issued under previous constitutions), together with its pronouncements thereon from time to time, and applied on a consistent basis.

"**Affiliate**" when used with respect to any Person, means (i) any other Person which, directly or indirectly, controls or is controlled by or is under common control with such Person; (ii) any Person that is an officer of, partner in or trustee of, or serves in a similar capacity with respect to, such Person or of which such Person is an officer, partner or trustee, or with respect to

which such Person serves in a similar capacity; and (iii) any Person that, directly or indirectly, is the beneficial owner of more than 50% of any class of Equity Interests in such Person or of which such Person is directly or indirectly the beneficial owner of more than 50% of any class of Equity Interests. For purposes of this definition, "control" (including the correlative terms "controlling," "controlled by" and "under common control with"), with respect to any Person, shall mean possession, directly or indirectly, of the power, to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"**Agreement**" means this Shareholders Agreement, dated as of the Effective Date, and all amendments hereto made in accordance with the provisions of <u>Section 8.09</u>.

"**Annual Budget**" has the meaning set forth in <u>Section 4.07(b)</u>.

"**Annual Business Plan**" has the meaning set forth in <u>Section 4.07(b)</u>.

"**Approved Sale**" has the meaning set forth in <u>Section 5.04(b)</u>.

"**Articles**" has the meaning set forth in <u>Section 2.01</u>.

"**Assignee**" has the meaning set forth in <u>Section 3.02(e)</u>.

"**Authorization Date**" has the meaning set forth in <u>Section 5.03(a)</u>.

"**B Shareholder**" means a Person who is recorded in the Company's register of shareholders as the holder of one or more Class B Shares.

"**Board**" has the meaning set forth in <u>Section 4.01</u>.

"**Board Observer**" has the meaning set forth in <u>Section 4.02(a)</u>.

"**Breaching Shareholder**" has the meaning set forth in <u>Section 6.03(b)(i)</u>.

"**Business Day**" means any day that is not a Saturday, a Sunday or other day on which banks or stock exchanges are required or authorized by Law to be closed in Panama City, Panama, Guatemala City, Guatemala, Cleveland, Ohio or Tortola, British Virgin Islands.

"**Capital Contribution**" means, in relation to any Shareholder, the total amount of any cash and the agreed value of any contribution of property or services contributed or agreed to be contributed by that Shareholder to the Company or any Company Subsidiary as set forth in the books and records of the Company or any such Company Subsidiary, including any payment made or required to be made by such Shareholder pursuant to <u>Section 3.02</u>.

"**Cash Contribution**" has the meaning set forth in <u>Section 3.02(a)</u>.

"**Chairman**" has the meaning set forth in <u>Section 4.02(e)</u>.

"**Claimant**" has the meaning set forth in <u>Section 8.15</u>.

"**Class A Shares**" means Class A shares of no par value in the Company.

"**Class B Shares**" means Class B shares of no par value in the Company.

"**Class C Shares**" means Class C shares of no par value in the Company.

"**Collocation Holding**" has the meaning set forth in the Preamble.

"**Colombian CT Subsidiaries**" means Continental Towers Colombia, S.A.S., a *sociedad por acciones simplificada* organized under the laws of Colombia, and Collocations Technologies Colombia, S.A.S, a *sociedad por acciones simplificada* organized under the laws of Colombia.

"**Colombian TBS Subsidiary**" means Telecom Business Solution Ltda., a *sociedad de responsabilidad limitada* organized under the laws of Colombia.

"**Company**" has the meaning set forth in the Preamble.

"**Company Subsidiary**" means any of Interco BVI, the CT BVI Subsidiaries, the CT Subsidiaries, TBS, the TBS Subsidiaries or any other entity that in the future may become a Subsidiary of the Company.

"**Confidential Information**" has the meaning set forth in Section 6.03(a).

"**Constitutional Documents**" has the meaning set forth in Section 2.01.

"**Contributing B Shareholder**" means Peppertree TBS.

"**Contribution Agreement**" has the meaning set forth in the Preamble.

"**Contribution Notice**" has the meaning set forth in Section 3.02(a)(i).

"**Corporate Opportunity**" has the meaning set forth in Section 6.06.

"**Credit Facilities**" has the meaning set forth in Section 6.05.

"**C Shareholder**" means a Person who is recorded in the Company's register of shareholders as the holder of one or more Class C Shares.

"**CT Contributing A Shareholder**" means Terra.

"**CT BVI Subsidiaries**" has the meaning set forth in the Preamble.

"**CT Enterprises**" has the meaning set forth in the Preamble.

"**CT Holding**" has the meaning set forth in the Preamble.

"**CT SA&C**" has the meaning set forth in the Preamble.

"**CT Subsidiaries**" means, collectively, (a) Continental Towers de Guatemala, S.A., a *sociedad anónima* organized under the laws of Guatemala, Colocation Technologies Guatemala, S.A., a *sociedad anónima* organized under the laws of Guatemala and Continental Telecommunications Corp. Guatemala, LTDA., a *sociedad de responsabilidad limitada* organized under the laws of Guatemala (the "**Guatemalan CT Subsidiaries**"); (b) Continental Towers El Salvador, S.A. de C.V., a *sociedad anónima de capital variable* organized under the laws of El Salvador, Collocation Technologies El Salvador, S.A. de C.V., a *sociedad anónima de capital variable* organized under the laws of El Salvador and Continental Corp. El Salvador, Ltda. de C.V., a *sociedad de responsabilidad limitada de capital variable* organized under the laws of El Salvador (the "**Salvadoran CT Subsidiaries**"); (c) Continental Towers Nicaragua, S.A., a *sociedad anónima* organized under the laws of Nicaragua, Collocation Technologies Nicaragua, S.A., a *sociedad anónima* organized under the laws of Nicaragua, and Continental Corp. Nicaragua y Compañia Limitada, a *sociedad de responsabilidad limitada* organized under the laws of Nicaragua (the "**Nicaraguan CT Subsidiaries**"); (d) Continental Towers de Honduras, S.A., a *sociedad anónima* organized under the laws of Honduras, Colocation Technologies de Honduras, S.A., a *sociedad anónima* organized under the laws of Honduras and Telecom Business Solution Honduras, S. de R.L., a *sociedad de responsabilidad limitada* organized under the laws of Honduras (the "**Honduran CT Subsidiaries**"); (e) Continental Towers Costa Rica, S.A., a *sociedad anónima* organized under the laws of Costa Rica, Collocation Technologies Costa Rica, S.A., a *sociedad anónima* organized under the laws of Costa Rica and Costa Rican Business Solution SRBS, SRL, a *sociedad de responsabilidad limitada* organized under the laws of Costa Rica (the "**Costa Rican CT Subsidiaries**"); (f) Continental Towers de Panama, S.A., a *sociedad anónima* organized under the laws of the Republic of Panama, Collocation Technologies de Panama, S.A., a *sociedad anónima* organized under the laws of the Republic of Panama and Continental Corp. Panama S. de R.L., a *sociedad de responsabilidad limitada* organized under the laws of the Republic of Panama (the "**Panamanian CT Subsidiaries**"); and (g) Continental Towers Peru, S.A., a *sociedad anónima* organized under the laws of Peru and Collocations Technologies Peru, S.A., a *sociedad anónima* organized under the laws of Peru (the "**Peruvian CT Subsidiaries**").

"**Deducted Issue Sites**" has the meaning set forth in the Subscription and Contribution Agreement.

"**Defaulting Shareholder**" has the meaning set forth in Section 3.02(d).

"**Development Agreement**" means that certain agreement by and among the Company, the Initial A Shareholder and DTH, dated as of the Effective Date.

"**Development Committee**" has the meaning set forth in Section 4.04(b).

"**Director**" means a director of the Company.

"**Disclosing Party**" has the meaning set forth in Section 6.03(a).

"**Dispute**" has the meaning set forth in Section 8.14.

"**Dispute Notice**" has the meaning set forth in Section 8.14.

"**DTH**" means DT Holdings, Inc., a company incorporated in the Republic of Panama.

"**DTH Entity**" means DT de Guatemala, S.A., Desarrollos Terrestres Colombia, S.A.S., Desarrollos Terrestres Honduras, S.A. de C.V., Desarrollos Terrestres (Nicaragua), S.A., Desarrolladora de Tierras Costa Rica Responsabilidad Limitada, Tierras Nacionales Ltd. de C.V., Desarrollos Terrestres de Panamá, S.A. and Desarrollos Terrestres Peru, S.A. and any Affiliate and/or Related Entity of DTH that in the future may enter into an EPC Contract with a Company Subsidiary.

"**DTI**" has the meaning set forth in Section 6.10(a).

"**DT Side Letter**" means that certain side letter, entered into as of the Effective Date, by and among the Company, DTH, certain DTH Entities, Peppertree, Peppertree TBS, Terra, Terra TBS and TBS.

"**Effective Date**" has the meaning set forth in the Preamble.

"**Encumbrance**" means (a) any lien, pledge, mortgage, deed of trust, security interest, charge, claim, easement, encroachment or other similar encumbrance, or (b) any option, right of pre-emption, "usufruct" or other third party interest or right of any kind.

"**EPC Contracts**" means those certain Engineering, Procurement and Construction Contracts (i) entered into or amended and restated as of the Effective Date (A) by and between DTH and the Company, and (B) a DTH Entity and a Company Subsidiary; and (ii) as may be entered into between a DTH Entity and any other entity that in the future may become a Subsidiary of the Company.

"**Equity Interests**" means, with respect to any Person, all of the shares (or other ownership or profit interests) in such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares (or other ownership or profit interests) in such Person, all of the securities (including loans, notes, debentures or other debt instruments) convertible into or exchangeable for shares (or other ownership or profit interests) in such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including, without limitation, partnership, member or trust interests therein), whether voting or non-voting. Unless otherwise specified, the term "Equity Interests" as used herein shall mean Equity Interests of the Company.

"**Excess Cash Flow**" means, with respect to the Company and the Company Subsidiaries on a consolidated basis, for each Fiscal Quarter, (a)(i) recurring ordinary rent payments collected during such Fiscal Quarter with respect to Tower Space Licenses minus (ii) expenses directly associated with the operation and maintenance of the Towers to which such Tower Space Licenses relate (including any insurance expenses or recurring ordinary rent payments, but excluding SG&A) accrued or paid by the Company and the Company Subsidiaries during such Fiscal Quarter, minus (b) interest expense accrued or paid by the Company and the Company Subsidiaries during such Fiscal Quarter, minus (c) taxes accrued or paid by the Company and the Company Subsidiaries during such Fiscal Quarter, minus (d) the aggregate principal amount of

scheduled payments on any indebtedness of the Company or any Company Subsidiary made during such Fiscal Quarter, minus (e) SG&A paid during such Fiscal Quarter, minus (f) any other expenses accrued but not yet payable by the Company and the Company Subsidiaries for such Fiscal Quarter.

"**Executive Team**" means the Chief Executive Officer and Chief Financial Officer of the Company.

"**Family Group Member**" means, with respect to any natural person, such natural person's spouse, parent, sibling, descendant (including any descendant by adoption or marriage) or the spouse of any such parent, sibling or descendant.

"**Financial Statements**" means, with respect to any Fiscal Year, true and complete copies of the audited consolidated balance sheet of the Company and the Company Subsidiaries as of the last day of such Fiscal Year and the related audited consolidated statements of income, retained earnings, shareholders' equity and cash flow of the Company and the Company Subsidiaries for such Fiscal Year, together with all related notes and schedules thereto, prepared in accordance with the Accounting Standards (except as noted therein), accompanied by the report thereon of the Company's independent certified public accountants.

"**Fiscal Quarter**" means, for financial accounting purposes, each three-month period ending March 31, June 30, September 30 and December 31, unless otherwise required by applicable Law.

"**Fiscal Year**" means, for financial accounting purposes, January 1 to December 31, unless otherwise required by applicable Law.

"**Funded Tower**" has the meaning set forth in Section 6.11(b).

"**FY16 Annual Budget**" has the meaning set forth in Section 4.07(a).

"**General Ledger Trial Balance**" means, with respect to a given Fiscal Year, the general ledger trial balance for the Company and the Company Subsidiaries as of December 31 of such Fiscal Year, listing accounts and account balances for assets, liabilities, equity, revenues and expenses.

"**Goldman**" has the meaning set forth in the Recitals.

"**Governmental Authority**" means, in any applicable jurisdiction, any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**GS**" has the meaning set forth in <u>Section 5.01(b)</u>.

"**GS Deal Team**" has the meaning set forth in <u>Section 6.09</u>.

"**GTSL**" means Global Tower Sites Limited, a company incorporated in the British Virgin Islands, with registered number 1878299, whose registered office is at Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands.

"**Guaranteed Annual Amount**" has the meaning set forth in <u>Section 6.10(b)</u>.

"**Initial Business Plan**" has the meaning set forth in <u>Section 4.07(a)</u>.

"**Initial Shareholders**" has the meaning set forth in the Preamble.

"**Initial A Shareholders**" means Terra and Terra TBS.  For the purposes of this Agreement, any action to be taken by the Initial A Shareholders may be taken by the holders of a majority of the Class A Shares.

"**Initial B Shareholders**" means Peppertree Latam and Peppertree TBS.  For the purposes of this Agreement, any action to be taken by the Initial B Shareholders may be taken by the holders of a majority of the Class B Shares.

"**Initial C Shareholder**" means Goldman.

"**Initial Class C Capital Contribution**" has the meaning set forth in <u>Section 3.01(a)</u>.

"**Initial Investor Shareholder Capital Contribution**" has the meaning set forth in <u>Section 3.01(a)</u>.

"**In Kind Contribution**" means any contribution made by a Shareholder to the Company other than in cash, including without limitation Towers or other assets.

"**Interco BVI**" has the meaning set forth in the Preamble.

"**Interco Transfer**" has the meaning set forth in <u>Section 6.15</u>.

"**Interim Annual Financial Statements**" means, with respect to a given Fiscal Year, true and complete copies of the unaudited consolidated balance sheet of the Company and the Company Subsidiaries as at the last day of such Fiscal Year and the related unaudited consolidated statements of income, retained earnings, shareholders' equity and cash flows of the Company and the Company Subsidiaries for such Fiscal Year, together with all related notes and schedules thereto, if any, prepared in accordance with the Accounting Standards (except as noted therein).

"**Interim Quarterly Financial Statements**" means, with respect to a given Fiscal Quarter, true and complete copies of the unaudited consolidated balance sheet of the Company and the Company Subsidiaries as at the last day of such Fiscal Quarter and the related unaudited consolidated statements of income, retained earnings, shareholders' equity and cash flows of the

Company and the Company Subsidiaries for such quarter, together with all related notes and schedules thereto, if any, prepared in accordance with the Accounting Standards (except as noted therein).

"**Investment Bank**" has the meaning set forth in <u>Section 5.04(b)</u>.

"**Investor B Shareholder**" means Peppertree Latam.

"**Investor B Shareholder Capital Contribution**" has the meaning set forth in <u>Section 3.01(a)</u>.

"**Investor Group**" has the meaning set forth in <u>Section 5.04(b)(ii)</u>.

"**Investor Group Companies**" has the meaning set forth in <u>Section 5.04(b)(ii)</u>.

"**Issue Sites**" has the meaning set forth in the Subscription and Contribution Agreement.

