# EXHIBIT 19

**CASE NUMBER 01-21-0000-4309**
**ARBITRATION PURSUANT TO**
**THE COMMERCIAL ARBITRATION RULES OF**
**THE AMERICAN ARBITRATION ASSOCIATION**

**BETWEEN:**

*Telecom Business Solution, LLC, et al.,*

**Claimants,**
v.

*Terra Towers Corp., et al.,*

**Respondents.**

---

**Claimants/Counterclaim Respondents Telecom Business Solution, LLC's and LATAM Towers, LLC's, and Respondents/Counterclaimants AMLQ Holdings (CAY) Ltd.'s Submission to the Panel Regarding Proposed Procedural Order No. 1, Phasing the Arbitration, and the Proposed Amended Counterclaim of Respondents Terra Towers Corp. and TBS Management, S.A.**

---

## I. INTRODUCTION / EXECUTIVE SUMMARY

Pursuant to the Panel's recent correspondence of July 30, 2021, August 2, 2021, and August 4, 2021, Claimants/Counterclaim Respondents Telecom Business Solution, LLC and LATAM Towers, LLC (collectively, "Claimants" or "Peppertree")[1], and Respondents/Counterclaimants AMLQ Holdings (CAY) Ltd. ("AMLQ" and together with Peppertree, "Peppertree/AMLQ") respectfully make this submission addressing the following issues:

(1) The Panel's request for a proposed procedural order;

(2) The Panel's query regarding the parties' interest in and the potential scope of a phased approach to the arbitration, with the "first phase" addressing the threshold issues

---

[1] Individual respondents Howard Mandel, John Ranieri, and Ryan Lepene (collectively, the "Individual Respondents") have raised and maintain objections to jurisdiction over them in this arbitration. The parties have reached an agreement to dismiss all claims against all individual respondents in this arbitration—including the Individual Respondents—without prejudice, and expect to do so shortly. Notwithstanding such agreement and without waiving their jurisdictional objections and explicitly reserving all rights, the Individual Respondents state that they have no objections to the Procedural Order proposed herein.

concerning a proposed sale of the Company;[2] and

(3) The Panel's query regarding whether Respondents/Counterclaimants Terra Towers Corp. and TBS Management, S.A. (collectively, "Terra") should be permitted to file the Amended Counterclaim they proposed on August 3, 2021 and August 4, 2021.

Herein, we summarize the Parties' key areas of agreement and disagreement on the Panel's proposed procedural order, a phased approach to the arbitration, and Terra's proposed amended counterclaim, in Sections I.A. through I.C, below. We provide a more detailed explanation of our positions on disputed issues for the procedural order, and on Peppertree/AMLQ's proposed phased approach to the Arbitration, in sections II and III below, respectively. We then summarize our requested relief in section IV.

### A. Proposed Procedural Order

Pursuant to Chair Goldstein's email of July 30, 2021, Peppertree/AMLQ respectfully request that the Panel enter the procedural order attached as **Exhibit A** (the "Proposed Order")[3] to govern the above-captioned arbitration (the "Arbitration").

In accordance with the Panel's request, the Proposed Order follows the template of the Panel's proposed procedural order of July 21, 2021 and includes certain limited changes addressed in detail below. For the Panel's convenience, the Peppertree/AMLQ parties have also submitted a redline version of the Proposed Order, attached hereto as **Exhibit B**,[4] which reflects Terra Respondents[5] proposed changes to the Proposed Order and clearly shows the areas of disagreement among the Parties.[6]

As an initial matter and as reflected in Exhibit B, despite some sharp differences, the Parties are in agreement on several matters, including large portions of the proposed case schedule (*see* Procedural Timetable at Appendix A of the Proposed Order). For example, the Parties agree, in

---

[2] The "Company" is defined as Continental Towers LATAM Holdings Ltd.

[3] Exhibit A is being submitted in both PDF and Microsoft Word formats.

[4] Exhibit B is based on the latest version of a proposed procedural order Terra Respondents shared with Peppertree/AMLQ, which was provided on August 3, 2021.

[5] As used herein, "Terra Respondents" are defined as Respondents/Counterclaimants Terra Towers Corp., TBS Management, S.A., and DT Holdings. Peppertree/AMLQ and Terra Respondents are collectively referred to herein as the "Parties".

[6] By way of background, after receiving Chair Goldstein's correspondence of July 30, 2021, requesting that the Parties submit a proposed order and identify any areas of disagreement, Peppertree/AMLQ drafted the Proposed Order and sent it to Terra Respondents for discussion. In doing so, Peppertree/AMLQ substantially revised the initial proposal they submitted to the Panel on July 29, 2021 to be more in line with Terra Respondents' initial submission. In response, Terra Respondents simply rejected all of Peppertree/AMLQ's substantive proposals and reverted to the same procedural order they submitted to the Panel on July 29.

principle, on the need for document requests, a general fact discovery timeline of 5-6 months, the need for experts and expert discovery, a subpoena process, the need for pre- and post-hearing submissions, a reasoned award, and a case schedule of approximately 10-11 months until the merits hearing (i.e., the Panel will note that the Parties' proposed timelines substantially track one another and are only separated by one month).

