# EXHIBIT 20

# ARBITRATION PURSUANT TO THE COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| TELECOM BUSINESS SOLUTION, LLC, on its own behalf and derivatively, on behalf of CONTINENTAL TOWERS LATAM HOLDINGS LIMITED and LATAM TOWERS, LLC, on its own behalf and derivatively, on behalf of CONTINENTAL TOWERS LATAM HOLDINGS LIMITED,<br><br>    Claimants,<br><br>v.<br><br>TERRA TOWERS CORP., TBS MANAGEMENT, S.A., DT HOLDINGS INC., JORGE HERNANDEZ and ALBERTO ARZU,<br><br>    Respondents,<br><br>and<br><br>CONTINENTAL TOWERS LATAM HOLDINGS LIMITED,<br><br>    Nominal Respondent. | Case No. 01-21-0000-4309 |
| TERRA TOWERS CORP. and TBS MANAGEMENT, S.A., derivatively and on behalf of CONTINENTAL TOWERS LATAM HOLDINGS LIMITED<br><br>    Counterclaimants,<br><br>v.<br><br>TELECOM BUSINESS SOLUTION, LLC, LATAM TOWERS, LLC, F. HOWARD MANDEL, JOHN RANIERI, RYAN LEPENE, and AMLQ HOLDINGS (CAY), LTD.,<br><br>    Counterclaim Respondents.<br><br>and<br><br>CONTINENTAL TOWERS LATAM HOLDINGS LIMITED,<br><br>    Nominal Counterclaim Respondent. | |

| |
|---|
| AMLQ HOLDINGS (CAY), LTD. |
|     Counterclaimant, |
| v. |
| TERRA TOWERS CORP. AND TBS MANAGEMENT, S.A. |
|     Counterclaim Respondents. |

**TERRA TOWERS CORP. AND TBS MANAGEMENT, S.A.'S
SUPPLEMENTAL SUBMISSION RELATING TO BIFURCATION**

Respondents/Counterclaimants Terra Towers Corp. and TBS Management, S.A. (hereinafter, "Terra"), pursuant to the Tribunal's August 7, 2021 correspondence to the parties, hereby submit this supplemental submission objecting to Claimants/Counterclaim Respondents Telecom Business Solution, LLC's, LATAM Towers, LLC's (collectively, "Peppertree") and Counterclaimant/Counterclaim Respondent AMLQ Holdings (CAY), LTD.'s ("AMLQ") request to bifurcate these proceedings with respect to Continental Towers LATAM Holdings Limited's (the "Company") development of Towers.[1]

## I. INTRODUCTION

Peppertree's claim for specific performance of the parties' agreements with respect to the development of Tower sites proposed by Terra should *not* be bifurcated from the hearing-at-large because a plain reading of Terra's Counterclaim illustrates that the issue is inextricably intertwined with the merits of the overarching dispute.

In its August 6, 2021 Submission, Peppertree states that the parties' "governing agreements could not be clearer: Terra *cannot* use Company funds to develop sites that have been expressly rejected by the Development Committee and/or the Board." PPT-AMLQ Aug. 6, 2021 Submission

---

[1] All capitalized terms not defined herein shall have the meaning as defined in the parties' contracts.

2

at 14. However, Peppertree conveniently omits the factual predicate underlying the period in question. First, it was not *Terra* who made the decision to develop sites but instead, the Company's management. Second, during this period, Peppertree, unilaterally and without any commercial basis, rejected thousands of offers by Terra to develop Towers throughout Latin America to depress the Company's value, paralyze its operations and profitability, and pressure Terra, as the Company's majority shareholder, to cave into accepting Peppertree and AMLQ's preferred credit facility. *See generally* Terra's Countercl. ¶¶ 45–76. Indeed, Peppertree and AMLQ subsequently attempted to sell the Company to an affiliated purchaser, Torrecom Partners LP ("Torrecom"), at the depressed value that the minority shareholders orchestrated in a disguised squeeze-out merger. *Id.* ¶ 110. In fact, in a clear illustration of the conflict of interest inherent in this deal, the sale to Torrecom was to be financed through AMLQ's *affiliate*. *Id.* ¶¶ 109–12.

