# EXHIBIT 22

**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**
**International Arbitration Tribunal**

**CASE NUMBER 01-21-0000-4309**

**ARBITRATION PURSUANT TO**
**THE COMMERCIAL ARBITRATION RULES OF**
**THE AMERICAN ARBITRATION ASSOCIATION**

**BETWEEN:**

TELECOM BUSINESS SOLUTION, LLC, on its own behalf and derivatively, on behalf of
CONTINENTAL TOWERS LATAM HOLDINGS LIMITED, and LATAM TOWERS, LLC,
on its own behalf and derivatively on behalf of CONTINENTAL TOWERS LATAM
HOLDINGS LIMITED,

Claimants,

vs.

TERRA TOWERS CORP., TBS MANAGEMENT,S.A., DT HOLDINGS INC., JORGE
HERNANDEZ and ALBERTO ARZÚ,

Respondents,

and

CONTINENTAL TOWERS LATAM HOLDINGSLIMITED,

Nominal Respondent,

---

TERRA TOWERS CORP., TBS MANAGEMENT,S.A., DT HOLDINGS INC. derivatively and
on behalf of CONTINENTAL TOWERS LATAM HOLDINGS LIMITED,

Counterclaimants,

vs.

TELECOM BUSINESS SOLUTION, LLC, LATAM TOWERS, LLC, F. HOWARD
MANDEL, JOHN RANIERI, RYAN LEPENE, and AMLQ HOLDINGS (CAY) LTD.,

Counterclaim Respondents.

-and-

1

CONTINENTAL TOWERS LATAM HOLDINGS LIMITED,

Nominal Respondent.

---

AMLQ HOLDINGS (CAY) LTD.,

Counterclaimant,

vs.

TERRA TOWERS CORP. and TBS MANAGEMENT,S.A.

Counterclaim Respondents.

---

**PARTIAL FINAL AWARD
CONCERNING SALE OF THE COMPANY**

WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with an arbitration provision contained in the Shareholders Agreement, dated October 22, 2015, between and among Claimants Telecom Business Solution, LLC and Latam Towers LLC ("Peppertree Claimants"), AMLQ Holdings (Cay) Ltd. ("AMLQ") a Counterclaim Respondent and Counterclaimant, aligned with the Peppertree Claimants (collectively hereinafter "Claimants"), Respondents Terra Towers Corp. and TBS Management S.A. ("Terra" or the "Shareholder Respondents"), and nominal party Continental Towers Latam Holdings Limited, and having been duly sworn, and having duly heard and considered the proofs and allegations of the parties, do hereby issue this Partial Final Award.

**I.       Introduction**

2

1. This arbitration involves claims and counterclaims between the majority and minority owners of a company, Continental Towers LATAM Holdings, Ltd. ("Continental" or the "Company"), whose business is the development and operation of telecommunications towers in Central and South America. The Company was formed in 2015 when investors, the Claimants here, made a private equity investment in the Company's predecessor, until then wholly owned by or through affiliates of the Respondents Terra Towers Corp. and TBS Management S.A. (together, herein referred to as "Terra") each of which is controlled by Respondent Jorge Hernandez. Terra became the majority shareholders of the Company, holding about 55%, and Claimants become the minority shareholders, holding about 45%. Claimants Telecom Business Solution, LLC and Latam Towers LLC are affiliates of a Cleveland, Ohio private equity firm, Peppertree Capital. Claimant AMLQ Holdings is an affiliate of Goldman Sachs.

2. Greatly simplified, the business model of the Company is to build telecom towers at suitable locations and then rent "space" on the towers to mobile communications operators. The construction of towers is an expense not a revenue stream for the Company, but such construction is a revenue stream for an affiliate of the majority shareholders, DT Holdings ("DTH"), a Respondent in this case. DTH is paid by the Company for the construction. One key element of the disputes in this arbitration is the divergent views of the majority and minority shareholders about what towers should be built and where, and the minority shareholders defend their having opposed certain tower construction, that the majority shareholders advocated, on the basis that the towers would not be profitable to operate. The majority shareholders, for their part, contend that the minority's opposition to tower construction has had a different and allegedly improper motive: to depress the value of the Company so that an alleged affiliate of one of the minority shareholders could acquire the Company at an artificially low price.

3. The Company, Continental, is a "nominal" party to this arbitration, because the case mainly presents disputes between the majority and minority shareholder groups. However, certain of the shareholders' claims and counterclaims purport to be asserted derivatively on behalf

3

of Continental. When Claimants made their investments in 2015, this entailed the creation of Continental as a new corporate entity with a set of new agreements contemporaneously executed that include a Shareholder Agreement (the "SHA" or "Agreement"), Articles of Association and By-Laws, and a Development Agreement and other agreements to which DTH is a party, including a service agreement with DTH whereby the Company pays DTH to provide the operating and management functions of Continental in consideration of a stipulated monthly payment by the Company.

4. In a procedural order issued in August 2021, the Tribunal after hearing the Parties decided that a Phase 1 of the arbitration would be conducted to determine whether to grant Claimants' claims for specific performance in regard to two matters. The first matter involves the sale of the Company. The SHA provides that after five years from the date of Claimants' investment, a sale of the Company would occur if the sale process defined in the SHA were initiated by Claimants according to the stated procedure. Claimants did purport to initiate that procedure, but due to objections by Terra the initiative culminated in this arbitration, commenced in February 2021, rather than in the sale of the Company. The first question presented in this Phase 1 is whether the Tribunal should grant specific performance by an Award directing a sale of the Company in the manner provided in the SHA. The second matter in Phase 1 concerns the process for the Company to make decisions about construction of new towers. It is alleged by Claimants and not disputed by Respondents that certain tower construction has taken place at the Company's expense, with payments having been made to DTH for such construction, despite the fact that the Board of the Company did not approve the new towers, the Claimants' representatives on the Board having voted in opposition. The Parties dispute whether those tower rejections by Claimants' appointees to the Board were proper. But the question presented in Phase 1 is whether Claimants are entitled *prospectively* to specific performance of the Agreements' provisions for approval of new tower construction – that is to say, for Board approval as a condition of such construction -- or whether alternatively Claimants are limited to a damages remedy for any harm caused to their shareholder interests (or the Company, on whose behalf they also bring the case in a derivative capacity) as a result of the Company having proceeded with tower construction rejected by its Board of Directors, but

nevertheless directed by Terra. Respondents have made extensive factual and expert submissions purporting to show that there is no such injury but that instead the Company and the Claimants as minority shareholders have benefited and will continue to benefit from new tower construction of the type that Claimants' Board representatives have disapproved.

5. After full briefing and an oral hearing on both issues[1], the Parties elected to attempt negotiation of a potential solution concerning the second matter of Phase 1 - the towers approval branch of Phase 1.[2] The Parties have not reported further concerning the towers approval matter. Accordingly, this Partial Final Award concerns only specific performance with respect to the SHA process for sale of the Company. To be clear, the towers approval matter, and the Company sale matter, involve separate and distinct alleged breaches of the SHA; they are not factually dependent on one another. They were linked only by the common issue of interpretation and application of the SHA's provision, discussed below,

---

[1] All Claimants as a group, and all Respondents as a group, agreed to make written submissions jointly. Claimants and Respondents each submitted two Phase 1 Memorials, consisting of Memoranda of Law, Witness Statements, Exhibits, and (in the case of Respondents) Expert Reports. Claimants and Respondents also made written submissions invited by the Tribunal in response to specific questions presented by the Tribunal. The Parties agreed that there was no need for cross-examination of witnesses in the Phase 1 Oral Hearing. That Oral Hearing proceeded on December 1, 2021, via Zoom, with the Tribunal assembled in person together at the hearing facilities of the American Arbitration Association in New York. Following that hearing, on December 9, 2021, Respondents submitted an application (not authorized by the Tribunal) to reconsider the original determination to treat the issue of specific performance in Phase 1, to re-consolidate the Phase 1 issues into Phase 2, and decide all issues at the conclusion of Phase 2. This submission also contained certain comments about how Respondents would wish to see a Company sale process proceed, if at all. Initially, on December 10, 2021, the Tribunal declined to receive Respondents' December 9 submission as it was not an authorized submission. Ultimately, by order dated December 20, 2021, the Tribunal determined that it would receive Respondents' December 9, 2021 submission and treat it as a post-hearing brief, permit a responsive post-hearing brief from Claimants on or before January 6, 2022, and a post-hearing reply brief from Respondents on or before January 13, 2022. The Tribunal also invited the Parties, in their submissions, to address what powers the Tribunal might or might not have to include in a specific performance award directing the sale of the Company any possible provisions concerning the sale process that are not specified in the SHA. Based on that December 20, 2021 Order, the record on which this Award is based includes Respondents' December 9, 2021 submission, Claimants' submission dated January 6, 2022, and Respondents' submission dated January 13, 2022.

[2] *See* Email from the Peppertree Claimants' counsel to the Tribunal dated December 8, 2021.

concerning specific performance as a remedy for non-performance of the terms of the SHA. The Parties' decision to negotiate on the towers approval matter does not affect the finality of this Partial Final Award.    Similarly, this Partial Final Award does not affect our continuing jurisdiction to hear the towers approval dispute if the Parties are unable to resolve it amicably.

