**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ X

TELECOM BUSINESS SOLUTION, LLC, *et al.*,          :          Civil Action No.: 1:22-cv-01761
                                                                              :
                                    Petitioners,          :          Judge Lewis A. Kaplan
                v.                                                      :
                                                                              :          Magistrate Judge Robert W.
TERRA TOWERS CORP., *et al.*,                              :          Lehrburger
                                                                              :
                                    Respondents.          :
------------------------------------------------------------------ X


**PEPPERTREE/AMLQ'S REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR**
**PRELIMINARY AND PERMANENT ANTI-SUIT INJUNCTION**

Respondents' Opposition brief (the "Opposition" or "Opp.") (ECF No. 179) fails to address the factual and legal arguments underlying the key inquiry before the Court: whether the BVI Action constitutes an improper collateral attack on its jurisdiction and that of the Tribunal.[1]  This Court can—and should—enjoin Respondents and their agents from prosecuting the BVI Action, which asks the BVI Court for a declaration regarding the identity of the Company's CEO, because that very same issue has already been decided by the Tribunal in the NY Arbitration in rulings subject to review by this Court.  *See* Ward Decl. Ex. 50 at ¶ 45 n.16 ("***The issue of whether Mr. Gaitan [is] in fact the CEO of Continental Towers was <u>already resolved by the Tribunal</u>***." (emphasis added)).

As the Court recognized just yesterday in confirming the Tribunal's TPFA, Respondents' and their agents' efforts to evade the rulings of the Tribunal is well-established.  ECF No. 182.  The Opposition makes clear that Respondents are the real parties in interest to the BVI Action, and that the BVI Action perpetuates this same pattern of misconduct.  Indeed, Respondents' half-hearted arguments to the contrary are belied by the fact that they devote the bulk of the Opposition to demonizing Mr. Gaitan, the Company's CEO, and improperly attempting to rewrite binding factual determinations that the Tribunal made against them in the NY Arbitration.  But Respondents' false narrative is immaterial to issuance of the requested anti-suit injunction.[2]  Moreover, their unwillingness to accept the Tribunal's well-reasoned and binding determination that Mr. Gaitan was validly appointed as the Company's CEO—and this Court's authority to

---

[1]     Capitalized terms herein have the same meaning as used in Peppertree/AMLQ's Motion for Preliminary and Permanent Anti-Suit Injunction (the "Motion").  *See generally* ECF Nos. 171 and 172 ("Br.").

[2]     The purportedly "factual" narrative Respondents set forth in the Opposition is rife with false statements and blatant mischaracterizations.  *See* Opp. at 3-17.  Because this narrative is both irrelevant to the Motion and an improper attempt to re-litigate factual findings that the Tribunal made in the SPFA, rejecting Respondents' baseless accusations against Mr. Gaitan, Peppertree/AMLQ will not take the time to address all of its inaccuracies here.  The facts leading up to issuance of the SPFA are set forth in Peppertree/AMLQ's briefing seeking confirmation of that award.  *See* ECF Nos. 92, 93 at 8-22.

review that determination—only underscores the need for an anti-suit injunction to prevent them from re-litigating the same issues in the BVI Action.

As explained in the Motion and more fully below, the BVI Action is part of a wholly improper series of repeated and relentless attempts by Respondents and their agents to undo the NY Arbitration ruling, and the Court should stop it by issuing the requested anti-suit injunction.

## LAW AND ARGUMENT

I.     **THE PARTIES TO THE BVI ACTION AND NY ARBITRATION ARE SUFFICIENTLY SIMILAR**

Respondents incorrectly attempt to cabin the substantial-similarity doctrine to only "companies owned by parties before the enjoining court."  Opp. at 24.  Respondents further disingenuously contend that "Quisquinay is acting in his role of CFO of the Company," not "as an agent of [Respondents]," *id.* at 23, and that they purportedly have "no more control over Quisquinay as CFO of the Company than Peppertree/AMLQ" do, *id.* at 24.  This argument fails for numerous reasons.

