P49FteLA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

TELECOM BUSINESS SOLUTION,
LLC, *et al.*

                    Plaintiffs,

            v.                          22 Civ. 1761 (LAK)

TERRA TOWERS CORP., *et al.*

                                        Oral Argument

                    Defendants.

------------------------------x

                                        New York, N.Y.
                                        April 9, 2025
                                        2:00 p.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                        District Judge

                         APPEARANCES

GREENSFELDER LLP
        Attorneys for Petitioner Telecom Business Solution
BY:   MICHAEL N. UNGAR
        KATHERINE M. POLDNEFF
        ASHTYN N. SALTZ

ROPES & GRAY LLP
        Attorneys for Petitioner AMLQ Holdings Cay Ltd.
BY:   GREGG L. WEINER
        ANDREW S. TODRES
        ETHAN R. FITZGERALD
        CASSANDRA FERRANTE

GST LLP
        Attorneys for Respondent Terra Towers Corp.
BY:   RODNEY Q. SMITH, II

Also Present:

Diego

P49FteLA

(Case called)

THE DEPUTY CLERK:  Petitioners, please put your appearances on the record.

MR. UNGAR:  Good afternoon, your Honor.

Michael Ungar from UB Greensfelder and colleagues on behalf of Peppertree.

Thank you.

THE COURT:  Afternoon.

MR. WEINER:  Good afternoon, your Honor.

Gregg Weiner from Ropes & Gray on behalf of the petitioner AMLQ, along with certain of my colleagues as well.

THE COURT:  Afternoon.

THE DEPUTY CLERK:  And respondents.

MR. SMITH:  Good afternoon, your Honor.

Quinn Smith on behalf of respondents.

I'm joined by my colleague at counsel table.  He's not entering an appearance.

THE COURT:  I didn't understand anything after Quinn Smith.

MR. SMITH:  Sure.  I'm joined by my colleague at counsel table.  He's not entering an appearance.

THE COURT:  What's his name?

MR. SMITH:  His name is Diego Gosis.

THE COURT:  Spell it for me, please.

MR. SMITH:  G-O-S-I-S.

P49FteLA

THE COURT:  And the first name?

MR. SMITH:  Diego, D-I-E-G-O.

THE COURT:  Is he an attorney admitted to practice in the United States?

MR. SMITH:  No, sir.

THE COURT:  So, who is he?

MR. SMITH:  He's my parter.  He's been licensed in Argentina, and so he's in the arbitration.  He's counsel in the arbitration and a Florida consultant in Florida.

THE COURT:  Okay.  Thank you.

Who wants to go first for the petitioners?

MR. UNGAR:  I would, your Honor.

THE COURT:  Okay.

MR. UNGAR:  Thank you very much.

MR. SMITH:  Your Honor, while Mr. Ungar is getting set up, we had some preliminary issues we wanted to address with you in relation to the demonstrative and the motion to unseal. I was hoping to address those now so counsel could go forward with his presentation.

THE COURT:  What are you talking about when you're talking about demonstratives?

MR. SMITH:  Sir, there's been a slide presentation prepared, and there were, I believe, two issues that we had with the slides.  We discussed them last night and this morning.  We were unable to resolve them, and so we'd like to

P49FteLA

bring them to your attention.

THE COURT:  You can do it later on.

MR. SMITH:  Okay.  Fine.

MR. UNGAR:  Thank you.

May I proceed, your Honor?

THE COURT:  You may.

MR. UNGAR:  Good afternoon.

Again, my name is Mike Ungar, and I represent the petitioners, Telecom Business Solutions and Latam towers for short.  As we have throughout these proceedings, I will refer to my clients, collectively, as Peppertree.

Mr. Weiner, my colleague, represents the petitioner AMLQ Holdings, which we refer to as AMLQ in our papers.  Our interests, as I'm sure your Honor as discerned, are highly aligned.  We've worked jointly and as efficiently as possible.

And we have jointly moved, your Honor, for an injunction, today, and sanctions to stop the respondent's relentless and frankly, heinous conduct described for the Court in our moving papers, all conducted, we submit, in efforts to avoid and evade the agreed arbitral forum and the multiple awards issued by the New York arbitration tribunal and, at least, with respect to partial awards numbers one through form, as confirmed and ordered by this Court and as with respect to partial final award number one, as unanimously affirmed, this Court was unanimously affirmed by the Second Circuit.

P49FteLA

This conduct is well-documented, we submit.  We will go through it for your Honor today, and largely --

THE COURT:  I'm going to hear the motion for an injunction first, and we'll deal with the contempt later.

MR. UNGAR:  Very good, your Honor.

As the Court is well aware, Peppertree, AMLQ, and the Terra respondents are all shareholders of Continental Towers, which we refer to in our papers and here today simply as the company, which is separately represented by independent counsel, Mr. Schachter and his colleague who are here in the courtroom today.

Respondent DT Holdings -- or DTH, as we refer to them -- Terra's affiliate, provides services to the company, including management of the company's subsidiaries in the eight different countries where the company operates.  And the individual respondent, Mr. Hernandez, owns and controls Terra and DT Holdings, as determined by the arbitrators on multiple occasions and as confirmed by this Court.

We thank you, your Honor, for agreeing to hear from us on an expedited basis.  We thank you for the scheduling that was put in place.  Urgent action is, indeed, required from this Court to stop this misconduct and flagrant and continuing violations of the Court's prior orders by the respondents.

In order to handle our presentation this afternoon as effectively and efficiently as possible, your Honor, I'll

P49FteLA

present an initial introductory overview of the issues we believe are before the Court, and then I will specifically address the attacks on company management, and now, unfortunately, successful efforts to imprison the company's CEO, all in an effort to avoid a sale.

