UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
TELECOM BUSINESS SOLUTION, LLC, *et al.*,

                            Petitioners,

                                                      22-cv-1761 (LAK)

                 -against-

TERRA TOWERS CORP., *et al.*,

                            Respondents.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION GRANTING ANTI-SUIT
INJUNCTION AND COERCIVE CIVIL CONTEMPT REMEDIES**

        Appearances:

                            Gregg L. Weiner
                            Ethan Fitzgerald
                            Daniel V. Ward
                            Katherine M. McDonald
                            ROPES & GRAY LLP

                            David A. Landman
                            Michael N. Ungar
                            Katherine M. Poldneff
                            Gregory C. Djordjevic
                            ULMER & BERNE LLP
                            *Attorneys for Petitioners*

                            Rodney Quinn Smith, II
                            GST LLP
                            *Attorney for Respondents*

LEWIS A. KAPLAN, *District Judge.*

        This matter is before the Court on the motion of Telecom Business Solution, LLC and

LATAM Towers, LLC (collectively, "Peppertree"), and AMLQ Holdings (Cay), Ltd. ("AMLQ," and

together with Peppertree, "Petitioners") for an anti-suit injunction and civil contempt sanctions

2

against Terra Towers Corp. and TBS Management, S.A. (collectively, "Terra"), and DT Holdings, Inc. ("DTH," and together with Terra, "Respondents").[1]

The Court previously has confirmed four partial final awards issued during an ongoing arbitration before a three-arbitrator panel (the "Panel" or "Tribunal").[2]  In its recently issued fifth partial final award ("5thPFA"), the Tribunal wrote, "We have made four Partial Final Awards, all of them against Respondents, and none of them has been complied with in any respect."[3] Petitioners seek an injunction and sanctions to protect and coerce compliance with this Court's judgments confirming the four partial final awards.

## Background

### I.    Procedural History

As set forth in the Court's opinion confirming the Tribunal's first partial final award ("FPFA"):[4]

On October 22, 2015, Petitioners and Terra entered the [shareholders agreement ("SHA")] whereby they co-own and operate Continental Towers LATAM Holdings, Ltd. (the "Company"), the business of which is the development and operation of

---

[1]      Dkt 243.

[2]      Dkts 124; 125 (confirming first partial final award); Dkts 207; 208 (confirming second partial final award); Dkts 182; 183 (confirming third partial final award); Dkts 202; 203 (confirming fourth partial final award).

[3]      Dkt 270-4 (hereinafter "5thPFA") at ¶ 1.

[4]      Dkt 124 at 2–7.

telecommunications towers in Central and South America.[5]  Pursuant to the SHA, Terra became the majority shareholder of the Company, holding about 55 percent, and Petitioners became the minority shareholders of the Company, holding about 45 percent.[6]  The SHA provides that, five years after the effective date of the agreement (the "Lock-Up Period"), Petitioners unilaterally could initiate a sale of the Company according to a procedure stated therein.[7]  The SHA provides also that it is governed by New York law and that the parties to the agreement are "entitled to specific performance" of any provision under Sections 8.10 and 8.12, respectively.[8] [. . .]

On November 4, 2020, two weeks after the expiration of the five-year Lock-Up Period, Petitioners sent a letter to the Company and Respondents purporting to initiate a sale of the Company to Torrecom Partners LP ("Torrecom") pursuant to Section 5.04(b) of the SHA.[9]  On November 24, 2020, Terra replied by letter rejecting the sale contemplated by Petitioners.  Over the following two months, the parties exchanged several communications in which Petitioners sought to retain an investment bank to facilitate a sale of the Company to an unaffiliated third-party purchaser – as provided by Section 5.04(b) of the SHA – and Terra refused, instead seeking to buy out Petitioners' shares in the Company.[10]

---

[5]

Dkt 9-22 (hereinafter "FPFA") at ¶ 1.

The facts are drawn principally from the Panel's FPFA of February 24, 2022 and interim orders of November 12, 2021 and March 15, 2022.  The Court "is not empowered to second-guess the arbitrators' fact-finding or assessment of credibility" and "must accept findings of fact if they are not clearly erroneous."  *Acciardo v. Millennium Sec. Corp.*, 83 F. Supp. 2d 413, 417 (S.D.N.Y. 2000) (citing *Int'l Bhd. of Elec. Workers v. Niagara Mohawk Power Corp.*, 143 F.3d 704, 706, 725–26 (2d Cir. 1998); *ConnTech Dev. Co. v. Univ. of Conn. Educ. Props*., 102 F.3d 677, 686 (2d Cir. 1996)).

[6]

FPFA, at ¶ 1.

[7]

Dkt 9-1 (hereinafter "SHA"), at 9, 28–31.

[8]

SHA at 48–49.

[9]

FPFA at ¶ 10.

[10]

FPFA at ¶¶ 12–16.

On February 2, 2021, Petitioners commenced the arbitration underlying this action (the "Arbitration"). They alleged, *inter alia*, that Terra had breached the SHA by obstructing their proposed sale of the Company and sought damages or specific performance.[11] [. . .]

On February 24, 2022, upon consideration of the parties' extensive submissions and oral argument during an all-day hearing [. . .] , the Panel issued its unanimous FPFA ordering a sale of the Company.

The FPFA was confirmed by this Court on January 18, 2023,[12] and the Second Circuit later affirmed the confirmation of the FPFA.[13] On March 14, 2023, Petitioners moved for civil contempt sanctions against Respondents for failing to perform their obligation to pay certain amounts owed to Petitioners under the FPFA.[14] The Court denied the motion without prejudice and stated that any renewed motion must set forth in detail all measures taken to collect the sums awarded by the FPFA.[15]

The Court's order confirming the Tribunal's third partial final award ("TPFA") picks up the story:[16]

On August 12, 2022, the Tribunal issued its Second Partial Final Award ("SPFA"), which sanctioned Respondents for engaging in a "multi-faceted effort . . . to present

---

[11]

*Id.*

[12]

*See* Dkts 124; 125.

[13]

*Telecom Bus. Sol., LLC v. Terra Towers Corp.*, No. 23-144, 2024 WL 446016, at *1 (2d Cir. Feb. 6, 2024) (summary order).

[14]

Dkt 136.

[15]

Dkt 200.

[16]

Dkt 182 at 2–5; *see also* Dkt 245-6 (TPFA).

th[e] Tribunal and the Company's Board a false narrative of misconduct and criminality by" the Company's chief executive officer and chief operating officer.[17] [ . . . ]

In December 2022, three of the Company's wholly owned subsidiaries and those subsidiaries' managers submitted a request for arbitration to the Arbitration Center of the Chamber of Commerce of Lima in Lima, Peru related to the Company and asserting claims substantially identical to Respondents' counterclaims that had been stayed in the NY Arbitration.[18]    Then, in January 2023, the Company's two Guatemala-based wholly owned subsidiaries initiated the Guatemala Arbitration, in which they also asserted claims substantially identical to those stayed by the Tribunal in the NY Arbitration.[19]   Although the parties differ between the NY Arbitration and the Foreign Arbitrations, the Tribunal has found that "[t]he real parties in interest . . . are precisely the same."[20]

On January 20, 2023, Petitioners filed a motion in the NY Arbitration seeking an anti-suit injunction relating to the Foreign Arbitrations (the "Motion").  Over the following three weeks, the parties submitted "more than 80 (mostly single-spaced) pages of briefing and more than 1,300 pages of exhibits," and the Tribunal heard nearly four hours of argument on the Motion.[21]  The Tribunal unanimously issued the TPFA on February 22, 2023.

In the TPFA, the Tribunal made, *inter alia*, the following factual and legal findings:

• "The real parties in interest in the Foreign Arbitrations and in this [NY] Arbitration are precisely the same."[22]

---

[17]    *See* Dkt 133-18 (hereinafter, "SPFA") at ¶ 9

[18]    *See* Dkt 133-47 at ¶ 2.

[19]    *See id.* at ¶ 5.

[20]    *Id.* at ¶ 126.

[21]    *See* Dkt 142 at 2; Dkt 133-41.

[22]    Dkt 133-47 at ¶ 126.

6

- "Respondents at a minimum have supported the Foreign Arbitrations, and . . . Respondents' proffer of a Board resolution purporting to seek dismissal of the Foreign Arbitrations was a pretense to mask their ongoing support for the Foreign Arbitrations."[23]

- Respondents have made the "same claims and sought the same damages already claimed by Respondents in [the NY Arbitration] in counterclaims submitted in 2021."[24]

- Respondents "acknowleg[ed] that the foreign tribunals lack jurisdiction over [Petitioners] and agree[d] that the Foreign Arbitrations are 'bizarre.'"[25]

- Respondents "breached the implied covenant of good faith and fair dealing" in the SHA and the Company's other governing documents.[26]

   Based on those findings, among others, the Tribunal issued the TPFA, which "require[d] Respondents to bring about the termination of the Foreign Arbitrations and [to] prevent new ones, and [to] bear financial risk if they fail[ed] to do so."[27]

   The TPFA was confirmed by this Court on September 6, 2023,[28] the fourth partial final award ("4thPFA")[29] was confirmed on February 8, 2024,[30] and the SPFA was confirmed on

---

[23]
   *Id.* at ¶ 78.

[24]
   *Id.* at ¶¶ 2, 11.

[25]
   *Id.* at ¶ 117.

[26]
   *Id.* at ¶ 116.

[27]
   *Id.* at ¶ 127.

[28]
   Dkts 182; 183.

