**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Telecom Business Solution, LLC, *et al.*, | Civil Action No.: 1:22-cv-01761 |
| Petitioners, | Judge Lewis A. Kaplan |
| v. | |
| Terra Towers Corp., *et al.*, | Magistrate Judge Robert W. Lehrburger |
| Respondents. | |

**PERU NON-PARTIES' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR RECONSIDERATION OF, OR ALTERNATIVELY,**
**FOR RELIEF FROM, APRIL 22, 2025 MEMORANDUM OPINION [DKT 295][1]**

Pursuant to Local Civil Rule 6.3, Federal Rules of Civil Procedure 59(a), (e), and 60(b), and the Court's May 14, 2025 extension order (ECF No. 316), non-parties—Telecom Business Solution S.R.L. ("**TBS Peru**"), Continental Towers Peru, S.R.L. ("**CT Peru**"), Collocation Technologies Peru, S.R.L. ("**CLL Peru**"), Magali Merino Ascarrunz, and Alejandro Garzaro Perez (collectively, the "**Peru Non-Parties**")—move for reconsideration of, or alternatively, for relief from, the Court's April 22, 2025 *Memorandum Opinion Granting Anti-Suit Injunction and Coercive Civil Contempt Remedies* (ECF No. 295, the "**Contempt Order**") as it relates to them only.

The Peru Non-Parties seek this relief because, respectfully, the Court does not have personal jurisdiction over them. And, as non-parties, they were not afforded due process before the Contempt Order was entered against them. That said, and without waiving their asserted defenses, since they learned of the Contempt Order on April 28, 2025, the Peru Non-Parties have been working diligently with the

---

[1] Contemporaneous with this Motion, the Peru Non-Parties seek leave of the Court to file this Motion for Reconsideration in excess of 3500 words. (ECF No. 321).

Board of Continental Towers Latam Holdings Limited ("**Continental**"), from which they are taking direction on this matter and which, in turn, is working to comply with the injunction granted in the April 22 Contempt Order.

## BACKGROUND

### I.     Case Overview and Procedural History

*The Parties*—The parties to this action are the claimants in an underlying New York arbitration—Telecom Business Solution, LLC and LATAM Towers, LLC (collectively, "**Peppertree**"), and AMLQ Holdings (Cay), Ltd. ("**AMLQ**," and together with Peppertree, "**Petitioners**")—and the respondents in that arbitration—Terra Towers Corporation ("**Terra**"), TBS Management, S.A. ("**TBS**"), and DT Holdings, Inc. ("DTH") (together, DTH, Terra, and TBS are "**Respondents**"). *See* ECF No. 295 at 1-4.

*The Dispute*—The Parties' dispute arises from the fallout of their business relationship, derived from their disagreement concerning the sale and direction of Continental, a British Virgin Islands company, that was formed by Peppertree, AMLQ, Terra, and TBS, on October 22, 2015, to develop and operate telecommunications towers in Central and South America. The shareholders organized their relationship pursuant to a Shareholders Agreement ("**SHA**"). Pursuant to the SHA, Petitioners on one hand, and Terra and TBS, on the other hand, co-owned and operated Continental, *see* ECF No. 295 at 2-3. Continental, since its formation, has had at all times a Board of four members – two designated by Peppertree and two by Terra and TBS.[2]

The dispute between the Parties led to the arbitration in New York, and then to this action.

---

[2] Corporate governance, through the SHA, thus transformed Peppertree into a shareholder capable of exercising control over the rights of the subsidiaries and made Peppertree's decisions have a direct impact on the execution of the corporate purpose of the Peruvian subsidiaries.

***The Contempt Order***—The Court entered the April 22, 2025 Contempt Order based on Petitioners' request for an anti-suit injunction and civil contempt sanctions. *See* ECF No. 295 at 1-2 (citing ECF No. 243). The Contempt Order imposes coercive civil contempt sanctions against the named Respondents and certain non-parties, including the Peru Non-Parties, to terminate several foreign proceedings and vacate any relief granted to them in the foreign proceedings, or risk significant coercive civil fines, starting on May 6, 2025 (fourteen days after entry of the Contempt Order). *See* ECF No. 295 at 43-51.

Specifically, the Contempt Order requires that the named Respondents, as well as Jorge Hernandez (controlling shareholder of Terra), and the Peru Non-Parties terminate, and vacate any relief granted in certain proceedings in the British Virgin Islands. ECF No. 295 at 16-19, 33-36, 50 [§ 7.14]. That proceeding refers to Case No. BVIHCOM2024/0577, filed before the Eastern Caribbean Supreme Court in the High Court of Justice, Commercial Division, British Virgin Islands (the "BVI Court"), under the title *Telecom Business Solutions S.R.L. et al. v. Continental Towers Holding Corp., et al.* ECF No. 295 at 50 [§ 7.14] ("the Peru-Related BVI Proceeding"). As it relates to the Peru Non-Parties, the coercive civil fines are applicable only to Magali Marino Ascarrunz and Alejandro Garzaro Perez, individually (the "Individual Peru Non-Parties"). ECF No. 295 at 48. The remaining Peru Non-Parties (the three entities—TBS Peru, CT Peru, and CLL Peru) are specifically carved out of the imposition of the coercive fines or entry of money judgments for such fines in paragraph 8 of the Contempt Order. ECF No. 295 at 50.

