**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------  X
TELECOM BUSINESS SOLUTION, LLC, et al.,          :   Civil Action No.: 1:22-cv-01761
                                                 :
                          Petitioners,           :   Judge Lewis A. Kaplan
            v.                                   :
                                                 :   Magistrate Judge Robert W.
TERRA TOWERS CORP., et al.,                      :   Lehrburger
                                                 :
                          Respondents.           :
-----------------------------------------------------------------  :
                                                 X
```

### PETITIONERS' MEMORANDUM IN OPPOSITION TO JORGE HERNÁNDEZ'S FED. R. CIV. P. 12(B)(4) & (5) MOTION TO QUASH SERVICE OF PROCESS

Petitioners Telecom Business Solution, LLC, LATAM Towers, LLC (collectively, "Peppertree"), and AMLQ Holdings (Cay) Ltd. ("AMLQ," and together with Peppertree, "Petitioners"), hereby submit their Memorandum in Opposition to the Motion to Quash Service filed by Jorge Hernández, pursuant to Federal Rules of Civil Procedure ("Rules") 12(b)(4) and (5) (ECF Nos. 301-302) ("Motion" or "Mot.").

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .......................................................................................................... 1

II.   BACKGROUND .......................................................................................................... 3

   A.   Service of Process on Hernández Was Complete on March 28, 2025 .............................. 3

   B.   The Napa Estate Is Hernández's "Dwelling Place or Place of Abode" ............................ 5

   C.   Hernández Affirmatively Subjected Himself to Jurisdiction When He Brought A Petition
      in New York to Permanently Stay the Underlying Arbitration ........................................ 7

III.  LEGAL STANDARD .................................................................................................... 8

IV.   ARGUMENT ................................................................................................................ 9

   A.   Hernández's Motion to Quash Service Was Not Raised In A Reasonably Timely Fashion
      Under the Circumstances Here And Hernández Thus Waived His Objections to Service. 9

   B.   Petitioners Properly Served Hernández Under 9 U.S.C. § 9 and Fed. R. Civ. P. 4(e) By
      Leaving Copies of the Notice of the Petition to Confirm and Notice of Motion with
      Hernández's Son in Hernández's Napa Valley Estate ...................................................... 10

      1.   The FAA, 9 U.S.C. § 9, and Rule 4(e) Govern Here .................................................... 10

      2.   Proper Service was Made on Hernández by Personally Delivering Copies to
         Hernández's Son at his Napa Estate ......................................................................... 11

   C.   Hernández Received Timely Actual Notice and Therefore No Injustice Results From
      Giving Effect to that Notice ............................................................................................ 18

   D.   In the Alternative, Petitioners Request that the Court Order Service By Electronic Mail
      Directed to Hernández's Counsel, Mr. Smith, to be Effective ........................................ 18

   E.   Petitioners Properly Served the Anti-Suit Injunction Motion on Hernández ................... 20

V.    CONCLUSION ............................................................................................................ 21

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*131 Main St. Associates v. Manko*,
   897 F.Supp. 1507 (S.D.N.Y. 1995) ...............................................................15, 16

*Absolute Nevada, LLC v. Grand Majestic Riverboat Co. LLC*,
   2020 WL 5209730 (S.D.N.Y. Sept. 1, 2020)...................................................20, 21

*Absolute Nevada, LLC v. Grand Majestic Riverboat Co., LLC*,
   646 F. Supp. 3d 426 (S.D.N.Y. 2022).........................................................10, 17, 18

*Burton v. Northern Dutchess Hosp.*,
   106 F.R.D. 477 (S.D.N.Y. 1985) .............................................................................9

*Commodities & Minerals Enterprise Ltd. v. CVG Ferrominera Orinoco, C.A.*,
   49 F.4th 802 (2d Cir. 2022) ...................................................................................10

*Darden v. DaimlerChrysler N. Am. Holding Corp.*,
   191 F. Supp. 2d 382 (S.D.N.Y. 2002).....................................................................9

*Doe v. Combs*,
   2025 WL 722790 (S.D.N.Y. Mar. 6, 2025) ..........................................................14

*F.D.I.C. v. Scotto*,
   1998 WL 357324 (N.D.N.Y. June 29, 1998).........................................................15

*Fed. Home Loan Mortg. Corp. v. Dutch Lane Assocs.*,
   775 F.Supp. 133 (S.D.N.Y. 1991) ...........................................................................9

*Gang Chen v. China Green Agric., Inc.*,
   2021 WL 103306 (S.D.N.Y. Jan. 6, 2021) ......................................................19, 20

*Hernández* et al. *v. Telecom Business Solution, LLC* et al.,
   Case No. 24-cv-03457 (LAK) (S.D.N.Y. 2024) ...........................................2, 7, 17

*Henderson v. United States*,
   517 U.S. 654 (1996)...............................................................................................11

*Jaffe & Asher v. Van Brunt*,
   158 F.R.D. 278 (S.D.N.Y. 1994) ...........................................................................16

*Johnson v. New York Univ.*,
   324 F.R.D. 65 (S.D.N.Y. 2018) ...............................................................................9

