**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ X

TELECOM BUSINESS SOLUTION, LLC, *et al.*,      :      Civil Action : 1:22-cv-01761
                                               :
                    Petitioners,               :      Judge Lewis A. Kaplan
            v.                                 :
                                               :      Magistrate Judge Robert W.
TERRA TOWERS CORP., *et al.*,                  :      Lehrburger
                                               :
                    Respondents.               :
------------------------------------------------------------------ :
                                               X

**PETITIONERS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION FOR FURTHER FINDINGS OF CIVIL CONTEMPT AND SANCTIONS**

Michael N. Ungar
(admitted *pro hac vice*)
Katherine M. Poldneff
Ashtyn N. Saltz
(admitted *pro hac vice*)
**UB GREENSFELDER LLP**
1660 West 2nd Street, Suite 1100
Cleveland, Ohio 44113-1406
Phone: (216) 583-7000
Fax:    (216) 583-7001
mungar@ubglaw.com
kpoldneff@ubglaw.com
asaltz@ubglaw.com

David A. Landman
**UB GREENSFELDER LLP**
1700 Broadway, Suite 1802
New York, New York 10019-7710
Phone: (917) 262-0470
Fax:    (917) 262-0480
dlandman@ubglaw.com

*Counsel for Petitioners Telecom Business*
*Solution, LLC and LATAM Towers, LLC*

Gregg L. Weiner
Andrew S. Todres
Ethan R. Fitzgerald
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, New York 10036-8704
Phone: (212) 596-9000
Fax:    (212) 596-9090
gregg.weiner@ropesgray.com
andrew.todres@ropesgray.com
ethan.fitzgerald@ropesgray.com

Daniel V. Ward
(admitted *pro hac vice*)
**ROPES & GRAY LLP**
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199-3600
Phone: (617) 951-7000
Fax:    (617) 951-7050
daniel.ward@ropesgray.com

*Counsel for Petitioner AMLQ Holdings*
*(Cay), Ltd.*

# Table of Contents

Page

I.   INTRODUCTION .................................................................................................1

II.  FACTUAL BACKGROUND .............................................................................7

 A. Respondents Initiate and Pursue Multiple Baseless Criminal Complaints against Company Management as Part of their Efforts to Block a Sale .................7

 B. Respondents Interpret the Court's April 22 Order as a Greenlight to Continue Escalating their Attacks and the Tribunal Orders Petitioners to Seek Relief from the Court .................................................................................10

 C. Respondents Fail to Comply with the Court's Discovery Order and the April 22 Order ................................................................................................14

  1. *Discovery Violations* .................................................................. 14

  2. *Non-Compliance with April 22 Order* ..................................... 18

III. ARGUMENT .....................................................................................................19

 A. Respondents Are in Contempt of Multiple Court Orders and Directives.............19

 B. The Court Should Make New Findings of Contempt Against Respondents for the Criminal Proceedings, Find Them in Contempt of the Court's Prior April 22 Order of Contempt, and Issue New and Increased Sanctions as a Result ................................................................................................24

  1. *Make New Findings of Contempt in Respect of the Criminal Proceedings, Including Based on Adverse Inferences Regarding Respondents' Involvement In, and Motivations For, Initiating the Criminal Actions Against Gaitán, Mr. Schachter, and the Company.* ................................ 25

  2. *Order Respondents to Withdraw Existing Criminal Complaints, and Prohibit Them from Filing Any New Complaints, Against Gaitán, Mr. Schachter, and the Company* ........................................................ 27

  3. *Order the Civil Confinement of Hernandez, and Put Respondents on Notice of Possible Criminal Contempt Sanctions.* .................................... 29

  4. *Find Respondents (Including Hernandez) in Contempt of this Court's April 22 Order* .......................................................................... 32

  5. *Award Petitioners' Attorney's Fees in Connection with These Contempt Proceedings.* ........................................................................ 32

IV.  CONCLUSION ..................................................................................................32

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Berger v. Heckler*,
  771 F.2d 1556 (2d Cir. 1985)..................................................................................24

*CBS Broad. Inc. v. FilmOn.com, Inc.*,
  2013 WL 4828592 (S.D.N.Y. Sept. 10, 2013)..........................................................28

*CE Int'l Res. Holdings LLC v. S.A. Mins. Ltd. P'ship*,
  2013 WL 324061 (S.D.N.Y. Jan. 24, 2013) ..............................................................29

*Chevron Corp. v. Donziger*,
  296 F.R.D. 168 (S.D.N.Y. 2013) ....................................................................25, 26, 27

*Chevron Corp. v. Donziger*,
  384 F. Supp. 3d 465 (S.D.N.Y. 2019)............................................................... *passim*

*Drywall Tapers & Pointers of Greater N.Y., Loc. 1974 of I.B.P.A.T. v. Loc. 530 of
  the Operative Plasterers' & Cement Masons' Int'l Ass'n*,
  2002 WL 31641597 (E.D.N.Y. Nov. 19, 2002)........................................................21

*Gasser v. Amboy Nat'l Bank*,
  507 F. App'x 19 (2d Cir. 2013) ...........................................................................21, 27

*John B. Stetson Co. v. Stephen L. Stetson Co.*,
  128 F.2d 981 (2d Cir. 1942)....................................................................................21

*Motorola Credit Corp. v. Uzan*,
  2002 WL 1963301 (S.D.N.Y. Aug. 22, 2002) .........................................................20

*Nat'l Rsch. Bureau, Inc. v. Kucker*,
  481 F. Supp. 612 (S.D.N.Y. 1979)..........................................................................21

*Quinlan v. Lender*,
  422 N.Y.S.2d 634 (Sup. Ct. 1979) ....................................................................27, 28

*Sassower v. Signorelli*,
  99 A.D.2d 358 (N.Y. App. Div. 1984) .....................................................................28

*Soundkillers LLC v. Young Money Ent., LLC*,
  2016 WL 4990257 (S.D.N.Y. Aug. 2, 2016)...........................................................24

*Telecom Bus. Sol., LLC v. Terra Towers Corp.*,
  2024 WL 446016 (2d Cir. Feb. 6, 2024)...................................................................8

*Telecom Bus. Sol., LLC v. Terra Towers Corp.*,
  2025 WL 1177768 (2d Cir. Apr. 23, 2025) ............................................................8

*United States v. Donziger*,
  2021 WL 1845104 (S.D.N.Y. May 7, 2021) .......................................................30

*United States v. Mongelli*,
  857 F. Supp. 18 (S.D.N.Y. 1994) ...............................................................19, 21

*Universal City Studios, Inc. v. N.Y. Broadway Int'l Corp.*,
  705 F.2d 94 (2d Cir. 1983) ........................................................................24, 30

*WFMC 2016-LC25 W. Bay Area Boulevard LLC v. Tyler*,
  2022 WL 17487730 (S.D.N.Y. Dec. 7, 2022) ......................................................20

**Statutes**

9 U.S.C. § 203 ........................................................................................29

9 U.S.C. § 207 ........................................................................................29

9 U.S.C. § 9 ...........................................................................................29

**Other Authorities**

Fed. R. Civ. P. 4.1(b) ..............................................................................29

Fed. R. Crim. P. 42(a) ..............................................................................30

## I.    <u>INTRODUCTION</u>[1]

Since February 2022, the Tribunal has issued five unanimous partial final awards—four of which have been confirmed by this Court—all against Respondents.  As the Tribunal and this Court have concluded, "none of [these awards] has been complied with in any respect."  Apr. 22 Order 2.  Most critically, since the issuance of the First Partial Final Award (the "1PFA"), which compelled Respondents to specifically perform under the SHA and sell the Company and raise "no objection" to such a sale, and the Second Partial Final Award (the "2PFA"), which sanctioned Respondents for failing to reinstate Jorge Gaitán as CEO of the Company in violation of a prior order of the Tribunal, Respondents have deliberately and repeatedly sought to evade compliance with these contractual and Court-ordered obligations.  Respondents' defiant conduct has been going on for years, and it has continued unabated—and escalated—even after this Court found them in contempt of the judgment confirming 1PFA in its April 22 sanctions order.

