**United States District Court**
**Southern District of New York**

---

Telecom Business Solution, LLC, *et al.*,

        Petitioners,

    v.

Terra Towers Corp., *et al.*,

        Respondents.

---

Civil Action No.: 1:22-cv-01761

Judge Lewis A. Kaplan

Magistrate Judge Robert W. Lehrburger

**RESPONSE IN OPPOSITION TO PETITIONERS' MOTION FOR**
**<u>FURTHER FINDINGS OF CIVIL CONTEMPT AND SANCTIONS</u>**

Rodney Quinn Smith, II
(admitted *pro hac vice*)
**GST LLP**
78 SW 7th Street, Suite 500
Miami, FL 33130
Phone: (305) 856-7723
Fax: (305) 856-7724
quinn.smith@gstllp.com

*Counsel for Respondents*

Lucila I. M. Hemmingsen
**The Fladgate Firm PC**
305 Broadway, 7th Floor
New York, NY
Phone: (646) 369-5843
lh@hemmingsenadr.com

## Table of Contents

INTRODUCTION…………………………………………......................................................................3

BACKGROUND...................................................................................................................................5

LEGAL ARGUMENT .......................................................................................................................14

I.    Petitioners still cannot provide any legal support for an injunction designed to effectively halt foreign criminal proceedings..................................................................14

    A.    There is no basis to seek "further findings of civil contempt" because Respondents have purged the contempt as to Judgment No. 1 ............................17

    B.    Petitioners have failed to show that the criminal proceedings will block the sale of the Company ...............................................................................................18

    C.    There is no basis for any finding of contempt, especially when Petitioners have relied on perjured testimony to support their arguments before this Court ..........18

    D.    In light of the death threats aimed at Mr. Hernandez and his family, any injunction is particularly inappropriate ...........................................................................21

II.    There is no basis for adverse inferences when the Terra Parties and DT Holdings are not in contempt of 2PFA, have complied with their discovery obligations, and Petitioners have failed to meet their burden to show that the criminal proceedings are identical ................................................................................................................22

    A.    The Terra Parties and DT Holdings are not in contempt of 1PFA or 2PFA ..........22

    B.    Petitioners cannot meet any of the three elements required for an adverse inference..................................................................................................................22

    C.    Petitioners appear to have abandoned the basis for the prior TRO, that the evidence presented in El Salvador and Guatemala is identical to the evidence before the arbitral tribunal ..................................................................................25

III.    Civil confinement is inappropriate, and there is no basis for criminal contempt sanctions..........................................................................................................................27

CONCLUSION ...................................................................................................................................29

## Table of Authorities

**Cases**

*Armstrong v. Guccione*, 470 F.3d 89, 101 (2d Cir. 2006) ..............................................................28

*Banco Nacional De Cuba v. Sabbatino*, 376 U.S. 398, 417-418 (1964)......................................16

*Chevron Corp. v. Donziger*, 296 F.R.D. 168, 222 (S.D.N.Y. 2013)........................................ 22-23

*Coventry Capital US LLC v. EEA Life Settlements, Inc.*, No. 1:17-cv-07417, 19 (S.D.N.Y. Jan 24, 2019) ...............................................................................................................................................23

*Maggio v. Zeitz*, 333 U.S. 56, 73 (1948) ......................................................................................28

*Munaf v. Geren*, 128 S. Ct. 2207, 2224 (2008) ...........................................................................16

*Oetjen v. Central Leather Co.*, 246 U.S. 297, 303-304, 38 S. Ct. 309 (1918).............................16

*Quinlan v. Lender*, 102 Misc. 2d 127, 129 (N.Y. Sup. Ct. 1979)...............................................15

*Residential Funding Corporation v. Degeorge Financial Corp., et al.*, 306 F.3d 99 (2d Cir. 2002) ...........................................................................................................24

*Sassower v. Signorelli*, 99 A.D.2d 358, 358 (N.Y. App. Div. 1984) ...............................................15

*Sobol v. UMG Recordings, Inc.*, No. 1:19-cv-01091, 4 (S.D.N.Y. Jul 13, 2020).........................23

*Spectacular Venture, L.P. v. World Star International, Inc.*, 927 F. Supp. 683, 685 (S.D.N.Y. 1996) ...............................................................................................................................................29

Respondents, Terra Towers Corp. ("Terra"), TBS Management S.A. ("TBS") (the "Terra Parties"), and DT Holdings Inc. ("DT Holdings"), hereby respond to Petitioners' Memorandum of Law in Support of their Motion for Further Findings of Civil Contempt and Sanctions (the "Second Sanctions Motion"), filed by Telecom Business Solution, LLC; LATAM Towers, LLC (together, "Peppertree"); and AMLQ Holdings (Cay), Ltd. ("AMLQ"), and in support thereof state as follows.

## INTRODUCTION

Having abandoned their request for a temporary restraining order, and the argument that the foreign proceedings are identical to those discussed in 2PFA, Petitioners now return seeking further findings of contempt of 1PFA. Curiously, this request comes days after the Terra Parties and DT Holdings had met the elements for purging any contempt. The Terra Parties and DT Holdings are not in contempt of either 1PFA or 2PFA, and the Second Sanctions Motion should be denied for the following reasons:

- Despite months of litigating this issue, Petitioners still fail to provide any legal basis that would justify violating principles of international comity by issuing their sought-after anti-suit injunction aimed at stopping foreign prosecutors;

- Petitioners have failed to provide a basis for any contempt sanctions, especially when they rely heavily on the unreliable testimony of Ms. Alejos;

- An anti-suit injunction is particularly inappropriate where Mr. Hernandez has received death threats related to this case; and

- There is no basis for an adverse inference when the Terra Parties and DT Holdings have fully complied with their discovery obligations and are not in contempt of 1PFA or 2PFA.

For these reasons and those set forth below, the Terra Parties and DT Holdings respectfully request that the Court deny the Second Sanctions Motion in its entirety.

BACKGROUND

*The Proceedings before this Court from March 18 to May 7*

On March 18, 2025, Petitioners filed their Motion for Antisuit Injunction and Contempt Sanctions (the "First Motion for Contempt"), seeking an order that Respondents "withdraw, dismiss, and/or terminate" a number of foreign lawsuits. ECF 243-1, p. 6. After briefing and oral argument, the Court issued its Memorandum Opinion on April 22, 2025 (the "April 22 Order"). ECF 295. The April 22 Order contained contempt findings as to Judgment No. 1 (the order enforcing 1PFA) and Judgment No. 2, split into the El Salvador Contemnors and the BVI Contemnors. April 22 Order, pp. 47-48. The Terra Parties, DT Holdings, Jorge Hernandez, and the Peru Non-Parties have all timely filed notices of appeal. ECF 339; 340; and 341.

