UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------- X
TELECOM BUSINESS SOLUTION, LLC, *et al.*,       :  Civil Action : 1:22-cv-01761
                                                :
                    Petitioners,                :  Judge Lewis A. Kaplan
        v.                                      :
                                                :  Magistrate Judge Robert W.
TERRA TOWERS CORP., *et al.*,                   :  Lehrburger
                                                :
                    Respondents.                :
----------------------------------------------------------------- :
                                                X

# PETITIONERS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR FURTHER FINDINGS OF CIVIL CONTEMPT AND SANCTIONS

Michael N. Ungar
(admitted *pro hac vice*)
Katherine M. Poldneff
Ashtyn N. Saltz
(admitted *pro hac vice*)
**UB GREENSFELDER LLP**
1660 West 2nd Street, Suite 1100
Cleveland, Ohio 44113-1406
Phone: (216) 583-7000
Fax:    (216) 583-7001
mungar@ubglaw.com
kpoldneff@ubglaw.com
asaltz@ubglaw.com

David A. Landman
**UB GREENSFELDER LLP**
1700 Broadway, Suite 1802
New York, New York 10019-7710
Phone: (917) 262-0470
Fax:    (917) 262-0480
dlandman@ubglaw.com

*Counsel for Petitioners Telecom Business Solution, LLC and LATAM Towers, LLC*

Gregg L. Weiner
Andrew S. Todres
Ethan R. Fitzgerald
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, New York 10036-8704
Phone: (212) 596-9000
Fax:    (212) 596-9090
gregg.weiner@ropesgray.com
andrew.todres@ropesgray.com
ethan.fitzgerald@ropesgray.com

Daniel V. Ward
(admitted *pro hac vice*)
**ROPES & GRAY LLP**
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199-3600
Phone: (617) 951-7000
Fax:    (617) 951-7050
daniel.ward@ropesgray.com

*Counsel for Petitioner AMLQ Holdings (Cay), Ltd.*

Respondents' Opposition (ECF No. 375) attempts to perpetuate the charade that they support the sale of the Company and that the Criminal Actions they have initiated are just coincidental acts of good citizens reporting crimes.[1]  Nonsense.  The evidence is clear that Respondents initiated the Criminal Actions (almost all of which are based on matters previously addressed by the Tribunal) as part of their "long-running series of misconduct intended to thwart the provisions of the SHA, the awards of the Tribunal, and the judgments of this Court." ECF No. 381 at 12.  Respondents then escalated their attacks in connection with the issuance of the 5PFA, again intending to impede a sale of the Company by concocting new false claims against Gaitán and Mr. Schachter after both were assigned roles related to the sale of the Company in 5PFA.  And tellingly, Respondents literally have no answer for their initiation of proceedings against the Company resulting in the seizure of 163 towers.

All of the proceedings fabricated by Respondents indisputably interfere with a sale of the Company and confirm the need to (i) hold Respondents in further contempt of this Court's judgments, and (ii) order further sanctions to compel their compliance with this Court's judgments. For the following reasons and those set forth in the Brief, the Motion should be granted.

I. **THE RECORD IS CLEAR THAT RESPONDENTS INITIATED THE CRIMINAL ACTIONS TO INTERFERE WITH THE SALE OF THE COMPANY, IN CONTEMPT OF THE 1PFA JUDGMENT**

A. **There is No Dispute that Respondents Initiated the Criminal Actions**

Respondents do not dispute that they initiated the Criminal Actions.  Instead, they attempt to focus the Court on various red herrings and contradictory positions to distract from the following undisputed evidence:

---

[1] Unless otherwise noted, all defined terms herein shall have the same meaning as in Petitioners' Memorandum of Law (ECF No. 368, the "Brief") in Support of their Motion for Further Findings of Civil Contempt and Sanctions (ECF No. 367, the "Motion"), and the Proposed Order filed therewith (ECF No. 367-1).  All citations to exhibits ("Ex.") refer to exhibits to the Declaration of Ethan R. Fitzgerald filed herewith.

1

- Hernandez, Quisquinay, and other DTH agents have initiated and supported multiple Criminal Actions against Gaitán, Mr. Schachter, the Company, and others. *See* ECF No. 368-1.

