```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 01/21/2026
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
TELECOM BUSINESS SOLUTION, LLC, *et al.*,

           Petitioners,

-against-

TERRA TOWERS CORP., *et al.*,

           Respondents.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

22-cv-1761 (LAK)

# MEMORANDUM OPINION

Appearances:

> Gregg L. Weiner
> Andrew S. Todres
> Ethan R. Fitzgerald
> Daniel V. Ward
> ROPES & GRAY LLP
>
> Michael N. Ungar
> Katherine M. Poldneff
> Ashtyn N. Saltz
> David A. Landman
> UB GREENSFELDER
>
> *Attorneys for Petitioners*
>
> Lucila I. M. Hemmingsen
> SAGIANCE LLP
>
> Rodney Quinn Smith, II
> GST LLP
>
> *Attorneys for Respondents*

LEWIS A. KAPLAN, *District Judge.*

        Petitioners Telecom Business Solution, LLC, LATAM Towers, LLC, and AMLQ Holdings (Cay), Ltd. obtained a substantial monetary judgment against Respondents Terra Towers Corp. and TBS Management, S.A. Petitioners now move this Court to order Respondents to turnover their shares in Continental Towers LATAM Holdings, Ltd. ("the Company") in satisfaction

2

or partial satisfaction of the judgment.

*Facts*

The Court assumes familiarity with the underlying facts and procedural history. In sum, Petitioners entered into a shareholders agreement ("SHA") with Respondents in 2015 whereby they co-own and operate the Company, the business of which is the development and operation of telecommunications towers in Central and South America.[1] Respondents are the majority shareholders (owning roughly 55 percent of the Company) and Respondents are the minority shareholders (owning the remaining roughly 45 percent).[2] Under the SHA, either set of shareholders was entitled to force a sale of the Company after five years.[3] Petitioners initiated that process in November 2020, but Respondents balked.[4] Petitioners responded by commencing an arbitration before a three-arbitrator panel (the "Tribunal") in New York.

The Tribunal issued five partial final awards between 2022 and 2025, all of which the Court has confirmed. The first partial final award ("1stFPA") found Respondents to have breached the SHA and ordered specific performance of the sale requirement.[5] The next two awards addressed assorted misconduct by Respondents and others acting in concert with them. In the second award, the Tribunal sanctioned Respondents for presenting the Tribunal and the Company's

---

[1] Dkt 9-22 at ¶ 1.

[2] *Id.*

[3] Dkt 497-1 at § 5.04(b).

[4] Dkt 9-22 at ¶¶ 10-17.

[5] *Id.* at ¶ 72. The Tribunal also awarded Petitioners certain attorneys fees and expenses. *Id.*

3

Board of Directors with "a false narrative of misconduct and criminality" by the Company's chief executive and chief operating officers.[6]  And in the third award, the Tribunal determined that Respondents had "supported, if not instigated," improper foreign arbitrations that were likely to "harm[] both the prospects of a sale, and the price obtainable, in ways that cannot be adequately measured."[7]  The fourth award then granted Petitioners certain attorneys's fees and costs.[8]

Particularly relevant here is the firth partial final award ("5thPFA"). After determining that none of its prior awards had been compiled with "in any respect,"[9] the Tribunal found Respondents jointly and severally liable for slightly more than $300 million in damages, plus compounding interest.[10]  As a precautionary measure, the award requires the proceeds from any Company sale to be placed in escrow to ensure Petitioners can recover (at least some of) their damages.[11]

Respondents have paid no damages in satisfaction of the 5thFPA, despite receiving multiple demands from Petitioners.[12]  Meanwhile, the sale process is back to square one after

---

[6] Dkt 94-103 at ¶ 9.

[7] Dkt 272-27 at ¶¶ 71, 99.

[8] Dkt 272-28.

[9] Dkt 500-1 at ¶ 1.