"**LATAM TBS Subsidiaries**" means Telecom Business Solution, Limitada de Capital Variable, a *Sociedad de Responsabilidad Limitada de Capital Variable* organized under the laws of El Salvador; Telecom Business Solution Panama S de RL, a *Sociedad de Responsabilidad Limitada* organized under the laws of the Republic of Panama and Telecom Business Solution Guatemala Limitada, a *Sociedad de Responsabilidad Limitada* organized under the laws of Guatemala.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Leases**" means all leases, subleases, licenses, concessions and other agreements (written or oral), including all amendments, extensions, renewals, guaranties, and other agreements with respect thereto, pursuant to which any Person holds any interest in Real Property.  For the avoidance of doubt, Leases include (i) all agreements regarding easements, rights of use or usufruct interests in Real Property and (ii) all licenses, concessions or other agreements with municipalities or associations of municipalities regarding the use of Real Property owned by such municipalities, including but not limited to Permits allowing construction on public premises.

"**Lock-up Period**" means the period of five (5) years starting on the Effective Date and ending on the fifth anniversary of the Effective Date.

"**Management Team**" means (i) the Executive Team and (ii) the senior managers of the Company and senior management of the Company Subsidiaries.

"**Memorandum of Association**" has the meaning set forth in <u>Section 2.01</u>.

"**Municipal Agreement**" means those certain agreements executed by and between certain Company Subsidiaries and certain municipalities or associations of municipalities within the Territory.

"**Net Cash**" means any amounts distributed other than Excess Cash Flow, including but not limited to net proceeds from the sale of assets of the Company or the Company Subsidiaries.

"**New Market**" has the meaning set forth in Section 6.07.

"**Non-Managing Shareholder**" means each of the Initial B Shareholders and the Initial C Shareholder, separately, and, together, the "Non-Managing Shareholders."

"**Non-Transferring Shareholders**" has the meaning set forth in Section 5.03(a).

"**Objecting Shareholder**" has the meaning set forth in Section 5.04(b)(i).

"**Offset Agreement**" has the meaning set forth in Section 6.10(a).

"**Payment Period**" has the meaning set forth in Section 6.10(b).

"**Peppertree Latam**" has the meaning set forth in the Preamble.

"**Peppertree TBS**" has the meaning set forth in the Preamble.

"**Percentage Interest**" means a percentage corresponding to a fraction (A) the numerator of which is the number of Shares held by a Shareholder, and (B) the denominator of which is the sum of Shares held by all Shareholders. The initial Percentage Interests of the Initial Shareholders shall be as set forth in Exhibit A.

"**Permit**" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from any Governmental Authority.

"**Permitted Transfer**" means a Transfer of any Shares by any Shareholder to a Permitted Transferee.

"**Permitted Transferee**" means (a) with respect to any Person that is an entity, any Affiliate of such Person, and (b) with respect to any Person who is a natural person, (i) a trust or a private interest foundation, under which the distribution of shares or other Equity Interests may be made only to such Person and/or any Family Group Member of such Person, (ii) a charitable remainder trust, the income from which will be paid to such Person during his life, (iii) a corporation, partnership or limited liability company, the shareholders, partners or members of which are only such Person and/or Family Group Members of such Person or (iv) by will or by the laws of intestate succession, to such Person's executors, administrators, testamentary trustees, legatees or beneficiaries.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Peruvian TBS Subsidiary**" means Telecom Business Solution SRL, a *Sociedad de Responsabilidad Limitada* organized under the laws of Peru.

"**Prohibited Transferee**" means (i) any Person that, directly or indirectly through its Subsidiaries and Affiliates, engages in the Tower Business and (ii) any Person with a current controlling equity interest in any Person that, directly or indirectly through its Subsidiaries or Affiliates, engages in the Tower Business as of the time of such Transfer; *provided, that* (x) with the exception of mobile phone operators, such Person's engagement in the Tower Business represents a material portion of such Person's (including its Subsidiaries' and Affiliates') business activities, taken as a whole, and (y) the Tower Business of the Company and its Subsidiaries shall be disregarded for purposes of determining whether a Person is a Prohibited Transferee.

"**Proposed Offer**" has the meaning set forth in Section 5.04(b)(i).

"**Proposed Sale**" has the meaning set forth in Section 5.04(b).

"**Proposed Sale Notice**" has the meaning set forth in Section 5.04(b).

"**Proposing Shareholders**" has the meaning set forth in Section 5.04(b).

"**Real Property**" means any parcel or tract of land, including any and all buildings, structures, fixtures and improvements located thereon, including those under construction, and all privileges, rights, usufructs, easements and appurtenances belonging to or for the benefit thereof.

"**Receiving Party**" has the meaning set forth in Section 6.03(a).

"**Rejected Colombia Towers**" has the meaning set forth in Section 6.10(b).

"**Rejected Corporate Opportunity**" has the meaning set forth in Section 6.06(b).

"**Related Entity**" when used with respect to any Person, means any other Person that is related to such Person through some type of control or ownership. For the avoidance of doubt, investors in Peppertree Latam not otherwise affiliated with Peppertree Capital Management, Inc. shall not be deemed Related Entities of Peppertree Latam for purposes of this Agreement.

"**Removed Tower**" has the meaning set forth in Section 6.11(b).

"**Representative**" has the meaning set forth in Section 6.03(a).

"**Request**" has the meaning set forth in Section 8.15.

"**Reserves**" means, with respect to any fiscal period, funds set aside or amounts allocated during such period to reserves which shall be maintained in amounts which the Board deems sufficient for working capital, contingencies, to pay taxes, insurance, debt service or other costs, operating expenses, capital improvements or replacements or liabilities incident to the ownership or operation of the Company's business.

"**Restricted Period**" has the meaning set forth in Section 6.09.

"**Respondent**" has the meaning set forth in <u>Section 8.15</u>.

"**Sale Notice**" has the meaning set forth in <u>Section 5.03(a)</u>.

"**SCP Package**" has the meaning set forth in the Development Agreement.

"**Securities Act**" means the United States Securities Act of 1933, as amended, or any successor federal statute, and the rules and regulations thereunder, which shall be in effect at the time.

"**SG&A**" means all direct and indirect selling, general and administrative expenses classified as such under the Accounting Standards <u>plus</u> all personnel or consulting costs or commissions that would be capitalized under the Accounting Standards <u>less</u> any transaction-related legal or accounting fees and expenses.

"**Shareholder**" has the meaning set forth in the Preamble.

"**Shares**" means Class A Shares, Class B Shares or Class C Shares issued, or to be issued, by the Company.

"**Strategic Business Information**" has the meaning set forth in <u>Section 6.02</u>.

"**Subscription and Contribution Agreement**" has the meaning set forth in the Recitals.

"**Subscription Loan**" has the meaning set forth in the Subscription and Contribution Agreement.

"**Subsidiary**" means, with respect to any Person, any other Person in which a majority of the outstanding shares or other Equity Interests having the power to vote for directors or comparable managers are owned, directly or indirectly, by the first Person.

"**Tag-Along Closing**" has the meaning set forth in <u>Section 5.06(a)(i)</u>.

"**Tag-Along Notice**" has the meaning set forth in <u>Section 5.06(a)</u>.

"**Tag-Along Participation Notice**" has the meaning set forth in <u>Section 5.06(b)</u>.

"**Tag-Along Pro Rata Amount**" has the meaning set forth in <u>Section 5.06(c)</u>.

"**Tag-Along Right**" has the meaning set forth in <u>Section 5.06(b)</u>.

"**Tag-Along Shareholder**" has the meaning set forth in <u>Section 5.06(a)(ii)</u>.

"**TBS**" has the meaning set forth in the Preamble.

"**TBS Contributing A Shareholder**" means Terra TBS.

"**TBS Subsidiaries**" means the LATAM TBS Subsidiaries, the Colombian TBS Subsidiary and the Peruvian TBS Subsidiary.

"**Terra**" has the meaning set forth in the Preamble.

"**Terra TBS**" has the meaning set forth in the Preamble.

"**Terra Group**" has the meaning set forth in Section 5.04(b)(ii).

"**Terra Group Companies**" has the meaning set forth in Section 5.04(b)(ii).

"**Territory**" means those initial jurisdictions set forth on Exhibit C, as well as any new jurisdictions as may be agreed by the Board.

"**Third Party Purchaser**" has the meaning set forth in Section 5.03(a).

"**Total Cash Contribution**" has the meaning set forth in Section 3.02(a).

"**Tower**" means any wireless communication, broadcast or other transmission tower and other communication infrastructure sites.

"**Tower Business**" means the business of purchasing, selling, development, owning or managing Towers.

"**Tower Space License**" means a lease or license of space on a Tower.

"**Tower Cash Flow**" means, with respect to a Tower (i) recurring ordinary rent payments with respect to Tower Space Licenses minus (ii) expenses directly associated with the operation and maintenance of such Tower (including any insurance expenses or recurring ordinary rent payments) accrued or paid by the Company and the Company Subsidiaries, with each component of the such calculation consistently applied every time a determination of Tower Cash Flow for such Tower is made.

"**Transactions**" has the meaning set forth in the Recitals.

"**Transfacil Guatemala**" has the meaning set forth in Section 6.10(a).

"**Transfacil Panama**" has the meaning set forth in Section 6.10(a).

"**Transfer**" means any sale, assignment, transfer, pledge, Encumbrance, donation or other disposition of Shares or of any interest in Shares, including the grant of an option or put in respect of Shares or of any interest in Shares, or other right therein, whether voluntarily or by operation of law, and whether for or without consideration. The word "Transfer," when used as a noun, shall mean any Transfer transaction.

"**Transferred Fiber Assets**" has the meaning set forth in Section 6.11.

"**Transferee**" has the meaning set forth in Section 4.09.

"**Transferring Shareholder**" has the meaning set forth in Section 5.03(a).

"**Unfunded Towers**" has the meaning set forth in Section 6.11(c).

# ARTICLE II
## ORGANIZATIONAL DOCUMENTS;
## REPRESENTATIONS AND WARRANTIES

**Section 2.01      Memorandum of Association, Articles and Constitutional Documents**.  Attached as <u>Schedule 1</u> hereto, are (i) the amended and restated memorandum of association of the Company (the "**Memorandum of Association**"), (ii) the amended and restated articles of association of the Company (the "**Articles**") and (iii) the constitutional documents of each of the Company Subsidiaries (collectively, the "**Constitutional Documents**") as in effect on the Effective Date.  The Shareholders and the Company agree to take all necessary action to ensure that the above-mentioned organizational documents are modified to reflect the matters set out in this Agreement (to the extent that such action has not been taken at the Effective Date).

**Section 2.02      Representations and Warranties of the Shareholders**.  Each Shareholder, as of the date it becomes a party hereto, severally and not jointly, represents and warrants to the Company and each other Shareholder that:

(a)      It is duly incorporated or organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization and has all necessary power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby.  The execution and delivery by such Shareholder of this Agreement, the performance by it of its obligations hereunder and the consummation by it of the transactions contemplated hereby have been duly authorized by all requisite action on its part. This Agreement constitutes the valid and binding obligation of such Shareholder, enforceable against it in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).  The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, require no action by or in respect of, or filing with, any Governmental Authority.

(b)      The execution, delivery and performance of this Agreement by such Shareholder does not (i) violate, conflict with or result in the breach of any provision of its memorandum of association or articles of association (or equivalent constitutional documents), (ii) conflict with or violate any Law or Governmental Order applicable to it or any of its assets, properties or businesses, or (iii) require any consent or other action by any Person under any provision of any material agreement or other instrument to which such Shareholder is a party.

(c)      Except for this Agreement (and with respect to the Initial Shareholders, the Subscription and Contribution Agreement or the Contribution Agreement), such Shareholder has not entered into or agreed to be bound by any other agreements or arrangements of any kind with any other party with respect to Shares, including agreements or arrangements with respect to the acquisition or disposition of Shares or any interest therein or the voting of Shares (whether or not such agreements and arrangements are with the Company or any other Person) other than, in the

case of the Initial Shareholders, agreements among the Initial Shareholders or agreements with such Shareholders' investors and co-investors.

## ARTICLE III
## CAPITAL CONTRIBUTIONS; DISTRIBUTIONS

**Section 3.01        Purpose; Initial Capital Contributions**.

(a)        The purpose of the Company is to develop, own, acquire and operate, directly or indirectly through the Company Subsidiaries, Towers in the Territory.  The parties stipulate and agree that the value of the equity in the Company Subsidiaries that are being contributed by (i) the CT Contributing A Shareholder pursuant to the Subscription and Contribution Agreement is One Hundred Fifty-Five Million United States Dollars ($155,000,000), following the satisfaction of the Subscription Loan; (ii) the Contributing B Shareholder pursuant to the Contribution Agreement is Twenty-Eight Million Five Hundred and Sixty Seven Thousand and One Hundred Ninety Nine United States Dollars ($28,567,199) and (iii) the TBS Contributing A Shareholder pursuant to the Contribution Agreement is Twenty-Eight Million Five Hundred and Sixty Seven Thousand and One Hundred Ninety Nine United States Dollars ($28,567,199).

(b)        The Investor B Shareholder has made an initial Capital Contribution to the Company of Seventy Two Million Eighty Five Thousand Three Hundred Eighty Four United States Dollars ($72,085,384) (the "**Investor B Shareholder Capital Contribution**") and the Initial C Shareholder has made an initial Capital Contribution to the Company of Forty Million Five Hundred and Forty Eight Thousand and Twenty Nine United States Dollars ($40,548,029) (the "**Initial C Shareholder Capital Contribution**" and, together with the Initial Investor B Shareholder Contribution, the "**Initial Investor Shareholder Capital Contributions**").

**Section 3.02        Additional Contributions**.  The Initial Shareholders shall make additional Capital Contributions in accordance with the terms as set forth below:

(a)        <u>Non-Managing Shareholders Contributions in Exchange for Equity Interests</u>.  The Non-Managing Shareholders shall make one or more additional contributions to the Company in an aggregate amount equal to the difference between (i) One Hundred and Twenty Five Million United States Dollars ($125,000,000) *minus* (ii) the Initial Investor Shareholder Capital Contributions, at such times as requested by the Board in exchange for Equity Interests in the Company in accordance with the terms set forth below (each, a "**Cash Contribution**" and, together, the "**Total Cash Contribution**"):

(i)        Subject to the satisfaction or waiver of the conditions set forth in <u>Section 3.02(c)</u> and upon receipt of written notice from the Company acting upon the approval of the Board pursuant to <u>Section 4.04(a)</u> (the "**Contribution Notice**"), the Non-Managing Shareholders shall make additional Cash Contributions to the Company.  The amount of each Non-Managing Shareholder's Cash Contribution set forth in such Shareholder's Contribution Notice will correspond to such Shareholder's proportional share of the aggregate Cash Contribution due from all Non-Managing Shareholders, as set forth on <u>Exhibit A</u> under the heading "Cash Contribution Participation Percentage".  The Company shall issue to the Initial B Shareholders the number of Class B Shares and the

Initial C Shareholder the number of Class C Shares equal in value to the amount of the Cash Contributions set forth in the Contribution Notices, utilizing the same pricing terms set forth in the Subscription and Contribution Agreement.  The number of Shares issued to the Non-Managing Shareholders upon each Cash Contribution shall increase the Percentage Interest of each of the Investor Shareholders on an incremental basis, up to an amount not to exceed the percent specified on Exhibit A under the heading "Post-Cash Contribution Percentage Interest".