However, there are a few key points of disagreement, previewed in Peppertree/AMLQ's correspondence to the Panel of July 29, 2021, which are summarized as follows:

(1) **Application and/or Guidance of IBA Rules:** As agreed by the Parties and the Panel in their respective proposed procedural orders, the governing agreements all provide that the Arbitration should be conducted pursuant to the Commercial Arbitration Rules of the American Arbitration Association (AAA) effective October 1, 2013, including the Procedures for Large Complex Commercial Disputes set forth therein (the "Commercial Rules"). While Peppertree/AMLQ do not object to being guided by the ICDR Guidelines since this Arbitration is being administered by the ICDR, they do object to being governed or guided by the IBA Rules. They *never* agreed to such rules. Instead, the parties explicitly negotiated for and agreed to be bound by the Commercial Rules to the exclusion of any other rules. Had the parties wanted to apply the IBA Rules, they easily could have done so in the governing agreements. That did not happen.

(2) **The Need for Depositions:** Given the number of parties and claims, the amounts in controversy which, collectively, exceed $500 million, and the overall complexity of this Arbitration, the Parties should be entitled to conduct depositions to ensure due process and a full and fair opportunity to conduct the discovery necessary to present their respective cases. Indeed, Rule L-3(f) of the Commercial Rules, relating to large, complex commercial cases, contemplates the taking of depositions in a matter such as this one, and depositions are frequently conducted in large commercial arbitrations pursuant thereto.

Peppertree/AMLQ are at a massive disadvantage with respect to relevant documents and information because they are *minority* shareholders who do not control the day-to-day operations of the Company.[7] Terra, which collectively is the majority shareholder and on the ground in Latin America, manages the Company and controls its daily operations. As a result, while Terra has knowledge of the various actions that it has taken with respect to the Company, as well as the actions it caused the Company to take, Peppertree/AMLQ do not. Given the egregious nature of the conduct alleged against Terra, which includes continuous misappropriation, self-dealing, embezzlement, and ongoing violations of the most basic provisions of the Parties' agreements, Peppertree/AMLQ should be entitled to take depositions of key individuals who control both Terra and the actions of the Company and discover the

---

[7] This fact is made clear by Peppertree's Amended Statement of Claims, which explains that Terra is running the Company and taking any actions that it wants without regard to any Board or Development Committee decisions.

truth about both the actions Terra is causing the Company to take and how Terra is using Company funds. To be clear, Terra is not simply disbursing Company funds without the contractually required approvals by Peppertree, but it is diverting these funds to, and for the benefit of, itself and its affiliates.

Thus, for the reasons set forth herein (*see infra* at 5-8), depositions are both an essential discovery tool and necessary, in the interests of justice and the ultimate pursuit of the truth. It is not surprising that the parties who have been accused of misappropriation, self-dealing, fraud, and embezzlement are the ones who now oppose depositions. That fact alone should be telling to the Panel. Accordingly, Peppertree/AMLQ seek a reasonable and limited number of depositions to discover the truth central to the disputed issues among the Parties. Allowing for such depositions will facilitate the efficiency of the ultimate merits hearing.

(3) **The Document Discovery Process:** Peppertree/AMLQ's proposed document discovery process, which entails objecting to document requests in writing while producing documents on a rolling basis while discovery disputes are resolved, is the only reasonable and workable proposal for a case of this magnitude, involving various parties, over twenty (20) different claims, and spanning several years. Terra Respondents' proposal, which requires production of documents that are not objected to within thirty (30) days, is not only temporally and administratively untenable, but also is bound to result in additional objections and discovery disputes due to the unreasonable production deadline. Additionally, Terra Respondents' proposed process is inappropriate here because it is based on the IBA Rules, which do not govern this arbitration and to which Peppertree/AMLQ expressly and strenuously object.

(4) **Discretionary Witness Statements:** Peppertree/AMLQ do not agree to the use of witness statements in lieu of live testimony at the merits hearing in this Arbitration. Rather, Peppertree/AMLQ propose that each party be permitted to present its case in the manner it sees fit in order to ensure that all parties receive due process and a full and fair opportunity to be heard. In other words, the Parties and their experienced counsel should each be allowed to try their cases in the manner they deem appropriate, given the high stakes of this Arbitration. Not only is live direct witness testimony common in large, complex commercial arbitrations pursuant to the Commercial Rules, but it is already apparent that it will be especially critical here, given the divergence of the Parties' positions and the egregious nature of the conduct alleged. Live witnesses permit the Panel and counsel the important opportunity to gauge witness credibility. This cannot be achieved using written submissions in all likelihood drafted by lawyers. Additionally, Respondent Jorge Hernandez—who owns and controls both Terra and DT Holdings and runs the litigation from the side of Terra Respondents—exerts significant influence over certain key witnesses, including because he employs them and their families, and is responsible for their livelihood. Under these circumstances, it is much more likely that live examination, as opposed to witness statements, will elicit credible testimony. Thus, witness credibility will be crucial. To the extent the Panel has any doubts about that, they should be resolved *in favor* of live witnesses, not against them.

4

(5) **Case Schedule:** As explained above, the Parties are largely in agreement as to the general timing of the case schedule, which is set forth in Appendix A to the Proposed Order. The primary point of disagreement is that Peppertree/AMLQ has requested an extra month of fact discovery to account for necessary depositions.

Accordingly, for these reasons, which are explained in more detail below, Peppertree/AMLQ respectfully request that the Panel enter the Proposed Order in this Arbitration.