Though Peppertree is quick to discern and judge Terra's financial incentive for proposing development opportunities (*see* PPT-AMLQ Aug. 6, 2021 Submission at 14), Peppertree's own directors exhibited an insurmountable conflict of interest each time they rejected an offer from Terra to develop Towers or conditioned their acceptance on Terra's acquiescence to Peppertree's preferred credit facility. Any discussion about Terra's alleged actions related to the development of Towers cannot be had without considering Peppertree's own course of conduct during this time, which is outlined in Terra's Counterclaim. As such, preliminary litigation of this issue would necessarily invoke the merits of the dispute that contextualize the rest of the parties' claims and counterclaims. For these reasons and those that follow, bifurcation would be inappropriate and duplicative of the parties' work and the Tribunal's resources.

## II. ARGUMENT

Peppertree's claim for specific performance of the parties' Shareholders Agreement and

Development Agreement with respect to development of Towers cannot be divorced from Peppertree's own bad-faith breaches of the same contracts. Indeed, Peppertree's assertion that the facts and applicable contractual provisions relating to the development of Towers are "straightforward" and can be resolved summarily cannot be further from the truth. Peppertree's requested relief of this alleged "threshold" issue is that of an injunction essentially prohibiting the Company's management from operating based on Peppertree's bad-faith rejection of tower proposals. As set forth in Terra's Counterclaim, because Peppertree's directors rejected the development of Towers in bad faith, and in breach of the governing documents and duties owed to the Company, the issue of whether an injunction should be entered requires an evidentiary hearing whereby Peppertree must demonstrate it has a substantial likelihood of success on the merits of its claim. To prepare for this hearing, Terra, in turn, is entitled to discovery and the right to present evidence disputing Peppertree's conclusory allegations.[2]

The issue of Tower development goes to the very heart of this dispute. The parties all agreed in the Shareholders Agreement that the purpose of the Company is to "develop, own, acquire and operate directly or indirectly through" its subsidiaries Towers. *See* Shareholders Agreement § 3.01 (stating the "purpose of the Company is to develop . . . Towers"). Notably, the Company's governing documents require Board and/or Development Committee approval before the Company can take actions such as building Towers or making distributions. *See* Development Agreement § 1.1(a), (c); *see also* Shareholders Agreement §§ 4.04 (a)(xx), 5.01(a). Both the Board and Development Committee are controlled by four members, consisting of two directors appointed by Terra and two appointed by Peppertree. While decisions must be approved by the Board/Development Committee, the governing documents do not provide a solution to a deadlock.

---

[2] Peppertree does not request specific performance in its breach of contract claim relating to Tower development and instead seeks only damages. *See* Peppertree's First Am. Demand for Arbitration and Statement of Claims ¶¶ 252–59.

Aware of a lack of a deadlock provision, which was agreed by all parties when drafting the governing documents, and in furtherance of Peppertree's plan to devalue the Company, Peppertree's appointed Directors on the Development Committee summarily rejected and/or ignored multiple opportunities to develop new Towers, thus frustrating the Company's very purpose. Terra's Counterclaim ¶¶ 45–64 (describing the "GS Facility Breach"); *id*. ¶¶ 66–76 (describing Peppertree's "Tower Rejection Breach"). As further alleged in Terra's Counterclaim, Peppertree's plan to devalue the Company derived from Terra's 2017 refusal to approve Peppertree's proposed $60 million credit facility ("GS Credit Facility") from one of AMLQ's affiliates. *Id.* ¶ 47. Peppertree's own counsel, Thompson Hine, conducted an alleged impartial evaluation of the credit facility's sensibility. *Id.* ¶ 48. Yet through its own independent investigation and consultation, Terra came to learn that the credit facility's terms were prejudicial to the Company's and shareholders' interests. *Id.* ¶¶ 49–52.