## II. Relevant Provisions of the Agreements

### A. Provisions Concerning Sale of the Company

6. Section 5.04 of the Shareholders Agreement entitled "Sale of the Company" provides in sub-section (b) entitled "Approved Sale" (as quoted here with omissions to exclude irrelevant phrases; emphases are original):

> Following the earlier of (i) the expiration of the Lock-Up Period, or [certain other events not relevant here] ... then within ninety (90) days of such event...the Initial B Shareholder[s][3] ... may request, upon written notice to the other Initial Shareholders and the Company (the "**Proposed Sale Notice**"), a sale of all or substantially all of the Company's assets or all or substantially all of the Shares in the Company (in one or more transactions) to an unaffiliated Third Party Purchaser (an "**Approved Sale**").
>
> (i)     If the Proposing Shareholders have already procured or received an offer from an unaffiliated Third Party Purchaser to purchase the assets or Shares of the Company (a "Proposed Offer"), the Proposed Sale Notice shall disclose in reasonable detail the identity of the prospective purchaser and the proposed terms and conditions of the Proposed Offer. The Initial A Shareholders or the Initial B Shareholders, as applicable, (the "Objecting Shareholders") may reject such Proposed Offer within thirty (30) calendar days of delivery of the Proposed Sale Notice by providing the Company with an opinion from an independent and reputable investment bank with experience in the industry and a cross-border practice (an "Investment Bank"), retained at the sole expense of the Objecting Shareholders, stating that the value of the proposed transaction is materially less than comparable transactions in the industry and the Territory; *provided that*, if such opinion

---

[3] In the SHA, the Peppertree-affiliated Claimants are referred to as the Initial B Shareholders, AMLQ as the Initial C Shareholder, and Terra as the Initial A Shareholders. The Lock-Up Period is defined in the SHA as five years from the effective date of the SHA, which was October 22, 2015.

is provided, the provisions of Section 5.04(b)(ii) shall apply. In the event that no such opinion is provided by the expiration of such 30 day period, each Shareholder shall vote for, consent to and raise no objections against such Approved Sale and take all necessary and reasonable actions in connection with the consummation of the Approved Sale as requested by the Proposing Shareholders.

(ii)   If the Proposing Shareholders have not already procured an offer from an unaffiliated Third Party Purchaser or if an opinion has been provided by an Objecting Shareholder pursuant to Section 5.04(b)(i), the Company shall, within thirty (30) calendar days of receipt of the Proposed Sale Notice, retain an Investment Bank to facilitate an Approved Sale and each Shareholder shall vote for, consent to and raise no objections against such Approved Sale and take all necessary and reasonable actions in connection with the consummation of the Approved Sale as requested by the Proposing Shareholders. In the event that the consideration to be received for the Shares or assets of the Company upon the consummation of the Approved Sale is less than the Proposed Offer provided by the Third Party Purchaser pursuant to Section 5.04(b)(i), the difference between the amount of the Proposed Offer and the purchase price of the Approved Sale shall be deducted from the proceeds otherwise due to the Objecting Shareholders.

There are additional subsections of Section 5.04(b) that pertain to allocation of proceeds and other elements of completion of the sale of the Company. We omit quotation of them here because the quoted subsections above are sufficient for an appreciation of the relevant history, recited below, concerning Claimants' presentation of a Proposed Sale in November 2020 and again in January 2021.

### B.  **Other Pertinent Provisions**

7.   Section 8.06 of the Agreement states:

**Entire Agreement**  This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the parties with respect to the subject matter hereof.

8.   Section 8.10 of the Agreement states:

**Governing Law**  This Agreement will be governed by and construed in accordance with the Laws of the State of New York, United States, without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction).

9.  Section 8.12 of the Agreement states:

> **Specific Performance**   The parties hereto agree that irreparable damage would occur in the event any provision of this Agreement was not performed in accordance with the terms hereof and the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or in equity. Therefore, each party hereto consents to the issuance of an injunction or the enforcement of other equitable remedies against him at the suit of an aggrieved party without the posting of a bond or other security, to compel the specific performance of all of the terms hereof and to prevent any disposition of Shares in contravention of any terms of this Agreement.

## III. Facts Relevant to the Proposed Sale of The Company -- November 2020 to January 2021

10.  On November 4, 2020, two weeks after the expiration of the Lock-Up Period, the Peppertree-affiliated Claimants (B Shareholders in the SHA) sent a letter to the Company and the other Shareholders, giving notice pursuant to Section 5.04(b) of the Proposed Sale of the Company to Torrecom Partners LP ("Torrecom"). Torrecom's purchase offer, also dated November 4, 2020, was annexed. (PPT-AMLQ Ex. 5).

11.  By letter dated November 24, 2020, Terra (A Shareholders in the SHA) rejected the sale contemplated by that Proposed Sale Notice enclosing an opinion by an investment bank, UBS, that Torrecom's bid was inadequate from a financial point of view. (PPT-AMLQ Ex. 6). Terra's letter stated in material part:

> Pursuant to Section 5.04(b)(i) of the SHA, the A Shareholders as "Objecting Shareholders" reject the Proposed Offer by tendering the enclosed opinion from an independent and reputable investment bank with experience in the industry and a cross-border practice (an "Investment Bank"), stating that the value of the proposed transaction is materially less than comparable transactions in the industry and the Territory. For additional reasons, which Terra has outlined in its Notice of Dispute dated October 23, 2020[4], and its response of even date herein, the Proposed Offer is not a bona fide offer and is thus rejected.

> According to Section 5.04(b)(ii) of the SHA, the Company shall within thirty (30) calendar days of receipt of a Proposed Sale Notice retain an Investment Bank to

---

[4] We omit discussion of the Parties' respective Notices of Dispute, which were required under the Shareholder Agreement prior to the commencement of any arbitration. The Notices of Dispute are not material to the question of whether there was a non-performance of the Agreement in regard to sale of the Company.

facilitate an Approved Sale. Accordingly, the deadline for the Company to appoint an Investment Bank to facilitate an Approved Sale is December 4, 2020. Given that time is of the essence, Terra proposes convening a Board meeting in the next ten (10) days in order to discuss proposals for the retention of an Investment Bank by the Company and consider the conditions under which the Board could approve such retention.

12.   Communications exchanged by the Parties and submitted into the record suggest that the Parties in early- to mid- December 2020 extended the 30 day period under 5.04 (b)(ii) for appointment of an Investment Bank to facilitate a sale of the Company to a new purchaser, to provide time for Claimants to consider a counterproposal by Terra to buy them out. (See PPT-AMLQ Exs. 7, 8, 16, 17). We make no findings of fact as to the accuracy of any Parties' rendition of those events.

13. On December 16, 2020, Claimants by email "demand[ed] that the process required by Section 5.04(b)(ii) of the SHA immediately proceed unabated." Terra's answer sent by its general counsel on December 22, 2020, asserted that "[t]he A Shareholders are not amenable to reviving an expired time period required by the SHA. At this point, it is a moot point to be discussing the appointment of an Investment Banker." After then asserting that "it is in the best interests of the Company to conduct a formal process to select an Investment Bank to lead any potential sale process," Terra stated that "the hasty and unstructured proposed process to select an advisor does not look after the best interests of the Company and is, therefore, not acceptable to the A Shareholders." (PPT-AMLQ Ex. 7).

14.   Also on December 22, 2020, Claimants in an email communication asserted that Terra had breached the SHA by not pursuing the sale of the Company, and Terra's general counsel then replied in pertinent part that "the Board as the governing body of the Company is deadlocked and effectively defunct. These issues illustrate all the more why the Buy-out of the B and C

9

shareholders' shares is what we should all be working towards. The B and C shareholders would be better served by focusing their efforts on supporting the A Shareholders with respect to the Buy-out process and by allowing the management to run the operations of the Company in the best interests of all." (PPT-AMLQ Ex. 16).

15. On January 19, 2021, the Peppertree-affiliated Claimants sent a letter to the Company, Terra, and Goldman Sachs, requesting a sale of all of the assets or shares of the Company pursuant to Section 5.04(b)(ii) of the SHA to an unaffiliated Third Party Purchaser, attaching no purchase offer from Torrecom or any other potential buyer, and demanded that the Company, within thirty days, retain an Investment Bank to facilitate an Approved Sale. The letter stated that "[r]epresentatives of Peppertree are available this week to initiate the process of retaining an Investment Bank as required by the SHA. Please advise as to Terra's availability at you[r] earliest convenience." (PPT-AMLQ Ex. 8).

16. On January 27, 2021, Terra submitted to Claimants a "Redemption Resolution" for Board approval of a binding offer of the A Shareholders to redeem the B and C Shareholders shares using financing to be obtained by the Company. In the letter accompanying that Redemption Resolution, Terra contended that as of December 16, 2020 "the deadline for the Company to appoint an investment bank pursuant to Section 5.04(b)(i) of the Shareholders Agreement had expired." (PPT-AMLQ Ex. 17). After summarizing the proposed Redemption, Terra wrote in regard to Claimants' January 19, 2021 Notice of Proposed Sale:

> The Company, however, can only act through its Board. For the last five years, the Initial B Shareholders have intentionally and in bad faith deadlocked the Board to inhibit growth. It is therefore hard to fathom that a Board which you have intentionally deadlocked for years will be able to agree on the appointment of an Investment Bank. Terra does not trust the Initial B Shareholder to act in the best interests of the Company or to protect Terra's shareholder interests in the event of

an Approved Sale. The directors appointed by Terra will not likely be inclined to approve an Investment Bank proposed by Peppertree and much less will they approve John Ranieri as a "Seller Representative." With a deadlocked Board, the Company will be unable to appoint an Investment Bank to facilitate an Approved Sale. The Proposed Redemption is consistent with the business divorce we have been proposing ...

17. Claimants commenced this arbitration on February 2, 2021, alleged (inter alia) that Terra had breached the SHA by objecting to and interfering with the sale proposed in their Proposed Sale Notice, and sought damages and in the alternative specific performance as remedies for the alleged breach.