*First*, courts in the Second Circuit do not construe the substantial-similarity doctrine so narrowly.  Parties "are substantially similar if the real parties in interest are the same in both cases." *WTA Tour, Inc. v. Super Slam Ltd.*, 339 F. Supp. 3d 390, 403 (S.D.N.Y. 2018); *see also Int'l Equity Investments, Inc. v Opportunity Equity Partners Ltd*., 441 F. Supp. 2d 552, 562 (S.D.N.Y. 2006) ("Where parties to the two actions are affiliated or substantially similar, such that their interests are represented by one another, courts have found the [substantial-similarity] requirement is met.").  As Respondents have already admitted, the real parties in interest in the BVI Action are the Company's shareholders.  Ward Decl. Ex. 57 at 1-2.  The fact that Respondents are using Quisquinay—instead of one of their subsidiaries—as a proxy to prosecute the BVI Action does not dilute the applicability of the substantial-similarity doctrine.

***Second***, Respondents' attempt to argue that Quisquinay is acting independently is belied by the substantial record before this Court, including the Court's confirmation of the TPFA (ECF No. 182), and Respondents' admission that the Company directors appointed by Terra "intend to apply to intervene [in the BVI Action] as interested parties in order to be heard" on the "substantive arguments" in the BVI Action. Opp. at 15. To begin, Respondents' aim of undoing the Tribunal's finding that Mr. Gaitan is the Company's CEO is beyond question.[3]  Moreover, during the pendency of the NY Arbitration, Respondents have repeatedly used their agents, including Quisquinay, as pawns to support their positions and do their bidding, including by: (1) submitting written testimony by Quisquinay and others to the Tribunal on Respondents' behalf, *see, e.g.,* Ward Decl. Ex. 22; and (2) causing Quisquinay and others to sign letters supporting Respondents' positions, *see, e.g., id.* at Ex. 34. Although Respondents would have this Court believe that Quisquinay independently initiated the BVI Action, the facts before this Court compel the opposite conclusion.

***Third***, Respondents' contention that "this Court should not enjoin [Quisquinay] from bringing a lawsuit vindicating his statutory rights under" BVI law, Opp. at 21-22,[4] is directly at

---

[3]      Respondents' prior efforts to undo this ruling include: (1) asking the Tribunal to reconsider the November 12 Interim Order, *see* Ward. Decl. Ex. 24; (2) filing suit in Florida state court against, among others, the Company's independent counsel in the NY Arbitration, and asking the court to rescind the Framework Agreement, which confirms Mr. Gaitan's role as CEO, even though the Tribunal already rejected this argument, *see Terra Towers Corp., et al. v. Gelber Schachter & Greenberg, P.A., et al.*, 1:22-cv-06150-LAK (S.D.N.Y.) at ECF No. 1-4 at ¶ 40 (asking the court to rescind the Framework Agreement because, "[a]t the time of the Framework Agreement's execution, Plaintiffs and Defendants erroneously believed that Gaitan was the Company's CEO…"); and (3) soliciting and submitting to the Company's Board and the Tribunal a misleading purported "legal opinion" to support Respondents' spurious argument that Mr. Gaitan has been engaged in wrongdoing, *compare* Ward Decl. Ex. 34 (Quisquinay letter to the Board, attaching a purported, and subsequently discredited, "legal opinion") *with id.* Ex. 50 ¶ 9 (Tribunal finding that Respondents engaged in a "multi-faceted effort… to present to th[e] Tribunal and to the Company's Board a false narrative of misconduct and criminality by Mr. Gaitan" so that they could refuse to comply with its "orders to restore Mr. Gaitan[]" to his role as CEO.).

[4]      Respondents' argument that Quisquinay is somehow seeking to vindicate his own rights is wholly disingenuous since he has no authority to appoint the Company's CEO, which is reserved to the Board (*i.e.*, Terra and Peppertree). Indeed, Quisquinay would have no basis for a claim unless Respondents disputed the settled identity of the CEO, like they are doing here. It is Respondents' abject refusal to respect and abide by the authority and decisions of both the Tribunal and this Court—and the very dispute resolution process to which they agreed in the Shareholders Agreement and other governing documents—that created the purported "Board dispute" Quisquinay seeks the BVI

odds with Respondents' counsel's representation that the best approach to dealing with the BVI Action is "for each shareholder group to derivatively represent the Company in the BVI Courts to argue their respective positions."  Ward Decl. Ex. 57 at 1-2.  This statement reveals that the real parties in interest to the BVI Action are the Respondents; Quisquinay is merely their marionette.