And I will also address respondent's false public communications designed to, once again, undermine and interfere with the tribunal's and this Court's order, all of which are calculated to attack, subvert, and undermine the underlying New York arbitration and all of which, we believe, need to be stop.

Ped. I will then yield the floor to Mr. Weiner to address collateral actions that respondents are actively pursuing, likewise, in violation of the Court's orders, and likewise, things that need to be stopped.

I respectfully submit, your Honor, that all of this conduct represents flatout unabashed attacks, not only on this Court's orders, not only on the arbitrator's awards and orders, but, in fact, on our system of justice and, indeed, on the rule of law. I would have hoped that instead of fighting us every step of the way, my colleagues to my right would have joined us, but alas, hope is not a strategy.

In reviewing the opposition papers that came in shortly following the status conference, which your Honor quickly convened following the submission of our papers -- prompt action of which we were most appreciative -- what's

P49FteLA

most noteworthy about what is before your Honor right now, by way of the opposition to this conduct, is what you do not see.

There is no declaration before your Honor from Mr. Hernandez denying that he and his agents are behind the offending conduct of which we complain.  There is no statement under oath from Mr. Hernandez before your Honor disputing the fact that this conduct imposes enormous irrepairable harm on the company and its shareholders by interfering with the ordered sale process, court-ordered sale process.  There's no sworn statement from Mr. Hernandez that suggests that the respondent's actions about which we complain were not violations of your Honor's orders or the tribunal's awards. You don't have any of that.

Instead, what you have, basically, your Honor, is a Machiavellian word salad in front of you that tries to justify what they've done.  And Mr. Weiner said it well at our status conference, so I'll just piggyback on what he said.  This is conduct the likes of which I have not seen in 40 years of practicing law.  In many respects, I find it surreal that I find myself standing before you complaining about some of the things that have happened in this case.

While they try to focus the spotlight away from themselves, they spend no time in their opposition papers explaining why anyone other than them, why anyone other than the respondents would have any motivation --

THE COURT:  I've got that point.

Could we get to the point?

MR. UNGAR:  Yeah; we can move on.

Could we put up the first slide?

Let me just show the Court, your Honor -- hopefully in a pretty simple and straightforward format in this initial slide -- this captures the first, second, third, fourth, partial final awards, all of which have been confirmed, and again, the first of which your confirmation has been affirmed by the Second Circuit.

In the first partial final award confirmed by you on January 18, 2023, ordering the sale of the company, have they complied?  They have not complied.  Look no further than the most recently-issued award finding that none of the awards has been complied with in any respect.

And I understand, your Honor -- I think you're going to hear from my adversary -- and they're worthy adversaries, to be sure -- I think you're going to hear form them:  Well, we haven't had a chance yet to vacate or modify, and that's our right under the FAA, and it is their right under the FAA, but that doesn't make the arbitral award wrong.

And you, your Honor, can give it whatever weight you deem appropriate.  And it says --

THE COURT:  But, that's talking only about the fifth award; right?

P49FteLA

MR. UNGAR:  The fifth award says that none of the prior awards, none of the prior four awards have been complied with in any respect.

And even if we didn't have it -- when we filed this, as your Honor knows -- sequencing this is the better to be lucky than good category, we didn't have the fifth final award. We since have it, and the arbitrators have made very clear that none of these have been com- --

THE COURT:  But as to the first four, they've had an opportunity to move to vacate or whatever; right.

MR. UNGAR:  They've had a full and fair opportunity to vacate with respect to each of the prior four awards, and they now have that ability with respect to the fifth one.  I'm just talking to you a little bit about pre-hearing banter today, your Honor.

There was some objection by the other side.  They said, you can't talk about the fifth award, which we've filed with, your Honor, and our position is, you can look at it, and you can give it the weight the Court seems its due.

It's a valid arbitration award.  It's a unanimous arbitration award.

THE COURT:  Let's get to the point.

MR. UNGAR:  Okay.  Second point, second partial final award, finding that Mr. Gaitan is the CEO and that respondents advanced a false narrative of misconduct and initiated baseless

P49FteLA

criminal proceedings against company management.  Again, second partial final award confirmed by your Honor on February 20, 2024.

Third partial final award --

THE COURT:  It would help a lot if you would tell me something I don't know.

MR. UNGAR:  Okay.  Well, of course I don't know that.

I will try to move with a little bit more alacrity and dispatch.  There's the third award, which has to do with the termination of the foreign arbitrations.  They've continued to prosecute those -- I think your Honor is well aware of that -- and then the fourth award, which is not all that relevant here.

So, bottom line is that the tribunal has, to date, issued five partial final awards, and Peppertree and AMLQ have won each of them unanimously.  And Terra and DTH and Mr. Hernandez have lost unanimously each and every time, and those awards have been confirmed by your Honor.

And the first partial final award ordering the sale of the company was challenged, again, before your Honor, and then challenged on appeal and unanimously affirmed, and yet they've done --

THE COURT:  I've not been sleeping through the past several years.

MR. UNGAR:  I know that.

In response, I'm going to go back to their response

P49FteLA

for a moment -- and again, your Honor, this is at some risk that I'm not telling you something that you don't already know -- they argue completely irrelevant red herring issues. I'll give you an example.

They submit to your Honor the declaration of Mr. Azucena, okay, and they claim -- and I think are about to argue -- that that declaration that they've put before you, and I quote, confirms that Mr. Gaitan -- the company's CEO -- has received due process every step of the way.

We submit that, as usual, that completely misses the point, completely sidesteps the issue. Petitioners are not making a due process argument here on behalf of the company's CEO, and we're not asking the Court to enjoin any Guatemalan or El Salvadorian prosecutor from doing anything. Petitioners are simply asking this Court to stop the respondents and their agents to continue from violating the tribunal's and this Court's order.