[29]
   Dkt 272-28.  The 4thPFA specified the amounts of attorneys' fees, expenses, and arbitrator fees Respondents are obligated to pay to Petitioners.  *Id.* at ¶ 1.

[30]
   Dkts 202; 203.

February 20, 2024.[31]

        Also on February 20, 2024, the Court issued an order granting an anti-suit injunction against Respondents ("February 20 Order")[32] in response to foreign litigation filed by Respondents' agent in the British Virgin Islands ("Quisquinay Action") seeking an declaratory judgment regarding the identity of the Company's CEO.  The Court concluded that (1) the parties in this action and in the Quisquinay Action were substantially similar, (2) the issue raised in the Quisquinay Action was resolved by the arbitral tribunal in the SPFA, and (3) the factors set forth in *China Trade & Dev. Corp. v. M.V. Choong Yong*[33] weighed in favor of an anti-suit injunction.[34]

        On May 3, 2024, Respondents filed a petition in New York State Court seeking to stay the arbitration.  After that action was removed to this Court, the Court issued an order dismissing the petition.[35]

        On March 24, 2025, the Tribunal issued its fifth partial final award ("5thPFA").  The 5thPFA ordered Respondents to pay over $354 million, including $25,166,643 in punitive damages.[36]  The Tribunal determined that it had jurisdiction to determine claims against Jorge

---

[31]
        Dkts 207; 208.

[32]
        Dkt 209.

[33]
        837 F.2d 33 (2d Cir. 1987).

[34]
        Dkt 209 at 2–6.

[35]
        *Hernandez v. Telecom Bus. Sol., LLC*, No. 24-CV-03457 (LAK), 2024 WL 3401092 (S.D.N.Y. July 12, 2024).

[36]
        5thPFA at 191–98.

8

Hernandez — the sole owner of Terra and DTH[37] — under the doctrine of direct benefits estoppel.[38] Petitioners' motion to confirm the 5thPFA[39] is pending.

On April 9, 2025, this Court held oral argument on this motion.

## II.     *Foreign Actions*

As set forth above, Respondents, at a minimum, have supported multiple foreign arbitrations, including the Quisquinay Action and arbitrations in Peru (the "Peru Arbitration") and Guatemala (the "Guatemala Arbitration").

Petitioners allege that Respondents have instigated and supported additional foreign actions, including:

- Proceedings in El Salvador initiated on behalf of the Company's El Salvador subsidiary (the "El Salvador Action").  According to Petitioners, the El Salvador Action was initiated in February 2023, but Petitioners did not learn of it until December 20, 2024.[40]  On that date, Respondents' counsel notified them of a resolution issued by the Supreme Court of El Salvador on October 18, 2024, that purported to enjoin the enforcement of the Tribunal's award in the arbitration with

---

[37]

     *Id.* at ¶¶ 165–66.

[38]

     *Id..* at ¶ 164.

[39]

     Dkt 257.

[40]

     Dkt 244 at 8.

9

respect to the Company's subsidiary in El Salvador.[41]

- Proceedings in the British Virgin Islands initiated by the Company's Peruvian subsidiaries seeking to register decisions issued in the Peru Arbitration (the "Peru-Related BVI Action"). On November 29, 2024, the Eastern Caribbean Supreme Court in the High Court of Justice, British Virgin Islands, entered judgment confirming the award in the Peru arbitration.[42]

- Proceedings in the British Virgin Islands initiated by the Company's El Salvador and Guatemala subsidiaries seeking to register decisions issued by an arbitral tribunal in El Salvador (the "El Salvador-Related BVI Action", ). On December 17, 2024, the Eastern Caribbean Supreme Court in the High Court of Justice, British Virgin Islands, entered judgment confirming the award in the El Salvador arbitration.[43]

- Proceedings in Guatemala concerning the Company's Guatemala subsidiaries ("Guatemala Action"). According to a notification from Hugo Ortiz, chief executive of the Company's Guatemala subsidiary,[44] the court in that case ordered the seizure of 163 cell towers belonging to one of the Company's Guatemala subsidiaries and other punitive relief.[45]

---

[41] Dkt 245-17.

[42] Dkt 245-22.

[43] Dkt 245-21.

[44] Dkt 245-3 at ¶ 18.

[45] Dkt 245-28.

•      Criminal proceedings in Guatemala and El Salvador against Company officers as set forth below.

III.     *Criminal Proceedings in Guatemala and El Salvador*

       The SHA recognizes Jorge Gaitan as the Company's chief executive officer ("CEO"). Gaitan's position with the Company has been the subject of dispute in the arbitration and in collateral litigation.[46]  In an interim order issued on November 12, 2021, the Tribunal required that Gaitan be restored to his position as CEO after having been forced out in late September or early October 2021.[47]  On December 6, 2021, the Tribunal issued an order denying Respondents' motion to reconsider the November 12 order.[48]  Over the ensuing months, Respondents presented purported evidence of Gaitan's misdeeds to the Tribunal and, on March 30, 2022, informed the Tribunal that Gaitan was "under indictment for criminal acts."[49]

       After receiving submissions from the parties and conducting a hearing at which Gaitan and other witnesses testified, the Tribunal, on August 12, 2022,  issued the SPFA in which it wrote that Respondents engaged in a "multi-faceted effort" following the November 12 order to present "a false narrative of misconduct and criminality by Mr. Gaitan . . . . This effort included, as

---

[46]

     *See Telecom Bus. Sol., LLC v. Terra Towers Corp.*, No. 23-144, 2024 WL 446016, at *3 (2d Cir. Feb. 6, 2024); *Terra Towers Corp. v. Gelber Schachter & Greenberg, P.A.*, No. 22-CV-6150 (LAK), 2025 WL 1004750 (S.D.N.Y. Apr. 1, 2025).

[47]

     SPFA at ¶ 8.

[48]

     *Id.* at  ¶ 16.

[49]

     *Id.* at  ¶ 28.

its most central feature, filing multiple criminal complaints in a court in Guatemala in December 2021 and January 2022."[50]  The Tribunal specifically found, *inter alia*, that (1) a December 2021 criminal complaint against Gaitan filed in a Guatemala criminal court by a DTH employee, a proxy for DTH, lacked any good faith factual basis and was retaliatory for Gaitan's neutral role in the arbitration as Company CEO,[51] (2) a January 2022 criminal complaint against Gaitan was "an entirely pretextual effort to manufacture false evidence of criminality on the part of" Gaitan,[52] and (3) the December 2021 and January 2022 criminal complaints were "a contrivance by Respondents."[53]

Notwithstanding the Tribunal's findings in the SPFA, on May 11, 2024, Respondents filed an application with the Tribunal seeking the removal Gaitan as CEO based on allegations that he had committed acts of disloyalty against the Company, used Company funds for personal purposes, and engaged in other misconduct.[54]  On May 13, 2024, the Tribunal denied the application.[55]

Petitioners assert that Respondents have continued to pursue criminal prosecutions against Gaitan in Guatemala and El Salvador in efforts to oust him as CEO.  Specifically, Petitioners

---

[50]

*Id.* at ¶ 9.

[51]

*Id.* at ¶ 81.

[52]

*Id.* at ¶ 85.

[53]

*Id.* at ¶ 82.

[54]

Dkt 245-9.

[55]

Dkt 245-10.

12

submit that Respondent DTH, Hernandez, and/or entities or individuals affiliated with them have

initiated at least seven criminal matters against Gaitan and other Company officials.[56]

Those efforts allegedly culminated in the arrest of Gaitan and his father on January

26, 2025, and their subsequent imprisonment in early March 2025.  According to information

received by counsel for the Company, Adam Schachter, Gaitan was detained in connection with an

El Salvador criminal proceeding ("El Salvador Criminal Action") that was initiated by Tierras

Nacionales Ltda. de C.V. ("Tierras"), an affiliate of DTH.[57]  According to documents provided by

Jose Azucena, a Salvadoran lawyer retained by Respondents, the El Salvador Criminal Action

involves allegations that Gaitan and his father misappropriated over $1 million from Tierras between

2016 and 2021.[58]

According to a declaration by Josue Cifuentes, a Guatemalan lawyer retained by

Respondents, Gaitan has been incarcerated pursuant to a separate, Guatemala-based criminal

proceeding (together with the seven matters referenced in Petitioners' submissions, "Guatemala

Criminal Matters").[59]  This proceeding was not among the seven criminal matters identified by

Petitioners.  According to Cifuentes, the judge in that case ordered Gaitan's incarceration after

---

[56]
       *See* Dkt 270-6 at ¶ 11; Dkt 279-1 at 3–4.

[57]
       Dkt 245-47 at 6.

[58]
       Dkt 254-17 at 20–22.

[59]
       Dkt 254-24 at ¶¶ 24–32.  According to Cifuentes, "[o]n March 10, 2025, Mr. Gaitan's preliminary incarceration was mandated and carried out" pursuant to that proceeding. However, Schachter's email reported that Gatin was detained on March 6.  Dkt 245-47 at 6.

Gaitan's ex-wife purportedly discovered a laptop that did not belong to him at their shared residence.[60]

## Discussion

I.    Legal Standards

    A.    Anti-Suit Injunction

"The power of federal courts to enjoin foreign suits by persons subject to their jurisdiction is well-established."[61]  "[P]rinciples of comity," however, "counsel that injunctions restraining foreign litigation be 'used sparingly' and 'granted only with care and great restraint.'"[62]

An anti-suit injunction against parallel litigation may be imposed only if two threshold conditions are satisfied.  First, the parties must be the same in both matters.[63]  Second, "resolution of the case before the enjoining court [must be] dispositive of the action to be enjoined."[64]  Provided both conditions are satisfied, courts then consider five factors set out in the *China Trade* case:  "whether the parallel litigation would: '(1) frustrate a policy in the enjoining forum; (2) be vexatious; (3) threaten the issuing court's *in rem* or *quasi in rem* jurisdiction; (4)

---

60

    *Id.* at ¶ 30.