The Court entered the Contempt Order against the Peru Non-Parties based on the following findings and conclusions:

> The Peru-Related BVI Action was initiated on behalf of the Company's Peru subsidiaries against the Company. [ECF No. 245-22]. The Peru-Related BVI Action seeks confirmation of an award from a Peruvian arbitration initiated on behalf of the subsidiaries by the DTH managers for Peru, Magali Merino and

Alejandro Garzaro.  [ECF No. 245-22; *see* ECF No. 254-11 (Peru arbitration award)]. In the TPFA, the Tribunal found that (1) the real parties in interest in the Peru arbitration and the New York arbitration are "precisely the same," [TPFA at ¶ 126] (2) Respondents "have full capacity to bring about the termination of the [Peru arbitration]," [TPFA at 43] and (3) the claims made there were the same as the Respondents' counterclaims in the New York arbitration.  [TPFA at ¶ 124].

***

With respect to the Peru and El Salvador arbitrations and the corresponding BVI Actions, the claimants/petitioners there self-evidently refused to terminate them for Respondents' benefit. The Tribunal found that "[t]he evidence of Respondents' control over the Manager Claimants is considerable, while the evidence that they are acting without Respondents' blessing here is almost nil." [TPFA at ¶ 57].  The Non-Parties responsible for the foreign actions are therefore taking actions for the benefit of Respondents and to assist them in violating the TPFA. Moreover, these actions "obstruct the Parties' ability effectuate [the FPFA] because [they] impair prospects for sale of the Company."  [TPFA at ¶ 52].

The claimants in the Peru and El Salvador arbitrations and the petitioners in the BVI Actions — DTH managers Granillo, Ortiz, Merino, and Garzaro and the Company's Peru, Guatemala, and El Salvador subsidiaries (together with Hernandez, "Non-Party Contemnors") — therefore are subject to civil contempt remedies.

Dkt 295 at 16, 41.

## II.    The Peru Non-Parties

The Peru Non-Parties are not parties to these proceedings.[3]  And, contrary to the findings in the Contempt Order, they are not the same as the named Respondents.  *See* Merino Decl. at 1; Garzaro Decl. at 1.

***Peru Non-Parties' Backgrounds***—The Peru Non-Parties are independent from Respondents, as well as from Jorge Hernandez.  *See* Merino Decl. at 17; Garzaro Decl. at 17.  Mrs.

---

[3] As the Peru Non-parties explained in their request for a 14-day extension of the May 5, 2025 deadline to seek reconsideration of the Contempt Order and for compliance with paragraph 6 of that Order (ECF No. 298), they first learned of the Contempt Order on April 28, 2025, with only eight days remaining to comply with the May 5, 2025 deadline.  Due to the serious matters described in the Contempt Order that refer to and address them directly, the Peru Non-Parties immediately sought and retained counsel.  Ultimately, they were able to retain the Florida firm of Shutts & Bowen LLP, mid-afternoon on May 1, 2025, and the undersigned mid-afternoon on May 2, 2025 (three days before compliance with the Contempt Order was due).

4

Magali Merino Ascarrunz and Mr. Alejandro Garzaro Perez (the "**Peru Individual Non-Parties**") are citizens domiciled in Peru, who are employed, and paid, by Telecom Business Solution S.R.L. *See* Peru Individual Non-Parties' Employment Agreements; Merino Decl. at 16; Garzaro Decl. at 16. They hold positions solely at Telecom Business Solution S.R.L. ("**TBS Peru**"), Continental Towers Peru, S.R.L. ("**CT Peru**"), and Collocation Technologies Peru, S.R.L. ("**CLL Peru**") (collectively, the "**Peru Corporate Non-Parties**"), and represent only their interests and no other entities. *See* Merino Decl. at 17; Garzaro Decl. at 17.[4] The Peru Corporate Non-Parties are each incorporated in and maintain their principal places of business in Peru. *See* Merino Decl. at 5; Garzaro Decl. at 6.

 ***Peru Non-Parties' Formation, Roles, and Operations***—Two of the Peru Corporate Non-Parties (CT Peru and CLL Peru) were initially formed in 2012. *See* Garzaro Decl. at 6. Mr. Garzaro was designated as general manager of both companies, but was listed in CLL's payroll. *See* Garzaro Decl. at 13. Mrs. Merino would become a year later Legal Manager of CLL Peru. *See* Merino Decl.

 The third Peru Corporate Non-Party that Mrs. Merino and Mr. Garzaro work for—TBS Peru—was formed in July 2014. *See* Merino Decl. Mrs. Merino was named the general manager of TBS Peru and Mr. Garzaro as its Commercial Vice-President. *See* Merino Decl.

 CT Peru and CLL Peru are wholly owned by a BVI entity named Continental Towers South America & Caribbean Corp., who in turn is wholly owned by another BVI entity called Interco Latam Limited ("**Interco**"). *See* Garzaro Decl. Finally, Interco is wholly owned by Continental. *See* Garzaro Decl.

---

[4] The Employment Agreements identify as one of their key premises that Mrs. Merino and Mr. Garzaro have initiated actions solely to defend the interests of Telecom Business Solution S.R.L. *See* Peru Individual Non-Parties' Employment Agreements, p. 2.

TBS Peru, on the other hand, has two members, the BVI entity Telecom Business Solution Limited ("**TBS BVI**") and the Colombian entity Telecom Business Solution Ltda. ("**TBS Colombia**") (collectively "**TBS Peru Members**").  *See* Merino Decl. The TBS Peru Members are also owned by Interco, and consequently by Continental. *See* Merino Decl.