*Krantz & Berman, LLP v. Dalal*,
    2011 WL 1810490 (S.D.N.Y. May 12, 2011), aff'd, 472 F. App'x 76 (2d Cir.
    2012) .................................................................................................................................17

*Matter of Lauritzen Kosan Tankers (Chem. Trading, Inc.)*,
    903 F. Supp. 635 (S.D.N.Y. 1995) .....................................................................................18

*Luv N'Care, Ltd. v. Babelito, S.A.*,
    306 F. Supp. 2d 468 (S.D.N.Y. 2004).................................................................................9

*Moss v. City of Arnold*,
    2015 WL 1565358 (E.D. Mo. Apr. 8, 2015).......................................................................12

*Nat'l Dev. Co. v. Triad Holding Corp.*,
    930 F.2d 253 (2d Cir. 1991)...........................................................................................1, 15

*Poppington, LLC v. Brooks*,
    2021 WL 3193023 (S.D.N.Y. July 27, 2021) .....................................................................12

*Preston v. New York*,
    223 F. Supp. 2d 452 (S.D.N.Y. 2002).................................................................................9

*Rana v. Islam*,
    305 F.R.D. 53 (S.D.N.Y. 2015) ..........................................................................................15

*Reed & Martin, Inc. v. Westinghouse Elec. Corp.*,
    439 F.2d 1268 (2d Cir. 1971).............................................................................................11

*Smiga v. Dean Witter Reynolds, Inc.*,
    766 F.2d 698 (2d Cir. 1985)................................................................................................17

*United States v. Mellon*,
    719 F. App'x 74 (2d Cir. 2018) .......................................................................................1, 16

*Vega v. Hastens Beds, Inc.*,
    339 F.R.D. 210 (S.D.N.Y. 2021) ......................................................................................8, 19

*Vidaplan, S.A., Inc. v. Cipriani Int'l, S.A.*,
    2006 WL 8461283 (S.D.N.Y. Aug. 7, 2006) ......................................................................18

*In re World Trade Ctr. Disaster Site Litig.*,
    722 F.3d 483 (2d Cir. 2013)...........................................................................................13, 14

**Statutes & Court Rules**

28 U.S.C. § 1746.........................................................................................................................13, 14

Federal Arbitration Act ............................................................................................................. *passim*

Fed. R. Civ. P. 4 .......................................................................................................... *passim*

Fed. R. Civ. P. 12(b)(4) ...........................................................................................8

Fed. R. Civ. P. 12(b)(5) ...........................................................................................8

Local Rule 83.6 .................................................................................................4, 20, 21

## I.    **INTRODUCTION**

Despite having participated in the underlying Phase 2 arbitration with Quinn Smith (the same attorney who represents him on this Motion) as his legal counsel, Hernández evidently now seeks to avoid dealing with the Tribunal's Fifth Partial Final Award ("5PFA") adjudicating the claims in that same Phase 2, which holds him personally liable for over $300 Million in damages that he and the other Respondents caused Peppertree/AMLQ.  At the same time, he seeks to evade this Court's Order on Petitioners' Motion for Preliminary and Permanent Anti-Suit Injunction and Civil Contempt Sanctions ("Anti-Suit Injunction Motion"), despite this Court having already found jurisdiction over Hernández and specifically enjoining him in his personal capacity. Hernández's Motion to Quash Service of the Petition to Confirm the 5PFA ("Petition") and the Anti-Suit Injunction Motion should be denied, and the Court should hold Hernández accountable to Petitioners alongside the other Respondents—all companies he owns or controls—in the confirmation proceeding.

Service of the Petition and Anti-Suit Injunction Motion was made on Hernández by personally delivering copies to 2500 Spring Mountain Road, St. Helena, California—a Napa Valley estate of more than 62.5 acres that he owns (the "Napa Estate")—and handing them to his son, who lives there and who, according to a sworn affidavit issued by the process server, expressly confirmed that he would accept service on Hernández's behalf.  That constitutes proper service under the Federal Arbitration Act, 9 U.S.C. § 9, and Federal Rule of Civil Procedure 4(e). Hernández's claim that he resides in Guatemala is irrelevant under settled Second Circuit precedent which holds that, "[i]n a highly mobile and affluent society, it is unrealistic to interpret [then] Rule 4(d)(1) so that the person to be served has only one dwelling house or usual place of abode at which process must be left." *Nat'l Dev. Co. v. Triad Holding Corp.*, 930 F.2d 253, 257 (2d Cir. 1991); *accord, United States v. Mellon*, 719 F. App'x 74, 76 (2d Cir. 2018) (rejecting a

1

"wooden reading of the rule" which "ignore[s] its purpose: to insure that service is reasonably calculated to provide a defendant with actual notice of the action").

Hernández's argument is also disproven by a wealth of publicly available evidence establishing his dwelling at the Napa Estate, including that Hernández moved his wife and children to Napa Valley in 2010; that he invested substantial effort and expense to build an over 18,000 square foot "primary residence" on the estate that is owned, according to various filings, by the Hernández Family Trust; that he told the St. Helena Planning Commission that he and his wife, Ana, want the Napa Estate to "stay in their family for generations";  that his wife Ana resides at the Napa Estate; that his daughter Marcela resides "in a separate house on the family ranch"; and that Ana, Marcela, and Hernández's son, Jorge Hernández Anguiano ("Hernández Anguiano"), own and operate, on a day-to-day basis, family olive oil and wine businesses in Napa Valley. The only "evidence" Hernández submits to the contrary consists of two unsworn and, thus, inadmissible declarations. The record establishes sufficient permanence of Hernandez' connections to and use of the Napa Estate as his "dwelling," and—not surprisingly—that Hernández received actual notice of the Petition to Confirm the 5PFA and the Anti-Suit Injunction Motion as a result of service made on his adult son at the Napa Estate. In addition, his counsel in the Arbitration who has appeared and has been actively participating in these proceedings was also served.

Moreover, Hernández also availed himself of this Court's jurisdiction when he filed a petition to permanently stay the Arbitration. *See Hernández* et al. *v. Telecom Business Solution, LLC* et al., Case No. 24-cv-03457 (LAK) (S.D.N.Y. 2024) ("Stay Proceeding" or "Stay Proc."), ECF No. 6-2. In short, he has no basis to evade the Court's Order or jurisdiction, and is simply playing games to avoid the consequences of his own actions.

The Motion should be denied, and Hernández should be held accountable.

## II.    BACKGROUND

### A.    Service of Process on Hernández Was Complete on March 28, 2025

On March 18, 2025, Petitioners filed their Notice of the Anti-Suit Injunction Motion (ECF No. 243); a [Proposed] Order Granting the Anti-Suit Injunction Motion (ECF No. 243-1); a Memorandum of Law in Support (ECF No. 244); and a Declaration of Gregg L. Weiner in Support (ECF No. 245), along with 51 Exhibits thereto. That same day, in anticipation of the 5PFA, Petitioners' counsel wrote to Hernández's counsel, Quinn Smith:

> Further, as the draft provisions of the Fifth Partial Final Award circulated by the Tribunal in the underlying arbitration contemplate Jorge Hernández being determined to be a proper party to the arbitration, please confirm whether, as counsel to Mr. Hernández in the arbitration, you consent to Mr. Hernández being joined to the SDNY Action as a Respondent pursuant to Fed. R. Civ. P. 20 and 21, and will consent to accept service of the Petition to Confirm the Fifth Partial Final Award Peppertree/AMLQ expect to file, and all future filings in the SDNY Action on behalf of Mr. Hernández and Terra/DTH.