That order—while finding Respondents in contempt of the 1PFA's requirement to engage an investment bank, and ordering them to facilitate such an engagement—did not separately find Respondents in contempt of 1PFA for maintaining and continuing to initiate baseless criminal proceedings against Company management.  Yet those proceedings are an obvious violation of 1PFA's requirement to raise "no objection" to a sale: as detailed herein, the Court has already

---

[1] As the Court is aware, this action arises from an arbitration administered by the International Centre for Dispute Resolution of the American Arbitration Association captioned *Telecom Business Solution, LLC, et al. v. Terra Towers Corp., et al.*, AAA/ICDR Case No. 01-21-0000-4309 (the "Arbitration") and presided over by a panel of three highly qualified and experienced arbitrators (the "Tribunal"). The Arbitration is pending among petitioners Telecom Business Solution, LLC and LATAM Towers, LLC (collectively, "Peppertree"), and AMLQ Holdings (Cay), Ltd. ("AMLQ," together with Peppertree, "Peppertree/AMLQ" or "Petitioners"), Continental Towers LATAM Holdings Limited (the "Company"), and respondents Terra Towers Corp. and TBS Management, S.A. (collectively, "Terra"), respondent and Terra affiliate DT Holdings, Inc. ("DTH" and together with Terra, "Terra/DTH"), and Terra/DTH's controller, respondent Jorge Hernandez ("Hernandez" and together with Terra/DTH, the "Respondents"). Terra is the majority shareholder of the Company together with minority shareholders Peppertree and AMLQ. Unless otherwise noted, all defined terms used herein shall have the same meaning as in the Court's April 22, 2025 Order (ECF No. 295, the "April 22 Order").

confirmed as much.  Yet Respondents have treated the April 22 Order's narrow contempt finding and sanction (hiring an investment bank—a directive they feigned compliance with years earlier) as a license to double-down on their broader, more injurious, and years-long campaign to obstruct a sale through maintaining and initiating fabricated criminal proceedings against the Company's management and the Company itself.  Accordingly, new contempt findings and sanctions are needed to stop Respondents' years-long, calculated scheme to block the sale of the Company.[2]

\*\*\*

There can be no dispute that Respondents' campaign violates their obligation to raise no objection to the sale, and that as long as the Company remains unsold, DTH will continue to siphon away millions of dollars in Company funds each year.  Remarkably, at his deposition last week, while acknowledging the Company's payments to DTH, Jorge Hernandez claimed under oath that—contrary to the findings of the Tribunal and this Court—he and Respondents have "never opposed [] a fair sale of the Company" and "were looking forward to selling the company since 2017." Ex. 48 at 26:17-18, 110:24-11:1.  That is the alternate reality in which Respondents are living.  The actual reality, clear on the face of the Tribunal's confirmed awards, is this: Respondents have orchestrated multi-faceted efforts to oust Company Management based on a "false narrative of misconduct and criminality" *because Jorge Hernandez considered Company*

---

[2] As detailed herein, Respondents have also already violated the Court's April 22 Order in meaningful respects, for which Petitioners seek additional sanctions in the Court's discretion.  Specifically, Respondents have (i) failed to withdraw any of the various foreign proceedings initiated in multiple jurisdictions, including BVI, Peru, Guatemala, and El Salvador, as required by the April 22 Order (*see* Apr. 22 Order 41-42; ECF No. 317); (ii) failed to pay any of the monetary awards pending against them, as required by the April 22 Order (*see, e.g.*, Apr. 22 Order 37); (iii) failed to file Hernandez's affidavit concerning attempts to comply with the Court's orders, which was due to the Court on June 2, 2025 (*See* Apr. 22 Order 47 (¶ 5.2), 48 (¶ 6.2); and (iv) failed to file any of the status reports required by the April 22 Order (*see* Apr. 22 Order 43).  These violations are undisputed and reinforce Respondents' utter contempt of this Court's orders and the need for new findings of contempt and escalating sanctions to stop Respondents' campaign to block a sale.

*Management to be "insufficiently supportive" of Respondents' opposition to a sale of the Company.* Ex. 8 at 33 (¶ 78.1).[3]

The Tribunal and this Court have stressed the importance of having "finality" over the status of Gaitán's role as CEO to proceed with a sales process. *Id.* at 3 (¶ 4). Yet in the more than three years since the Tribunal (and this Court) determined that Gaitán should be restored to his position as Company CEO, and that the Company should be sold, Respondents have done everything in their power to try to oust him again and again—almost entirely on the basis of the same false allegations that the Tribunal and this Court have already rejected. That campaign has escalated dramatically in recent months. The timing of that escalation—including Gaitán's "immaculate incarceration" on fabricated criminal charges that were initiated by them over three years prior—coincides directly with the issuance of the Fifth Partial Final Award ("5PFA") in the Arbitration. That timing is not a coincidence: as Respondents anticipated prior to its issuance, including based on draft 5PFA provisions distributed to the parties over a month before the award was issued, the 5PFA assigned specific oversight duties to Gaitán and Company Counsel Adam Schachter in relation to the anticipated, Court-ordered sale of the Company. Both then suffered the consequences.

After the Tribunal signaled its intent to rule against Respondents and assign Gaitán and Schachter roles related to the sale of the Company, Respondents instigated and directed an onslaught of new criminal proceedings against both of them—as well as the Company itself, resulting in Gaitán's incarceration in a maximum-security prison, and the seizure of 163 of the Company's towers. Gaitán's and his father's situation should not be underestimated. As Gaitán's attorney, Ms. Alejos, testified at her June 1 deposition: (i) Gaitán and his father face an imminent

---

[3] Unless otherwise noted, all citations to "Ex." refer to the Declaration of Gregg L. Weiner being filed herewith.

threat of bodily harm while in the maximum security Pavoncito prison; (ii) she has never seen anything like the attacks Hernandez and DTH have perpetrated against Gaitán; (iii) Gaitán would not be in prison today but for the efforts of Hernandez and DTH to prosecute him. Ex. 50 at 38:10–40:10.

These are not good-faith criminal proceedings. Rather, most of these are based on the same false allegations that the Tribunal and this Court rejected years ago. The more recent ones are based on allegations by DTH's CFO, Juan Francisco Quisquinay (who, as the Court will recall, initiated the prior proceedings in the BVI to try to undo the Tribunal's awards, which this Court enjoined), that Gaitán used an electronic device to communicate with the Company's independent counsel, Adam Schachter. As detailed in sworn declaration from Mr. Schachter, a highly respected lawyer and officer of the court, these allegations are false: "To be clear, while I have not had any electronic communications with Mr. Gaitán during the time of his incarceration, I have been able to communicate with him through lawful, non-electronic means." Ex. 53 ¶ 69. These "electronic device" allegations and purported evidence supporting them—which have already been rejected by the Tribunal—were confected as part of a highly improper and unethical scheme by Respondents and their Arbitration counsel to again try to sideline individuals with roles and responsibilities that are critical to the sale of the Company. As further detailed in Mr. Schachter's sworn declaration, Respondents have been falsely accusing Mr. Schachter of wrongdoing as far back as 2021, and the recent "Criminal Complaint is part of a continuing pattern of harassment and intimidation, designed to remove me as independent Company Counsel." Ex. 53 ¶ 82.

Similarly, in another recent criminal proceeding, Hernandez alleges that Gaitán committed attempted murder despite admitting at his deposition that he did not, at the time he filed the complaint, believe Gaitán had committed a crime. Finally, *after* Petitioners sought sanctions from

this Court following Gaitán's incarceration, Hernandez purported to receive death threats from Gaitán and his personal criminal counsel, Ana Lucia Alejos Botran, only disclosing the "evidence" of this purported crime *after* Gaitán and his father had been relocated to a maximum-security prison in Guatemala. Hernandez's account—which lacks both evidence and credibility—has been thoroughly refuted by Ms. Alejos.

Respondents were asked to provide discovery about these purported crimes during the Arbitration. They refused. This Court ordered, and Petitioners asked, that Respondents provide discovery about these purported crimes in this proceeding. *See* ECF No. 334; Ex. 41 at 20:18-24:1. They refused. As set forth in Petitioners' letter-motion filed earlier today, Respondents produced no documents beyond the actual criminal complaints they filed, and they designated an incompetent and unprepared 30(b)(6) witness whose knowledge about the criminal complaints was based solely on purporting to have read them.

When viewed in the appropriate context of Respondents' years-long campaign to prevent a sale of the Company, the facts and circumstances of these criminal proceedings—including Respondents' (i) continuing to maintain and perpetuate them after they were confirmed by this Court to be based on false allegations, (ii) failing and refusing to provide discovery related to them, (iii) well-established pattern of using disinformation to gain tactical advantages in this commercial dispute, and (iv) escalation of criminal proceedings in anticipation of and following the issuance of the 5PFA—supports only one plausible inference: the criminal proceedings are part of a continuing campaign to prevent or impair a sale, in violation of this Court's judgments confirming both the 1PFA and 2PFA.

Unfortunately, while the Court's April 22 Order has been helpful in advancing renewed efforts to retain an investment bank to sell the Company, Respondents have treated the Order as a

license to interfere with the Court-ordered sale because the Order did not specifically sanction them for simultaneously initiating and expanding the baseless criminal proceedings. Indeed, Respondents' own counsel boasted at a May 8 hearing before the Tribunal that the April 22 Order "rejected" sanctioning Respondents in respect of these criminal proceedings—all while expressly declining to provide the Tribunal any assurances regarding the safety and well-being of Gaitán. Just one week later, after Petitioners moved for interim relief from the Tribunal regarding Gaitán, Gaitán and his father were violently moved to the maximum-security prison in Guatemala, where their lives are at risk.

In sum, while Respondents will attempt—as they have done previously—to create the appearance of being willing to have the Company sold, the reality is that they are repeatedly acting to impede a sale. Accordingly, new findings of contempt and additional sanctions are needed— urgently—to protect this Court's judgment affirming the 1PFA and its April 22 Order, to protect the years-overdue sales process and Petitioners' multi-hundred million dollar interest in the Company, to protect the integrity of arbitration as an internationally accepted forum for dispute resolution, and to protect the rule of law. Petitioners therefore respectfully request that the Court (i) find Respondents and their agents again in contempt of the 1PFA, (ii) find Respondents and their agents in contempt of the 2PFA; (iii) order Respondents and their agents to purge their contempt of the 1PFA and the 2PFA by notifying relevant criminal authorities that they withdraw all criminal complaints initiated by them or their proxies concerning or related to matters that have already been raised to the Tribunal and/or this Court and notify those criminal authorities that they no longer believe that such proceedings should be pursued (a decision which, in all respects, will remain subject to the discretion of the local criminal authorities); (iv) issue a civil arrest warrant for Hernandez if Respondents have not complied with (iii), above, within fourteen days of the

Court's new finding of contempt; (v) order Respondents not to initiate any new criminal proceedings concerning matters that have already been raised to the Tribunal and/or this Court; (vi) find Respondents in contempt of the April 22 Order (*see* n.2, *supra*) and (vii) award Petitioners attorneys' fees incurred in connection with this contempt proceeding and any other sanctions that the Court deems just, proper, and necessary to coerce compliance with its orders and judgments.