Petitioners then returned to the arbitral tribunal, seeking much the same relief regarding the foreign criminal proceedings as the First Motion for Contempt.

*The Proceedings before the Arbitral Tribunal*

On May 15, 2025, Petitioners sought injunctive relief from the arbitral tribunal. ECF 376-1. Petitioners requested a partial final award requiring the Terra Parties, DT Holdings, and Mr. Hernandez to "take any and all necessary actions to facilitate the termination of the Criminal Actions." ECF 376-2.

Their request was based on a declaration submitted by Ana Lucia Alejos Botrán. ECF 376-1, p. 11-12. Company counsel also submitted a letter on May 16 (ECF 369-38), referring to statements received by Ms. Alejos, counsel to Jorge Gaitán. *Id*. The next day, May 17, the arbitral tribunal relied on the factual statements from Ms. Alejos, citing them in paragraph 1 of the procedural order. ECF 369-39, p. 3. The arbitral tribunal also relied on Ms. Alejos's declaration dated May 14, 2025, to find that the "pending criminal charges against [Mr. Gaitan] are

predicated exclusively on factual allegations propounded by Respondents that this Tribunal has previously adjudicated to be unsubstantiated in our PFA-2 Award[.]" *Id*. The Terra Parties and DT Holdings were never heard prior to these findings, and the arbitral tribunal suspended the deadline for submissions. *Id*., p. 5. The Terra Parties and DT Holdings are thus unable to be heard.

*The Proceedings before this Court from May 8 to the present*

During the proceedings before the arbitral tribunal, Mr. Hernandez filed a motion to quash service on him of both the First Motion for Contempt and Petition to Confirm 5PFA. ECF 302. Briefing is complete. Mr. Hernandez has provided sworn testimony that California is not his dwelling place or abode. ECF 302-1; 350-1. He has also argued that service was also improper under Local Civil Rule 83.6. ECF 302; 350. There has been no known attempt to serve the Second Motion for Contempt.

The Peru Non-Parties have entered an appearance and are seeking reconsideration of the April 22 Order. ECF 322. The briefing is continuing separate from the Terra Parties and DT Holdings, who are taking no position other than urging compliance with the April 22 Order.

On May 20, 2025, Petitioners filed a motion for civil contempt sanctions, preliminary injunction, and temporary restraining order. ECF 330. The order to show cause relied on a verification of Ms. Alejos, signed on May 19, 2025. ECF 329, p. 1. This verification stated that Ms. Alejos had "personal knowledge" of the facts set forth in a letter from Company counsel, also dated May 19. ECF 331-13, p. 2. The May 19 letter, verified by Ms. Alejos, stated that "Mr. Gaitán and his father were forcibly removed from the prison and, with extreme violence, placed in a vehicle." ECF 331-12, p. 4. On May 21, 2025, the Court heard oral argument. ECF 369-41.

At the hearing, there was a discussion about expedited discovery. Petitioners sought leave to "request document discovery and [take] two-hour depositions of the respondents, a corporate rep perhaps and one other[,]" to seek "the evidence around the criminal proceedings." Hr'g Tr. at 20:19–21:5. Petitioners represented to the Court they would "keep them focused." *Id.*

The document discovery was motivated by Petitioners' assertion of "information asymmetry," which they claimed arose because they allegedly lacked the "information [the Terra Parties and DT Holdings] provided that set off these [criminal] proceedings" in foreign jurisdictions. *Id.* at 7:14-24 & 10:7-12. The Terra Parties and DT Holdings stated that it would take "seven days to provide either designations or any evidence that hasn't yet been presented." *Id*. at 21:10-12. Petitioners agreed to "serve the document request by tomorrow," *id*. at 21:15-16—that is, by May 22, 2025.

On May 28, the Terra Parties and DT Holdings wrote to Petitioners "to confirm the parties' agreement as to the scope and conditions" of the upcoming depositions. ECF 374-1. One of those conditions was that "[d]epositions will be limited to 'the evidence around the criminal proceedings,' Hr'g Tr. [at] 21:4-5, by which we understand Petitioners to be referring to 'criminal complaints' that Petitioners allege Respondents have 'initiated' 'against Mr. Gaitán, his counsel, and counsel for the Company,' ECF No. 330 at 2." *Id.*

Petitioners responded that they ***"agree generally that the subject of the requests for production and depositions is the 'criminal proceedings[.]'"*** Petitioners continued, stating that "[a]s with most depositions, the natural course of the deposition may include questions that may not fit perfectly within your interpretation of what relates to the "criminal proceedings." You, of course, will be free to object (as will we during your deposition) and it will then ultimately be up to Judge Kaplan as to what discovery is appropriate with respect to these proceedings. However,

***we expect little to no activity of this nature****. Id.* (emphases added). The Terra Parties and DT Holdings shared that expectation.

On May 22, the promised "document request" for "any evidence that hasn't yet been presented" mushroomed into nine separate requests. Eight of those requests sought communications; none of the requests were for evidence not yet presented in the criminal proceedings. *See* ECF 374-2. On May 29—i.e., the deadline for responding to the May 22 Request—Petitioners unilaterally proffered a new set of requests, expanding the scope from five proceedings to 15. *See* ECF 374-3. The Terra Parties and DT Holdings met their May 29 deadline to respond to the May 22 Requests and produced all responsive documents located after a reasonable search on the expedited timeline set by the Court, spanning over 6,000 pages. The documents originate from the court files in the five proceedings listed in the May 22 Requests. There is no dispute that these document produced were sufficient, as discussed at the May 21 hearing, to provide the evidence submitted in the criminal proceedings—Petitioners' letter does not claim otherwise.

The Terra Parties and DT Holdings objected to the May 29 Requests that had arrived only hours earlier. *See* ECF 365-1. In their letter, Petitioners now complain about a failure to produce communications, which they argue would be responsive to those May 29 Requests. ECF 365, pp. 2-3. But the May 29 Requests were untimely—and even for the May 22 Requests, it would be unduly burdensome to request the Terra Parties and DT Holdings to collect, review, and produce all "Communications" with a seven-day turnaround.