- The subset of Criminal Actions that led to Gaitán and his father's criminal charges, arrests, and subsequent incarcerations over the last few months, are based on the same criminal complaints and allegations that the Tribunal found Respondents responsible for initiating over three years ago that "had no merit" and were part of a "false narrative of misconduct and criminality." *See* ECF No. 369-37 at 6-8 ¶¶ 10-14; ECF No. 369-8 at ¶¶ 9, 80.

- Mr. Schachter has offered unrefuted testimony that Respondents have perpetrated numerous attacks against him and Gaitán over the last several years because Respondents viewed them as not sufficiently supportive of Respondents' position in the Arbitration opposing a sale of the Company. *See* ECF No. 358.

- Respondents' recent escalation of criminal proceedings coincides with the issuance of 5PFA, which assigned specific roles to Mr. Schachter and Gaitán in the sale of the Company. *See* ECF No. 368-1; ECF No. 369-24 at 193 (¶ 8), 195 (¶ (8)e).

### B. Respondents' Contradictory Positions and Red Herrings are Unavailing and Not Credible.

There is no dispute that Quisquinay has been involved with the initiation of recent criminal proceedings. *See* Br. at 11. But remarkably, Respondents now try to distance themselves from him by asserting that he is "not an officer, director, or employee of [DTH]", *see* ECF No. 375 at 13-14 (hereinafter "Opp."), despite the ample record to the contrary, including this Court's own rulings.[2]

Even if Quisquinay conveniently relinquished his role, and is no longer *currently* a DTH employee, the inescapable reality is that he is continuing to do Respondents' bidding to impair a sale. Indeed, Respondents admitted Quisquinay provided "sworn testimony" to prosecutors of Gaitán's purported unlawful use of electronic devices to communicate with Mr. Schachter while in prison, parroting allegations previously made by Respondents in the Arbitration. *See* Opp.

---

[2] Quisquinay's October 20, 2021 witness statement submitted in the Arbitration, under penalty of perjury, stated that he was the "CFO of [DTH]", "work[ed] for [DTH] since 2004", and was "directly employed by [DTH]." *See* Ex. 1 ¶ 4; *see also* ECF No. 369-24 at 12, ¶ 10(3) (finding Quisquinay is a "DTH employee whom [the Tribunal] determined to be an agent of Respondents"); ECF No. 209 at 3 (enjoining the BVI Action brought by Quisquinay and finding "Petitioners argue persuasively that Quisquinay 'is clearly advancing Respondents' interest' in bringing the BVI Action, and that he is 'controlled by and acting on behalf of Respondents.'").

2

at 13-14. The only reasonable conclusion is that Quisquinay did that in coordination with Respondents—why else would someone unconnected with Respondents and the Arbitration be providing testimony about Gaitán using electronic devices based on communications only disclosed in the confidential Arbitration? Indeed, Respondents offer no other plausible explanation.

Quisquinay's role supporting the criminal complaint that led to Gaitán's transfer to the Pavoncito maximum-security prison likewise diminishes Respondents' credibility regarding their assertion that they have "no connection or communication with"[3] an anonymous complainant using the pseudonym "Rafael Carrera", the individual they admit initiated the same criminal complaint against Gaitán, Mr. Schachter, and Ms. Alejos, on the *same day* Gaitán was released from prison. *See* Opp. at 13-14.

Respondents admit that they presented to prosecutors in Guatemala a "report" that "tracked the IP addresses used" for the "whistleblower@peppertreecapitalwakeup.com" email address to the vicinity of the prison where Gaitán was incarcerated, which subsequently led to the May 15, 2025 raid and Gaitán's transfer to Pavoncito prison. Opp. at 11-12. Interestingly, Respondents state that emails from that address were previously only sent to Peppertree, but because one was sent to Terra (shortly after the 5PFA and April 22 Order were issued), they could "conduct an analysis" of the "source." *Id.* It is reasonable to infer—but of course cannot be confirmed due to Respondents' failure to produce relevant communications—that Respondents orchestrated their own receipt of an email from the address to conduct such an "analysis" that would form the basis

---

[3] Respondents failed to produce any communications related to any of the Criminal Actions, including this one, which supports an adverse finding that Respondents communicated with Carrera. *See* Br. at 25-27. But the Court need not draw an adverse inference—Respondents' connection to Carrera is obvious on the face of the evidence and circumstances noted above, as well as Respondents' historical resort to anonymous "whistleblowers" and disinformation as part of their campaign to prevent a sale. *See, e.g.*, ECF Nos. 369-16, 369-24.

of another criminal complaint, and that they would later bring to the Tribunal's attention (and which the Tribunal would promptly reject as unreliable on its face). *See* ECF No. 369-34. This certainly would not be Respondents' first association with purported "whistleblowers" or anonymous sources that supported Respondents' position after unfavorable outcomes in the Arbitration. *See, e.g.*, ECF Nos. 369-16, 369-24.