[10] *Id.* at Award ¶ 18.  The award separately directed Respondents to deposit nearly $54 million—and to cause the Company to deposit another $480,000 per month—into escrow accounts as an equitable remedy.  *Id.* at Award ¶ 8.  The accounts sat empty at the end of November 2025.  Dkt 497-15.

[11] *Id.* at ¶ 67.

[12] Dkt 500-2 at ¶ 3; Dkt 500-3; Dkt 500-4; Dkt 500-5.

4

Respondents unilaterally rejected the highest bidder's offer and induced the investment bank managing the process to terminate its contract.[13] Accordingly, on December 4, 2025, Petitioners filed a motion for a turnover order directing Respondents to transfer all their shares in the Company to Petitioners in satisfaction of their damages under the 5thPFA.[14]

## *Discussion*

I.  *Legal Background*

Federal Rule of Civil Procedure 69(a) provides that "[t]he procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies."[15] The relevant law therefore is the New York C.P.L.R., which provides that a money judgment generally may be enforced "against any property which could be assigned or transferred."[16] Against that backdrop, Section 5225(a) of the C.P.L.R. states:

> "Upon motion of the judgment creditor, upon notice to the judgment debtor, where it is shown that the judgment debtor is in possession or custody of money or other personal property in which he has an interest, the court shall order that the judgment debtor pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor and, if the amount to be so paid is insufficient to satisfy the judgment, to deliver any other personal property, or so much of it as is of sufficient value to satisfy the judgment, to a designated sheriff."[17]

---

[13] Dkt 497-11 at 1-2; Dkt 516-1 at 1.

[14] Dkt 498.

[15] Fed. R. Civ. P. 69(a)(1).

[16] N.Y. C.P.L.R. § 5201(b).

[17] *Id.* § 5225(a).

The above states the default rule. Under Section 5240, a court may, on its own initiative or at the request of any interested person, "make an order denying, limiting, conditioning, regulating, extending or modifying the use of any enforcement procedure."[18] This provision gives a court "broad discretion[]" to alter any enforcement procedure[19] and "substantial authority to order equitable relief."[20]

## II. Analysis

Respondents do not contest that their roughly 55 percent stake in the company (the "Shares") constitutes assignable or transferrable personal property in their possession.[21] That is no surprise, as the record clearly establishes that Respondents own and control the Shares,[22] and Petitioners cite numerous cases in which courts have ordered the turnover of corporate stock (including in foreign entities) under Section 5225.[23] Although a court must order the turnover of

---

[18] N.Y. C.P.L.R. § 5240.

[19] *Sirotkin v. Jordan, LLC*, 141 A.D.3d 670, 672, 35 N.Y.S.3d 443 (2d Dep't 2016).

[20] *Distressed Holdings, LLC v. Ehrler*, 113 A.D.3d 111, 120, 976 N.Y.S.2d 517 (2d Dep't 2013).

[21] Respondents only argument that (indirectly) touches on those elements is their contention that they "do not own and cannot turnover" the ability to record a transfer of shares in the Company's books, a task that is entrusted to the Board of Directors (the "Board"). Dkt 511 at 7. Respondents do not explain why the Board might refuse to record a transfer. Furthermore, the Court and the Tribunal both previously have recognized that the Board members appointed by Respondents act at their direction. Dkt 9-22 at ¶ 72(ii); Dkt 295 at 46. Accordingly, the Court is empowered to order Respondents to cause its Board members to take any and all actions necessary to effectuate the turnover.

[22] Dkt 272-20 at 18; Dkt 500-6 at 4; Dkt 500-7 at 4; Dkt 511 at 8.