(ii)     Following consummation of the Total Cash Contribution pursuant to this Section 3.02(a), the Non-Managing Shareholders will own Equity Interests in the Company, representing, collectively, 45.55% of all of the outstanding Shares in the Company.

(b)     Subsequent Capital Contributions.     Other than the additional Capital Contributions required to be made by the Non-Managing Shareholders pursuant to Section 3.02(a) above, no Shareholder shall be required to make any other additional Capital Contributions to the Company.  Notwithstanding the foregoing, in the event any Corporate Opportunity is approved by the Board in accordance with Section 6.06 and the funding of such Corporate Opportunity exceeds the funds available under the Credit Facilities, if any, then in place or the Board determines that the Corporate Opportunity should not be funded with the funds available under the Credit Facilities, each Shareholder, upon receipt of a Contribution Notice, shall make an additional Capital Contribution to the Company in the amount set forth in the Contribution Notice in exchange for a number of Shares of such Shareholders' existing class of Shares equal in value to the amount of such Shareholder's Capital Contribution in accordance with Section 3.02(c).  The amount of each Shareholder's Cash Contribution set forth in such Shareholder's Contribution Notice will correspond to such Shareholder's proportional share of the aggregate Cash Contribution due from all Shareholders, as determined by such Shareholder's Percentage Interest.

(c)     Contribution Closing.     Once the Board has authorized the call for a Capital Contribution pursuant to Section 3.02(b), each Shareholder shall within ten (10) Business Days, or within such other time as determined by the Board, after receipt of the Contribution Notice transfer to the Company such amount in immediately available funds as set forth in such Shareholder's Contribution Notice.  In consideration for such Capital Contribution the Company will issue share certificates corresponding to such number of Class A Shares, Class B Shares or Class C Shares, as applicable, equal in value to the amount of such Shareholder's Capital Contribution.  The Board may agree to issue the corresponding share certificates on a consolidated quarterly basis.

(d)     Failure to Make a Capital Contribution.  The Company shall be entitled to enforce the obligations of each Shareholder to make the additional Capital Contributions as set forth in Section 3.02(a) and Section 3.02(b), and the Company shall have all remedies available at law or in equity in the event any such Capital Contribution is not so made.  In the event that any Shareholder fails to make a Capital Contribution when required (a "**Defaulting Shareholder**"), then the Board may, in its sole discretion, elect to charge such Shareholder interest at an annual rate equal to the lesser of (i) twenty percent (20%) per annum and (ii) the highest rate permitted by applicable Law on the amount due from the date such amount became due until the date on

which such payment is received by the Company.  In addition to the other rights provided in this Section 3.02(d), and to the extent not inconsistent with such other rights, no part of any distribution shall be paid to any Defaulting Shareholder from which there is then due and owing to the Company, at the time of such distribution, any amount required to be paid to the Company.  At the election of the Board, the Company may either (i) apply all or part of any such withheld distribution in satisfaction of the amount then due to the Company from such Defaulting Shareholder or (ii) withhold such distribution until all amounts then due are paid to the Company by such Defaulting Shareholder.  Upon payment of all amounts due to the Company (by application of withheld distributions or otherwise), the Board shall distribute any unapplied balance of any such withheld distribution to such Defaulting Shareholder.  No interest shall be payable on the amount of any distribution withheld by the Company pursuant to this Section 3.02(d).  Whenever the consent or decision of a Shareholder or of the Shareholders is required or permitted pursuant to this Agreement or by Law, a Defaulting Shareholder shall not be entitled to participate in such consent or to make such decision.  The Board may, in its discretion, permit any Shareholder (other than a Defaulting Shareholder) to fund all or any portion of any Capital Contribution that one or more other Defaulting Shareholders have failed to make.

(e)     Assignment of Capital Contribution Rights and Obligations.  Each Shareholder may assign its rights and obligations to make additional Capital Contributions and purchase Shares pursuant to Section 3.02(a) and Section 3.02(b) in whole or in part, to any Permitted Transferee or any other holder of the same class of Shares (an "**Assignee**") by providing to the Company written notice signed by the Shareholder and such Assignee prior to the relevant Contribution Date which notice shall indicate the total number of Shares to be purchased by the Assignee.  Upon receipt of such notice by the Company, any Assignee that is not already a Shareholder shall be deemed to be a Shareholder for purposes of the previous and subsequent Sections and, following the relevant Contribution Closing (and execution of this Agreement by the Assignee), the Assignee shall be a Shareholder for all purposes hereunder.

**Section 3.03     Distributions**.

(a)     Upon approval of the Board and in the manner determined by the Board, subject to Section 3.03(c), within thirty (30) calendar days following the end of each Fiscal Quarter, the Company shall distribute the Excess Cash Flow, if any, and Net Cash, if any, to each of the Shareholders according to their respective Percentage Interests.

(b)     The Company may offset (and re-allocate to the other Shareholders) any amount otherwise distributable to a Shareholder by any amounts owed to the Company by such Shareholder pursuant to Section 3.02.

(c)     No distribution shall be declared and paid unless the assets of the Company and the Company Subsidiaries are in excess of all liabilities of the Company and the Company Subsidiaries, on a consolidated basis.

(d)     No Shareholder shall be entitled to interest on its Capital Contribution or to a return of its Capital Contribution, except as otherwise specifically provided for herein.

(e)     The Shareholders hereby agree to evaluate and establish appropriate and cost efficient mechanisms to distribute any Excess Cash Flow generated by the Company Subsidiaries to the Company and the Shareholders, taking into consideration tax, corporate, exchange controls and other regulations to which the Company Subsidiaries may be subject under any applicable Law of their respective jurisdictions.

## ARTICLE IV
## CORPORATE GOVERNANCE

**Section 4.01      Board of Directors, Powers**.  The Company will be managed by a board of directors (the "**Board**"), which will have the power and authority to exercise all the powers of the Company and to take all actions that are not required to be exercised or done by the Shareholders by Law or under this Agreement, the Memorandum of Association or the Articles.

**Section 4.02      Composition of the Board**.

(a)     For as long as the Initial Shareholders or their Permitted Transferees are the only Shareholders of the Company and otherwise until this Agreement is properly amended as provided herein, unless the Shareholders decide otherwise by a resolution of Shareholders, the Board shall consist of four (4) Directors, (i) two (2) of which may be appointed (and removed) by the Initial A Shareholders (or their Permitted Transferees) by giving notice to the Company and each other Initial Shareholder and (ii) two (2) of which may be appointed (and removed) by the Initial B Shareholders (or their Permitted Transferees) by giving notice to the Company and each other Initial Shareholder.

(b)     The Initial C Shareholder may appoint an individual to attend meetings of the Board and any committee thereof, on its behalf (the "**Board Observer**"), for as long as the Initial Shareholders are the only Shareholders of the Company and the Initial C Shareholder holds at least 10% of the total number of issued Shares; *provided*, *however*, that, in the event any matter relating to or in connection with Strategic Business Information comes before the Board, at the joint request of the Initial A Shareholder and the Initial B Shareholder, the Board Observer shall withdraw from such meeting as necessary or portion thereof prior to and throughout the duration of any discussions relating to and in connection with such Strategic Business Information.  The Initial C Shareholder shall have the right to remove and replace any Board Observer by giving notice to the Company and each other Initial Shareholder.  For the avoidance of doubt, the Board Observer shall not be (i) entitled to vote on any matter or (ii) considered a Director for the purposes of this Agreement.

(c)     The Initial Shareholders agree to appoint and remove Directors in order to ensure that, at any given time, each Initial Shareholder has appointed the full number of Directors that such Initial Shareholder is entitled to appoint pursuant to the terms of this Section 4.02.

(d)     A Director may only be removed by the Shareholder that appointed such Director (or its Permitted Transferees).  If a Director is removed, resigns, or is otherwise unable or unwilling to fulfill his duties as a Director, the Shareholder that appointed such Director (or its Permitted Transferees) has the sole right to fill the vacancy created thereby.

(e)    The chairman of the Board (the "**Chairman**") will be Jorge Hernandez for the remainder of 2015 and 2016.  Thereafter, so long as the Initial A Shareholders and/or their Permitted Transferees hold collectively, at least fifty percent (50%) of the total number of issued Shares, the Chairman will be a Director appointed by the Initial A Shareholders and/or their Permitted Transferees.  The Initial A Shareholders will appoint the Chairman by giving notice to the Company and each other Shareholder.  The Chairman will not have a casting vote at any meeting of the Board.  If the Chairman is unable to attend any meeting of the Board, the Shareholder who appointed him will be entitled to appoint another Director to act as Chairman at the meeting.  The Chairman may instruct any Director or other Person present at a meeting of the Board to record and file minutes of the meeting.

(f)    The first Board will be comprised as follows:

| Appointed by: | Name: | Position |
| --- | --- | --- |
| The Initial A Shareholders | Alberto Arzu | Director |
| The Initial A Shareholders | Jorge Hernandez | Director and initial Chairman |
| The Initial B Shareholders | F. Howard Mandel | Director |
| The Initial B Shareholders | Ryan D. Lepene | Director |

(g)    The composition of the board of directors of each of the Company Subsidiaries shall be identical to the composition of the Board, unless otherwise approved by the Board; provided, that, where permitted by applicable Law, the CT Subsidiaries and TBS Subsidiaries shall instead be managed by a sole administrator appointed by the shareholders of each such Subsidiary and each such sole administrator shall be granted only such powers as are expressly determined by the shareholders of the respective Subsidiary.

**Section 4.03    Meetings**.

(a)    The meeting schedule of the Board shall be determined by the Board.  Meetings of the Board may also be called by or at the request of any two (2) Directors.  Directors may participate in and hold meetings by or through the use of any means of electronic communication by which each of the following occurs:  (i) all Directors participating in the meeting can simultaneously hear each other and (ii) all communication during the meeting is immediately transmitted to all Directors participating in the meeting.  At each meeting held in such a way, each Director's identity shall be verified prior to voting on any matter by each Director stating his or her name as it appears on the records of the Company.  Participation by a Director in a meeting by such a means of communication shall constitute presence in person at the meeting, except where a Director participates in the meeting for the sole and express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(b)     Notice of each meeting of the Board shall be given not less than 24 hours prior to the time of the meeting.  Such notice shall be deemed to have been given (i) when delivered by hand (with written confirmation of receipt); (ii) when received by the relevant Director if sent by an internationally recognized courier (receipt requested); (iii) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if received before 5:00 PM. at the place of receipt, and on the next Business Day at the place of receipt if received after that time; or (iv) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Whenever any notice of a meeting of the Board is required to be given to any Director under this Agreement or any provision of Law, a waiver of that requirement in writing signed at any time, whether before or after the meeting, by that Director shall be deemed equivalent to the giving of such notice.  The attendance of a Director at a meeting constitutes a waiver of notice of that meeting, except where a Director attends a meeting and objects at such meeting to the transaction of any business because the meeting is not lawfully called or convened.  A Director of the Company who is present at a meeting of the Board at which action on any matter is taken shall be presumed to have assented to the validity of the meeting unless the Director objects at the beginning of the meeting, or promptly upon his or her arrival, to holding the meeting or transacting business at the meeting.

(c)     A notice of any meeting of the Board shall indicate (i) the date, time and place of the meeting, (ii) (if it is anticipated that not all of the Directors will participate in the meeting from the same place) the means by which they will communicate with each other during the meeting; and (iii) the general nature of the business to be conducted at the meeting.

(d)     All the Directors must be present in person, by alternate or by electronic means at any meeting of the Board in order to constitute a quorum for the transaction of business at such meeting.  A Director may only appoint another Director as his alternate.  A notice addressed to the Board by the Director appointing an alternate shall be sufficient for the effectiveness of such appointment and the Board shall not be required to take further action for such purpose. Each Director will have one vote at each meeting of the Board.  The Board will take all actions (i) by an affirmative vote of a majority of the Directors (whether present in person, by electronic means or represented by an alternate) at a duly called meeting at which a quorum is present or (ii) in lieu of a meeting, by the unanimous written consent of all Directors.  A signed consent has the effect of a meeting vote and may be so described in any document.  Any proposal that does not receive either an affirmative vote by a majority of Directors or the unanimous written consent of all Directors will be deemed to have been rejected by the Board.

(e)     The Company shall reimburse the reasonable and properly documented out-of-pocket expenses incurred by each Director in connection with such Director's service on the Board and Subsidiary boards (such as travel expenses related to out-of-town Board meetings attended by such Director).  Except for such reimbursement, the Directors shall not receive compensation for their services as members of the Board.  These expenses shall be included in the Annual Business Plans and Annual Budgets.

(f)     Subject to applicable Law, no Director and no officer or agent appointed by the Board, individually or severally, shall be liable, responsible or accountable in damages or otherwise to the Company or to any Shareholder for any acts performed or omitted by him while serving as a Director or an officer or agent of the Company.  Subject to applicable Law and the

Articles, each Director and each officer or other agent appointed by the Board shall be indemnified and held harmless by the Company, to the extent of the Company's assets, against obligations and liabilities arising or resulting from or incidental to the management of the Company's affairs.