    **B.**   **Phasing of Arbitration to Address Claims Related to (i) the Sale of the Company; and (ii) the Unauthorized Use of Company Funds to Develop Rejected Sites**

In response to Chair Goldstein's email of August 2, 2021, Peppertree/AMLQ agree that a phased approach makes sense and respectfully request that the Panel allow a "first phase," permitting requests for summary disposition on two threshold legal issues: (i) whether Peppertree/AMLQ are entitled to specific performance of the provisions of Section 5.04(b) of the Shareholders Agreement related to the sale of the Company; and (ii) whether Peppertree, derivatively and on behalf of the Company, is entitled to specific performance of Section 1.1(c) of the Development Agreement and Sections 4.03(d) and 4.04 of the Shareholders Agreement, which do not permit the Company to move forward and develop towers sites that have been rejected by the Development Committee or the Board of Directors. Peppertree/AMLQ submit that conducting the Arbitration using this "phased" approach would allow the Panel to resolve some of the most important and urgent disputed issues in an expeditious and efficient manner on written submissions, without prejudice to any party's ability to seek damages in a subsequent phase of the Arbitration.

    **C.**   **Terra's Proposed Amended Counterclaim**

Peppertree/AMLQ do not oppose Terra's motion for leave to file its proposed Amended Counterclaim.

**II.**   **KEY POINTS OF DISAGREEMENT REGARDING THE PROPOSED PROCEDURAL ORDER**

    **A.**   **Peppertree/AMLQ Have Not Agreed—and Do Not Agree—to be Governed or Guided by IBA Rules**

There is no dispute that this Arbitration is governed by the Commercial Rules in accordance with the governing agreements. Indeed, all parties and the Panel so stated in their respective proposed orders. (*See* Ex. B, Redline of Proposed Order at ¶ 13). The selection of the Commercial Rules was purposeful and Peppertree/AMLQ negotiated for the application of the Commercial Rules to the exclusion of all other possible rules, including any international rules. Indeed, Peppertree/AMLQ *never* agreed to the application of, for example, the ICDR International Dispute Resolution Procedures, which would otherwise have governed this Arbitration. This is because this case is a commercial arbitration that is to take place in New York and is primarily

5

based on commercial contract claims that are governed by New York law. The fact that certain parties reside outside of the United States is incidental to the underlying dispute. As such, Peppertree/AMLQ object and do not consent to be bound or guided by the IBA Rules—rules which were not contemplated by the parties and to which Peppertree/AMLQ never agreed. Imposing the IBA Rules, in any way, on Peppertree/AMLQ is in direct contravention of their explicit arbitration agreements.

That said, Peppertree/AMLQ appreciate the guidance suggested by Chair Goldstein in his July 30, 2021 email and agree to be guided, but not bound by, the ICDR Guidelines, to the extent that they do not conflict with the binding and governing Commercial Rules. (*See* Ex. A., Proposed Order at ¶ 14).

### B. The Parties Should Be Permitted to Take Depositions, Which Are Both Contemplated by the Applicable Commercial Rules for Large, Complex Cases and Are Especially Necessary Here Given the Egregious Nature of the Wrongful Conduct Alleged

The Parties disagree about depositions. Peppertree proposed that, in addition to taking party depositions,[8] each side is entitled to conduct up to five depositions (Ex. A, Proposed Schedule at ¶ 51). Terra does not include any depositions in its proposal. The Parties should be permitted to take depositions in this case because, as set forth below, there is good cause for the use of this basic and important discovery tool.

First, discovery depositions are common in large, complex commercial cases and are expressly contemplated by the Commercial Rules upon a showing of good cause. *See* Commercial Rules L-3(f).[9] The reason for this is simple. Foremost, discovery, and this entire Arbitration, are

---

[8] Peppertree/AMLQ propose that the Parties are entitled to depose the opposing party. Specifically, assuming the individual respondents are dismissed, Peppertree/AMLQ, collectively, will be entitled to depose Terra and DT Holdings, and Terra Respondents, collectively, will be entitled to depose Peppertree and AMLQ.

[9] The policies disfavoring depositions in arbitration do *not* apply in the same manner to large, complex arbitration:

> U.S. arbitral practice respecting discovery depositions is clear: where the parties have not agreed to depositions, arbitrators rarely order them. If depositions were to become routine in arbitration, one of the key reasons given to choose arbitration over litigation (the absence of litigation—style discovery) would disappear. **This consideration, however, loses some of its force in complex arbitrations (where high cost and lengthy proceedings may be unavoidable),** and parties often agree to depositions in such arbitrations. The distinction between large matters and other arbitrations, insofar as depositions are concerned, is reflected in the AAA Rules: while the AAA's Commercial Arbitration Rules do not expressly address the issue of pre-hearing depositions, the AAA's newly revised Procedures for Large, Complex, Commercial Disputes, L-4(d) authorize them under certain circumstances: At the discretion of the arbitrator(s), upon good cause shown and consistent with the expedited nature of arbitration, the arbitrator(s) may order depositions of, or the propounding of interrogatories to, such persons who may possess information determined by the arbitrator(s) to be necessary to determination of the matter.

6

about the search for truth. Depositions, in turn, are one of the primary and most valuable tools in a litigant's toolbox for unearthing that truth. Depositions aid parties to streamline cases, narrow disputes, avoid surprises, and prepare for a trial or hearing. As such, they are especially important in large, complex cases such as this one.

Second, depositions are necessary and appropriate here given the number of parties (currently 11), hundreds of pages of claims, responses to claims and counterclaims (more than 20 claims at issue), the total amount "at issue" or in controversy (over $500 million), and the overall complexity of the case, as evidenced by the pleadings. In cases just like this, depositions are a key discovery tool that can be used to promote economy and efficiency by allowing the parties to discover key facts which, in turn, can serve to streamline the claims and issues in dispute. Additionally, any cross-examination permitted at the merits hearing based on attorney-drafted witness statements will be ineffective if the Parties are not first permitted to depose key witness. In fact, the ability to conduct discovery depositions will allow the parties to make more efficient presentations—and conduct more efficient cross examinations—at the hearing.