Peppertree subsequently began to condition Peppertree's approval of business proposals on the Terra Directors' acceptance of the GS Credit Facility. *See, e.g.*, *id.* ¶ 55 ("We are willing to accept this proposal if the Company closes [on] the [GS Credit Facility] within 30 days of today."); *id.* ("We are willing to cooperate with this plan as long as the company closes [on] the [GS] credit facility within 30 days of today"). Moreover, Peppertree, through its director, Mandel, advised Terra on February 7, 2017 that "[f]urther investment for new site development is not something we will pursue at this time." *Id.* ¶ 61. A month later, Mandel reiterated Peppertree's position in an email to Arzú, where he stated that "we [the Peppertree Directors] have been clear to you for months that we are not going to approve any new tower builds or approve new debt financing." *Id.*

Thereafter, Peppertree frustrated the Company's purpose from 2017 to 2019 by rejecting 1,000 tower development opportunities in Colombia and 2,000 in Peru, resulting in a $600,000,000

5

loss in the Company's enterprise value. *Id.* ¶¶ 66–73. The Peppertree directors' course of action contributed to a complete deadlock of the Company's Board and left the Company's management in the uncomfortable position of making independent development decisions to keep the Company afloat. By continuously and systematically rejecting opportunities to develop Towers proposed by Terra, Peppertree expressly and absolutely refused to perform, and/or voluntarily acted in a way which rendered it impossible for Terra to perform under the Shareholders Agreement. *Id.* Thus, Peppertree's continuous and baseless rejections violated the "purposes clause" of the Shareholders Agreement, among other violations of law. Without the ability to develop Towers, the Company's corporate purpose is rendered void and its value plummets.[3]

Peppertree's rejection of opportunities in Colombia was especially duplicitous in light of its partner, Goldman Sachs & Co., LLC's ("Goldman Sachs"), interest in Cell Site Solutions, a competing telecommunication company in Colombia. *Id.* ¶¶ 73–76. Peppertree's directors were plainly interested in protecting Goldman Sachs' foothold in the Colombian telecommunication towers market and, as such, rejected opportunities for the Company to develop towers in the territory. In safeguarding Goldman Sachs' interest to the detriment of the Company's, Peppertree's directors undeniably violated their fiduciary duties of care, loyalty, good faith, and candor to the Company's shareholders. *See id.* ¶¶ 150–54, 156–59. Moreover, these same breaches of their contractual obligations were apparent on the face of Peppertree's systemic rejection of development opportunities over the course of two years, resulting in an irreversible depression of the Company's value by the time preparations for its sale commenced in 2020. Without question, the minority shareholders' goal was to, in essence, squeeze out Terra, force a buyout, and thereafter

---

[3] The Company's management also issued distributions to both Peppertree and AMLQ in 2020 (Terra's Countercl. ¶¶ 123–28), yet Peppertree isn't eager to have the Tribunal rule on this issue.

6

purchase the Company at a bargain price via an AMLQ affiliate. Indeed, that is exactly what Peppertree and AMLQ attempted the Torrecom offer. *Id.* ¶¶ 109–10.

Needless to say, all of these issues related to Tower development are inextricably intertwined with the merits of this case and it is simply impractical to decide these issues on a piecemeal basis. For example, Terra argues that Peppertree anticipatorily breached the Shareholders Agreement when it systematically set out to reject towers to devalue the company. "Anticipatory repudiation occurs when a party 'attempt[s] to avoid its obligations by advancing an untenable interpretation of the contract, or . . . communicate[s] its intent to perform only upon the satisfaction of extracontractual conditions.'" *Fonda v. First Pioneer Farm Credit, ACA*, 86 A.D.3d 693, 694–95 (N.Y. App. Div. 2011) (internal citations omitted). "Such conduct excuses the non-repudiating party from further performance and entitles it to claim damages for total breach." *Id*. Thus, this Panel must decide whether Peppertree breached the Shareholders Agreement by systematically rejecting Towers, whether such breach excused Terra's future performance, and whether Terra is somehow responsible for management's decision to continue operating the Company in light of Peppertree's bad-faith creation of a deadlock. These issues, of course, can only be decided after discovery and the presentation of evidence.