## IV. The Tribunal's Analysis of Claimant's Entitlement to Specific Performance of the Sale of the Company Under Section 5.04(b) of the Agreement

### A. The Relevance of Section 8.12 of the SHA

18. Respondents contend that Section 8.12 – quoted in full in paragraph 9 above - is not relevant to our ability to grant specific performance because the elements an applicant for specific performance must satisfy, as stated in court cases decided under New York law, are allegedly not satisfied. (Respondents' Second Phase 1 Memorial ("RSM") at 2-4, 7-11). Respondents contend that this is so whether we regard the New York law elements of specific performance as substantive law applicable by reason of the Agreement's governing law clause, or as controlling procedural law because this is a New York-seated arbitration. (Id.).

19. AAA Commercial Rule R-47(a), applicable because the SHA provides for arbitration under those Rules (SHA para. 8.15), states: "The arbitrator[s] may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract."

11

20. This Tribunal's remedial powers are derived from the Parties' contract. That means our power to grant specific performance is controlled by Section 8.12 of the Shareholder Agreement and AAA Commercial Rule R-47(a), both adopted by the Parties in the SHA. It is true that the Agreement also provides that the Agreement is governed by New York law, and that New York shall be the place of any arbitration. But the New York law applicable to the granting of specific performance of a contract, while relevant to our analysis, does not require that an arbitral tribunal, whose powers are derived entirely from the agreement of the Parties, should then disregard entirely the agreement of the Parties concerning remedies for breach. We discuss the case law in this regard in later sections of this Award. As explained in those sections, New York law on specific performance, at least based on the case law presented to us, does not provide a controlling principle of law that the Parties may not deviate by contract from judicially-crafted standards for specific performance.   And no party has presented to us authorities under New York arbitration law that require an arbitrator to refrain from applying the standards for specific performance set forth in the Parties' contract in favor of judicial standards.

21. We will return to these considerations later on, in connection with the question of irreparable injury. But first we address other contentions made by Respondents.

**B. Whether There Has Been a Breach by Terra**

22. Terra contends that the Company's failure to engage an Investment Bank was not a breach of the Agreement by Terra, since the duty to engage an Investment Bank was an obligation of the Company. (RSM at 5). If we were simply asked to declare the rights of the parties under the SHA, this contention would be beside the point, as the Agreement provides for specific performance in case of *non-performance*, without stating that there must have been a breach of contract by one

party or the other. Here it cannot be disputed that the Company failed to retain an Investment Bank as called for by Section 5.04(b)(ii) and the contractual condition to the issuance of specific performance under Section 8.12 has therefore been satisfied. Whether that non-performance is attributable to a breach by Terra enters into our consideration because Claimants claim that there was a breach by Terra, ask us to resolve that issue, and seek specific performance as a remedy for breach of contract. (Claimants' Amended Statement of Claim at paras. 192 *et seq*). Further, our powers under AAA Commercial Rule R-47(a) to grant specific performance concern the granting of "any remedy or relief," and where as here the Claimants' claim seeks specific performance as a remedy for breach of contract, we apply the Rule R-47(a) "just and equitable" standard in the context of that claim.  On this basis we proceed to consider whether Terra breached Section 5.04(b)(ii).

24. A contention was raised by Respondents that their prospective objection to the engagement of an Investment Bank proposed by Claimants, in their January 27, 2021 letter, was not a breach of Section 5.04(b)(ii). The contention, in essence, was that the language of 5.04(b)(ii) only prohibits Shareholders from raising objections against the Approved Sale to be facilitated by the Company-engaged Investment Bank, but does not prohibit raising objections to the Company's retention of an Investment Bank. We do not accept that contention, and here clarify our construction of Section 5.04(b)(ii) in this regard, anticipating that this issue could arise again.

25. Investment Bank is a defined term in the SHA, and the definition relates only to the qualifications, reputation, telecoms industry experience, and cross-border practice of the bank proposed. (Section 5.04(b)(i)). Section 5.04(b)(ii) commands that the Company "***shall... retain an Investment Bank***" and leaves no room for the Company to fail to hire an investment bank on any basis except that it is not an Investment Bank as defined in Section 5.04(b)(i). As the Company

must so act, it follows that no Shareholders' representatives on the Board may cast their votes, or threaten that Board votes will be cast, to prevent the hiring of a qualified investment bank to facilitate an Approved Sale.

26. Further, the ensuing command in Section 5.04(b)(ii) that the Shareholders shall take "all necessary and reasonable actions in connection with the consummation of the Approved Sale as requested by the Proposing Shareholders" is not expressly or by implication limited to the period after the retention by the Company of an Investment Bank, and is most reasonably read to include the voting of the Shareholders' Board representatives in favor of the retention of an Investment Bank when that action is manded by the Agreement.

27. In addition, and contrary to Terra's contention, an "Approved Sale" is not defined as the end-product of an approval process (thus by Terra's proposed implication permitting Shareholder objections prior to approval), but simply "as one or more transactions in which all or substantially all of the Company's assets or shares are sold" It is defined in the same sentence as, and therefore logically it arises in conjunction with, the Proposed Sale Notice. Moreover, the Shareholders' obligations to take "all necessary and reasonable actions in connection with the consummation of *such* Approved Sale" are obligations in the sale process, which begins upon the Company's receipt of a Proposed Sale Notice, and are not obligations triggered by the Sale or by an approval process that begins after the Proposed Sale Notice (of which none is provided). (Emphasis added.) Terra's contention is contrary to the plain meaning of 5.04(b)(i) and (ii). Notably, the provision concerning the retention of an Investment Bank expressly states that the bank's purpose is "to facilitate an Approved Sale." Since an Investment Bank is a necessary prerequisite to an Approved Sale, interpreting the SHA to authorize a party to object to the appointment of an Investment Bank would sanction paralysis of the sale process at its initial stages. That reading is not only contrary to the

text, but would be contrary to each Party's implicit obligation under New York law of good faith and fair dealing, under which one contracting party may not deprive its counter-party of the fruits of the contract.

28. It is clear from Respondents' January 27, 2021 letter that they asserted that they had the right to take into consideration, with respect to the Company's retention of an Investment Bank, the conduct of the Claimants in allegedly "deadlock[ing] the Board to inhibit growth." This is not within the definition of Investment Bank, and so it was a prohibited consideration. The same is true of Respondents' concerns that Claimants could not be "trust[ed] ... to act in the best interests of the Company or to protect Terra's shareholder interests in the event of an Approved Sale" and of the mere fact that an Investment Bank might be one "proposed by Peppertree," as such considerations do not address the contractually-defined qualifications of an Investment Bank, particularly as one of the banks Peppertree proposed was the very bank Terra had hired just weeks earlier to consider the Torrecom proposal. All of these statements were made in violation of the express commitments of the Shareholders to raise no objections against the Approved Sale and to take all necessary and reasonable steps in connection with an Approved Sale, one of which obviously was the Company's retention of an Investment Bank.

29. In the specific circumstances here, Terra also breached its obligations under 5.04(b)(ii) through the January 27, 2021 letter, by presenting a Redemption Proposal. Section 5.04 (b)(ii) states that *"each Shareholder shall vote for, consent to and raise no objections against such Approved Sale and take all necessary and reasonable actions in connection with the consummation of the Approved Sale as requested by the Proposing Shareholders."* Although Terra is free to propose a buy-out of Peppertree if it wishes, its presentation of a Redemption Proposal, which was in response to Terra's buy-out proposal in reply to the November 4, 2020 Notice of Proposed Sale

15

(see para. 12 above), amounted to an objection against an Approved Sale of the Company to a third party. Whether one views Terra's phrasing concerning Board action as expression of doubt or a flat refusal to have the Board support the engagement of an Investment Bank as Section 5.04(b)(ii) required, the "necessary and reasonable action" in response to the January 19, 2021 Notice of Proposed Sale letter was to make the Terra-appointed Board members available for a Board meeting at which the hiring of an Investment Bank would be approved and accomplished. This was not done, and it was a breach of Section 5.04(b)(ii) by Terra.

30. In reading Respondents' letter of January 27, 2021 as a whole and in the context of the Parties' communications recited above following Claimants' Proposed Sale Notice on November 4, 2020, we have little difficulty concluding that the letter clearly communicated that Respondents would exercise their power as majority shareholders to prevent the Company from retaining an Investment Bank, in contravention of their clear contractual obligation under Section 5.04(b)(ii). This is particularly the case because, as noted above, by the time of the Respondents' January 27, 2021 letter, Claimants in their letter of December 16, 2021 (PPT-AMLQ Ex. 7) had already identified UBS, the Investment Bank chosen by Respondents weeks earlier, and whose qualifications as an Investment Bank were admitted by Respondents (PPT-AMLQ Ex. 6) in the covering letter accompanying the UBS Letter rejecting the Torrecom offer, as one of a group of Investment Banks acceptable to Claimants. This fact negates any interpretation of the January 27 letter that reads Terra's comment about approval of an investment bank proposed by Claimants as equivocal. Moreover, if Terra was merely reporting that it was disinclined to approve a bank proposed by Claimants, Terra was obligated under the SHA to then propose a qualified investment bank acceptable to it for approval by Claimants, but it failed to do so.

## C.   Whether the Time for Claimants to Seek a Company Sale Has Expired (Respondents' Waiver Defense)

31. Terra ultimately contended that Claimants waived the right to require a sale of the Company because the 30-day period specified in Section 5.04(b) for appointment of an Investment Bank by the Company after the delivery of a Proposed Sale Notice, expired 30 days after Claimants' January 19, 2021 Proposed Sale Notice, allegedly without Claimants having taken the initiative that Respondents contend was required of them to request that the Board approved the hiring of an Investment Bank. (RSM at 12). [5]   The relevant text is in Section 5.04(b)(ii) of the Agreement where it is stated that "*the Company shall, within thirty (30) calendar days of delivery of the Proposed Sale Notice, retain an Investment Bank to facilitate an Approved Sale and each Shareholder shall vote for, consent to and raise no objections against such Approved Sale and take all necessary and reasonable actions in connection with the consummation of the Approved Sale as requested by the Proposing Shareholders.*"

32. The language just quoted did not specify any further action to be taken by the Proposing Shareholder to bring the issue of engagement of an Investment Bank before the Board for a vote. The requirement to take "all necessary and reasonable actions in connection with the consummation of the approved sale **as requested by the Proposing Shareholders**" is, in our view, meant to place the burden of taking such actions on the other Shareholders, with the Proposing Shareholders being understood to have done their part by delivering the Proposed Sale Notice.