## II.    THE SPFA, AND THE CURRENTLY PENDING PETITION TO CONFIRM IT, IS DISPOSITIVE OF THE BVI ACTION

Respondents next contend that "courts in the Second Circuit have found anti-suit injunctions in aid of arbitration appropriate when necessary only to: (1) compel arbitration of certain issues or (2) protect the court's judgment on the merits (because it confirmed an arbitration award)."  Opp. at 25.  This argument misrepresents the case law.

In *Jolen, Inc. v. Kundan Rice Mills, Ltd*., which is precisely on point, this Court issued an anti-suit injunction to protect a partial arbitration award that was pending confirmation before it. 2019 WL 1559173, *1-6 (S.D.N.Y. Apr. 9, 2019).  Specifically, "[a]fter the issuance of the Partial Award but prior to the start of th[e] [action before this Court seeking to confirm it], the Kundan Entities initiated ex parte proceedings in an Indian court seeking to vacate the Partial Award."  *Id*. at *1.  After Kundan initiated the Indian court action, suit was filed before "this Court to confirm the arbitration," and then a "motion for an anti-suit injunction" aimed at terminating the Indian court action was also filed here.  *Id*.  This Court found that the confirmation petition was dispositive of the Indian action because "[b]oth the petition before th[e] Court and the proceeding pending in

---

Court to resolve.  In any event, to the extent Quisquinay is acting as an agent of the Company—which he expressly alleges—an anti-suit injunction is also necessary because the Company is party to both the NY Arbitration *and* the BVI Action.  *See* Br. at 5 n.5, 22.  In his role as CFO of the Company, Quisquinay cannot be permitted to do that which the Company itself cannot do.  Respondents' argument that granting the anti-suit injunction would mean "a company could enjoin its employees from suing the company because they are its agents" (Opp. at 22) makes no sense because the injunction would prohibit *the Company*, which has taken no position on the Motion—and Quisquinay, as its purported agent—from prosecuting the BVI Action.

the courts of India purport to address the validity and enforceability of the Partial Award." *Id.* at *2. Indeed, the actions were "based on the same underlying dispute." *Id*.

The same is true here. The BVI Action asks the BVI Court to identify the Company's CEO, Ward Decl. 51 at ¶ 23, but, "*[t]he issue of whether Mr. Gaitan [is] in fact the CEO of Continental Towers was already resolved by the Tribunal*." Ward Decl. Ex. 50 (SPFA) at ¶ 45 n.16 (emphasis added). Given the clear overlap between the BVI Action and the SPFA, which is currently pending confirmation before this Court, there is no doubt that the SPFA is dispositive of the BVI Action. In a strained attempt to argue otherwise, Respondents try to frame the Tribunal's ruling that Mr. Gaitan is the CEO of the Company as merely a finding of fact and not a binding legal ruling. *See* Opp. at 26.[5] But this distinction is irrelevant (and false).[6] It is well settled that an order confirming an arbitral award "merely makes what is already a final arbitration award a judgment of the court." *Idea Nuova, Inc. v. GM Licensing Group, Inc.*, 617 F.3d 177, 180 (2d Cir. 2010); *see also Pacelli v. Vane Line Bunkering, Inc.*, 549 F. Supp. 3d 306, 313 (S.D.N.Y. 2021) ("confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court.") (internal quotations omitted). Second Circuit law does not differentiate between an arbitrator's findings of fact or conclusions of law but, instead, speaks in terms of arbitral awards generally. Indeed, an "arbitrator's factual findings . . . are not subject to judicial challenge." *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 214 (2d Cir. 2002). To hold otherwise would permit a disgruntled party to endlessly attack this Court's final judgments by re-litigating the factual findings on which they are based.

---

[5]      The New York state appellate court's decision in *Hidalgo v. 4-34-68, Inc.*—the lone authority on which Respondents rely to argue that the SPFA is not dispositive—has nothing to do with an arbitration award. *See* 988 N.Y.S.2d 64 (2d Dep't 2014).