Just a couple of days ago, Mr. Weiner and I had the privilege of arguing before three judges on the Second Circuit Court of Appeals on respondent's appeal of your Honor's judgment confirming the tribunal's second, third, and fourth partial final awards. And,the judges in that case got a pretty good taste of the same horror show that you've witnessed in this case. And at one point during the argument, Judge Walker commented to my adversary -- and I quote -- every step you've

P49FteLA

made has been to delay an award, close quote.  And Judge Walker, we respectfully submit, had it exactly right.  And it's time for them to be stopped; and only your Honor can stop them.  They haven't listened to us.  They haven't listened to the arbitrators, and it will be up them as to whether or not they listen to you, assuming that get we get the relief that we're looking for.

Now, what I think you're going to hear is, they're going to attempt to convince you that they had nothing to do with the misconduct that we are asking be enjoined, that these are the actions, somehow, of rogue agents that they don't control.

As Mr. Smith previewed during respondent's arguments at the March 19 status conference, and I quote -- this is what he said to you, your Honor -- quote, whenever you get a chance to look at the response and our papers in response and what the facts show to you, it's a lot more complicated than as being presented, close quote; wrong.

That's just wrong.  We've now seen the response papers, and your Honor has the response papers, and it's not more complicated.  What facts?  What facts is he talking about?  Where are they?  It's just a rehash of the same tried and true arguments that have been paraded in front of the arbitrators and paraded in front of this Court and have not faired well at all.

P49FteLA

Opposing counsel at the March 19 status conference wanted the Court to believe that nothing before the Court with respect to the motion at issue today is urgent.  As reflected in that transcript that was filed with this Court from that hearing counsel told you -- and I quote -- these are facts from December of last year and emails from January of this year.

Counsel told you -- and I quote -- the investor letter is described in the motion as a continuation of a narrative that has been ongoing for, as far as I know, at least, almost a year.

Well, facts are stubborn things, and what counsel didn't tell you about is that our motion was filed immediately on the heels of a very dangerous and serious escalation of respondent's misconduct.

On March 6, which is precisely eight business days before we filed seeking your Honor's help, the company's CEO Jorge Gaitan was thrown to prison.

On March 16, just two calendar days before petitioner's filed this motion, respondents sent an email blast to some of the largest institutional investors in the world making allegations of criminality against my client, Peppertree, who is represented in the room today and its senior leadership who are here as well, and against the AAA-ICDR arbitrators and against the forum itself.

On March 18, the day before we filed for relief, we

P49FteLA

learned that 163 of the company's towers had been seized, seized, pursuant to a Guatemalan court order.

Petitioner's motion is anything but untimely; it is urgent and it is timely.  The reality is that respondents before you -- Mr. Hernandez, Terra, and DTH -- largely through other entities and individuals that they control, have consistently and maliciously and willfully violated this Court's orders and are doing everything in their power to interfere with and undermine this Court's continuing jurisdiction.  Their actions are part and parcel of a transparent years-long quest to avoid selling the company, despite this Court's specific order to do so.

Is there a question, your Honor?

THE COURT:  When are you going to get to something new?

MR. UNGAR:  Hard to answer that, your Honor, in the following sense -- and I don't mean to be immodest in what I'm about to say -- I think we covered this in our submissions, and I think we covered it well.

THE COURT:  I do too, so I'm --

MR. UNGAR:  And I'm sensing an invitation -- which, at 65, you think I would have learned this lesson -- maybe I'll just say, I'll rest on my papers and sit down, and I can do that.

I don't think I have anything that is necessarily

P49FteLA

new, your Honor.  Again, we tried to lay it -- we tried to lay everything we could out there for the Court in detail with excruciating detail, because we recognize, first of all, this is serious as a heart attack for my clients, as I'm sure your Honor can appreciate.  I've never seen anything like it.

I can't believe the CEO is actually in jail.  I don't even know what they're going to say about that.  And they've orchestrated the entire thing just be- --

THE COURT:  They're going to say it was an immaculate incarceration.

MR. UNGAR:  That's right.  Precisely, your Honor.

It was an immaculate incarceration for sure.

THE COURT:  I mean, it just happened to pop into the mind of some Guatemalan or Salvadorian prosecutor:  Gee, why don't we lock him up.

I understand that's their position.

MR. UNGAR:  Amazing, isn't it?  It's just amazing, like, complete coincidence.

Just like it's a coincidence that can we just put up -- just skip to the slide.  I don't know if this qualifies as new or not, but it's late-submitted evidence, your Honor, because we just got wind of it.

Can we skip to the Hernandez criminal complaint against Echevarria?  Can we just put that one up?

And this is what?  Two days.  What's the date of this?

P49FteLA

March.

MS. POLDNEFF:  17.

MR. UNGAR:  March 17, 2025.

Mr. Hernandez, himself, is behind this criminal complaint, which does nothing but attempt to undermine your Honor's order, every single one of partial final arbitration awards, numbers one through five, and everything else is transparent as well.

So, with that, we submit, your Honor, this is some of -- again, respectfully, this is some of it not the most heinous conduct for all the reasons set forth in our papers, and we urge you to grant the injunctive relief and to issue sanctions, which, we've taken a shot -- well, you asked me to --

THE COURT:  We'll deal with that separately.

MR. UNGAR:  We'll leave that separate.

So, I'll leave it at the injunctive relief.

Right now, we've submitted a proposed order of injunctive relief for your Honor's consideration, and I thank you very much.

I'll yield the floor to Mr. Weiner.

THE COURT:  Okay.  Thank you.

Mr. Weiner.

MR. WEINER:  Thank you, your Honor.

I think, given the -- obviously, your Honor's read the papers and understand the case that's put forward.  The only

P49FteLA

thing I have that's new that's not in the papers is, there was an email exchange on Friday, April 4, which we'd like to introduce into the record, and I have a copy of the emails.