61

    *China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 35 (2d Cir. 1987).

62

    *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 652 (2d Cir. 2004) (quoting *China Trade*, 837 F.2d at 36).

63

    *Id.*

64

    *Id.*

14

prejudice other equitable considerations; or (5) result in delay, inconvenience, expense, inconsistency, or a race to judgment.'"[65]

### B.    Civil Contempt Sanctions

"The purpose of civil contempt is not to punish but to compensate for injury caused by any violation of a court order or process, to coerce compliance, or both. In order to prevail on a civil contempt motion, the moving party must establish that (1) the court order with which the alleged contemnor failed to comply was clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the alleged contemnor has not diligently attempted to comply in a reasonable manner. . . . A court order is clear and unambiguous when it 'leaves no uncertainty in the minds of those to whom it is addressed.'"[66] Courts regularly order civil contempt sanctions to induce compliance with judgments confirming arbitration awards.[67]

### II.    Anti-Suit Injunction

Petitioners seek an injunction that requires Respondents and affiliated individuals and

---

[65]

Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 500 F.3d 111, 119 (2d Cir. 2007) (cleaned up) (quoting Ibeto Petrochemical Industries Ltd. v. M/T Beffen, 475 F.3d 56, 64 (2d Cir.2007)).

[66]

Chevron Corp. v. Donziger, 384 F. Supp. 3d 465, 488–89 (S.D.N.Y. 2019) (footnotes omitted) (quoting Hess v. New Jersey Transit Rail Operations, Inc., 846 F.2d 114, 116 (2d Cir. 1988)), aff'd in relevant part, 990 F.3d 191 (2d Cir. 2021).

[67]

See Cardell Fin. Corp. v. Suchodolksi Assocs., Inc., 896 F. Supp. 2d 320, 328 (S.D.N.Y. 2012); Telenor Mobile Commc'ns AS v. Storm LLC, 587 F. Supp. 2d 594, 615–21 (S.D.N.Y. 2008).

entities, *inter alia*, (1) to withdraw, dismiss, and/or terminate the El Salvador Action, Guatemala Action, and the BVI Actions with prejudice, (2) to take "any and all actions necessary to nullify and/or terminate" those actions, (3) to refrain from participating in those actions, and (4) to refrain from bringing, causing to be brought, or participating in any other proceeding, action, or conduct that contradicts the awards issued in the arbitration or otherwise interferes with the arbitration.[68]

### A.    *Threshold Conditions*

As set forth above, to qualify for an anti-suit injunction, (1) the parties to the action in the enjoining court must be the same as those in the parallel litigation, and (2) resolution of the case before the enjoining court must be dispositive of the action to be enjoined. To satisfy the first threshold condition, "the parties need not be exactly identical; it is enough if they are substantially similar"[69] "such that their interests are represented by one another."[70]    The second threshold condition is satisfied where the action to be enjoined "concerns issues that . . . are reserved to arbitration."[71]

---

[68]    Dkt 243-1.

[69]    *WTA Tour, Inc. v. Super Slam Ltd.*, 339 F. Supp. 3d 390, 403 (S.D.N.Y. 2018).

[70]    *Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd.*, 441 F. Supp. 2d 552, 562 (S.D.N.Y. 2006), *aff'd*, 246 F. App'x 73 (2d Cir. 2007); *accord Paramedics*, 369 F.3d at 652 ("substantial similarity and affiliation" suffice).

[71]    *Karaha Bodas Co.*, 500 F.3d at 121.

1.    *Peru-Related BVI Action*

The Peru-Related BVI Action was initiated on behalf of the Company's Peru subsidiaries against the Company.[72]  The Peru-Related BVI Action seeks confirmation of an award from a Peruvian arbitration initiated on behalf of the subsidiaries by the DTH managers for Peru, Magali Merino and Alejandro Garzaro.[73]  In the TPFA, the Tribunal found that (1) the real parties in interest in the Peru arbitration and the New York arbitration are "precisely the same,"[74] (2) Respondents "have full capacity to bring about the termination of the [Peru arbitration],"[75] and (3) the claims made there were the same as the Respondents' counterclaims in the New York arbitration.[76]

Respondents attempt to relitigate the Tribunal's findings that they have control over the claimants in the Peru arbitration.[77]  However, they do not address whether the Court is empowered to revisit those findings.  In the context of confirming an arbitration award, the Court "is not empowered to second-guess the arbitrators' fact-finding or assessment of credibility" and

---

[72]    Dkt 245-22.

[73]    *Id.*; *see* Dkt 254-11 (Peru arbitration award).

[74]    TPFA at ¶ 126.

[75]    *Id.* at 43.

[76]    *Id.* at ¶ 124.

[77]    Respondents do not contest that the issues at stake in the Peru arbitration are the same as those at stake in their counterclaims in the New York arbitration.

"must accept findings of fact if they are not clearly erroneous."[78]  Respondents have not offered, and the Court has not identified, any authority indicating that the Court may second-guess arbitrators' fact-finding in the context of ordering relief to protect a judgment confirming an arbitral award.

Even if the Court could revisit the arbitrators' fact-finding, the doctrine of collateral estoppel may prevent Respondents from relitigating issues that were decided by the Tribunal.  "An arbitration decision may effect collateral estoppel in a later litigation or arbitration if the proponent can show 'with clarity and certainty' that the same issues were resolved."[79]  "Collateral estoppel is permissible as to a given issue if '(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; [] (4) the resolution of the issue was necessary to support a valid and final judgment on the merits[,]' [and (5)] application of the doctrine is fair."[80]

Here, "Respondents had ample opportunity to be heard during the proceedings that culminated in the TPFA, including — by Respondents' own estimation — more than 80 (mostly single-spaced pages of briefing, more than 1,300 pages of exhibits, and a three-hour hearing with arguments from both sides."[81]  Based on those proceedings, the Tribunal decided the issue of

---

[78]

> *Acciardo v. Millennium Sec. Corp.*, 83 F. Supp. 2d 413, 417 (S.D.N.Y. 2000) (citing *Int'l Bhd. of Elec. Workers v. Niagara Mohawk Power Corp.*, 143 F.3d 704, 706, 725–26 (2d Cir. 1998)).

[79]

> *Bear, Stearns & Co., Bear, Stearns Sec. Corp. v. 1109580 Ontario, Inc.*, 409 F.3d 87, 91 (2d Cir. 2005) (quoting *Postlewaite v. McGraw–Hill, Inc.*, 333 F.3d 42, 49 (2d Cir. 2003)).

[80]

> *Id.* (quoting *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 91 (2d Cir. 1997)).

[81]

> Dkt 182 at 10 (quotation marks omitted).

18

Respondents' control over the claimants in the Peru arbitration.[82]  The issue of Respondents' control over the claimants in the Peru arbitration therefore was raised, litigated, and decided in the arbitration proceedings.

The Second Circuit "has instructed district courts to consider the following factors in determining whether a party has had a full and fair opportunity to litigate the issue in a prior action: 'the size of the claim, the forum of the prior litigation, the use of initiative, the extent of the litigation, the competence and experience of counsel, the availability of new evidence, indications of a compromise verdict, differences in the applicable law[,] and foreseeability of future litigation.'"[83]  The claims at stake in the arbitration involve hundreds of millions of dollars, and the consequence for noncompliance with the TPFA is over $20,000,000.[84]  Nothing about the forum of the prior proceeding (the Tribunal) or the extent of the litigation cuts against the application of collateral estoppel, especially where the Tribunal conducted a hearing and received written submissions from the parties.  Respondents' counsel in the proceedings underlying the TPFA is a seasoned trial lawyer with extensive relevant experience.[85]  Respondents have not offered any new

---

[82]

TPFA at 42.

[83]

*CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 77–78 (2d Cir. 2017) (alteration in original) (quoting *King v. Fox*, 418 F.3d 121, 130 (2d Cir. 2005)).

[84]

TPFA at 43.

[85]

Michael B. Smith, Rottenstreich Farley Bronstein Fisher Potter Hodas LLP (last visited Apr. 15, 2025), https://www.rfbllp.com/team-Michael-Smith.html.

evidence undermining the Tribunal's findings,[86] indications of a compromise ruling by the Tribunal, or differences in the applicable law.  And the foreseeability of future litigation was manifest, since Respondents' failure to comply with an anti-suit injunction inevitably would result in further litigation to induce compliance.  Based on the foregoing, Respondents had a full and fair opportunity to litigate the issue of their control over the Peru arbitration claimants.

Resolution of the issue of Respondents' control was necessary to support the Court's award directing Respondents to cause the arbitration to be terminated.[87]  In fact, the TPFA provides that "[w]hereas the Tribunal has determined that Respondents have full capacity to bring about the termination of the Foreign Arbitrations, . . . they shall not present in any forum as an excuse for non-compliance with this Award that their efforts to bring about termination of the Foreign Arbitrations . . . were appropriate but unsuccessful."[88]  That is exactly what Respondents have done here.