In September 2015, both Mr. Garzaro and Mrs. Merino, were transferred from CLL Peru's payroll to DT Peru (defined below).  *See* Merino Decl.; Garzaro Decl.  This was done in anticipation of "contractual arrangements entered into by Terra, Peppertree, and AMLQ.  The Company agreed to engage a third party related to Terra, the company named DT Holdings, Inc. ("**DTH**"), to carry out the construction of wireless telecommunications towers at suitable locations across a number of markets in the Americas, provide administrative overhead or back-office support concerning the development and operation of the Company's business in the region, while at the same time shielding the Company from potential liabilities and costs, including those labor related, implied with the telecommunications' business.  In Peru, this structure was formalized through the Framework Contract for Design, Engineering, Supply of Goods, Construction, Installation, and Commissioning, signed on October 2, 2015, between TBS Peru and Desarrollos Terrestres Peru S.A. ("**DT Peru**"), a subsidiary of DTH." *See* Merino Decl.; Garzaro Decl.

In August of 2023, Mrs. Merino and Mr. Garzaro's employment was transferred from DT Peru to TBS Peru, as a result of the Peru arbitration (discussed below), initiated by the Peruvian Corporate Non-Parties, and Mr. Garzaro as General Manager of CT Peru and CLL Peru, and Mrs. Merino, as General Manager of TBS Peru.  *See* Merino Decl.; Garzaro Decl. This change of employment status was triggered "because DTH and DT Peru considered that [Mr. Garzaro and Mrs. Merino] initiated and prosecuted actions solely to defend the interests of TBS Peru." *See* Merino Decl.; Garzaro Decl. This transfer, however, did not affect or modify Mr. Garzaro's role

as administrator of CT Peru and CLL Peru, nor Mrs. Merino's same role at TBS Peru. *See Merino* Decl.; Garzaro Decl. They have continued to exercise those functions to date. *See Merino* Decl.; Garzaro Decl.

   ***The Peru-Related BVI Action and its proper context*** Mrs. Merino and Mr. Garzaro thoroughly explain in their Declaration in support of this motion how they had to "procure certain filings before courts and arbitral tribunals, including in the BVI **…** to protect TBS Peru, CT Peru, and CLL Peru, their clients, workers, and regulatory obligations, from the abandonment of the Peruvian Subsidiaries by the shareholders of the Company." *See Merino Decl.; Garzaro Decl.*.

   In December 2022, TBS Peru, CT Peru, and CLL Peru, as well as Mrs. Merino and Mr. Garzaro as their General Managers, initiated an arbitration in Peru against Peppertree and Continental, specifically intended to fulfill the legal obligations of the Peru Corporate Non-Parties before government entities, operators, protect the continuity of the public service being provided in Peru by the Peru Corporate Non-Parties, preventing the legal and operational stability of the Peru Corporate Non-Parties from being affected, preserving the corporate purpose of the Peru Corporate Non-Parties; and ending the abusive exercise of rights by the class B partner, Peppertree, over the Peruvian Subsidiaries, and specifically the Peru Corporate Non-Parties. *See* Merino Decl.; Garzaro Decl. Neither Mrs. Merino or Mr. Garzaro sought any personal relief in the Peru Arbitration. *See* Merino Decl.; Garzaro Decl..

   Also, in December 2022, the Peruvian Non-Parties sought before the Peruvian courts an injunction to keep Peppertree from interfering with the Peruvian Corporate Non-Parties' business, which was granted well over two years now, on January 12, 2023 (the "**Peru Injunction**"). The Seventh Civil Commercial Court of the Superior Court of Justice issued the Peru Injunction ordering Continental and Peppertree to maintain the Peru Corporate Non-Parties' services and EPC

contracts with DT Peru, to keep Mrs. Merino as General Manager of TBS Peru, and Mr. Garzaro as General Manager of CT Peru and CLL Peru.

In March of 2023, the Court extended the Peru Injunction, suspending the effect of a certain Continental Board resolution dated January 12, 2023, directing that the Peru arbitration be dismissed with prejudice and any other agreement or decision that is directly or indirectly inconsistent with the Peru Injunction, and ordered Continental to cease taking any action to interfere with the Peru arbitration. *See* Merino Decl.; Garzaro Decl.

As explained by Mrs. Merino and Mr. Garzaro, "subsequently, these measures were challenged by Peppertree before the Arbitral Tribunal in the Peru Arbitration. However, through two Awards, one dated June 10, 2024, and another dated October 23, 2024, the Peru Arbitral Tribunal resolved by majority to: (a) declare unfounded Peppertree's request to nullify the judicial resolutions; (b) ratify the validity and effectiveness of the precautionary measures issued by the Peruvian Judiciary; and (c) order Peppertree to strictly comply with these measures and refrain from any act that interferes with their execution." *See* Merino Decl.; Garzaro Decl.

It is with this backdrop, that in November of 2024, the Peru Non-Parties, initiated the Peru Related BVI Proceedings, through counsel, seeking, solely, the recognition of the Peru Awards issued in the Peru Arbitration ratifying the Peru Injunction issued by the Peruvian Courts. On November 27, 2024, the Peru Injunction was recognized and registered in the BVI. *See* Merino Decl.; Garzaro Decl. When the BVI actions were initiated, Mrs. Merino and Mr. Garzaro were no longer employees of DTH. They stopped working at DT Peru as a result of worker transfer agreements entered into between DT Peru and TBS Peru. *See* Employment Agreements; Merino Decl.; Garzaro Decl.