Ex.[1] 19. Respondents' counsel, Mr. Smith, responded: "We do not consent to the joinder of Mr. Hernández or service on him." Ex. 20.

The Tribunal issued the 5PFA on March 24, 2025. (ECF No. 262-41). On March 27, 2025, Petitioners filed the Notice of Petition (ECF No. 256), the Petition to Confirm 5PFA (ECF No. 257), a Memorandum of Law in Support (ECF No. 258), and the Declaration of Gregg L. Weiner in Support (ECF No. 259), along with 193 Exhibits thereto (ECF Nos. 259-1 through 262-43).

Less than 24 hours later, on March 28, 2025 at about 9:00 a.m. Pacific Time, a process server left copies of the following documents at Hernández's Napa Estate with his son, Hernández Anguiano: (i) the Notice of Petition, (ii) the Petition to Confirm 5PFA, (iii) Petitioners'

---

[1] Unless otherwise noted, all exhibits referenced herein refer to exhibits to the Declaration of Katherine M. Poldneff, filed herewith.

Memorandum of Law in Support, (iv) the Declaration of Gregg L. Weiner in Support without the 51 Exhibits thereto, (v) Notice of the Anti-Suit Injunction Motion; (vi) the [Proposed] Order Granting the Anti-Suit Injunction Motion; (vii) Petitioners' Memorandum of Law in Support; and (viii) Declaration of Gregg L. Weiner in Support without the 193 Exhibits thereto. (ECF No. 265, ¶ 2). Hernández Anguiano self-identified as the son of Hernández and stated that he would accept service on behalf of Hernández, according to an affidavit submitted by a duly authorized process server. (*Id.*, ¶¶ 4, 7). Hernández does not dispute that Hernández Anguiano is of suitable age and discretion, and Hernández Anguiano admits that he resides at the Napa Estate. (*See* ECF Nos. 302, 302-1, 302-2).  Of course, such materials were also served via CM/ECF on Quinn Smith, his personal counsel in the Arbitration (although until the filing of the Motion to Quash, Mr. Smith had disclaimed that he was representing Hernández for purposes of these proceedings before the Court).

Having served the Notice of Petition and Notice of Motion on March 28, 2025, along with several supporting papers, on Hernández by leaving copies with Hernández Anguiano at the Hernández Napa Estate, on April 7, 2025, Petitioners served the voluminous Exhibits to the Declarations, along with the Reply in Support of the Anti-Suit Injunction Motion, a copy of the S.D.N.Y. Local Civil Rule regarding Contempt Proceedings in Civil Cases (Local Rule 83.6), and additional filings made in the preceding week via the Court's CM/ECF filing system, on Hernández by Federal Express Priority (Overnight Delivery) directed to Hernández's Napa Estate. (*See* ECF No. 281 ("Pavlak Affidavit")). Petitioners sent this service package to provide Hernández with a thumb drive containing electronic copies of the voluminous Exhibits (given that paper copies would have filled multiple bankers boxes) and, in addition, to serve copies of subsequent filings made via CM/ECF because, until the instant Motion was filed, Hernández did

not have active counsel in this docket and, thus, could not be served by operation of the Court's CM/ECF system. *See* ECF No. 281-1. The service package evidenced by the Pavlak Affidavit was not an attempt to comply with the N.Y. C.P.L.R., as Hernández contends, but rather the Federal Rules and the Federal Arbitration Act, which govern these proceedings.

### B.    The Napa Estate Is Hernández's "Dwelling Place or Place of Abode"

Hernández claims to reside in Guatemala; contends that the Napa Estate is not Hernández's "dwelling place or usual place of abode"; claims that Hernández Anguiano lives at the Napa Estate; denies ownership of the Napa Estate; and denies that his wife, Ana, lives at the Napa Estate. (*See* ECF Nos. 302, 302-1, 302-2).[2] For this motion in particular, Hernández relies on two self-serving, unsworn and, thus, inadmissible declarations. *See infra*, Section IV.B.2.a. Not surprisingly, the matters asserted, but not sworn to, in those declarations are readily disproven by evidence gathered by Petitioners to date.

Hernández met his wife, Ana, at the Culinary Institute of America in Napa Valley. Ex. 4, at A1-A2. Years later, in 2010, Hernández moved his family, including his wife, Ana, and children from Guatemala to Napa Valley. Ex. 15, at 2. The family bought the Napa Estate—an over 62.5-acre ranch in St. Helena—the following year. *Id*. According to publicly available records, including St. Helena Planning Commission and City Council records and Statements of Information filed with the California Secretary of State, the Napa Estate is owned by the Hernández Family Trust and is the personal address for Hernández and his wife. Ex. 1, at 2-3; Ex. 2; Ex. 3, at 2-3; Ex. 6; Ex. 7; Ex. 8; Ex. 11; Ex. 12; Ex. 13; Ex. 14; Ex. 16; and Ex. 17.[3] In 2013 and 2014, the

---

[2] Respondents have refused to respond to information requests properly made regarding judgment enforcement which, there is no doubt that if responded to, would confirm information determined from public records.

[3] Notably, the filings with the California Secretary of State for multiple entities list the Napa Estate as the personal address of Hernández and/or his wife, Ana. In addition, other records link Hernández to the property, including two UCC filings. Ex. 9 & Ex. 10. Databases also suggest that mortgage and property assessment records will name him in connection with that address, but these documents have not been retrieved as of this filing.

Hernández family sought, among other things, a General Plan Amendment, Rezoning, Use Permit, Variance, Lot Line Adjustment and Design Review from the St. Helena Planning Commission and City Council. Ex. 2; Ex. 3; Ex. 4. According to the minutes, staff reports, and application materials submitted on behalf of the Hernández family, and public news sources, Hernández himself sought approval to construct an 18,188 square foot single family residence to be used as the Hernández family's primary residence, a detached 4,222 square foot guest house to be used for Hernández's sisters and their children, a detached 1,772 square foot guest cottage for Hernández's mother, a detached barn with an olive oil processing facility, a 444 square foot pool cabana adjacent to a family swimming pool and spa, and "eventually . . . a small agricultural barn to accommodate 2 to 4 horses for the family to enjoy." *See* Ex. 4, at A1-A2; *see also* Ex. 2, at 1-3; Ex. 5.