## II.    FACTUAL BACKGROUND

### A.    Respondents Initiate and Pursue Multiple Baseless Criminal Complaints against Company Management as Part of their Efforts to Block a Sale

The Court is already familiar with the years-long and complex history of proceedings in this matter. *See, e.g.*, Apr. 22 Order 2-8. This includes, of course, the 1PFA—which awarded Petitioners specific performance of the Shareholders Agreement provision requiring Respondents to "vote for, consent to, and raise no objection against" the sale of the Company—and the 2PFA— which sanctioned Respondents for their failure to comply with the Tribunal's interim order requiring them to restore Company CEO Jorge Gaitán and COO Carol Echeverria, reasoning that "finality with regard to the status of [Gaitán and Echeverria] is desirable for the process of sale of the Company to proceed in an efficient way" and finding that the December 2021 and January 2022 criminal complaints lodged against Gaitán in Guatemala "relied on a false account of submissions made in this arbitration" and were part of a "multi-faceted effort by Respondents to present to this Tribunal and to the Company's Board a false narrative of misconduct and criminality by Gaitán and [Company COO] Echeverria" levied because Hernandez "considered them to be insufficiently supportive of the Respondents' position in this arbitration" that the Company should not be sold. Ex. 8 ¶¶ 9, 78.1. Both of those unanimous awards were confirmed by this Court in judgments that were later affirmed by the Second Circuit. *See* ECF Nos. 124-25 (the "1PFA Judgment"); *Telecom Bus. Sol., LLC v. Terra Towers Corp.*, 2024 WL 446016 (2d Cir.

Feb. 6, 2024); ECF No. 207; *Telecom Bus. Sol., LLC v. Terra Towers Corp.*, 2025 WL 1177768 (2d Cir. Apr. 23, 2025).

The Court is likewise familiar with the Respondents' continuation of that "multi-faceted effort" leading up to and since the issuance of the Tribunal's 5PFA, which resulted in what the Court aptly described as the "immaculate incarceration" of Gaitán and his father and their subsequent transfer to Guatemala's most notorious and dangerous maximum-security prison. Ex. 29 at 15:9-10; *see also* Apr. 22 Order 10-13; ECF Nos. 244, at 13-18; 330, at 2-9. For the convenience of the Court, a chart summarizing many of the events in Respondents' ever-multiplying measures to sideline Gaitán and the context of their broader efforts to stop a sale of the Company at all costs is submitted as an Appendix ("App'x") hereto. *See* ECF No. 366.

In reviewing these events, three key themes readily emerge. *First*, the criminal allegations against Gaitán and management are baseless. Indeed, the arrest of Gaitán and his father in March 2025 was made based on the very same allegations that had been raised in a criminal complaint filed in El Salvador in May 2022, which the Tribunal had rejected in the 2PFA over two years ago in August 2022. *See* App'x at Rows 16; 44; Ex. 24 at 3 (¶ 4) ("Respondents by continuing to claim that the CEO committed 'crimes,' and causing public prosecutors in Central America accept this claim, are defying our authority and that of the SDNY Court."). Respondents' newer complaints are just as bogus, including Hernandez's March 17, 2025 personal criminal complaint against Gaitán and others for ***attempted murder***. *See* Ex. 22. As he admitted at his deposition, Hernandez filed that charge on the basis of private, stolen text messages he came into possession of in May 2024, which merely show that someone else said they had dreamed about killing Hernandez and recounted that dream by text message to Gaitán and others. *See* Ex. 48 at 52:1-61:25, 69:7-15. After receiving the text messages, Respondents submitted them to the Tribunal as a basis to remove

Gaitán as CEO on the eve of the July 2024 Phase 2 hearing—an application that the Tribunal promptly denied.  *See* Ex. 15 ¶ 2.  Belying his claim that he feared for his life, Hernandez did not file the criminal complaint charging Gaitán with attempted murder until ten months later, in March 2025—on the eve of the issuance of the 5PFA, and after Gaitán had already been incarcerated.  *See* Ex. 48 at 58:2-59:1, 60:9-63:7, 64:13-66:17, 67:2-68:13.  And he admitted at his deposition that at the time he filed that complaint, he did not have evidence that Gaitán was actually attempting to kill him.  *See id.* at 61:20-22 ("Q.  And so, in your view, they committed a crime; correct?  A.  No, in my view, it needs to be investigated").

*Second*, Respondents are behind all of these proceedings.  Respondents have never denied—and the Court has repeatedly confirmed—that Hernandez and DTH's wholly-owned subsidiaries brought all of the criminal complaints, just as they have repeatedly used foreign civil proceedings to collaterally attack the Tribunal's orders and awards and undermine the judgments of this Court, as recognized in the 3PFA, February 20 Order, and April 22 Order.  *See* App'x at Rows 17; 38; 54.  Hernandez spent much of his deposition pretending not to be involved or have control over DTH, instead claiming that "elders" in his family controlled it through a trust.  *See* Ex. 48 at 21:2-23:14, 40:4-41:9.  When asked to identify those "elders," he refused.  *See id*.  When Petitioners sent counsel to Terra/DTH and Hernandez a follow-up request after the deposition to identify those "elders" and/or produce any applicable trust agreement(s), they again refused.  *See* Ex. 51.

*Finally*, these actions are all a pretext for Respondents to interfere with a sale, frustrate the confirmed Arbitration awards, and avoid their obligations.  From the very start, as this Court has confirmed, Respondents' attacks on Gaitán have been in direct retaliation for his refusal to support their efforts in the Arbitration to oppose a sale and have escalated in direct response to

developments in the Arbitration. *See* App'x at Rows17; 54; *see also* Ex. 24 ¶¶ 226-27 (finding Respondents engaged in "a strategy of resistance to [the 1PFA] by counterattack [that] is corroborated by many other elements in the history of this matter" and then tying Respondents' wrongful conduct, warranting punitive damages, to significant events in these proceedings). Indeed, in one recent criminal action, DTH sought and obtained a court order directing the Guatemalan government to ***seize 163 Company towers*** in Guatemala. *See* Apr. 22 Order 9, 23; Ex. 23; Ex. 26 ¶ 11. Plainly, causing the Guatemalan government to seize a portion of the Company's core assets interferes with the sale of the Company and all of its assets. Respondents' escalations are also clearly timed to interfere with the 5PFA and its sale-related directives, which appoint both Gaitán and Company counsel Adam Schachter—whom Respondents have also continuously attacked, and against whom a criminal complaint has now been made—to roles overseeing Company payments to DTH and the escrow of sale proceeds. *See* App'x at Rows 37, 48-49; Ex. 24 193 (¶ 8), 195 (¶ (8)e.

> **B.      Respondents Interpret the Court's April 22 Order as a Greenlight to Continue Escalating their Attacks and the Tribunal Orders Petitioners to Seek Relief from the Court**

The Court's April 22 Order held Respondents in contempt of its judgments confirming the 1PFA and 3PFA and ordered them to withdraw the foreign civil proceedings they had initiated and engage an Investment Bank to facilitate the sale of the Company or face coercive monetary sanctions. *See* Apr. 22 Order 46-48. But the April 22 Order did not sanction Respondents in respect of the criminal proceedings. Respondents took notice. At a May 8 hearing before the Tribunal, Respondents' counsel boasted that the Court's order "rejected the biggest portion of the request by" Petitioners because this Court declined to hold Respondents in contempt of the 2PFA Judgment or enjoin the foreign criminal proceedings. Ex. 36 at 21:1-16. Emboldened,

Respondents immediately ratcheted up their attacks by, for the umpteenth time, attempting to remove Gaitán as CEO.

Indeed, later on the very same day that the Court issued the April 22 Order, Respondents' agent Juan Francisco Quisquinay—who has been directly involved in multiple of Respondents' schemes to undermine the Tribunal and this Court, including by initiating the BVI action enjoined in the Court's February 20 Order—gave a false statement to Guatemalan prosecutors claiming to have evidence that Gaitán was unlawfully using electronic devices to communicate with Mr. Schachter while in prison. *See* Ex. 40, Ex. A (Trans.) at 8; Ex. 53 ¶¶ 80-81.[4]  On May 2, 2025, Respondents requested that the Tribunal lift the stay of their counterclaims that was ordered in the 2PFA.  Their request was based not on sudden compliance with the interim orders to restore Gaitán underlying the 2PFA, but because, they argued, the very incarceration of Gaitán that they had procured made Gaitán's "performance of any role in or for the Company legally impossible." Ex. 33 at 2.[5]  Moreover, the purported "evidence" of Gaitán's use of electronic devices appears to have been based on nothing more than email exchanges among counsel in the arbitration— Respondents' counsel, Diego Gosis, repeatedly interrogated Mr. Schachter about his means of communication with Gaitán, insinuating that any communication between them must have been via impermissible electronic means, despite Mr. Schachter's repeated denial of any such prohibited communication.  *See* Ex. 40, Ex. A (Orig.) at 17-22; Ex. 53 ¶¶ 80-81.  As Mr. Schachter explains in his declaration, the allegations against him are not only false—he has "not had any electronic communications with Mr. Gaitán during the time of his incarceration" (Ex. 53 at ¶ 69)—they are

---

[4] The April 22 Order was issued at approximately 11:12 a.m. Eastern Time.  Quisquinay's interview took place at or around 3:40 p.m. Guatemala time.  *See* Ex. 40 Ex. A (Trans.) at 8.