As more fully described in the letter submitted on June 10, the Terra Parties and DT Holdings were able to procure Mr. Hernandez as a witness, even though Mr. Hernandez was not subject to deposition by notice and Petitioners had not requested his testimony at the hearing on

May 21. ECF 374, pp. 2-3. The depositions exceeded the time allotted. ECF 374, p. 3. Mr. Pimentel testified as to the names of the directors who appointed him. *Id*. He testified that a corporation owns DT Holdings. *Id*. He was prepared to testify as to the criminal proceedings, but counsel cut him off. *Id*.

Petitioners dedicated much of their deposition to the steps taken to produce documents responsive to the **May 29** Requests. *Id*. Those amended (expanded and improper) requests were not on the list of topics to be discussed in either the May 22 Notice or the May 29 Notice. ECF 374-4, p. 7; ECF 365-7, p. 7. Mr. Pimentel did not receive a single question about the documents that DT Holdings actually produced. Mr. Pimentel was asked pages of questions about Mr. Quisquinay, who is not an officer, director, or employee of DT Holdings. ECF 365-5, p. 72:22-24; *see also* ECF 369-40, pp. 9, 23. Mr. Quisquinay is the CFO of the Company, which is not owned or controlled by DT Holdings. When Petitioners requested information regarding DT Holdings's interaction with Mr. Quisquinay, Mr. Pimentel answered truthfully that Mr. Quisquinay is not DT Holding's CFO and has no positions within DT Holdings. ECF 365-5, p. 19:11-17; 72:22-24.

*The Perjured Testimony from Ms. Alejos*

The Court granted the Terra Parties and DT Holdings a deposition of Ms. Alejos, whose declarations have been routinely submitted. ECF 331-13, 369-37, and 369-47. Ms. Alejos's declaration dated May 14, 2025, was also presented to the arbitral tribunal, and then on May 19, 2025, a letter from Company counsel was circulated and filed in support of the TRO application. ECF 331-12; *see also* ECF 369-40. As stated above, Ms. Alejos verified the facts in the letter based on her "personal knowledge." ECF 331-13.

The day before her deposition, Ms. Alejos circulated a Supplemental Declaration. ECF 369-47. In her Supplemental Declaration, Ms. Alejos testified that she "learned" about certain facts that allegedly occurred on May 15. ECF 369-47, p. 4. This was different. Ms. Alejos testified that "personal knowledge" means that she "personally witnessed the facts[.]" ECF 369-50, p. 9:12-14. She then confirmed that if she "learned of a fact" it would not be personal knowledge of "what really happened because I am hearing from a third party." *Id*., p. 9:16-21. Ms. Alejos was presented her Supplemental Declaration, which contained the facts that allegedly occurred on May 15. *Id*., p. 10:11-16. Ms. Alejos testified that she was not personally present when "Mr. Gaitan and his father were forcibly and violently removed from Mariscal Zavala prison during a raid that took place on May 15th, 2025." *Id*, p. 10:18-11:6. She confirmed that the following statement was not based on her personal knowledge: "[d]uring their violent removal, Mr. Gaitán and his father were heard screaming to other inmates to notify me of what was transpiring, and they were then violently placed into a vehicle." *Id*., p. 11:16-24. She gave the same answer in regards to the statement that "Mr. Gaitan and his father were forcibly removed from the prison and with extreme violence placed in a vehicle." *Id*., p. 12:4-9.

In the May 19 Letter, Ms. Alejos verified that she had personal knowledge of the facts on May 15: "I, Ana Lucia Alejos Botrán, declare under penalty of perjury that I have read and reviewed the foregoing letter dated May 19, 2025, and I affirm, verify, and declare that the facts set forth in the letter insofar as they refer to the events of May 15 . . . are true, accurate, and based on my personal knowledge." ECF 331-12. This verification is impossible to square with her Supplemental Declaration, confirmed under oath, that the facts were not based on her personal knowledge.

Towards the end of her deposition, Ms. Alejos accused counsel of committing a crime in Guatemala based on the content of a question. ECF 369-50, p. 37:1-14.

*The Proceedings in Guatemala*

On the day of oral argument on the First Motion for Contempt, Mr. Hernandez received a death threat. ECF 369-30. The document referenced where Mr. Hernandez's children go to school, where his wife spends her time, and the location of a house. ECF 369-30, p. 3. The threat ordered Mr. Hernandez to "stop messing around with the case of Analucía Alejos." *Id*. It stated that Mr. Hernandez is "going to realize that there are more expensive things than losing a business with the gringos of Peppertre [sic]." *Id*. The threat concluded by stating "We don't give twice notice [sic] Be careful [sic]." *Id*. Petitioners received this document on May 29 as well as during Mr. Hernandez's deposition. ECF 376-3. Mr. Hernandez also testified that his children who are citizens of the United States and Canada are receiving death threats. ECF 369-48, p. 9:6-15; 23:23-24:6; 113:7-11. Petitioners asked Mr. Hernandez hardly any questions about the threat received on April 9, preferring to instead argue, in a footnote, that the threat was "an attempt at damage control" and "defies credulity." Mot., p. 17, FN 10. Mr. Hernandez reported the threat to the authorities. ECF 369-48, pp. 23:21-24:6; p. 70:21-23. The Terra Parties and DT Holdings can only lament the response by Petitioners.

On April 30, 2025, the Terra Parties received an email from the address "whistleblower@peppertreecapitalwakeup.com." ECF 376-4. In the past, emails from this email address had gone to Peppertree, not the Terra Parties. ECF 245-51. The Terra Parties could not analyze the source, but they offered to do so. ECF 253, p. 14. With this email, the Terra Parties could conduct an analysis, which they did. The Terra Parties retained Cyber Security Group and Arthur Diaz Ortiz, a Certified Forensics Digital Examiner, who produced a report. ECF 376-5, p.

11. This report tracked the IP addresses used to send the email and identified the Mariscal Zavala Prison in Guatemala, where Mr. Gaitán was incarcerated. ECF 376-5, p. 19. The email sought to validate the efforts of Ms. Echeverría and requested attorneys' fees for Mr. Gaitán. ECF 376-5, p. 10.