Respondents next maintain that this Court should not require a "non-party to stop availing himself of the protection of the law" with respect to the two criminal complaints Hernandez has filed against Gaitán regarding alleged death threats. Opp. at 16-17. However, this is undercut by Respondents' history of fabrications aimed at improving their position in the Arbitration (and related litigation) at conspicuously critical times. *See generally* ECF Nos. 368-1, 369-16, 369-24. Hernandez admitted that he did not file the March 17, 2025 complaint against Gaitán for attempted murder regarding purported threatening text messages until **ten months after** he became aware of such texts, on the eve of the issuance of the 5PFA, and after Gaitán was already incarcerated. *See* Br. at 8-9. Hernandez admitted at his deposition that at the time he filed the complaint he did not believe Gaitán had committed a crime. *Id.* Therefore, his concerns about the letter death threat he claimed to receive in early April are simply not credible. *See* Opp. at 21.

Respondents' red herring claim of "perjured testimony from Ms. Alejos" regarding her lack of "personal knowledge" of the raid that took place at the Mariscal Zavala prison on May 15, 2025 is unavailing. *See* Opp. at 10. Respondents do not, and cannot, challenge Ms. Alejos's testimony that the allegations resulting in the criminal charges against Gaitán are the same as those previously rejected as false by the Tribunal, and later confirmed by this Court and affirmed by the Second Circuit. *See* ECF No. 369-37 at ¶¶ 9-13; Br. at 7. And Respondents ignore Mr. Schachter's May 19, 2025 submission confirming the accuracy of Ms. Alejos's reporting with a verification

4

from Gaitán. *See* Ex. 5.[4]

In light of the above and as set forth in the Brief, adverse inferences are not necessary to find Respondents in contempt of the 1PFA and 2PFA for initiating and maintaining baseless criminal proceedings to obstruct a sale, which they do not rebut. *See* ECF 368 at 25. But to be sure, the Court can draw adverse inferences because Respondents have failed to produce ***any*** communications related to any of the Criminal Actions, regardless of whether those actions were included in the May 22 RFPs, and they failed to object to producing any such communications until their deadline ***to produce*** those communications. *See* ECF No. 375 at 8.[5]

Chalking up their failure of production to "undue burden," Respondents try to pivot the Court's attention to the list of criminal proceedings in Petitioners' amended RFPs. But Petitioners amended their RFPs only in response to Respondents' correspondence insisting on an untenably narrow document production, which required clarifying the relevant criminal proceedings in the amendment. Nor did Respondents make any effort whatsoever to establish that undue burden. In an expedited proceeding with hundreds of millions of dollars at stake, it is not unreasonable to demand the production of communications within the timeframe ordered by the Court. Of course, if Respondents have so many communications related to the Criminal Actions that it would be too burdensome for them to collect and produce them, then that only corroborates their extensive involvement in the Criminal Actions as part of of their campaign to block the sale of the Company.

---

[4] Respondents also falsely claim that "Ms. Alejos did not bother to review the Solórzano Declaration." Opp. at 26. In reality, Ms. Alejos provided a substantial analysis of the Solórzano Cifuentes Declaration. *See* ECF No. 369-47 at 15-16, n.37.

[5] Respondents' failure to produce documents is par for the course in the Arbitration and this proceeding. Respondents have failed to produce documents responsive to Peppertree/AMLQ's information requests, and the Tribunal drew adverse inferences in Phase 2 of the Arbitration for their failure to produce documents. *See* Br. at 18.

5

### C. There is No Dispute that the Criminal Actions Impede the Sale of the Company Required by the 1PFA Judgment

Respondents likewise fail to dispute that the Criminal Actions they initiated impede the sale of the Company. *See* Br. at 9-10, 13, 19-24. Indeed, they concede the obvious: that the Criminal Actions could "somehow interfere" with a sale. Opp. at 19. Despite admitting they have caused potential interference with a sale they were ordered by this Court to "vote for, consent to, and raise no objection" against, and even though the Tribunal has expressly determined that "Mr. Gaitán's and his father's incarceration . . . may impede a sale of the Company" (ECF No. 369-39 ¶ 7), Respondents nevertheless argue that they are not in contempt of the 1PFA Judgment because Gaitán is to blame for his incarceration, while raising several other irrelevant contentions, and outright ignoring many of the other examples of their contempt. *See* Opp. at 17-21. None of these arguments passes muster.