[23] *See, e.g.*, *Kaplan v. Kaplan*, 174 A.D.3d 691, 694, 174 N.Y.S.3d 102 (2d Dep't 2019); *Koehler v. Bank of Bermuda Ltd.*, 557 F.3d 497, 499 (2d Cir. 2009); *Gryphon Domestic VI,*

6

money before anything else, Respondents have none: the Shares are their only asset.[24] When Section 5225's requirements are met, as they are here, the court "shall" order the turnover of property.[25]

But turnover to whom? Ordinarily, the judgment debtor is to deliver the property to a sheriff for sale at a public auction.[26] But Petitioners argue that the Court should exercise its discretion to alter that procedure here. Courts have recognized that a sheriff's sale is a poor fit for intangible property that lacks a ready market and could likely be sold at a private sale for a substantially higher price.[27] And although receivership is an option in those circumstances, some courts have ordered a direct turnover to the judgment creditor where the value of the property is uncertain and the judgment debtor has attempted to frustrate efforts to execute the judgment.[28]

The Court agrees with Petitioners that a direct turnover is appropriate here. A direct turnover will allow Petitioners to pursue a private sale of the Company that would satisfy the 1stFPA and likely generate a substantially higher return than a sheriff's sale of Respondents' Shares. Furthermore, Petitioners remain bound by the 1stFPA and 5thFPA, making a pre-turnover appraisal

---

*LLC v. APP Int'l Fin. Co., B.V.*, 41 A.D.3d 25, 39, 836 N.Y.S.2d 4 (1st Dep't 2007).

[24] Dkt 500-6 at 4; Dkt 500-7 at 4; Dkt 511 at 8.

[25] N.Y. C.P.L.R. § 5225(a).

[26] *Id.* § 5233(a).

[27] *Hotel 71 Mezz Lender LLC v. Falor*, 14 N.Y.3d 303, 318, 900 N.Y.S.2d 698 (2010); *Freeman v. Giuliani*, No. 24-mc-353, 2024 WL 4546883, at *3 (S.D.N.Y. Oct. 22, 2024).

[28] *79 Madison LLC v. Ebrahimzadeh*, 203 A.D.3d 589, 590-91, 166 N.Y.S.3d 126 (1st Dep't 2022); *245 Park Member LLC v. HNA Grp. (Int'l) Co.*, 674 F. Supp. 3d 28, 41-42 (S.D.N.Y. 2023).

7

or a receivership unnecessary to protect Respondents' interests.  Consistent with the 1stFPA, any post-turnover sale process must comply with Section 5.04(b) of the SHA.[29]  Then, under the 5thPFA, all proceeds must be placed in escrow so that Respondents may receive their pro rata share (or what is left of it) after the arbitral judgments are satisfied.[30]  The Court therefore rejects the notion that a direct turnover would provide Petitioners with a windfall or otherwise alter past judgments.

Respondents' record of obstruction over the past nearly five years of litigation further demonstrates that a direct turnover is the most equitable remedy.  Respondents have falsely accused company executives of misconduct,[31] have supported improper foreign arbitrations likely to decrease the attractiveness of the Company,[32] and repeatedly have thwarted the sale process.[33]  This obstruction is likely to continue.  Respondents have little incentive to proceed with a sale because the $300 million damages award (plus interest) would significantly reduce, if not totally eliminate, their *pro rata* share.  Without a sale, meanwhile, Respondents likely would continue to "reap[] substantial profits" from the Company's relationship with affiliate DT Holdings, Inc., which the Company pays to manage its operations.[34]  A direct turnover would allow Petitioners to satisfy their judgment as quickly and efficiently as possible after years of delay.

---

[29] Dkt 9-22 at ¶ 72(iii).

[30] Dkt 500-1 at ¶ 67.

[31] Dkt 94-103 at ¶ 9.

[32] Dkt 272-27 at ¶¶ 71, 99.

[33] Dkt 295 at 30-32; Dkt 497-11 at 1-2; Dkt 516-2 at 5-6.

[34] Dkt 484 at 8.

***Conclusion***

For the foregoing reasons, Petitioners' motion for a turnover order (Dkt 498) is granted. A separate order will follow.

SO ORDERED.

Dated: January 21, 2026

                                                      Lewis A. Kaplan
                                            United States District Judge