**Section 4.04     Action by the Board**.

(a)     Except as otherwise expressly provided in this Agreement, the Memorandum of Association or the Articles, or under applicable Law, the Board shall have the authority to manage the Company and is authorized to make any and all contracts and decisions, enter into transactions and make and obtain any commitments on behalf of the Company to conduct or further its business, including but not limited to the following (each of which shall require the approval of the Board):

(i)     any requirement that the Shareholders make an additional Capital Contribution pursuant to Section 3.02(a) and Section 3.02(b);

(ii)     any decision to accept an In Kind Contribution (including the determination of the value of such In Kind Contribution);

(iii)     the financing or refinancing (or amendments thereto) of, or the granting of any liens over, on the property or rights of the Company or any of its Company Subsidiaries, including, without limitation, any external financing or securitization or the granting of any Encumbrance, guarantee or indemnity by the Company or any of its Company Subsidiaries in relation thereto and the voluntary prepayment of any indebtedness in accordance with the terms of any financing or refinancing arrangements;

(iv)     the setting of a dividend policy or the declaration or payment of any dividend or other distribution by the Company in respect of Equity Interests in the Company (including a distribution of Excess Cash Flow and Net Cash) or any change to any policy regarding the payment of dividends or the making of other distributions;

(v)     any amendment to the Company's or any Company Subsidiary's respective constitutional documents;

(vi)     the hiring or firing and compensation of members of the Management Team, including the Executive Team;

(vii)     the commencement, settlement, payment, discharge or satisfaction of any unaffiliated third-party litigation, claim, liability or obligation (absolute, accrued, asserted or unasserted, contingent or otherwise);

(viii)     the commencement, settlement, payment, discharge or satisfaction of any litigation, claim, liability or obligation (absolute, accrued, asserted or unasserted, contingent or otherwise) involving (A) DTH or any of the DTH Entities under the EPC Contracts; (B) the Company, the Initial A Shareholders or DTH under the Development Agreement or (C) the Company or any Company Subsidiary and any Shareholder or any

Affiliate or Related Entity of a Shareholder pursuant to any other agreement, arrangement or transaction;

(ix)     the approval of Annual Budgets and Annual Business Plans including any material waiver or amendment thereto;

(x)     the appointment or removal of the Company's auditors or any change to the accounting methods or policies of the Company (other than as required by the Accounting Standards);

(xi)     the approval of any capital expenditure by the Company not included in the approved Annual Budget for any given Fiscal Year;

(xii)    entry by the Company or any Company Subsidiary into any agreement, arrangement or transaction with any Shareholder or Affiliate or Related Entity of a Shareholder (or the later amendment or termination of such agreement or the terms of such arrangement or transaction) or the amendment of the terms or termination of any existing agreement with any Shareholder or Affiliate or Related Entity of a Shareholder in place as of the Effective Date;

(xiii)   the acquisition of any asset or business by the Company or any Company Subsidiary not included in the Annual Budget for any given Fiscal Year or, in the case of Towers, approved by the Development Committee;

(xiv)    the transfer, in a single transaction or series of transactions, of assets or receivables of the Company or any Company Subsidiary, except as provided in <u>Section 5.04</u> or <u>Section 6.15</u>;

(xv)     the (A) merger of the Company or any Company Subsidiary into or with any other person, the consolidation of the Company or any Company Subsidiary with any person, or the sale, reorganization or restructuring of the Company or any Company Subsidiary (or any similar transaction) except as provided in <u>Section 6.15</u> or (B) transfer, in a single transaction or series of transactions, of substantially all of the Company's or any Company Subsidiary's assets, including in each of (A) and (B) the proposed sale of all or substantially all the Shares or assets of the Company to a Third-Party Purchaser, except as provided in <u>Section 5.04</u>;

(xvi)    the formation, winding up, liquidation or dissolution of the Company or any Company Subsidiary; the adoption of a plan of liquidation for the Company or any Company Subsidiary;

(xvii)   any action by the Company or any Company Subsidiary to commence any suit, case, proceeding or other action (A) under any existing or future law of any jurisdiction relating to bankruptcy, insolvency, reorganization or relief of debtors seeking to have an order for relief entered with respect to the Company or any Company Subsidiary, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to the Company or any Company Subsidiary or (B) seeking appointment of a

receiver, trustee, custodian or other similar official for the Company or any Company Subsidiary, or for all or any part of its assets, or making a general assignment for the benefit of the creditors of the Company or any Company Subsidiary;

(xviii) entry by the Company or a Company Subsidiary into any agreement, or the consummation by the Company or a Company Subsidiary of any transaction (whether in one transaction or series of related transactions), not included in the Annual Budget;

(xix)  any material change in the nature or scope of the business, purpose or corporate strategy of the Company or entry by the Company into a joint venture or similar strategic alliance by it with any Person;

(xx)  the (A) issuance or sale of Shares or other Equity Interests in the Company to any Person or (B) entry by the Company into, or the effecting by the Company of, any transaction or series of related transactions involving the repurchase, redemption or other acquisition of Shares from any Person, in each case, except as otherwise contemplated by the terms of this Agreement;

(xxi)  the approval of a proposed investment by the Company or any Company Subsidiaries not included in the Annual Budget;

(xxii)  the amendment or termination of the DT Side Letter, the Development Agreement and/or EPC Contract by and between DTH and the Company dated as of the Effective Date;

(xxiii) the amendment or termination of any of the EPC Contracts executed by and between a DTH Entity and a Company Subsidiary dated as of the Effective Date, including any of the amended and restated EPC Contracts between a DTH Entity and a TBS Subsidiary;

(xxiv) the entry into any agreement for engineering, procurement and construction services substantially similar to the services provided under the EPC Contracts, other than the EPC Contracts dated as of the Effective Date or the later amendment or termination of such agreement;

(xxv)  the approval of any expansion of the Territory into a New Market;

(xxvi)  the approval of any Transfer of an Equity Interest in the Company by (A) the Initial A Shareholder or the Initial B Shareholder prior to the expiration of the Lock-up Period or (B) the Initial C Shareholder to a Prohibited Transferee; and

(xxvii) the approval of any loans by the Company to GTSL.

(b)  Development Committee.  A committee (the "**Development Committee**") shall be established to review and approve the SCP Packages for Tower opportunities presented to the Company pursuant to the Development Agreement.  The initial members of the Development Committee will be the Directors.  The Board may establish procedures for voting, appointing, removing and replacing additional and/or alternate individuals to the Development Committee.

Unless and until the Development Committee establishes a contrary procedure, decisions of the Development Committee will be made by the Board. At its discretion, the Board may delegate any of the duties of the Development Committee to a sub-committee of the Board or the Development Committee.

**Section 4.05    Action by Shareholders**.

(a)    <u>Meetings</u>. Shareholders' meetings will be held (i) in accordance with the Articles, (ii) when action by the Shareholders is required by Law, the Memorandum of Association or the Articles or (iii) if called by the Board to obtain any approval.

(b)    <u>Quorum</u>. A quorum is present at a meeting of Shareholders if at least the Initial A Shareholders and at least the Initial B Shareholders are present in person or by proxy. The Shareholders shall take reasonable steps to ensure that each meeting of Shareholders is quorate throughout.

(c)    <u>Voting</u>. The Shareholders may take action (i) by a vote of Shareholders present, or represented by proxy, and entitled to vote at a duly convened meeting of the Shareholders at which a quorum is present, provided that the relevant action receives the affirmative vote of Shareholders representing at least seventy-five percent (75%) of the issued Shares, or (ii) in lieu of a meeting, by the written consent of Shareholders representing at least the number of issued Shares that would be required to authorize such action at a meeting of Shareholders contemplated by the previous subsection (i).

(d)    <u>Reimbursement</u>. The Company will reimburse each Shareholder or its representative for all reasonable expenses incurred by that Shareholder or representative in connection with attending a Shareholders meeting.

(e)    <u>Redemption of Minority Shares</u>. Section 176 of the BVI Business Companies Act, 2004 shall not apply to the Company.

**Section 4.06    Management Team**.

(a)    The Executive Team shall be appointed by the Board (except that the initial Chief Executive Officer shall be Jorge Gaitán Castro and the initial Chief Financial Officer shall be Juan Francisco Quisquinay). The Executive Team shall, in general, supervise and control all of the business and affairs of the Company, subject to the oversight of the Board. For the avoidance of doubt, the Executive Team shall not have authority to take any action set forth in <u>Section 4.04</u> without the approval of the Board.

(b)    Subject to approval by the Board, the Chief Executive Officer shall nominate the remaining senior managers of the Company and senior management of the Company Subsidiaries.

**Section 4.07    Business Plans and Annual Budgets**.

(a)    Within the two (2) months of the Effective Date, the Management Team shall present to the Board the Annual Budget of the Company and Company Subsidiaries for Fiscal

Year 2016 (the "**FY16 Annual Budget**") and forecasts for the next three (3) years (the "**Initial Business Plan**").

(b)     Prior to the end of each Fiscal Year, and in no event fewer than thirty (30) days prior to the end of such Fiscal Year, the Management Team must submit to the Board for approval:   (i) an annual budget of the Company and the Company Subsidiaries for the subsequent Fiscal Year substantially in the form of the FY16 Annual Budget (the "**Annual Budget**") and (ii) updated forecasts for the next three (3) years substantially in the form of the Initial Business Plan (the "**Annual Business Plan**").   The Board shall approve an Annual Business Plan and an Annual Budget for such subsequent Fiscal Year no later than ten (10) Business Days prior to the start of such subsequent year.   In the event of a deadlock on the approval by the Board of the Annual Budget relating to any given Fiscal Year, the Annual Budget approved for the preceding Fiscal Year will be deemed approved again and be implemented by the Board and the Management Team until such time as a new Annual Budget is approved by the Board.   For the avoidance of doubt, approval of an Annual Budget or Annual Business Plan will not be deemed an approval of the projected Capital Contributions or any specific Tower opportunities described therein.

### Section 4.08     Accounting Matters.

(a)     The parties also agree that the Company will keep its books in accordance with the Accounting Standards and will prepare its consolidated Financial Statements in accordance with the Accounting Standards unless applicable Law requires any of the Company or its Company Subsidiaries to use a different accounting system.   The initial auditors of the Company will be mutually agreed upon by the Shareholders.   Each calendar year the Board must vote to appoint auditors for the Company.   In the event that the Board fails to agree on the auditors, the auditors that are presently serving as auditors for the Company will continue to serve as auditors.

(b)     The accounting records of the Company must be maintained by accountants to be mutually agreed upon by the Shareholders.   From the Effective Date through December 31, 2015, within fifteen (15) Business Days of the end of each month and commencing on January 1, 2016, within ten (10) Business Days of the end of each month, such accountants must provide a monthly report to the Board regarding the expenditures and cash flows of the Company as compared to planned operational expenses of the Company pursuant to Annual Budgets and Annual Business Plans.   The Company shall provide such accountants with all access, information assistance it may reasonably require to prepare such monthly reports.

### Section 4.09     Transferability of Governance Rights.   In connection with the Transfer by any Shareholder of all of its Shares to any Person (a "**Transferee**") in accordance with <u>ARTICLE V</u>, the corporate governance rights of such Shareholder as set forth in this <u>ARTICLE IV</u> will be Transferred to the Transferee.

## ARTICLE V
## PREEMPTIVE RIGHTS; RESTRICTIONS ON TRANSFER

### Section 5.01     General Restrictions.

(a)     Neither the Initial A Shareholders nor the Initial B Shareholders may Transfer any Equity Interest in the Company during the Lock-up Period other than (i) to a Permitted Transferee, (ii) with the approval of the Board.  The Initial C Shareholder may Transfer some or all of its Equity Interests in the Company (A) to any Person other than a Prohibited Transferee at any time (including during the Lock-up Period) and (B) to a Prohibited Transferee upon the approval of the Board.  Both before and after the Lock-up Period, any Transfer of Equity Interests by a Shareholder shall be made in accordance with the provisions of this Agreement, including but not limited to the provisions set forth in this ARTICLE V.

(b)     A Shareholder desiring to make a Transfer, including a Permitted Transfer, shall give to the Company and the Board thirty (30) calendar days' prior written notice of such proposed Transfer; *provided*, *that*, with respect to the Initial C Shareholder, no such notice shall be required prior to a Transfer (i) to a wholly-owned Affiliate of the Initial C Shareholder's parent entity, Goldman, Sachs & Co. ("**GS**") or (ii) at the request or order of any Governmental Authority.  Any Transfer in violation of this Section 5.01 shall be ineffective.  As a condition of any Transfer, each transferee shall execute and deliver a counterpart to this Agreement and agree to be bound by the terms and conditions herein.  Notwithstanding any other provision of this Agreement, no Shareholder will be entitled to Transfer its Shares if such Transfer would violate any applicable Law.  In the event of a purported Transfer by a Shareholder of any Shares in violation of the provisions of this Agreement, such purported Transfer will be null and void, and the Company will not give effect to such Transfer.

(c)     Any Permitted Transferee who becomes a Shareholder pursuant to any Transfer of Shares from an Initial Shareholder shall for purposes of this Agreement be deemed an Initial Shareholder and shall succeed to the rights and obligations of the Initial Shareholder from whom the Shares were transferred; *provided that*, the transferor Shareholder shall remain liable for its obligations, if any, under this Agreement, the Subscription and Contribution Agreement, the Contribution Agreement and any other Transaction Document (as defined in the Subscription and Contribution Agreement) and such Permitted Transferee shall assume the transferor Shareholder's obligations under this Agreement, the Subscription and Contribution Agreement and any other Transaction Document, if any.

(d)     No Shareholder shall avoid the provisions of this Article V by making one or more Transfers to one or more Permitted Transferees and then disposing of all or any portion of such party's interest in any such Permitted Transferee or (ii) by allowing the Transfer of any securities of any entity holding (directly or indirectly) Equity Interests.  Notwithstanding the foregoing, the parties agree and acknowledge that Jorge Hernandez may transfer his shares in the Initial A Shareholders to a Permitted Transferee at any time and such transfer shall not constitute a violation of any provision of this Agreement.

**Section 5.02     Legends**.  In addition to any other legend that may be required by Law, each certificate for Shares will bear a legend in substantially the following form:  THE SHARES EVIDENCED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AS SET FORTH IN THE COMPANY'S ARTICLES OF ASSOCIATION.

**Section 5.03      Right of First Refusal**.

(a)      In the event that after expiration of the Lock-up Period, any Shareholder(s) (the "**Transferring Shareholder**") desire(s) to Transfer any Shares to any Person other than to a Permitted Transferee (a "**Third Party Purchaser**"), such Transferring Shareholder(s) shall offer to sell all (but not less than all) of the Shares proposed for Transfer to the Company and the other Shareholders (the "**Non-Transferring Shareholders**") by giving written notice of the same (the "**Sale Notice**") to the Company and the Non-Transferring Shareholders.  The Sale Notice will disclose in reasonable detail the identity of the prospective transferee(s), the number and type of Shares to be Transferred and the terms and conditions of the proposed Transfer.  The Transferring Shareholder(s) may not consummate any Transfer until the earlier of (A) ninety (90) days after the Sale Notice has been given to the Company and each Non-Transferring Shareholder and (B) the day on which the Transferring Shareholder(s) receive(s) written notice that neither the Company nor the Non-Transferring Shareholders elect to purchase all of the Shares specified in the Sale Notice pursuant to this <u>Section 5.03(a)</u> (the date of the first to occur of such events is referred to herein as the "**Authorization Date**").  The Company may elect to purchase some or all of the Shares to be transferred upon the same terms and conditions as those set forth in the Sale Notice by delivering a written notice of such election to the Transferring Shareholder(s) and each Non-Transferring Shareholder within twenty (20) days after the Sale Notice has been given to the Company.  If the Company has elected not to purchase all of the Shares to be Transferred, each Non-Transferring Shareholder may elect to purchase all (but not less than all) of the Shares that the Company has elected not to purchase upon the same terms and conditions as those set forth in the Sale Notice by giving written notice of such election to the Transferring Shareholder(s) within twenty-five (25) days of the date that each Non-Transferring Shareholder received written notice from the Company of its election.  If the Non-Transferring Shareholders elect to purchase the Shares to be Transferred, the Shares to be sold shall be allocated among the Non-Transferring Shareholders pro rata according to the relative Percentage Interests of the Non-Transferring Shareholders or as otherwise agreed by them.  If the Non-Transferring Shareholders, acting together, do not elect to purchase all Shares to be Transferred, other than the Shares the Company has elected to purchase, the provisions of <u>Section 5.03(b)</u> will apply.

(b)      In the event that the Company or the Non-Transferring Shareholders, in the aggregate, shall have exercised their respective rights to purchase all, and not less than all, of the Shares proposed to be Transferred by the Transferring Shareholder(s) pursuant to this <u>Section 5.03(a),</u> then the Transferring Shareholder(s) shall sell such Shares to the Company and/or the Non-Transferring Shareholders, as applicable, and the Company and/or the Non-Transferring Shareholders, as applicable, shall purchase such Shares, within forty five (45) calendar days following the Authorization Date.  The Company and each Shareholder shall take all actions as may be reasonably necessary to consummate the sale contemplated by this <u>Section 5.03(a)</u>, including, without limitation, entering into agreements and delivering certificates and instruments and consents as may be deemed necessary or appropriate.  At the closing of any sale and purchase pursuant to this <u>Section 5.03(b)</u>, the Transferring Shareholder(s) shall deliver to the Company or the Non-Transferring Shareholders, as applicable, certificates (if any) representing the Shares to be sold, free and clear of any Encumbrances, accompanied by evidence of Transfer and stamps affixed, if necessary, and do all things necessary under applicable Law to properly effect the Transfer of the Shares to the Company and/or the Non-Transferring Shareholders, as

applicable, against receipt of the purchase price therefor from the Company or the Non-Transferring Shareholders, as applicable, by certified or official bank check or by wire transfer of immediately available funds.