Third, depositions are a necessary discovery tool to ascertain the truth, which is to the benefit of all Parties and the Panel. This is a case where both sides allege egregious misconduct—in fact, Peppertree has alleged that Terra Respondents are engaged in a continuous and systematic pattern of embezzlement, misappropriation, and self-dealing. Peppertree/AMLQ are, however, at a significant disadvantage because Terra is the manager of the Company and oversees its day-to-day operations. Thus Terra is in possession of relevant knowledge that Peppertree/AMLQ do not have, including actions they are taking and/or causing the Company to take, such as unauthorized Company funds that are being disbursed to affiliates of Terra to develop rejected sites, and where and how those funds are being diverted and used. Depositions are the discovery tool Peppertree/AMLQ need to ascertain the additional underlying facts necessary to litigate their claims and defend against Terra's counterclaims. Thus, it is telling that Terra Respondents are opposed to depositions that would allow Peppertree/AMLQ to discover these crucial facts. In light of these circumstances, document discovery alone is woefully insufficient. Peppertree's claims, brought derivatively on behalf of the Company, implicate complicated financial transactions and embezzlement; documents without the clarity and explanations offered by accompanying testimony will not provide Peppertree with the facts it is entitled to regarding what actions were taken on behalf of the Company and why they were taken. Accordingly, Peppertree/AMLQ should be entitled to take depositions to ensure that they (1) receive the opportunity to discover the facts they need; (2) are fully prepared for the merits hearing; and (3) achieve a full and fair opportunity to conduct the discovery that is needed to present their case in the way they see fit.

Finally, Peppertree/AMLQ has proposed that, in addition to party depositions, each party is entitled to conduct up to five depositions because Peppertree/AMLQ expect that they will require the deposition testimony of at least the following individuals to support their claims and defend against Terra's counterclaims:

- The Terra Board members who caused the Company to take unauthorized actions

---

*See* Paul D. Friedland and Lucy Martinez, *Arbitral Subpoenas under U.S. Law and Practice*, 14 Am. Rev. Int'l Arb. 197 (2003) (emphasis added).

- without majority Board approval, in contravention of the Shareholders Agreement and other governing documents;

- The CEO of the Company, who was responsible for overseeing the Company and acting in its best interests and in accordance with the Company's governing documents, as well as high level Company executives who worked with him or at his direction; and

- The CFO of the Company, who caused unauthorized Company funds to be disbursed and would be able to identify where those funds went and who directed those disbursements.

Given the scope of this case and the significant amount in controversy, up to five non-party depositions is a relatively low and streamlined number and in no way disproportionate to the stakes or magnitude of this case.[10]

C. **Document Discovery Should be Handled as it Normally is in Complex Commercial Cases**

With respect to a proposed document production timeline, the Terra Respondents' proposed schedule contemplates that the parties produce all "documents not objected to" simultaneously with serving their written objections (just one month after receiving document production requests); and then requires that the parties produce any documents that were objected to and that the Panel orders to be produced just three weeks after the tribunal so rules.

In contrast, and more realistically, Peppertree/AMLQ's proposed schedule contemplates staggered deadlines for serving document requests, serving objections to those requests, resolving any contested requests, and substantially completing productions, with productions to be made to requests not objected to on a rolling basis during this period, and productions of documents that were previously objected to be made within approximately five weeks of the Panel's ruling. (*See* Appendix A to the Proposed Order).

The Terra Respondents' proposed production timeline is not workable. The Parties collectively assert twenty claims, including breaches of contract and fiduciary duties that arise from commercial interactions between multiple representatives of each party spanning several years. Peppertree's claims in particular involve, among other things, allegations that the Terra Respondents have caused the Company to take unapproved actions to benefit themselves and their affiliates, which implicate accounting and asset-tracing issues. For a case of this size and complexity, involving numerous disputed issues covering a multi-year period, it is not realistic to expect the Parties to produce all documents that are not subject to objections within a 30 day time period, nor is it realistic for the parties to produce all documents ordered by the Panel within a month of the Panel's ruling. In addition to being impractical, the Terra Respondents' proposed timeline would result in an inefficient production schedule and likely multiply the number of disputes. In particular, the Terra Respondents' proposed timeline contemplates that the Parties

---

[10] Peppertree/AMLQ also propose that the Parties are entitled to expert discovery, including depositions, which is reflected in the Procedural Timetable at Appendix A to the Proposed Order.

8

making a single production of non-objected-to documents, and then a single production of all objected-to documents, unlike Peppertree/AMLQ's proposed schedule, which contemplates rolling productions, as is typical in disputes of this type and magnitude and facilitate the production and review of documents in a more efficient and orderly fashion. In addition, the Terra Respondents' proposal that the Parties produce *all* "documents not objected to" simultaneous with serving their written objections and just one month after receiving document requests will likely result in parties making more objections than they otherwise would due to the impracticality of the one-month deadline. This, in turn, would increase the number of disputes, needlessly burdening both the Parties and the Panel. The staggered deadlines for serving document requests, serving objections to those requests, and substantially completing productions reflected in Peppertree/AMLQ's proposed schedule provides the Parties with a meaningful opportunity to identify and produce relevant documents and meet and confer on disputed issues without objecting and initiating unnecessary discovery disputes prematurely.