To the extent Peppertree cites to the letter of the contract and its business judgment in support of its conduct, such a defense would also necessarily invoke the allegations of Terra's Counterclaim. "Generally, the actions of directors and majority shareholders are protected by the business judgment rule, which bars inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes." *Lippman v. Shaffer*, 836 N.Y.S.2d 766, 772 (N.Y. Sup. Ct. 2006) (internal quotations omitted) (quoting in part *Auerbach v. Bennett*, 47 N.Y.2d 619 (N.Y. 1979)). However, "[t]he

business judgment rule will not protect interested directors in certain situations." *Id.*; *see also In re Perry H. Koplik & Sons, Inc.*, 476 B.R. 746, 795–96 (Bankr. S.D.N.Y. 2012) (finding that under New York law, "[w]hen a corporate director or officer has an interest in a decision, the business judgment rule does not apply"). Indeed, directors' "decisions are not protected by the business judgment rule if they were the product of fraud, bad faith, self-dealing, or lack of due care." *U.S. Small Bus. Admin. v. Feinsod*, 347 F. Supp. 3d 147, 161 (E.D.N.Y. 2018). "Directors are self-interested in a challenged transaction where they will receive a direct financial benefit from the transaction which is different from the benefit to shareholders generally." *Lippman*, 836 N.Y.S.2d at 772 (quoting *Marx v. Akers*, 88 N.Y.2d 189, 202 (N.Y. 1996)). "Where such self-interest exists, the burden shifts to the self-interested director to demonstrate the 'entire fairness' and reasonableness of the actions." *Id.* (quoting in part *Alpert v. 28 Williams St. Corp.*, 63 N.Y.2d 557 (N.Y. 1984)); *see also, e.g.*, *In re Kenneth Cole Prods., Inc.*, 27 N.Y.3d 268, 275 (N.Y. 2016).

Peppertree's directors were interested in depriving the Company of business opportunities in Colombia and Peru to depress the Company's value overall and force a buyout to Terra's detriment. Peppertree's unilateral, bad-faith conduct resulted in a deadlock of the Company's Board and forced the Company's management to pursue business opportunities in the form of Tower development. This issue, therefore, must be evaluated against the backdrop of the parties' contracts, the Peppertree directors' conflict of interest, and the fairness of their conduct, all of which speaks to the merits of this dispute. Indeed, the determination of this issue requires extensive discovery and the opportunity for both sides to present comprehensive evidence, neither of which will occur if the Tribunal summarily disposes of the matter and awards specific performance during a preliminary phase of these proceedings, as Peppertree and AMLQ request. Any ruling regarding the development of Towers inevitably forces the Tribunal to rule upon the allegations in

Terra's Counterclaim because the issues are inextricably intertwined, rendering bifurcation inappropriate.

## III. CONCLUSION

As evidenced above, the Tower development issue is not a "straightforward" one that can be disposed in a summary fashion. The Tribunal should reject Peppertree's proposal of a phased approach and allow the parties to participate in discovery to properly bring these intertwined issues before the Tribunal at a final hearing.

Dated: August 10, 2021                                     Respectfully submitted,

**CAREY RODRIGUEZ MILIAN, LLP**                            **SANCHEZ FISCHER LEVINE, LLP**
1395 Brickell Avenue, Suite 700                            1200 Brickell Avenue, Suite 750
Miami, Florida 33131                                       Miami, Florida 33131
Telephone: (305) 372-7474                                  Telephone: (305) 925-9947

*/s/ Juan J. Rodriguez*                                    */s/ David M. Levine*
Juan J. Rodriguez                                          David M. Levine
Fla. Bar No. 613843                                        Fla. Bar No. 84431
Email: jrodriguez@careyrodriguez.com                       New York No. 5079942
Jennifer M. Hernandez                                      Email: dlevine@sfl-law.com
Fla. Bar No. 1018836                                       Paola Sanchez Torres
Email: jhernandez@careyrodriguez.com                       Fla Bar No. 99639
                                                           Email: psanchez@sfl-law.com

*Counsel for Terra Towers Corp., and TBS Management, S.A.,*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served via email on August 10, 2021 on all counsel of record, the Arbitration Panel, and Mr. Luis Martinez and Ms. Ana Lombardia of the ICDR.

By: *Juan J. Rodriguez*
Juan J. Rodriguez