---

[5] In the Memorials, Terra also argued that (1) Claimants could not now in 2022 deliver a new Approved Sale Notice beyond 30 days following the end of the Lock-Up Period, and (2) Claimants could no longer require appointment of an Investment Bank more than 30 days after Terra's rejection of the Torrecom proposal (Respondents' First Phase 1 Memorial ("RFM") at 18, 20-23 ). But once Claimants made clear that they rely on the January 19, 2021 Proposed Sale Notice, timing factors ensuing from that Notice became the focus of Terra's waiver argument.

33.  Waiver is the intentional relinquishment of a known right. (Werking v. Amity Estates, Inc., 2
N.Y.2d 43, 52 (1956); County of Suffolk v. Ironshore Indem., Inc., 187 A.D.3d 1137, 1139 (2d
Dep't 2020)).  For Claimants to be chargeable with waiver, by not bringing before the Board a
resolution for the engagement of an Investment Bank within 30 days after the January 19, 2021
Proposed Sale Notice, at minimum Claimants would have to have known that by not presenting
such a resolution, they were forfeiting the right to the Approved Sale.  Whereas the Agreement
imposed no such requirement on the Proposing Shareholder specifically, such a requirement can
only be inferred by a debatable construction of the various provisions of the Agreement concerning
corporate governance generally intertwined with Section 5.04(b) which itself stated that the
Peppertree-appointed Board members were available in the ensuing week. This alone negates
intentional relinquishment, and defeats Terra's contention of waiver.

34.   What is more, Claimants' course of action was obviously influenced by the written
communication received from Terra on January 27, 2021 (PPT-AMLQ Ex. 17, see para. 16
above).  In that communication Terra proposed a redemption of Claimants' shares as an alternative
to the Approved Sale. In addition, Terra stated that it was "unlikely" that Terra's appointees on the
Board would support engagement of an Investment Bank. And the ensuing sentence stated that
"[w]ith the Board deadlocked" the Approved Sale could not go forward. Respondents contend that
"unlikely" meant that support of the Terra-appointed Board members remained possible,
notwithstanding the next sentence referring to Board deadlock, and that this letter therefore did not
relieve Claimants of a burden to present the Investment Bank retention matter to the Board within
30 days after January 19, 2021. We are unpersuaded by this argument. As the Agreement did not
clearly impose this duty on Claimants, they could not have known that they were forfeiting the
right to consummate the Approved Sale by failing to call a Board meeting and present a Board

resolution more formally than they had already done by sending the January 19, 2021 Proposed Sale Notice. Whatever ultimately might be the proper application of the Agreement on a technical basis to the circumstances, Claimants could have reasonably believed that sending the Proposed Sale Notice put the ball squarely in Terra's court. This negates the intentionality of forfeiture necessary to Respondents' defense of waiver.

35. Moreover, Claimants conduct is best viewed not as a waiver but as a resort to arbitration in furtherance of their rights, in the context of (i)Terra's December 2020 rejection of the Torrecom proposal (see para. 11 above), (ii) Terra's service of a Notice of Dispute on the Peppertree and AMLQ Shareholders even before the Torrecom proposal (Notice of Dispute dated October 23, 2020 referenced in see PPT-AMLQ Ex. 6), (iii) Terra's attempts to sidetrack the sale process in December 2020 by negotiating a tolling of the deadline for retention of an Investment Bank while Terra sought to convince Claimant to accept a buy-out by Terra (see para. 12 above), and (iv) the overall anti-Approved Sale thrust of the January 27, 2021 communication (see para. 16 above),

36. Further, the January 27, 2021 letter breached Respondents' obligations under 5.04(b)(ii) to advance the Approved Sale process without objection and with the taking of all necessary and reasonable steps. We refer as we did at the December 1 hearing to the equity maxim *"Ex turpi causa non oritur actio"* roughly translated as "persons may not rely upon their own violations of law as a basis for a claim." (*See* Matter of Dorsey, 161 Misc. 2d 258, 260 (Surrogate's Court, Dutchess County 1994); Riggs v. Palmer, 70 Sickels 506, 516 (N.Y. Court of Appeals 1889) ("No one shall be permitted to profit from his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity....")). We would confer such an improvident benefit on Respondents if we found waiver by Claimants in these circumstances.

19

**D. Whether Claimants Have an Adequate Remedy at Law**

37. Respondents argue that damages are an adequate remedy for the alleged breach of the Agreement, if found to have been a breach, consisting of Respondents' interference with Claimants' rights to an Approved Sale of the Company under Section 5.04(b)(ii) of the SHA. We disagree, and find that while damages may be possible, they are not an adequate remedy. We reach that conclusion taking into consideration Section 8.12 of the SHA, but also even without regard to Section 8.12.

38. Damages would logically be measured by the difference between (1) what a sale of the Company in early 2021 would have yielded to Claimants as their *pro rata* share of the sale proceeds, and (2) the value now retained by Claimants because they still own their shares. While a valuation expert asked to assign a value to each of these two variables would do so, the reliability of such valuations, compared to specific performance (*i.e.* a third party sale facilitated by an Investment Bank), is far inferior.[6] The valuation would take place 15-18 months after the sale process would have occurred, but for Terra's breach of the SHA, in January-February 2021. A valuation expert would have to reconstruct the Company's financial position as it was in January 2021. Whereas the granular information pertinent to such valuation is in possession of Respondent DTH Holdings, a company under common control with Terra, and is dispersed in the various countries where, through DTH, the Company has operations, there is an issue of information access for any valuation expert engaged by Claimants. The impact on value and on marketability itself of the six-year history of stress between the shareholders, and taking into account the allegations of

---

[6] We note that Respondents did submit a valuation expert report in the Phase 1 Proceedings, but that report was addressed to the alleged enhancement of the value of the Company by the development of towers that the Peppertree Board members did not approve. That is a different valuation issue and does not bear on the analysis in the text.

20

wrongdoing in both directions, is not readily capable of capture in traditional valuation methodology. It is the kind of subjective dynamic that is better measured by looking for actual bidders. It stands to be more reliable for an actual bidder to value the Company on the basis of owning 100% of it, as compared to having valuation experts opine on what the Company's business, under control of a single owner and without the dynamics that the Peppertree-Terra relationship has produced, would be worth.

39. For valuation experts to offer reliance-worthy opinions on the value of the minority shares if they are retained by Claimants would be equally fraught. The opinions of experts retained by Claimants and Respondents on the willingness of any third parties to acquire the minority interest under the corporate governance arrangements of the current SHA are likely to vary widely. The experts' opinions on how a hypothetical minority interest purchaser would take into account the history of Claimants' and Respondents' relationship would probably vary as widely as do the Parties' perceptions of how that relationship has affected the business of the Company.

40. The Tribunal sees these matters as serious obstacles to making damages *adequate* as opposed to merely *possible*, and Respondents' position that this dispute is merely about money and therefore should result only in the award of damages obscures this critical difference.  We could also foresee that an actual attempt by the Peppertree and AMLQ shareholders to sell their shares to a third party would follow the damages award. Unless such a sale were made at close to the value assigned in the damages award, that sale would produce even more arbitration, with one side claiming more damages from the other based on the difference between the actual sale price and the value used in the damages formula. That prospect also cuts against the alleged adequacy, as opposed to the mere possibility, of a damages remedy. It is clearly the controlling law of New York that ultimately the prospective reliability of measurement of damages is often the litmus test

of whether an applicant for specific performance has an adequate remedy at law. *See* Van Wagner Advertising Corp. v. S&M Enterprises, 67 N.Y.2d 186, 193 (1986) ("The point at which breach of a contract will be redressable by specific performance thus must lie not in any inherent physical uniqueness of the property but instead in the uncertainty of valuing it…. When the relevant information is thin and unreliable, there is a substantial risk that an award of money damages will either exceed or fall short of the promisee's actual loss"). *Accord*, Sokoloff v. Harriman Estates Dev. Corp., 96 N.Y.2d 409, 415 (2001), cited by Respondents (RSM at 8).

41. Further, to deny specific performance on the basis that there is an adequate remedy at law would have the Tribunal refuse to apply one clearly applicable principle of New York contract law, that is, to give full effect to the plain meaning of the Contract. (*E.g.*, Friends of Wicker Creek Archeological Site, Inc. v. Landing on the Water at Dobbs Ferry Homeowners Ass'n, 198 A.D.3d 728, 729 (2d Dep't 2021). Section 8.12 provides both Parties with the remedy of specific performance when the SHA is not performed according to its terms, and states that such non-performance causes irreparable harm. "Lock-Up Period" is a defined term in Article I of the SHA (at p.9 that means "the period of five (5) years starting on the Effective Date and ending on the fifth anniversary of the Effective Date." Claimants may exit via a Company sale at the end of the Lock-Up Period, as provided in Section 5.04(b). Subject to certain narrowly defined conditions, there was no option during the Lock-Up Period for Claimants to sell their minority stake to a third party or to insist that Respondents buy them out. See Section 5.01. The Claimants' entitlement to a Company sale at the end of the Lock-Up Period was the clear reciprocal right granted to Claimants for the Lock-Up Period restrictions on the transfer of the Claimants' shares, and the possibility for specific enforcement of those restrictions by Terra against Claimants, that the same

Section 8.12 conferred on Terra.[7] If specific performance of a Company sale under 5.04(b)(ii) is denied, the Lock-Up Period is five years plus an indeterminate additional period unless Claimants wish to sell a minority stake in the Company to a third party subject to Terra's right of first refusal, or to sell to Terra at whatever price Terra is prepared to offer. That would distort not only the plain meaning of the SHA, but the equilibrium and reciprocity of the rights and obligations during the Lock-Up Period, on the one hand, and after its expiration, on the other. Specific performance with a presumption of irreparable harm was included in Section 8.12 of the Agreement for the benefit of *all* Shareholders. New York contract law does not allow us to revise the SHA in the manner Respondents' arguments would require.