[6]      In identifying the Company's CEO, the Tribunal necessarily interpreted and applied the relevant provisions of the Shareholders Agreement to make a legal determination. Ward Decl. Ex. 23 ¶¶ 3-4, 7.

### III.     BECAUSE THE IDENTITY OF THE COMPANY'S CEO IS GOVERNED BY THE SHAREHOLDERS AGREEMENT, AN ANTI-SUIT INJUNCTION DOES NOT INTERFERE WITH THE SOVEREIGNTY OF THE BVI COURT

Respondents also contend that an anti-suit injunction would impermissibly interfere with the BVI Court's sovereignty, claiming that the BVI Court's power to determine the validity of the November 12 Interim Order is "controlling" because the Company is incorporated in the BVI. Opp. at 18.   But this novel theory ignores—and is entirely negated by—the Company's Shareholders Agreement, which is expressly governed by the law of New York.  That agreement unambiguously (i) vests the Company' Board with the power to appoint the CEO and (ii) requires any disputes among the Board to be arbitrated before the Tribunal, which must apply New York law.  *See* Br. at 9-10 (discussing Ward Decl. Ex. 1 §§ 4.06(a), 8.14, 8.15).  Indeed, Respondents cannot possibly argue with a straight face that only the BVI Court has the authority to evaluate the November 12 Interim Order:  they have already asked ***this Court*** to vacate that order, ***twice***.  *See* ECF Nos. 27 104, 108.   In short, they agreed in the Shareholders Agreement to resolve the instant matter through the Tribunal, not in the BVI Court.

The authority on which Respondents rely—*LAIF X SPRL v. Axtel, S.A. de C.V.*, 390 F.3d 194 (2d Cir. 2004)—is inapposite.  There, the Second Circuit held that the District Court did not abuse its discretion in denying an anti-suit injunction because "(i) principles of comity counsel[ed] against the anti-suit injunction; (ii) the Southern District of New York ha[d] no appreciable interest in [the foreign] suit; and (iii) [the party that brought the foreign suit] ha[d] not attempted to 'sidestep' arbitration."  *Id.* at 196-97.

None of this reasoning applies here.  ***First***, in *Axtel*, the foreign suit was brought in Mexico to decide whether a party was a *bona fide* shareholder of a Mexican corporation under the corporation's bylaws—a question of Mexican law.  *Id.* at 200.  Here, Respondents agreed in the

6

Company's Shareholders Agreement that the question of how the CEO is appointed is governed by New York law, and that related disputes must be arbitrated with the NY Tribunal.  *See* Ward Decl. Ex. 1 at §§ 4.06(a), 8.14, 8.15.  Accordingly, there is no comity concern.  **Second**, in *Axtel*, the Southern District of New York had no involvement with the parties' dispute until it was petitioned for the anti-suit injunction and thus had no underlying interest in the foreign suit.  *See* 390 F.3d at 198.  In contrast, this action predates the BVI Action by over two years, in which time the Court has already confirmed the FPFA and TPFA, assumed jurisdiction over two related actions initiated by Respondents, and has been asked to consider numerous other requests for relief, including confirmation of the SPFA—which involves the *same* issue at the heart of the BVI Action.  *See* Br. at 26 ("The BVI Action . . . threatens this Court's jurisdiction to decide the pending Petition to Confirm the SPFA, in which the Tribunal found that Mr. Gaitán was the CEO of the Company.").  **Third**, there was no attempt to "sidestep" the related arbitration in *Axtel*; rather, the party opposing the anti-suit injunction simply asked the arbitration panel to stay the proceedings pending resolution of the Mexican law question but in all events "submitted itself to the arbitral forum."  390 F.3d at 200.  Here, Respondents' intention of sidestepping the NY Arbitration is beyond question, *see* Br. at 25-26, and Quisquinay has been instrumental to their efforts.  *See, e.g.*, *id.* at 13, 15, 18 n.9.[7]

## IV.   THE REMAINING *CHINA TRADE* FACTORS WEIGH IN FAVOR OF GRANTING THE NECESSARY ANTI-SUIT INJUNCTION

Respondents' argument that "the five factors set out in *China trade* favor denying Peppertree/AMLQ's motion," Opp. at 27, is unpersuasive for the following additional reasons:

---

[7]      For the same reasons, Respondents' argument regarding the first *China Trade* factor is equally unpersuasive. *See* Opp. at 28 ("The United States policy for enforcing arbitration clauses is on equal footing with that of its policy 'against interfering with proceedings before a foreign sovereign.'" (quoting *Laif X Sprl v. Axtel, S.A. de C.V.*, 310 F. Supp. 2d 578 (S.D.N.Y. 2004))).