And it -- specifically, this is an email from the DTH manager, Mr. Garzaro, who emailed the company's board and counsel for the parties.  And this was in an exchange with Mr. Ranieri or precipitated by an exchange with Mr. Ranieri regarding funding for new towers in Peru, which, as your Honor knows, has been the subject of the arbitration and many fights.

And in this email from Mr. Garzaro to the board, he expressly states that regardless of the arbitration between the shareholders A and B and the arbitral awards rendered in those proceedings, we clarify that.  And then it says, TBS Peru, CT Peru, and CLL Peru -- those are the subsidiaries -- are not parties to such arbitration, and, accordingly, are not bound by any of its resulting awards.

And then it continues on to say that those arbitrations are continuing, and we put it up on the slide here, your Honor.

So can we introduce that?

THE COURT:  Sure.

MR. WEINER:  And other than that, I don't have anything new or different from what's in our papers.

THE COURT:  I take it that it's your position, at least as to confirmed awards that direct or prohibit action

P49FteLA

other than the payment of money, a violation of the confirmed award is a contempt of an order of this Court.

MR. WEINER:  That is our position.

We agree with that; yes.

THE COURT:  And is your position, also, that anyone with notice of a confirmed award who is in active concert or participation with anyone who is bound by the award is, likewise, in contempt of an order of this Court, if the order is violated, regardless of whether that person was a party to the arbitration in which the arbitration award was entered; is that right?

MR. WEINER:  Yes; that is right.

THE COURT:  Is it also your position -- let me just get my rules -- that this is a New York convention matter in respect of all of the various proceedings to confirm all of the awards we're talking about; yes?

MR. WEINER:  Yes.

THE COURT:  In your view, is an award confirmed by this Court that commands or prohibits action, other than the payment of money, enforced in a manner that involves the enforcement of federal law under Federal Rule of Civil Procedure 4.1?

MR. WEINER:  Well, I'm not sure I've analyzed it that way in our papers, but I think it is just as any judgment of this Court is a judgment of this Court and therefore, subject

P49FteLA

to enforcement pursuant to those rules.

THE COURT:  So, when I confirmed the first partial final award directing the sale of the company, a proceeding to enforce the order of this Court in respect of the sale of the company involves the enforcement of a federal law, because the convention is a treaty of the United States and is federal law.

MR. WEINER:  We agree with that; yes.

THE COURT:  All right.  The significance of that, I suggest to counsel on both sides, is that unless I hear persuasive argument to the contrary, I have the authority to issue arrest warrants, for a whole lot of people, to enforce the confirmed awards here for civil contempt.

MR. WEINER:  Yes.

THE COURT:  And they are executable anywhere in the United States.

MR. WEINER:  We agree with that, your Honor.

And in our brief, we certainly cited to the cases in which civil confinement was a sanction and ordered by your Honor and other judges in this context.

THE COURT:  All right.  Anything you want to add on this?

MR. WEINER:  Nothing further.

MR. UNGAR:  Nothing.

MR. WEINER:  Your Honor, just that one exhibit, can I hand it up?

P49FteLA

THE COURT:  Yes.

MR. WEINER:  Thank you very much.

MR. TODRES:  Your Honor, if I may approach with a copy of the slide deck as well.

THE COURT:  Yeah, please.

Okay.  Mr. Smith.

MR. SMITH:  Thank you, sir.

I am going to do my best to focus on your last discussion of the federal rules, since that seems to be what is of most interest to you.

THE COURT:  There are a great many things of interest to me.

MR. SMITH:  Sir, well, then, I'll start there, and whatever else you have --

THE COURT:  You start wherever you want to start.

MR. SMITH:  Thank you.

So, I wanted to speak a little bit about the New York convention.  And while it is --

THE COURT:  Do you agree that it's a treaty of the United States?

MR. SMITH:  I do agree that it is a treaty of the United States.

THE COURT:  And it is the supreme law of the land under the supremacy clause of the United States Constitution; yes?

P49FteLA

MR. SMITH:  Yes, sir.

THE COURT:  Okay.

MR. SMITH:  At the time, the convention encompasses how other countries might view international awards.

THE COURT:  I'm sorry.

I can't understand you.

MR. SMITH:  It encompasses how other countries might view international arbitration awards.  So, while I agree with you that it is the supreme law of this country and the courts in this country can look at the defenses in Article V, it doesn't follow that what these courts decide on those defenses will necessarily apply in other countries, because those courts get the same chance to look at international awards under those same defenses.

THE COURT:  That may sometimes be right, and it's certainly sometimes wrong, because the laws of other countries sometimes embody concepts such as -- we describe it as collateral estoppel and *res judicata*.

MR. SMITH:  Yes, sir.

THE COURT:  They involve issues of comity.  They involve respect for injunctive relief granted in other countries, and so your generality is overbroad.

MR. SMITH:  Well, then I'll try to limit it some.

Article V(2) of the New York convention, it provides for each country to look at an award and apply its own public

P49FteLA

policy.  That isn't -- I would argue that not an issue of collateral estoppel or not.  And we've seen even in this court that sometimes awards are annulled at the seat of arbitration, and we cited one of those cases, and they can be enforced here.

And so the point I'm trying to make is that the mere act of one country confirming or whatever it is doesn't necessarily have impact outside of that country's borders.

As a result, when it comes to the context of anti-suit injunctions and relief to be ordered that involves the cooperation of other courts, that, in the framework of the New York convention, the best answer is that the award should be taken and enforced in those countries so that those countries get the same chance to apply Article V that we have in this country.

Therefore, whenever we look at the anti-suit injunctions requested, such as the order to sell the company, the company is based in the British Virgin Islands, and the sale has to take place where the shares would be located, which would be in the British Virgin Islands.  This has been possible since 2022.  We're three years on, and the claimants have not sought to sell the company in the British Virgin Islands.