Finally, application of the collateral estoppel is fair.  Respondents do not offer — and the Court cannot identify — any evidence of unfairness.  Indeed, in confirming the TPFA, the Court rejected Respondents' arguments that the proceedings related to that award were unfair.[89]

Accordingly, the threshold conditions are satisfied as to the Peru-Related BVI Action.

---

[86]
Respondents assert that "new facts" support reconsideration of the TPFA because they have "continued to demonstrate their separation from the award holders in the BVI Actions" by "seeking a dismissal of both of those cases and maintaining a joint defense with [Petitioners] on behalf of the Company." Dkt 253 at 21.  This assertion, which lacks any citation to the factual record, reiterates Respondents' arguments before the Tribunal and does not present any new evidence undermining the basis for the TPFA.

[87]
*Id.* at 42.

[88]
*Id.* at 43.

[89]
Dkt 182 at 9–10.

2.      *El Salvador Action*

The El Salvador Action was initiated on behalf of the Company's El Salvador subsidiary.[90]  Petitioners allege, and Respondents do not dispute, that the Action was brought by Antonieta Granillo, the DTH manager in El Salvador.[91]  Although the Action was not brought against Petitioners, the El Salvador Supreme Court's October 18 resolution purports to enjoin Petitioners from demanding compliance with the Tribunal's first four partial final awards.[92]

The TPFA did not address the El Salvador Action, and Respondents therefore are not collaterally estopped from arguing that plaintiffs there are not subject to their control.  Nevertheless, the Tribunal's findings regarding Respondents' control over DTH managers and the Company's foreign subsidiaries — which are binding on Respondents, per the above analysis — inform the Court's analysis.  In the February 20 Order, the Court recognized that Respondents were parties to the Quisquinay Action because their employee and agent filed the action, was advancing Respondents' interest, and was controlled by and acting on behalf of Respondents.[93]  The Court held also that while the action was brought against the Company rather than Petitioners, Petitioners were the real party in interest because they, along with Terra, owned the Company.[94]  Here too, Granillo

---

[90]

       Dkt 245-17.

[91]

       Dkt 244 at 8.

[92]

       Dkt 245-17 at 8.

[93]

       Dkt 209 at 3.

[94]

       *Id.*

is an employee of Respondent DTH and is controlled by Respondents.[95]  The Action advances the same intended result that Respondents have pursued in the arbitration — impeding the sale of the Company.  And Petitioners are the real parties in interest because the action seeks to enjoin them from enforcing the arbitration awards and this Court's judgments.  The parties in this action and the El Salvador Action therefore are substantially similar and the first threshold condition for an anti-suit injunction is met.

Respondents object that the parties to the El Salvador Action are Continental El Salvador and the Republic of El Salvador.  Respondents contend that the "Amparo Proceedings" in the El Salvador Action are "a judicial challenge to the validity or constitutionality of acts of a government authority,"[96] and therefore are directed at the Republic of El Salvador, not Petitioners.  The text of the October 18 resolution — which states that "the defendant and the companies that have been identified as third party beneficiaries in this proceeding must refrain from" demanding compliance with the four partial final awards issued by the Tribunal[97] — dispels that argument.

With respect to the second threshold condition, the El Salvador Action concerns the enforceability of the first four partial final awards issued by the Tribunal.  The Court has issued judgments confirming each of those awards, rendering them enforceable.  The issues at stake in the El Salvador Action already have been ruled on and disposed of by this Court.

---

[95]  *See, e.g.*, SPFA at ¶ 8 n.1 (Jorge Hernandez controls Respondents); *id.* at ¶ 40(7) (Hernandez controls DTH's individual country DTH affiliates).

[96]  Dkt 253 at 17 (quoting *Corporación Mexicana De Mantenimiento Integral v. Pemex-Exploración Y Producción*, 962 F. Supp. 2d 642, 646 n.5 (S.D.N.Y. 2013)).

[97]  Dkt 245-17 at 8.

Accordingly, the threshold conditions for an anti-suit injunction are satisfied as to the El Salvador Action.

3.     *El Salvador-Related BVI Action*

The El Salvador-Related BVI Action was initiated on behalf of the Company's El Salvador and Guatemala subsidiaries against the Company.[98]  The El Salvador-Related BVI Action seeks confirmation of an award from an El Salvador arbitration ("El Salvador Arbitration"), which was initiated on behalf of those subsidiaries by Granillo and Hugo Ortiz,[99] DTH managers for El Salvador and Guatemala respectively.  For the reasons stated above and in the February 20 Order, the Court finds that the parties to the El Salvador-Related BVI Action and this litigation are substantially similar.

With respect to the second threshold condition, the El Salvador Arbitration concerned claims that the Company failed to fulfill its obligations to the subsidiary under a partnership agreement by refusing to allocate sufficient economic resources to the subsidiary.[100]  The plaintiffs in the El Salvador Arbitration asserted that the "origin of the conflict" was the signing of the SHA, while at the same time declaring that "the SHA is not the document on which our claims are based."[101]  They further argued that their claims arose from "a systematic blockade by Mr. John

---

[98]     Dkt 245-21.

[99]     Dkt 254-6 at 2.

[100]     Dkt 245-21 at 4.

[101]     Dkt 254-7 at 2–3.

23

Rainieri, PepperTree's legal representative."[102]  Respondents do not dispute that the claims at issue

in the El Salvador are covered by the SHA's arbitration clause or that they are attempting to press

these claims in the underlying arbitration.[103]  To the contrary,  Respondents purportedly "denounced

the illegality" of the El Salvador Arbitration.[104]

Accordingly, the threshold conditions for an anti-suit injunction are satisfied as to the

El Salvador-Related BVI Action.


4.    *Guatemala Action*

The only information in the record concerning the Guatemala Action is an email from

Ortiz stating that (1) he "was notified by the Seventh Multi-Personal Court of First Instance for

Criminal Matters, Drug Activity, and Environmental Crimes of Guatemala regarding the

precautionary measures imposed by said court in case number 1079-2025-00058 concerning [the

Company's Guatemala subsidiaries]," (2) those measures include "[s]eizure with intervention of both

companies" and "[p]recautionary seizure of 163 towers belonging to [one of the subsidiaries]," and

(3) according to the information Ortiz received, the case "arises from a criminal complaint filed

against both companies."[105]

---

[102]

    *Id.* at 4.

[103]

    TPFA at ¶ 37 (foreign arbitrations and counterclaims in the arbitration both center on "Peppertree-appointed Company Board members' allegedly improper refusals to approve proposals for Tower development advanced by Terra and its Tower-construction affiliate owned and controlled by Jorge Hernandez, DTH").

[104]

    Dkt 254-6 at 7.

[105]

    Dkt 245-28.

On the present record, the identity of the parties to the Guatemala Action and the issues at stake are not clear. Accordingly, there is insufficient information to determine whether the threshold conditions are met with respect to the Guatemala Action.

>    5.    *El Salvador Criminal Action and Guatemala Criminal Matters*

>        i.    *Applicability of Anti-Suit Injunction Standard*

"An anti-suit injunction is one that prevents a litigant from pursuing litigation before a foreign tribunal."[106]  In *China Trade*, the Second Circuit recognized that "[t]he fact that the injunction operates only against the parties, and not directly against the foreign court, does not eliminate the need for due regard to principles of international comity, because such an order effectively restricts the jurisdiction of the court of a foreign sovereign."[107]

Here, Petitioners concede that "[w]hile this Court cannot control the decisions of foreign prosecutors, it can nonetheless grant effective relief by directing Respondents to withdraw heir false criminal claims and not to commence any new ones . . . ."[108]  In support, Petitioners submit a declaration from a Guatemalan lawyer, Alejandro Morales, who states that criminal complaints in Guatemala "are subject to withdrawal or discontinuance by the claimant or petitioner."[109]

The relief sought here would affect a foreign sovereign because it would cause the

---

[106]    *Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd.*, 441 F. Supp. 2d 552, 561 (S.D.N.Y. 2006), *aff'd*, 246 F. App'x 73 (2d Cir. 2007).

[107]    *China Trade*, 837 F.2d at 35 (citation omitted).

[108]    Dkt 269 at 6.

[109]    Dkt 270-6 at ¶ 13.

25

termination of the pending criminal actions in foreign courts.  It therefore would qualify as an anti-suit injunction.

### ii.    Application of Anti-Suit Injunction Threshold Conditions

The El Salvador Criminal Action was brought against Gaitan and his father by an auxiliary agent of the El Salvador Attorney General's Office.[110]  Based on the information available to the Court, it appears that the Guatemala Criminal Matters were brought by local prosecutors in Guatemala.[111]  The parties in this litigation are not the same as the parties in those matters.  Even though the prosecutions appear to have been initiated by Respondents, the Court cannot conclude on the present record that Respondents and local prosecutors are substantially similar "such that their interests are represented by one another."[112]  Moreover, Gaitan — an officer to the Company who Petitioners maintain is a neutral party as to the disputes between Petitioners and Respondents — is not substantially similar to any of the parties here.

With respect to the second threshold condition, Petitioners have failed to show that this Court's judgments are dispositive as to the El Salvador Criminal Action and the Guatemala Criminal Matters.  In the SPFA, the Tribunal found that (1) Respondents had caused multiple criminal complaints to be filed against Gaitan and others, and (2) the allegations of criminality were

---

[110]

Dkt 254-17 at 18.

[111]

*See* Dkt 254-24 at ¶ 25.