***Actions Taken By Peru Non-Parties Since Contempt Order Issued***—Since the Peru Non-Parties learned of the Contempt Order and retained counsel, they have expressed to the Continental Board multiple times already their willingness to find ways to effectuate Continental's request and intent to vacate, dismiss, terminate and/or withdraw the Peru-Related BVI Proceeding, and have acted consistent with those statements. *See* Peru Non-Parties' May 4 Letter; Peru Non-Parties' May 5 Letter; and Peru Non-Parties' May 8 Letter. (ECF No. 310 and exhibits). The Peru Non-Parties contacted the well-known BVI law firm of Walkers to consult regarding what steps could be taken to attend to the Company's request. *Id*. They then communicated to Continental's Board the outcome of their consultations with Walkers and twice sought confirmation how to proceed given the options available under BVI law. *Id*.

Peppertree, in turn, first delayed its confirmation of, and agreement to, a proposed written resolution of the Board of Directors of the Company requesting that the Peru-Related BVI Proceeding be vacated, dismissed, terminated and/or withdrawn. Not until the evening of May 5, the date compliance with the Injunction was due, did the Peru Non-Parties receive Continental's Resolution confirming that instruction (the "Board Resolution"). *See* Board Resolution of May 5 with transmittal email. *Id.*

Walkers confirmed that the BVI Proceeding has concluded. *See* Walkers' First Declaration, ¶ 6. (ECF No. 310-7). That matter was limited to the recognition, on an *ex parte* basis, of one partial award on jurisdiction and one award on interim relief issued in Peru. *See* Walkers First Declaration, ¶ 5 & 6. The BVI Court recognized the Awards (the "Recognition Order"). *Id.*, ¶ 7. No enforcement relief was sought, and thus, none was adjudicated. *Id.*, ¶ 6.

Walkers explains that there are three potential courses of action available with varying degrees of viability to seek to set aside the limited Recognition Order, namely: (i) that the

applicants, Telecom Business Solution S.R.L., Collocation Technologies Peru S.R.L., Continental Towers Peru S.R.L., Magali Merino Ascarrunz, and Alejandro Garzaro Perez (the "Applicants") seek unilaterally to discharge the Recognition Order; (ii) that the same Applicants seek to appeal the Recognition Order; or, (iii) that the Company be the one applying to set aside the Recognition Order and submitting with the application a consent order that will be joined by the Applicants for the discharge of the Recognition Order. *Id.*, ¶ 10.

Walkers advises that options (i) and (ii) are not certain to succeed, are not straightforward, and would entail significant expenditure and time as they would likely require hearings. *Id.*, *generally* ¶ 11-15. As to option (i), as noted by Walkers, "if the application is filed with a certificate of urgency, it is possible, but not certain, that the application could be heard before the end of term in July 2025. Otherwise, it is likely the application would come up for hearing in the new term (following the Court's August 2025 recess), between September and December 2025." *Id.*, ¶ 13. Option (ii) is no simpler or faster: "The BVI Court of Appeal sits in the Virgin Islands three times in each calendar year. Although the Court will, occasionally, list an appeal for hearing in another member state, it will do so only in the most urgent of cases. Consequently, such an appeal may take many months to be heard and would also involve very considerable expense. It is also not certain to succeed. If the appeal is filed with a certificate of urgency, it is possible, but not certain, that the application could be heard in either the October 2025 or the February/March 2026 session. Otherwise, I anticipate that the appeal would come up for hearing in the June/July 2026 term." *Id.*, ¶ 15.

As to option (iii), meaning application by the Company with consent from the Applicants— the Peru Non-Parties, Walkers outlined how the BVI Court "could issue an order within four weeks of filing" and concludes that "this is not only the most straightforward, expeditious, and cost-

effective option, but also is the option most likely to succeed in accomplishing the intent of the Resolution." *Id.*, ¶ 17.  Walkers has issued even a Second Declaration to that effect, further addressing, substantively, why under BVI law option (iii) represents the clearest path to fulfill the Board Resolution.

The Peru Non-Parties offered expressly their concurrence and collaboration: "if option (iii) is your preferred option, we will task Walkers with the preparation of the papers and submit for your consideration.  These papers would be joined by the Applicants' consent." *See* Peru Non-Parties' May 5 Letter.  Still, Peppertree has continued to reject the most expeditious course of action to unwind the Peru-Related BVI Proceeding advised by Walkers, as provided and supposedly intended in the Board Resolution.  *See* Merino Decl.; Garzaro Decl.

Peppertree's rejection of option (iii) basically amounts to demanding that the Peru Non-Parties delay compliance with the Board's directive and instead just file "something," *i.e.*, options (i) or (ii) above, with no prospects of success or prompt resolution and with the only possible explanation being that Peppertree wants it that way so that the Peru-Related BVI Proceeding remains at issue on the mind of this Court.[5]  This is confusing as Peppertree, on the one hand, is the party who sought the relief provided by the Court in the Contempt Order, and yet, at the other hand seems to seek delay of compliance, or worst wants non-compliance.

---

[5] What is clear from the Walkers Declaration is that none of the three possible courses of action to be pursued in the BVI in order to vacate the Recognition Order and implement the Board Resolution, could have been done within the time limits imposed by the Contempt Order to avoid the coercive sanctions set forth therein.  Stated differently, based on the Walkers Declaration, the Contempt Orderdoes not provide a real and meaningful opportunity for the BVI Contemnors, which includes the Peru Non-Parties, to purge themselves of the alleged contempt within the deadline imposed by the Court.