According to the St. Helena Star, Jorge Hernández personally appeared at a March 2014 St. Helena Planning Commission meeting and "told commissioners that he and his wife Ana want their Howard Backen-designed estate to stay in their family for generations" and that "[k]eeping the property in the family will be a condition of his children's inheritance". Ex. 4, at A1. Hernández also underscored that the plan for his Napa Estate had "the support of the neighboring Culinary Institute of America, a place that Hernández said is of enormous significance to his family because he met his wife there." *Id*. at A1-A2.

The applicant statement submitted on behalf of the Hernández family stated that the Napa Estate "will be the primary residence for the Hernández family" and that the "Hernández family is very much looking forward to living and raising their children in the St. Helena community for decades to come . . . ." Ex. 2 (Applicant Statement, at 1, 5). The St. Helena Planning Commission and City Council approved the project, and the City of St. Helena issued a Certificate of Occupancy for 2500 Spring Mountain Road on July 26, 2018. Ex. 3, at 2-3; Ex. 4; Ex. 5, at 2; Ex. 6.

Since then, the Hernández family has put down even deeper roots in Napa Valley. Hernández's wife, Ana, and daughter, Marcela, own and operate Grove 45, an olive oil company near the Napa Estate. Ex. 15. A September 2023 news piece highlights their "deep connections to the Napa Valley community" and "long history" there. *Id.*, at 1-2. According to the article, Ana stated that St. Helena "**is [her] home**" and she is "**here** as the head of an olive oil company", *id.* at 2, and "Marcela added that she and her mother talk or meet daily to discuss the business – sometimes multiple times a day because **she lives in a separate house on the family ranch**", *id.* at 3. The article further disclosed that Grove 45 hosts a decadent high tea on the third Sunday of every month, serving "sandwiches and treats that Ana makes herself." *Id.* at 3.

Hernández Anguiano and his sister Marcela also own and operate the winery Museion Napa which, according to the website, realizes Hernández's vision "to host the finest winemakers, produce exceptional wines, offer exquisite cuisine, and grow into one of Napa Valley's premier multi-experiential destinations". Ex. 22.

Further, there is a Maserati registered in Hernández's name which was parked in the driveway of the Napa Estate on March 28, 2025, when the process server made service. Ex. 18 & Ex. 23. This wealth of evidence leaves little doubt that the Napa Estate qualifies as Hernández's dwelling or usual place of abode.

C.  **Hernández Affirmatively Subjected Himself to Jurisdiction When He Brought A Petition in New York to Permanently Stay the Underlying Arbitration**

Only two (2) months before the final Phase 2 merits hearing—after over three (3) years of arbitration—Hernández and other Terra Directors, including Alberto Arzú, Alejandro Sagastume, and William Mendez, filed a Petition to Stay the Arbitration in New York State Court, arguing that only a court and not the Tribunal could resolve their objections to the Tribunal's jurisdiction, even though they never previously sought court intervention. *See Hernández* et al. *v. Telecom Business*

*Solution, LLC* et al., Case No. 24-cv-03457 (LAK) (S.D.N.Y. 2024) ("Stay Proceeding" or "Stay Proc."), ECF No. 6-2. On May 6, 2024, Peppertree/AMLQ filed a Notice of Removal and had the case transferred to this Court.  Stay Proc., ECF No. 1. There was no reservation of objections to personal jurisdiction. The case was designated as "related" to the instant confirmation action.

On June 10, 2024, Peppertree/AMLQ filed a Motion to Dismiss the Petition to Stay, arguing that the Stay Proceeding was merely a ploy to delay Phase 2 of the Arbitration and that the Terra Directors had waived their right to Court intervention by waiting years to bring their jurisdictional challenges to the Court's attention. *See* Stay Proc. ECF Nos. 22, 24. The parties fully briefed the motion, Stay Proc. ECF Nos. 29, 31, and, on July 12, 2024, this Court granted the Motion to Dismiss, finding that the Terra Directors forfeited their right to seek judicial intervention because they waited months or years to seek a judicial stay, "which strongly suggests gamesmanship." Stay Proc. ECF No. 34 at 8. In any event, Hernández affirmatively subjected himself to jurisdiction when he brought the petition to stay in a New York court.[4]

## III.    **LEGAL STANDARD**

The Motion is brought under Federal Rules of Civil Procedure 12(b)(4) and 12(b)(5). "An objection under Rule 12(b)(4) concerns the form of the process rather than the manner or method of its service." *Vega v. Hastens Beds, Inc.*, 339 F.R.D. 210, 215 (S.D.N.Y. 2021). In contrast, "'[a] Rule 12(b)(5) motion is the proper vehicle for challenging the mode of delivery or the lack of delivery of the summons and complaint. Other than those cases in which it is confused with a motion under Rule 12(b)(5), a motion under Rule 12(b)(4) is fairly rare.'" *Id*. (quoting 5B Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1353 (3d ed. 2004)).

---

[4]Tellingly, notwithstanding that counsel for Terra/DTH in this action represents Hernández in the underlying arbitration, and that Hernández was represented by separate counsel in stay proceedings, Mr. Smith refused to confirm he represented Hernández in this action until filing the Motion to Quash.

"[I]n considering a motion to dismiss pursuant to 12(b)(5) for insufficiency of process, a Court must look to matters outside the complaint to determine whether it has jurisdiction." *Darden v. DaimlerChrysler N. Am. Holding Corp.*, 191 F. Supp. 2d 382, 387 (S.D.N.Y. 2002). Petitioners readily meet their burden to prove the adequacy of service of process here, *see Preston v. New York*, 223 F. Supp. 2d 452, 466 (S.D.N.Y. 2002), given the record evidence submitted herewith and Hernández's reliance on unsworn and, thus, inadmissible declarations.

## IV.    ARGUMENT

### A.    Hernández's Motion to Quash Service Was Not Raised In A Reasonably Timely Fashion Under the Circumstances Here And Hernández Thus Waived His Objections to Service

Hernández contends that he "moved to quash 21 days following the date that service was purportedly complete, making his application timely." (ECF No. 302 at 4). If, in fact, the motion to quash service of process was due within 21 days after completion of service, as Hernández contends, then the Motion was due on April 18, 2025, and is untimely. *See Johnson v. New York Univ.*, 324 F.R.D. 65, 68 (S.D.N.Y. 2018) (clock runs from date of service); ECF No. 265 (service complete on March 28, 2025).