[5] Respondents have requested that the 2PFA's stay of their counterclaims be lifted on multiple occasions, even though they have never purported to comply with the tribunal's underlying interim orders.  *See* Ex. 53.

the result of a highly unethical scheme by Respondents and Mr. Gosis to try yet again to sideline him and Gaitán given their roles in the sales process (*id.* at ¶ 85).

Respondents also contended—without disclosing to the Tribunal Quisquinay's statement to prosecutors—that a "tracking analysis" they had commissioned demonstrated that Gaitán was sending emails while in prison (including, nonsensically, "anonymous" emails from an email account titled, "whistleblower@peppertreewakeup.com," attacking Peppertree and the Tribunal), and that this "further ma[d]e it untenable that [Gaitán] occupy the position of CEO of the Company." *Id.* at 2, Annex A. The Tribunal promptly rejected Respondents' "tracking analysis" as "unreliable *prima facie*," including because it provided no evidence that Gaitán actually communicated through electronic means from prison. Ex. 39 at 3; *see also* Ex. 34.

Moreover, this gambit was straight out of Respondents' disinformation playbook: as the Tribunal previously found in a detailed procedural order dated July 12, 2024, there is overwhelming evidence that Respondents have directed a sprawling disinformation campaign against Gaitán, Peppertree, AMLQ, and the Tribunal, which commenced in February 2022 when, ***two days after the Tribunal ordered the Company to be sold***, an obscure website published a slanderous blog post falsely claiming that Peppertree committed FCPA violations by supporting Gaitán's role at the Company. *See* Ex. 16 at 8.[6] As the Tribunal observed, these disinformation campaigns are unfortunately common in Guatemala, and Respondents' campaign likely violates U.S. criminal laws. *See id.* ¶ 14 n.4.

---

[6] Petitioners urge the Court to read the Tribunal's July 12, 2024 procedural order in full, as it provides exceptional clarity and context regarding Respondents' use of and reliance on disinformation and false allegations to perpetuate their opposition to the sale of the Company. These disinformation campaigns are often run through professional disinformation companies known as "net centers"—a term that Hernandez admitted familiarity with at his deposition. *See* Ex. 48 at 99:10-17. As noted elsewhere herein, during the Arbitration, Respondents refused to produce communications internally or with any third parties or media companies that may have assisted them in their disinformation campaign efforts. *See* Ex. 16 ¶ 15(g).

On May 16, 2025, Gaitán and his father were subjected to a violent raid at the prison where they had been held over two months.  *See* Exs. 40; 47.  As Petitioners later learned, the basis for that raid was the complaint Quisquinay had falsely made, claiming that Gaitán was in violation of a Guatemalan law prohibiting the "use of mobile terminal equipment in detention centers."  Ex. 40, Ex. A (Trans.) at 11.  Company counsel promptly informed the Tribunal and the parties of these developments, and on May 17, 2025, the Tribunal issued a procedural order in which it determined "that there is an imminent threat to Mr. Gaitán's life and health" and that "Respondents are responsible for the proceedings that have led to Mr. Gaitán's incarceration," which are "predicated exclusively on factual allegations propounded by Respondents that this Tribunal has previously adjudicated to be unsubstantiated" in the 2PFA.  Ex. 39 ¶¶ 2-3.[7]

The Tribunal also observed that "Mr. Gaitán's, and his father's, incarceration . . . may impede the sale of the Company . . . ."  Ex. 39 ¶ 7.  The Tribunal thus determined that this Court was the proper forum to determine whether the attacks on Gaitán "constitute additional acts of contempt" of the Court's 1PFA Judgment and "the severity of contempt sanctions to be imposed and the timing of their imposition."  *Id.* ¶¶ 2, 7.  Accordingly, the Tribunal directed Petitioners to seek emergency relief from this Court in connection with these developments, which Petitioners did on May 20.  *See* ECF No. 329 *et seq.*  On May 21, 2025, Gaitán and his father were transferred to the violent Pavoncito prison as a result of the raid. *See* Exs. 40; 47.

---

[7] The Tribunal's determinations in this regard were based on Mr. Schachter's letter and a sworn declaration from Ms. Alejos, which unequivocally stated that the Gaitans' arrests were founded on the same allegations that the Tribunal had rejected in the 2PFA, which this Court confirmed.  *See* Ex. 37 ¶¶ 12 (prosecutor in the Guatemala Criminal Matters "is relying on the same criminal allegations that were previously submitted by" DTH), 23 (in the El Salvador Criminal Action, the prosecution is relying on "factual allegations [that] are the same as when the complaint was filed in May 2022," meaning "the only relevant evidence presented" is a purported forensic audit which the Tribunal previously determined in the 2PFA to have "no merit").

### C.    Respondents Fail to Comply with the Court's Discovery Order and the April 22 Order

#### 1.    *Discovery Violations*

On May 21, 2025, the Court held an initial hearing on Petitioners' motion and ordered expedited discovery and further briefing on the matter. *See* Ex. 41 at 23:2-24:1. As set forth in the letter-motion Petitioners filed earlier today, Respondents failed to engage in expedited discovery in good faith, and tellingly, produced no communications of any kind related to their criminal proceedings, consistent with their long-running record of noncompliance with the Court's and/or Tribunal's orders and directives, which have been largely ignored with impunity, and long-running pattern of making false claims and then failing to produce supporting evidence. *See* ECF No. 365. Nevertheless, Respondents' meager document productions (consisting only of untranslated copies of some, but not all, of their criminal actions) and witness testimony (from an utterly unprepared corporate representative) confirm the obvious: (i) Respondents are behind each of the criminal complaints involving the Company and its management; (ii) none of the criminal allegations are based in fact or any good faith basis to believe an actual crime harming Respondents or anyone else has been committed; and (iii) the overriding purpose of initiating these criminal proceedings is to make the sale of the Company impossible.

Petitioners served document requests and deposition notices for Hernandez and a DTH corporate representative on May 22, 2025. *See* Exs. 42; 43. Respondents' objections to Petitioners' requests baselessly purported to limit the scope of expedited discovery, including by taking the untenable position that the Court's order only required Respondents to produce "documents produced in the criminal proceedings" and no other "Documents" or "Communications" as those terms are defined by the Court's rules. *See* Ex. 45. Petitioners' requests also expressly sought documents and communications in Hernandez's possession,

custody, or control.  *See* Ex. 42.  Respondents failed to produce ***any*** such documents or communications, or the typical privilege log Petitioners had requested, and instead produced the same complaints they had previously submitted without any of the corroborating evidence or communications internally or with prosecutors that Petitioners had requested.  Respondents also refused to address these deficiencies as demanded by Petitioners.  *See* Ex. 46.

At Respondents' request, on Sunday, June 1, Petitioners deposed Raul Pimentel, an outside Guatemalan lawyer whom Respondents designated as DTH's Rule 30(b)(6) designee.  *See generally* Ex. 49.  Mr. Pimentel was an entirely unprepared and inappropriate 30(b)(6) witness. Notwithstanding that he had personally filed the civil complaints against Company Management of which Petitioners informed the Court on April 4, 2025 (*see* ECF Nos. 278-79), Mr. Pimentel was unfamiliar with any of the individuals or topics listed in the deposition notice, which included Quisquinay's interview with Guatemalan prosecutors and the criminal complaint initiated against Mr. Schachter and others by an anonymous social media account.  Indeed, he could not even fully identify the DTH directors who purportedly designated him as a corporate representative, and was unaware that Quisquinay, the CFO of DTH who has been behind other improper proceedings designed to circumvent the 1PFA, was even a DTH employee.  *See* Ex. 49 at 12:24-13:14; 72:19-24; 77:14-17.  Prior to being engaged as DTH's 30(b)(6) representative, Mr. Pimentel had no prior involvement in, nor familiarity with, *any* of the fifteen criminal matters specifically identified in the 30(b)(6) Notice. *Id*. at 43:14-19.  He likewise had no knowledge of this Court's orders or the 5PFA; and testified that in preparation for his deposition, he did not bother to speak to any of the purported criminal complainants, their representatives, witnesses, or prosecutors involved in the bogus criminal actions against Company management.  *See id.* at 59:2-5.