The Terra Parties presented this report to the prosecuting authorities in Guatemala, who requested a judge to permit a search of the prison. ECF 376-6, p. 2. The judge considered the evidence showing electronic communications by Mr. Gaitan while he was in prison, and the judge authorized the search. *Id*., p. 3. The judge required that the results of the search be submitted to the court and a hearing set to appoint an expert. *Id*. They found mobile devices on three inmates, including Mr. Gaitán and his father. ECF 369-50, p. 19:4-11. It is illegal for prisoners to have mobile devices while incarcerated. ECF 376-12, p. 4. Ms. Alejos, Mr. Gaitán's attorney, has stated that she believes that the devices were planted. ECF 369-50, p. 18:17-24. She got this information from a friend and the inmates, including Mr. Gaitán. *Id*., p. 19:1-3. There is no admissible evidence to support her claim. Based on the presence of the mobile device, the local prosecutors recommended that Mr. Gaitan be sent to a different prison, where he is being held pending extradition. The criminal case related to the mobile devices was filed by the local district attorney, and Mr. Gaitán was transferred based on the request of the district attorney and the ruling of a judge. *Id*., p. 19:15-18.

Due in large part to the public statements made by Ms. Alejos, the cases involving Mr. Gaitán have attracted interest from the local media. *See, e.g.,* ECF 376-7, p. 16 (references statements from March 8). Ms. Alejos frequently posts on social media about the case. ECF 376-7, pp. 7-16. When 5PFA came out, Ms. Alejos posted "Ganamos," or "we won," on her social media. ECF 376-7, p. 16. Mr. Gaitán's arrest at the request of El Salvador was covered in the

press, as well as the raid that led to the discovery of mobile devices. ECF 369-40, pp. 36, 39 (the image on the bottom left is a screenshot of the coverage). The issue of the mobile devices is a particularly sore point in local politics, since it gives the public the impression that prison system is not sufficiently serious about enforcing the law. ECF 369-40, pp. 36, 39.

An account on X known as @RafaelCarrera has begun to follow the proceedings related to Mr. Gaitán. ECF 369-40, pp. 28-39. The individual(s) behind the account are frequent posters on social media, broadly criticizing government officials. ECF 369-40, pp. 38-39. The complaint is anonymous, other than the name of the account. ECF 369-40, p. 21. Ms. Alejos believes that a member of the Congress of the Republic of Guatemala is behind the account. ECF 376-7, p. 13. The Terra Parties and DT Holdings have no connection or communication with @RafaelCarrera, and the corporate representative was not asked. The same is true for Jorge Hernández, who was not asked about the @RafaelCarrera account during his deposition.

The individual(s) behind @RafaelCarrera filed a "denuncia," or criminal complaint related to Mr. Gaitán. ECF 369-40, p. 21. The complaint was filed on April 8, 2025. *Id*. This is the same day that news broke about an order from the Court of Appeals directing the release of Mr. Gaitán. ECF 376-8. One of the judges was Elia Raquel Perdomo Ruano. ECF 376-8. Judge Perdomo had posted pictures of herself with Mr. Taracena, a partner of Ms. Alejos. ECF 369-40, p. 32. The next day, the ruling was revoked. ECF 376-8.

Mr. Quisquinay appeared at the district attorney's office to testify about the complaint filed by @RafaelCarrera. ECF 369-40, p. 23. The complaint had generated substantial buzz on social media based on repeated criticisms of the government by @RafaelCarrera, which started in March. ECF 369-40, p. 29 (Mar. 23), 369-40, p. 30 (Apr. 8); 369-40, p. 31 (Apr. 9); ECF 369-40, p. 33 (Apr. 10); ECF 369-40, p. 35 (Apr. 24); ECF 369-40, p. 36. Mr. Quisquinay, who is not

an officer, director, or employee of DT Holdings (ECF 369-49, p. 72:19-24), gave sworn

testimony. ECF 369-40, p. 23. Ms. Lucero, an Assistant Prosecutor, was present and notified Mr.

Quisquinay that failure to report knowledge of any facts related to the case "or any other facts

related to Mr. Jorge Alberto Gaitán Castro and/or CONTINENTAL TOWERS LATAM

HOLDINGS LIMITED" could "result in criminal or any other liability." ECF 369-40, p. 25.

Terra Parties and DT Holdings do not control Mr. Quisquinay. ECF 369-49, p. 72:19-24.

*Compliance with the April 22 Order*

      Regarding Judgment No. 1, the FPFA Contemnors have complied with the April 22 Order

as of June 4, 2025. ECF 371. Compliance was timely and full. *Id*. The Terra Parties and DT

Holdings have thus moved for an order confirming the purging of contempt as to Judgment No.

1.

      Regarding Judgment No. 2, the Terra Parties and DT Holdings have sought to comply,

providing the declarations of Mr. Hernandez. The individuals in charge of the local entities, all of

which are subsidiaries of the Company, not any of the Terra Parties and DT Holdings, have

confirmed their intent to comply. ECF 299-2, 299-1. On May 21, 2025, the Terra Parties and DT

Holdings informed the Court that the El Salvador Action had been dismissed. ECF 338-1, p. 2.

The Terra Parties now have a copy of the resolution dismissing the El Salvador Action. It is

being translated, and we anticipate filing it as soon as possible.

**LEGAL ARGUMENT**

**I.**      **Petitioners still cannot provide any legal support for an injunction designed to
effectively halt foreign criminal proceedings**

      As this Court observed, "[a]n anti-suit injunction is one that prevents a litigant from

pursuing litigation before a foreign tribunal." Order, p. 24 (citations omitted). The relief that

"would cause the termination of the pending criminal actions in foreign courts . . . would qualify

as anti-suit injunction." Order, pp. 24-25. Petitioners did not appeal these conclusions. Now, they argue that the "extraordinary remedy . . . requiring Respondents to withdraw all such complaints is both warranted and appropriate" where there are "exceptional circumstances." Mot., p. 27. Petitioners still present no authority that would authorize an anti-suit injunction aimed at criminal investigations by authorities in Guatemala.

Petitioners direct the Court to two forty-year-old cases from New York state court, both of which are inapt. In *Quinlan v. Lender*, the plaintiff sought to restrain Mr. Lender from filing civil and criminal proceedings in New York. 102 Misc. 2d 127, 129 (N.Y. Sup. Ct. 1979). No principles of international comity were at issue. A New York court had also found Mr. Lender had committed fraud on the court. *Id*., p. 128. Mr. Lender was the proponent of the actions, and they were directed at the plaintiff, not a third party. *Id*. In *Sassower v. Signorelli*, the court also addressed only lawsuits in New York. 99 A.D.2d 358, 358 (N.Y. App. Div. 1984). The court relied on the existence of issue preclusion, immunity, and statutory provisions that directly barred the relief sought. *Id*., p. 359. International comity makes no appearance.