Respondents' circular argument that they cannot be sanctioned for initiating the Criminal Actions to attack Gaitán because the Criminal Actions are "a result of Mr. Gaitán's conduct" also fails. Opp. at 19. Respondents ignore that the Criminal Actions have either or both been determined to be based on "fabricated facts" (Br. at 18 (citing ECF No. 369-24 ¶ 213)), or are transparently concocted to interfere with a sale. For example, Respondents claim that Gaitán's incarceration is based on the revelation on June 28, 2024—two weeks before the Phase 2 evidentiary hearing in the Arbitration began—that Gaitán was in possession of a laptop and external hard drive that belonged to Respondents. *See* Opp. at 26. But that is the exact allegation the Tribunal rejected in the 2PFA as "baseless." *See* ECF No. 369-8 at 35.[6] Moreover,

---

[6] For avoidance of doubt, after the Tribunal ordered that Gaitán be restored as CEO, Gaitán's attorney asked Respondents what they wanted to do with the laptop, but Respondents' counsel never responded. Ex. 3 at 2-3. Instead, Respondents filed a criminal complaint against Gaitán on January 20, 2022, while just one week later, DTH representative Kristha Pineda submitted written testimony in the Arbitration that Gaitán and Echeverria could "continue their work for [the Company] using this equipment." Ex. 2 at ¶¶ 8, 10, 26. Gaitán also debunked this false

Respondents completely ignore that the "conduct" they cite is only before criminal authorities because of Respondents' own zealous prosecution of Gaitán, all occurring around the issuance of the 5PFA.

Respondents scarcely address, or ignore altogether, their other conduct in contempt of the 1PFA Judgment and this Court's April 22 Order.[7] They brush away the Guatemala Action that resulted in government seizure of 163 Company towers as "a precautionary, not final, measure" (Opp. at 20), but say nothing about the fact that that action was initiated by the same DTH lawyer that represented Hernandez in filing his "death threat" complaint, and do not even bother to dispute the obvious point that seizure of Company assets interferes with a sale of the Company. *See* Br. at 10, 17-18, 22. Nor do Respondents address their complete failure to pay the coercive monetary sanctions ordered by the Court in the April 22 Order, to substantiate their bare assertion that the El Salvador Action has been terminated, or to say anything about the El Salvador-Related BVI Action, while continuing to blame Peppertree (which is not a party to that action) for their failure to withdraw the Peru-Related BVI Action.

## II. THE COURT HAS THE AUTHORITY TO HOLD RESPONDENTS IN CONTEMPT AND ISSUE NECESSARY COERCIVE SANCTIONS

Having failed to contest that they initiated the Criminal Actions and that the Criminal Actions interfere with a sale in violation of the 1PFA Judgment, Respondents misrepresent the relief being sought by Petitioners in order to argue that this Court has no authority to enforce its

---

allegation in a June 19, 2024 submission by providing evidence that he personally purchased the laptop in October 2022. Ex. 4.

[7] Respondents' agreement to engage Santander is a red herring. *See* Opp. at 17-18. Respondents' finally taking the first step necessary to effectuate a sale—nearly ***five years after*** their contractual obligation to do so vested—certainly does not mean they will not take other actions to interfere with a sale process and must be viewed in the context of another bank declining the engagement in light of Respondents' wrongdoing. *See* ECF No. 382; Ex. 7. Respondents' argument about the pending acquisition of Peppertree Capital Management, Inc. (not Peppertree) is likewise irrelevant because Peppertree's interests in the Company were carved out of that transaction. *See* Ex. 6.

7

own judgments. *See* Opp. at 14-21. But the Court does have that power through its ability to make findings of contempt and issue coercive sanctions to purge that contempt. *See* Br. at 19-24, 30, 32-33. Respondents' arguments fail for the following reasons.