(c)     If the Company and the Non-Transferring Shareholders do not elect to purchase all of the Shares specified in the Sale Notice, the Transferring Shareholder(s) may Transfer the Shares specified in the Sale Notice at a price and on terms no more favorable to the transferee(s) thereof than specified in the Sale Notice during the ninety (90) calendar day period immediately following the Authorization Date.  Any Shares not Transferred within such ninety (90) calendar day period will be subject to the provisions of this ARTICLE V upon subsequent Transfer.

**Section 5.04     Sale of the Company**.

(a)     Tower Transfer.

(i)     During the Lock-up Period, the parties agree that:

(A)     all development and acquisitions of Towers in the LATAM TBS Subsidiaries and the Peruvian CT Subsidiaries shall cease and all Corporate Opportunities shall be undertaken exclusively by the Guatemalan CT Subsidiaries, the Salvadoran CT Subsidiaries, the Nicaraguan CT Subsidiaries, the Honduran CT Subsidiaries, the Costa Rican CT Subsidiaries, the Panamanian CT Subsidiaries, the Colombian TBS Subsidiary and Peruvian TBS Subsidiary;

(B)     the Company shall use commercially reasonable efforts to assign, or ensure that the relevant Company Subsidiary assigns, all Towers from (y) the LATAM TBS Subsidiaries to the Guatemalan CT Subsidiaries, the Salvadoran CT Subsidiaries and the Panamanian Subsidiaries, as applicable and (z) the Peruvian CT Subsidiaries to the Peruvian TBS Subsidiary.

(ii)     The parties further agree that, at the request of the Initial B Shareholders based on a good faith determination and advice from local counsel, the CT Subsidiaries and the TBS Subsidiaries in which development and acquisition of Towers will cease and in which Corporate Opportunities will be undertaken pursuant to Section 5.04(a)(i) will be adjusted and this Section 5.04(a)(ii) revised, as required to (A) more readily facilitate the assignment of assets and an Approved Sale and (B) reflect the intention of the parties to maximize the Towers that may be assigned to the Investor Group (as defined below) and minimize the Towers remaining in the Terra Group (as defined below).

(iii)     For the purposes of this Section 5.04 the assignment of any Towers shall include the assignment of any Permits, Leases, Tower Space Licenses and other assets associated with such Tower, to the extent (A) such assignment is not prohibited by the terms of such Permits, Leases or Tower Space Licenses or applicable Law and (B) if the consent of a third party is required to permit such assignment, such consent has been obtained.

(b)     Approved Sale.  Following the earlier of (i) the expiration of the Lock-Up Period, (ii) the transfer by Jorge Hernandez of his shares in either of the Initial A Shareholders to any

Person other than a Permitted Transferee or (iii) such time, if any, as Jorge Hernandez dies or becomes permanently disabled and (x) prior to such time the Initial A Shareholders has not proposed, and the Board has not accepted, a succession plan or (y) the other Initial Shareholders are unable to come to an agreement with his heirs and/or the Company's Management Team regarding the continued operation of the Company, then within ninety (90) calendar days of such event,(A) either the Initial A Shareholders or the Initial B Shareholders in the case of sub-section (i) or (B) the Initial B Shareholder in the case of sub-section (ii) – (iii) (such shareholders, the "**Proposing Shareholders**") may request, upon written notice to the other Initial Shareholders and the Company (the "**Proposed Sale Notice**"), a sale of all or substantially all of the Company's assets or all or substantially all of the Shares in the Company (in one or more transactions) to an unaffiliated Third Party Purchaser (an "**Approved Sale**").

(i)      If the Proposing Shareholders have already procured or received an offer from an unaffiliated Third Party Purchaser to purchase the assets or Shares of the Company (a "**Proposed Offer**"), the Proposed Sale Notice shall disclose in reasonable detail the identity of the prospective purchaser and the proposed terms and conditions of the Proposed Offer.  The Initial A Shareholders or the Initial B Shareholders, as applicable, (the "**Objecting Shareholders**") may reject such Proposed Offer within thirty (30) calendar days of delivery of the Proposed Sale Notice by providing the Company with an opinion from an independent and reputable investment bank with experience in the industry and a cross-border practice (an "**Investment Bank**"), retained at the sole expense of the Objecting Shareholders, stating that the value of the proposed transaction is materially less than comparable transactions in the industry and the Territory; *provided that*, if such opinion is provided, the provisions of Section 5.04(b)(ii) shall apply.  In the event that no such opinion is provided by the expiration of such 30 day period, each Shareholder shall vote for, consent to and raise no objections against such Approved Sale and take all necessary and reasonable actions in connection with the consummation of the Approved Sale as requested by the Proposing Shareholders.

(ii)      If the Proposing Shareholders have not already procured an offer from an unaffiliated Third Party Purchaser or if an opinion has been provided by an Objecting Shareholder pursuant to Section 5.04(b)(i), the Company shall, within thirty (30) calendar days of receipt of a Proposed Sale Notice, retain an Investment Bank to facilitate an Approved Sale and each Shareholder shall vote for, consent to and raise no objections against such Approved Sale and take all necessary and reasonable actions in connection with the consummation of the Approved Sale as requested by the Proposing Shareholders.  In the event that the consideration to be received for the Shares or assets of the Company upon the consummation of such Approved Sale is less than the Proposed Offer provided by the Third Party Purchaser pursuant to Section 5.04(b)(i), the difference between the amount of the Proposed Offer and the purchase price of the Approved Sale shall be deducted from the proceeds otherwise due to the Objecting Shareholders.

(iii)      In connection with the Approved Sale, the Company Subsidiaries shall be divided into two groups (the "**Terra Group**" and the "**Investor Group**"): (A) the Investor Group shall include all assets as well as all issued and outstanding shares of the Guatemalan CT Subsidiaries, the Salvadoran CT Subsidiaries, the Panamanian CT Subsidiaries, the Honduran CT Companies, the Costa Rican CT Companies, the

Nicaraguan CT Subsidiaries, the Peruvian TBS Subsidiary and the Colombian TBS Subsidiary (the "**Investor Group Companies**"); and (B) the Terra Group shall include all assets as well as all issued and outstanding shares of the LATAM TBS Subsidiaries and the Peruvian CT Subsidiaries (the "**Terra Group Companies**").

(iv)     The Company shall sell or cause to be sold all issued and outstanding equity interests in, or assets of, the Investor Group Companies to the Third Party Purchaser and the proceeds of such sale shall be distributed among the Shareholders in accordance with their respective Percentage Interests, subject to the conditions set forth in Section 5.04(b)(ii) and Section 5.04(b)(iv)(B) and Section 5.04(b)(iv)(D) and transfer or cause to be transferred all of the issued and outstanding equity interests in the Terra Group Companies to the Initial A Shareholders (or their designees).  The Shareholders agree that the Approved Sale shall be subject to the following additional conditions:

(A)     the names of the Investor Group Companies shall be changed, within sixty (60) calendar days following the date of the closing of the transactions contemplated by the Approved Sale, to any other name that does not include the words "continental towers" or "collocation technologies" or any variation thereof and that the Investor Group Companies shall thereafter cease use of the name "continental towers" or "collocation technologies";

(B)     the cash proceeds distributed to the Initial A Shareholders (or their Permitted Transferees) from the Approved Sale shall be reduced by the value of: (w) any Towers owned by the Terra Group Companies upon the closing of the transaction contemplated by the Approved Sale, with the value of such Towers calculated based on Tower Cash Flow for such Towers as of immediately prior to the closing of such transaction and the multiple of Tower Cash Flow implied by the final purchase price of the transactions contemplated by the Approved Sale; (x) any Unfunded Towers pursuant to the terms of Section 6.11(c)(i); (y) any Rejected Colombia Towers pursuant to the terms of Section 6.11(c)(ii); and (z) any Deducted Sites pursuant to the terms of Section 5.06 of the Subscription and Contribution Agreement;

(C)     no Shareholder shall be required to transfer or sell any of its Shares if the consideration for the Approved Sale is other than cash or registered securities listed on an established U.S. or foreign securities exchange or traded on the NASDAQ National Market or foreign established over-the-counter trading system.  The consideration to be received by each Shareholder shall be the same form and amount of consideration per Share.  No Shareholder shall be liable (as a result of post-closing indemnification obligations or otherwise) for amounts greater than the amount received by such Shareholder in connection with such Approved Sale, all representations and warranties shall be made severally and not jointly and any indemnification obligation shall be pro rata based on the Percentage Interests of the Shareholders.  No Shareholder shall be subject to post-sale restrictive covenants; and

(D)     each Shareholder shall bear its pro rata allocation (based upon the proceeds to be received) of the costs of any sale of Shares pursuant to an Approved Sale to the extent such costs are incurred for the benefit of all Shareholders and are not otherwise paid by the Company or the acquiring party. Costs incurred by Shareholders on their own behalf shall not be considered costs of the transaction hereunder.

(v)     In the event that any proposed Approved Sale is not consummated, for any reason or no reason, both the Initial A Shareholders and the Initial B Shareholders shall retain the right to request an Approved Sale in the future pursuant to the terms of this Section 5.04(b).

**Section 5.05     Preemptive Rights**.

(a)     Except for the issuance of the Shares referenced in Section 3.02 above, if the Company authorizes the issuance of any Shares or other Equity Interests in the Company or any of the Company Subsidiaries, the Company shall, or shall (to the extent that it is able to do so under applicable Law) cause such Company Subsidiary to, first offer to issue to each Initial Shareholder a portion of such Shares or other Equity Interests equal to the quotient determined by dividing (1) the number of Shares held by such Initial Shareholder by (2) the total number of issued Shares.  Each such Initial Shareholder shall be entitled to purchase such Shares or other Equity Interests at the same price and on the same terms as such Shares or Equity Interests are to be offered to others.

(b)     In order to exercise its preemptive rights pursuant to this Section 5.05, a Shareholder must, no later than fifteen (15) Business Days after receipt of a written notice from the Company describing in reasonable detail the Shares or other Equity Interests being offered, the purchase price thereof, the payment terms and the such Shareholder's percentage entitlement to the Shares or other Equity Interests being offered, deliver a written notice to the Company stating the number of Shares or other Equity Interests that it wishes to purchase or that it does not wish to purchase any Shares or other Equity Interests.

(c)     Upon the expiration of the offering period described above, the Company or any relevant Company Subsidiary shall be entitled to issue such Shares or other Equity Interests which the Shareholders have not elected to purchase during the one hundred eighty (180) days following such expiration on terms and conditions no more favorable to the purchasers thereof than those offered to the Shareholders.  Any Shares or other Equity Interests proposed to be offered or sold by the Company or any of the Company Subsidiaries after such one hundred eighty (180) day period must be reoffered to the Shareholders pursuant to the terms of this Section 5.05.

(d)     Any Initial Shareholder may assign its rights under this Section 5.05, in whole or in part, to any of its Affiliates, any of its limited partners and/or any institutional investor.

(e)     Each Share issued to:

(i)     an A Shareholder under this Section 5.05 shall be a Class A Share;

(ii)     a B Shareholder under this <u>Section 5.05</u> shall be a Class B Share; and

(iii)     a C Shareholder under this <u>Section 5.05</u> shall be a Class C Share.

**Section 5.06     Tag Along Rights**.

(a)     In the event that, after expiration of the Lock-up Period and other than pursuant to <u>Section 5.04(b)</u>, one or more Shareholder(s) desires to Transfer for value to a Third Party Purchaser Shares representing at least (fifty) 50% of the Equity Interests in the Company (including all Equity Interests previously Transferred by such Shareholder(s) to such Third Party Purchaser), following the actions required by <u>Section 5.03(a)</u>, that Shareholder or those Shareholders shall give to the Company and each other Shareholder at least ninety (90) calendar days' advance written notice (a "**Tag-Along Notice**") of such proposed Transfer.  The Tag-Along Notice shall:

(i)     state the number of Shares proposed to be Transferred, the proposed transferee, the purchase price, and the other material purchase terms including the time and place for consummation (the "**Tag-Along Closing**"); and

(ii)     state that each other Shareholder (a "**Tag-Along Shareholder**") shall have the right, if permitted by Law, to participate in such Transfer by Transferring its Tag-Along Pro Rata Amount (as hereinafter defined) of Shares on the purchase terms set forth in the Tag-Along Notice.

(b)     For a period of thirty (30) calendar days after the provision of the Tag-Along Notice, if permitted by Law, each Tag-Along Shareholder shall have the right to elect to sell at the Tag-Along Closing up to such Shareholder's Tag-Along Pro Rata Amount to the proposed transferee (a "**Tag-Along Right**") exercisable by giving written notice to the Transferring Shareholder(s) and the Company (a "**Tag-Along Participation Notice**").  The offer of a Tag-Along Shareholder set forth in a Tag-Along Participation Notice shall be irrevocable, and, to the extent such offer is accepted, such Tag-Along Shareholder shall be bound and obligated to sell in the proposed sale on the terms and conditions set forth in this <u>Section 5.06</u>.

(c)     For purposes of this Agreement, a Shareholder's "**Tag-Along Pro Rata Amount**" with respect to the Shares owned by such Shareholder shall be equal to (i) the total number of Shares owned by such Shareholder, multiplied by (ii) a fraction, the numerator of which is the aggregate number of Shares which the Transferring Shareholder(s) propose(s) to Transfer and the denominator of which is the aggregate number of Shares owned of record by the Transferring Shareholder(s).  At the Tag-Along Closing, the Shareholders desiring to exercise their Tag-Along Rights hereunder and who have properly given notice thereof shall be required to participate in the closing of any such Transfer on the purchase terms set forth in the Tag Along Notice, including making any deliveries in connection with the sale of their Shares provided therein.

(d)     The Transferring Shareholder(s) shall use commercially reasonable efforts to include in the proposed sale to the proposed transferee all of the Shares that the Tag-Along Shareholder(s) have requested to have included pursuant to the applicable Tag-Along

Participation Notices, it being understood that the proposed transferee shall not be required to purchase Shares in excess of the number set forth in the Tag-Along Notice. In the event the proposed transferee elects to purchase less than all of the Shares sought to be sold by the Tag-Along Shareholder(s), the number of Shares to be sold to the proposed transferee by the Transferring Shareholder(s) and each Tag-Along Shareholder shall be reduced so that each such Shareholder is entitled to sell its pro rata portion of the number of Shares the proposed transferee elects to purchase (which in no event may be less than the number of Shares set forth in the Tag-Along Notice).

(e)     If, following the delivery of a Tag-Along Participation Notice and prior to a Tag-Along Closing, the terms of the proposed Transfer as set forth in the Tag-Along Notice are amended in a manner that materially affects the transaction with respect to a Tag-Along Shareholder or such Transfer is not closed within thirty (30) calendar days of the Tag-Along Closing date set out in the Tag-Along Notice, any previously delivered Tag-Along Participation Notice shall be deemed void and the Transferring Shareholder(s) shall repeat the process set forth in this Section 5.06 prior to completing the proposed Transfer.