With respect to the format of document requests and objections, the Terra Respondents proposed that document production requests and objections be drafted in accordance with Articles 3(2) and 3(3) of the IBA Rules and that document production requests, responses, and applications be made using a common form of Redfern Schedule, as agreed-upon by the Parties. In contrast, Peppertree/AMLQ have proposed that document production requests be made in the form of requests and responses/objections commonly used in AAA arbitrations conducted pursuant to the Commercial Rules, and that objections be resolved by the panel through concise letter-motions of no more than 10 pages. Peppertree/AMLQ's proposed format for document requests and objections is aligned with the Parties' agreement on the governing rules and the complex nature of this case, whereas the Terra Respondents' proposal is not. The Terra Respondents' proposal that the IBA Rules "guide" the parties' document production requests, and that the parties agree to a common form of the Redfern Schedule (which is premised on the IBA Rules), is inconsistent with the parties' agreement that the AAA Commercial Rules, not the IBA Rules, govern this Arbitration. *See* Shareholders Agreement, § 8.15 ("The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association in effect at the time of the arbitration, except as they may be modified herein or by mutual agreement of the parties."). As stated previously and throughout, neither Peppertree nor AMLQ have ever agreed to the application of IBA Rules and have expressly *objected* to the same. Moreover, creating and maintaining a Redfern Schedule only injects unnecessary complexity to the discovery process and would unnecessarily burden the Parties given that any disputed requests, including the reason for the request and grounds for objections, can be presented concisely to the tribunal in short letter motions, as contemplated by Peppertree/AMLQ's proposed schedule.

> D. **The Use of Witness Statements at the Merits Hearing Should be at the Discretion of the Parties, and the Parties Should be Permitted to Elicit Live Witness Testimony**

Peppertree/AMLQ propose that, at the merits hearing, the Parties be permitted to present witness testimony (for both direct and cross examination) and litigate their case as they see fit. In other words, Peppertree/AMLQ respectfully ask that the Panel allow them to try their case and present their evidence in the manner they see fit to do so. Specifically, the use of witness statements in lieu of direct examination should be at the Parties' discretion, and the Parties should

be permitted to elicit live witness testimony from any witnesses they call (including those called as on cross-examination). (*See* Ex. A, Proposed Order at ¶¶ 73-74). Terra Respondents have rejected this proposal and seek to submit direct examination testimony through witness statements only. (Ex. B, Redline of Proposed Order at rejected ¶ 73). To be clear, under Peppertree/AMLQ's proposal, Terra Respondents should be permitted to do so, if that is what they choose; however, they should not be permitted to impose their preferred approach on Peppertree/AMLQ.

As the Panel undoubtedly knows, live witness testimony is quite common in large, complex commercial cases such as this one. Given the nature of the parties' allegations in this case—including Peppertree's derivative claims against Terra Respondents for misappropriation, embezzlement, and self-dealing, all of which implicate veracity and are akin to misrepresentation and fraud—witness credibility is a crucial issue. Live witness testimony is designed to allow the Panel to judge a witness's credibility in a way that counsel-drafted written statements relating to only the issues that witness feels the need to address, are not. *Alfadda v. Fenn*, 159 F.3d 41 (2d Cir. 1998) ("The ability to secure witness testimony takes on added importance in this action because where, as here, appellants have alleged fraud, live testimony of key witnesses is necessary so that the trier of fact can assess the witnesses' demeanor"); *Iragorri v. United Technologies Corp.*, 274 F.3d 65 (2d Cir. 2001) ("live testimony of key witnesses is necessary so that the trier of fact can assess the witnesses' demeanor").[11] The Supreme Court has found, "[p]articularly where credibility and veracity are at issue ... written submissions are a wholly unsatisfactory basis for decision." *Goldberg v. Kelly*, 397 U.S. 254, 269, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970). Live testimony is especially important here where the extent of Terra's misconduct is presently unclear and the purpose of the hearing testimony should be to ascertain the truth, which is to the benefit of both the Parties and the Panel. Additionally, Respondent Jorge Hernandez, who runs this litigation for Terra Respondents, exerts significant influence over certain key witnesses, including because he employs them and their family members and is responsible for their livelihood. As such, it is much more likely that live examination, as opposed to witness statements, will elicit credible testimony from key witnesses AMLQ/Terra intends to call at the merits hearing. Peppertree/AMLQ welcome the opportunity to testify live in front of the Panel to tell their stories and ensure that they have a full and fair opportunity to be heard. They are entitled to such due process. To the extent the Panel has any doubts regarding the need for live witness testimony at the hearing, such doubts should be resolved in favor of live witness testimonies and permitting the Parties to decide how to present their respective cases.

---

[11] In *Colby v. Klune*, 178 F.2d 872 (2d Cir. 1949), the Second Circuit explained how crucial it was to observe a witness's demeanor instead of conducting a "trial by affidavit":

> We have in this case one more regrettable instance of an effort to save time by an improper reversion to 'trial by affidavit', improper because there is involved an issue of fact, turning on credibility. Trial on oral testimony, with the opportunity to examine and cross-examine witnesses in open court, has often been acclaimed as one of the persistent, distinctive, and most valuable features of the common-law system. For only in such a trial can the trier of the facts (trial judge or jury) observe the witnesses' demeanor; and that demeanor- absent, of course, when trial is by affidavit or deposition- is recognized as an important clue to witness' credibility.