42.  Terra cites Convergen Energy WI, LLC v. L'Anse Warden Electric Co., 2020 WL 5894079 (S.D.N.Y. Oct. 5, 2020), a case in which a U.S. District Court, asked to grant a preliminary injunction, declined to find a contractual recital of irreparable harm resulting from breach to be dispositive of the existence of irreparable harm, and stated that "[t]he parties to a contract cannot secure by agreement among themselves the equitable power of the court." Id. at *6 (RSM at 3). There are several reasons why this argument is not convincing.

43.  First, the Second Circuit case cited in *Convergen*, in support of the proposition that the parties may not contractually usurp the equitable power of the Court, held that a contractual stipulation of irreparable injury from breach is *not controlling* on the irreparable harm issue, but that case did not find that the stipulation is *irrelevant*. Baker's Aid, a Div. of M. Raubvogel Co. v. Hussman

_____

[7] *See* the restrictions on transfer of shares in the Company during the Lock-up Period (Section 5.01(a)), related transfer procedures (Section 5.01(b)), non-circumvention restrictions (Section 5.01(c)), and the obligation to give Terra a right of first refusal to buy all or some of the shares proposed to be sold to a non-affiliate of Peppertree after the expiration of the Lock-Up Period (Section 5.03(a))

Foodservice Co., 830 F.2d 13, 16 (2d Cir. 1987), cited in *Convergen*, *supra*, at \*6. Our analysis is consistent with *Baker's Aid*, as we do not render the parties' stipulation of irreparable injury controlling to the exclusion of other considerations, but we do give that stipulation considerable weight, especially as we are arbitrators whose powers are derived from the agreement of the Parties and our essential mandate from the Parties is to enforce their agreement.

Second, as an arbitral tribunal we do not exercise "the equitable power of the court" but (as just observed) the powers conferred on us by the Parties in the Agreement. Our relevant sources of power on the question of specific performance are Section 8.12 of the Agreement and Rule R-47(a) of the AAA Commercial Rules. It is well recognized in case law applying the Federal Arbitration Act that equitable powers of arbitrators are those conferred by the parties, even if that results in relief that would not be available if sought from a court. *See* CE International Resources Holdings LLC v. S.A. Minerals Ltd., 2012 WL 6178236 at \*3-5 (S.D.N.Y. Dec. 10, 2012) and Second Circuit cases cited therein.

Third, neither New York nor federal law *of arbitration* requires arbitrators, when asked to grant specific performance as a breach of contract remedy, to treat a contractual recital of irreparable harm in a particular way. Neither party here contends otherwise, Further, neither party has argued that New York or federal law *of arbitration* makes judicial equitable criteria for granting specific performance as a breach of contract remedy binding on a New York-seated arbitral tribunal. And no case cited by the parties holds that New York judicial equitable criteria for granting specific performance are part of the *substantive law of New York* that arbitrators must apply when there is a governing law clause of the type present here.

Finally, *Convergen* was decided in the context of a motion for interlocutory injunctive relief, not specific performance as a final remedy for breach of contract.

44. To summarize, we give significant but not dispositive weight to the contractual stipulation in SHA Section 8.12 of irreparable harm resulting from a breach and giving rise to the right to specific performance. But even if we gave no weight to that Section of the SHA, we would find irreparable injury here for Terra's breach. Damages are too difficult to measure *reliably* in this circumstance. The relationship of shareholders in a closely-held enterprise is specific and unique, especially when there are in essence two shareholder groups with polarized interests and views. There is a human toll to corporate deadlock in a closely-held corporation that cannot be adequately measured in money damages. *See* Gimaex Holding, Inc. v. Spartan Motors USA, Inc., 2015 WL 6673687 at *6 (D. Del. Oct. 30, 2015) (forcing business partners to remain in business together was an irreparable injury weighing in favor of accelerated dissolution of joint venture), *report and recommendation adopted by* Gimaex Holding, Inc. v. Spartan Motors USA, Inc., 2015 WL 9437530 (D. Del. Dec. 22, 2015) (cited in Claimants' Phase 1 Memorial at p. 25). The shareholders also have fiduciary obligations to the Company and to one another. The cost of remaining a fiduciary when one no longer wishes to be in that role – expending effort that could otherwise be deployed toward other investments, making a record of those actions to manage the risk of claims of fiduciary breach by the opposing side -- cannot be measured adequately by money damages. Also, the Peppertree Claimants here are financial investors, a private equity firm, and prolonged illiquidity deprives a private equity firm of an essential element of such a business, control over the deployment of its capital.

**E. Whether a Sale of the Company Imposes Undue Hardship on Respondents**

45. Terra contends that "a forced sale will clearly prejudice Terra by taking away Terra's ownership rights in the Company against its will." (RSM at 11). But this is not the case. The sale process prescribed by Section 5.04(b)(ii) is "forced" only in the sense that intervention of an

arbitral tribunal is required to compel Terra to do what it agreed to do in 2015 as one of the conditions of the Claimants' making an investment and becoming minority shareholders. Terra's "will" in late 2021 when this argument was presented, insofar as it is different from the "will" expressed in the SHA, simply doesn't count. Our task as a Tribunal is to enforce Terra's and the other SHA parties' mutual "will" as expressed in the SHA at the time it was made. Sections 5.04, 8.12, and Rule 47(a) of the AAA Commercial Rules, together express clearly the will of the parties: the Company would be sold at the request of either the B Shareholders (Peppertree Claimants) or the A Shareholders (Terra) at the end of the Lock-up period in an Approved Sale facilitated by a Company-retained Investment Bank, and if there was a dispute about this an arbitral tribunal could order specific performance, upon finding specific performance to be "just and equitable"(Rule R-47(a)), without requiring an actual showing of irreparable harm.

46.  As a result, there is no injustice or inequity involved here, at least on the part of Claimants. We deal only with the Claimants' lawful contract-based desire to liquidate their investment, having fulfilled their end of the bargain by respecting the lock-up of their minority shares for the duration of the Lock-Up Period, and Terra's desire to prevent that and extend the Lock-Up Period indefinitely. Terra takes this position, evidently, because they wish to keep control of the Company (as reflected in their December 2020 and January 2021 buy-back offers, and in the arguments made in their Memorials), and to do so either by making Claimants' investment illiquid (*i.e.* forcing them to remain invested) or by forcing Claimants to sell to Terra in a "redemption" that would not involve having an Investment Bank secure a third party offer for 100% of the Company.

46.  Ultimately *this* part of the dispute is *only about money* in one sense: what it will cost Terra, if it wishes to acquire 100% control, to outbid a potential third-party purchaser to acquire the Peppertree and AMLQ shares. That this calculus would potentially present itself at the end of the

Lock-up Period had to have been obvious to Terra when it signed the Agreement. The Agreement provided for a Company sale process, not a majority-minority redemption process. There is no injustice or inequity in requiring Terra to live up to the contract. It is entitled to its *pro rata* share of the sale proceeds, subject to any setoffs that may be established, and nothing in the SHA stops Terra from asking Claimants, at any time, but more likely once the value achievable by a third-party sale is better understood, to sell their shares to Terra. [8]

48.  Terra contends that Claimants may exit their investment by selling their shares to a third party. (e.g. RFM at p. 2). But the Parties in the Agreement specifically agreed on sale of the Company as the source of liquidity for a Shareholder at the end of the Lock-Up Period, and, without our considering whether such a transaction might be permitted by the Agreement, and without our inquiring about whether such a transaction might provide equivalent value to Claimants compared to a sale of the Company, our task is to enforce the Agreement as the Parties made it. To repeat, specific performance does not necessarily force Terra to sell its interest in the Company. It does however require a genuine sales process to go forward so that the price for Terra to have 100% control – if it elects to bid against a third-party purchaser and Claimants ultimately elect to sell their interest to Terra – is determined with market-based knowledge of what a sale outright of the Company would yield to Claimants.  And the risk to Terra that Claimants for business reasons may prefer to sell to the third party purchaser rather than to Terra at the same price is a risk embedded in the SHA. Terra would at worst case have its share of the proceeds of the sale, and its

---

[8] Respondents contend that Goldman Sachs, owner of AMLQ, controls a competing telecoms company operating in Central and South America, and implies that the Company sale is desired to eliminate Terra as a competitor. (RFM at p. 9).  That argument appears to assume that Peppertree, which owns many more shares in the Company than AMLQ, is willing to sacrifice the interests of its investors for the benefit of Goldman Sachs' investors.  We make no findings of fact about this. But nothing in the SHA prevents Claimants or their affiliates -- or Respondents --from competing in this market after a Company sale.

counterclaims against Claimants for breach of contract damages intact. There is no hardship or inequity in that solution, in our judgment.[9]

### F.  Whether Claimants Must Show That They Have Substantially Performed By First Defeating Respondents' Counterclaims on the Merits