*First*, contrary to Respondents' representation, "[a] proceeding is [not only] vexatious where a foreign proceeding threatens to undermine a federal judgment." Opp. at 28. A proceeding is vexatious where, as here, "a suit would require parallel actions to proceed concurrently." *Jolen*, 2019 WL 1559173, at *4 (internal quotations and alterations omitted). Moreover, like in *Jolen*, even though "there has been no federal judgment" confirming the SPFA, "[a]ny ruling by the [BVI Court] will threaten to undermine the jurisdiction of *this Court* to confirm or enforce the [FPFA and SPFA] pursuant to the New York Convention and the remainder of the arbitration proceedings." *Id*. (emphasis added). The BVI Action is also an obvious "end run around the parties' agreements to arbitrate disputes." *Id*.

*Second*, Respondents posit that the BVI Action is not a threat to this Court's jurisdiction because the BVI Court is not "attempting to carve out exclusive jurisdiction over" the issues before it. Opp. at 28. This argument misses the mark. The BVI Action threatens this Court's jurisdiction because it is "an affront to the strong public policy in favor of forum selection clauses," *Int'l Equity Investments,* 441 F. Supp. 2d at 563, like the one in the Shareholders Agreement, Ward Decl. Ex. 1 at § 8.15. In addition, the BVI Action threatens this Court's jurisdiction because it "is an attempt to interfere with the"SPFA, which is pending confirmation, by undermining factual findings therein. *See Jolen*, 2019 WL 1559173 at *4. The BVI Action also constitutes an attempt to interfere with the Company's sale, which was ordered by the FPFA and confirmed by this Court. *See* ECF No. 124.

*Third*, as explained in the Motion, a litany of equitable considerations weigh in favor of granting an anti-suit injunction. Br. at 26-27. Tellingly, Respondents do not address the lion's share of these considerations and, instead, argue that the BVI Action "is not delaying, or even interfering with the ongoing" NY Arbitration and the BVI Court "should be allowed to hear

litigation over its own company."  Opp. at 29.  These arguments fail because: (1) while the BVI Action is pending, there exists the potential for inconsistent judgments, which precludes the NY Arbitration from fully concluding; and (2) although comity sometimes weighs against the issuance of an anti-suit injunction, it is "well established […] that orders of foreign courts are not entitled to comity if the litigants who procure them have deliberately courted legal impediments to the enforcement of a federal court's orders."  *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 60 (2d Cir. 2004) (internal quotations omitted).

      *Fourth*, the risk of delay, inconvenience, additional expense, and inconsistent judgments all weigh in favor of granting the requested anti-suit injunction.  Br. at 27-28.  Respondents blatantly misrepresent that Peppertree/AMLQ have not "incurred substantial time and money litigating" in the BVI because "most of th[e] fees have been shifted to [Respondents] by the" Tribunal.  Opp. at 29.  The Tribunal has not even considered, let alone awarded, any fees or expenses to Peppertree/AMLQ due to Respondents' wrongful initiation of the BVI Action.  Ward Decl. Ex. 54.