And so what we're arguing -- and we cite a few cases along this line -- is that, you can't come and say:  Well, you know, you should be selling the company.  And we make an offer

as to how to go about doing that.  Respondents don't respond to that offer -- sorry.  Claimants don't respond to that offer, and they come to you and say, force the sale of the company in the BVI.

All that we're saying is, go to the BVI and do what you want to do to require the sale of the company.  And that doesn't conflict with this Court's power and it doesn't conflict with this Court's power, and it doesn't convict with the New York convention.

Similarly, for whatever is happening in Peru or whatever is happening ion the other jurisdictions.  And that, to us, is how the New York convention works in this context and why it is different than other contexts that don't have the New York convention.  So, that's my submission on that part of the argument.

You said there were other things that you might want to get to.  If you could guide me, I can discuss them.  If not, I just have one or two points, based on what we heard earlier, but I am not here to belabor your time or anybody else's.

THE COURT:  Make your points.

MR. SMITH:  So, there was an argument that there were no declarations submitted in regards to the interference conduct.  In fact, we did give you the declarations from the arbitration.  Those were ECF 254, exhibit 16, Mr. Hernandez's pages 18 to 21, so it's not true that there has never been a

P49FteLA

denial of those statements, and we continue to not agree with them.

The investor email, when I referred to it as a narrative, I was taking a word from the motion, so I don't know I wasn't being trite. I wasn't being cavalier, which is what I was accused of being in that call. It talked about it being part of the same narrative, and so that's why I used the word.

That investor email, we have no idea. I have no idea who Peppertree's investors are. We don't care.

And I looked in the list of the recipients. I find the Albuquerque Foundation. I happen to know about Albuquerque; I went to high school there. I have no idea if they even invest money. It's just a charitable organization. So, whenever we see things like that, all we're saying is, there needs to be some kind of actual facts offered that it had something to do with our clients.

And at that time, we said: Well, we've got to look at the arbitration tribunal. Now we have the partial final award. Our point on that, it's pretty straightforward. It shouldn't be considered until you've had a chance to hear from our clients as to whether it is a mutual final definite award that can be confirmed under the new York convention.

THE COURT: Your papers are due almost momentarily, aren't they?

MR. SMITH: Well, we are discussing with counsel on a

P49FteLA

briefing schedule, and we've been back and forth.

We've all been busy, and I'm --

THE COURT:  Counselor, the last time I looked, I had set the briefing schedule.

MR. SMITH:  For the petition to confirm?

THE COURT:  I thought so.  Maybe I'm mistaken.  Maybe I'm confusing it with the schedule on this motion.

MR. SMITH:  Yes, sir.

That was my understanding, there isn't a briefing schedule on this.  And we had emails on Monday and Tuesday. And I talked to counsel today before we came here, so we were on top of this.

THE COURT:  Okay.  Then I'll stand corrected.

MR. SMITH:  My understanding is that we're close, so we're not trying to delay at all.

That does take me to the point -- I heard that there was a statement from Judge Walker about delay on Monday.  I took that to be a question from Judge Walker, not an affirmation.

And I think that the important thing -- because it gave me a chance to respond, and so that's why I took it as a question -- and it was whether or not the second partial -- we looked at what is happening now in the Second Circuit, and we see is there a lot of delay that has nothing to do with anybody, rather, it was the tribunal's decision to issue those

P49FteLA

partial final awards and create more litigation.

I'm not making that argument to you; I'm just responding to what I heard and understood to be an allegation of delay against us, and I wanted to be forthright and oppose that.

A couple other things that I heard. There's not a request for an injunction as to the prosecutors in the different countries. We had made that point in our opposition, and so it sounds like that's not actually an issue, whether there would be on injunction directed in any way, either effectively or not, as prosecutors in different countries or at Interpol that issued the red notice.

I heard about this. I did want to touch on this, your Honor, and it was referred to as an immaculate incarceration. I mean, this is -- the incarceration is in relation to a proceeding in El Salvador where Mr. Gaiton did not appear, and there was a red notice issued, and then, he was then arrested for failure to appear in El Salvador, and he's awaiting extradition to go to El Salvador.

And this has been pending for a while, so the arrest warrant itself is -- we talked about it at our hearing in October together. I can't give you an exact date, but I don't want to leave the Court with the impression that it was just, like, one day to the next. This has been a long-running proceeding, and we've provided evidence that it is not the kind

P49FteLA

of thing that you've seen before where somebody was messing with the Courts.

The only evidence provided by experts is that there is no control being exercised over anybody in El Salvador or Guatemala related to my clients or anyone related to them.  So I did want to touch on that.

The last thing I want to talk about is, you posed a series of questions so Mr. Weiner about the scope of an injunction, if you were to issue one.  And I think it's important that there's a tension here between Rule 65 and the actual injunction that was issued and turned into the judgment, because the tribunal in the third partial final award limits that injunction to the parties.

THE COURT:  No, they don't.

MR. SMITH:  Oh.  Sorry, sir.

THE COURT:  I know what you're referring to.

MR. SMITH:  Okay.

THE COURT:  And you're exaggerating and taking a little poetic license with it.

MR. SMITH:  Well, your Honor, I'm sorry.  I don't mean to exaggerate or take poetic license.

Well, your Honor, I take it that you've read our papers.  I was just trying to cite directly to what the award says.

And if -- and so please don't take me as coming here

P49FteLA

to exaggerate.

THE COURT:  If you are under the impression that the scope of an order of a federal court, in terms of who it binds, depends on the arbitration award, I think you ought to pay some very careful attention to whether that's right.

MR. SMITH:  That's not what I'm saying, your Honor.