[112]

*Int'l Equity Invs., Inc.*, 441 F. Supp. 2d at 562 (S.D.N.Y. 2006), aff'd, 246 F. App'x 73 (2d Cir. 2007); *accord Paramedics*, 369 F.3d at 652 ("substantial similarity and affiliation" suffice).

deliberately false.[113]   These findings are not dispositive of Gaitan's criminal liability vis a vis Guatemala and Salvador authorities.[114]

Accordingly, neither of the threshold conditions for an anti-suit injunction is met for the El Salvador Criminal Actions and the Guatemala Criminal Matters.[115]

B.    China Trade *Factors*

For the actions that satisfy the threshold conditions, the Court next considers five factors set out in the *China Trade* case: "whether the parallel litigation would: '(1) frustrate a policy in the enjoining forum; (2) be vexatious; (3) threaten the issuing court's *in rem* or *quasi in rem* jurisdiction; (4) prejudice other equitable considerations; or (5) result in delay, inconvenience, expense, inconsistency, or a race to judgment.'"[116]  "Furthermore, where a party initiates a foreign suit in 'an attempt to sidestep arbitration,' an anti-suit injunction may be particularly appropriate 'given the federal policy favoring liberal enforcement of arbitration clauses.'"[117]

---

[113]    SPFA at ¶¶ 9, 80–88.

[114]    Moreover, as the Tribunal recognized, the issue of Gaitan's criminality was "a sideshow to the merits of the arbitration, as it does not involve directly the determination of the merits claims the Parties have asserted against one another."  *Id.* at 1.

[115]    In so holding, the Court does not rule on (1) the Tribunal's authority to enjoin or sanction Respondents' participation in those matters, or (2) the availability of a tortious interference, breach of fiduciary duty, or other claim for damages arising from Respondents' participation in those matters.

[116]    *Karaha Bodas*, 500 F.3d at 119 (alteration marks omitted) (italics added) (quoting *Ibeto Petrochemical Industries Ltd.*, 475 F.3d at 64).

[117]    *Alstom Chile S.A. v. Mapfre Compania De Seguros Generales Chile S.A.*, No. 13 CIV. 2416 LTS DCF, 2013 WL 5863547, at *4 (S.D.N.Y. Oct. 31, 2013) (quoting *LAIF X SPRL v.*

The Court's analysis of the *China Trade* factors in the February 20 Order applies with equal force here:

- Permitting the El Salvador and BVI Actions "would frustrate the strong United States policy of enforcing arbitration clauses."[118]  This policy outweighs the policy against interfering with proceedings before a foreign sovereign where, as here, "the foreign action interferes with the U.S. court's own jurisdiction[ and] . . . is designedly vexatious or calculated to cause material and burdensome delay."[119]

- The El Salvador and BVI Actions are vexatious because they seek to relitigate issues already resolved by the arbitral tribunal.  "This factor is so compelling that it may be 'alone sufficient to support [the] foreign anti-suit injunction.'"[120]

- The El Salvador and BVI Actions threaten the Court's jurisdiction because they attempt to thwart the Courts's orders confirming the FPFA and TFPA.

- Equitable considerations weigh in favor of an injunction because (1) "if an injunction is not entered, Petitioners will be forced to litigate in New York and the BVI [and El Salvador], despite the bargained-for Arbitration Agreement mandating that shareholder and Company disputes be arbitrated in New York," and (2) the El Salvador and BVI Action "harm[] the prospects of the contractually-mandated sale

---

*Axtel, S .A. de C.V.*, 390 F.3d 194, 199 (2d Cir.2004)).

[118]

Dkt 209 at 4.

[119]

*Id.* at 5 (alterations in original) (quoting *Laif X Sprl v. Axtel, S.A. de C.V.*, 310 F. Supp. 2d 578, 581 (S.D.N.Y. 2004), *aff'd*, 390 F.3d 194 (2d Cir. 2004)).

[120]

*Id.* (quoting *Paramedics*, 369 F.3d at 654).

of the Company ordered by the Tribunal and this Court."[121]

- The risks that the El Salvador and BVI Actions "will cause delay, inconvenience, unnecessary additional litigation expense, and inconsistency between this Court's and the [foreign courts'] judgment[s] are manifest."[122]  Indeed, as detailed above, the El Salvador Action and BVI Actions already have yielded rulings that contradict the awards of the Tribunal and the judgments of this Court.

Accordingly, entry of an anti-suit injunction against the El Salvador and BVI Actions is warranted here.[123]

## III.    Interference Conduct

Petitioners seek also an injunction against "actions and conduct designed to undermine and/or interfere with the Arbitration, the Arbitration awards, or this Court's corresponding judgments and orders."[124]  Petitioners contend that this relief is warranted because

---

[121]

     *Id.* at 6 (cleaned up)

[122]

     *Id.*

[123]

     Petitioners' motion states that — after determining that an anti-suit injunction is warranted per the above analysis — the Court must next determine whether the standard test for issuance of a preliminary injunction is met.  Dkt 244 at 29.  In their reply brief, Petitioners argue that they need not satisfy the ordinary preliminary injunction requirements.  Dkt 269 at 5–6.  The Court agrees with the latter view.  "Once confirmed, [arbitration] awards become enforceable court orders, and, when asked to enforce such orders, a court is entitled to require actions to achieve compliance with them."  *Zeiler v. Deitsch*, 500 F.3d 157, 170 (2d Cir. 2007).  The preliminary injunction analysis is not applicable where a party has already obtained a judgment in its favor and seeks to enjoin conduct that violates that judgment. *Canada Dry Delaware Valley Bottling Co. v. Hornell Brewing Co.*, No. 11 CIV. 4308 PGG, 2013 WL 5434623, at *11 (S.D.N.Y. Sept. 30, 2013).

[124]

     Dkt 243-1.

Respondents "have launched a coordinated misinformation campaign to spread their false and unsupported narrative about the Arbitration," including an unattributed email to investors impugning the integrity of the arbitration (collectively, "Interference Conduct").[125]

Petitioners point to district court decisions enjoining parties from interfering with arbitration proceedings.[126]  But Petitioners have not identified any authority that supports enjoining a party to an arbitration from criticizing an arbitration proceeding.   Nor have Petitioners grappled with the potential First Amendment implications of such an injunction.  The injunctive relief sought by Petitioners is unavailable for the additional reason that it does not "describe in reasonable detail . . . the act or acts restrained or required."[127]

Accordingly, the Court declines to enter an injunction against the Interference Conduct.


*IV.    Civil Contempt*

As set forth above, to prevail on a civil contempt motion, the moving party must establish that (1) the order or judgment with which the alleged contemnor failed to comply was clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the alleged contemnor has not attempted diligently to comply in a reasonable manner.  Petitioners move for civil contempt relief against individuals affiliated with Terra for their non-compliance with the Court's

---

[125]
    Dkt 244 at 18, 33.

[126]
    Dkt 244 at 33 (citing cases).

[127]
    Fed. R. Civ. P. 65(d)(1)(C).

30

judgments confirming the Tribunal's first four partial final awards.


    *A.*    *Compliance with the FPFA*

        The FPFA ordered Respondents to facilitate the sale of the Company.[128]  Specifically, the FPFA directed Terra to cause its appointed members of the Company's board of directors "to vote in favor of the engagement of an Investment Bank as defined in the SHA at a Board meeting to be held within 15 days after those Respondents are notified in writing by Claimants of the Investment Bank that Claimant propose that the Company engage, provided that such written notice is received within 30 days from the date of [the FPFA]."[129]  The FPFA further provided that the sale of the Company "shall proceed on the basis of Claimants' Proposed Sale Notice of January 19, 2021 and pursuant to the engagement of the Investment Bank . . . ."[130]

        Petitioners contend that Respondents have failed to comply with these components of the FPFA.  The 5thPFA includes a thorough account of Respondents' non-compliance with the FPFA.[131]  In sum, the Tribunal found that Respondents prevented the engagement of an investment bank to facilitate the sale of the Company.[132]  Although Terra's appointed members of the Board approved a resolution to engage Citibank to facilitate the sale of the Company, Terra's

---

[128]      FPFA at ¶ 72.

[129]      *Id.* at ¶ 72(ii)

[130]      *Id.* at ¶ 72(iii).

[131]      5thPFA at ¶¶ 12–21.

[132]      *Id.*

representatives delayed and effectively prevented the retention of Citibank.[133]  For example, Terra
insisted on "three quid pro quos for a Citibank engagement letter that they would sign: (1) that there
would be an immediate pro rata distribution of all received proceeds at closing, (2) that Citi would
first provide its own current valuation of the Company, and (3) that Citi would confirm whether it
was correct, or not, that Citi would not begin the Company Sale before completing its engagement
for Torrecom[, a potential bidder]."[134]  Insistence on these terms violated the SHA and prevented the
engagement of Citibank.[135]

Respondents argue in opposition that Petitioners have not complied with this Court's
order denying a previous motion for contempt sanctions.[136]  Petitioners there had moved for
contempt remedies arising from Respondents' failure to pay amounts owed to Petitioners under the
FPFA.[137]  The Court denied that  motion without prejudice and stated that any renewed motion must
"set forth in detail all measures taken . . . to collect the sums awarded by the [FPFA]."[138]
Nevertheless, Respondents' argument is without merit because the disobedience that was the subject
of the former motion did not concern Respondents' noncompliance with the specific performance
components of the FPFA, which is at issue in this motion. A detailed statement of measures taken

---

[133]

　　　　*Id.*

[134]

　　　　*Id.* at ¶ 15.

[135]

　　　　*Id.* at ¶¶ 17–21.

[136]

　　　　Dkt 253 at 25–26.

[137]

　　　　Dkt 137.