## ARGUMENT

### I.    Legal Standard

#### A.    Motion for Reconsideration

##### 1.    Local Civil Rule 6.3

Under Local Civil Rule 6.3 of the Southern District of New York, a motion for reconsideration must be filed within fourteen days of the court's order and is committed to the sound discretion of the district court. *See In re Optimal U.S. Litig.,* 813 F.Supp.2d 383, 403 (S.D.N.Y.2011). To succeed, the movant must demonstrate that the court overlooked "controlling decisions or data . . . that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp. Inc.,* 70 F.3d 255, 257 (2d Cir.1995) (internal citations omitted). Additionally, a motion for reconsideration may be granted to "correct a clear error or prevent manifest injustice." *In re Optimal U.S. Litig.*, 813 F.Supp.2d at 387 (internal quotations and citations omitted); *see also Structured Asset Sales, LLC v. Sheeran*, 673 F.Supp.3d 415, 420 (S.D.N. 2023).

Courts in this District have permitted affected non-parties to file motions for reconsideration under Local Civil Rule 6.3 when they have a sufficient interest in the litigation. *See, e.g., Wultz v. Bank of China Ltd.,* 291 F.R.D. 42, 45 (S.D.N.Y.2013) (adjudicating motion of non-party Office of the Comptroller of the Currency for reconsideration challenging the court's order granting plaintiffs' motion to compel certain documents); *Dietrich v. Bauer*, 198 F.R.D. 397, 402 (S.D.N.Y. 2001) (granting, in part, non-party's motion for reconsideration); *S.E.C. v. Neto*, 27 F.Supp.3d 434, 440 (S.D.N.Y. 2014) ("Plaintiff has not cited, and the Court has not located, any case explicitly limiting Rule 6.3 to parties to the litigation. To the contrary, and as the [non-party]

Plan points out, courts in this District have allowed affected nonparties to a litigation to file motions for reconsideration under Rule 6.3.").

In such cases, the courts have consistently considered affidavits or declarations submitted by the non-parties to evaluate the motion's merits, provided they address overlooked controlling authority or data, clear error, or manifest injustice.  *Neto,* 27 F.Supp.3d at 439; *see also* Local Rule 6.3 (addressing that ***parties*** cannot file affidavits, but not prohibiting non-parties from submitting affidavits).

### 2.  Federal Rule of Civil Procedure 59(e)

Federal Rule of Civil Procedure 59(e) provides that "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment."  Fed. R. Civ. P. 59(e).  The Federal Rules define "judgment" to include "any order from which an appeal lies." Fed. R. Civ. P. 54(a).  Because civil contempt orders "against *non-parties* are immediately appealable" and are considered "final," Rule 59(e) is a proper mechanism for seeking reconsideration of the Court's Contempt Order.  *OSRecovery, Inc. v. One Groupe Int'l, Inc.,* 462 F.3d 87, 92 (2d Cir. 2006) (emphasis in original).  A motion under Rule 59(e) may be granted to correct a clear error, prevent manifest injustice, or account for newly discovered evidence or intervening change in controlling law.  *Metzler Inv. Gmbh v. Chipotle Mexican Grill, Inc.*, 970 F.3d 133, 142–43 (2d Cir. 2020).  Like Local Civil Rule 6.3, Rule 59(e) is not a vehicle for relitigating issues already decided.  *Shrader*, 70 F.3d at 257.

In the context of non-parties, courts in the Second Circuit have permitted motions for reconsideration under Rule 59(e) when the non-party is directly affected by a final order, such as a civil contempt order.  *See Waterkeeper All., Inc. v. Salt*, 829 F. App'x 541, 543 n.2 (2d Cir. 2020)

("Salt argues in passing that the district court did not have the power to hold him in civil contempt as a non-party. This is not the case.") (internal citation omitted).

### 3.    Federal Rule of Civil Procedure 60(b)

Rule 60(b) of the Federal Rules of Civil Procedure permits a motion for relief from a judgment or order for, *inter alia*, "mistake, inadvertence, surprise, or excusable neglect" or "any other reason justifying relief from the operation of the judgment." Fed. R. Civ. P. 60(b)(1), (6). A Rule 60(b) motion must be filed within a "reasonable time," no later than one year after the entry of the judgment or order. Fed. R. Civ. P. 60(c)(1). The Rule "confers broad discretion on the trial court to grant relief when appropriate to accomplish justice and it constitutes a grand reservoir of equitable power to do justice in a particular case." *In re New Oriental Ed. & Tech. Group Sec. Lit.*, 293 F.R.D. 483, 488 (S.D.N.Y. 2013) (granting, in part, Rule 60 motion). "Relief [under Rule 60(b)(6)] is warranted where there are extraordinary circumstances, or where the judgment may work an extreme and undue hardship, and should be liberally construed when substantial justice will thus be served." *United Airlines, Inc. v. Brien,* 588 F.3d 158, 176 (2d Cir. 2009) (citation omitted); *see also Aczel v. Labonia*, 584 F.3d 52, 61 (2d Cir. 2009).