Courts in this Circuit generally hold that a motion to quash service "must be raised in a reasonably timely fashion or [be deemed] waived." *Fed. Home Loan Mortg. Corp. v. Dutch Lane Assocs.*, 775 F.Supp. 133, 136 (S.D.N.Y. 1991); *Burton v. Northern Dutchess Hosp.*, 106 F.R.D. 477, 481 (S.D.N.Y. 1985). "The question for this Court, therefore, is whether, considering the circumstances of this case, [Hernández's] motion was made in a reasonably timely fashion." *See Luv N'Care, Ltd. v. Babelito, S.A.*, 306 F. Supp. 2d 468, 472 (S.D.N.Y. 2004).

Here, Hernández waited 41 days after service was hand-delivered to his son to file his motion to quash—despite the fact that his counsel in the underlying arbitration (who is now his counsel in this proceeding) received notice of the Petition on March 27, 2025, the day it was filed,

followed by CM/ECF notice of service of process on March 31, 2025, when Petitioners filed the process server's affidavit. (*See* ECF No. 265). This is not a "reasonably timely" motion to quash under the circumstances presented here. Accordingly, the Court should find Hernández waived his objections and deny the Motion on that basis alone.

**B.**     **Petitioners Properly Served Hernández Under 9 U.S.C. § 9 and Fed. R. Civ. P. 4(e) By Leaving Copies of the Notice of the Petition to Confirm and Notice of Motion with Hernández's Son in Hernández's Napa Valley Estate**

Hernández wrongly assumes that Petitioners relied on the New York Civil Practice Law and Rules to effect service of the Notice of Petition to Confirm and Contempt Motion. Service was properly effected under the Federal Arbitration Act ("FAA") and Federal Rules of Civil Procedure – the governing legal framework here.

**1.**     *The FAA, 9 U.S.C. § 9, and Rule 4(e) Govern Here*

The language in the FAA at 9 U.S.C. § 9 "specifies both what is to be served ('notice of the application') and how it is to be served ('in like manner as other process of the court')." *Commodities & Minerals Enterprise Ltd. [CME] v. CVG Ferrominera Orinoco, C.A.*, 49 F.4th 802, 811 (2d Cir. 2022). In this Circuit, "the phrase 'in like manner as other process of the court' refers to [Fed. R. Civ. Pro.] 4[.]" *Absolute Nevada, LLC v. Grand Majestic Riverboat Co., LLC*, 646 F. Supp. 3d 426, 439 (S.D.N.Y. 2022) (service of motion to confirm proper under Rule 4(e)(2)(B) and 9 U.S.C. § 9 where process server left copies with a person of suitable age who resides at the target's home in Kentucky); *accord CME*, 49 F.4th at 812 ("Rule 4 sets forth the basic procedures for serving process in connection with arbitral awards."); *Reed & Martin, Inc. v. Westinghouse Elec. Corp.*, 439 F.2d 1268, 1277 (2d Cir. 1971).

Federal Rule of Procedure 4 provides, in pertinent part, as follows:

**(e) Serving an Individual Within a Judicial District of the United States.** Unless federal law provides otherwise, an individual--other than a minor, an incompetent person, or a person whose waiver has been filed--may be served in a judicial district

of the United States by:

> **(1)** following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made; or

> **(2)** doing any of the following:  . . .  **(B)** *leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there* . . . .

* * *

(k) Territorial Limits of Effective Service.

> (1) *In General.* Serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant:

> > (A) who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located;

> > (B) who is a party joined under Rule 14 or 19 and is served within a judicial district of the United States and not more than 100 miles from where the summons was issued; or

> > (C) when authorized by a federal statute.

Fed. R. Civ. P. 4(e), (k). "[T]he core function of service is to supply notice of the pendency of a legal action, in a matter and at a time that affords the defendant a fair opportunity to answer the complaint and present defenses and objections." *Henderson v. United States,* 517 U.S. 654, 672 (1996). As discussed further below, service on Hernández was authorized by the FAA consistent with Rule 4(k)(1)(c).

> **2.    *Proper Service was Made on Hernández by Personally Delivering Copies to Hernández's Son at his Napa Estate***

Service of the Notice of Petition to Confirm 5PFA and Anti-Suit Injunction Motion was made on Hernández by personally delivering copies to Hernández's Napa Estate and handing them to his son, who lives there and expressly confirmed that he would accept service on Hernández's behalf. *See* ECF No. 265. That constitutes proper service under the FAA, 9 U.S.C. § 9, and Rule 4(e).

Hernández does not dispute that Hernández Anguiano resides at the property or that Hernández Anguiano is "of suitable age and discretion." The Rule does not require that the person to whom the copies are delivered agree to accept service. *Comp.* Fed. R. Civ. P. 4(e)(2)(B) ("leaving a copy . . . at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there") *with* Fed. R. Civ. P. 4(e)(3)(C) ("delivering a copy . . . to an agent authorized by appointment or by law to receive service of process"); *see also Poppington, LLC v. Brooks*, 2021 WL 3193023, at *3 (S.D.N.Y. July 27, 2021) (service left with defendant's husband proper under Fed. R. Civ. P. 4(e)(2)(B) despite his refusal to take the documents, forcing the process server to leave them on the doorstep); *Moss v. City of Arnold*, 2015 WL 1565358, at *3–4 (E.D. Mo. Apr. 8, 2015) (rejecting notion that a person of "suitable age and discretion" who resides at the service target's dwelling or place of abode must also be authorized to accept service on the target's behalf). Nor does Hernández dispute that he received actual notice of the documents served at his Napa Estate on his son, Hernández Anguiano. Hernández's sole argument appears to be that the Napa Estate is not Hernández's "dwelling place or place of abode", that he "does not frequent the Property", and that he "resides in Guatemala".  (ECF No. 302 at 1). The sole support for these arguments are the unsworn and inadmissible declarations submitted with the Motion, while a wealth of evidence contradicts the claim that the Napa Estate is not Hernández's "dwelling place or usual place of abode" within the meaning of Rule 4(e).