As for the second Court-ordered deposition, Hernandez insisted his deposition be conducted remotely and was represented by new counsel from Williams & Connolly LLP, who surfaced moments before the deposition began and who had never previously appeared in this action or the Arbitration. *See generally* Ex. 48.[8]  Unsurprisingly, Hernandez's testimony was riddled with non-answers and unsupported denials of his own prior admissions.  Most incredibly, Hernandez denied that Respondents opposed a sale of the Company and claimed that he wanted to and had been trying to sell the Company since 2017, in contravention of both the Tribunal's and this Court's prior findings. *See id.* at 26:17-21; 89:4-7; 110:24-111:2; *cf.* Ex. 29 at 38:12-14 ("THE COURT: You're really standing there, and with a straight face, saying [the Company] could have been sold if [Petitioners] wanted to?").  Hernandez also disputed this Court's and the Tribunal's repeated determination that he owns and controls Terra and DTH, while refusing to identify— either during the deposition or via a follow-up request to his and Terra/DTH's counsel—the "elders" and "family trusts" that he claims do control those companies. *See id.* at 21:2-23:14; 38:16-41:9; Ex. 48.[9]  Worse, Hernandez contended that the criminal complaints against Gaitán were legitimate, legally required, and could not be withdrawn, even though he could not explain why, after reading text messages that purportedly caused him to fear for his life, he *waited over ten months*—until just before the 5PFA was issued and *after Gaitán had already been imprisoned*—to file his complaint for "attempted murder" against Gaitán (and indeed, admitted that when he finally filed the complaint charging Gaitán with attempted murder, he still did not

---

[8] The last-minute appearance of a new law firm on the scene is not surprising: Respondents have been represented by no fewer than 10 different law firms in this action alone—and yet more in the Arbitration—that have serially withdrawn from representing Respondents.  Earlier this week, Respondents' counsel Walkers also withdrew their representation in the El Salvador-Related BVI Action on an undisclosed basis. *See* Ex. 52.

[9] Tellingly, in the more than three years that this action has been pending, Respondents have never filed corporate disclosure statements for Terra/DTH as required by Rule 7.1.

have evidence that Gaitán had committed a crime).  Ex. 48 at 61:20-22 ("Q.  And so, in your view, they committed a crime; correct?  A.  No, in my view, it needs to be investigated").[10]

The evidence produced by Respondents and their witnesses' testimony created no doubt as to their responsibility for bringing these criminal proceedings, the phony nature of their complaints, and the fact that they are all part of a larger scheme to make the sale of the Company impossible.  Indeed, they confirmed it.[11]  As one notable example, Mr. Pimentel testified that he was engaged to file the civil complaints against Company Management by another lawyer named Walter Sierra.  *See* Ex. 49 at 25:23-27:3.  Mr. Sierra is the same lawyer who brought the Guatemala Action that resulted in the seizure of 163 Company towers by the Guatemalan government in March 2025.  *See* Ex. 23; Apr. 22 Order 9, 23.  And Mr. Sierra also represented Hernandez personally in yet another complaint, filed a month later, that he had received death threats on April 10, 2025.  *See* Ex. 30.  In addition, Carlos Guzman Lopez, the same DTH agent who filed the December 2021 criminal complaint against Gaitán that the Tribunal deemed part of a "false narrative of criminality," is also named as a co-plaintiff in the Guatemala Action that resulted in

---

[10] In an attempt at damage control, Hernandez claimed his belated "attempted murder" complaint was subsequently corroborated by a "death threat" he purportedly received from Gaitan's lawyer, Ms. Alejos.  *See* Exs. 30; 48.  But this claim defies credulity given (i) Respondents' failure to provide any discovery in support of this claim beyond the letter itself; (ii) Respondents' demonstrated pattern of manufacturing false information; (iii) that it was conveniently made while Petitioners' March 18 contempt motion was pending; and (iv) Alejos's credible denial of this absurd allegation.  *See* Exs. 47; 50.  If Respondents had produced internal communications concerning this threat, they would likely show that Respondents manufactured the death threat, as they likely have countless other communications throughout this proceeding that they have tried to attribute to Gaitan (such as the aforementioned "whistleblower" e-mail slandering Peppertree and the Tribunal that was sent while Gaitan was in prison and bears the hallmark of the previous "whistleblower" communications attacking Peppertree and the Tribunal, which the Tribunal previously concluded in its July 12, 2024 Procedural Order were likely initiated by Respondents in violation of federal and state criminal laws).  Respondents' self-serving claim that they are required by Guatemalan law to report these "crimes" and cannot withdraw their complaints is incorrect.  *See* Ex. 26.

[11] Hernandez did not dispute that the criminal proceedings harm the prospect for a sale (*see* Ex. 48 at 78:11-80:7), a conclusion that is also supported by common sense, the Tribunal's findings that this Court has confirmed, and evidence from the Phase 2 record.  *See* Exs. 8 ¶ 3 ("[T]he independence and integrity of Executive Management could materially affect whether the Company is in fact sold, and also could bear on the timing, price and other terms of the sale and the potential damages claims by Claimants and/or Respondents relating to the impact of Company Management actions or inactions on the sale process."); 17 at 1374-76 (corporate finance expert's testimony that she had "never seen anything [that could impact sale of the Company] like" criminal proceedings against a company's CEO and his father).

the seizure of 163 Company towers. *See* App'x at Row 46. Of course, Respondents' failure to participate in the discovery ordered by the Court in good faith is simply part and parcel of their long-running pattern of flouting discovery obligations and the orders of this Court and the Tribunal more generally.  In Phase 2 of the Arbitration, Respondents refused to produce documents in response to virtually all of Petitioners' requests and in violation of the Tribunal's order that they do so. *See* Ex. 16.  As a result, the Tribunal properly drew adverse inferences against Respondents, including the adverse inference that "the Guatemala criminal case brought by DTH against Mr. Gaitán was based on fabricated facts that were within Hernandez's personal knowledge" and that Respondents advanced those "fabricated facts" before courts in Guatemala and El Salvador to "undermine orders and awards in th[e A]rbitration."  Ex. 24 ¶ 213.  Respondents have likewise failed and refused to produce any information in response to the requests Petitioners served on them in aid of execution of the judgments confirming the first, second, and third awards nearly two months ago on April 11, 2025.  *See* Ex. 31; ECF No. 364.

### 2.    *Non-Compliance with April 22 Order*

Nor are Respondents in compliance with the Court's April 22 Order.  To begin, Hernandez has failed to timely file the third affidavit required to demonstrate purported compliance with the order's anti-suit injunction.  *See* Apr. 22 Order 47 (¶ 5.2), 48 (¶ 6.2).  Instead, he has sought to avoid the Court's jurisdiction altogether by moving to quash service.  *See* ECF No. 301 *et seq.* And moreover, Respondents assuredly have not complied with the anti-suit injunction.[12]  They have provided no evidence to support their claim that the El Salvador Action was terminated and

---

[12] To the extent Respondents are nominally compliant with the April 22 Order's mandate that they agree to engage an Investment Bank selected by Peppertree, their doing so is unlikely to actually lead to a sale as long as collateral litigation and bogus criminal complaints regarding the Company remain pending and its CEO is in jail.  Respondents have not disputed this.  *See* Ex. 48.

have not even purported to attempt to terminate the El Salvador-Related BVI Action.[13]  *See* ECF No. 338-1.  Meanwhile, the Peru Contemnors continue to maintain that the onus is on Peppertree and the Company to terminate the Peru-Related BVI Action, while they likewise seek to avoid the Court's jurisdiction and create another escape hatch for Respondents to continue to claim they cannot be held responsible for the actions of their agents.  *See* ECF No. 322 *et seq.*  Accordingly, the "more onerous consequences" for noncompliance the Court warned of in the April 22 Order are now warranted.

## III.    ARGUMENT

Because Respondents have been undeterred from continuing their coordinated and networked campaign of frustrating the sale of the Company in contravention of the Court's orders and the Tribunal's awards, additional findings of contempt and sanctions to compel Respondents' compliance are now warranted.

### A.    Respondents Are in Contempt of Multiple Court Orders and Directives.

"Our judicial system could not function if litigants were free to evade lawful orders of the [c]ourt."  *United States v. Mongelli*, 857 F. Supp. 18, 21 (S.D.N.Y. 1994).  A party may be held in civil contempt for failure to comply with a court's judgments where (1) the order a party fails to comply with is "clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the [violating party] has not [been reasonably] diligent[ and energetic] in attempt[ing to accomplish what was ordered]."  *Chevron Corp. v. Donziger*, 384 F. Supp. 3d 465, 488-89 (S.D.N.Y. 2019) (Kaplan, J.), *aff'd in relevant part*, 990 F.3d 191, 206 (2d Cir. 2021).  All of these criteria are readily satisfied here.

---

[13] Curiously, counsel for the claimants in the El Salvador-Related BVI Action withdrew their appearance without explanation on June 4, 2025, notwithstanding that they still represent the claimants in the Peru-related BVI Action. *See* Ex. 52; ECF No. 362 (Walkers reply declaration, failing to acknowledge their representation and then withdrawal in the El Salvador-Related BVI Action).

*First*, the Court's orders and the Tribunal's awards are clear and unambiguous. They expressly require, *inter alia*:

- The sale of the Company, and that Respondents raise "no objection" thereto (Ex. 7; *see also* Apr. 22 Order 32 ("The [1PFA's] order of specific performance is clear and unambiguous."));

- Gaitán to be restored to and remain in his position as CEO (Exs. 6; 8);[14]

- Respondents' termination of the baseless foreign proceedings they have initiated in multiple jurisdictions (Apr. 22 Order);

- Respondents' payment of the fines and monetary sanctions assessed against them (Apr. 22 Order);

- Respondents to demonstrate compliance by, among other things, filing with the Court an affidavit from Hernandez and status reports at regular intervals (Apr. 22 Order); and

- Respondents to engage in expedited discovery in aid of the upcoming June 17 hearing before this Court (Ex. 41 at 20:18-24:1).