Neither of these cases can form the basis for the relief Petitioners seek. The cases do not deal with international comity or provide a framework for a court in the United States to issue an anti-suit injunction directed at stopping criminal investigations in foreign countries. In both cases, the restrained party was bringing cases against the plaintiff. This is quite different from our dispute. Petitioners are not named in the proceedings. The various criminal cases are within the ambit of local prosecutors, who have investigative powers and conduct their own analysis. The Terra Parties and DT Holdings have no control over the decisions reached, unlike the plaintiffs in the cases cited by Petitioners. Stated simply, Petitioners have provided no legal authority that can begin to form a basis for the relief sought.

The failure to bring cases involving international comity is no small matter. "To permit the validity of the acts of one sovereign State to be reexamined and perhaps condemned by the courts of another would very certainly imperil the amicable relations between governments and vex the peace of nations." *Banco Nacional De Cuba v. Sabbatino*, 376 U.S. 398, 417-418 (1964), (quoting *Oetjen v. Central Leather Co.*, 246 U.S. 297, 303-304, 38 S. Ct. 309 (1918); punctuation omitted). The Supreme Court has cautioned against allowing "United States courts to intervene in an ongoing foreign criminal proceeding and pass judgment on its legitimacy." *Munaf v. Geren*, 128 S. Ct. 2207, 2224 (2008). Petitioners seek a result contrary to the principles laid down by the Supreme Court, citing two cases concerned with proceedings entirely within New York. This attempt must fail.

Petitioners instead appear to be filing an untimely motion for reconsideration of the Order. They seek functionally identical relief, requiring instead that Respondents withdraw their complaints (the same relief as before, *see* ECF 243-1, p. 6) but now notify "the prosecutors that they no longer believe those complaints should be pursued." Mot., p. 28. In effect, this would be compelled speech added to a reiteration of the prior request already rejected by this Court. On this basis alone, the Second Sanctions Motion must also fail.

There are other grounds to reject the relief requested. Petitioners ask this Court to force the conclusion of the "Extradition Case" (ECF 367-1, pp. 2, 6), even though El Salvador is requesting extradition. This is essentially a request to enjoin the actions of El Salvador in relation to Guatemala—a proposition that would affect comity with not one but two foreign sovereigns. There is no basis for such a request. Petitioners want Mr. Hernandez to withdraw the criminal complaint he filed as a result of the death threats he has received. ECF 367-1, pp. 2, 6 (Criminal Case MP001-2024-27634). The same is true of the most recent round of death threats. ECF 367-

1, pp. 2, 6 (Criminal Case MP001-2025-14744). Requiring a non-party to stop availing himself of the protection of the law is inappropriate.

Looking at the other cases, none of the defendants are parties here or necessary for the sale of the Company. There is no support offered for the dismissal of numerous cases in Guatemala, even though this Court has already ruled that Petitioners needed to better substantiate their request for an injunction. Order, p. 25. And as to the last two cases, one was filed by an anonymous source with no connection to Respondents, and the other is unknown. ECF 367-1, pp. 2, 7. None of the individuals listed is a party here. And one of the current bases for Mr. Gaitán's incarceration is his use of a cell phone while in prison. ECF 366-50, p. 19:15-18. This is a case prosecuted by the local district attorney, over whom Respondents have no control. *Id*. Mr. Gaitán can seek to prove his theory that the phone was planted, but nothing in the relief sought can compel the local prosecutors to drop charges that Mr. Gaitán has further violated Guatemalan law.

A.    There is no basis to seek "further findings of civil contempt" because Respondents have purged the contempt as to Judgment No. 1

As noted in their filing on June 9 (ECF 371), the FPFA Contemnors have purged the contempt as to Judgment No. 1. The April 22 Order required the FPFA Contemnors to cause the Terra-appointed directors to vote in favor of the resolution described. April 22 Order, p. 46. The resolution was voted for. ECF 371, p. 1; 371-1, p. 2. The Terra-appointed directors accepted the Investment Bank proposed by the Peppertree-appointed directors, and the Company hired the Investment Bank. The final signatures were circulated on June 4, 2025, before the deadline imposed by the April 22 Order. The Terra Parties and DT Holdings procured a sworn statement by Mr. Hernández, completing the required elements to purge contempt of Judgment No. 1.

There can therefore be no "further findings of civil contempt" absent an independent factual basis, one that Petitioners have not offered.

      B.    <u>Petitioners have failed to show that the criminal proceedings will block the sale of the Company</u>

The criminal proceedings will not block the sale of the Company, and the activities of market participants reveal as much. On May 6, 2025, TPG announced the purchase of Peppertree's business. ECF 376-9. TPG is an alternative asset manager with USD 246 billion in assets under management. *Id*., p. 2. The Terra Parties and DT Holdings have no visibility into this transaction, other than the public announcements of those involved, but the purchase of Peppertree's business would likely include Peppertree's interest in the Company. However Petitioners may wish to characterize the legal proceedings, they are not stopping a transaction that would appear to include Petitioners' interests in the Company.

The criminal proceedings also did not close the market of investment banks that are interested in working on a sale of the Company. As seen in the execution of the resolution retaining Santander, there is a strong interest in the sale process. Santander did not reject the mandate out of hand, and the terms agreed were commercially reasonable. Again, the criminal proceedings are not blocking the sale of the Company.

      C.    <u>There is no basis for any finding of contempt, especially when Petitioners have relied on perjured testimony to support their arguments before this Court</u>

Petitioners struggle to describe the facts underlying their motion for contempt of the 1PFA Judgment. There is a complaint that the Company has not sold, but the sale process is underway. How the market reacts to the efforts of the Investment Bank is beyond the control of the Terra Parties. And the sale process is not one exclusively within the control of the Terra Parties. A director appointed by the Terra Parties and another appointed by Peppertree will be

leading the sale process on behalf the Company. The Peppertree-appointed director could reject any offer that is made or impose terms that a potential buyer will not accept, keeping the sale from closing. In other words, the existence of the future sale of the Company cannot be a basis for contempt.