### A. Petitioners Are Not Seeking an Anti-Suit Injunction, Reconsideration of the Court's Prior Order, or Relief that is Barred by Comity Concerns

Respondents misrepresent the relief Petitioners seek. As expressly set forth in Petitioners' Brief, Petitioners are *not* seeking an anti-suit injunction, or any "relief that would require foreign prosecutors or courts to do anything." Br. at 28. Instead, the Court should order Respondents to withdraw the baseless criminal complaints they filed in various jurisdictions, including those that led to Gaitán's imprisonment, in order to purge their own contempt. Respondents ignore the cases in the Brief regarding the Court's broad contempt and sanctions power. *See* Br. at 19-21, 24. There is no dispute that Respondents are responsible for filing these complaints, the purported bases for which the Tribunal and this Court already have rejected. *Id.* at 3-5, 8-10.[8]

Contrary to Respondents' arguments, Petitioners are not asking the Court to intervene in the conduct of foreign prosecutions, or to disturb the activities of those foreign prosecutorial authorities. Principles of comity are therefore irrelevant.[9] Indeed, even if principles of international comity controlled here—they do not—such considerations would not be dispositive of the relief Petitioners seek. *See Banco Nacional*, 376 U.S. at 409 (the Supreme Court "has called

---

[8] Respondents argue that Petitioners' choice to streamline their request for relief in light of the Court's guidance by not seeking a temporary restraining order somehow undermines the Motion. *See* Opp. at 25-27. But this argument has no bearing for the same reason—Respondents fail to dispute that they or their agents initiated each of the Criminal Actions targeting Gaitán. *See* Section I.A., *supra*. And as Petitioners noted in the Brief, Respondents cannot be heard to contend their refusal to continue perpetuating these complaints in the face of the 2PFA does not constitute contempt, having previously argued that the "2PFA converts the November 12 and March 15 Orders into enforceable elements of an interim partial award." Br. At 20 n.14 (quoting ECF No. 369-18 at 11).

[9] *Cf. Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 417-18 (1964) ("To permit the validity of the acts of one *sovereign state* to be reexamined and perhaps condemned by the courts of another would very certainly imperil the amicable relations *between governments* and vex the peace of nations" (internal quotations and citation omitted; emphases added)).

'comity' in the legal sense neither a matter of absolute obligation . . . nor of mere courtesy and good will"); *see also* Br. at 29 n.16 (any comity "concerns are readily outweighed by each of the *China Trade* factors in light of Respondents' vexatiously perpetuating the[ Criminal Actions], which indisputably undermine the jurisdiction of the Court, the Tribunal, and international arbitration as an institution.").

Accordingly, Petitioners are not seeking reconsideration of the Court's April 22 Order. But even if Petitioners were seeking such reconsideration, Respondents do not—and cannot—dispute that the Court may exercise its "inherent authority to reconsider its own interlocutory orders, even *sua sponte*." *WFMC 2016-LC25 W. Bay Area Blvd. LLC v. Tyler*, 2022 WL 17487730, at *4 (S.D.N.Y. Dec. 7, 2022) (internal quotations omitted).[10]

### B. The Court May Direct Respondents to Take Affirmative Steps to Withdraw Baseless Criminal Complaints That Frustrate the Purpose of the Court's Orders

Petitioners *are* asking the Court to exercise its discretion to issue contempt findings and sanctions, including an order that Respondents withdraw their bogus criminal complaints designed to frustrate the sale of the Company, to compel Respondents' compliance with the Court's prior orders and directives.[11]  None of the cases Respondents cite concerns similar facts or circumstances, let alone forecloses such relief.[12]

---

[10] Respondents also ignore that the reason the parties are now before this Court is due to the express order of the Tribunal, which directed Petitioners to seek this relief. ECF No. 369-39.

[11] The Peru Contemnors' opposition likewise misrepresents the relief sought by Petitioners, in another attempt by Respondents' agents to muddy the waters for the Court. *See generally* ECF No. 377. The Proposed Order directs affirmative action by Respondents only, and only prohibits *future* wrongful conduct by Respondents' agents, including the Peru Contemnors. *See* ECF No. 367-1 at 2-4. Petitioners do not request any specific sanction against the Peru Contemnors should Respondents fail to purge their contempt. *See id.* Petitioners have no way of knowing if the Peru Contemnors are involved with the Criminal Action in Peru (*see* ECF No. 377 at 2-3), because Respondents have refused to produce any information about that action. But if, as they claim, the Peru Contemnors have nothing to do with the Criminal Actions, then there is no risk to them arising from the Motion.