(f)     If a Tag-Along Shareholder breaches its obligations in connection with a Tag-Along Closing, or in the event that any representation or warranty of the Tag-Along Shareholder given in any agreement executed and delivered in connection with the proposed Transfer is not true and correct as of the date made or as of the proposed closing date, or if such Tag-Along Shareholder shall breach or fail to perform any covenant, agreement or obligation contained in any document executed in connection with the Tag-Along Closing, and if such misrepresentation, breach or failure to perform results in the nonsatisfaction of a condition precedent to such Tag-Along Closing (which is not waived by the transferee), the Transferring Shareholder(s) shall be free to sell its/their Shares to the Third Party Purchaser and such Transfer shall not limit or waive in any respect any claim, right or cause of action that the Company, the Shareholder(s) or the Third Party Purchaser may have against such Tag-Along Shareholder in respect of such misrepresentation, breach or failure to perform.

**Section 5.07     Conversion of Shares**.  Where a Share is Transferred to a Shareholder in accordance with this Agreement and that Share is of a different class to the Shares held by that Shareholder, that Share will, immediately before the Transfer is recorded in the Company's register of shareholders, be automatically converted to a Share of the class held by that Shareholder.

**ARTICLE VI**
**COVENANTS**

**Section 6.01     Financial Statements and Information**.

(a)     The Company shall:

(i)     prepare and deliver to each Shareholder (A) Interim Quarterly Financial Statements for each Fiscal Quarter within forty-five (45) calendar days of the end of each Fiscal Quarter with the first Interim Quarterly Financial Statement to be delivered within forty-five (45) calendar days following December 31, 2015; (B) Interim Annual Financial

Statements within forty-five (45) calendar days of the end of each Fiscal Year with the first Interim Annual Financial Statement to be delivered within forty-five (45) calendar days following December 31, 2015; (C) a General Ledger Trial Balance to be delivered within sixty (60) calendar days of the end of each Fiscal Year, with the first General Ledger Trial Balance to be delivered within sixty (60) calendar days following December 31, 2015, and (D) Financial Statements within one hundred and twenty (120) calendar days of the end of each fiscal year with the first annual Financial Statement to be delivered one hundred and twenty (120) calendar days following December 31, 2015;

       (ii)    promptly inform the Shareholders of any Governmental Order or the Company's notice of any pending investigation or action by any Governmental Authority involving the Company, including, but not limited to, any investigations relating to compliance with Law; and

       (iii)    provide any Shareholder with information as may reasonably be required to allow such Shareholder to comply with reporting obligations to its investors or any Governmental Authority.

**Section 6.02**    **Access to Information**.  From and after the Effective Date, the Company and each of the Company Subsidiaries will provide and/or will permit Representatives (as defined below) of the Initial A Shareholders and the Initial B Shareholders, at the Company's expense and upon reasonable notice, to obtain (including, without limitation, by providing access to relevant premises and full audit rights) all documents and other information in the possession of the Company and any Company Subsidiary as may reasonably be requested by the Initial A Shareholders or Initial B Shareholders in order to enable such Shareholders to monitor their investment in the Company, monitor and comply with their obligations under applicable regulatory regimes and exercise its rights under this Agreement; *provided*, *however* that any release of Confidential Information will be subject to the provisions of <u>Section 6.03</u> and the approval of the Board.  The Company will maintain, at its expense, an online data room to store all information reasonably requested by the Initial A Shareholders and the Initial B Shareholders. The Initial B Shareholders shall provide the Initial C Shareholder with all documents and information provided by the Company and its Subsidiaries to the Initial B Shareholders and/or the Directors appointed by the Initial B Shareholders, including, without limitation, Board reports and customary Tower-level information such as the Company's Tower master file; *provided*, *that* certain personally identifiable information or other information relating to the Company's operations that could reasonably be expected to facilitate a third party's attempt to compete directly with the interests of the Company (including without limitation, status of and techniques for the negotiation of certain ground leases and Municipal Agreements) and the identity of landlords under Leases, contacts of the Company, its Affiliates and Related Entities with municipalities, Governmental Authorities or other public authorities and external advisors (collectively, the "**Strategic Business Information**") may be redacted from the information provided to the Initial C Shareholder, *provided, that* the Initial A Shareholders and the Initial B Shareholders shall use their commercially reasonable good faith efforts to include supplementary or aggregated information reflecting the Strategic Business Information so redacted and *provided, further*, that nothing herein shall limit the provision of information pursuant to <u>Section 6.01</u>.

**Section 6.03      Confidential Information**.

(a)      Nondisclosure of Confidential Information.  During the term of this Agreement, each Shareholder (the "**Receiving Party**") agrees that it will not disclose any Confidential Information disclosed to it by another Shareholder or the Company (the "**Disclosing Party**") to any Person (other than its Representatives to whom disclosure is required), *provided, that* each Shareholder agrees that it will not be a breach of this Section 6.03(a) for the Initial Shareholders to disclose Confidential Information to an unrelated third party (i) with the consent of the Disclosing Party; or (ii) in connection with a bona fide intent to Transfer Shares pursuant to the terms of Article V or in connection with an Approved Sale pursuant to Section 5.04(b); *provided further that* in either such case, such third party is bound by a nondisclosure agreement with terms at least as restrictive as those in this Section 6.03.  For the avoidance of doubt, a Receiving Party may disclose Confidential Information to its Affiliates, officers, directors, lenders, employees, investors, professional advisers and consultants (the "**Representatives**"), *provided, that* the Receiving Party shall be responsible for any breach of this Section 6.03(a) by its Representatives.  The term "**Confidential Information**" means, with respect to a Shareholder, an Affiliate of a Shareholder, the Company or any Company Subsidiary, trade secrets, proprietary information, information concerning business plans, business processes, know-how, operating practices and methods, material terms of commercial agreements, expansion plans, strategic plans and marketing plans, that the Disclosing Party treats as confidential and which were disclosed to the Receiving Party by the Disclosing Party as a result of this Agreement or the Subscription and Contribution Agreement; *provided, that* Confidential Information shall not include any information that (A) is or becomes generally available to the public (other than as a result of a disclosure by the Receiving Party or its Representatives in breach of this Section 6.03(a)), (B) is or becomes available to the Receiving Party or its Representatives on a non-confidential basis from a third-party source that is not and was not prohibited from disclosing such Confidential Information, (C) the Receiving Party or its Representatives is required or requested, pursuant to Law, regulation, legal process or regulatory authority to disclose, (D) is developed independently by the Receiving Party or its Representatives and is not based on or derived from Confidential Information previously disclosed by the Disclosing Party, or (E) is known to the Receiving Party or its Representatives prior to its disclosure by the Disclosing Party.  For the avoidance of doubt, any disclosure of the existence and general terms of this Agreement, the Subscription and Contribution Agreement, the Contribution Agreement, the Development Agreement, the DT Side Letter or the EPC Contracts or the fact that the Company and the Company Subsidiaries develop, own, acquire and operate Towers in the Territory shall not be considered a breach of this Section 6.03(a).

(b)      Remedies/Liquidated Damages.

(i)      Each Shareholder acknowledges that the Confidential Information has unusual and extraordinary value, and that a breach by such Shareholder of its obligations under Section 6.03(a) (as such, a "**Breaching Shareholder**") will cause the Disclosing Party great and irreparable harm, for which remedies available at law are inadequate. Therefore, without the necessity of proving actual damages or posting any bond, the Disclosing Party shall be entitled to injunctive and other equitable relief, including, but not limited to, specific performance, to prevent a breach, continued breach or threatened

breach of <u>Section 6.03(a)</u>. No remedy or election in this <u>Section 6.03</u> shall be deemed exclusive but shall be cumulative with all other remedies available at law or in equity.

(ii)     Any Breaching Shareholder will (and each Shareholder hereby agrees, if found a Breaching Shareholder by a court of competent jurisdiction to) pay Disclosing Party liquidated damages in the amount of One Million United States Dollars ($1,000,000) for such breach of its obligations under <u>Section 6.03(a)</u>. The amount of such liquidated damages is agreed by the Parties as a reasonable amount to compensate Disclosing Party for losses incurred in the event of breach of <u>Section 6.03(a)</u>.

**Section 6.04     Use of Name**. None of the Company, the Company Subsidiaries, the Shareholders or their respective Affiliates or Related Entities shall use the name of any other Shareholder or its Affiliates or Related Entities in any press release, published notice or other publication without such Shareholder's prior written approval. For the avoidance of doubt, the Company, the Company Subsidiaries, the Shareholders or their respective Affiliates or Related Entities shall not, without the Shareholder's prior written consent in each case, (i) use in advertising, publicity or otherwise the name of such Shareholder or its Affiliates or Related Entities or (ii) represent directly or indirectly, that any product or any service provided by the Company, the Company Subsidiaries, the Shareholders or their respective Affiliates or Related Entities has been approved or endorsed by the Shareholder or its Affiliates.

**Section 6.05     Credit Facility**. The Shareholders agree to use commercially reasonable efforts to assist the Company in obtaining any credit facilities as the Board determines are required to facilitate the growth of the Company (the "**Credit Facilities**"). If, in connection with such Credit Facilities, a lender requires that all or substantially all Shareholders pledge or charge their Shares as security for the repayment of such funds, then all Shareholders shall, and each does hereby agree to, execute the form of pledge or charge agreement approved by the Board, acting in good faith, *provided however* that in no event shall a Shareholder be required to execute a form of pledge or charge agreement that provides for any liability to such Shareholder other than (i) the loss of such Shareholder's actual Shares, (ii) customary miscellaneous costs and expenses, including costs and expenses associated with executing upon such pledge or charge agreement, and (iii) any liability associated with misrepresentations by such Shareholder regarding its own Shares.

**Section 6.06     Corporate Opportunities**. Neither the Initial A Shareholders, the Initial B Shareholders, nor any of their respective Affiliates or Related Entities may collectively, individually, or through any other Person (whether as an officer, director, manager, member, owner, employee, partner, consultant, lessor, holder of equity or debt investment, lender, agent, or in any other manner or capacity) engage in, participate in or invest in any telecom infrastructure transaction, investment or business opportunity (including without limitation the development and acquisition of Towers, fiber and small cells, but excluding the management of Towers and related assets on behalf of telecommunications operators, provided the Company receives a management fee on the same terms as set forth in <u>Section 6.06(b)</u> and that such management opportunity would not have otherwise been available to the Company or the Company Subsidiaries) that is or will be located primarily in any jurisdiction in the Territory (as such term is defined at the time of such engagement, participation or investment), unless such Shareholder (or such Shareholder's Affiliate or Related Entity) has first presented such

opportunity to the Company (each such business opportunity hereinafter referred to as a "**Corporate Opportunity**") subject to the following terms and conditions:

(a)     Participation by the Company in any Corporate Opportunity shall require the approval of the Board in accordance with Section 4.04(a).  Any Corporate Opportunity shall be referred promptly to the Board by the Shareholder contemplating participation in such Corporate Opportunity (the "**Referring Shareholder**") and the Board shall consider the Corporate Opportunity within no more than fifteen (15) Business Days after the Corporate Opportunity is referred to it, or, if there are deadlines imposed by the Corporate Opportunity, sufficiently in advance of their expiration to enable the Company to pursue the Corporate Opportunity or, in the alternative, to enable the Referring Shareholder and its respective Affiliates to pursue the Corporate Opportunity, in the event the Corporate Opportunity is not approved by the Board. Upon approval of such Corporate Opportunity by the Board, all Shareholders shall be required to fund the Company's participation in such Corporate Opportunity pro rata in accordance with their respective Percentage Interests and shall be entitled to share in the profits derived from the Company's participation in such Corporate Opportunity pro rata in accordance with their respective Percentage Interests, in accordance to Section 3.02(d) of this Agreement.

(b)     The parties acknowledge and agree that neither (i) the ongoing processes to acquire Towers and other assets from Entel in Chile and Peru and from Telefonica in Peru and Colombia by the CT Contributing A Shareholder through any of its Affiliates or Related Entities as previously disclosed to the Initial B Shareholders nor (ii) the management and operation in the ordinary course of business of telecommunications infrastructure and related assets owned by the Initial A Shareholders, their Affiliates and Related Entities as of the Effective Date, shall be deemed a Corporate Opportunity.  Each other Shareholder consents to the continued involvement of the Initial A Shareholders (or any of their Affiliates or Related Entities) in such business opportunities for themselves, provided, however, the parties agree that (A) the Company shall charge a management fee in an amount not to exceed three (3) times the aggregate cost of managing the assets associated with each such business opportunity as invoiced by DTH, and (B) the Initial B Shareholders may require the Initial A Shareholders or their Affiliates or Related Entities, as applicable, to contribute all or part of their Equity Interests in such business opportunity to the Company, to the extent permissible, so long as the Non-Managing Shareholders make a Capital Contribution in cash to the Company in an amount equal to the value of the equity interest contributed to the Company by the Initial A Shareholders as determined by the Board.

(c)     In the event the Board does not approve the Company's participation in a Corporate Opportunity as contemplated by Section 6.06(a) or any Shareholder (other than the Referring Shareholder) is unable to fund its pro rata share based on its respective Percentage Interest of the Company's participation in such Corporate Opportunity, the Referring Shareholder and its Affiliates or Related Entities shall have the right to pursue such Corporate Opportunity on its own behalf separate from its interest in the Company (each such Corporate Opportunity, hereinafter referred to as a "**Rejected Corporate Opportunity**").  In the event that participation in a Rejected Corporate Opportunity by an Initial A Shareholder or any of such Initial A Shareholder's Affiliates or Related Entities is subject to the rights granted by a Municipal Agreement, such Initial A Shareholder will present a proposal to the Board as to how the Company or the applicable Company Subsidiary may (i) partially assign such Municipal

Agreement or (ii) otherwise grant a right of use regarding such Municipal Agreement to such Initial A Shareholders or any of its Affiliates or Related Entities. Upon approval by the Board, the Company shall authorize the applicable Company Subsidiary to partially assign the Municipal Agreement to such Initial A Shareholder or any of its Affiliates or Related Entities. For the avoidance of doubt, nothing in this Section 6.06(c) shall require the Company or any Company Subsidiary to (i) assign all or any part of a Municipal Agreement to the extent such assignment (A) would materially affect the ability of the Company or any Company Subsidiary to own and operate its Towers, either at the moment of such assignment or at any point in the future, (B) would materially affect the value of the assets or equity of the Company or any Company Subsidiary upon a sale to a Third Party Purchaser, or (C) is prohibited by the terms of such Municipal Agreement, including where assignment is prohibited without the consent of a third party; (ii) assign any Towers, permits, licenses or other assets owned by the Company or any Company Subsidiary or (iii) take any action in violation of applicable Law. The Initial Shareholders agree that any such assignment or grant of right of use will not require the payment of any consideration by the relevant Initial A Shareholder; *provided, that*, the relevant Initial A Shareholder shall be responsible for all expenses incurred by the Company or any Company Subsidiary in connection with such assignment, including, but not limited to, reasonable attorneys' fees.