### E. **Peppertree/AMLQ's Proposed Case Schedule is Appropriate Given the Complexity of this Case**

As explained above, given the complexity of this case, the egregious nature of the Parties' claims, and the amounts in controversy, Peppertree/AMLQ should be entitled to substantial discovery, including a limited number of depositions, in order to fully and effectively litigate and present their case. In light of the need for such discovery, Peppertree/AMLQ's proposed schedule of less than eleven (11) months, with a merits hearing in June 2022,[12] is already appropriately aggressive for a case of this scope and magnitude. Given that Terra Respondents propose a fact discovery cutoff of January 2022 and a merits hearing in May 2022—deadlines that are only one month shorter than those proposed by Peppertree/AMLQ—the parties are largely in agreement with respect to how long it will take to conduct discovery and litigate this case.

Additionally, even though both sides' July 29, 2020 proposals to the Panel included deadlines for summary disposition after the close of fact discovery via dispositive motion briefing, Terra Respondents removed these deadlines from the most recent proposal provided to Peppertree/AMLQ. Peppertree/AMLQ continue to believe that dispositive motions will likely be useful in this case to streamline the issues and narrow the Parties' claims in advance of a merits hearing—a process which is to the benefit of all Parties. Specifically, the majority of the Parties' claims are contract claims that are governed by the language of the agreements at issue and are the very type of claims that are more easily decided as a matter of law. Nevertheless, Peppertree/AMLQ appreciate the Panel's guidance and concerns regarding dispositive motion briefing. As a result, the Proposed Order sets forth a procedure by which the Parties may seek leave to file dispositive motions (Ex. A, Proposed Order at rejected ¶ 67), and the proposed schedule therein reserves time for dispositive motion briefing (*id*. at Appendix A). If time is not reserved in the schedule for dispositive motion briefing, should such briefing be appropriate, the schedule will not allow for it in advance of the merits hearing and any such briefing will not be useful in terms of streamlining the issues the Parties must present at the hearing.

### F. **Additional Issues on Which the Parties Disagree**

In addition to the issues set forth above, the Parties' proposals reflect disagreement on the following issues:

- **Place of Arbitration:** There is no dispute that the Parties' governing agreements provide that "[t]he seat of the arbitration shall be New York, New York." (Ex. B, Redline of the Proposed Order at ¶ 8). This language reflects the Parties' intent that the merits hearing be conducted in New York, New York. Nevertheless, Terra Respondents inexplicably rejected Peppertree/AMLQ's proposal to make clear that the final hearing take place in New York, New York.

- **Governing Law:** There is also no dispute that the governing agreements in this

---

[12] Peppertree/AMLQ are available on the proposed hearing dates of June 20, 2022 through June 29, 2022. Should the Panel wish to set an alternate hearing date, Peppertree/AMLQ respectfully request that the Panel conduct a scheduling conference (or employ another procedural mechanism) to ensure all parties' and counsel's availability.

11

case all provide that they "shall be governed by and construed in accordance with the laws of the State of New York." (Ex. B, Redline of Proposed Order at ¶ 9). This language clearly reflects that New York substantive law should be applied to the governing agreements and the Parties' contract claims thereunder, as set forth in Peppertree/AMLQ's proposal. (Ex. A, Proposed Order at ¶ 9). Terra Respondents, however, rejected that proposal and proposed alternate language stating that New York law should be applied "on *issues* or claims *arising from* the parties' agreements." (Ex. B, Redline of Proposed Order at ¶ 9 (emphasis added)). Because claims other than direct breach of contract claims, may "arise from" contracts, Terra Respondents' language is too broad. As reflected in Peppertree/AMLQ's Proposed Order, because the seat of the Arbitration is New York, New York, to determine what substantive law governs any non-contract claims, the Panel should apply the conflict of laws rules and principles of New York. (Ex. A, Proposed Order at ¶ 9).[13]

- **Confidentiality:** Peppertree/AMLQ agree with the Panel's proposal that the arbitration should be confidential while Terra Respondents rejected that proposal. (Ex. B, Redline of Proposed Order at stricken ¶¶ 24, 26, 27). Indeed, one of the primary reasons parties agree to arbitration provisions is to ensure that any disputes between them are not publicly litigated. Peppertree/AMLQ seek the benefit of this confidentiality, which is crucial in this case because Peppertree/AMLQ's primary claims are related to the mandatory sale of the Company. A non-confidential arbitration process will cause harm to Peppertree/AMLQ because it is highly likely to interfere with or frustrate any future sale of the Company, including by tainting the market and having a chilling effect on potential bidders. This is not a hypothetical concern—Terra has already filed a lawsuit against a bidder publicly and issued a press release vowing it will take "all necessary actions" to prevent a sale.

### III. THE ARBITRATION SHOULD BE CONDUCTED IN PHASES TO PERMIT SUMMARY DISPOSITION OF THRESHOLD LEGAL ISSUES RELATING TO (i) THE REQUIRED SALE OF THE COMPANY; AND (ii) TERRA'S CONTINUING USE OF UNAUTHORIZED COMPANY FUNDS TO DEVELOP REJECTED SITES

In response to Chair Goldstein's email of August 2, 2021, Peppertree/AMLQ respectfully request that the Panel allow a "first phase" of summary disposition on two threshold legal issues: (i) whether Peppertree/AMLQ are entitled to specific performance of the provisions of Section 5.04(b) of the Shareholders Agreement related to the sale of the Company; and (ii) whether Peppertree, derivatively and on behalf of the Company, is entitled to specific performance of Section 1.1(c) of the Development Agreement and Sections 4.03(d) and 4.04 of the Shareholders Agreement, which do not permit the Company to move forward and develop towers sites that have been rejected by the Development Committee or the Board of Directors. Peppertree/AMLQ

---

[13] By way of example, Terra has alleged claims for breach of fiduciary duty, which are not governed by New York law because the Company is not a New York corporation. The governing law to be applied to these claims should be determined by New York conflict of laws principles.

submit that conducting the Arbitration using this "phased" approach would allow the Panel to resolve some of the most important and urgent disputed issues in a more expeditious and efficient manner.