49.   Both sides in this case cite New York case law stating that an applicant for specific performance must demonstrate that it has substantially performed the contract. (RSM at p. 3, Claimants Initial Phase 1 Memorial at p. 20). Claimants contend that they have fully performed, saying that the legal standard of New York law is "easily satisfied" here, (Id.) but in making that argument they contend that we should find that Respondents' counterclaims are without merit.. Respondents, on the other hand, contend that until their counterclaims are fully resolved, the issue of substantial performance by Claimants is an open one that prevents our awarding specific performance.[10] Whereas the parties have not presented to us New York controlling authorities on

---

[9] We take note of the New York authorities cited by Terra for the proposition that "irreparable harm does not exist where alternatives are available to a movant, even if these alternatives are less convenient." (RSM at 9, internal quotations marks omitted).  But we approach that principle in context. Section 5.04 was negotiated (as its highly specific phrasing indicates), between sophisticated parties with sophisticated counsel (as the notice provisions reflect), and no right of the majority Shareholder was included, as a basis to object to a proposed sale of the Company, that the minority Shareholder must demonstrate that it had exhausted the possibility of selling its minority interest to a third party. Were we to hold here that Peppertree must search for a purchaser of the minority interest, we would be re-writing the Agreement. Further, in this context, for Terra's argument to have any equitable resonance, Terra would have had to provide convincing evidence that a transfer of the minority interest was readily obtainable, other than to Terra, and to a new minority Shareholder acceptable to Terra, at a value reasonably equivalent to what a sale of the Company would yield. That is not, in this context, Peppertree's burden. And Terra offered no such evidence.  The principle stated in some cases cited by Terra, that irreparable harm is not established because the applicant would otherwise bear minor inconveniences absent equitable relief – like having to buy a monthly commuter train ticket through the mail rather than from a ticket vending machine (Molloy v. MTA, 94 F.3d 808, 813 (2d Cir. 1996), cited by Terra in its Nov. 15 Answers Submission at para. 4) – does not fit here. It is not self-evident that selling the minority interest in Continental to a third party is even possible, much less a minor inconvenience as compared to the value achievable by an outright sale of the Company.

[10] This position is not set forth explicitly and completely in Respondents' two Phase 1 Memorials, but is to be understood from their contentions made in opposition to creation of the Phase 1 process,

how the general requirement of substantial performance is to be applied to a long-term multiple-obligation contract like the SHA, we address that issue as a matter of discretion and in a manner that will achieve a just and equitable result.

50. As a first step, we observe that no contention is made by Respondents that Claimants failed in any respect to observe the SHA's restrictions on transfer of their shares during the Lock-Up Period. It is thus not contended by Respondents that this aspect of Claimants' performance of the SHA, which we view as the reciprocal of the right to a Company sale after the Lock-Up Period, was not fully performed by Claimants. Stated simply, Claimants stayed the course from October 2015 to October 2020 as required by the Agreement.

51. In the cases cited to us by the Parties, we do not find a clearly controlling statement of New York law that the applicant for specific performance must show as prerequisite to granting the relief, no matter what the nature of the specific performance sought, and no matter the nature of the contract, that it has not committed *any* breaches of the contract at issue. The New York Court of Appeals has held, for example, that an applicant for specific performance of a simple bilateral exchange of contractually promised performances, like the purchase and sale of real estate, must show that the applicant is ready, willing and able to uphold its end of the bargain. *E.g.*, Huntington Mining Holdings, Inc. v. Cottontail Plaza, Inc., 60 N.Y.2d 997, 998 (1983); Alba v. Kaufmann, 27 A.D.3d 816, 818 (3d Dep't 2006). But we have not seen a case among those cited by the Parties in which the New York Court of Appeals held, in a complex multiple-obligation contract, to be performed on both sides over several years, like the SHA, that the applicant for specific

---

and in their post-hearing submission concerning Phase 1 urging abandonment of the Phase 1 process and re-joinder of the Phase 1 issues with all other issues including Respondents' breach of contract counterclaims.

performance must first prevail on all counterclaims for breach of contract before any request for specific performance of any obligation may be granted. If that were controlling New York law, a specific performance applicant, like Claimants here, would too often be forced to litigate to judgment (or arbitrate to an award) a counterclaim for breach of contract raising some potentially complicated issues, entirely collateral to the right sought to be specifically enforced, that cannot be resolved without extended discovery and merits disposition. It would be an inequitable rule in many cases.

52. We do not believe New York's courts would so hold. And we decline to adopt such a rule in this case, as it would be unjust and inequitable under AAA Commercial Rule R-47(a), to condition Claimants' right to specific performance under 5.04(b)(ii) on first defeating any counterclaims Terra might raise. That would too easily make the raising of counterclaims -- that might well require information exchange and a merits hearing before they can be resolved -- into a weapon to defeat the clear terms of Section 5.04(b)(ii). Indeed, Section 5.04(b)(ii) in its plain terms enjoins Terra from raising *any objection* to the Proposed Sale, and this includes raising counterclaims and insisting that the counterclaims must be resolved first.

53. Moreover, the case law cited by Respondents does not show New York law to require a perfect record of contract performance by the applicant for specific performance. The cited cases refer to "*substantial performance*" by the applicant as one of the conditions that, when present, would make specific performance "*appropriate*" (*e.g.,* DiPilato v. 7-Eleven, Inc., 662 F.Supp.2d 333, 345 (S.D.N.Y. 2009), cited in RSM at 3; Travellers Int'l AG v. Trans World Airlines, Inc., 722 F. Supp.2d 1087, 1104 (S.D.N.Y. 1989) (cited and quoted in DiPilato)). But these cases do not hold that specific performance of one obligation in a complex contract is *never appropriate* where "substantial performance" is in dispute because the counterparty alleges a breach by the applicant

30

of an obligation in the agreement that is distinct from the one for which specific performance is sought. Further, in both <u>DiPilato</u> and <u>Travellers</u>, the applicants were seeking to enforce continuation of a business relationship -- in <u>DiPilato</u>, a 7-Eleven retail franchise; in <u>Travellers</u>, a tour operator contract with an international airline. Those cases are unlike this one.

54. Here, specific performance is sought to sever a shareholder relationship in a manner consistent with the Agreement, and granting that remedy does not impair Respondents' damages claims against Claimants for their alleged breaches in causing the Board to disapprove new tower construction. One federal court case cited by Respondents states that under New York law a decree of specific performance may be granted by a court "*only if*" the applicant has substantially performed under the contract (<u>Niagara Mohawk Power Corp. v. Graver Tank & Mfg. Co.</u>, 470 F.Supp. 1308, 1324 (N.D.N.Y. 1979) (cited in Respondents' First Phase 1 Memorial ("RFM") at 19). But the court did not actually apply that requirement (which we note is not stated in the New York cases cited in <u>Niagara Mohawk</u>). Instead, it granted specific performance in that case while counterclaims for plaintiff's alleged breaches of the contract remained to be litigated. In doing so, the Court stated: "*The Court will not, at this time, definitively resolve the question of whether Niagara Mohawk has committed any breaches of contract prior to exercising its rights under the termination clause, but the Court does find that any prior breaches that may have occurred were, at most, partial rather than total breaches of contract. Therefore, Graver was not discharged from its own contractual obligations and would not have been justified in rescinding the contract for any such breaches.*" Id. at 1323. And the Court observed that defendant Graver had a damages remedy available for any such breaches. Id. at 1322. The same is true here, with respect to Respondents' counterclaims relating to Claimants' allegedly wrongful refusals to approve new tower development.

55. In summary, we find that the relevant substantial performance in relation to the Company sale under Section 5.04(b)(ii) is Claimants' observance of the restrictions on disposition of their shares during the Lock-Up Period, and no contention is made that Claimants committed a breach of that provision. We further find the approach of the federal district court in the Niagara Mohawk case to be appropriate with respect to Respondents' counterclaims.[11]

**G. Whether Terra May Invoke Claimants' Alleged "Unclean Hands" To Bar Specific Performance**

---

[11]   For these reasons, it is appropriate to grant specific performance at this stage even though there has been no discovery of the type sought by Respondents into Claimants' intentions in refusing to support Terra proposals for new tower development. Our approach is consistent with the possibility that Respondents may ultimately prevail on their counterclaims.

56. Terra invokes "unclean hands" and "equitable estoppel"[12] [13] as defenses to the granting of specific performance. In essence, Terra contends, as it did in its January 27, 2021 letter, that Claimants' alleged bad faith actions -- to depress the value of the Company so that Torrecom could acquire the Company at a favorable price -- form a basis to deny specific performance, and, Terra argues, at the very least those allegations form a basis to deny specific performance at this time because the allegations of improper conduct by Claimants should be examined with the benefit of

---

[12] At least formally, Respondents also referred to "repudiation" and "anticipatory repudiation" as affirmative defenses. (E.g. Nov. 15 Answers Submission at para. 12). New York law requires for anticipatory repudiation that there should be a "sufficiently clear and unequivocal" statement by the repudiating party that it will commit a total breach, or a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a total breach. See Norcon Power Partners v. Niagara Mohawk Power Corp., 92 N.Y.2d 458, 463 (1998) (cited in Terra's Nov. 15 Answers Submission at para. 12). Respondents have not pointed to any such unequivocal declaration of total breach or voluntary affirmative act of Claimants that constitutes a total breach or that disables them from future performance without such total breach. The rejections of tower approval packages, ostensibly in the name of what is in the Company's best interests, is not such an unequivocal declaration or act. Neither is the submission of the Torrecom purchase offer, since Claimants stood down from that offer in favor of the solicitation of other third party bids in January 2021.

Further, Respondents still regard the Shareholder Agreement and Development Agreement as being in effect, the Claimants as being Shareholders, and the Claimants' Board of Directors appointees as being members of the Board and the Development Committee. (See Terra's November 15 Answers Submission at para.12, stating that "Terra [has] continued to operate under the Shareholders Agreement").