## V.   PEPPERTREE/AMLQ SATISFY THE TEST FOR A PRELIMINARY INJUNCTION

      Finally, Peppertree/AMLQ meet the test for a preliminary injunction because (1) they will be irreparably harmed if this Court does not issue an anti-suit injunction; and (2) they are likely to succeed on the merits.  *First*, it is well established that the threat of inconsistent rulings constitutes irreparable harm.  *See, e.g., Keep on Kicking Music, Ltd. v. Hibbert*, 268 F. Supp. 3d 585, 591 (S.D.N.Y. 2017).  Respondents *concede* that the BVI Action could yield an inconsistent ruling; yet, they still implore this Court to "decline to interfere with the" BVI Action.  Opp. at 30. Unsurprisingly, Respondents cite no authority to support their request that the Court ignore the parallel and improper BVI Action.  It is also black-letter Second Circuit law that "[l]osing the

ability to enforce an arbitration agreement is a form of irreparable harm." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Seneca Family of Agencies*, 255 F. Supp. 3d 480, 490 (S.D.N.Y. 2017). Attempting to avoid this binding precedent, Respondents double down on the fiction that Quisquinay is acting independently, and that he "cannot be compelled to arbitrate his dispute" because he "is not a party to any arbitration agreement." Opp. at 30. This post-hoc justification for the BVI Action both fails to address the clear irreparable harm suffered by Peppertree/AMLQ absent the injunction and flies in the face of Respondents' counsel's admission that the BVI Action is truly a dispute among the Company's shareholders, Ward Decl. Ex. 57 at 1-2, which is subject to the Shareholders Agreement's broad arbitration clause, *id.* Ex. 1 at § 8.15.

**Second**, the relevant inquiry with regard to likelihood of success on the merits is whether "the claims [asserted in the BVI Action] must be submitted to arbitration." *WTA Tour*, 339 F. Supp. 3d at 406. Respondents ignore the fact that the claims asserted in the BVI Action ***have already been submitted to, and decided by, the Tribunal in the NY Arbitration***. Instead, they contend that "Quisquinay is not subject to this Court's jurisdiction," and he is raising "a dispute among directors of a deadlocked Board implicating the issue of an appointment of a Company CEO consistent with [BVI] corporate law." Opp. at 30. These arguments fail because: (1) for the reasons set forth above and in the Motion, Quisquinay is acting as an agent of both Respondents and the Company, and initiated the BVI Action at Respondents' behest; and (2) as Respondents' counsel's admission laid bare, the BVI Action is nothing more than an ill-conceived attempt to re-litigate a shareholder dispute that the Tribunal fully and finally resolved.

## CONCLUSION

For the foregoing reasons, Peppertree/AMLQ respectfully request that the Court grant the Motion and issue the Proposed Order filed therewith.

Dated:  September 7, 2023                    Respectfully submitted,


/s/ *Michael N. Ungar*                       /s/ *Gregg L. Weiner*
Michael N. Ungar                             Gregg L. Weiner
(admitted *pro hac vice*)                    Andrew S. Todres
Katherine M. Poldneff                        Ethan R. Fitzgerald
Gregory C. Djordjevic                        **ROPES & GRAY LLP**
(admitted *pro hac vice*)                    1211 Avenue of the Americas
**ULMER & BERNE LLP**                        New York, New York 10036-8704
1660 West 2nd Street, Suite 1100             Phone: (212) 596-9000
Cleveland, Ohio 44113-1406                   Fax:    (212) 596-9090
Phone: (216) 583-7000                        gregg.weiner@ropesgray.com
Fax:    (216) 583-7001                       andrew.todres@ropesgray.com
mungar@ulmer.com                             ethan.fitzgerald@ropesgray.com
kpoldneff@ulmer.com
gdjordjevic@ulmer.com
                                             Daniel V. Ward
                                             (admitted *pro hac vice*)
David A. Landman                             **ROPES & GRAY LLP**
**ULMER & BERNE LLP**                        Prudential Tower
275 Madison Avenue, Suite 2002               800 Boylston Street
New York, New York 10016-1138                Boston, Massachusetts 02199-3600
Phone: (917) 262-0470                        Phone: (617) 951-7000
Fax:    (917) 262-0480                       Fax:    (617) 951-7050
dlandman@ulmer.com                           daniel.ward@ropesgray.com


*Counsel for Petitioners Telecom Business*   *Counsel for Petitioner AMLQ Holdings*
*Solution, LLC and LATAM Towers, LLC*        *(Cay), Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was filed electronically on September 7, 2023 Notice of this filing will be sent to all counsel of record through the Court's electronic notice system.

<u>/s/ Michael N. Ungar</u>

*Counsel for Petitioners Telecom Business Solution, LLC and LATAM Towers, LLC*