And I don't mean to question your authority.  I was just -- the point that I was going to make is, to me, this is more like an injunction by agreement as opposed to an injunction under Rule 65.  That's the point that I'm making.

I am not here to quarrel with you about your powers under Rule 65.  I'm just making an analogy, your Honor.

So, that was the last point that I had from what I have heard so far.  So, with that, I will sit down, absent any other questions that you might have.

THE COURT:  Okay.  Thank you.

MR. SMITH:  Thank you.

MR. UNGAR:  Real quick, with your permission, your Honor.

THE COURT:  Yup.

MR. UNGAR:  I just want to focus on one point that counsel talked about with respect to these claims that led to the immaculate imprisonment.

This is what the arbitrators had to say about that.  Quote -- and could we put that slide up?  It's slide deck

P49FteLA

page 7.

And this is before your Honor in the fifth partial final award, page 2 paragraph 4:  Respondents, by continuing to claim that the CEO committed crimes in causing public prosecutors -- causing public prosecutors in Central America to accept this claim are defying our authority and that of the Southern District of New York Court -- referring of course, to your Honor -- and I want to be clear.  I want to follow up and, amazingly, agree with something that my adversary said; that doesn't happen very often in this case.

He's right.  We are asking this Court to issue a mandatory injunction to act swiftly and decisively to put an end to this madness by issuing the injunction that we seek. But it is not against, most assuredly, prosecutors or judges in any South or Central American country.

And though there can be no guarantees if this relief is granted, it will likely stop these unwarranted criminal prosecutions.  You, your Honor, I respectfully submit, are the only one that I know of that is going to finally, at long last, gain their attention.

The criminal prosecutions that brought the immaculate imprisonment about are -- most assuredly, as your Honor noted -- not the result of police or prosecutors independently determining that Mr. Gaitan is somehow engaged in any sort of criminal misconduct.  Instead, these criminal cases against

P49FteLA

Mr. Gaitan only exist because agents of respondents filed criminal complaints, in both Guatemala and El Salvador, urging that Mr. Gaitan be prosecuted and imprisoned.

And why did they do that?

THE COURT:  Are there copies of such complaints in the record?

MR. UNGAR:  I don't know that they are, your Honor.

We have -- we referenced the most recent complaint from Mr. Hernandez.

Are they in the record?

(Counsel conferred)

MR. UNGAR:  I am told that the dockets in the foreign proceedings are sealed, so we don't have access.

THE COURT:  Sealed in this Court?

MR. UNGAR:  No; not sealed in this docket.

THE COURT:  And when you say the dockets, what are you referring to?

MR. UNGAR:  Well, I'll have to bring my colleague back on that.

(Counsel conferred)

MR. UNGAR:  What that means, I am told, is that once the papers are filed, the papers that commence prosecution are filed, the papers are not accessible to us.

THE COURT:  And they're filed with whom?

MR. UNGAR:  They are filed with criminal courts in

P49FteLA

Guatemala, El Salvador -- Honduras?

THE COURT:  Is there --

MR. UNGAR:  And probably more jurisdictions.  There are probably more jurisdictions than we know about, your Honor.

THE COURT:  Is there any dispute that respondents or their agents or Mr. Hernandez's agents, directly or indirectly, in fact, made such complaints, whatever it is they say?

MR. UNGAR:  Can I yield the floor to my adversary?

THE COURT:  Sure.

MR. UNGAR:  I think the question is better put to them.

I will tell you, there is no evidence in the record that suggests otherwise, and now would have been the time to do it.

We think they're directly linked to every single one of these --

THE COURT:  I know what you think.

MR. UNGAR:  Yeah.  Sure.  All right.

MR. SMITH:  Your Honor, as to the Guatemalan proceedings, I believe that one of them that was shown to you was filed by Mr. Hernandez in relation to certain threats that were made against him.  The other ones, I believe, were filed by subsidiaries of the company, the company being the BVI company I've referred to you.

THE COURT:  So they were complaints filed by

P49FteLA

subsidiaries of the company or Mr. Hernandez in all these matters; is that right?

MR. SMITH:  I believe that that is correct but I -- without knowing which proceeding is which, I want to -- I don't want to overstate things.  I don't want to exaggerate things, so that's my understanding.  I'll give you my understanding of it.

THE COURT:  Okay.

MR. UNGAR:  May I supplement, your Honor?

THE COURT:  Yes.

MR. UNGAR:  In ECF 270-6 and 270-7, the Court will find some fairly-detailed narratives from counsel that we've affiliated with, with respect to each of the foreign proceedings that we've referenced.

THE COURT:  All right.  That's fine.

Now, a couple of things that you said.  I want to follow up on.  You referred to a mandatory injunction.

What mandatory relief are you seeking, specifically, and isn't the standard for mandatory preliminary relief quite different?

MR. UNGAR:  I misspoke.

And what I meant to say is, it is most assuredly -- mandatory in the sense that it is not voluntary, in the sense that my colleagues are not joining us in that.  I'm aware of the distinction you're making, your Honor, and I didn't mean to

P49FteLA

suggest otherwise.

THE COURT:  I'm distinguishing prohibitory from mandatory; that's what I'm referring to.

MR. UNGAR:  And we are seeking a prohibitory injunction, and I apologize for the misspeaking, the wrong use of the term.

THE COURT:  I think what Mr. Smith was endeavoring to tell me is that in one of the awards -- possibly the fifth, but I don't have that one here with me, because it's not at issue today -- the arbitrators commented somewhere that they were -- and this is not a precise quote, but a sense of what I took from it -- giving prohibitory relief against the respondents but not persons who were not respondents or words, sort of, to that effect.

Am I right about that?

MR. SMITH:  Yes, sir.

That was my argument, and that's footnote 17 of the third partial final award.  That's ECF 133-47, page 43.