[138]

　　　　Dkt 200.

by respondents to collect sums awarded by the FPFA simply would have nothing to do with the contempt motion now before the Court, which concerns the subject of specific performance of the SHA sale provision.

The FPFA's order of specific performance is clear and unambiguous. The factual record provides clear and convincing proof of noncompliance with the FPFA. And the record demonstrates that Respondents have not attempted diligently to comply with the FPFA in a reasonable manner. Accordingly, Respondent's disobeyed the specific performance provisions of the FPFA and thus the judgment confirming that award and they have continued in their disobedience. They are in civil contempt of this Court's order confirming the FPFA and appropriate relief to secure compliance will be granted.

B.    *Compliance with the SPFA*

The SPFA stayed Respondents' counterclaims in the underlying arbitration pending Respondents' compliance with the FPFA and interim orders of the Tribunal.[139] One of those interim orders required Respondents to restore Gaitan to his position as CEO.[140] Petitioners contend that Respondents are in ongoing violation of the SPFA by refusing to restore Gaitan to his position as CEO and by initiating criminal proceedings against him.

Respondents' non-compliance with interim orders of the Tribunal does not support the entry of civil contempt sanctions. The Court's order confirming the SPFA confirmed the stay

---

[139]    SPFA at 53.

[140]    *Id.* at ¶ 8.

of Respondents' counterclaims — it did not convert the Tribunal's interim orders into enforceable judgments. The conduct complained of in relation to the SPFA therefore does not warrant entry of civil contempt sanctions.

### C.    Compliance with TPFA

The TPFA provided that (1) "Respondents shall cause the [Peru and Guatemala] arbitrations to be terminated," and (2) "Respondents shall prevent the commencement of any similar Foreign Arbitrations or other legal proceeding involving all or any of the subject matter of Respondents' counterclaims in this arbitration (as set forth in Respondents' Answer and Counterclaims dated February 19, 2021)."[141] Petitioners contend that Respondents "never terminated the Foreign Arbitrations and instead instituted new actions seeking to have them recognized by courts in the BVI."[142] The Court addresses separately each purported violation of the TPFA.[143]

### 1.    Peru Arbitration and Peru-Related BVI Action

The TPFA specifically required that Respondents cause the Peruvian arbitration to be terminated.[144] Petitioners contend that Respondents have not terminated the Peruvian arbitration and have sought to confirm the award from that arbitration through the Peru-Related BVI Action.

---

[141]    TPFA at 42.

[142]    Dkt 244 at 6.

[143]    Petitioners do not assert that the El Salvador Action, the Guatemala Criminal Matters, or the Interference Conduct violated the TPFA. Dkt 269 at 9 n.11.

[144]    TPFA at 42.

That award was confirmed by this Court on September 6, 2023.  The record demonstrates the Peru arbitration nevertheless continued, culminating in the issuance of an award on June 10, 2024.[145]

Respondents contend that they complied with TPFA because they "undertook to seek the dismissal of the Peru Arbitration."[146]  For example, Respondents state that they denounced the Peruvian arbitration as illegal and supported the Company's efforts to seek dismissal of the Peruvian arbitration.[147]

These are of no avail.  The Tribunal found in the TPFA that (1) the real parties in interest in the Peru arbitration and the New York arbitration are "precisely the same,"[148] and (2) Respondents "have full capacity to bring about the termination of the [Peru arbitration]."[149]  Based on that finding, the Tribunal ordered that "Respondents shall cause the [Peruvian arbitration] to be terminated within 10 days of the date of [the TPFA, February 22, 2023]."[150]  Respondents have not caused the arbitration to be terminated.  Moreover, to the extent Respondents argue that they lack the capacity to terminate the arbitration,[151] they are contravening the TPFA's order that Respondents

---

[145]    Dkt 254-11.

[146]    Dkt 253 at 27.

[147]    *Id.*

[148]    TPFA at ¶ 126.

[149]    *Id.* at 43.

[150]    TPFA at 42.

[151]    Dkt 253 at 27 ("[T]he decision by the other arbitral tribunals to continue, despite the existence of 3PFA, makes item 2 [of the TPFA] impossible to comply with.").

"shall not present in any forum as an excuse for non-compliance with [the TPFA] that their efforts to bring about termination of [the Peru arbitration] . . . were appropriate but unsuccessful."[152]

Respondents argue also that contempt sanctions are not warranted because Petitioners did not move to compel compliance with the TPFA.[153]  Respondents cite *Next Invs. v. Bank of China*[154] for the proposition that "[w]hen a party chooses not to enforce a judgment, it cannot then turn around and compel compliance."[155]  In *Next*, the district court denied a motion to hold non-party banks in contempt for failure to comply with asset restraint orders.  The Second Circuit held that the district court did not abuse its discretion because "until the contempt motion . . . the Banks were unable to obtain a ruling on their arguments that the asset restraint orders did not reach them."[156]  Here, Respondents had a full and fair opportunity to litigate the issues underlying the TPFA — including their control over the claimants in the Peruvian arbitration — and the TPFA unambiguously ordered them to terminate the Peruvian arbitration.  Petitioners need not move to compel compliance before moving for contempt sanctions.

Accordingly, Respondents violated the Court's judgment confirming the TPFA because they did not cause the Peruvian arbitration to be terminated.  Furthermore, the initiation of the Peru-Related BVI Action by the Peruvian arbitration claimants violated the TPFA's order that

---

[152]
       TPFA at 42.

[153]
       Dkt 253 at 27.

[154]
       12 F.4th 119 (2d Cir. 2021).

[155]
       Dkt 253 at 27.

[156]
       12 F.4th at 130.

"Respondents shall prevent the commencement of any similar Foreign Arbitrations or other proceeding involving all or any of the subject matter of Respondents' counterclaims in this arbitration . . . ."[157]

### 2.    Guatemala Arbitration

The TPFA required also the termination of the Guatemala arbitration. Petitioners assert that "the Foreign Arbitrations have continued"[158] but do not provide any information about the status of the Guatemala arbitration. Accordingly, Petitioners have not established Respondents' non-compliance with the TPFA with respect to the Guatemala arbitration.

### 3.    El Salvador Arbitration and El Salvador-Related BVI Action

The TPFA did not address the El Salvador Arbitration specifically. The El Salvador Arbitration concerned claims that the Company failed to allocate sufficient economic resources to its El Salvador subsidiary.[159] This claim mirrors Respondents' counterclaim in the arbitration concerning "Peppertree-appointed Company Board members' allegedly improper refusals to approve proposals for Tower development advanced by Terra and its Tower-construction affiliate owned and controlled by Jorge Hernandez, DTH."[160] Respondents' participation in the El Salvador Arbitration

---

[157]    TPFA at 42.

[158]    Dkt 244 at 35.

[159]    Dkt 245-21 at 4.

[160]    TPFA at ¶ 37.

and their attempts to confirm the award in that arbitration via the El Salvador-Related BVI Action therefore violate the TPFA's order to prevent the commencement of any foreign arbitrations concerning the subject matter of Respondents' counterclaims in the arbitration.

### D.    Compliance with 4thPFA

The 4thPFA directed Respondents to pay $471,045.10 to Peppertree and $166,637.78 to Respondents within ten business days of the award, which was issued on April 10, 2023.[161]  Those amounts constituted attorneys' fees, expenses, and arbitrator fees.[162]  Petitioners assert — and Respondents do not contest — that Respondents have not paid those fees to claimants.

The Court's "contempt power should not be used to enforce a money judgment."[163] "In cases where contempt is appropriately imposed for the violation of courts' orders to render payment, the reliefs are usually the kinds that are traditionally available in equity . . . ."[164]  The parties have not briefed whether the monetary award in the 4thPFA is relief traditionally available in equity.  Moreover, Petitioners have not "set forth in detail all measures taken . . . to collect the sums awarded by the [4thPFA]."[165]

Accordingly, Petitioners have not demonstrated the availability or propriety of civil

---

[161]

4thPFA at 14.

[162]

Id. at ¶ 1.

[163]

Ecopetrol S.A. v. Offshore Expl. & Prod. LLC, 172 F. Supp. 3d 691, 698 (S.D.N.Y. 2016).

[164]

Id. at 697.

[165]

Dkt 200.

contempt sanctions arising from Respondents' non-compliance with the 4thPFA.


E.      *Contempt Sanctions Against Non-Parties*

Respondents are in contempt of this Court for failing to comply with the FPFA and TPFA.  Petitioners move also to hold in contempt certain non-parties, including Hernandez, DTH managers, subsidiaries of the Company and/or DTH, and Terra's current and former representatives on the Company board of directors (collectively, the "Non-Parties").[166]

Petitioners argue that the Non-Parties are subject to sanctions for violating the Court's orders confirming the FPFA and TPFA because they are in active concert with Respondents in violating this Court's orders.[167]  Courts may hold in contempt a non-party who, with notice of an injunction, aids and abets a party in violating the injunction.[168]  "Under an aiding-and-abetting theory, a court first must conclude that 'the party subject to the court's mandate committed contempt.'"[169] "A court must next conclude that 'the challenged action' of the nonparty 'was taken for the benefit of, or to assist, a party subject to the decree' in violating the injunction."[170]  "The enjoined party must, in essence, be the principal or the intended beneficiary of the nonparty's

---

[166]

Dkt 290 at 4–5.

[167]

Dkt 290 at 5.

[168]

*Havens v. James*, 76 F.4th 103, 111 (2d Cir. 2023).

[169]

*Id.* at 112 (quoting *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002)).