## II.    The Court Should Reconsider Its Contempt Order Against the Peru Non-Parties

### A.    The Applicable Law on Personal Jurisdiction Over Foreign Non-Parties

Under settled Second Circuit law, "'no court can make a decree which will bind anyone but a party' because a court's 'jurisdiction is limited to those over whom it gets personal service, and who therefore can have their day in court.'" *Havens v. James,* 76 F.4th 103, 111 (2d Cir. 2023) (quoting *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832-33 (2d Cir. 1930) (L. Hand, J.) and citing *Whole Woman's Health v. Jackson*, ⸺ U.S. ⸺, 142 S. Ct. 522, 535 (2021) for the principle that, "[c]onsistent with historical practice, a federal court exercising its equitable

authority may enjoin named defendants from taking specified unlawful actions. But under traditional equitable principles, no court may lawfully enjoin the world at large.") (internal quotation marks omitted). "The principle that everyone should have his [or her] own day in court is fundamental and part of our deep-rooted historic tradition." *Havens,* 76 F.4th at 111 (citing *Richards v. Jefferson County*, 517 U.S. 793, 797-98 (1996)) (internal quotation marks omitted).

> For that reason, "[c]ourts have carefully distinguished between entering an injunction against a non-party, which is forbidden, and holding a non-party in contempt for aiding and abetting in the violation of an injunction that has been entered against a party, which is permitted." *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 96 F.3d 1390, 1395 (Fed. Cir. 1996). Accordingly, "the only occasion when a person not a party may be punished" for contempt is when "he [or she] has helped to bring about ... an act of a party." *Alemite*, 42 F.2d at 833. The nonparty must either be "legally identified" with the enjoined party or "abet" the enjoined party's violation of the injunction. *Id*. By contrast, a court may not "punish[ ] the conduct of persons who act independently and whose rights have not been adjudged" in the earlier proceeding. *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 13, 65 S.Ct. 478, 89 L.Ed. 661 (1945); *Chase Nat'l Bank v. City of Norwalk*, 291 U.S. 431, 437, 54 S.Ct. 475, 78 L.Ed. 894 (1934) (same).

*Havens,* 76 F.4th at 111.

There can be no adjudication of liability or sanctions against a non-party without affording it a full opportunity at a hearing, after adequate notice, to present evidence. *NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230, 243 (2d Cir. 2013). And before a court can hold such a hearing and make any potential finding of liability or sanction against a non-party, the court must have personal jurisdiction over the non-party—either general or specific personal jurisdiction. *Id.*; *see also Gucci America, Inc v. Weixing Li,* 768 F.3d 122, 134 (2d Cir. 2014) (court could not enjoin non-party bank from transferring and disposing of defendants' assets unless court determined, because general jurisdiction was lacking, that court had specific jurisdiction over the non-party bank); *Tiffany (NJ) LLC, Tiffany and Co. v. China Merchants Bank*, 589 F.App'x. 550, 553 (2d Cir. 2014) (no personal jurisdiction over non-party banks to issue asset freeze injunction);

15

*Canterbury Belts Ltd. v. Lane Walker Rudkin, Ltd.*, 869 F.2d 34 (2d Cir. 1989) (no personal jurisdiction to enforce injunction where plaintiff asked court to impose contempt sanctions).

### B.    General Personal Jurisdiction

"General, all-purpose jurisdiction permits a court to hear any and all claims against an entity . . . . Specific jurisdiction, on the other hand, permits adjudicatory authority only over issues that arise out of or relate to the entity's contacts with the forum." *Gucci America, Inc*, 768 F.3d at 134 (internal quotation marks and citations omitted); *see also Daimler v. Bauman*, 571 U.S. 117, 126-128 (2014). General personal jurisdiction only exists when a defendant is "at home" in a jurisdiction. *Daimler,* 571 U.S. at 137-39 (the contacts that render a defendant at home are formal incorporation in the jurisdiction and maintaining its principal place of business in that jurisdiction; for individuals, it is their place of domicile); *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 332 (2d Cir. 2016) ("*Daimler* analogized its 'at-home test' to that of an individual's domicile. . . . [T]here is no reason to invent a different test for general personal jurisdiction depending on whether the defendant is an individual, a corporation, or another entity").

Here, there is no general personal jurisdiction over the Peru Non-Parties because the three non-party entities are all incorporated and maintain their principal places of business abroad (*see* Merino Decl.; Garzaro Decl.); the non-party individuals are both domiciled abroad in Peru (*see* Merino Decl.; Garzaro Decl.); and no "exceptional circumstances" exist that would otherwise support general jurisdiction over them. *Daimler,* 134 S.Ct. at 761 n. 19.[6] None of the Peru Non-Parties are "at home" in New York.

---

[6] The exceptional circumstance exception refers to "the possibility that in an exceptional case, a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State." *Daimler,* 134 S.Ct. at 761 n. 19. Here, the Peru Non-Parties have not engaged in any activities in New York; the Contempt Order is based on their activities abroad. *See* Merino Decl.; Garzaro Decl.; ECF No. 295 at 8-9, 16-19, 48, 50 [§§ 7.14 and 7.18].

### C.    Specific Personal Jurisdiction

Because there is no basis for asserting general jurisdiction over the Peru Non-Parties, the Court may only compel them to comply with the Contempt Order if it can exercise specific personal jurisdiction over them.  To determine whether the Court can exercise specific personal jurisdiction over the non-parties, the Court must "(i) first assess the connection between the nonparty's contacts with the forum and the order at issue and (ii) then decide whether exercising jurisdiction for the purposes of the order would comport with fair play and substantial justice."  *In re del Valle Ruiz*, 939 F.3d 520, 529 (2d Cir. 2019) (quoting *Gucci*, 768 F.3d at 136); *see also Australia and New Zealand Banking Group Limited v. APR Energy Holding Limited*, 2017 WL 3841874 (S.D.N.Y. Sep. 1, 2017) (quashing subpoena issued to Australian bank under 28 U.S.C. § 1782 because general personal jurisdiction was lacking as the bank was incorporated and headquartered in Australia and specific personal jurisdiction was lacking because there was no nexus between the bank's New York contacts and the discovery sought through the subpoena).