> a.    *The Declarations of Hernández and Hernández Anguiano Are Inadmissible Because They Are Not Sworn or Made Under Penalty of Perjury, As Required by 28 U.S.C. § 1746*

Hernández primarily relies on his own self-serving declaration and that of his son, Hernández Anguiano. Neither one is sworn, nor are the contents stated to be true and correct, under penalty of perjury, as required by 28 U.S.C. § 1746, and, as such, neither one is admissible.[5]

Title 28 U.S.C. § 1746 provides:

Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

(1) If executed without the United States: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date).(Signature)".

(2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).(Signature)".

28 U.S.C. § 1746. "Parsing the declaration provided in the statute reveals its substantive elements: the declarant must (1) 'declare (or certify, verify, or state),' (2) 'under penalty of perjury,' (3) that the matter sworn to is 'true and correct.'" *In re World Trade Ctr. Disaster Site Litig.*, 722 F.3d 483, 488 (2d Cir. 2013). "Inclusion of the language 'under penalty of perjury' is an integral requirement of the statute for the very reason that it impresses upon the declarant the specific punishment to which he or she is subjected for certifying to false statements." *Id*. "Moreover, . . . omission of the phrase 'under penalty of perjury' would 'allow[ ] the affiant to circumvent the

---

[5]Petitioners identified this issue in connection with Hernández's May 5 Declaration. *See* ECF Nos. 299-3, 305.

penalties for perjury in signing onto intentional falsehoods.'" *Id*. (quoting *Nissho–Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1306 (5th Cir. 1988)).

As the Second Circuit held in *In re World Trade Ctr. Disaster Site Litig.*, "28 U.S.C. § 1746 requires that a certification of the truth of a matter be expressly made under penalty of perjury. Any other result would be contrary to the plain language of the statute and the objective sought to be advanced by it."  722 F.3d at 488; *see also Doe v. Combs*, 2025 WL 722790, at *2 (S.D.N.Y. Mar. 6, 2025) ("declaration is not sworn or made under penalty of perjury under the laws of the United States and is thus inadmissible" (citing *Cobalt Multifamily Invs. I, LLC v. Arden*, 857 F. Supp. 2d 349, 355 (S.D.N.Y. 2011))).

The declarations of Hernández and Hernández Anguiano are unsworn. Although each declaration cites to 28 U.S.C. § 1746, neither one includes the language "under penalty of perjury", nor do the declarants aver that the matter sworn to is "true and correct". (*See* ECF Nos. 302-1, 302-2). The Court therefore should strike the declarations and disregard both as inadmissible, unsworn statements.[6]

> b.      *Substantial Evidence Contradicts Hernández's Claims, and Establishes that the Napa Estate is Hernández's "Dwelling or Usual Place of Abode"*

Even if the Court were to credit Hernández's ambiguous claim to have "residence in the Department of Guatemala", (*see* ECF No. 279-2 (cited in ECF No. 302 at 2, 5), it is unclear what that means and, in any event, it is irrelevant given the trove of evidence that shows that Hernández's Napa Estate is a "dwelling or usual place of abode" for him within the meaning of Rule 4(e).

---

[6] Notably, 28 U.S.C. § 1746 provides alternate language to be used if the declaration is executed *within* or *without* the United States.  Omitting this language from Hernández's declaration eliminates a potentially valuable indicator as to Hernández's present location, which may well be an admission that contradicts the substance set forth therein.

14

Hernández relies on *National Development Company v. Triad Holding Corp.*, 930 F.2d 253 (2d Cir. 1991), to support his argument that service should be quashed because the property is not his "dwelling place or usual place of abode." Yet, *National Development Company* and its progeny support the precise opposite result.

In *National Development Company*, the Second Circuit observed that, "'[i]n a highly mobile and affluent society, it is unrealistic to interpret [then] Rule 4(d)(1) so that the person to be served has only one dwelling house or usual place of abode at which process may be left.'" *Nat'l Dev. Co.*, 930 F.2d at 257. The Court found that "[t]here is nothing startling in the conclusion that a person can have two or more 'dwelling houses or usual places of abode,' provided each contains sufficient indicia of permanence." *Id.* In that case, the service target was a "wealthy man and a frequent intercontinental traveler", who spent time at twelve locations around the world, including homes owned in at least four locations, and the court concluded that the target had more than one "usual place of abode". *Id.*

"Courts have identified [indicia of permanence] as including belongings kept at the address, mail received at the address, ownership of the property, and frequent use of the property." *Rana v. Islam*, 305 F.R.D. 53, 63 (S.D.N.Y. 2015); *see also F.D.I.C. v. Scotto*, 1998 WL 357324, at *4 (N.D.N.Y. June 29, 1998) (indicia of permanence there were "far more substantive" where the defendants maintained "a fully furnished house for their sole use and enjoyment, and employ a caretaker who lives on the property year round"); *131 Main St. Associates v. Manko*, 897 F.Supp. 1507, 1524 (S.D.N.Y. 1995) (finding sufficient permanence where defendant stayed in apartment owned by nephew despite visits being "episodic rather than constant"); *id.* ("it cannot be said that the permanence [defendants] enjoyed at [one residence] was lessened by the fact that [they] enjoyed permanence elsewhere"); *Jaffe & Asher v. Van Brunt*, 158 F.R.D. 278, 280 (S.D.N.Y.

1994) (finding sufficient indicia of permanence such that service was "reasonably calculated to provide [defendant] with actual notice of the action", even though he "was not actually staying" at that location when service was made). "Such indicia give confidence that the person served will receive notice", *Mellon*, 719 F. App'x at 77, as Hernández unquestionably did here.

Examining the "indicia of permanence" in this case, it is plain that the Napa Estate is Hernández's dwelling house or usual place of abode. Hernández moved his family to Napa Valley in 2010 and, the next year, bought the Napa Estate—a sprawling over 62.5 acre ranch that, according to various filings, is owned by the Hernández Family Trust, and is the personal address of Hernández and his wife. *Supra*, at 5-7. In 2013 and 2014, Hernández sought and obtained permission to construct a compound for his family, including an over 18,000 square foot "primary residence" for his immediate family's use, a 4,222 square foot guesthouse for his sisters and their children, a 1,772 square foot guest cottage for his mother, and lavish amenities including a family pool cabana, swimming pool, and spa, and an agricultural barn to house hobby horses. *Id*.[7] In seeking approval for this construction, Hernández told commissioners that "he and his wife Ana want their Howard Backen-designed estate to stay in their family for generations" and that his children's inheritance would be conditioned on keeping the estate in the family. *Id*. at 6. Their application stated that they intended to live in "the St. Helena community for decades to come". *Id*. at 7.