Respondents have done none of this. Indeed, as the Court has expressly found, they have engaged in a course of conduct designed to frustrate these orders. *See, e.g.*, ECF No. 317, at 2 ("Respondents contumaciously . . . fail[ed] to terminate" multiple foreign proceedings and initiated others "for the purpose of frustrating enforcement of the confirmed arbitration awards."). "Whatever lame excuses [Respondents] may now offer for this materially misleading conduct, the real reason [is] to conceal as long as possible their involvement in these collusive suits and their intent to use them, if all else failed, to subvert the orders of this [c]ourt and the [c]ourt of [a]ppeals." *Motorola Credit Corp. v. Uzan*, 2002 WL 1963301, at *5 (S.D.N.Y. Aug. 22, 2002).

---

[14] To the extent the Court determines that the relief sought herein requires reconsideration of its determination in the April 22 Order that the interim orders underlying the 2PFA are not judgments of which Respondents my be held in contempt, Petitioners respectfully submit that the facts discussed herein warrant such reconsideration and note that the Court "always has 'inherent authority' to 'reconsider its own interlocutory orders,' even '*sua sponte*.'" *WFMC 2016-LC25 W. Bay Area Boulevard LLC v. Tyler*, 2022 WL 17487730, at *4 (S.D.N.Y. Dec. 7, 2022) (citation omitted). Both Mr. Schachter's declaration and the Tribunal's 5PFA describe Respondents' contempt of this Court's judgment confirming the 2PFA in painstaking detail. Exs. 24; 53. And to be sure, Respondents cannot be heard to object to such an outcome, as their own position in their appeal of the 2PFA Judgment was that the "2PFA converts the November 12 and March 15 Orders into enforceable elements of an interim partial award." Ex. 18 at 11.

The Court's orders need not explicitly anticipate and prohibit every iteration of Respondents' egregious conduct—including the filing of baseless criminal complaints—for such conduct to be grounds for contempt.  Contempt cannot "be avoided by some literal or hypertechnical reading of an order." *Nat'l Rsch. Bureau, Inc. v. Kucker*, 481 F. Supp. 612, 615 (S.D.N.Y. 1979).  Rather, "it is proper to observe the objects for which the relief was granted and to find a breach of the decree in violation of the spirit of the injunction, even though its strict letter may not have been disregarded."  *John B. Stetson Co. v. Stephen L. Stetson Co.*, 128 F.2d 981, 983 (2d Cir. 1942); *see also Gasser v. Amboy Nat'l Bank*, 507 F. App'x 19, 21 (2d Cir. 2013) ("While Amboy contends that the Auction Order did not 'articulate what Amboy was supposed to do,' it can hardly be clearer that, as a bailee, Amboy knew that it could not sabotage the auction by removing assets from the premises." (citation omitted)); *Drywall Tapers & Pointers of Greater N.Y., Loc. 1974 of I.B.P.A.T. v. Loc. 530 of the Operative Plasterers' & Cement Masons' Int'l Ass'n*, 2002 WL 31641597, at *8 (E.D.N.Y. Nov. 19, 2002) ("Elaboration on the specifics of an order is 'not required to forbid all the tortured interpretations defendants might devise to evade it.'" (citation omitted)); *Mongelli*, 857 F. Supp. at 21 (defendant's and his wife's "collusive sham [divorce proceedings] designed to frustrate the [c]ourt's ability to enforce the sanctions it imposed to compel . . . compl[iance] with its lawful order" would not be "permit[ted] . . . to succeed in any way").

The objects of the Tribunal's awards and the Court's orders are abundantly clear: to effectuate the sale of the Company, and to remove obstacles to that result.  Indeed, the 1PFA could not have been clearer: Respondents are to raise "no objection" to the sale.  Ex. 7 at 15 (¶ 28).  Respondents, however, continue to object with increasingly outrageous conduct that threatens the

sale of the Company (and certainly will diminish the sale price—proceeds of which are security for the more than $300 million awarded in the 5PFA).

*Second*, the proof of Respondents' noncompliance is overwhelming. As the Court recently concluded in its order denying Respondents' request for an extension of time to comply with the April 22 Order, "Respondents have yet to comply with any" of the Tribunal's awards or this Court's judgments affirming those awards. ECF No. 317 at 1. Indeed, as demonstrated by the record in this case and as the Court observed, Respondents' conduct "smack[s] of what has been seen all along—attempts to delay and avoid their obligations." *Id.* at 4; *see generally* App'x. Specifically, Respondents have, among other things:

- Maintained (and escalated) frivolous criminal complaints against Gaitán to prevent his reinstatement as CEO and to frustrate sale of the Company, in violation of the 1PFA, 2PFA, and the Court's orders and judgments confirming those awards, as well as the April 22 Order requiring compliance with the judgment confirming the 1PFA (*see, e.g.*, *See* App'x at Rows 10-12, 17, 23, 36, 44, 51, 53; Apr. 22 Order 32 ("The factual record provides clear and convincing proof of noncompliance with the [1PFA]."));

- Maintained frivolous criminal complaints against **the Company** to frustrate a sale of it, including a proceeding in Guatemala that has resulted in the seizure of 163 of the Company's towers, in violation of the 1PFA and the Court's order and judgment confirming that award, as well as the April 22 Order requiring compliance with the judgment confirming 1PFA (Ex. 23; Apr. 22 Order);

- Pursued their counterclaims—despite the 2PFA, which this Court confirmed, expressly staying those claims—including by bringing the same claims in foreign arbitrations, which they have refused to withdraw as required by 3PFA and the April 22 Order, and repeatedly asking the Tribunal to lift the stay of their counterclaims—including as recently as May— notwithstanding their undisputed non-compliance with the orders and wards underlying the 2PFA (*see* App'x at Rows 28, 56.);

- Failed to withdraw any of the various foreign proceedings initiated in multiple jurisdictions, including BVI, Peru, Guatemala, and El Salvador, as required by the April 22 Order (*see* Apr. 22 Order 41-42; ECF No. 317);

- Failed to pay any of the monetary awards pending against them, as required by the April 22 Order (*see, e.g.*, Apr. 22 Order 37);

- Failed to file Hernandez's affidavit concerning attempts to comply with the Court's orders, which was due to the Court on June 2, 2025 (*See* Apr. 22 Order 47 (¶ 5.2), 48 (¶ 6.2);

- Failed to file any of the status reports required by the April 22 Order (*see* Apr. 22 Order 43);

- Contravened this Court's directive in this contempt proceeding to engage in discovery by failing to produce responsive, highly relevant documents and communications in response to Petitioners' document requests (Exs. 41; 46);

- Designated a wholly unqualified and unprepared Rule 30(b)(6) witness who could not meaningfully answer Petitioners' counsel's questions (Exs. 41; 49);

- Refused to provide information reasonably requested by Petitioners' counsel in response to certain answers given by Messrs. Pimentel and Hernandez at their depositions, including with respect to the names of unspecified "elders" and family trusts that Hernandez testified purportedly control Terra and DTH. (Ex. 48 at 21:2-23:14, 40:4-41:9)

Of course, it is self-evident—and for good measure, supported by evidence in the Arbitration and the Tribunal's determinations that this Court has confirmed—that these actions all harm the Company's sale prospects.  Respondents' actions are squarely directed at and are thus in clear contempt of the 1PFA because these actions scare away potential buyers unwilling to diligence—let alone purchase—a company with a majority shareholder and management and service provider that nakedly flout court orders, that is embroiled in sham litigation all over the world, and whose CEO is imprisoned on false charges.  *See* Exs. 8 ¶ 3 ("[T]he independence and integrity of Executive Management could materially affect whether the Company is in fact sold, and also could bear on the timing, price and other terms of the sale and the potential damages claims by Claimants and/or Respondents relating to the impact of Company Management actions or inactions on the sale process."); Ex. 17 at 1374-76 (testimony from corporate finance and investment banking expert that she had "never seen anything [that could impact sale of the Company] like" criminal proceedings against a company's CEO and his father).  Indeed, during his deposition, Hernandez did not disagree that the criminal proceedings made a value-maximizing sale impossible.  *See* Ex. 48 at 78:11-80:7.

  ***Third***, as this Court has expressly and repeatedly concluded, Respondents cannot demonstrate any diligent, reasonable, or good-faith efforts to comply with the Court's orders and directives.  *See, e.g.*, Apr. 22 Order 32 ("[T]he record demonstrates that Respondents have not

attempted diligently to comply with the [1PFA] in a reasonable manner."); ECF No. 317, at 3 ("Respondents have not demonstrated sincere, diligent, good faith and effective attempts to comply with the April 22 Opinion."); *id.* at 3-4 ("Indeed, Respondents['] actions to date do not evidence a good faith and effective effort to come into compliance at the earliest possible moment."). And Respondents' contumacy of the Court's orders is ongoing and escalating.

> **B.** **The Court Should Make New Findings of Contempt Against Respondents for the Criminal Proceedings, Find Them in Contempt of the Court's Prior April 22 Order of Contempt, and Issue New and Increased Sanctions as a Result**

As the Court is aware, it has "broad discretion to design a remedy that will bring about compliance" with its orders and directives. *Donziger*, 384 F. Supp. 3d at 505 (citation omitted). And even if the standard for contempt were not satisfied here—it is—the Court would nonetheless be empowered to issue remedies to ensure compliance with its prior orders. *See Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir. 1985) ("[A] federal court's interest in orderly, expeditious proceedings justifies any reasonable action taken by the court to secure compliance with its orders." (internal quotations omitted) (citations omitted)); *Soundkillers LLC v. Young Money Ent., LLC*, 2016 WL 4990257, at *3 (S.D.N.Y. Aug. 2, 2016) ("Where a district court imposes a remedy to compel compliance with its own order, that remedy may be treated as a sanction imposed upon an order of contempt, even if no finding of contempt is explicitly made." (citing *Berger*, 771 F.2d at 1569 n.19)), *report and recommendation adopted*, 2016 WL 4926198 (S.D.N.Y. Sept. 15, 2016).