Petitioners do not allege that any of the various cases will block a sale of the Company. Rather, they argue that the proceedings will somehow interfere. Mot., p. 14. Perhaps, but that is a result of Mr. Gaitán's conduct, not the result of the ensuing criminal proceedings. Mr. Gaitán has now failed to appear at a hearing in El Salvador, leading to the issuance of a red notice by Interpol, and his later incarceration and extradition proceedings. Mr. Gaitán told the authorities in Guatemala that he had turned over all property belonging to a subsidiary of DT Holdings, which was found to be untrue. ECF 254-24, p. 9. Mr. Gaitán has fomented an environment where it is acceptable to muse about killing Mr. Hernández and his children. ECF 369-48, pp. 54:19-57:22. It is illegal to have a mobile device in prison or communicate with a prisoner by email. ECF 369-50, pp. 24:21-25:4. Yet Mr. Gaitán had a mobile device, and Ms. Echeverría relayed a letter to the board of directors of the Company from Mr. Gaitán that states it was sent "via email." ECF 376-10, p. 1. Today, Ms. Echeverría sent a self-serving email, providing an unsworn, after-the-fact explanation that the words "via email" referred to how she would send the letter that Mr. Gaitán authored and signed. ECF 376-13. The timing is suspicious, the phrasing is legalistic, and the "lawful means" are not described. *Id.* This is little more than a last-ditch attempt to hide criminality.

The evidence presented by Petitioners does not support the relief sought. Petitioners have relied extensively on the declarations of Ms. Alejos, who is an attorney and knows the meaning of personal knowledge. She testified that the facts on May 15 were based on her personal

knowledge, a strong statement that can induce a finder of fact to believe the events in question actually occurred. Ms. Alejos later testified that the facts were, in fact, based on conversations with an unnamed friend and other inmates—in other words, inadmissible hearsay and not personal knowledge. Ms. Alejos offered a "professional opinion" on the law of El Salvador, where she is not licensed. She also accused undersigned counsel of violating Guatemalan criminal law by posing a question at her deposition. Ms. Alejos's partner, Mr. Taracena, was in a public romantic relationship with a judge who ruled on a request for relief presented on behalf of Mr. Gaitán. Ms. Alejos avoided questions on this topic, but it is highly improper for her firm to try to leverage a romantic relationship with a judge to benefit Mr. Gaitán's case.

The reference to an action in Guatemala is conclusory and vague. Mot., p. 17. From the documents, it is difficult to understand the *querella*, or complaint, that was filed, including the causes of action. ECF 369-23, pp. 2-3. It appears to be a precautionary, not final, measure, more akin to a lien. *Id.*, p. 5. The Morales Declaration does not provide any clarity. ECF 369-26. Petitioners could have asked Mr. Pimentel about this case, but no questions were put to him, and this case did not appear in the May 22 Requests. ECF 374-2. In sum, this is another instance of Petitioners failing to make their case.

Finally, there are legal obligations in Guatemala and El Salvador that undermine the relief sought. It is a legal obligation to report evidence of a crime. ECF 376-11; 376-12. The obligation exists in El Salvador as well as in Guatemala. ECF 376-11, p. 4 (El Salvador); 376-12, p. 3 (Guatemala). The failure to meet this obligation in El Salvador comes with a sentence of 50-100 days in prison. ECF 376-12, p. 4. In Guatemala, there is a fine, as Petitioners' local counsel cites (ECF 369-54, pp. 2-3), but there are practical consequences that extend much further. These include civil liability and having the conviction in one's personal record, impacting their life in a

myriad of ways. ECF 376-12, p. 3. Petitioners cannot expect the Terra Parties and DT Holdings to refuse to report, or instruct their subsidiaries to stop reporting, evidence of a crime to the relevant authorities. The local authorities then make their own determination, following an investigation.

There are practical considerations, the kinds of issues inherent to international comity. There are restrictions in Guatemala on being forced to essentially make a false statement, which is what the anti-suit injunctions seek. The individuals who provided testimony and the basis for the claims come from sworn testimony and honest belief. Forcing them to recant violates the freedoms protected by the Interamerican Convention on Human Rights (applicable in Guatemala and El Salvador) and constitutional guarantees. In other words, it is inappropriate to fashion an anti-suit injunction that will require the Terra Parties and DT Holdings to violate applicable law or punish them for complying with the law in the past.

D.    <u>In light of the death threats aimed at Mr. Hernandez and his family, any injunction is particularly inappropriate</u>

Incredibly, Petitioners demand that Mr. Hernandez withdraw the criminal complaints he has filed based on threats to him and his family. Mot., p. 6. The Terra Parties and DT Holdings regret that Petitioners do not take these threats seriously. Petitioners had the chance to ask Mr. Hernandez about the most recent death threats but failed to do so other than in the most generic terms. ECF 369:48, pp. 48:1-49:4; pp. 68:19-69:6. The threat delivered on April 9 is chilling. It references where Mr. Hernandez's wife spends her time and where his children go to school. Mr. Hernandez is facing direct threats on his life and that of his children, threats that Mr. Hernandez has conveyed to the local authorities for the proper investigative processes to follow. It is highly improper to attempt to deprive Mr. Hernandez of the protection of local authorities through an anti-suit injunction that could endanger his life and that of his family.

**II.    There is no basis for adverse inferences when the Terra Parties and DT Holdings are not in contempt of 2PFA, have complied with their discovery obligations, and Petitioners have failed to meet their burden to show that the criminal proceedings are identical**

Petitioners seek to convert a dispute over scope of discovery ordered into an order for adverse inferences. They overstate their case. The Terra Parties have produced thousands of pages of documents and two witnesses for deposition: a corporate representative of DT Holdings, and Mr. Hernandez. The Terra Parties met and exceeded their discovery obligations, and adverse inferences are unwarranted.

A.    <u>The Terra Parties and DT Holdings are not in contempt of 1PFA or 2PFA</u>

As stated above, the Terra Parties and DT Holdings have met the requirements to purge the contempt of Judgment No. 1. There was no contempt of 2PFA found in the April 22 Order, and nothing has changed to merit a finding of contempt. Petitioners recognize as much, asking, in a footnote, for reconsideration of the April 22 Order. Mot., p. 19, FN 86. The request is untimely and could have been coupled with the request made by the Peru Non-Parties. Nothing has changed in 2PFA, and the arbitral tribunal has not issued a new award. Without any contempt of 1PFA or 2PFA, there is no basis for adverse inferences or any contempt sanctions.

B.    <u>Petitioners cannot meet any of the three elements required for an adverse inference</u>

As this Court has previously opined, an adverse inference sought on the basis that the evidence was not produced in time requires the party seeking the instruction to show "(1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and (3) that the missing evidence is 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Chevron Corp. v. Donziger*, 296 F.R.D. 168, 222

(S.D.N.Y. 2013). Petitioners' complaint over the scope of the discovery ordered falls far short of a basis to seek an adverse inference.