[12] *Cf. Munaf v. Geren*, 553 U.S. 674, 693, 698-99 (2008) (rejecting habeas petitions effectively "seeking a court order requiring the United States to shelter [petitioners] from" criminal prosecution in Iraq, where petitioners "concede[d] that . . . Iraq would be free to arrest and prosecute them under Iraqi law"). The lack of directly on point authority

9

To the extent Respondents contend that a Court order directing them to withdraw their baseless criminal complaints would amount to "compelled speech," Respondents cite no law for this proposition, and insofar as Petitioners are aware, there is none. Respondents' "compelled speech" claim fails for at least two reasons. *First*, Respondents and their agents who have filed these groundless criminal complaints are "foreign citizens outside U.S. territory [who] do not possess rights under the U.S. Constitution," and thus cannot assert any First Amendment protection to be free from "compelled" speech. *Agency for Int'l Dev. v. Alliance for Open Society Int'l*, 591 U.S. 430, 433 (2020). *Second*, even if Respondents and their agents *could* properly invoke the protections of the First Amendment—they cannot—these criminal complaints already have been found to be fraudulent, and thus are outside the ambit of the First Amendment. *See United States v. Hansen*, 599 U.S. 762, 783 n.4 (2023) ("False claims that are made to effect a fraud or secure moneys or other valuable considerations are not protected by the First Amendment" (internal quotations and alterations omitted)). Moreover, Hernandez has repeatedly sought to avoid this Court's jurisdiction and its authority over him; he cannot now credibly attempt to invoke the protections of U.S. federal law solely when he thinks they inure to his benefit.[13]

### III.  CONCLUSION

For the foregoing reasons and those set forth in the Brief, the Motion should be granted in the form of the Proposed Order filed therewith.

---

involving the abuse of foreign criminal proceedings to evade a U.S. court's order for specific performance is not surprising given the uniqueness of Respondents' misconduct. In all events, the Court has the power to take "any reasonable action . . . to secure compliance with its orders." Br. at 24 (citing *Berger v. Hecker*, 771 F.2d 1556, 1568 (2d Cir. 1985)).

[13] Respondents' argument that the Court cannot order civil confinement against a foreigner (Opp. at 29) is false. *See CE Int'l Res. Holdings LLC v. S.A. Mins. Ltd. P'ship*, 2013 WL 324061, at *2 (S.D.N.Y. Jan. 24, 2013) (quoting *FTC v. Verity Int'l, Ltd.*, 140 F. Supp. 2d 313, 318 (S.D.N.Y. 2001)).

Dated: June 14, 2025

By: */s/ Michael N. Ungar*
Michael N. Ungar
(admitted *pro hac vice*)
Katherine M. Poldneff
Ashtyn N. Saltz
(admitted *pro hac vice*)
**UB GREENSFELDER LLP**
1660 West 2nd Street, Suite 1100
Cleveland, Ohio 44113-1406
Phone: (216) 583-7000
Fax:    (216) 583-7001
mungar@ubglaw.com
kpoldneff@ubglaw.com
asaltz@ubglaw.com

David A. Landman
**UB GREENSFELDER LLP**
1700 Broadway, Suite 1802
New York, New York 10019-7710
Phone: (917) 262-0470
Fax:    (917) 262-0480
dlandman@ubglaw.com

*Counsel for Petitioners Telecom Business Solution, LLC and LATAM Towers, LLC*

Respectfully submitted,

By: */s/ Gregg L. Weiner*
Gregg L. Weiner
Andrew S. Todres
Ethan R. Fitzgerald
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, New York 10036-8704
Phone: (212) 596-9000
Fax:    (212) 596-9090
gregg.weiner@ropesgray.com
andrew.todres@ropesgray.com
ethan.fitzgerald@ropesgray.com

Daniel V. Ward
(admitted *pro hac vice*)
**ROPES & GRAY LLP**
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199-3600
Phone: (617) 951-7000
Fax:    (617) 951-7050
daniel.ward@ropesgray.com

*Counsel for Petitioner AMLQ Holdings (Cay), Ltd.*

**CERTIFICATE OF SERVICE**

    I hereby certify that a copy of the foregoing was filed electronically on June 14, 2025. Notice of this filing will be sent to all counsel of record through the Court's electronic notice system.

*/s/ Gregg L. Weiner*
*Counsel for AMLQ Holdings (Cay), Ltd*