(d) The parties acknowledge and agree that the Company shall have no interest or expectation in any Rejected Corporate Opportunity, and no Director, Shareholder nor any Affiliate or Related Entity of such Director or Shareholder, to the fullest extent permitted by law, shall be liable to the Company or any of its Affiliates or Shareholders for breach of any duty (fiduciary or otherwise) as a Director, Shareholder or Affiliate or Related Entity of a Director or Shareholder by reason of the fact that any such Director, Shareholder, Affiliate or Related Entity acquires, creates, develops or seeks such Rejected Corporate Opportunity for itself or directs such Rejected Corporate Opportunity to another Person or entity. The Company and each Shareholder, to the fullest extent permitted by Law, waives and renounces any claims that any Rejected Corporate Opportunity constitutes a Corporate Opportunity of the Company. The provisions of this Agreement, to the extent that they restrict the duties (including fiduciary duties) and liabilities of a Director or Shareholder otherwise existing at law or in equity or by operation of this Section 6.06, are agreed by the Shareholders to replace such duties and liabilities of such Director or Shareholder.

**Section 6.07     New Markets**. As of the Effective Date, the scope of the Company's operations is confined to the Territory (any jurisdiction outside of the Territory, as defined on the Effective Date, hereinafter referred to as a "**New Market**"). The parties acknowledge and agree that each Initial Shareholder shall have the right (either itself, or through its Affiliates, Subsidiaries or Related Entities) to pursue any business opportunity in any New Market on its own behalf separate from its interest in the Company. For the avoidance of doubt, the Initial Shareholders are under no obligation to pursue any business opportunities in a New Market with the Company; however, they may refer any such business opportunities for participation by the Company to the Board and the participation of the Company in any such business opportunity must be approved in accordance with Section 4.04(a). In the event the Board approves entry by the Company into any New Market in which either or both of the Initial A Shareholders or any of their Affiliates or Related Entities are already present, the Non-Managing Shareholders, either directly or through the Company, as agreed by the parties, will reimburse the Initial A

Shareholders or such Affiliate or Related Entity, as applicable, for the Non-Managing Shareholders' proportionate share of reasonable and documented expenses incurred by the Initial A Shareholders in connection with their entry into the New Market; *provided, that*, prior to the Board's approval of the Company's entrance into such New Market, the Initial A Shareholders (i) informed the Board (including all Directors appointed by the Initial B Shareholders) of (A) the fact that they (or any of their Affiliates or Related Entities) were already present in such New Market; (B) the exact amount of all expenses incurred by them (or any of its Affiliates or Related Entities) in connection with their entry into such New Market for which they would seek reimbursement from the Non-Managing Shareholders or the Company; and (C) all of the Initial A Shareholders' equity interests and/or Tower assets (and any related liabilities) in such New Market (other than any information related to such assets which is subject to an applicable non-disclosure, confidentiality or similar agreement); and (ii) has agreed to contribute to the Company or any Company Subsidiary such equity interests and/or Tower assets as may have been agreed with the Board in consideration of such reimbursement. The parties acknowledge that as of the Effective Date, the expenses incurred by the CT Contributing A Shareholder in connection with its market entry into Mexico are equal to Five Million United States Dollars ($5,000,000) and that the expenses incurred by the CT Contributing A Shareholder in connection with its market entry into the Dominican Republic are equal to One Million United States Dollars ($1,000,000).

**Section 6.08     No Competition**.

(a)     Notwithstanding the provisions of <u>Section 6.06</u>, the Initial B Shareholders hereby agree that they will not, either directly or indirectly:

(i)     during the time either owns Equity Interests in the Company, make any equity investments in any other Person that engages in the development, ownership, acquisition and operation of Towers in the Territory (as defined at the time of any such equity investment); and

(ii)     for a period of one (1) year following termination of this Agreement, make any equity investments in any other Person that as a primary business model engages in the development, ownership, acquisition and operation of Towers in the Territory (as defined at the time of any such equity investment) through the use of municipal agreements that grant the right of use of public spaces to any other Person in exchange for multipurpose poles that incorporate security cameras and lighting devices as part of a municipal or government security program; *provided that* (A) the Agreement was terminated as a result of an Approved Sale proposed by the Initial B Shareholders, (B) the closing of the transactions contemplated by the Approved Sale occurred within six months following the Board's receipt of the Proposed Sale Notice, and (C) both the Initial A Shareholders and the Initial B Shareholders have used commercially reasonable efforts to effect the consummation of the Approved Sale within such six month period.

(b)     For the avoidance of doubt, the limitations in this <u>Section 6.8</u> shall not apply to any equity investments by the Initial B Shareholders in GTSL and its Subsidiaries.

**Section 6.09    Non-Solicitation**.  In light of each party's access to Confidential Information, each of the Initial A Shareholders, the Initial B Shareholders and the Private Capital Investing and Specialty Lending Group Desks of the Americas Goldman Sachs Special Situations Group within GS ("**GS Deal Teams**") agrees that, throughout the term of this Agreement and for a period of one (1) year following the earlier of (a) with respect to each party, the Transfer of all Shares held by such party in accordance with the provisions of this Agreement or (b) the termination of this Agreement for any reason (the "**Restricted Period**"), such party shall not, (i) directly, in the case of the GS Deal Teams or (ii) directly or indirectly through one or more of any of its Affiliates, in the case of the Initial A Shareholders or the Initial B Shareholders, hire or solicit, or encourage any other Person to hire or solicit, any individual who is or was employed by any other party or its Affiliates, whether such individual is or was engaged by such other party or its Affiliates as an employee, independent contractor, partner, or in any other capacity.  This Section 6.09 shall not prevent a party from hiring or soliciting any employee or former employee of another party who responds to a general solicitation that is a public solicitation of prospective employees and not directed specifically to any employee.  This Section 6.09 shall survive the expiration or termination of this Agreement.

**Section 6.10    Transfacil Offset**

(a)    On or prior to the Effective Date, Desarollos Terrestres, Inc., a company limited by shares organized under the laws of the British Virgin Islands ("**DTI**") will sell to CT Holding, and CT Holding will acquire from DTI, fiber assets and poles with an aggregate book value of Seven Million Two Hundred Thousand United States Dollars ($7,200,000) (the "**Transferred Fiber Asset**s").  The parties agree and acknowledge that, pursuant to that certain Off-Set Agreement, dated April 30, 2015, by and among DTI, Transfacil Pagos de Centroamérica S.A., a company organized under the laws of the Republic of Panamá ("**Transfacil Panamá**") and CT Holding (the "**Offset Agreement**"), CT Holding has assigned to DTI, as payment for the Transferred Fiber Assets, CT Holding's right to receive certain payments from Transfacil Panamá pursuant to the terms of that certain Master Lease Agreement, dated October 21, 2010, by and between Transfacil Pagos de Centroamérica, Sociedad Anónima, a company organized under the laws of the Republic of Guatemala ("**Transfacil Guatemala**") and Collocation Technologies, Sociedad Anónima, a company organized under the laws of the Republic of Guatemala; as assigned on March 8, 2012 to Transfacil Panamá and to CT Holding pursuant to the terms of that certain "Cesión de Contrato de Arrendamiento de Espacio en Postes Multiusos para la Instalación y Ubicación de Equipos de Comunicaciones (the "**Transfacil Agreement**").

(b)    In accordance with the terms of the Off-Set Agreement, (i) prior to the Effective Date, Transfacil Panamá will have made a payment on behalf of CT Holding to DTI in the amount of One Million Eight Hundred Thousand United States Dollars ($1,800,000) (the "**Guaranteed Annual Amount**") and (ii) for the three (3) years following the Effective Date (the "**Payment Period**"), Transfacil Panamá will make a payment equal to the Guaranteed Annual Amount each year to DTI on behalf of CT Holding.  Each annual payment contemplated by Section 6.10(b) shall be made within (ninety) 90 calendar days of January 1st of such year.  For the avoidance of doubt, (x) during the Payment Period all annual amounts due to CT Holding by Transfacil Panamá pursuant to the Transfacil Agreement that are in excess of the Guaranteed Annual Amount shall continue to be paid by Transfacil Panamá to CT Holding and (y) following

the Payment Period, Transfacil Panamá will make no further payments to DTI on behalf of CT Holding.

(c)     If, during the Payment Period, Transfacil Panamá fails to make any of the annual payments contemplated by Section 6.10(b)(ii), in whole or in part, the Initial A Shareholders shall pay to CT Holding the difference between the Guaranteed Annual Amount and the actual amount, if any, paid by Transfacil Panamá to DTI on behalf of CT Holding in such year.  If, in the fourth and fifth years following the Effective Date, Transfacil Panamá fails to pay at least the Guaranteed Annual Amount per year to CT Holding pursuant to the terms of the Transfacil Agreement, the Initial A Shareholders shall pay CT Holding the difference between the Guaranteed Annual Amount and the actual amount, if any, paid by Transfacil Panamá to CT Holding in such year.  Such payments will be made by the Initial A Shareholders within thirty (30) calendar days of written notice from the Initial B Shareholders.

(d)     The Initial A Shareholders agree and acknowledge that, (i) notwithstanding the fact that DT Inc. is an Affiliate, the transfer of the Transferred Fiber Assets to CT Holding will not be considered an In Kind Contribution by the Initial A Shareholders and will not increase the Initial A Shareholders' Equity Interests and (ii) no payments made to CT Holdings by the Initial A Shareholders pursuant to Section 6.10(c) will be considered Capital Contributions or increase the Initial A Shareholders' Equity Interests.

**Section 6.11     Colombian Exchange**.

(a)     Immediately prior to the transactions contemplated by this Agreement and the Subscription and Contribution Agreement, CT SA&C caused the transfer to Maintenance and Services Sociedad Anónima de Capital Variable, and Maintenance and Services Sociedad Anónima de Capital Variable accepted, all of its issued and outstanding shares in the Colombian CT Subsidiaries.

(b)     In consideration for the forty two (42) Towers owned by the Colombian CT Subsidiaries (collectively, the "**Removed Towers**") and the agreement of the Investor B Shareholder and the Initial C Shareholder to not reduce (i) the value attributed to the assets contributed by the CT Contributing A Shareholder pursuant to Section 3.02(a) or (ii) the amount of the Initial Investor Capital Contributions to reflect the Removed Towers, the CT Contributing A Shareholder agrees that it will finance the development, construction or acquisition of forty two (42) of the first eighty four (84) Towers approved by the Development Committee in any jurisdiction following the Effective Date (collectively, the "**Funded Towers**").  All costs and expenses associated with providing Funded Towers, including all payments due by the Company and the Company Subsidiaries under the EPC Contracts and applicable Taxes, shall be borne by the CT Contributing A Shareholder.  In no event will any amounts paid by the CT Contributing A Shareholder with regard to Funded Towers be considered a Capital Contribution by the CT Contributing A Shareholder or increase the CT Contributing A Shareholder's Equity Interests.

(c)     In the event that, upon the occurrence of an Approved Sale, (i) the CT Contributing A Shareholder has not satisfied its obligation to finance all of the Funded Towers (any such unfinanced Towers, the "**Unfunded Towers**"), the value of such Unfunded Towers calculated based on the number of Unfunded Towers multiplied by One Hundred and Seventy

Five Thousand United States Dollars ($175,000) shall be deducted from the Initial A Shareholders' portion of the proceeds from the Approved Sale; or (ii) the proposed buyer is unwilling to purchase the Tower assets owned by the Colombian TBS Subsidiary, including by an acquisition of the Equity Interests of the Colombia TBS Subsidiary (such Towers, the "**Rejected Colombia Towers**"), (x) the value of such Rejected Colombia Towers calculated based on Tower Cash Flow for such Towers as of immediately prior to the closing of the Approved Sale and the multiple of Tower Cash Flow implied by the final purchase price of the transactions contemplated by the Approved Sale, shall be deducted from the Initial A Shareholders' portion of the proceeds from the Approved Sale and (y) the Company shall transfer to the Initial A Shareholders (or their designees), and the Initial A Shareholders (or their designees) shall accept, the Equity Interests of the Colombia TBS Subsidiary.

**Section 6.12      Designation of Tax Matters Partner**.  The parties acknowledge that an election has been (or will be made) to treat the Company as a disregarded entity of the CT Contributing A Shareholder for U.S. federal income tax purposes effective before the closing date of the Subscription and Contribution Agreement and this Agreement.  The parties further acknowledge that upon the closing of the Subscription and Contribution Agreement, the Company will be treated as a partnership for U.S. federal income tax purposes.  Solely for U.S. federal income tax purposes, the parties designate the Investor B Shareholder as the tax matters partner (within the meaning of Section 6231(a)(7) of the U.S. Internal Revenue Code of 1986) of the Company.  The Investor B Shareholder, in its capacity as tax matters partner, may make any tax elections in furtherance of such tax classification.  Attached as the Appendix to this Agreement are provisions relating primarily to U.S. partnership tax matters, relevant to the Initial B Shareholders and the Initial C Shareholder.  In the event any Initial A shareholder should at any time after the Effective Date become subject to taxation in the United States, all actions taken by the Investor B Shareholder in its capacity as tax matters partner shall be subject to the consent of the Initial A Shareholders, which consent shall not be unreasonably withheld or denied.

**Section 6.13      Report on Tax Policies and Procedures; Ongoing Tax Review**.  Promptly following the Effective Date, the Company shall retain Deloitte LLP or any other internationally recognized accounting firm to prepare and deliver, no later than ninety (90) calendar days after the Effective Date, a written report on overall tax compliance by the Company and the Company Subsidiaries in all relevant tax jurisdictions, including regarding the material policies and practices of the Company and the Company Subsidiaries with respect to income and non-income taxes and transfer pricing, and including any recommendations to ensure that the Company and the Company Subsidiaries are compliant with all applicable laws and rules relating to such matters.  The Company shall deliver a complete copy of a draft of such report to the Shareholders for their review promptly after receiving any draft, and the Company shall consider in good faith and shall communicate to Deloitte LLP or such other accounting firm, as the case may be, any and all comments provided by the Shareholders on such draft.  Thereafter, the Company shall deliver a complete copy of the final version of such report to the Shareholders promptly after receiving such final version, and the Company shall cause its and the Company Subsidiaries' tax policies and practices to comply, within ninety (90) days of receiving such reports, with any recommendations provided in each such report (including, to the extent required by law, by amending tax returns of the Company and/or its subsidiaries).  For avoidance of doubt, such report shall include a transfer pricing study regarding transactions between and

among one or more of the Company, Interco BVI, the CT BVI Subsidiaries, TBS, the CT Subsidiaries and the TBS Subsidiaries. At all times after the Effective Time, the Company will engage Deloitte LLP (or another independent internationally recognized accounting firm) to review and approve any non-U.S. tax returns and any other non-U.S. tax reporting required to be filed by the Company or any of its subsidiaries. All fees, expenses and taxes incurred in connection with the Company's compliance with this Section 6.13 shall be borne by the Company.