Peppertree/AMLQ propose that the early summary disposition motion on the above-referenced issues be filed and briefed concurrently with the Procedural Timetable set forth as Appendix A to the Proposed Order (*see* Exhibit A), and that the motion be limited to addressing the following claims and counterclaims asserted by the parties: (i) the third claim for relief at paragraphs 192 – 205 of Peppertree's Amended Statement of Claims (seeking specific performance of Section 5.04(b) of the Shareholders Agreement); (ii) the third claim for relief at paragraphs 73 – 84 of AMLQ's Amended Counterclaims (seeking specific performance of Section 5.04(b) of the Shareholders Agreement); and (iii) the portion of Peppertree's derivative claim for breach of contract at paragraphs 252 – 259 related to the future use of Company resources to build and/or develop unapproved sites. Peppertree/AMLQ propose that the motion be limited to 25 pages and due on August 27, 2021; that any opposition be limited to 25 pages and due September 10, 2021, and that any reply be limited to 10 pages and due September 17, 2021.

### A. Contractually Required Sale of the Company

The threshold issues that must be resolved to decide the proposed sale claims are straightforward: (i) whether Peppertree triggered the required sale process set forth in Section 5.04(b) of the Shareholders Agreement; (ii) if so, whether Terra has breached Section 5.04(b) by failing and refusing to comply with the required sale process; and (iii) if so, whether specific performance of Section 5.04(b) of the Shareholders Agreement is warranted.

The essential facts underlying these issues and the applicable contract provisions are just as straightforward. Peppertree submitted two notices pursuant to Section 5.04(b) of the Shareholders Agreement requesting a sale of the Company—the first of which attached a Proposed Offer, and the second of which did not. Terra refused (and continues to refuse) to proceed with a sale process in response to either notice. Section 5.04(b) provides that if a party objects to a Proposed Offer attached to a sale notice (as Terra did in response to Peppertree's first proposed sale notice) or receives a notice that does *not* attach a Proposed Offer (as was the case with Peppertree's second notice), then in either case the Company shall "retain an Investment Bank to facilitate an Approved Sale" and the party "shall vote for, consent to and raise no objections against" and "take all necessary and reasonable actions in connection with the consummation of" an Approved Sale. In addition, the parties explicitly agreed in Section 8.12 that they each "shall be entitled to specific performance of the terms hereof" and consent to the enforcement of a remedy "compel[ling] specific performance of all of the terms hereof."

All of these facts are undisputed, and copies of the relevant documents—the Shareholders Agreement, the sale notices, and related correspondence—are already in possession of the parties. As a result, no document disclosure or other discovery is required to decide these issues, and the Tribunal could issue a ruling on this matter based upon a straightforward application of the terms of the Shareholders Agreement to the undisputed facts. Importantly, Section 5.04(b) can be triggered whether or not a sale notice attaches a Proposed Offer, and, as noted above, Peppertree submitted a second sale notice that did *not* attach a Proposed Offer. As a result, while Terra

disputes whether the Torrecom proposal attached to Peppertree's first sales notice constitutes a "Proposed Offer," that argument is irrelevant to Peppertree/AMLQ's claim for specific performance of Section 5.04(b). Even if Terra is right about Torrecom's proposal (it is not), Peppertree/AMLQ are nonetheless entitled to an award directing Terra to comply with its obligations to facilitate a sale of the Company.[14] Such a ruling will help to streamline the case. Moreover, starting the sale process following the first phase of the Arbitration will facilitate the quantification of Peppertree/AMLQ's damages claims, if any, in the second phase, as the parties will then be better able to determine the extent to which Terra's delay and obstruction negatively impacted a sale. Peppertree/AMLQ bargained for the unequivocal right to begin a sale process in 2020 and exit their investments in the Company promptly thereafter; Peppertree/AMLQ have already waited nearly a year to do so and any further delay only further prejudices them. To the extent Peppertree/AMLQ seek damages following enforcement of the "forced sale" provision, such damages will be pursued in the second phase of the Arbitration.

### B. Continued Unauthorized Use of Company Funds to Develop Rejected Sites

The threshold issues that should be resolved to decide whether Peppertree (derivatively, on behalf of the Company) is entitled to specific performance of the contracts in connection with site rejections are: (i) whether the Board and/or Development Committee were permitted, under the Shareholders Agreement and Development Agreement, respectively, to reject towers sites proposed by Terra at their discretion; (ii) if so, whether Terra was permitted to use Company funds to build and/or develop sites over the Board and/or Development Committee's rejection thereof; and (iii) if not, whether Peppertree is entitled to specific performance of Section 1.1(c) of the Development Agreement and Sections 4.03(d) and 4.04 of the Shareholders Agreement such that Terra is not permitted to continue to use unauthorized Company funds to develop future rejected sites.

The essential facts underlying these issues and the applicable contract provisions are just as straightforward as those relating to the sale of the Company. The governing agreements could not be clearer: Terra *cannot* use Company funds to develop sites that have been expressly rejected by the Development Committee and/or the Board. The underlying facts are undisputed that Terra is developing sites without Board or Development Committee approval, and, indeed, in the face of rejection of those sites, as well as paying the costs for such sites to one of its affiliates, DT Holdings. Both Terra and Peppertree are in possession of documents reflecting the same. Terra's only response is that the Peppertree Board and/or Development Committee members should not reject proposed sites even though the governing agreements unequivocally provide them with the unrestricted right to do so and, conversely, do not provide Terra with the right to take actions on behalf of the Company without the required Board and Development Committee approvals. Terra Respondents have a significant financial motive for Terra's continued breaches of the Shareholders Agreement and Development Agreement by developing rejected sites: DT Holdings receives $175,000 for the development of any site, regardless of whether such development is in the best interests of the Company. Thus, as clearly set forth in Peppertree's Amended Statement of Claims,

---

[14] Due to Terra's systematic, egregious, and pervasive wrongful conduct in frustrating and actively obstructing any required sale process, to the extent that Peppertree/AMLQ prevail on their dispositive motion on this issue and a sale of the Company is ordered by the Panel, Peppertree/AMLQ will seek that the Panel exercise continuing jurisdiction over such process.

14

approval and construction of all sites is desirable for DT Holdings and Jorge Hernandez (who owns and controls both DT Holdings and Terra), regardless of the long-term profitability of the project to the Company and whether the tower even becomes operational. (Peppertree's Amended Statement of Claims ¶ 17). To be clear, due to Terra's continued breaches of contract and failure to abide by the binding decisions of the Board and the Development Committee with respect to rejected sites, Peppertree will be seeking specific performance on this portion of its breach of contract claim on a going forward basis. As set forth in its Amended Statement of Claims, any prior breaches of this nature will be addressed by monetary damages and litigated in the second phase.

\* \* \*

Terra objects to a phased approach, claiming that all of Terra's claims are "inextricably intertwined with the merits" of the proposed sale claims and that the issues cannot "be segregated so as to make interim relief possible." Peppertree/AMLQ disagree. Terra seeks only monetary relief for all of its counterclaims, (*see* Terra Counterclaims at Relief Sought); thus, to the extent any of Terra's counterclaims have merit (which they do not), Terra is free to pursue damages for those claims regardless of how and when the proposed sale claims or the unauthorized tower funding claims are resolved. Terra, however, is *not* free to lock up Peppertree/AMLQ in the Company indefinitely—or to continue flagrantly embezzling Company funds—while Terra litigates its meritless breach claims. Peppertree/AMLQ's request for specific performance of the proposed sale provisions, and Peppertree's request for specific performance of the provisions related to Board and Development Committee approvals of tower sites, therefore can and should be decided first.

## IV. CONCLUSION

For the foregoing reasons, Peppertree/AMLQ respectfully request that the Panel order the following:

(1) That the Proposed Order, attached hereto as Exhibit A, is entered in this Arbitration; and

(2) That in "Phase 1" of the Arbitration, the Panel permit requests for summary disposition on the following two threshold legal issues: (i) whether Peppertree/AMLQ are entitled to specific performance of the provisions of Section 5.04(b) of the Shareholders Agreement related to the sale of the Company; and (ii) whether Peppertree, derivatively and on behalf of the Company, is entitled to specific performance of Section 1.1(c) of the Development Agreement and Sections 4.03(d) and 4.04 of the Shareholders Agreement, which do not permit the Company to move forward and develop towers sites that have been rejected by the Development Committee or the Board of Directors.

At the Panel's discretion, Peppertree/AMLQ remain willing to answer any questions and/or to discuss these issues in more detail should the Panel so request.

August 6, 2021

Respectfully submitted,

/s/ Michael N. Ungar
Michael N. Ungar
(Ohio Bar No. 0016989)
Katherine M. Poldneff
(Ohio Bar No. 0088529/
NY Registration No. 4361259)
Gregory C. Djordjevic
(Ohio Bar No. 0095943)
**ULMER & BERNE LLP**
1660 W. 2nd St., Ste. 1100
Cleveland, Ohio 44113
Tel: (216) 583-7000
Fax: (216) 583-7001
mungar@ulmer.com
kpoldneff@ulmer.com
gdjordjevic@ulmer.com

David A. Landman
(NY Registration No. 4403993)
**ULMER & BERNE LLP**
420 Lexington Avenue, Ste. 2733
New York, NY 10170
Tel: (917) 262-0470
Fax: (917) 262-0480
dlandman@ulmer.com

*Counsel for Telecom Business Solution, LLC, LATAM Towers, LLC, and Messrs. Mandel, Ranieri, and Lepene*

s/ Gregg L. Weiner_____
Gregg L. Weiner
Christian Reigstad
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, NY 10036
Tel: (212) 596-9000
Fax: (212) 596-9090
Gregg.weiner@ropesgray.com
Christian.reigstad@ropesgray.com

Daniel V. Ward
Katherine M. McDonald
**ROPES & GRAY LLP**
800 Boylston Street
Boston, MA 02199-3600
Tel: (617) 951-7000
Fax: (617) 951-7000
Daniel.ward@ropesgray.com
Katherine.mcdonald@ropesgray.com

*Counsel for AMLQ Holdings (Cay), Ltd.*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served via email on August 6, 2021 on all counsel of record, the Arbitration Panel, as well as Mr. Luis Martinez and Ms. Ana Lombardia of the ICDR.

*/s/ Michael N. Ungar*
*Counsel for Telecom Business Solution,*
*LLC, LATAM Towers LLC, and Messrs.*
*Mandel, Ranieri, and Lepene*

Ulmer2020:200341455v2
45261.00000