Terra also asserted a defense framed as "Failure to State a Claim" (RSM at 12). But under New York law specific performance is a remedy, not a cause of action, a principle inherent in the question of whether an applicant for specific performance of a contract should instead recover only money damages if there has been a breach. (E.g. Sokoloff v. Harriman Estates Dev. Corp., 96 N.Y.2d 409 (2001). Insofar as this embraces the contention of anticipatory repudiation of the Shareholder Agreement and Development Agreement, we reject it for the reasons just stated. And insofar as this is just another way of saying no breach of the SHA has been established, we reject that position based on the analysis in this Award.

---

[13] Respondents asserted equitable estoppel as an affirmative defense on the basis the "Claimants are trying … [to] implement a 'sale process' that is founded on the sham Torrecom offer Claimants procured and their efforts to take over the Company." (RFM at 33). But because Claimants have clarified that they do not seek enforcement of the Torrecom offer, and our Award does not decree performance based on the Proposed Sale Notice that presented the Torrecom offer, that basis for equitable estoppel is unavailable and no other has been raised by Respondents.

information exchange and not in an early-disposition framework. We think the SHA answers this contention. The Parties agreed in Section 5.04(b)(ii) that the Shareholders in receipt of a request for a proposed sale of the Company would "*vote for, consent to and raise no objections against such Approved Sale and take all necessary and reasonable actions in connection with the consummation of the Approved Sale as requested by the Proposing Shareholders.*" That language clearly envisioned that there might be disputes about the conduct of the requesting party unresolved at the time of the request for sale of the Company. If such disputes could be invoked as an objection, then liquidity of the investment would be illusory. Liquidity of the investment then could only come about at the end of a long dispute resolution process. Section 5.04(b)(ii) makes clear that the Parties intended that allegations of misconduct such as those made by Terra against the Peppertree Claimants would not and could not be invoked to prevent the 5.04(b)(ii) sale process from moving forward.

57. Respondents do not identify any controlling authority under New York contract law holding (specifically or by implication) that merely raising a defense of unclean hands prevents the granting of specific performance, in an arbitration where New York contract law governs, until the merits of that defense are determined. Petrello v. White, 2007 WL 2236700 (E.D.N.Y. Aug. 7, 2007) (RFM at 32) refers to a rule of equity concerning judicial equitable power, not a controlling principle of substantive New York contract law applicable in an arbitration where such law is the governing law. The same is true of PenneCom B.V. v. Merrill Lynch & Co., 372 F.3d 488, 493 (2d Cir. 2004) (Id.). Our powers as arbitrators to grant specific performance – arbitral as opposed to judicial equitable power – are derived here from the SHA, including AAA Commercial Rule R-47(a) adopted in the Agreement. (See *CE Int'l Holdings*, discussed *supra* at para. 43). This cited law concerning the judicial equitable power is a discretionary factor informing our determination

34

of whether specific performance would be "just and equitable." And <u>Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.</u>, 324 U.S. 806, 814 (1945), also cited by Respondents (RFM at 32), confirms our view that the doctrine of unclean hands is a judicial procedural principle applicable when a court sits as a court of equity, rather than an aspect of the New York law of contracts: *"This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief....The doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith."*

58. In authority cited by Respondents, it is stated that "the doctrine of unclean hands bars equitable relief when the moving party has engaged in improper conduct similar to the alleged improper conduct from which he seeks relief." <u>Scaminaci v. Jaffrey</u>, 2021 WL 276705 at *5 (S.D.N.Y. Jan. 27, 2021) (RSM at 26). In the Second Circuit case cited for this proposition in <u>*Scaminaci*</u>, <u>Motorola Credit Corp. v. Uzan</u>, 561 F.3d 123, 128-29 (2d Cir. 2009), the Court cited <u>Precision Instrument</u>, *supra*, which we quote again in pertinent part with different emphasis: "[The unclean hands doctrine] is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith ***relative to the matter in which he seeks relief....*"** (emphasis supplied). Here, however, Claimants' alleged bad faith conduct in advancing the Torrecom proposal to buy the Company is a collateral matter at this point, as Claimants do not seek enforcement of the Torrecom bid or any other sale to a specific third party that they have identified. No misconduct by Claimants is alleged by Respondents in regard to the Company sale process at issue here – <u>the sale initiated by the January 19, 2021 Proposed Sale Notice</u>. And Claimants' alleged bad faith conduct in refusing to approve Tower development proposals is also a collateral

matter. Sale of the Company will leave intact Respondents' counterclaims seeking damages for this alleged wrongdoing by Claimants.

59. Insofar as the judicial equitable doctrine of unclean hands informs our discretion here, we do not find these principles sufficient, on the facts alleged by Respondents, to make it unjust and inequitable to enforce the right to a Company sale granted in Section 5.04(b)(ii). Respondents do not assert a counterclaim based on fraud. Their assertions that the Torrecom bid violated the Agreement (because Torrecom was allegedly affiliated with Claimants and wanted a covenant not to compete from Respondents) are claims that there was breach of contract, not unconscionable behavior. Respondents' contention that Claimants sought to depress the value of the Company in service of a low bid by Torrecom, if proven, would perhaps amount to inequitable conduct. But Claimants do not here seek enforcement of the proposed sale to Torrecom. The factual foundations of Respondents' unclean hands defense do not concern anything integral to the concept that the Company would be sold at the end of the Lock-up Period, such as might be the case if Respondents contended that Claimants made promises to extend the Lock-Up Period or forego a Company sale entirely except on conditions different from those stated in 5.04(b)(ii). Thus, the elements of unclean hands alleged by Respondents, even if assumed to be true, do not warrant our exercising discretion to deny relief on the basis of them.

### H. Whether Alleged Impairment of An Oppression Remedy Under BVI Law Provides An Affirmative Defense to Respondents

60. Terra contends that its potential right to relief against Claimants for a forced sale of Claimants' shares to Respondents as a remedy for alleged "oppression, discrimination, or prejudice" under Section 184I of the Companies Act of the British Virgin Islands (BVI) would be compromised if

specific performance under Section 5.04(b)(ii) brings about a sale of the Company's shares to a third party (RFM at 33-34, RSM at 14-16).

61. The SHA excludes the application of BVI law *to the interpretation and performance of the Shareholders Agreement*. The Parties to the Shareholders Agreement, including three Parties incorporated in the BVI (the Company, Terra, and AMLQ), agreed to Section 8.10, which states: *This Agreement will be governed by and construed in accordance with the Laws of the State of New York, United States without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction)*." If the right of specific performance under Section 8.12 of the Agreement and under AAA Rule R-47(a), as applied to the Claimants' right to a Company sale under Section 5.04(b)(ii), were nullified, as Respondents contend, by the alleged requirement to preserve the availability of those shares for a potential forced sale to Respondents as an oppression remedy under the BVI Companies Act, then the SHA would effectively be *governed* to that extent by BVI law, contrary to Section 8.10.

62. This would also effectively add a term to the SHA, which is prohibited for the additional reasons that the Parties expressly made the SHA the exclusive source of their rights with respect to one another concerning the subject matter of the SHA. The seventh "Whereas" clause of the Shareholders Agreement recites that "*the parties are entering into this Agreement to set forth their respective rights and obligations with respect to the Company and the Shares ....*" We read that, in its plain meaning, to mean **all of** their respective rights and obligations. And Section 8.06 states: "*This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof....*" We would ignore that standard integration clause if we decided that the SHA sets forth the parties' entire agreement with respect to the sale of Shares except that we cannot grant specific performance of the Company sale provided for in Section 5.04(b)(ii) – or at least

37

cannot grant it at the time it is requested and on a timetable consistent with Section 5.04(b)(ii) -- because this would prevent us from eventually ordering a forced sale of Claimants' shares to Respondents as an oppression remedy under the BVI Companies Act. Further, this BVI Company Act objection to a Company sale falls within the requirement of Section 5.04(b)(ii) that Terra should **raise no objection**.

63. The case cited by Terra, in support of its argument for application here of the BVI Companies Act Section 184I(2)(a) as an obstacle to specific performance, <u>Mindspirit, LLC v. Evalueserve Ltd.</u>, 346 F.Supp.2d 552, 580 (S.D.N.Y. 2018), states: "[t]he internal affairs doctrine *is a 'generally-recognized choice-of-law rule,'* which is followed in New York, and which provides that questions relating to the internal affairs of corporations are decided in accordance with the law of the place of incorporation'" (emphasis supplied).[14] But the question here is not whether Terra may assert an "oppression" claim under the BVI Companies Act in this arbitration. We assume here without deciding that such a claim may be asserted. But among the various potential remedies for such oppression listed in the BVI Companies Act S. 184I(2)(A), forced sale of Claimants' shares to Respondents is foreclosed by the SHA.[15]

64. To find otherwise we would have to ignore the express exclusion of New York choice-of-law rules from the New York law we are empowered to apply to the SHA, and instead hold that in order to protect our *discretion potentially to grant* the forced sale of shares remedy under 184I(2)(a) of the BVI Company Law, we should invoke the "internal affairs doctrine" to prohibit

---

[14] *See* Terra's Nov. 15 Answers Submission at para. 2.

[15] Subsection 2(a) of S. 184I of the BVI Act vests discretion in the High Court to provide, as an oppression remedy, *"in the case of a shareholder, requiring the company or any other person to acquire the shareholder's shares."*

or at least delay specific performance of Section 5.04(b)(ii) of the Shareholders Agreement. Doing so here in our view would contradict the plain terms of the Agreement. Whether Respondents state a cause of action for oppression under the BVI Companies Act, and which of the other remedies under that Act might be appropriate if there is a cause of action and a violation by Claimants is established, are questions that may arise another day.

65. Terra also cites a number of cases for the proposition that a New York choice-of-law clause in a contract that says the contract shall be governed by New York law is not determinative of what law applies to tort claims. [16] It is not necessary for us to analyze these cases. Even as we assume without now deciding that Respondents have a legally sufficient BVI Companies Act oppression claim that the Tribunal may hear and decide under that Act, Terra's argument for Section 184I(2)(a) of that Act as an impediment to specific performance of Section 5.04(b)(ii) of the Shareholders Agreement fails for the reasons stated above.

**V. The Tribunal's Analysis and Decision as to Cost Allocation**

66. Rule R-47(b) of the AAA Commercial Arbitration Rules states: "In any interim, interlocutory, or partial award, the arbitrator may assess and apportion the fees, expenses, and compensation among the parties in such amounts as the arbitrator determines is appropriate." Rule R-47(d)(ii) states: "The award of the arbitrator(s)...may include:...an award of attorneys' fees if all parties have requested such an award or it is authorized by law or their arbitration agreement."

67. Section 8.11 of the SHA states in pertinent part: "The award may include an award of costs, including reasonable attorney's fees and disbursements." In view of the Parties' adoption of the AAA Commercial Arbitration Rules in the same Section 8.11, we construe the reference to "[t]he

---

[16] Terra's Nov. 15 Answers Submission at para. 2.

award" to apply to a partial final award such as this one, and to include the types of costs identified in Rule R-47 quoted above.

68. We construe the cost allocation provision in Section 8.11 to be one that permits the prevailing party to recover its reasonable attorney's fees and expenses and other costs associated with the proceeding in which it was successful, solely on the basis of having been successful, and without subjective evaluation by the Tribunal of the factual and legal positions advanced by the unsuccessful parties, or of the conduct of the parties and party representatives during the proceedings or in the business interactions that led to the arbitration. (That is not to say that this is the limit of our discretion in allocating costs under the clause, but it is the relevant scope for purposes of this Award). Our award of costs herein therefore entails no such subjective assessments, and is reflective only of the fact that Claimants are the prevailing parties in this Partial Final Award.

69.  As directed by the Tribunal, Claimants made a submission concerning the amounts of their legal fees and disbursements, and comments on the reasonableness of the sums claimed. Also as directed by the Tribunal, Respondents submitted written comments on the reasonableness of the sums claimed by Claimants. The Tribunal has carefully considered Respondents' arguments supporting a substantial reduction in the legal fees to be awarded. We note that an Arbitral Tribunal is not bound by New York law or federal law concerning awards of attorneys' fees in judicial proceedings. This is a procedural matter in the arbitration. While some of the factors affecting the amount of the award are similar, we are not bound to give the same level of scrutiny as would a court. We are influenced mainly by the degree to which Claimants were the prevailing party, the complexity and difficulty of the proceedings, and the reasonableness of the hourly billing rates (which Respondents do not question). We do not find any abusive billing practices or significant

redundancies or misallocations of time indicated by the examples in timesheets cited by Respondents. We have also considered Respondents' position that we should defer the award of attorneys' fees to a different stage of the arbitration. The Tribunal proposed that the Parties stipulate to such a solution but they did not. Owing to the uncertainty that could arise in terms of finality for enforcement in one or more jurisdictions where enforcement of this Award might be sought, the Tribunal finds its prudent to make a complete disposition on awardable costs for Phase 1 Company Sale at this time.

70.   Accordingly the Tribunal finds that the Peppertree Claimants are entitled to recover $139,189.50 of attorney's fees and $59,847.40 of disbursements, and Claimant AMLQ is entitled to recover $392,345.50 of attorney's fees and $ 26,777.90 disbursements.

71.   The Claimants are also entitled to recover the percentages of the Arbitral Tribunal's fees and expenses associated with this Phase 1 Award that are equal to the percentages of the deposits for the Tribunal's fees and expenses that the Peppertree Claimants and AMLQ have, respectively, paid to the ICDR. The relevant percentage for the Peppertree Claimants is 70% and for AMLQ is 30%. The Tribunal's fees and expenses associated with this Phase 1 Award have been $200,000 (a rounded figure reflecting the necessity of reasonable approximation) and therefore the Peppertree Claimants are entitled to be awarded $140,000 and AMLQ is entitled to be awarded $60,000 as recovery of their respective payments of shares of the Tribunal's fees and expenses associated with this Phase 1 Partial Final Award.

## VII.   PARTIAL FINAL AWARD CONCERNING SALE OF THE COMPANY

72.   For the reasons stated above, we award as follows:

(i)      Claimants' claim that Respondents Terra Towers Corp. and TBS Management S.A. breached the SHA by failing to cause the Company to proceed with sale of the Company pursuant to Claimants' January 19, 2021 Proposed Sale Notice is sustained, and Claimants' request that specific performance be granted as a remedy for such breach is sustained.

(ii)     Respondents Terra Towers Corp. and TBS Management S.A. shall cause their appointed members of the Board of Directors of the Company to vote in favor of the engagement of an Investment Bank as defined in the SHA at a Board meeting to be held within 15 days after those Respondents are notified in writing by Claimants of the Investment Bank that Claimant propose that the Company engage, provided that such written notice is received within 30 days from the date of this Award.

(iii)    The Approved Sale of the Company shall proceed on the basis of Claimants' Proposed Sale Notice of January 19, 2021 and pursuant to the engagement of the Investment Bank as required in (i) above, and pursuant to Section 5.04(b) of the SHA as construed in this Partial Final Award.

(iv) The Claimants' share of the compensation and expenses of the arbitrators totaling US$200,000 (the "Awarded Tribunal Fees") shall be borne by Respondents, jointly and severally. Therefore, Respondents, being jointly and severally liable, shall pay the Peppertree Claimants, within thirty (30) days from the date of this Partial Final Award, the sum of United States Dollars 140,000 (US$140,000), representing that portion of the Awarded Tribunal Fees that have been paid to the arbitrators for proceedings culminating in this Partial Final Award from deposits made to the ICDR by the Peppertree Claimants. The Respondents, being jointly and severally liable, shall reimburse AMLQ, within thirty (30) days from the date of this Partial Final Award, the sum of United States Dollars 60,000 ($60,000), representing that portion of the Awarded Tribunal Fees

that have been paid to the arbitrators for proceeding culminating in this Partial Final Award from deposits made to the ICDR by AMLQ. The amounts payable to the Claimants under this sub-paragraph shall bear simple interest from the date of this Partial Final Award until the date of payment at the rate of three and one quarter percent (3.25%) per annum.

(v)   Respondents, being jointly and severally liable, shall pay the Peppertree Claimants, within thirty (30) days from the date of this Partial Final Award, the sum of United States Dollars 199,036.90 (US$199,036.90) to reimburse them for attorney fees and costs incurred in connection with proceedings culminating in this Partial Final Award.  The amount payable shall bear simple interest from the date of this Final Award until the date of payment at the rate of three and one quarter percent (3.25%) per annum.[17]

(vi) Respondents, being jointly and severally liable, shall pay AMLQ, within thirty (30) days from the date of this Final Award, the sum of United States Dollars 419,123,40 (US$419,123.40) to reimburse them for attorney fees and costs incurred in connection with proceedings culminating in this Partial Final Award.  The amount payable shall bear simple interest from the date of this Final Award until the date of payment at the rate of three and one quarter percent (3.25%) per annum.

---

[17] This is the current Wall Street Journal Prime Rate (www.bankrate.com/rates/interest-rates/wall-street-prime-rate) (last visited February 20, 2022). The Tribunal declines to award the 9% rate provided in the New York Civil Practice Law & Rules, Article 50, as the Tribunal considers that it is not bound to apply this rate by reason of the New York choice-of-law clause, or the fact that New York is the place of arbitration. That rate is an aspect of procedure in the courts of the State of New York, is not agreed by the Parties, and is not aligned with what is necessary to compensate Claimants for the potential loss associated with delay in payment.  *See Report of the International Commercial Disputes Committee of the New York City Bar Association, Awards of Interest in International Commercial Arbitration: New York Law and Practice* (June 21, 2017) (www.nycbar.org) (last visited Feb. 20, 2022).

(vii)   The ICDR's administrative fees attributable to the proceedings culminating in this Partial Final Award shall be borne by the Respondents, jointly and severally. However, in view of the difficulty of attributing the correct portion of such fees to these proceedings in the context of all proceedings held and to be held, quantification is reserved to the Final Award.

(viii)   This Partial Final Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.


We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, and for the purposes of Article 4 of the Inter-American Convention on International Commercial Arbitration ("Panama Convention"), this Partial Final Award was made in New York, New York, United States of America.

Date: February 23, 2022

Mélida N. Hodgson, Co-Arbitrator

Date: February __, 2022

Richard F. Ziegler, Co-Arbitrator

Date: February __, 2022

Marc J. Goldstein, Tribunal Chair

Date: February __, 2022

_____
Mélida N. Hodgson, Co-Arbitrator

Date: February 23, 2022

_____
Richard F. Ziegler, Co-Arbitrator

Date: February __, 2022

_____
Marc J. Goldstein, Tribunal Chair

Date: February __, 2022            _____

                    Mélida N. Hodgson, Co-Arbitrator

Date: February __, 2022     _____
                    Richard F. Ziegler, Co-Arbitrator

Date: February 24, 2022     *M G* _____
                    Marc J. Goldstein, Tribunal Chair

I, Mélida N. Hodgson, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is the Partial Final Award Concerning Sale of the Company.

Date:  February 23, 2022

Mélida N. Hodgson

I, Richard J. Ziegler, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is the Partial Final Award Concerning Sale of the Company.

Date:  February 23, 2022

Richard F. Ziegler

I, Marc J. Goldstein, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is the Partial Final Award Concerning Sale of the Company.

Date:  February 24, 2022      *M G*

                                 Marc J. Goldstein