And it says, quote, we decline to make relief applicable to persons who are not parties to the arbitration.

THE COURT:  I'm sorry.  You're losing me.

MR. SMITH:  I did it again.

And that's the problem with reading and speaking into a microphone.

We're referring to footnote 17, and that's ECF 133-47,

page 43 says, quote, we decline to make relief applicable to persons who are not parties to the arbitration, comma, while expressing no opinion as to whether some persons that PPT/AMLQ proposed to be within the scope of relief could become parties.

That's the full statement.

THE COURT:  And this is form the third?

MR. SMITH:  Yes, sir.

And so we would just take that as to be a statement of what the tribunal was saying as it relates to that point in time, not as statement as to future relief that you might grant.  So, that's the point.

MR. WEINER:  Your Honor, could I respond to that?

THE COURT:  Before you respond, let me find what I want to ask you about.  Too much paper.  Okay.

Go ahead, Mr. Weiner.

MR. WEINER:  Thank you, your Honor.

So just a couple of points on that.  First, the next sentence of the third award, which was not read in the footnote, says, FRCP 65 is not applicable before this tribunal for us in this case.

For us, in this case, the scope of permissible arbitral interim relief in an award is set by the Triple A commercial rules, so they were saying they didn't have the authority, under Rule 65, to bind agents.

But regardless, the award itself expressly says, the

P49FteLA

respondents shall prevent the commencement of any similar foreign arbitration or other legal proceeding, *et cetera*.

THE COURT:  But just to pursue the point that I thought Mr. Smith was trying to raise -- maybe he wasn't, but it provoked the thought in my mind.

Let's imagine a hypothetical different arbitral award, and the respondent is Joe Smith.  And the award says, Joe Smith shall not erect a structure on a piece of real estate that he owns somewhere in Wyoming.  It gets confirmed by a U.S. District Court.  Joe Smith's the only respondent in the arbitration.

Joe Smith goes out and he hires Harvey Builder to erect the building on that parcel, and for reasons that are extraneous to the hypothetical, Harvey Builder has notice of the award against Joe Smith, and is, obviously -- if he goes to erect the building -- in active concert and participation with Joe Smith.

Now, the arbitration award, in and of itself, makes no mention of Harvey Builder.  He's not a respondent.  It is addressed solely to prohibitory relief against Joe Smith.

The award gets confirmed.  Harvey Builder, knowing of the award, knowing of the judgment confirming it, and in an act

P49FteLA

of concert and participation with Jo Smith, goes and puts up a building.

Under Rule 65, is Harvey Builder subject to prosecution for contempt of Court?  That's my question.

MR. WEINER:  Well, I think Rule 65 covers agents and others acting in active concert, so I believe there would be a basis to do that.

I believe that your hypothetical is different from the facts here, and the facts here are actually much easier because --

THE COURT:  Because Hernandez a respondent.

I get that.

MR. WEINER:  Yes, exactly that.

And also that Hernandez and DTH are controlling the build- -- in your hypothetical, I think the builder is a third party who, with knowledge, agrees to do something.

That's different than the third parties here who are being directed by the respondents who are covered by the award.

THE COURT:  You're right.

It is a stronger case, I think.

If either side wants to brief that precise point, the Rule 65 application to somebody with notice and in active concert and participation with a respondent subject to a prohibitory or other injunction -- excuse me; injunction is the wrong word -- award that's been confirmed, you have until

P49FteLA

Friday at 5 o'clock, both sides; it's optional, and it's not to exceed five pages.

Okay.  Yes.

MR. UNGAR:  Happy to do so, your Honor.

One concluding point.  I agree with my colleague. What we have here is different than your Honor's hypothetical.

THE COURT:  I know that.

MR. UNGAR:  Right.

In the second partial final award, the arbitrators made it crystal clear who was behind all of these criminal prosecutions, and your Honor confirmed that.

You got it.  Okay.

THE COURT:  Yeah.

MR. UNGAR:  I'll sit down.

Thank you.

THE COURT:  So, now I'll hear on the contempt if there's anything else to be said.

MR. UNGAR:  May I have a moment to confer with my colleagues before I stand up again?

THE COURT:  Sure.

(Counsel confer)

MR. UNGAR:  We're good, your Honor.

THE COURT:  Okay.  Mr. Smith.

MR. UNGAR:  Thank you.

MR. SMITH:  I think there may be just a couple of

P49FteLA

points on contempt, and the only points I'd like to make on contempt are: number one, as it relates to the fines that are being requested, it -- it's hard for us to see, like, what is the relationship between the fines, the amounts, and the actual harm whenever -- for example, if the sale of the company could have been carried out a long time ago, if they had chosen to --

THE COURT:  I'm sorry.

The sale of the company, it what?

MR. SMITH:  Could have carried out a while ago, if they had wanted to, because they could have taken the award to BVI and sold it.

THE COURT:  You're really standing there, and with a straight face, saying it could have been sold if they wanted to?

MR. SMITH:  If you take it to the BVI, you can enforce the sale of the company.  That's how you do it in the BVI, your Honor.

THE COURT:  And you're really going to tell me no BVI company has ever been sold without going to the BVI.

MR. SMITH:  Yeah.

No.  No; that's not what I'm saying.

THE COURT:  Good luck.

MR. SMITH:  Sir, that's not what I'm saying.

I apologize for the incorrect implication created by my statement.

P49FteLA

The only thing is that it appears that the proposed order was quite broad on the monetary sanctions.  It talked about enjoined parties, and then it talked about enjoined parties being, kind of, a wide group of people and that monetary sanctions included --

THE COURT:  Enjoined.

MR. SMITH:  Enjoined parties.

I'm just going off of the proposed --

THE COURT:  Whatever you're going off I'm not hearing it all.

MR. SMITH:  Enjoined parties.

THE COURT:  That's the part I heard.

MR. SMITH:  Yes.

There is a very wide description of enjoined parties. That wide description carries over to the request for the monetary fines.  But in the reply, it appears that that was limited, and so the only request is that, if there is to be a fine, that it actually be limited.  Otherwise, it would appear that I would be fined and other people in the future would be fined, and that just seems too broad and inconsistent with the argument.  And so I just wanted to make that point while I have the opportunity.

THE COURT:  Okay.

MR. UNGAR:  Just briefly, your Honor.

We're good with whatever we proposed or anything that

P49FteLA

your Honor believes in your discretion and your wisdom that is appropriate, mindful of the fact that we're not talking about *de minimis* sums of money here.

The fifth partial award orders the respondents to pay upwards of $354 million, 25 million of which is punitive damages jointly and severally against them.  We would ask the Court to take that into account and give it whatever weight you deem appropriate in determining whatever amount of sanctions is appropriate.

THE COURT:  Well, the purpose of civil contempt remedies is coercive, not punitive, and some of the relief you asked for seemed to be punitive.

MR. UNGAR:  Well, we'll stop short of punitive.  We've gotten our punitive damages award from the arbitrators, and it will be up to your Honor as to whether or not that will be confirmed.

THE COURT:  The punitive damages you got from the arbitrator are for different conduct.

MR. UNGAR:  That's true.

And we're not looking for punitive damages.  We are very interested in course of damages.  One of the things we talked about, if your Honor had pressed us on this issue, is, there's a $480,000 per month payment that is made to DT for the management.  That would be another alternative that we think they may pay attention to, if your Honor deems that could be

P49FteLA

appropriate.

But again, we think there are --

THE COURT:  But I don't get it.

What does that suggest to me?

MR. UNGAR:  That suggests to you -- look, we put in our suggestion.  We think that money will get their attention.

And we suggested to your Honor the sum of $20,000 per day and then doubling, thereafter, every 14 days thereafter during a period of non-compliance with your Honor's order, we think that it is an appropriate coercive remedy that will have their attention.

We don't know what will have their attention, and we are amenable to anything else that your Honor may have in mind. Many of the remedies that came from the arbitrators, frankly, were not suggested by us, and I do understand that this is of different import.

THE COURT:  Let me ask you a practical question.

MR. UNGAR:  Yes, sir.

THE COURT:  Have you given any thought of the collectibility of any coercive fine that I might impose?

MR. UNGAR:  I would say, I don't mean to be smug, your Honor, but we give constant thought to that question.

In the context of this thought --

THE COURT:  Well, if you're giving it constant thought to it, maybe you can enlighten me as to whether you think it's

P49FteLA

collectible and why.

MR. WEINER:  Your Honor, if I could just jump in for a second -- hopefully we're on the same page; we usually are -- but I think what our concern has been is that the orders of this Court, to date, have not been successful in compelling compliance and that awards of the tribunal requiring escrows and other monetary relief have not been successful in coercing the respondents to comply.

And so when we sought this relief, we thought that, to the extent there's a monetary sanction, it should be significant, and, hopefully, get their attention, and, you know, create the opportunity for collection, potentially.  But we know that that's going to be a bit of a long shot.

So I do think --

THE COURT:  Is there money of property you can send the sheriff to get?

MR. WEINER:  The only property that I'm aware of in the United States is the Napa Valley -- I'll call it estate -- an olive oil vineyard and the like, and that is property that I think is quite valuable.  And we would make efforts to try to collect against that.  Undoubtedly, that would be resisted.

Who the actual owner is, whether Mr. Hernandez has put it in some LLC or some family member's name, I think it's going to be a challenge.  And that's one of the reasons we did allude to civil confinement as a sanction in our papers.

P49FteLA

We do think that something needs to be done to get Mr. Hernandez's attention to compel him to comply with the orders of this Court.  He hasn't done it.  All the monetary awards haven't been compelling to him to this date, and we thought that -- obviously, it's in your Honor's discretion in that regard -- we requested, you know, a significant monetary fine as well as --

THE COURT:  Yeah, but look, you've got to give me something to work with, assuming I conclude that a sanction is appropriate.

A civil commitment is not a first resort.

MR. WEINER:  Understood.

THE COURT:  And to tell me that there's a piece of property, you don't know who owns it, it must be valuable, and it probably would be resisted, and maybe it's in an LLC, where's the homework?

MR. WEINER:  Well, we've been doing the homework on that, and we're going to be doing more, of course, but I think that we have reason to believe that it will make a difference if there's an award that's collectible in the United States in terms of being able to collect on it in the United States where there are assets, and that's what we're hoping to do.

MR. UNGAR:  I agree with my colleague.

It will also make a difference, your Honor -- if we've been able to convince your Honor -- to issue an order that

P49FteLA

says, stop it; stop seizing towers in Guatemala.

THE COURT:  Is there anything in your motion papers about towers in Guatemala?

MR. UNGAR:  Yeah.  There is.

THE COURT:  There is?

MR. UNGAR:  There is.  There sure is.

THE COURT:  Okay.

MR. UNGAR:  The seizure that happened just before we moved, they took efforts to have 163 towers seized.  There are still approximately 1350 towers in the portfolio -- I just confirmed with my client -- from a collectibility standpoint.

I, perhaps, am, maybe, a bit more optimistic.  We'll see.  I think that we'll see.  I mean, that chapter has yet to be written, your Honor.  It's an issue, to be sure.

You're looking --

THE COURT:  I'm puzzled, but that's okay.

It's not the first time.

MR. UNGAR:  But your Honor's orders will certainly -- if we've been successful before your Honor --

THE COURT:  Well, the last four have been rousing successes, so, okay.

Thank you, gentlemen.

(Adjourned)