[170]

*Id.* (quoting *Arista Records, LLC v. Tkach*, 122 F. Supp. 3d 32, 36 (S.D.N.Y. 2015)).

conduct."[171]

With respect to Hernandez, the Tribunal found in the 5thPFA that he caused Terra to prevent the engagement of Citibank, in violation of the FPFA.[172]  Specifically, the Tribunal found that Hernandez had sole control over Terra's representatives on the Company's board,[173] and he was responsible for those representatives' insistence on the inclusion of dealbreaker conditions in the engagement letter with Citibank.[174]  The Tribunal further determined that "[t]he self-evident motivation for such conduct was to prevent [Petitioners] from seeking the type of sales proceeds escrow for which they have applied to the Tribunal . . . and to create collection risk for [Petitioners] on money damages that might be awarded to them.  The direct beneficiary of such collection risk would be Mr. Hernandez, as sole shareholder of Terra."[175]  In other words, Hernandez's motivation was to prevent Terra from complying with the FPFA until he could secure more favorable terms for them.  Accordingly, Hernandez is in civil contempt for abetting Terra's non-compliance with the FPFA.[176]

---

[171]

      *Id.* at 113.

[172]

      *Id.* at ¶¶ 190–93; *see also id.* at 195 ("Without the intervention of Mr. Hernandez to cause Terra and DTH to commit the breaches of contract" — including the violations of the FPFA — "there would have been no such breaches.").

[173]

      *Id.* at ¶ 165.

[174]

      *Id.* at ¶¶ 15–18, 190–93.

[175]

      *Id.* at ¶ 191.

[176]

      At the present posture, the Court does not hold that Hernandez is collaterally estopped from relitigating the Tribunal's findings in the 5thPFA.  *See Amalgamated Sugar Co. v. NL Indus., Inc.*, 825 F.2d 634, 640 (2d Cir. 1987) (collateral estoppel effect of a judgment may

In the alternative, Hernandez is in civil contempt to the extent that he is "legally identified" with Respondents and therefore bound by the FPFA and TPFA.[177] A non-party is "legally identified" with an enjoined party where, "as a practical matter," the two individuals or entities are "one and the same."[178] Courts have found that this standard is satisfied where the non-party is the defendant's chief executive and principal.[179] Here, Hernandez owns and controls Terra and DTH,[180] and he signed the SHA as "director" of Terra.[181] Further, the extensive record in the arbitration demonstrates that Hernandez's interests are indistinguishable from the interests of Terra and DTH.[182] Therefore, "it would be reasonable to conclude that [his] rights and interests have been represented and adjudicated in the" arbitration and proceedings in this Court concerning the confirmation of the arbitral awards.[183] Accordingly, Hernandez is subject to civil contempt sanctions on the separate

---

extend to non-party in privity with party bound by the judgment). Nevertheless, based on the factual record before the Court and for the reasons stated in the 5thPFA, the Court independently finds that Hernandez prevented the engagement of Citibank and did so to cause Terra not to comply with the FPFA.

[177]

*See People of State of N.Y. by Vacco v. Operation Rescue Nat.*, 80 F.3d 64, 70 (2d Cir. 1996).

[178]

*Spectacular Venture, L.P. v. World Star Int'l, Inc.*, 927 F.Supp. 683, 684–85 (S.D.N.Y. 1996).

[179]

*Id.* at 685; *Absolute Nevada, LLC v. Grand Majestic Riverboat Co. LLC*, No. 19-CV-11479 (PKC), 2021 WL 4894556, at *1 (S.D.N.Y. Sept. 17, 2021); *Yimby, Inc. v. Fedak*, No. 17 CIV. 223 (PAC), 2017 WL 2693719, at *5 (S.D.N.Y. June 22, 2017).

[180]

5thPFA at ¶¶ 3, 165–66; TPFA at ¶ 2.

[181]

SHA at 51.

[182]

*See, e.g.*, 5thPFA at ¶ 191; TPFA at ¶¶ 73–79.

[183]

*See Matrix Essentials v. Quality King Distributors, Inc.*, 346 F. Supp. 2d 384, 391 (E.D.N.Y. 2004) (alteration in original) (quoting *Additive Controls & Measurement Sys., Inc. v.*

ground that he is legally identified with Respondents.

With respect to the Peru and El Salvador arbitrations and the corresponding BVI Actions, the claimants/petitioners there self-evidently refused to terminate them for Respondents' benefit. The Tribunal found that "[t]he evidence of Respondents' control over the Manager Claimants is considerable, while the evidence that they are acting without Respondents' blessing here is almost nil."[184] The Non-Parties responsible for the foreign actions are therefore taking actions for the benefit of Respondents and to assist them in violating the TPFA. Moreover, these actions "obstruct the Parties' ability effectuate [the FPFA] because [they] impair prospects for sale of the Company."[185]

The claimants in the Peru and El Salvador arbitrations and the petitioners in the BVI Actions — DTH managers Granillo, Ortiz, Merino, and Garzaro and the Company's Peru, Guatemala, and El Salvador subsidiaries (together with Hernandez, "Non-Party Contemnors") — therefore are subject to civil contempt remedies.[186] Hernandez likewise is subject to civil contempt

---

*Flowdata, Inc.*, 154 F.3d 1345, 1355 (Fed. Cir. 1998)).

[184]

TPFA at ¶ 57.

[185]

*Id.* at ¶ 52.

[186]

The Court's conclusion that the foreign arbitrations aid and abet Respondents' compliance with the FPFA arguably supports the attachment of liability for civil contempt upon the confirmation of the FPFA on January 18, 2023. Nevertheless, the Court declines to hold that contempt liability attached on that date because it was not clear and unambiguous that the FPFA prohibited foreign subsidiaries from initiating the arbitrations. The TPFA eliminated any ambiguity. Accordingly, civil contempt liability for the initiation of the foreign arbitrations attached upon (1) the confirmation of the TPFA on September 6, 2023, and (2) the receipt of notice of that judgment.

The record does not indicate when each of the claimants in the foreign arbitrations first received notice of the FPFA, the TPFA, and the Court's judgments confirming them. The

42

relief because the arbitration claimants are subject to his control[187] and he is responsible for the

foreign arbitration proceedings.[188]  In addition, Hernandez is liable for civil contempt for his role in

instigating the foreign actions because, as set forth above, he is legally identified with Respondents.

        With respect to Terra's current and former representatives on the Company board of

directors, Petitioners have not identified which if any directors have taken actions that aided and

abetted Respondents in non-compliance with the FPFA or TPFA.  In any renewed motion for

contempt sanctions against these non-parties, Petitioners must identify the specific actions taken by

particular directors that were undertaken to assist Respondents in avoiding compliance with this

Court's orders.

### F.    Remedy

        "[T]he sanctions for civil contempt serve two purposes: to coerce future compliance

and to remedy any harm past noncompliance caused the other party."[189]  The Second Circuit "has

---

record in the arbitration indicates that Ortiz, Merino, and Garzaro "have submitted extensive
written testimony" in the arbitration, TPFA at ¶ 74, and it is reasonable to infer that all
claimants have long been on notice of the FPFA and TPFA.  *See* Dkt 143-80 (email to Ortiz,
Merino, and Garzaro about New York arbitration proceedings).  The record does include an
email dated April 1, 2025, sent to Granillo, Ortiz, Merino, Garzaro, and others, that
referenced the Tribunal's order in the FPFA and attached the 5thPFA, which includes a
detailed account of the FPFA and TPFA and this Court's orders confirming them.  *See, e.g.*,
5thPFA at ¶¶ 6, 10(2).  Accordingly, the Court finds that Granillo, Ortiz, Merino, and
Garzaro — and, by extension the Company's Peru, Guatemala, and El Salvador subsidiaries
— have received actual notice of this Court's judgments affirming the FPFA and TPFA.

[187]

    TPFA at ¶¶ 56–57.

[188]

    TPFA at ¶ 5, ¶¶ 68–79; 5thPFA at ¶¶ 272–75.

[189]

    *Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir. 1996) (quoting *United States v. United Mine
Workers of America*, 330 U.S. 258, 302-04 (1947)).

commented that, '[s]o far as the first of these functions is concerned, the district judge, sitting in equity, is vested with wide discretion in fashioning a remedy.'  The compensatory goal, by contrast, can only be met by awarding to the plaintiff any proven damages."[190]  Petitioners have not attempted to prove any damages they have suffered as a result of non-compliance with this Court's judgments. Accordingly, the Court imposes sanctions here exclusively for the purpose of coercing compliance with the FPFA and TPFA.

To coerce compliance, the Court will afford a brief period before the commencement of coercive monetary sanctions during which Respondents and the Non-Party Contemnors may comply fully with the judgments confirming the FPFA and TPFA.  Should they fail to do so within that period, they will be subject to fines for each additional day of continued non-compliance.  And possibly to different and more onerous consequences.

Furthermore, the Court orders Respondents and the Non-Party Contemnors (1) to file a status report within fourteen days of the issuance of this order detailing all steps taken to comply with the Court's judgments confirming the FPFA and TPFA, and (2) to file a status report every fourteen days thereafter until the Court determines that they have complied with the Court's judgments.

### Conclusion

The foregoing constitute the Court's findings of fact and conclusions of law.

Petitioners' motion for an anti-suit injunction and civil contempt sanctions (Dkt 243)

---

[190]      *Id.* (alteration in original) (quoting *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir.1979)).

is granted to the extent hereafter set forth.

*Anti-Suit Injunction*

1.      This Order binds the following persons who receive actual notice of it by personal service or otherwise:

      1.1.      Respondents;

      1.2.      Respondents' officers, agents, servants, employees and attorneys; and

      1.3.      Every other person who now and/or in the future is in active concert or participation with any person described in paragraph 1.1 or 1.2 and/or any direct or indirect subsidiary of any of them.

2.      Without limiting the generality of Section 1, every person listed in Sections 2.1 through 2.5 below who (a) receives actual notice of this Order and (b) now or hereafter satisfies one or more of the requirements of Section 1.1, 1.2 or 1.3 is bound by this Order:

      2.1.      Jorge Hernandez;

      2.2.      any and all former, current and future members of the board of directors of the Company;

      2.3.      any and all former, current and future officers, agents, servants, employees and attorneys of the Company and/or  DTH;

      2.4.      any and all attorneys who now are prosecuting, formerly prosecuted,

or hereafter may prosecute the BVI Actions and/or the El Salvador Action; and

       2.5.    any or all direct or indirect subsidiaries of the Company, Terra, TBS, and/or DTH.

       3.    All persons bound by this Order in accordance with Section 1 and/or Section 2 hereof be, and they hereby are, **ENJOINED AND RESTRAINED** from:

       3.1.    Prosecuting, litigating, participating in, or taking any action to obtain or enforce any relief or remedy that has been or hereafter may be issued or awarded in the El Salvador Action and/or either or both of the BVI Actions; and

       3.2.    Commencing, instituting, maintaining, or causing to be commenced, instituted, or maintained any arbitration, legal action, appeal or other proceeding anywhere in the world — other than the Arbitration — seeking to raise any claims or matters raised in the El Salvador Action and/or either or both of the BVI Actions including without limitation claims or matters related to the enforceability of awards issued in jurisdictions that are inconsistent with awards issued in the Arbitration or involving past, current or future claims or defenses or other matters that are subject to the Arbitration.

       3.3.    Nothing in this Order shall restrain persons bound by it from opposing and contesting the confirmation of an award issued in the Arbitration and confirmation of which is sought by Petitioners.

*Civil Contempt*

4.      The FPFA Contemnors are in contempt of Judgment No.1.

4.1.      Unless the FPFA Contemnors, on or before June 9, 2025, shall have caused the members of the Company's board of directors appointed by Terra and TBS to vote in favor of a resolution (i) approving the engagement of an Investment Bank as defined in the SHA at a Board meeting to be held within 45 days from the date of this Order, provided that Petitioners notify Respondents in writing of the Investment Bank that Petitioners propose within 30 days from the date of this Order, and (ii) stating that the board of directors will not require, as a condition of the engagement, that there must be an immediate pro rata distribution of all received proceeds at closing or that the investment bank must provide its own current valuation of the Company, the FPFA Contemnors thereby shall continue in civil contempt of Judgment No. 1.

4.2.      Unless the FPFA Contemnors on or before June 9, 2025, shall have complied fully with the conditions stated in paragraph 4.1, each of them shall pay a coercive civil fine to the Clerk of this Court with respect to for June 10, 2025 and each subsequent day until the date of which they have complied fully with the conditions stated in paragraph 4.1.  The amount of the coercive fine shall begin at $20,000 for June 10, 2025, and shall double every fourteen days so long as the FPFA Contemnors fail fully to purge themselves of this contempt by full compliance with the conditions stated in paragraph 4.1.  The Clerk of Court shall enter all coercive

fines as judgments in favor of the United States against the FPFA Contemnors.

4.3.    On or before June 9, 2025, the FPFA Contemnors shall serve and file in this Court an affidavit, signed by Jorge Hernandez, stating the measures taken to comply with Judgment No. 1.  The FPFA Contemnors shall serve and file such an affidavit every fourteen days thereafter so long as they fail fully to purge themselves of this contempt.

5.    The El Salvador Contemnors, by initiating and maintaining the El Salvador Action, committed and continue to commit contempt of Judgment No. 2.

5.1.    Unless the El Salvador Contemnors, on or before May 5, 2025,  shall have caused the termination of the El Salvador Action and vacatur of any relief granted to them therein, each of them shall pay a coercive civil fine to the Clerk of Court with respect to May 6, 2025, and each subsequent day from that date until the date on which they fully purge themselves of this contempt.  The amount of the coercive fine shall begin at $10,000 for May 6, 2025, and shall double every fourteen days so long as the El Salvador Contemnors fail fully to purge themselves of this contempt.  The Clerk of Court shall enter all coercive fines as judgments in favor of the United States against the El Salvador Contemnors.

5.2.    On or before May 5, 2025, the El Salvador Contemnors shall serve and file in this Court an affidavit, signed by Jorge Hernandez, stating the measures taken to effectuate the termination of the El Salvador Action and the vacatur of any relief granted therein.  The El Salvador Contemnors shall serve and file such an

affidavit every fourteen days thereafter so long as they fail fully to purge themselves of this contempt.

6.    The BVI Contemnors, by initiating and maintaining the BVI Actions, committed and continue to contempt of Judgment No. 2.

6.1.    Unless the BVI Contemnors, on or before May 5, 2025, shall have caused the termination of the BVI Actions and vacatur of any relief granted to them therein, each of them shall pay a coercive civil fine to the Clerk of Court with respect to May 6, 2025, and each subsequent day from that date until the date on which they fully purge themselves of this contempt. The amount of the coercive fine shall begin at $10,000 for May 6, 2025, and shall double every fourteen days so long as the BVI Contemnors fail fully to purge themselves of this contempt. The Clerk of Court shall enter all coercive fines as judgments in favor of the United States against the BVI Contemnors.

6.2.    On or before May 5, 2025, the BVI Contemnors shall serve and file in this Court an affidavit, signed by Jorge Hernandez, stating the measures taken to effectuate the termination of the BVI Actions and the vacatur of any relief granted therein. The BVI Contemnors shall serve and file such an affidavit every fourteen days thereafter so long as they fail fully to purge themselves of this contempt.

7.    The following terms are defined as follows for purposes of this Order:

7.1    "Company" means Continental Towers LATAM Holdings Limited.

49

7.2.    "DTH" means DT Holdings, Inc..

7.3.    "Terra" means Terra Towers Corp.

7.4.    "TBS" means TBS Management, S.A.

7.5.    "Respondents" means Terra, TBS, and DTH collectively.

7.6.    "Petitioners" means Telecom Business Solution, LLC, LATAM Towers, LLC, and AMLQ Holdings (Cay), Ltd.

7.7.    "Arbitration" means the arbitration styled *Telecom Business Solution, LLC, et al. v. Terra Towers Corp., et al.,* AAA/ICDR Case No. 01-21-0000-4309.

7.8.    "First Partial Final Award" means the first partial final award issued in the Arbitration on February 24, 2022.

7.9.    "Third Partial Final Award" means the third partial final award issued in the Arbitration on February 6, 2023.

7.10.    Judgment No. 1 means this Court's January 18, 2023, judgment confirming the First Partial Final Award.

7.11.    Judgment No. 2 means this Court's September 6, 2023, judgment confirming the Third Partial Final Award.

7.12.    "El Salvador Action" means the action filed by Continental El Salvador, Ltda. and Continental Towers de Guatemala, Ltd. against the Company in the Constitutional Chamber of the Supreme Court of Justice in Sal Salvador, El

Salvador (amparo no. 227-2023).

7.13.   "El Salvador-Related BVI Action" means the action filed in the Eastern Caribbean Supreme Court in the High Court of Justice, Commercial Division, British Virgin Islands, styled *Continental Towers El Salvador, LLC v. Continental Towers Holding Corp.,* Case No. BVIHCOM2024/0623.

7.14.   "Peru-Related BVI Action" means the action filed in the Eastern Caribbean Supreme Court in the High Court of Justice, Commercial Division, British Virgin Islands, styled *Telecom Business Solutions S.R.L. v. Continental Towers LATAM Holdings Limited,* Case No. BVIHCOM2024/0577.

7.15.   "BVI Actions" means the actions described in Sections 7.11 and 7.12.

7.16.   "FPFA Contemnors" means Terra, TBS, and Jorge Hernandez.

7.17.   "El Salvador Contemnors" means Terra, TBS, DTH, Jorge Hernandez, Antonieta Granillo, Hugo Rene Ortiz, Continental Towers El Salvador, Ltda., and Continental Towers de Guatemala, Ltd.

7.18.   "BVI Contemnors" means Terra, TBS, DTH, Jorge Hernandez, Magali Merino Ascarrunz, Jorge Alejandro Garzaro Perez, Telecom Business Solution, S.R.L., Collocation Technologies Peru S.R.L., Continental Towers Peru,

51

S.R.L., Hugo Rene Ortiz, Antonieta Granillo, Continental Towers El Salvador, Ltda., and Continental Towers de Guatemala, Ltd.

7.19.  "Person" includes a human being and any form of legal entity wherever organized or situated.

7.20.  "SHA" means the October 22, 2015, shareholders agreement entered into by the Company, Terra, TBS, and Petitioners.

8.  Notwithstanding the provisions of Sections 5 and 6, absent further order of the Court, coercive fines shall not be imposed on nor money judgments for such fines be entered against the following subsidiaries of the Company: Continental El Salvador Ltda., Continental Towers de Guatemala, Ltd., Telecom Business Solution S.R.L., Collocation Technologies Peru S.R.L., and Continental Towers Peru, Ltd.

SO ORDERED.

Dated:        April 21, 2025
Issued at:    5:10 p.m.

_____
Lewis A. Kaplan
United States District Judge