### 1.    New York statutory basis for specific jurisdiction

As to the first requirement—the connection between the non-party's contacts with the forum and the order at issue—the Court must consider if New York's long-arm statute authorizes jurisdiction.  *Spetner v. Palestine Investment Bank*, 70 F.4th 632, 639 (2d Cir. 2023).

New York's long-arm statute states:

(a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

> 3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he
>
>> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
>>
>> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce ....

N.Y. C.P.L.R. § 302(a).

Under N.Y. C.P.L.R. § 302(a)(1), the Court must determine "(1) whether the defendant 'transacts any business' in New York, and, if so, (2) whether this cause of action arises from such a business transaction." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007). As to the first prong of § 302(a)(1), "the overriding criterion necessary to establish a transaction of business is some act by which the defendant purposefully avails itself of the privilege of conducting activities within New York." *Ehrenfeld v. Bin Mahfouz*, 881 N.E.2d 830, 834 (N.Y. 2007). "Purposeful activities are those with which a defendant, through volitional acts, avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Fischbarg v. Doucet*, 880 N.E.2d 22, 26 (N.Y. 2007). If a defendant has never been physically present in New York, "jurisdiction may still be proper if the defendant on his or her own initiative projects himself or herself into this state to engage in a sustained and substantial transaction of business." *Id.* at 28.

As to the second prong of § 302(a)(1), "a suit will be deemed to have arisen out of a party's activities in New York if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York." *Best Van Lines, Inc.*, 490 F.3d at 246. This "does not require a causal link," but rather requires "a relatedness between the transaction

and the legal claim such that the latter is not completely unmoored from the former." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168-69 (2d Cir. 2013). "A connection that is 'merely coincidental' is insufficient to support jurisdiction." *Best Van Lines, Inc.*, 490 F.3d at 249; *see also Licci v. Lebanese Canadian Bank*, 984 N.E.2d 893, 901 (N.Y. 2012) ("Where this necessary relatedness is lacking, we have characterized the claim as 'too attenuated' from the transaction, or 'merely coincidental' with it.").

N.Y. CPLR § 302(a)(2) reaches only tortious acts performed by a defendant who was physically present in New York when he or she performed the wrongful Act. *Edwardo v. Roman Cath. Bishop of Providence*, 66 F.4th 69, 75 (2d Cir. 2023).

### 2. Constitutional due process

As to the second requirement—constitutional due process:

> [A] court may only exercise specific personal jurisdiction over a non-domiciliary where the non-domiciliary has "'certain minimum contacts with [the State] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Goodyear*, 564 U.S. at 923, 131 S.Ct. 2846 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). In making this determination, courts typically employ a two-step analysis: first, evaluating the quality and the nature of the non-domiciliary's contacts with the forum state, and second, considering whether, in light of several factors discussed below, the assertion of personal jurisdiction would comport with fair play and substantial justice. *Licci IV*, 732 F.3d at 170 (2d Cir. 2013).

*Nike, Inc. v. Wu,* 349 F.Supp.3d 310, 329 (S.D.N.Y.), *aff'd,* 349 F.Supp.3d 346 (S.D.N.Y. 2018); *see also Gucci America, Inc v. Weixing Li*, 135 F.Supp.3d 87, 96 (S.D.N.Y. 2015).

***Minimum Contacts***—Determining whether sufficient minimum contacts exist is a two-party inquiry: (1) a court must first determine whether the non-party has 'purposefully availed' itself of the forum by 'deliberately direct[ing] its conduct at the forum," *Gucci*, 135 F.Supp.3d at 97, and (ii) the court then considers whether the matter at issue arose out of, or is sufficiently related to, the nonparty's forum conduct. *Id.* The "minimum contacts" test looks at whether the

defendant purposefully availed itself of the forum and could foresee being haled into court there." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013).

> ***Fair Play and Substantial Justice***—If minimum contacts are established, the exercise of personal jurisdiction must comport with notions of fair play and substantial justice by presenting "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Gucci*, 135 F.Supp.3d at 96 (quoting references omitted). Courts generally consider five factors in evaluating reasonableness: (1) the burden that the exercise of jurisdiction will impose on the foreign non-party; (2) the interests of the forum state in adjudicating the case; (3) the petitioner's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies. *Chloé*, 616 F.3d at 173; *see also Bank Brussels Lambert*, 305 F.3d at 129. Where, as here, the entities and persons potentially subject to personal jurisdiction are foreign, the "courts consider the international judicial system's interest in efficiency and the shared interests of the nations in advancing substantive policies." *Gucci*, 135 F.Supp.3d at 99 (citing *Asahi Metal Indus. Co. v. Superior Court of Cal., Solano Cty.*, 480 U.S. 102, 115 (1987)).

### D.    The Court Does Not Have Personal Jurisdiction Over the Peru Non-Parties

Applying those principles to the facts set out above, the Court has no general or specific personal jurisdiction over the Peru Non-Parties. The non-parties are based in Peru (the entities are incorporated and maintain their principal places of business there and the individuals are domiciled in Peru, Mrs. Merino is a citizen of Peru and Mr. Garzaro is a citizen of Guatemala) and they have no contacts whatsoever with New York. *See* Merino Decl.; Garzaro Decl.

Based on the facts set out above and in the supporting Declarations of Mrs. Merino and Mr. Garazo, the Peru Non-Parties are independent entities and individuals whose rights have not been properly adjudged.

Specifically, Mrs. Merino and Mr. Garzaro are employed, and paid, by Telecom Business Solution S.R.L. *See* Peru Individual Non-Parties' Employment Agreements.  They hold positions solely at TBS Peru, CT Peru, and CLL Peru.  *See* Employment Agreement at 2; Merino Decl.; Garzaro Decl.  As it relates to the Peru-Related BVI Actions, the transfer of Mrs. Merino and Mr. Garzaro from the payroll of DT Peru (a Terra subsidiary where Peppertree has no participation), to TBS Peru (in which Peppertree does have participation) is particularly important because Peppertree alleged in support of the request for the anti-suit injunction and sanctions that at the time Mrs. Merino and Mr. Garzaro sought to register the Peru partial Awards in the BVI (in November 2024), they worked for DTH; but their employment agreements show that is not true; by then, Mrs. Merino and Mr. Garzaro had worked for TBS Peru for over one year.  *See* Merino Decl.; Garzaro Decl.  More to the point, the BVI Proceeding was limited to the recognition, on an *ex parte* basis, of one partial Award on jurisdiction and one Award on interim relief issued in Peru. Walkers First Declaration, ¶ 5 & 6. The BVI Court recognized the Awards. *Id.*, ¶ 7.  No enforcement relief was sought, and thus, none was adjudicated.  *Id.*, ¶ 6.  As Walkers has confirmed, the BVI Proceeding has concluded.  *Id.*, ¶ 6.

Further, the Peru Arbitration was initiated in December 2022 on behalf of the Peru Corporate Non-Parties, whose interests Mrs. Merino and Mr. Garazo serve, because the shareholders were violating their functions and undermining the Peruvian subsidiaries business operations.  *See* Merino Decl.; Garzaro Decl.  The purpose for the Peruvian arbitration is different than that of the New York arbitration because in Peru specifically what is sought is: (i) to safeguard

21

the fulfillment of the legal obligations of the Peru Corporate Non-Parties before government entities and operators, (ii) to protect the continuity of the public service being provided in Peru by the Peru Corporate Non-Parties, (iii) to prevent the legal and operational stability of the Peru Corporate Non-Parties from being affected, (iv) to preserve the corporate purpose of the Peru Corporate Non-Parties; and (v) to end the abusive exercise of rights by the class B partner, Peppertree, over the Peruvian Subsidiaries, and specifically the Peru Corporate Non-Parties. *See* Merino Decl.; Garzaro Decl.

In short, the Peru Non-Parties are not Respondents' agents, they do not work for Jorge Hernandez, and are not DTH Managers, as Petitioners have improperly alleged. The Peru Non-Parties have nothing to do with any action engaged or prosecuted by entities or persons in New York, Guatemala, El Salvador, or any other place other than Peru, and the BVI as addressed above. No court or tribunal in proceedings in which the Peru Non-Parties, Telecom Business Solution S.R.L., Continental Towers Peru, S.R.L., Collocation Technologies Peru, S.R.L., Magali Marino Ascarrunz, and Alejandro Garzaro Perez, have been a party has ever made those findings and there is no factual or legal basis to do so here. The Peru Non-Parties are not "at home" in New York, they have no minimum contacts with New York (and no resulting connection between any such contacts and the proceedings in New York that led to the Contempt Order exists), and, as a result, they have no reason to foresee that their actions in Peru could subject them to being haled into court in New York.

## CONCLUSION

For these reasons, the Peru Non-Parties respectfully ask the Court to reconsider its Contempt Order (ECF No. 295) and vacate it as it applies to them. The Peru Non-Parties also request the Court to stay the effect of the Contempt Order as it applies against them until the Court

has had an opportunity to consider and rule on their motion for reconsideration.  Further, the Peru

Non-Parties seek such other and further relief as is deemed just and proper.  .

Dated: May 19, 2025                                    Respectfully submitted,

                                                       *s/ Eduardo De la Peña Bernal*

**PRYOR CASHMAN LLP**                   **SHUTTS & BOWEN LLP**
James Stephen O'Brien , Jr              Eduardo De la Peña Bernal
Erik Bakke                              Aliette D. Rodz
7 Times Square, Ste. 40th Floor         Martha Ferral
New York City, NY 10036                 200 S. Biscayne Blvd., Ste. 4100
(212) 421-4100                          Miami, FL 33131
Fax: (212) 326-0806                     (305) 358-6300
ebakke@pryorcashman.com                 edelapena@shutts.com
jobrien@pryorcashman.com                arodz@shutts.com
                                        mferral@shutts.com

*Counsel for Peru Non-Parties, Telecom Business Solution S.R.L.,*
*Continental Towers Peru, S.R.L., Collocation Technologies Peru, S.R.L.,*
*Magali Marino Ascarrunz, and Alejandro Garzaro Perez*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed electronically on May 19, 2025.

Notice of this filing will be sent to all counsel of record through the Court's electronic notice

system.

                                        */s/ Eduardo De la Peña Bernal*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this filing complies with the word count limitations of Local Civil

Rule 7.1(c )—the memorandum of law consists of 7,069 words.

                                        */s/*