Hernández's wife, Ana, daughter, Marcela, and son, Hernández Anguiano, all reside in or adjacent to the Napa Estate. *Id*. at 7. The three own and operate the family businesses in Napa, Grove 45 and Museion Napa, and press pieces dated September 2023 note their "deep connections

---

[7]Hernández's claim that the Napa Estate "is the residence of someone else: Mr. Hernández Anguiano" (ECF No. 302 at 5) also defies belief, given the overwhelming evidence confirming that Hernández built the Napa Estate as a family compound for him and his family.

to the Napa Valley community". *Id*. at 7-8. Indeed, Hernández's unsworn declaration does not deny that he stays at the Napa Estate when in Napa Valley.

Under Rule 4(k)(1)(A) and 4(k)(1)(C), service of the Notice of Petition established this Court's personal jurisdiction over Hernández because (a) it is authorized under the FAA, *see* 9 U.S.C. § 9 ("Notice of the application shall be served upon the adverse party, and thereupon the court shall have jurisdiction of such party as though he had appeared generally in the proceeding."); and (b) Hernández is subject to personal jurisdiction in New York courts because he affirmatively subjected himself to jurisdiction when he brought an action in New York to permanently stay the arbitration that was then removed to this Court, *see Hernández,* et al. *v. Telecom Business Solution, LLC*, et al. (Case No. 1:24-cv-03457).[8] In short, he has no basis to evade the Court's Order or jurisdiction.[9]

Thus, service of process on Hernández was effective under Fed. R. Civ. P. 4(e), was complete on March 28, 2025, and established this Court's jurisdiction over Hernández.

---

[8]Despite language in 9 U.S.C. § 9 that "notice of the application shall be served" on a nonresident adverse party "by the marshal of any district within which the adverse party may be found," courts routinely hold that service by a process server is sufficient. *See, e.g.*, *Absolute Nevada*, 646 F. Supp. 3d at 439. Further, service by marshal is waived where the adverse party was already before the Court based on prior motion practice. *See Smiga v. Dean Witter Reynolds, Inc.*, 766 F.2d 698, 707 (2d Cir. 1985); *see also Krantz & Berman, LLP v. Dalal*, 2011 WL 1810490, at *3 (S.D.N.Y. May 12, 2011), aff'd, 472 F. App'x 76 (2d Cir. 2012) (same; rejecting argument that service of notice of application to confirm was improper because it was not made by a marshal where "the Court had previously acquired personal jurisdiction over Dalal based on his appearance and submission of briefs in the litigation over the K&B attorneys' fees and the related litigation"). Hernández affirmatively brought a petition to permanently stay the underlying arbitration in New York state court, which Petitioners removed to this Court. *Supra*, at 8-9. He thereby submitted himself to the personal jurisdiction of this Court in related litigation and, as a result, service by marshal is waived.

[9]Evading service on Hernández is just one of several bad-faith strategies Respondents are employing in an attempt to avoid liability and the judgments of this Court. For example, when Peppertree/AMLQ served Terra/DTH and Hernández with discovery requests in aid of execution of the Court's monetary judgments, Respondents' counsel requested, and was granted, an extension of the deadline to respond on behalf of Terra/DTH (while refusing to accept service on behalf of Hernández). *See* Ex. 21. But instead of providing timely responses to the requests, Respondents tried to side-step their obligation to respond or face additional contempt sanctions by making a half-baked offer to satisfy the relatively nominal judgments – an offer which ignores their much greater liability under the 5PFA. (*See* ECF No. 257). Petitioners' requests remain unanswered 27 days after they were due. Peppertree/AMLQ reserve all rights to seek further relief from the Court as needed to address these ploys, including to serve Hernández via alternative means and to hold Respondents' in contempt of their discovery obligations.

**C.**    **Hernández Received Timely Actual Notice and Therefore No Injustice Results From Giving Effect to that Notice**

In the event that the Court finds a technical defect in service of process (it should not), "[i]n cases involving arbitration proceedings, '[c]onsiderations of fairness' may excuse improper service." *Absolute Nevada, LLC*, 646 F. Supp. 3d at 439–40 (quoting *Matter of Lauritzen Kosan Tankers (Chem. Trading, Inc.)*, 903 F. Supp. 635, 637 (S.D.N.Y. 1995)); *see also Vidaplan, S.A., Inc. v. Cipriani Int'l, S.A.*, 2006 WL 8461283, at *6 (S.D.N.Y. Aug. 7, 2006) ("'The Second Circuit has held that standards for service are to be liberally construed in the context of arbitration.'"). In *Matter of Lauritzen Kosan Tankers*, the petitioners' service of process on the respondent's New York attorney was not adequate service; nevertheless, the court opined that "[c]onsiderations of fairness . . . may excuse that failure [if the complaining party has actually received notice and the case involves arbitration proceedings]." *Matter of Lauritzen Kosan Tankers*, 903 F. Supp. at 637. There, the court concluded that the respondent actually received notice through its attorney and, further, that no injustice would result from giving effect to that notice. *Id.*

Here, Hernández admits that he received actual notice of the Petition to Confirm 5PFA and the Anti-Suit Injunction Motion. (*See generally* ECF No. 302). Indeed, Hernández was a party to the Phase 2 arbitration proceedings, represented there by Mr. Smith (Respondents' counsel). No injustice would result from giving effect to the actual notice Hernández received.

**D.**    **In the Alternative, Petitioners Request that the Court Order Service By Electronic Mail Directed to Hernández's Counsel, Mr. Smith, to be Effective**

In the unlikely event that the Court credits Hernández's claim that Guatemala is his sole "dwelling or usual place of abode" and, in turn, finds service was insufficient (which it should *not*), there is little question that the Court should exercise its discretion to retain the case, quash service, and enter an Order permitting Petitioners to make service by other means, under Fed. R. Civ. P. 4(f)(3).

"'[D]ismissal is not mandatory when service of process is improper.'" *Vega*, 339 F.R.D. at 217. Here, the Court unquestionably should retain the case. Respondents were properly served and agreed to a briefing schedule on the Petition, which the Court so-Ordered. (*See* ECF No. 286). As the Tribunal has found, Hernández owns and controls both Terra and DT Holdings. (*See* ECF No. 277-1 at ¶ 3).

Assuming, for the sake of argument, that Hernández's sole "dwelling or usual place of abode" is Guatemala (and setting aside the mountain of evidence that undercuts the credibility of this claim, *see supra*, at 5-8), Federal Rule of Civil Procedure 4(f)(3) permits service on an individual in a foreign country "by other means not prohibited by international agreement, as the court orders." Fed. R. Civ. P. 4(f)(3). "The law is clear, however, that before the Court will authorize alternative service pursuant to Rule 4(f)(3), the moving party 'must make some showing of the need for judicial intervention.'" *Gang Chen v. China Green Agric., Inc.*, 2021 WL 103306, at *2 (S.D.N.Y. Jan. 6, 2021). "The showing that must be made has frequently been described as follows: '(1) a showing that the plaintiff has reasonably attempted to effectuate service on the defendant, and (2) a showing that the circumstances are such that the court's intervention is necessary.'" *Id.*

Here, Petitioners reasonably attempted to effectuate service on Hernández pursuant to 9 U.S.C. § 9 and Fed. R. Civ. P. 4(e). Hernández argues that Petitioners must attempt to serve him in Guatemala. But it is clear from his Motion and the refusal of his counsel in the underlying arbitration (and, indeed, on the Motion seeking to quash service) that Hernández intends to engage in the sort of catch-me-if-you-can evasion and gamesmanship worthy of a Hollywood movie. This Court's intervention is necessary. And this Court can and should put an end to Hernández's obvious objective to dodge service—and hold him accountable for the over $300 Million in

damages owed to Peppertree/AMLQ—now. In the event the Court finds service was not properly effected at the Napa Estate (although it was), it should order that service via electronic mail directed to Mr. Smith is effective service on Hernández under Fed. R. Civ. P. 4(f)(3).

### E.    Petitioners Properly Served the Anti-Suit Injunction Motion on Hernández

Service of the Anti-Suit Injunction Motion was made on Hernández by personally delivering copies to Hernández's Napa Estate and handing them to his son, who lives there and expressly confirmed that he would accept service on Hernández's behalf. (ECF No. 265). This is proper service under Rule 4(e)(2)(B). It also satisfied the requirement in Local Rule 83.6(a) that an alleged contemnor who has not appeared in the action by an attorney be personally served with notice of the motion "in the manner provided for by the Federal Rules of Civil Procedure for the service of a summons"—here, Fed. R. Civ. P. 4(e)(2)(B). *See* Local Rule 83.6(a); *Absolute Nevada, LLC v. Grand Majestic Riverboat Co. LLC*, 2020 WL 5209730, at *4 n.1 (S.D.N.Y. Sept. 1, 2020) ("Courts operating under the aegis of Local [Civil] Rule 83.6(a) have interpreted the personal service requirement to encompass methods of substitute service permitted by Rule 4, Fed. R. Civ. P. . . .").

Petitioners served Hernández with a copy of Local Rule 83.6 in the service package sent on April 7, 2025, as evidenced in the Pavlak Affidavit. (*See* ECF No. 281 at ¶ 3.c). Although a copy of Local Rule 83.6 was not personally served on Hernández together with the Notice of the Anti-Suit Injunction Motion on March 28, 2025, there is no question that the Notice and Motion were served. Hernández does not cite to a single case in which a court quashed otherwise proper personal service of a contempt motion for failure to include a copy of Local Rule 83.6 in the service package, and Petitioners found no such case. In any event, the failure to personally serve a copy of Local Rule 83.6 is at most a minor technical defect that does not affect the validity of service of the Anti-Suit Injunction Motion under Fed. R. Civ. P. 4(e)(2)(B). Moreover, this Court has

inherent authority to excuse a party's non-compliance with a local rule. *See Absolute Nevada, LLC*, 2020 WL 5209730, at *6 (citing *Contino v. United States*, 535 F.3d 124, 126 (2d Cir. 2008)). In the event there is any question whether Petitioners complied with Local Rule 83.6(a), the Court should exercise its inherent authority to excuse the technical failure to personally serve a copy of the Local Rule on Hernández and find that Petitioners properly served Hernández with the Anti-Suit Injunction Motion.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the Motion to Quash, find that Petitioners properly served Hernández with the Petition to Confirm 5PFA and the Anti-Suit Injunction Motion as required under 9 U.S.C. § 9 and Fed. R. Civ. P. 4(e)(2)(B), and grant such other and further relief as this Court deems just and warranted.

Dated:  May 22, 2024                                Respectfully submitted,

By:*/s/ Michael N. Ungar*                          By:*/s/ Gregg L. Weiner*
Michael N. Ungar                                   Gregg L. Weiner
(admitted *pro hac vice*)                          Andrew Todres
Katherine M. Poldneff                              Ethan Fitzgerald
Ashtyn N. Saltz                                    **ROPES & GRAY LLP**
**UB GREENSFELDER LLP**                             1211 Avenue of the Americas
1660 West 2nd Street, Suite 1100                   New York, New York 10036-8704
Cleveland, Ohio 44113-1406                         Phone: (212) 596-9000
Phone: (216) 583-7000                              Fax:    (212) 596-9090
Fax:    (216) 583-7001                             gregg.weiner@ropesgray.com
mungar@ubglaw.com                                  andrew.todres@ropesgray.com
kpoldneff@ubglaw.com                               ethan.fitzgerald@ropesgray.com
asaltz@ubglaw.com

David A. Landman                                   Daniel V. Ward
**UB GREENSFELDER LLP**                             (admitted *pro hac vice*)
1700 Broadway, Suite 1802                          **ROPES & GRAY LLP**
New York, New York 10019-7710                      Prudential Tower
Phone: (917) 262-0470                              800 Boylston Street
Fax:    (917) 262-0480                             Boston, Massachusetts 02199-3600
dlandman@ubglaw.com                                Phone: (617) 951-7000
                                                   Fax:    (617) 951-7050
                                                   daniel.ward@ropesgray.com

*Counsel for Petitioners Telecom Business Solution, LLC and LATAM Towers, LLC*

*Counsel for Petitioner AMLQ Holdings (Cay), Ltd.*