"Though the use of judicial power to secure future compliance with a court order involves civil contempt remedies, the use of such power in the aftermath of past violations can take the form of either civil contempt remedies or criminal contempt punishments, or both." *Universal City Studios, Inc. v. N.Y. Broadway Int'l Corp.*, 705 F.2d 94, 96 (2d Cir. 1983) (citation omitted). These measures are surely needed here.

1. *Make New Findings of Contempt in Respect of the Criminal Proceedings, Including Based on Adverse Inferences Regarding Respondents' Involvement In, and Motivations For, Initiating the Criminal Actions Against Gaitán, Mr. Schachter, and the Company.*

As an initial matter, adverse inferences are not even needed to find Respondents in contempt of the 1PFA and 2PFA for initiating and maintaining baseless criminal proceedings to obstruct a sale. The Court has already confirmed the Tribunal's findings—in 2PFA—that Respondents fabricated criminal proceedings against Company management because they were insufficiently supportive of Respondents' efforts to oppose a sale, and that Company management (and finality over who the CEO is) is necessary to conducting the sales process. And the record is clear that those proceedings have continued unabated, resulting in the incarceration of Gaitán, and that Respondents have issued new proceedings against Company management and the Company based on the same fabricated allegations. *See generally supra* at 7-19. As such, Respondents have (i) violated this Court's judgment confirming 1PFA by maintaining and continually raising objections to a sale, and (ii) violated this Court's judgment confirming 2PFA by continually refusing (in the most egregious ways) to abide by its directive to restore Gaitán as CEO.

Lest there be any doubt over the clear record here, the Court can draw adverse inferences against Respondents. Adverse inferences "serve[] the remedial purpose 'of restoring the prejudiced party to the same position he would have been in absent the wrongful destruction of [or willful refusal to produce] evidence by the opposing party.'" *Chevron Corp. v. Donziger*, 296 F.R.D. 168, 222 (S.D.N.Y. 2013) (Kaplan, J.) (alteration in original) (citation omitted). Moreover, "[w]here an adverse inference . . . is sought on the basis that the evidence was not produced in time for use at trial, the party seeking the instruction must show (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had a culpable state of mind; and (3) that the missing evidence is relevant to

the party's claim or defense such that a reasonable for the trier of fact could find that it would support that claim or defense." *Id.* (internal quotations omitted) (citation omitted). Each of these conditions is satisfied here.

Respondents had a Court-ordered obligation to produce documents and communications responsive to Petitioners' discovery requests. *See* Ex. 41 at 23:2-9. At the May 21 hearing, Petitioners' counsel was clear that discovery would cover "evidence around the criminal proceedings." *Id.* at 21:4-5. The Court explicitly raised the possibility that failure to engage in discovery would lead to adverse inferences. *Id.* at 10:7-14. And Petitioners' discovery requests explicitly sought communications and documents in Respondents' (or their agents') personal email accounts, mobile phone(s), and/or personal devices and data repositories including, but not limited to, text messages, call records, voicemail records, contacts, calendar information, application-based messages (such as LinkedIn, WhatsApp, Telegram, or Signal messages), and/or chat messages (such as Slack). *See* Ex. 43. Respondents failed to produce any such communications, taking the untenable position that the Court's directive limited discovery to "documents" and not "communications." *See* Ex. 42. Respondents did not produce any correspondence—whether internal, with prosecutors, other third parties, or anyone else—that would shed light on Respondents' involvement in the criminal proceedings.[15] Ex. 46. Nor did they produce any such communications in the Arbitration, despite being ordered to do so. Ex. 16.

Respondents' culpable state of mind is beyond question. As in *Donziger*, Respondents' repeated and willful refusal to comply with the Court's orders, together with their not only "actively seek[ing]," but inventing, "legal impediments to justify [their] non-production,

---

[15] Of course, Respondents conveniently ignore that the term "documents" includes (and subsumes) the term "communications."

selectively determin[ing] when [to] produce documents and when [they] will not, and continu[ing] to assert objections to discovery that long have been rejected," establishes Respondents' culpable failure to produce evidence. *Donziger*, 296 F.R.D. at 222. Just as in *Donziger*, "an adverse inference . . . is warranted." *Id.*

Where, as here, "a party destroys [or fails to produce] evidence in bad faith . . . , that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party." *Id.* at 223 (alteration in original) (citation omitted). Respondents' willful failure to produce evidence showing their involvement in the criminal proceedings against Gaitán is therefore sufficient to establish that this evidence would have supported Petitioners' claims. *See id.*

        2.      *Order Respondents to Withdraw Existing Criminal Complaints, and Prohibit Them from Filing Any New Complaints, Against Gaitán, Mr. Schachter, and the Company*

The record is clear that Respondents are responsible for initiating the frivolous criminal complaints and ensuing criminal actions against Gaitán, Mr. Schacter, and the Company, all in an effort to frustrate the sale of the Company in violation of the Tribunal's awards and this Court's orders. *See, e.g.*, Ex. 8; Ex. 24 at 3 (¶ (4) ("Respondents by continuing to claim that the CEO committed 'crimes,' and causing public prosecutors in Central America accept this claim, are defying our authority and that of the SDNY Court."). Respondents' attempts to frustrate the Court-ordered sale—and its other lawful orders—are punishable as contempt even though the Court's orders did not specifically contemplate and proscribe Respondents' precise course of conduct. *See Gasser*, 507 F. App'x at 21; *supra* at 21-22.

While an "extraordinary remedy," an order requiring Respondents to withdraw all such complaints is both warranted and appropriate where, as here, "exceptional circumstances" exist. *Quinlan v. Lender*, 422 N.Y.S.2d 634, 635 (Sup. Ct. 1979) (enjoining party from bringing criminal

complaints "where it can be shown that the suit sought to be restrained is not brought in good faith, or that it was initiated for the purpose of vexing or harassing the party seeking the injunction . . . a foreign suit will also be enjoined where it is motivated by fraud.") *Id.* (citation omitted); *see also Sassower v. Signorelli*, 99 A.D.2d 358, 359 (N.Y. App. Div. 1984) ("[W]hen, as here, a litigant is abusing the judicial process by hagriding individuals solely out of ill will or spite, equity may enjoin such vexatious litigation.").

The record here establishes "[a] strong showing of harassment for harassment's sake" in Respondents' serial filing of baseless criminal complaints at critical junctures in this action. *Quinlan*, 422 N.Y.S.2d at 635; *see generally* App'x.  In light of the Court's "broad discretion to design a remedy that will bring about compliance," *Donziger*, 384 F. Supp. 3d at 505 (citation omitted), together with the extraordinary facts and circumstances present here, the Court may (and should) order Respondents to withdraw the baseless criminal complaints, and preclude Respondents from filing additional such complaints.  "Courts possess broad discretion to require a party to take affirmative steps when such steps are required to bring that party into compliance with a court order." *CBS Broad. Inc. v. FilmOn.com, Inc.*, 2013 WL 4828592, at *7 (S.D.N.Y. Sept. 10, 2013) (ordering party "to bring himself into compliance with" provisions of court-ordered consent judgment by, *inter alia*, removing certain material from websites in party's control).  For avoidance of doubt, Petitioners are not seeking relief that would require foreign prosecutors or courts to do anything, nor cause the termination of any current  proceedings those prosecutors have brought. Instead, Petitioners respectfully ask the Court to order Respondents and their agents to correct the false record presented to relevant local prosecutors by withdrawing their complaints and notifying the prosecutors that they no longer believe those complaints should be pursued.

28

Accordingly, the comity concerns the Court noted in the April 22 Order do not apply here.[16] Such an order will prevent further interference with Gaitán's reinstatement as CEO, and relatedly, the sale of the Company, as required by the Tribunal's awards and this Court's prior orders.

And to be sure, such relief is likely to be effective. As Petitioners' counsel in Guatemala, El Salvador, and Peru have all explained, where private criminal complaints are withdrawn in those countries, they are likely to be abandoned by prosecutors. *See* Exs. 26; 27; 28; *see also* Ex. 47 ¶¶ 41-45. And Respondents' farcical contentions in the Pimentel and Hernandez depositions that Guatemalan law "requires" them to report "crimes" they witness is, at best, misleading, as that requirement only applies to certain specified categories of people. *See* Ex. 26 ¶ 5. Moreover, this claim is completely devoid of context, as the maximum penalty for failing to report a crime is a fine of approximately USD $125. *See* Ex. 54.

3. *Order the Civil Confinement of Hernandez, and Put Respondents on Notice of Possible Criminal Contempt Sanctions.*

None of the contempt findings or monetary sanctions issued to date have effectively deterred Respondents' ongoing—and escalating—violations of the Court's orders. Accordingly, the Court may exercise its discretion to order the civil confinement of Respondents, including Hernandez, to compel compliance.[17] *See, e.g.*, *CE Int'l Res. Holdings LLC v. S.A. Mins. Ltd. P'ship*, 2013 WL 324061 (S.D.N.Y. Jan. 24, 2013) (ordering civil confinement for failure to post $10 million prejudgment security). Such escalating sanctions are warranted where a contemnor "behave[s] as if the [Court's] Judgment[s] . . . do not exist. He has disregarded his obligations,"

---

[16] *Cf.* Apr. 22 Order 24-25. In any event, those concerns are readily outweighed by each of the *China Trade* factors in light of Respondents' vexatiously perpetuating these proceedings, which indisputably undermine the jurisdiction of the Court, the Tribunal, and international arbitration as an institution. *See* Apr. 22 Order 27-28.

[17] This action, pursuant to the Federal Arbitration Act, 9 U.S.C. § 9, and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. § 207, arises "under the laws and treaties of the United States," 9 U.S.C. § 203. Therefore, "[a]n order committing [Hernandez] for civil contempt . . . may be served and enforced in any district." Fed. R. Civ. P. 4.1(b).

and "[t]he likelihood that he will continue to do so is high." *Donziger*, 384 F. Supp. 3d at 505.[18] Simply put, the sanction of civil confinement is entirely appropriate here.

As this Court is also well aware, it may, upon notice to the contemnor, issue criminal sanctions for failure to comply with its orders. *See United States v. Donziger*, 2021 WL 1845104, at *2 (S.D.N.Y. May 7, 2021) ("[I]t appears that Mr. Donziger left Judge Kaplan with no real option other than criminal charges. Mr. Donziger is alleged to have repeatedly defied court orders, openly invited civil contempt, and refused to budge even when faced with coercive sanctions. That course of conduct gives no basis for thinking that more orders, warnings, or threats would have produced improvement." (citation omitted)). While a harsh remedy, "criminal contempt penalties may be imposed, where appropriate, to punish [a] violation and vindicate the court's authority." *Universal City*, 705 F.2d at 96. Pursuant to Federal Rule of Criminal Procedure 42(a), the Court "must give the person notice" of the criminal contempt proceedings, "allow the defendant a reasonable time to prepare a defense," and "state the essential facts constituting the charged criminal contempt and describe it as such." Fed. R. Crim. P. 42(a)(1).

Hernandez has flouted the Tribunal's awards and this Court's orders for nearly five years— a fact that he continues to deny (as recently as last week at his deposition). He has trafficked in lies, disinformation, and evasion at every turn in order to prevent the Company from being sold. At times, when it suits his purposes, he is the "ultimate decisionmaker for all of the DT companies as needed." Ex. 4 p. 2, ¶ 13. At other times, when it suits his purposes, he purports to have no

---

[18] It is also well-settled even a "non-party" respondent, which Hernandez purports to be (notwithstanding that he was validly served with and joined to this proceeding and was held personally liable as a Respondent for over $300 million in the 5PFA, *see* Opp. to Hernandez Mot. to Quash Service, (ECF No. 342), may be held in contempt of a court order where that non-party aids and abets a party's violation of the order. *See* Apr. 22 Order 38. As the Court has already concluded, Hernandez is properly subject to contempt sanctions. *Id.* 39-41.

control whatsoever: "Not at that time [December 2021, January 2022], no. I didn't control DTH at all."  Ex. 48 at 32:24–33:4.

The linchpin of that misconduct has been the baseless criminal proceedings at issue in this Motion.  Hernandez has pursued them because he committed to "fight back" against anyone that tried to take his company, to which he has an emotional and familial attachment.  Ex. 3.  He has pursued them because DTH receives over $6 million a year from the Company—payments that could be cut off if the Company is sold.  *See* Ex. 48 at 80-81.  He has pursued them because he does not care about the agreements he entered into (including an agreement to arbitrate disputes relating to the Company), this Court's orders, or the rule of law.  As a result, the Company has been held hostage, Petitioners have no path towards recovering their investment, buyers have been scared away, and the Company's CEO and his elderly father are being subjected to violent incarceration for crimes that the Tribunal and this Court have found they did not commit.

In short, Hernandez has been given years to comply with the Court's orders, but he has not.  Instead, he has thumbed his nose at the Court's orders, including the sanctions already ordered by the Court, and denied responsibility.  *See* Ex. 48 at 95:5-7 (referring to this Court's orders: "There's someone who wants to charge me $10,000 a day or $20,000 a day for -- for things that I didn't commit . . . .").  And he has tried to evade the proceeding—per usual—while continuing to escalate vicious and fraudulent attacks on the Company and its CEO and independent counsel—simply because he has the means to do so—in order to prevent a sale at all costs.  After civil confinement, criminal contempt penalties are the only remaining mechanism for the Court to compel Hernandez to comply with its judgments, and, in turn, for Petitioners to obtain any of the relief they have been awarded.

4. *Find Respondents (Including Hernandez) in Contempt of this Court's April 22 Order*

As detailed above, it is undisputed that Respondents have (i) failed to withdraw any of the various foreign proceedings initiated in multiple jurisdictions, including BVI, Peru, Guatemala, and El Salvador, as required by the April 22 Order (*see* Apr. 22 Order 41-42; ECF No. 317); (ii) failed to pay any of the monetary awards pending against them, as required by the April 22 Order (*see, e.g.*, Apr. 22 Order 37); (iii) failed to file Hernandez's affidavit concerning attempts to comply with the Court's orders, which was due to the Court on June 2, 2025 (*see* Apr. 22 Order 47 (¶ 5.2), 48 (¶ 6.2); and (iv) failed to file any of the status reports required by the April 22 Order (*see* Apr. 22 Order 43). Accordingly, the Court should exercise its discretion to issue "more onerous" (Apr. 22 Order) sanctions to compel Respondents' compliance, including but not limited to awarding Petitioners' attorneys' fees in connection with these contempt proceedings, as explained below, and civil confinement of Hernandez, as explained above.

5. *Award Petitioners' Attorney's Fees in Connection with These Contempt Proceedings.*

"Attorneys' fees may be awarded with respect to civil contempt regardless of whether the other relief granted is coercive, compensatory or both." *Donziger*, 384 F. Supp. 3d at 506. The Court "may award appropriate attorney fees and costs to a victim of contempt." *Id.* (citation omitted). In light of Respondents' ongoing, flagrant, and willful violations of this Court's orders that have necessitated these contempt proceedings—including the pursuit of expedited discovery—an award of Petitioners' attorneys' fees and disbursements is warranted.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, Petitioners respectfully request that the Court: (i) find Respondents and their agents again in contempt of the 1PFA for interfering with the sale of the Company, (ii) find Respondents and their agents in contempt of the 2PFA; (iii) order Respondents

and their agents to purge their contempt of the 1PFA and the 2PFA by notifying relevant criminal authorities that they withdraw all criminal complaints initiated by them or their proxies concerning or related to matters that have already been raised to the Tribunal and/or this Court and notify those criminal authorities that they no longer believe that such proceedings should be pursued (a decision which, in all respects, will remain subject to the discretion of the local criminal authorities); (iv) issue a civil arrest warrant for Hernandez if Respondents have not complied with (iii), above, within fourteen days of the Court's new finding of contempt; (v) order Respondents not to initiate any new criminal proceedings concerning matters that have already been raised to the Tribunal and/or this Court; (vi) find Respondents in contempt of the April 22 Order; and (vii) award Petitioners attorneys' fees incurred in connection with this contempt proceeding and any other sanctions that the Court deems just, proper, and necessary to coerce compliance with its orders and judgments. Petitioners further respectfully request that the Court put Respondents on notice that the Court may issue criminal sanctions if civil confinement proves insufficient to compel compliance with the Court's orders, as set forth in the Proposed Order attached hereto.

Dated: June 6, 2025                     Respectfully submitted,

By: _/s/ Michael N. Ungar_              By: _/s/ Gregg L. Weiner_
Michael N. Ungar                        Gregg L. Weiner
(admitted *pro hac vice*)               Andrew S. Todres
Katherine M. Poldneff                   Ethan R. Fitzgerald
Ashtyn N. Saltz                         **ROPES & GRAY LLP**
(admitted *pro hac vice*)               1211 Avenue of the Americas
**UB GREENSFELDER LLP**                 New York, New York 10036-8704
1660 West 2nd Street, Suite 1100        Phone: (212) 596-9000
Cleveland, Ohio 44113-1406              Fax:   (212) 596-9090
Phone: (216) 583-7000                   gregg.weiner@ropesgray.com
Fax:    (216) 583-7001                  andrew.todres@ropesgray.com
mungar@ubglaw.com                       ethan.fitzgerald@ropesgray.com
kpoldneff@ubglaw.com
asaltz@ubglaw.com
                                        Daniel V. Ward
                                        (admitted *pro hac vice*)
David A. Landman                        **ROPES & GRAY LLP**
**UB GREENSFELDER LLP**                 Prudential Tower
1700 Broadway, Suite 1802               800 Boylston Street
New York, New York 10019-7710           Boston, Massachusetts 02199-3600
Phone: (917) 262-0470                   Phone: (617) 951-7000
Fax:   (917) 262-0480                   Fax:   (617) 951-7050
dlandman@ubglaw.com                     daniel.ward@ropesgray.com

*Counsel for Petitioners Telecom Business*   *Counsel for Petitioner AMLQ Holdings*
*Solution, LLC and LATAM Towers, LLC*        *(Cay), Ltd.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the foregoing was filed electronically on June 6, 2025. Notice of this filing will be sent to all counsel of record through the Court's electronic notice system.

*/s/ Gregg L. Weiner*
*Counsel for AMLQ Holdings (Cay), Ltd*