> 1.    *The Terra Parties and DT Holdings timely produced the evidence it was obligated to produce and over which it had control*

This factor calls on a court to conduct a basic analysis, considering the request made, the obligation to produce, and issues regarding possession, custody, or control of the evidence. Where there is no claim to support the request, the request need not be honored. *Sobol v. UMG Recordings, Inc.*, No. 1:19-cv-01091, 4 (S.D.N.Y. Jul 13, 2020). And where a party has complied with the discovery ordered, there is no basis for an adverse inference. *Coventry Capital US LLC v. EEA Life Settlements, Inc.*, No. 1:17-cv-07417, 19 (S.D.N.Y. Jan 24, 2019).

The Court ordered narrow discovery on an expedited basis based on a supposed "information asymmetry." Petitioners transformed their promise to produce "the request" into nine requests, followed by an additional set of requests on the day of the deadline for production later that day. Petitioners then used the depositions to seek either documents or information akin to an interrogatory, both of which were unrelated to the documents filed in the criminal proceedings. There was no obligation to produce the communications, and counsel never represented at the May 21 hearing that the Terra Parties and DT Holdings would do anything other than provide the documentary evidence that is part of the criminal proceedings. The documents discussed at the hearing were duly produced, and prior to the filing of the Second Motion for Contempt, the Terra Parties and DT Holdings had taken every step to purge the contempt of 1PFA. There could thus be no basis to seek any adverse inference. On this first prong, Petitioners have failed to meet their burden.

2.    *The Terra Parties and DT Holdings are far from the required "culpable state of mind"*

The culpable state of mind factor requires showing that the evidence was not produced "knowingly, even if without intent to [breach a duty to preserve it], or negligently." *Residential Funding Corporation v. Degeorge Financial Corp., et al.*, 306 F.3d 99 (2d Cir. 2002) (internal citations omitted). Courts apply a "case-by-case approach to the failure to produce relevant evidence" because "[s]uch failures occur along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality." *Id.* (internal citations omitted).

The Terra Parties and DT Holdings have produced the documents ordered, defeating any attempt to identify a culpable state of mind. In relation to the communications sought, the Terra Parties have not refused to comply with any court order, did not invent any legal impediment, selectively produce any document, or assert any objection to discovery that had been rejected. Notably, Petitioners do not cite to any conduct by the Terra Parties or DT Holdings on this prong, just text of *Donziger*. Mot., pp. 26-27. There is no allegation of destroying evidence or even making a bad faith objection to the scope of the discovery ordered. The Terra Parties and DT Holdings merely objected to the scope of expedited discovery—this is hardly grounds for an argument of bad faith.

3.    *The communications sought are not relevant to Petitioners' claims*

Currently, the Terra Parties and DT Holdings have met every requirement to purge the contempt of Judgment No. 1, leaving nothing of relevance to discuss. They were also not in contempt of 2PFA on April 22, and nothing has changed to create contempt. There is thus no claim for sanctions or basis to require production of communications.

Petitioners do not elaborate on the precise conduct that would constitute a new finding of contempt of 1PFA, other than a conclusory argument that the Terra Parties and DT Holdings

"continue to object with increasingly outrageous conduct that threatens the sale of the Company (and certainly will diminish the sale price—proceeds of which are security for the more than $300 million ordered in the 5PFA." Mot., pp. 21-22. This is not an allegation of blocking the sale of the Company, and this statement fails to account for the Terra Parties executing the resolution retaining the Investment Bank and engaging that same bank to conduct a sale process. It also does not explain how other market participants are willing to purchase Peppertree's assets, which undoubtedly includes its share (direct or indirect) in the Company. It is not uncommon for companies to sell while litigation is pending, and Petitioners have not presented any claim for contempt of 1PFA that can justify receiving the communications sought.

      C.    <u>Petitioners appear to have abandoned the basis for the prior TRO, that the evidence presented in El Salvador and Guatemala is identical to the evidence before the arbitral tribunal</u>

In their TRO application, Petitioners relied on the May 14 Declaration of Ms. Alejos. ECF 330, pp. 6-7. Ms. Alejos provided sworn testimony that the "prosecutor in the Guatemala Criminal Matters 'is relying on the same criminal allegations that were previously submitted by' the DTH subsidiary." ECF 330, p. 7. Petitioners cited Ms. Alejos for the proposition that, in the El Salvador Criminal Action, "the prosecution is relying on 'factual allegations [that] are the same as when the complaint was filed in May 2022,' meaning 'the only relevant evidence presented' is a purported forensic audit which the Tribunal previously determined in the 2PFA to have 'no merit.'" *Id*. Petitioners note that the arbitral tribunal relied on these statements, but Petitioners do not make an affirmative case that the factual allegations or evidence are the same.

This is likely because Ms. Alejos is an unreliable witness. At the hearing on May 21, the Terra Parties and DT Holdings identified how Ms. Alejos failed to account for evidence already before the Court showing that the El Salvador Action includes an additional expert report. Hr'g

Tr. p. 17:1-15. Given a few days to mull it over, Ms. Alejos presented, on the eve of her deposition, a Supplemental Declaration.

In relation to the El Salvador Action, Ms. Alejos was incorrect. She stated that a key witness appears to be Selvin Martin Reyes Andrade, who the Terra Parties and DT Holdings have known about. ECF 369-47, p. 13. Ms. Alejos did not address the fact that the witness offered evidence that was different from that before the arbitral tribunal, and Ms. Alejos then confirmed that she did not know the name of the witness. ECF 369-50, p. 30:14-22. There is thus no admissible evidence as to the identity of the witness. Ms. Alejos confirmed that criminal matters in El Salvador and an arbitration proceeding are "two different subjects." ECF 369-50, p. 29:17-20. She confirmed that there is another audit before the Salvadoran courts. ECF 369-47, p. 14.

In relation to the Guatemala Action, Ms. Alejos was also incorrect. There is already an expert opinion on the Guatemalan Action, provided in the Declaration of Josué Alexander Solórzano Cifuentes (the "Solórzano Declaration"). ECF 254-24. Ms. Alejos did not bother to review the Solórzano Declaration. ECF 254-24. If she had, she would have seen that Mr. Solórzano testified that, on June 28, 2024, Mr. Gaitán's ex-wife found a laptop and external hard drive that belonged to Mr. Gaitán's "former employer, which he had previously denied possessing." *Id*., p. 9. Based on this evidence, Mr. Gaitan was incarcerated. *Id*. This was obviously long after 2PFA, and this unrebutted evidence shows that Mr. Gaitán is not in prison based on the same facts. Rather, Mr. Gaitán routinely violates the law.

Petitioners have not provided any expert testimony regarding the El Salvador Action or the Guatemala Action, despite having expert reports submitted by the Terra Parties and DT Holdings on March 26, 2025. Ms. Alejos did not change the state of affairs. Ms. Alejos offered her "professional opinion" on some matters. ECF 369-47, pp. 16-17. At her deposition, Ms.

Alejos testified that her Supplemental Declaration, the one with the "professional opinion" is factual testimony. ECF 369-50, p. 32:18-20. Ms. Alejos also gave her "professional opinion" on Salvadoran law, even though she is not a lawyer licensed or admitted to practice in El Salvador. *Id.*, p. 34:14-18. This was yet another example of the unreliability of Ms. Alejos.

These evidentiary failures are crucial for any argument to reconsider the April 22 Order or issue a new finding of contempt of 2PFA. The two cases are the only criminal proceedings on which the arbitral tribunal opined in 2PFA, rendering interim orders that were not converted "into enforceable judgments." Apr. 22 Order, pp. 32-33. The prior allegations regarding these proceedings "are not dispositive of Gaitán's criminal liability vis a vis Guatemala and Salvador authorities." *Id.*, pp. 25-26. And the testimony from Ms. Alejos has only showed that the factual allegations are different than those before the arbitral tribunal and that there is no expert evidence to rebut the opinions offered by the Terra Parties and DT Holdings.

### III.    Civil confinement is inappropriate, and there is no basis for criminal contempt sanctions

Petitioners' demand for coercive civil confinement is extreme and unwarranted. *First*, Respondents have purged their contempt following the approval of an investment bank to facilitate the sale of the Company. Thus, there are no "ongoing—and escalating—violations of the Court's orders," as Petitioners suggest. Mot., p. 29. *Second*, the specific demand that Mr. Hernandez be incarcerated because of his personal criminal complaints is baseless. Mr. Hernandez availed himself of the protections of Guatemalan law by advising the authorities that he had received death threats. Reporting suspected criminal activity and seeking the protection of law enforcement (for himself, his wife, and his minor children) does not violate any order of this Court. In any event, an order purporting to compel foreign prosecutors to halt their investigations would present serious comity concerns, and an order purporting to compel Mr. Hernandez to

withdraw or denounce his complaint would run roughshod over fundamental First Amendment principles. *Third*, the Court should reject the suggestion that Mr. Hernandez be incarcerated because of the conduct of *other* corporate entities filing their own criminal complaints in El Salvador, Peru, and elsewhere. Coercive measures of any kind are improper where "there is 'no wilful disobedience but only an incapacity to comply.'" *Armstrong v. Guccione*, 470 F.3d 89, 101 (2d Cir. 2006) (quoting *Maggio v. Zeitz*, 333 U.S. 56, 73 (1948). *Fourth*, the Court should also reject Petitioners' attempt to expand the scope of relief provided in 1PFA. The arbitral tribunal ordered the Terra Parties to proceed with the sale of the Company. Petitioners now appear to argue that the award also provides Mr. Gaitán immunity from both criminal investigation and criminal prosecution is all jurisdictions around the world until that sale is effectuated. The 1PFA says no such thing, and it would be the height of irony and injustice to incarcerate Mr. Hernandez on the theory that Mr. Gaitán must remain free.

The Terra Parties and DT Holdings are working diligently to comply with the April 22 Order. Notably, they have satisfied the elements to purge the contempt of Judgment No. 1. As to 3PFA, Mr. Hernandez has provided a declaration with his understanding that the El Salvador Action has been dismissed. ECF 338-1. The Terra Parties and DT Holdings are attempting to provide the documentary evidence to confirm this fact. The Peru Non-Parties are taking a different approach, with their own counsel, arguments, and deadlines.

In relation to the expedited discovery ordered on May 21, the Terra Parties and DT Holdings produced all of the documents requested, with the only dispute being as to scope and including communications. The Terra Parties and DT Holdings have procured sworn testimony from Mr. Hernandez in accordance with the April 22 Order, with a lapse of two days on one occasion. The Terra Parties and DT Holdings procured the deposition of Mr. Hernandez, even

though they were not obligated to do so. DT Holdings provided a corporate representative who was prepared to answer questions regarding the criminal cases. His deposition was in compliance with the requirements set by the Court. ECF 374. This is far from a sign of willing non-compliance.

As it relates to the monetary sums that have been reduced to judgments, the Terra Parties and DT Holdings have identified an asset that can be sold. The Terra Parties and DT Holdings offered the asset, whose value exceeds the amount owed, to Petitioners, but Petitioners rejected the offer, preferring cash. The asset is owned by a subsidiary of DT Holdings, and the subsidiary is in the process of selling the asset.[1] Again, this is a sign of compliance and does not demonstrate a criminal state of mind of continuous refusal to comply.

An order of civil confinement of Mr. Hernandez would be especially inappropriate where Mr. Hernandez does not live in the United States and has not demonstrated an intent to routinely come to the United States. He lives in Guatemala, and once his children graduate from high school, he plans to move to a different country, not the United States. ECF 369-48, p. 67:20-25. Without a reasonable prospect that Mr. Hernandez will be subject to service of such an order, "there would be little point in issuing it." *Spectacular Venture, L.P. v. World Star International, Inc.*, 927 F. Supp. 683, 685 (S.D.N.Y. 1996).

### CONCLUSION

For the foregoing reasons, the Terra Parties and DT Holdings respectfully request that the Court deny the Second Sanctions Motion in its entirety.

Dated: June 12, 2025                                  Respectfully submitted,

_____/s/_____                              _____/s/_____

---

[1] DT Holdings is translating the documents and will provide them shortly.

Rodney Quinn Smith II
(admitted *pro hac vice*)
**GST LLP**
78 SW 7th Street, Suite 500
Miami, FL 33130
Phone: (305) 856-7723
quinn.smith@gstllp.com

Lucila I. M. Hemmingsen
**The Fladgate Firm PC**
305 Broadway, 7th Floor
New York, NY
Phone: (646) 369-5843
lh@hemmingsenadr.com

*Counsel for Respondents*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), I hereby certify that this document complies with the word count limitations. There are 9,021 words in this document.


_/s/ Quinn Smith_
Rodney Quinn Smith II