**Section 6.14** **Subscription to GTSL**. The Shareholders acknowledge and agree that, as soon as practicable following the completion of the additional capital contributions required by Section 3.02, the CT Contributing A Shareholder, the Investor B Shareholder and the Class C Shareholder shall, in exchange for nominal consideration, subscribe for shares of GTSL, in proportion to the Percentage Interests of such Shareholders in the Company at the time of such subscription. Concurrent with such subscription, the parties shall enter into a shareholders agreement (as well as an amended and restated memorandum of association and amended and restated articles of association) setting forth the rights and obligations of the shareholders of GTSL. Such shareholders agreement shall be substantially similar to this Agreement, with such amendments as may be agreed between the parties, including but not limited to those contemplated by the last sentence of this Section 6.14. The Shareholders further acknowledge and agree that it is the current intent of the Shareholders that (i) the working capital of GTSL will be provided by loans from the Company, issued from time to time on approval of the Board, rather than by capital contributions of its shareholders and (ii) GTSL will participate in any Approved Sale along with the Investor Group.

**Section 6.15** **Contribution of TBS and CT BVI Subsidiaries**. The Shareholders acknowledge and agree that (i) on the Effective Date, the Company shall transfer to Interco BVI all of the issued and outstanding shares of (A) TBS and (B) the CT BVI Subsidiaries (the "**Interco Transfer**") and (ii) each Shareholder and the Company shall execute and deliver, and take all actions necessary to cause the Company and any of the Company Subsidiaries to execute and deliver, such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to complete the Interco Transfer.

## ARTICLE VII
## TERMINATION

**Section 7.01** **Termination**.

(a)     The rights and obligations of the parties to this Agreement shall terminate upon: (i) the unanimous agreement of the Shareholders; or (ii) the dissolution or liquidation of the Company; *provided that* termination of this Agreement will not relieve a party with respect to obligations incurred prior to the date of such termination.

(b)     A Person who ceases to hold any Shares in the Company will cease to be a party and will have no further rights and obligations under this Agreement, except as provided herein or with respect to the rights and obligations that such Person may have hereunder or by reason of such Party's prior breach of this Agreement.

(c)     Upon dissolution, an accounting shall be made by either the Company or the Company's independent accountants, as determined by the Board, of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution.

**Section 7.02     Distributions upon Termination.**  If the Company is dissolved while it is solvent and its affairs are to be wound up, the Board shall:

(a)     sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Shareholders and the Board may unanimously determine to distribute any assets to the Shareholders in kind according to their respective Percentage Interests);

(b)     discharge all liabilities of the Company, other than liabilities to Shareholders for distributions, and establish such Reserves as may be reasonably necessary to provide for contingent or other liabilities of the Company; and

(c)     distribute the remaining assets of the Company to the Shareholders according to their respective Percentage Interests.  If any non-cash assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be calculated based on the fair market value of the Company as a whole as determined by independent appraisal.  No non-cash assets of the Company shall be distributed to the Initial C Shareholder without the prior written consent of the Initial C Shareholder.

# ARTICLE VIII
# MISCELLANEOUS

**Section 8.01     Conflict with Memorandum of Association or Articles**.  In the event that any provision of this Agreement conflicts with any provision of the Memorandum of Association or the Articles, the terms of this Agreement will prevail between the Shareholders only, and each Shareholder shall vote all of the Shares that it holds of record, and take all actions necessary, to ensure that at all times that the Memorandum of Association and the Articles do not conflict with any provision of this Agreement.

**Section 8.02     Expenses**.  Except as otherwise specified in this Agreement all reasonable and documented out-of-pocket costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred by the Shareholders in connection with the ordinary course of operations of the Company will be reimbursed by the Company to the shareholders from time to time.

**Section 8.03     Notices**.  All notices, requests, consents, claims, demands, waivers and other communications hereunder must be in writing and shall be deemed delivered as follows: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by an internationally recognized courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if received before 5:00 p.m. at the place of receipt, and on the next business day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail,

return receipt requested, postage prepaid.  Such communications must be sent to the respective parties at the following addresses.

(a)     Terra Towers Corp.
        Commerce House, Wickhams Cay 1
        P.O. Box 3140
        Road Town, Tortola
        British Virgin Islands, VG1110
        E-mail:  jhernandez@continentaltowerscorp.com
        Attention: Jorge Hernandez

        *with a copy (which copy shall not constitute notice) to*:

        Mayora & Mayora, S.C
        15 calle, 1-04 zona 10, 01010
        Edificio Céntrica Plaza, tercer nivel, oficina 301
        Ciudad de Guatemala, Guatemala
        E-mail: rbriz@mayora-mayora.com
        Attention: Rafael Briz

        *with a copy (which copy shall not constitute notice) to*:

        Holland & Knight LLP
        31 West 52nd St
        New York, NY 10019
        Facsimile: 212-385-9010
        E-mail: stephen.double@hklaw.com
        Attention: Stephen Double, Esq.

(b)     TBS Management, S.A.
        2da calle 8-01 zona 14, 01014
        Edificio Las Conchas, séptimo nivel
        Ciudad de Guatemala, Guatemala
        E-mail: jgaitan@continentaltowerscorp.com
        Attention: Jorge Gaitán

        *with a copy (which copy shall not constitute notice) to*:

        Mayora & Mayora, S.C
        15 calle, 1-04 zona 10, 01010
        Edificio Céntrica Plaza, tercer nivel, oficina 301
        Ciudad de Guatemala, Guatemala
        E-mail: rbriz@mayora-mayora.com
        Attention: Rafael Briz

        *with a copy (which copy shall not constitute notice) to*:

Holland & Knight LLP
31 West 52nd St
New York, NY 10019
Facsimile: 212-385-9010
E-mail: stephen.double@hklaw.com
Attention: Stephen Double, Esq.

(c)     LATAM Towers, LLC:
86 West Street
Chagrin Falls, Ohio 44022
Email: rlepene@peppertreecapital.com
Attention: Ryan Lepene

*with a copy (which copy shall not constitute notice) to*:

Thompson Hine LLP
335 Madison Avenue
New York, New York  10017
Facsimile:  212-344-6101
E-mail:  Garrett.Evers@Thompsonhine.com
Attention:  Garrett Evers

(d)     Telecom Business Solution, LLC
86 West Street
Chagrin Falls, Ohio 44022
Email: rlepene@peppertreecapital.com
Attention: Ryan Lepene

*with a copy (which copy shall not constitute notice) to*:

Thompson Hine LLP
335 Madison Avenue
New York, New York  10017
Facsimile:  212-344-6101
E-mail:  Garrett.Evers@Thompsonhine.com
Attention:  Garrett Evers

(e)     Goldman, Sachs & Co.
200 West Street
New York, NY 10282
Email:  Michael.McGinn@gs.com
Attention:  Mike McGinn

and

Goldman, Sachs & Co.
6011 Connection Drive

Irving, Texas 75039
E-mail: ben.nale@gs.com
Attention: Ben Nale

*with a copy (which copy shall not constitute notice) to*:

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
E-mail: Jonathan.Gill@ropesgray.com
Attention: Jonathan P. Gill

(f)     CONTINENTAL TOWERS LATAM HOLDINGS LIMITED
Commerce House, Wickhams Cay 1
P.O. Box 3140
Road Town, Tortola
British Virgin Islands, VG1110
E-mail: andrew.swapp@conyerdill.com
Attention: Andrew Swapp

*with a copy (which copy shall not constitute notice) to*:

Holland & Knight LLP
31 West 52nd St
New York, NY 10019
Facsimile: 212-385-9010
E-mail: stephen.double@hklaw.com
Attention: Stephen Double, Esq.

*with a copy (which copy shall not constitute notice) to*:

Thompson Hine LLP
335 Madison Avenue
New York, New York  10017
Facsimile:  212-344-6101
E-mail:  Garrett.Evers@Thompsonhine.com
Attention:  Garrett Evers

**Section 8.04     Headings**.  The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 8.05     Severability**.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law, governmental regulation or public policy, all other terms and provisions of this Agreement nevertheless will remain in full force and effect as long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such determination that any

term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

Section 8.06 **Entire Agreement**.  This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the parties with respect to the subject matter hereof.

Section 8.07 **Assignment**.  This Agreement may not be assigned without the express written consent of the parties (which consent may be granted or withheld in the sole discretion of any party), except that any Shareholder may assign its rights hereunder in connection with a Transfer of Shares permitted under <u>ARTICLE V</u> hereof and as permitted pursuant to <u>Section 3.02(e)</u>, and any assignment in violation of this provision made without such prior written consent shall be null and void.

Section 8.08 **No Third Party Beneficiaries**.  This Agreement will be binding upon and inure solely to the benefit of the parties hereto and their permitted assigns and successors and nothing herein, express or implied, is intended to or will confer upon any other person or entity, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 8.09 **Amendment**.  This Agreement may not be amended or modified, except by an instrument in writing signed by, or on behalf of, each of the parties bound by, entitled to the benefits of, or subject to the provision to be amended or modified and any amendment that materially adversely and disproportionately affects any Shareholder shall require the consent of such Shareholder.

Section 8.10 **Governing Law**.  This Agreement will be governed by and construed in accordance with the Laws of the State of New York, United States without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction).

Section 8.11 **Counterparts**.  This Agreement may be executed and delivered in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed and deemed to be an original but all of which taken together constitute one and the same agreement.

Section 8.12 **Specific Performance**.  The parties hereto agree that irreparable damage would occur in the event any provision of this Agreement was not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at Law or in equity.  Therefore, each party hereto consents to the issuance of an injunction or the enforcement of other equitable remedies against him at the suit of an aggrieved party without the posting of any bond or other security, to

compel specific performance of all of the terms hereof and to prevent any disposition of Shares in contravention of any terms of this Agreement.

Section 8.13    **WAIVER OF JURY TRIAL**.  EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY AND FOR ANY COUNTERCLAIM THEREIN.

Section 8.14    **Dispute Resolution**.  The parties agree that any controversy, claim or dispute arising out of or relating to or in connection with this Agreement including, without limitation, any dispute regarding its breach, termination, enforceability or validity hereof (each, a "**Dispute**") should be regarded as a business problem to be resolved promptly through business-oriented negotiations before resorting to arbitration pursuant to Section 8.15.  The parties therefore agree to attempt in good faith to resolve any Dispute promptly by negotiation between the executives of the parties who have authority to settle the Dispute.  Such negotiations shall commence upon the mailing of a notice (the "**Dispute Notice**") from the appropriate executive of the requesting party to an appropriate executive of the responding party.  If the Dispute has not been resolved by these Persons within forty-five (45) days of the date of the Dispute Notice, then such Dispute will be settled pursuant to binding arbitration pursuant to Section 8.15.  All negotiations pursuant to this Section 8.14 will be confidential and will be treated as compromise and settlement negotiations for purposes of applicable rules of evidence and not be used for, or admitted in, any arbitration or court proceedings under this Agreement.

Section 8.15    **Arbitration**.  Subject to Section 8.12, any Dispute that has not been resolved pursuant to Section 8.14 will be finally settled by binding arbitration.  The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association in effect at the time of the arbitration, except as they may be modified herein or by mutual agreement of the parties.  The seat of the arbitration shall be New York, New York.  The arbitration shall be conducted by three arbitrators.  The party initiating arbitration (the "**Claimant**") shall appoint its arbitrator in its request for arbitration (a "**Request**").  The other party (the "**Respondent**") shall appoint its arbitrator within thirty (30) calendar days of receipt of the Request and shall notify the Claimant of such appointment in writing.  If the Respondent fails to appoint an arbitrator within such thirty (30) day period, the arbitrator named in the Request shall decide the Dispute as the sole arbitrator.  Otherwise, the two arbitrators appointed by the parties shall appoint a third arbitrator within thirty (30) calendar days after the Respondent has notified the Claimant of the appointment of the Respondent's arbitrator.  When the arbitrators appointed by the parties have appointed a third arbitrator and the third arbitrator has accepted the appointment, the two arbitrators shall promptly notify the parties of such appointment.  If the two arbitrators appointed by the parties fail or are unable to appoint a third arbitrator, then the third arbitrator shall be appointed by the President of the American Arbitration Association which shall promptly notify the parties of the appointment of the third arbitrator.  The third arbitrator shall act as chairman of the panel.  The arbitration award shall be in writing and shall be final and binding on the parties.  The award may include an award of costs, including reasonable attorney's fees and disbursements.  Judgment upon award may be entered by any court having jurisdiction thereof or having jurisdiction over the parties or their

assets.  The Initial A Shareholders hereby designate, appoint and empower Corporation Service Company, (the "**Process Agent**") with offices as of the date of this Agreement at Corporation Service Company, 1180 Avenue of the Americas, Suite 210, New York, NY 10036 as their authorized agent to receive for and on their behalf service of summons or other legal process in any action commenced under this <u>Section 8.15</u> or otherwise related to this Agreement or the related investments and transactions in accordance with the Acceptance of Appointment Letter, substantially as attached hereto as <u>Exhibit B</u>.  Such service may be made by mailing or delivering a copy of such process to either or both of the Initial A Shareholders in care of the Process Agent at the Process Agent's above address, and the Initial A Shareholders hereby authorize and direct the Process Agent to accept such service on their behalf.  The Initial A Shareholders acknowledge and agree that they shall not revoke the appointment of such Process Agent unless they have appointed another agent for service of process and have received the written consent of the other Shareholders to such appointment.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized signatories thereunto duly authorized as of the date first written above.

**CONTINENTAL TOWERS LATAM HOLDINGS LIMITED**

By: _____

    Name: Jorge Hernandez

    Title: Director

**Terra Towers Corp.**

By: _____

    Name: Jorge Hernandez

    Title: Director

**LATAM Towers, LLC**

By _____

    Name:

    Title:

**AMLQ Holdings (Cay) Ltd.**

By _____

    Name:

    Title:

**TBS Management, S.A.**

By _____

    Name:

    Title:

**Telecom Business Solution, LLC**

By _____

    Name:

    Title:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized signatories thereunto duly authorized as of the date first written above.

**CONTINENTAL TOWERS LATAM HOLDINGS LIMITED**

By: _____
    Name:
    Title:

**Terra Towers Corp.**

By: _____
    Name:
    Title:

**LATAM Towers, LLC**

By _____
    Name:  Ryan D. Lepene
    Title:  President and Chief Executive Officer

**AMLQ Holdings (Cay) Ltd.**

By _____
    Name:
    Title:

**TBS Management, S.A.**

By _____
    Name:
    Title:

**Telecom Business Solution, LLC**

By _____
    Name: Ryan D. Lepene
    Title:  President

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized signatories thereunto duly authorized as of the date first written above.

**CONTINENTAL TOWERS LATAM HOLDINGS LIMITED**

By: _____
    Name:
    Title:

**Terra Towers Corp.**

By: _____
    Name:
    Title:

**LATAM Towers, LLC**

By _____
    Name:
    Title:

**AMLQ Holdings (Cay) Ltd.**

By _____ d.d.
    Name: Milton Keillman
    Title: President

**TBS Management, S.A.**

By _____
    Name:
    Title:

**Telecom Business Solution, LLC**

By _____
    Name:
    Title:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized signatories thereunto duly authorized as of the date first written above.

CONTINENTAL TOWERS LATAM
HOLDINGS LIMITED

By: _____
    Name:
    Title:

**Terra Towers Corp.**

By: _____
    Name:
    Title:

**LATAM Towers, LLC**

By _____
    Name:
    Title:

**AMLQ Holdings (Cay) Ltd.**

By _____
    Name:
    Title:

**TBS Management, S.A.**

By _____
    Name: JOSE ALEJANDRO SEGESTUME FIGUEROA
    Title: DIRECTOR

**Telecom Business Solution, LLC**

By _____
    Name:
    Title: