USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 05/07/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TELECOM BUSINESS SOLUTION, LLC, *et al.*,

        Petitioners,

        -against-

TERRA TOWERS CORP., *et al.*,

        Respondents.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

22-cv-1761 (LAK)

# OPINION GRANTING IN PART
# CIVIL CONTEMPT MOTIONS

Appearances:

> Gregg L. Weiner
> Andrew S. Todres
> Ethan R. Fitzgerald
> Daniel V. Ward
> ROPES & GRAY LLP
>
> *Attorneys for Petitioner AMLQ Holdings (Cay), Ltd.*
>
> Michael N. Ungar
> Katherine M. Poldneff
> Ashtyn N. Saltz
> David A. Landman
> UB GREENSFELDER
>
> Joon H. Kim
> Rahul Mukhi
> CLEARLY GOTTLIEB STEEN & HAMILTON LLP
>
> *Attorneys for Petitioners Telecom Business Solution,*
> *LLC and LATAM Towers, LLC*
>
> Lucila I. M. Hemmingsen
> SAGIANCE LLP
>
> Rodney Quinn Smith, II
> GST LLP
>
> *Attorneys for Respondents*

*Table of Contents*

*Facts* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*
    I.      *The Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*
          A.    *Petitioners – The Minority Investors* . . . . . . . . . . . . . . . . . . . . . . . . . *2*
          B.    *Respondents – The Recalcitrant Majority Owners* . . . . . . . . . . . . . . . . *3*
    II.     *The Investment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *5*
          A.    *Shareholders Agreement.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*
          B.    *Development Agreement and EPC Contract* . . . . . . . . . . . . . . . . . . . *8*
    III.    *The Arbitration* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *10*
          A.    *First Partial Final Award – Specific Performance* . . . . . . . . . . . . . . . . *10*
          B.    *Second Partial Final Award - Respondents Seize Control* . . . . . . . . . . . *11*
          C.    *Third Partial Final Award - The Foreign Litigation Campaign* . . . . . . *14*
              i.     *The 3dPFA* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *14*
              ii.    *Subsequent anti-suit injunctions* . . . . . . . . . . . . . . . . . . . . . . . *15*
          D.    *Fourth Partial Final Award* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *17*
          E.    *Fifth Partial Final Award – Damages Judgment* . . . . . . . . . . . . . . . . . . *17*
              i.     *Further obstruction of the sale process* . . . . . . . . . . . . . . . . . . . *17*
               ii.    *Compensatory damages award.* . . . . . . . . . . . . . . . . . . . . . . . . *19*
              iii.   *Respondents' misappropriation of DTH's monthly fee* . . . . . . . . *19*
              iv.   *Unauthorized tower construction* . . . . . . . . . . . . . . . . . . . . . . . *20*
               v.    *Failure to honor offset right.* . . . . . . . . . . . . . . . . . . . . . . . . . *21*
              vi.   *Liability of Hernandez and DTH* . . . . . . . . . . . . . . . . . . . . . . *22*
              vii.   *Punitive damages* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *24*
              viii.  *Respondents fail to satisfy 5thPFA* . . . . . . . . . . . . . . . . . . . . . *25*
          F.    *Final Award* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *25*
    II.     *The 2025 "Potemkin" Sale Process* . . . . . . . . . . . . . . . . . . . . . . . . . . *26*
          A.    *Terra and Hernandez Held in Contempt in April 2025* . . . . . . . . . . . *26*
          B.    *Santander's Hiring* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *26*
          C.    *Solicitation of Non-Binding Offers* . . . . . . . . . . . . . . . . . . . . . . . . *27*
          D.    *Terra's Rejection of the Leading Offer.* . . . . . . . . . . . . . . . . . . . . . *28*
          E.    *Santander Terminates Its Engagement* . . . . . . . . . . . . . . . . . . . . . *31*
    II.     *The Turnover Order* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *33*
          A.    *Hernandez-linked California property* . . . . . . . . . . . . . . . . . . . . . . *33*
          B.    *Turnover of Shares Granted* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *35*
          C.    *Terra Fails to Comply.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *36*
          D.    *Terra's Excuses for Non-Compliance.* . . . . . . . . . . . . . . . . . . . . . . *37*
              i.     *Director vacancies* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *37*
              ii.    *The purported legal opinions concerning El Salvador and*
                      *Guatemala.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *39*
                    1.    *Guatemala Opinion.* . . . . . . . . . . . . . . . . . . . . . . . . . . *40*
                  2.    *El Salvador Opinion* . . . . . . . . . . . . . . . . . . . . . . . . . . *42*

*Discussion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *44*
    I.      *Civil Contempt of the 1stPFA* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *45*
          A.    *Terra* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *45*
          B.    *Hernandez.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *48*
          C.    *DTH.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *54*
    II.     *Civil Contempt of the Turnover Order* . . . . . . . . . . . . . . . . . . . . . . . . . *54*

        A.     *Terra* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *54*

        B.     *Hernandez* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *59*

        C.     *DTH.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *59*

   *III.*    *Remedy* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *60*

*Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *62*

LEWIS A. KAPLAN, *District Judge.*

About a decade ago, the petitioners in this litigation – three entities affiliated with American financial firms – invested scores of millions of dollars to acquire 45 percent of the shares of a private, foreign company that builds and operates telecommunications towers in Central and South America. A shareholders agreement included several carefully bargained-for provisions to safeguard their investment. One was the right to force a sale of the company following a five-year lockup period. Another was an arbitration agreement enforceable in U.S. and, in theory, foreign courts under the so-called New York Convention.

The petitioners initiated that sale process more than five years ago, but no sale has occurred. The majority shareholders (respondents here) have thwarted a sale at every turn, rather than comply with their contractual obligations. This opinion addresses the two most recent instances of misconduct by the majority shareholders and the person who controls them, Jorge Hernandez.

First, these respondents yet again are in contempt of this Court's judgment requiring specific performance of the sale provision. The Court previously held them in contempt of that judgment for effectively preventing the hiring of an investment bank to commence and manage the sale process. Facing those sanctions, the majority shareholders pretended to relent and agreed to hire a bank in June 2025. But the pretextual nature of that agreement soon was exposed, as they went on to induce that bank to terminate its engagement at the end of last year, halting an otherwise promising sale process.

Second, the majority shareholders and Hernandez are in contempt of this Court's subsequent order requiring them to transfer their shares in the company to the petitioners in partial or full satisfaction of the more than $300 million in damages that respondents owe petitioners on a separate but related judgment of this Court. The terms of the order requiring the transfer of shares

2

could not have been more clear.  Nonetheless, the majority shareholders, controlled by Hernandez, continuously have flouted it.

This defiance of this Court's decisions demands appropriate remedies.  Perhaps more important, that defiance, if permitted to stand, will undercut severely the ability of the New York Convention — a 1958 U.N. treaty with over 170 state parties, including the United States – to provide a safe, secure, and effective means of resolving international business disputes.

### *Facts*[1]

I.     *The Parties*

A.     *Petitioners – The Minority Investors*

The petitioners in this case – i.e., the 45 percent minority shareholders of Continental Towers LATAM Holdings, Ltd. ("Continental" or the "Company") – are Telecom Business Solution, LLC and LATAM Towers, LLC (collectively, "Peppertree"), and the Cayman Islands entity AMLQ Holdings (Cay), Ltd. ("AMLQ," and collectively with Peppertree, "Petitioners").  The Peppertree entities are controlled by the Ohio-based private equity firm Peppertree Capital Management, Inc.,[2] and AMLQ is an affiliate of Goldman Sachs.[3]

---

[1]     Citations to page numbers in this opinion refer to the original, continuous pagination of the cited document if such pagination exists, and to the ECF page number in the document header if no such pagination exists

[2]     Dkt 173-53 at ¶ 14 n.3 [hereinafter "2dPFA"].

[3]     Dkt 497-2 at ¶ 2 [hereinafter "5thPFA"].

3

### B.    Respondents – The Recalcitrant Majority Owners

The majority shareholders of Continental are Terra Towers Corp. ("Terra Towers"), a British Virgin Islands company, and TBS Management, S.R.L. f/k/a TBS Management, S.A.[4] ("TBS" and, collectively with Terra Towers, "Terra"), a Panamanian company.[5] The Company pays an affiliate of Terra, DT Holdings, Inc. ("DTH"), to build towers and provide administrative overhead, including the services of DTH employees in Company management positions.[6] Terra and DTH have long been under the sole control of Jorge Hernandez ("Hernandez," and collectively with Terra and DTH, "Respondents").[7]

In a 2021 statement filed with the arbitral tribunal that heard this case, Hernandez, a man now in his mid-50's, described himself as an "Guatemalan entrepreneur involved in building telecommunications infrastructure and developing real estate and technology."[8] At the age of 19, following the death of his father in 1992, he took over his family's construction firm, which was very well known in the region, having built landmark projects such as the United States Embassy

---

[4]

TBS Management, S.A. is the entity referred to in the 2015 shareholders agreement and named as a party in this litigation and underlying arbitration. According to the parties, TBS Management, S.A. changed its corporate form under Panamanian law in 2016, such that it now exists as TBS Management, S.R.L. Dkt 562 at 1. The parties agree that the S.A. and S.R.L. entities "are one and the same for purposes of this action" and further state that "there is not, and has never been, any dispute that TBS SRL is a proper party to this action and bound by the Court's orders." *Id.* at 2.

[5]

Terra Towers owns approximately 46 percent of Continental shares while TBS owns approximately 8.5 percent. Dkt 272-18 at 14, 16.

[6]

Dkt 124 at 3-4; 5thPFA at ¶ 5.

[7]

*See, e.g.*, Dkt 414 at 7-9.

[8]

Dkt 180-7 at ¶ 2.

4

in Guatemala.[9]  Despite his youth, Hernandez "was the only one from [his] family who had sufficient knowledge of the business to take over the presidency of the company."[10] After taking the reins, Hernandez "transformed [his] father's business from a construction company into a development company that builds telecommunications infrastructure for telecommunications companies and other multinationals."[11]

Hernandez developed a business model whereby his company would use its local knowledge to identify and acquire appropriate sites, construct a telecommunications tower on the site, and then rent space on the towers to telecommunications firms.[12]  Terra Towers was formed in 2006 to develop such tower sites, and the Company – Continental Towers LATAM Holdings, Ltd. – was formed in 2008  "as Terra Towers' site-operating subsidiary to manage the leasing of space on acquired and/or constructed communications sites to telecommunications operators and tenants in other industries."[13]  In 2012, another Hernandez company, DTH, was formed to provide various services to the Company in exchange for compensation.[14]  Whatever the structure, however, it has been abundantly that it has been Hernandez who has controlled and driven this now international enterprise since he was 19 years of age.

---

[9]     *Id.* at ¶¶ 2-3.

[10]    *Id.* at ¶ 3.

[11]    *Id.*

[12]    *Id.*

[13]    Dkt 9-6 at 85 (¶ 23).

[14]    *Id.* at 86 (¶ 25).

5

To be sure, once the dispute between these parties developed, Hernandez has attempted progressively (1) to deny any ownership interest in Terra, DTH and affiliates, (2) to distance himself (a) from formal authority to effect or require a sale of Continental, which he opposes, (b) from the risk of personal liability, and (c) from formal ownership of millions of dollars of U.S. assets against which the $300 million judgment could be at least partially enforced. But his efforts have not obscured the reality. Jorge Hernandez has called the shots for all of the respondents and their affiliates since his father passed away. He is the ultimate source of power and control. And it is he that is responsible for the defiance of the arbitration awards and the judgments confirming them. The Tribunal repeatedly made findings on the basis of substantial evidence that Hernandez has sole control over the responding companies, and notwithstanding Hernandez's insistence that he now controls nothing and is little more than a casual observer, this Court concurs.

II.    *The Investment*

In 2015, Petitioners invested a very substantial sum into Hernandez's tower-building operation. To secure that influx of cash, the Hernandez entities executed a series of agreements with Petitioners that gave the new investors a significant role in the Company. Among those contracts were a shareholders agreement ("SHA"), a development agreement ("Development Agreement"), and an engineering, procurement and management contract ("EPC Contract").

The various agreements established that the Company's business model was to develop, acquire, own, and operate telecommunications towers in Costa Rica, El Salvador, Guatemala, Honduras, Nicaragua, Panama, Colombia, Peru, and potentially other jurisdictions.[15]

---

[15] Dkt 497-1 at 15; Dkt 94-2 at 1.

6

That was to be done both directly and indirectly through subsidiaries operating in those countries,[16] with the Company paying DTH to build towers and manage its day-to-day affairs.[17]

### A.    Shareholders Agreement

The SHA gave Terra and Peppertree each the authority to appoint (and remove) two members of the Company's four-member board of directors ("Board").[18]  Because the Board was empowered to act only by majority vote (with no mechanism for breaking a tie),[19] this arrangement gave each side essentially an equal say in the business – at least, as will be seen, on paper.   Each Board member serves also as a member of a "Development Committee," which is responsible for approving the development of new tower sites, as explained in more detail below.[20]  The SHA named Hernandez as the Board's initial chairman.[21]

A central feature of the SHA was its sale provision, which Terra – at Hernandez's direction – has refused to honor for more than five years now.   The provision gave either Terra or Peppertree the right to force a sale of the Company to a third party following a five-year lockup

---

[16]    Dkt 497-1 at 15.

[17]    Dkt 94-2 at 3; Dkt 272-3 at 3; *see* 5thPFA at ¶ 5.

[18]    Dkt 497-1 at 18.  AMLQ was given the authority to point a Board observer. *Id.*

[19]    *Id.* at 19-20.

[20]    *Id.* at 23-24.

[21]    *Id.* at 19.

period.[22]  Specifically, Section 5.04(b) of the SHA requires, upon such request, "a sale of all or substantially all of the Company's assets or all or substantially all of the Shares in the Company (in one or more transactions) to an unaffiliated Third Party Purchaser."[23]  It further requires the shareholders to hire an investment bank to facilitate a sale, to "vote for, consent to and raise no objections against" such a sale, and to "take all necessary and reasonable actions in connection with the consummation of" the sale.[24]

Hernandez was so central to the deal struck among Petitioners, Terra, and the Company that the SHA references him by name multiple times.  For example, the five-year lock-up period mentioned above would have terminated (leaving Peppertree free to demand a sale at any time) if Hernandez had transferred "his shares in either of" Terra Towers or TBS to any person other than certain permitted transferees (generally, close family members).[25]  The lock-up period would have ended also if Hernandez had died or become permanently disabled without a Board-approved "succession plan" in place or without the shareholders otherwise reaching "an agreement with his heirs and/or the Company's Management Team regarding the continued operation of the Company."[26]  In addition, the SHA specifies that Hernandez is allowed to "transfer his shares in [Terra Towers and TBS]" to such permitted transferees at any time without violating the

---

[22]   *Id.* at 28-29.

[23]   *Id.* at 29.

[24]   *Id.*

[25]   *Id.* at 28-29; *see id.* at 7, 10.

[26]   *Id.* at 29.

8

agreement.[27]  As these references make clear, Hernandez owned and controlled Terra Towers and TBS at the time that Petitioners invested in the Company.  Hernandez signed the SHA on behalf of the Company and Terra Towers, as a director of each.

### B.    Development Agreement and EPC Contract

The Development Agreement and EPC Contract established the process by which the Company acquires and develops new tower sites.  Under the Development Agreement, Terra is responsible for identifying new towers sites within the Company's territory of operations and presenting a "Site Candidate Profile" with all pertinent information to the Development Committee.[28]  The Committee – again, having the same equally divided composition as the Board – must then accept or reject the proposed site.[29]  If the Committee rejects a site, Terra or any of its affiliates "may acquire and/or develop the Proposed Site at their cost and without the participation of the Company."[30]

A central player in the Company's development of new towers is DTH, the tower-construction firm that repeatedly has been found throughout this litigation to be under Hernandez's sole control.  Under the Development Agreement and EPC Contract, DTH is responsible for developing tower sites approved by the Development Committee and for providing office space and

---

[27]    *Id.* at 26.

[28]    Dkt 94-2 at 1-2.

[29]    *Id.* at 2.

[30]    *Id.*

"other necessary and appropriate items for the 'back-office' activities of the Company" and its subsidiaries,[31] including the service of DTH employees in Company management positions.[32] DTH receives a $480,000 monthly fee for providing those services.[33] On top of that, the Company pays DTH and its local subsidiaries up to $175,000 for every new tower site that the Development Committee approves.[34] As these terms make clear, the Company's current business model provides significant financial benefits to DTH – a state of affairs that could be jeopardized if the Company were to come under new ownership.[35]

The EPC Contract included protections for the Company in the event that DTH failed to deliver tower sites in a timely manner. Specifically, the Company is entitled to credit its payments to DTH for failed or late projects against the amount that the Company otherwise would owe DTH for new projects.[36] The parties refer to this as the Company's "Offset Right."

---

[31]    *Id.* at 3.

[32]    5thPFA at ¶ 5.

[33]    Dkt 92-2 at 3. The Development Agreement set the monthly fee at $400,000, but the parties later increased it to $480,000. 5thPFA at ¶ 166.

[34]    Dkt 272-3 at 3.

[35]    *See* Dkt 484 at 8; 5thPFA at ¶ 73.

[36]    Dkt 272-3 at 4.

10

III.   *The Arbitration*

Under each of the agreements discussed above, the parties agreed to resolve all disputes by binding arbitration in New York.  Petitioners commenced such an arbitration in February 2021, and three-arbitrator panel (the "Tribunal") has since issued five partial final awards and one final award.

Shortly after Petitioners initiated the arbitration, Hernandez appeared on a podcast in which he declared that he was prepared to "fight back" against anyone who would try to "take away our company."[37]  As demonstrated in detail below, Hernandez has kept that promise.

A.   *First Partial Final Award – Specific Performance*

In November 2020, two weeks after the expiration of the five-year lock-up period, Peppertree attempted to initiate the sale process.[38]  Peppertree first proposed a sale to a specific entity from which Peppertree already had obtained a purchase offer.[39]  Terra rejected that proposal, triggering the SHA's requirement that the Company retain an investment bank to facilitate a sale on the open market.[40]  Peppertree demanded that the Company proceed in that process, but Terra refused to go along and instead sought to buy out Petitioners' shares.[41]

---

[37]   Dkt 369-3 at 16 ("[W]e have been very careful and we're not afraid to fight back if someone wants to take away our company because we are very passionate."); *see* 5thPFA at ¶ 179.

[38]   Dkt 9-22 at ¶ 10 [hereinafter "1stPFA"].

[39]   *Id.*

[40]   *Id.* at ¶ 11.

[41]   *Id.* at ¶¶ 14-17.

11

The First Partial Final Award ("1stFPA"), issued in February 2022, found that Terra had breached the SHA by refusing to hire an investment bank upon Peppertree's request and ordered specific performance by Terra of the sale requirement.[42]  The award, confirmed as a judgment by this Court in January 2023,[43] required Terra to cause its members of Board to approve the hiring of an investment bank proposed by Peppertree and provided that a sale of the Company "shall proceed . . . pursuant to Section 5.04(b) of the SHA as construed in this Partial Final Award."[44]

B.    *Second Partial Final Award - Respondents Seize Control*

The Second Partial Final Award ("2dPFA"), issued in August 2022 and confirmed by this Court in February 2024,[45] chronicled "a multi-faceted effort" by Respondents to present the Tribunal and the Company's board of directors with "a false narrative of misconduct and criminality" by the Company's CEO, Jorge Gaitán, and COO, Carol Echeverría, both DTH employees.[46]  In short, the Tribunal, after hearing testimony, found as follows.

---

[42]

*Id.* at ¶ 72.

[43]

*Telecom Bus. Sol., LLC v. Terra Towers Corp.*, No. 22-cv-1761, 2023 WL 257915 (S.D.N.Y. Jan. 18, 2023), *aff'd*, No. 23-144, 2024 WL 446016 (2d Cir. Feb. 6, 2024).

[44]

*Id.* at ¶ 72(i)-(iii).

[45]

Dkt 207.  The Second Circuit affirmed this Court's confirmation of the 2ndPFA.  *Telecom Bus. Sol., LLC v. Terra Towers Corp.*, Nos. 23-7312, 24-513, 24-722, 24-749, 2025 WL 1177768 (2d Cir. Apr. 23, 2025).

[46]

2dPFA at ¶ 9.

12

In September 2021, Hernandez forced Gaitán and Echeverría from their positions for being insufficiently supportive of Respondents in the ongoing arbitration.[47]  Specifically, on September 27, 2021, Hernandez met with Gaitan at DTH's Guatemala City offices to register his displeasure with the Company's position in the arbitration – even though the shareholders previously had agreed that the Company should remain neutral.[48]  The next day, Hernandez demanded another meeting with Gaitán, Echeverría, and two other DTH employees, during which armed bodyguards under the direction and control of Hernandez secured the office building.[49]  Hernandez accused Gaitán of stealing Company and DTH property and ordered searches of his personal vehicle and workspace, neither of which identified any stolen property.[50]  Hernandez then forced Gaitán, Echeverría, and the two other DTH employees to turn over their computers so that all the information on them could be copied.[51]  The IT department did not finish backing up Gaitán's personal laptop until 10:30 p.m., "by which time Mr. Gaitán had been detained under fear of physical restraint by armed guards for more than seven hours."[52]

Hernandez's bad-faith campaign against Gaitán and Echeverría ultimately culminated in the filing of unfounded criminal complaints against them in Guatemala in December 2021 and

---

[47]    *Id.* at ¶ 78(1).

[48]    *Id.* at ¶ 78(2)(a).

[49]    *Id.* at ¶¶ 78(2)(d), (e).

[50]    *Id.* at ¶¶ 78(2)(f), (g).

[51]    *Id.* at ¶ 78(2)(h).

[52]    *Id.*

13

January 2022.[53] Respondents later invoked those criminal cases as a ground for noncompliance with an interim order from the Tribunal that required Gaitán and Echeverría to be restored to their posts.[54] As the Tribunal thoroughly detailed, the filing of these complaints was "an entirely pretextual effort to manufacture false evidence of criminality on the part of Mr. Gaitán and Ms. Echeverría for the specific purpose of deploying that false evidence of criminality to Respondents' tactical advantage in this arbitration."[55]

Respondents went so far as to present the Tribunal with a legal opinion in support of their position by a large United States law firm, Morrison & Foerster, that Respondents obtained by materially misleading the authoring firm.[56] The memorandum, as solicited by Respondents, concerned the suitability of Gaitán to retain the role of compliance officer for the Company in light of misconduct allegations against him.[57] Respondents, however, made various material omissions and affirmative misstatements that – as revealed through testimony by one of Morrison & Foerster's partners – left the firm woefully misinformed as to the relevant facts.[58]

Hernandez provided written statements to the Tribunal concerning these events but refused to provide live testimony subject to cross examination, despite having been ordered to do

---

[53]     *Id.* at ¶ 9.

[54]     *Id.* at ¶¶ 9, 81-82, 85.

[55]     *Id.* at ¶ 85.

[56]     *Id.* at ¶¶ 90-104.

[57]     *Id.* at ¶ 90.

[58]     *Id.* at ¶¶ 97-98, 101, 104.

14

so by the Tribunal.[59]  Gaitán  and Echeverría both provided live testimony.  Respondents declined to cross examine either of them, and the Tribunal found their testimony to have been highly credible.[60]

As a sanction for this misconduct by Respondents, the 2dPFA stayed Terra's counterclaims in the arbitration until such time as compliance with the Tribunal's prior orders was demonstrated.[61]

### C.    Third Partial Final Award - The Foreign Litigation Campaign

#### i.    The 3dPFA

The Third Partial Final Award ("3dPFA"), issued in February 2023 and confirmed by this Court in September 2023,[62] addressed Respondents' attempts to undermine the authority of the Tribunal and harm the prospects of a sale by supporting improper litigations throughout the territory in which the Company operates.  Shortly after the Tribunal stayed Terra's arbitration counterclaims, the Company's subsidiaries in Peru and Guatemala initiated separate arbitrations in those countries that sought the adjudication of similar claims.[63]  The 3dPFA determined that

---

[59]  *Id.* at ¶ 85(4).

[60]  *Id.* at ¶¶ 42, 62, 85(2).

[61]  *Id.* at Award ¶¶ 1-5.

[62]  *Telecom Bus. Sol., LLC v. Terra Towers Corp.*, No. 22-cv-1761, 2023 WL 5748199 (S.D.N.Y. Sept. 6, 2023), *aff'd*, Nos. 23-7312, 24-513, 24-722, 24-749, 2025 WL 1177768 (2d Cir. Apr. 23, 2025).

[63]  Dkt 272-27 at ¶¶ 2, 5 [hereinafter "3dPFA"].

15

Respondents had "supported, if not instigated," these improper foreign arbitrations, which were likely to "harm[] both the prospects of a sale, and the price obtainable, in ways that cannot be adequately measured."[64]  The Tribunal therefore ordered Respondents to cause the termination of those arbitrations and to prevent the filing of any similar proceedings.[65]

### ii.    Subsequent anti-suit injunctions

Neither the 3dPFA nor this Court's confirmation of it dissuaded Respondents from obstructing that award and judgment.  Rather, Respondents continued to support improper foreign litigation seemingly designed to decrease the attractiveness of the Company to prospective buyers – all in violation of the forum-selection provisions of parties' contracts.

In February 2024, this Court issued an anti-suit injunction against a lawsuit brought by Respondents' agent, John Francisco Quisquinay ("Quisquiany"), in the British Virgin Islands. The action sought a declaration as to the identity of the Company's CEO, even though the Tribunal had already declared Gaitán to be the rightful CEO in the 2dPFA.[66]

In April 2025, the Court issued another anti-suit injunction against three additional civil actions.[67]  First, the Company's Peru subsidiaries, via the DTH managers for Peru, had petitioned in the British Virgin Islands to confirm an arbitration award issued in connection with the

---

[64]    *Id.* at ¶¶ 71, 99.

[65]    *Id.* at Award ¶¶ 1-4.

[66]    Dkt 209 at 3-4.

[67]    Dkt 295 at 44-48.

16

Peruvian arbitration that the 3rdPFA had ordered terminated.[68]  Second, the Company's El Salvador subsidiary, via the DTH manager in El Salvador, had brought a civil action that resulted in the El Salvador Supreme Court issuing a resolution that purported to enjoin Petitioners from demanding compliance with the Tribunal's first four partial awards.[69]  Finally, the Company's El Salvador subsidiary,[70] via its DTH manager, had petitioned in the British Virgin Islands to confirm an arbitration award stemming from claims that the Company had failed to allocate sufficient resources to El Salvador subsidiary.[71]  In addition to enjoining these actions, the Court determined that Respondents and certain non-parties were in contempt of the 3rdPFA for pursuing them.[72] Hernandez, Terra, DTH, and the third parties have yet to purge that contempt as to the El Salvador-related action in the British Virgin Islands.

The April 2025 opinion noted also (but declined to enjoin) the existence of ongoing criminal proceedings in El Salvador and Guatemala, including a criminal case in El Salvador against Gaitán and his father (also a DTH employee) that was initiated by a complaint filed by an affiliate of DTH.[73]

---

[68]

   *Id.* at 16.

[69]

   *Id.* at 20.

[70]

   The Company's Guatemala subsidiary also joined the action, asserting itself to be a partial owner of the El Salvador subsidiary.  Dkt 245-21 at 6.

[71]

   *Id.* at 22, 36.

[72]

   *Id.* at 47-48.

[73]

   *Id.* at 10-13, 25-26; *see also* Dkt 415 at 7-8, 11-15.

17

### D.    Fourth Partial Final Award

The Fourth Partial Final Award granted Petitioners certain attorneys fees and costs and was confirmed by the Court in February 2024.[74]

### E.    Fifth Partial Final Award – Damages Judgment

The Fifth Partial Final Award ("5thFPA"), issued in March 2025 and confirmed by the Court in August 2025,[75] is, in essence, a nearly 200-page treatise that painstakingly catalogues four years worth of misconduct by Respondents. Several aspects of the decision are worth summarizing in order to put Respondents' latest contumacious conduct in context.

### i.    Further obstruction of the sale process

In February 2023, roughly one year after the issuance of the 1stPFA, the Board passed a resolution agreeing to hire Citibank to manage the sale.[76] But Terra then refused to sign Citibank's engagement letter until the bank agreed to certain conditions, most notably a promise to distribute the proceeds of any sale to each shareholder immediately upon closing.[77]

---

[74] Dkt 272-28; *see* Dkt 202 (confirming); *Telecom Bus. Sol., LLC v. Terra Towers Corp.*, Nos. 23-7312, 24-513, 24-722, 24-749, 2025 WL 1177768 (2d Cir. Apr. 23, 2025) (affirming).

[75] *Telecom Bus. Sol., LLC v. Terra Towers Corp.*, No. 22-cv-1761, 2025 WL 2256683 (S.D.N.Y. Aug. 7, 2025), *appeal filed*, No. 25-2020 (2d Cir. Aug. 19, 2025).

[76] 5thPFA at ¶¶ 12, 15.

[77] *Id.* at ¶ 13.

18

In June 2023, Hernandez personally met with a representative of Citibank and made clear that Terra would not accept any provision requiring that the sale proceeds be placed in escrow.[78] Over the next months, Terra, through its then counsel,[79] insisted repeatedly that the 1stPFA, as confirmed by this Court, *required* the immediate distribution of proceeds, citing the Tribunal's statement that Terra was "entitled to its pro rata share of the sale proceeds, subject to any setoffs that may be established."[80] As the Tribunal explained in the 5thPFA, however, that statement had "a plain meaning that is the opposite of the meaning" that Terra's counsel assigned to it.[81]

The self-evident motivation for Terra's bad faith reading of the 1stPFA was, of course, to make it harder if not impossible for Petitioners to ever recover any damages awarded to them in connection with this dispute.[82] The Tribunal determined that Terra's obstruction of Citibank's engagement constituted a new breach of the SHA.[83]

---

[78] *Id.* at ¶ 17.

[79] Terra's counsel of record before this Court were not mentioned in the 5thPFA.

[80] *Id.* at ¶ 17.

[81] *Id.* at ¶ 18.

[82] *Id.* at ¶ 191.

[83] *Id.* at ¶¶ 18, 20-21.

19

### ii.    Compensatory damages award

After determining that none of its prior awards had been complied with "in any respect,"[84] the Tribunal awarded Petitioners roughly $275 million in compensatory damages.[85] Most of those damages – $185 million, plus another $61 million in pre-award interest – were attributable to the non-occurance of a Company sale.[86]  The Tribunal awarded also damages to reimburse Petitioners for various expenses that Respondents had caused them to incur, including expenses that the Company – under the *de facto* control of Hernandez – improperly had failed to pay itself.[87]  The Tribunal ordered further that the proceeds of any Company sale be placed into escrow so that Petitioners can satisfy their damages before Terra Towers and TBS are allowed to receive their share, if any, of the remaining proceeds.[88]

### iii.    Respondents' misappropriation of DTH's monthly fee

As noted above, the Company pays DTH $480,000 every month for selling, general and administrative costs ("SG&A").[89]  After Petitioners accused Respondents of misappropriating

---

84

*Id.* at Preamble ¶ 1.

85

*Id.* at Award ¶ 18.

86

*Id.* at Award ¶ 4.

87

*Id.* at ¶¶ 108-162, Award ¶¶ 5-7, 10-11.

88

*Id.* at ¶ 67, Award ¶ 9.

89

*Id.* at ¶ 166.

20

those funds, Respondents refused to respond to Petitioners' information requests.[90]  As a result, the

Tribunal drew an adverse that "some portion of the SG&A money has not been spent on SG&A but

instead has been put to uses the Respondents wish to conceal because they are not bona fide

Company SG&A."[91]  The 5thPFA ordered that Respondents cause the Company to pay the $480,000

monthly fee into an escrow account, from which DTH would be allowed to draw only by submitting

requests in writing.[92]

### iv.    Unauthorized tower construction

It was undisputed that, since the commencement of the arbitration, the Company had

spent more than $55 million developing at least 253 towers sites that had been rejected by the

Development Committee based on the opposition of the Peppertree-appointed members of that

committee.[93]  Although the Development Agreement gave Terra the right to develop rejected tower

sites at its own expense, "Terra, DTH and Mr. Hernandez all admit[ted] that instead of doing that,

the Company's money was used as if the rejected sites were approved sites, at the rate per site

[payable to DTH] of $175,000."[94]  The Tribunal explained that since September 2021 (when

Hernandez ousted the Company's legitimate CEO and COO), "'the realities' of the situation have

---

[90]  *Id.* at ¶ 91.

[91]  *Id.*

[92]  *Id.* at ¶ 93, Award ¶ 8(e).

[93]  *Id.* at ¶ 76.

[94]  *Id.*

21

been that Respondent Jorge Hernandez is the self-appointed *de facto* CEO of the Company despite his obvious conflicts of interest, and the CFO, Mr. Quisquinay, spends the Company's money as directed by Mr. Hernandez."[95]

The Tribunal ordered Respondents to pay $37 million plus interest – Petitioners share of the $55 million improperly spent on rejected sites – into an escrow account as a security for damages awarded by the Tribunal.[96]

### v.    *Failure to honor offset right*

As explained above, the EPC Contract gives the Company the right to offset payments to DTH for new tower sites based on the amounts paid to DTH for old tower sites that DTH failed to timely deliver.[97]  The Tribunal found that the Company had accumulated an offset credit of $6.58 million that had not been enforced against DTH.[98]  It therefore ordered Respondents to deposit $6.58 million plus interest into an escrow account so that such money could be used to fund future tower development.[99]

---

[95]      *Id.* at ¶ 73.

[96]      *Id.* at ¶ 85, Award ¶ 8(c).

[97]      *Id.* at ¶ 95.

[98]      *Id.* at ¶¶ 95-96, 107(1).

[99]      *Id.* at ¶¶ 107(1)-(4).

22

### vi.     *Liability of Hernandez and DTH*

The Tribunal next addressed Petitioners claims that Hernandez and DTH had tortiously interfered with their contractual rights.[100]  Although several individuals, including Hernandez, had been named as respondents in the arbitration from the outset, the Tribunal had postponed the adjudication of the claims against them until the 5thPFA.[101]

The Tribunal first determined that it had the authority to arbitrate this claim against Hernandez (even though Hernandez was not himself a party to the contracts among Petitioners, Terra, and DTH) on the theory of direct benefits estoppel, which applies where a non-signatory to an arbitration clause knowingly accepts benefits directly derived from the agreement.[102]  The Tribunal explained that (1) as the "sole owner of Terra," Hernandez received the benefits conferred on Terra a shareholder under the SHA, and (2) as "sole owner of DTH," Hernandez obtained the pecuniary benefit of the $400,000 per month fee (later increased to $480,000) that the Company pays to DTH, with "sole control over how that money was spent," as well as the power to select DTH employees to act as managers of the Company, with "sole power to terminate them from their DTH positions."[103]

---

[100]  *Id.* at ¶ 163.

[101]  *Id.*

[102]  *Id.* at ¶¶ 164, 168.

[103]  *Id.* at ¶¶ 165-67.  The Tribunal sustained objections as to jurisdiction filed by three other individual respondents who had served as Terra's appointed members of the Company's Board and dismissed the claims against them.  *Id.* at ¶ 169, Award ¶ 1.

23

Turning to the merits of the tortious interference claim, the Tribunal found that Hernandez had acted with malice in intentionally causing Terra to breach its agreements with Petitioners.[104]  The Tribunal concluded that Hernandez, whose conduct was attributable to DTH, at all times had acted solely from self-interest and not based on any reasonable concern about the economic welfare of the Company.[105]  Hernandez's actions were designed to (1) "maximize the revenue stream to DTH from the Company," (2) entrench his "*de facto* control over the Company," (3) "eviscerate" Petitioners' rights under the arbitration agreement by relitigating in other fora issues already decided by the Tribunal, and (4) ultimately make a third-party sale "effectively unachievable" so that Petitioners would have no choice but to accept a buyout on his terms.[106]

As a consequence, the Tribunal imposed the restrictions and obligations of its first four partial awards upon Hernandez personally and, to the extent they had not already been so imposed, upon DTH.[107]  Hernandez and DTH were held also jointly and severally liable for the damages awarded to Petitioners in the 5thPFA.[108]

---

[104] *Id.* at at ¶¶ 174, 176, 187, 193-194.

[105] *Id.* at ¶¶ 187, 191, 194.

[106] *Id.* at ¶ 194.

[107] *Id.* at Award ¶ 3(c).

[108] *Id.* at Award ¶ 3(a).

24

### vii.    Punitive damages

The Tribunal next concluded that Hernandez had engaged in "flagrantly improper conduct" throughout the course of the arbitration that justified an award of punitive damages on the tortious interference claim.[109]  The Tribunal detailed Hernandez's malfeasance over the course of more than 40 pages – from the ouster and legal harassment of Gaitán and Echeverría, to the fraudulent procurement of the Morrison & Foerster memorandum, to the publication of various news articles attacking the Tribunal and Petitioners, to the initiation of improper foreign litigation.[110]

The Tribunal explained that its confidence in Hernandez's responsibility for these acts was reinforced by "his absence from nearly all of the proceedings in this case as either a witness or a party representative."[111]  Hernandez prevented any Respondent-affiliated witness from testifying at the hearing that preceded the 2dPFA, sent proxies to the hearing that preceded the 5thPFA rather than appear personally, and submitted "self-serving declarations" from himself and his agents claiming that "they knew nothing and had no roles in this misconduct."[112]  The Tribunal was "strongly influenced to disbelieve perfunctory denials of involvement in malign activity by Parties like Mr. Hernandez who ask us to believe those denials but then refuse to submit to cross-

---

[109]    *Id.* at ¶ 202.

[110]    *Id.* at ¶¶ 206-73.

[111]    *Id.* at ¶ 275.

[112]    *Id.*

25

examination and refuse to produce any documents or comply with disclosure obligations so that the denials of involvement may be corroborated or disproved."[113]

The Tribunal imposed $25 million in punitive damages on Respondents jointly and severally.[114]

### viii.    Respondents fail to satisfy 5thPFA

In total, the 5thPFA awarded Petitioners roughly $300 million in damages and separately required Respondents to deposit nearly $54 million – and to cause the Company to deposit another $480,000 monthly – into escrow accounts as an equitable remedy for other breaches of the SHA.[115]    Respondents have not paid any of the damages that they owe, and the escrow accounts sat empty as of at least the end of November 2025.[116]

### F.    Final Award

The Tribunal issued its final award in November 2025, permanently enjoining Respondents from prosecuting Terra's counterclaims that were stayed by the 2dPFA.[117]  The parties have filed competing motions to vacate and confirm this award, which remain pending.

---

[113]    *Id.*

[114]    *Id.* at ¶ 281.

[115]    *Id.* at Award ¶¶ 8, 18.

[116]    Dkt 521 at 3; Dkt 497-15.

[117]    Dkt 531-16 at Award ¶ 1.

26

## II.    The 2025 "Potemkin" Sale Process

### A.    Terra and Hernandez Held in Contempt in April 2025

On April 22, 2025, the Court held Terra and Hernandez in civil contempt of its judgment confirming the 1stFPA based on the conduct by Terra and Hernandez (recounted above) that had effectively had prevented the engagement of Citibank[118] Finding this conduct contumacious of its judgment confirming the 1stPFA, the Court imposed coercive monetary sanctions on Terra and Hernandez if they did not cause the Company to hire an investment bank by June 9, 2025.[119]

### B.    Santander's Hiring

In early June 2025, Terra and Hernandez purportedly purged their contempt of the 1stPFA by causing the Company's Board to approve the engagement of the investment bank Santander Banca de Inversión Colombia S.A.S. ("Santander").[120] Specifically, the Board authorized the Company to hire Santander "as the Investment Bank that will facilitate the sale of the Company pursuant to Section 5.04(b) of the Shareholders Agreement."[121] The engagement letter, incorporated into the Board resolution by reference, defined the transaction that Santander was hired to oversee

[118]  Dkt 295 at 30-32, 39-41.  The Court subsequently vacated the April 22 opinion as to Hernandez after determining he had not been properly served.  Dkt 381 at 15; *see also* Dkt 387.  After due service on Hernandez, the Court again held him in contempt of the 1stFPA as of April 22 for substantially the same reasons as had been stated in the opinion of that date.  Dkt 414.

[119]  Dkt 295 at 31-32, 46.

[120]  Dkt 414 at 10-11; Dkt 371-1 at 1.

[121]  Dkt 371-1 at 1.

27

to include any sale or other disposition of "all or substantially all (measured by fair market value) of the assets or capital stock of the Company," whether "in one or a series of transactions."[122]  It contained also a provision explaining how Santander's fee would be calculated "[i]f less than all of the assets or equity securities of the Company [we]re acquired."[123]

### C.    Solicitation of Non-Binding Offers

After its hiring in June 2025, Santander proceeded to solicit non-binding offers from potential buyers in "Phase I" of the sale process.  Santander and Peppertree wished to advance one of the offers received (the "Leading NBO") – an offer that proposed excluding the Company's Colombian operations, which accounted for approximately 7 percent of the Company's total cash flow[124] – to "Phase II," in which the potential buyer would conduct due diligence and submit a binding offer.[125]  Santander recommended proceeding with the Leading NBO while exploring other options for the sale of the Colombian assets, such as "[r]e-engaging in conversations with certain local players . . . focused exclusively on the Colombian perimeter."[126]  It warned that it would be "counterproductive" to pause the sale process while searching for a buyer of the Colombian

---

[122]    *Id.* at 6.

[123]    *Id.*

[124]    Dkt 497-11 at 3; *see also* Dkt 516-2 at 6 (estimating the Colombian assets as comprising approximately 6 percent of total cash flow).

[125]    Dkt 497-11 at 6.

[126]    Dkt 516-2 at 6.

28

operations, explaining that "a more suitable solution for Colombia should be explored only once the process with [the Leading NBO] is well advanced."[127]

### D.    Terra's Rejection of the Leading Offer

On November 4, 2025, despite expressing concern that the Leading NBO did not "meet 100% of the mandate given to Santander," Terra purportedly agreed to grant that potential buyer "full access to the due diligence materials, as an invitation to present a *Firm Offer* subject to confirmatory due diligence."[128]  But Terra proposed withholding "an invitation to Phase 2" until the shareholders accepted a firm offer.[129]  In response, Santander recommended what it described as a compromise position between the two shareholder groups, whereby the potential buyer would be granted access to due diligence immediately and would be asked to provide an updated valuation of the Company, whether in the form of a firm offer or otherwise, within approximately eight weeks.[130]  Santander recommended against conditioning continuation of due diligence on the receipt of a revised offer acceptable to both shareholders.[131]

---

[127]    *Id.*

[128]    *Id.* at 1-2.  The communications described herein as being made by Terra were emails sent by Andrés Porras Castillo, who at the time was a member of the Company's Board of Directors appointed by Terra.  The emails were sent either "[o]n behalf of Class A shareholders" or "[o]n behalf of Class A shareholders' board members."  *E.g.*, Dkt 497-11 at 5; Dkt 516-2 at 2.  The Class A shareholders under the SHA are Terra Towers and TBS.

[129]    *Id.* at 2.

[130]    Dkt 516-3 at 8.

[131]    *Id.*

29

On November 7, however, Terra "formally reject[ed]" the Leading NBO.[132] It stated that the offer was too low and did not "meet the requirements of Santander's engagement, which [was] to pursue a sale of 100% of the Company's equity."[133]  Because the Leading NBO excluded Colombia, Terra complained that the Company "would have to transfer its Colombian operations out of the Company prior to closing or as a condition of closing," which would lower the Company's net worth and cause the sale "no longer [to] represent the sale of the same company that Santander was mandated to sell."[134]  According to Terra, the Board previously had instructed Santander that "the sale must be for 100% of the Company's equity."[135]  Selling less than all of the Company, Terra said, would "perpetuate[] a relationship that all shareholders agreed must end."[136]

As explained in more detail below, this purported reliance on the fact that the Leading NBO did not include the Colombian operations – accounting for only 7 percent of the Company's total cash flow – was entirely pretextual. The SHA requires a sale of all *or substantially all* of the Company, and Santander's engagement by the Company used nearly identical language. Moreover, as noted above, Santander proposed that the Company find a local buyer for its Colombian assets, such that 100 percent of the Company would, in fact, be sold in two transactions.

---

[132]    Dkt 497-11 at 5.

[133]    *Id.* at 4.

[134]    *Id.* at 5.

[135]    *Id.*

[136]    *Id.*

30

Santander responded the same day, explaining that Terra's communication "effectively pauses or terminates the sale process."[137]  Although two new prospective buyers recently had joined the process, the bank assessed "a low probability of them submitting an offer at a level that Class A shareholders [Terra] would consider satisfactory."[138]  Furthermore, Santander said that there were no other potential investors left to contact given that its previous solicitations "already [had] covered all investors . . . approved by both shareholders."[139]  "Please advise if you see any other way to move the process forward," Santander told Terra, "considering the rejection of all Santander-proposed alternatives."[140]

Terra responded on November 13 by doubling down on its previous contentions and inviting Santander to terminate its contract with the Company.  Terra again asserted – contrary to the flatly inconsistent terms of the SHA and the written engagement of Santander – that the sale of "100% of the Company's equity" was "an essential and non-negotiable condition expressly approved by the Board of Directors."[141]  Thus, according to Terra, the exclusion of the Colombian assets was "not a matter of the relative economic value of the Colombian [total cash flow]" but rather "one of principle and compliance."[142]  Terra had been led to believe by Santander's previous

---

[137] *Id.* at 4.

[138] *Id.*

[139] *Id.*

[140] *Id.*

[141] *Id.* at 1.

[142] *Id.*

31

representations "that Santander has reached the limit of its capacity to move the process forward."[143]

"Consequentially," Terra said, "the Class A shareholders [Terra] consider that the engagement can

on longer continue under these circumstances, and that Santander should proceed to terminate it, so

that the shareholders can engage another financial institution capable of fulfilling the approved sale

mandate in accordance with its objectives."[144]

Peppertree responded that it was "not in agreement with terminating Santander's

engagement to continue with the ongoing sale process of the Company" and saw "a path toward a

successful sale with the current bidder."[145]  It  pointed out that "[a] potential buyer of Colombia

would reasonably and expectedly come from th[e] pool of prospective parties already contacted by

Santander."[146]

E.      *Santander Terminates Its Engagement*

Notwithstanding Terra's November 13 email, Santander apparently proceeded over

the ensuing week to hold a sale-related meeting and to share its regular weekly report with the

shareholders.[147] This prompted Terra, on November 20, to ask Santander to clarify whether the bank

---

[143] *Id.* at 2.

[144] *Id.*

[145] Dkt 516-3 at 1.

[146] *Id.*

[147] *See* Dkt 510-1 at 1.

32

was still proceeding with the sale process and upon what grounds.[148]  It questioned whether Santander had revised its previous view that two recently identified investors were not likely to submit viable bids, noting that "alignment is essential for the continuation or termination of this process."[149]

On November 24, Santander emailed the shareholders to cancel that day's weekly call and to postpone indefinitely any future calls "considering the differing positions of each shareholder" and given that the bank was "currently unclear about the next steps."[150]  On December 3, Terra's counsel shared with Petitioner's counsel a message from Terra concluding that "the only logical next step is for [Santander] to terminate the engagement."[151]

On December 8, Santander terminated its engagement with the Company, citing the inability of the shareholders to reach agreement on any of the non-binding offers already received and the unlikelihood of obtaining any new offers capable of satisfying the conditions and expectations of both groups of shareholders.[152]

---

[148]    *Id.*

[149]    *Id.*

[150]    Dkt 510-2 at 1.

[151]    Dkt 497-16 at 3.

[152]    Dkt 516-1 at 5-6.

II.     *The Turnover Order*

As explained above, the 5thPFA, confirmed by a judgment of this Court, held Respondents jointly and severally liable to Petitioners for roughly $300 million in damages attributable to various breaches of the SHA, including the sale requirement, by Respondents.[153] Petitioners have attempted to collect on this judgment, thus far to no avail.

A.      *Hernandez-linked California property*

Petitioners first went after two business properties associated with Hernandez in Napa Valley, California, that Petitioners alleged recently had been listed for sale at $50 million and $65 million, respectively.[154] Petitioners sought an order requiring the turnover to them of all rights, title, and interests in the two limited liability companies that own the properties.[155]

Hernandez had been listed in official records as recently as April 2024 as the sole manager or member of LLCs that held title to the real estate and had signed an equipment finance agreement on behalf of one of the LLCs in August 2022 that identified him as a "member" of that LLC.[156] To no one's surprise, however, Hernandez submitted a declaration opposing Petitioners' motion in which he claimed that he (1) never had owned either LLC, (2) had not controlled or overseen the day-to-day activities of either LLC during the time that he served as sole manager of

---

[153]  5thPFA at Award ¶¶ 3-7, 10-13, 18.

[154]  Dkt 486 at 3.

[155]  *Id.* at 1.

[156]  *Id.* at 3-4.

34

each, and (3) had only a limited understanding of the operations of the LLCs.[157]  He claimed to have resigned as manager of both entities in June 2024.[158]

Hernandez's daughter, who succeeded him as manager of the LLCs according to April 2025 filings with the California secretary of state,[159] submitted a declaration stating that the entities both are owned by another LLC, which is owned by still another LLC, that in turn is beneficially owned by the "HF 2018 Dynasty Trust,"[160] a name rather suggestive in itself.  Because the record demonstrated that Hernandez did not *presently* own either LLC, the Court denied Petitioners' motion, explaining that under the applicable New York law Petitioners were required to proceed, if at all, against the owners of the LLCs.[161]

The two LLCs that were the subject of Petitioner's turnover motion are not the only California assets connected to Hernandez.  His son (and possibly other members of his nuclear family) resides or has resided on a 62.5-acre residential property in St. Helena, California,[162] where a process server once observed in the driveway a 2017 Maserati registered to Hernandez.[163]  In October 2025, Peppertree filed a lawsuit in California state court that accuses Hernandez of

---

[157]  Dkt 472-1 at ¶¶ 2-3, 6, 8-9, 12.

[158]  *Id.* at ¶¶ 2, 8.

[159]  Dkt 486 at 3.

[160]  *Id.* at 3-4.

[161]  *Id.* at 7-8.

[162]  Dkt 350-1; Dkt 350-2; Dkt 343-3 at 3.

[163]  Dkt 343-18; Dkt 343-23; *see also* Dkt 350-1; Dkt 350-2.

conspiring with his wife and children in order fraudulently to divest himself of formal ownership of the family's significant assets in the state, including winery and olive oil businesses.[164]

### B.    Turnover of Shares Granted

In early December 2025, Petitioners sought to enforce the 5thPFA by moving for an order requiring Terra Towers and TBS to transfer their shares in the Company to Petitioners.[165] The purpose of this request was to allow Petitioners to sell the Company and use the resulting proceeds to satisfy their damages.  Applying Federal Rule of Civil Procedure 69(a) and New York's procedures for enforcing money judgments, the Court granted the requested turnover order.[166]  A January 21, 2026, order directed Terra to "IMMEDIATELY turn over to Petitioners 100% of Terra's shares . . . in the Company" (the "Turnover Order").[167]  The Turnover Order further directed Terra and "all those in active concert and participation with Terra, including, without limitation, DT Holdings, Inc. and Jorge Hernandez," to "take any and all actions" necessary to effectuate the turnover and to "take no action" obstructing it.[168]  The Turnover Order gave Petitioners ten calendar

---

[164]    Dkt 475-3.

[165]    Dkts 498, 499.

[166]    *Telecom Bus. Sol., LLC v. Terra Towers Corp.*, No. 22-cv-1761, 2026 WL 161298, at *2-3 (S.D.N.Y. Jan. 21, 2026), *appeal filed*, No. 26-374 (2d Cir. Feb. 19, 2026).

[167]    Dkt 520 at 1.

[168]    *Id.* at 2.

36

days to provide Terra with signature documents necessary to effectuate the turnover of Terra's shares.[169] It then gave Terra three calendar days to execute and return those documents.[170]

### C. Terra Fails to Comply

Petitioners satisfied their obligations under the Turnover Order on January 31, 2026.[171] Terra never complied. On February 3, 2026, its counsel responded with a short letter explaining that Terra "cannot comply with the requests."[172] Counsel represented that the "sole director" of Terra Towers and TBS had resigned because of "a material conflict between the orders binding on him in the United States and other jurisdictions."[173] The letter said that Terra Towers and TBS were seeking a new director and could not then execute the documents demanded by Petitioners "due to the fact that they have no directors and can only act through their directors."[174]

Petitioners' counsel protested by email that there must be "at least one individual who can execute the transfer documents on Terra's behalf" given that someone evidently was providing instructions to Terra's counsel and seeking a new director for Terra.[175] They demanded that Terra's

---

[169] *Id.*

[170] *Id.*

[171] Dkt 537-1.

[172] Dkt 537-2 at 4.

[173] *Id.*

[174] *Id.*

[175] Dkt 537-3 at 1.

37

counsel identify "the person(s) instructing you to act on behalf of Terra" and to produce the "purported conflicting orders . . . that you now contend somehow restrict Terra, as a shareholder, from properly transferring its shares."[176]

Terra's counsel then doubled down. In a February 5 email, he argued that, under "Article 109(1) of the BVI Companies Act," "any actions taken by Terra or TBS must be done by a director."[177] He explained that "we" – presumably referring to himself and Terra's other counsel copied on the email – "were given instructions immediately prior to [the director's] resignation that cover the present exchanges" but "do not have the authority to appoint a director."[178] And he clarified that the director had resigned out of concern that complying with the Turnover Order would expose him to "criminal liability related to ongoing proceedings in El Salvador and Guatemala."[179]

### D.    Terra's Excuses for Non-Compliance

#### i.    Director vacancies

Despite their counsel's reference to a "sole" director,[180] Respondents now assert that Terra Towers and TBS each had two directors, José Alejandro Sagastume Figueroa ("Sagastume") and Andrés Porras Castillo ("Porras"), who until recently had served also as Terra's appointed

---

[176]    *Id.*

[177]    Dkt 537-4 at 1.

[178]    *Id.*

[179]    *Id.*

[180]    Dkt 537-2 at 4.

38

members of the Company's board.[181]  The record contains letters of resignation from Sagastume and Porras addressed to Terra, TBS, and the Company, each of which contends that the issuance of the Turnover Order had created an unacceptable level of civil and criminal liability for the directors personally.[182]

In reply, Petitioners assert that Porras "never had any position with TBS Management," and in any event, that the resignation of TBS's two directors – Sagastume and, according to Petitioners, Quisquiany – had not taken legal effect under Panamanian law by the date compliance with the Turnover Order had been required.[183]  These allegations are concerning to the extent that they contradict Terra's version of events.  But for the reasons explained below, Terra's contempt has been shown by clear and convincing evidence regardless of who TBS's directors are or were or when their resignations were legally effective.

Respondents claim that a Guatemalan attorney, Raul Pimentel Mata, has been retained by the "the shareholders" of Terra Towers and TBS to identify new directors for those entities.[184]  He allegedly contacted three people for those positions but upon "informing them of the legal situation of the companies arising from the arbitration and other processes," they each declined to accept an appointment out of fear that "they would be exposing themselves to legal risks that they

[181] Dkt 547 at 3.

[182] Dkts 549-1 to 549-8.

[183] Dkt 550 at 7; *see* Dkt 552 at 3-4.

[184] Dkt 549-14 at 1; *see also* Dkt 549-13.

39

do not wish to take."[185]   Terra Towers and TBS apparently are owned by Telecom Construction Panamerica Limited (BVI), which had two directors as of March 2.[186]

    *ii.   The purported legal opinions concerning El Salvador and Guatemala*

    Terra's counsel attached to his February 5 email to Petitioners' counsel one of the legal opinions pertaining to the alleged conflict between the Turnover Order and the foreign proceedings and followed up on February 9 with a second such opinion.[187]   Both opinions were in Spanish, but Respondents have submitted English translations.   Respondents assert without evidentiary support that "[t]he Directors sought" the opinions.[188]   The record does not otherwise demonstrate the circumstances that led to the opinions' issuances, such as what information, if any, the directors provided to the authoring attorneys beyond the questions apparently posed.

    Notably, as explained above, Respondents previously were found to have materially misled a law firm that authored a legal opinion that Respondents submitted as evidence to the Tribunal.[189]   Respondents then used that legal opinion in support of their position that DTH could not comply with an order requiring DTH to re-associate itself with the two Company executives

---

[185]  Dkt 549-14 at 1.

[186]  Dkt 511 at 4-5; Dkt 551 at 3; Dkt 551-1 at 1.

[187]  Dkt 537-4; Dkt 537-5.

[188]  Dkt 547 at 3-4.

[189]  Dkt 369-8 at ¶¶ 90-104.

40

whom Respondents had improperly ousted.[190]  That was so, according to Respondents, because "re-association with persons under criminal indictment would present" "unacceptable compliance risks."[191]  It turned out, however, that the facts supplied to the authoring law firm "were materially misleading by both omission and affirmative misstatement."[192]  With this history in mind, the Court turns now to the latest legal opinions offered by Respondents.

### 1.    *Guatemala Opinion*

The opinion purportedly written by a Guatemalan lawyer (the "Guatemala Opinion") does not identify or discuss any criminal or civil proceeding involving the Company or its affiliates.[193]  Nor does the opinion discuss the Turnover Order in any detail.  Rather, the opinion answers several highly general questions about financial restitution in criminal cases and hypothetical conflicts between a criminal order in Guatemala, if there were any, and a civil order issued abroad.

The opinion starts by explaining that "[p]ublic criminal proceedings in Guatemala consist of all procedures carried out to punish a crime" and further summarizing the criminal process.[194]  It then discusses the purposes and operation of a criminal code provision giving victims

---

[190]    *Id.* at ¶ 102.

[191]    *Id.*

[192]    *Id.* at ¶ 104.

[193]    *See* Dkt 549-10.

[194]    *Id.* at 1.

41

of a crime the ability to receive compensation, restitution, or other damages through the criminal case [195]  Next, the opinion describes the various "precautionary measures" that a judge in a criminal case can impose to ensure that funds remain available to compensate victims.[196]

With that background, the opinion then purports to answer two additional questions: (1) "What is the scenario of an order issued in a civil action within a criminal proceeding in Guatemala against a purely civil order issued by a judge in another country for the surrender of property?" and (2) "What is the responsibility of the director or directors with respect to an order from a US judge?"[197]

As to the first question, the opinion says that "priority is given to" the order issued by the Guatemalan judge, "which must be complied with."[198]  As to the second question, the opinion says that although "an arbitration order issued abroad may eventually be recognized by a Guatemalan judicial authority," criminal proceedings in Guatemala take priority and "the person who fails to comply with a criminal court order is personally liable and may in turn be punished as the perpetrator of contempt of court."[199]  But the Guatemala Opinion does not even identify any allegedly relevant Guatemalan criminal proceeding, much less any order issued in one.

---

[195]     *Id.* at 1-2.

[196]     *Id.* at 2-3.

[197]     *Id.* at 3.

[198]     *Id.*

[199]     *Id.* at 3; *see also id.* at 4 (discussing crime of "disobedience").

42

### 2.    El Salvador Opinion

The opinion purportedly written by a Salvadoran lawyer (the "El Salvador Opinion") is similar in many respects.[200]  It speaks primarily in broad generalizations and provides background on the financial restitution procedures available in criminal cases.[201]  It purports to explain also the difference between a Salvadoran court order and a United States court order and describes how a foreign arbitral award must be confirmed in El Salvador before it has effect.[202]  Unlike the Guatemala Opinion, however, the El Salvador Opinion identifies a specific order in a criminal case that is supposedly pending before a court in El Salvador.

According to the opinion, Salvadoran prosecutors have brought "criminal proceedings for fraud" against Gaitán, the CEO of the Company whose purported firing was chronicled by the 2dPFA, and his father, Jorge Alberto Gaitán Paredes,[203] who Petitioners report recently died in custody.[204]  The opinion explains that a Salvadoran judge has the authority to order certain precautionary measures to ensure that compensation ultimately will be available for victims of an alleged crime.[205]  Consistent with that authority, a judge in the identified case apparently has appointed "an auditor with cash responsibilities" to manage the finances of "Continental Towers El

---

[200]    *See generally* Dkt 549-9.

[201]    *Id.* at 1-3.

[202]    *Id.* at 4-5.

[203]    *Id.* at 5.

[204]    Dkt 540 at 9 n.2.

[205]    Dkt 549-9 at 3.

Salvador Ltda. de CV" and "Collocation Technologies El Salvador Ltda de CV."[206]  The opinion

says that the auditor's responsibilities are to (1) add or modify signature in bank accounts, (2) obtain

users and passwords for digital banking, and (3) carry out banking operations, including handling

all transactions "necessary for the ordinary operation of the commercial companies in question."[207]

The opinion does not explain the relationship, if any, between these two Salvadoran entities and the

Company, although the record suggests they are two of the Company's subsidiaries.[208]

> After explaining the foregoing, the opinion pivots to making vague and conclusory
statements regarding the consequences of transferring ownership or control of "the various
companies" to "third parties," terms that are left undefined.  Specifically, the opinion says that any
director who is "part of the corporate structure of Continental Towers" – presumably  referring to
the two Salvadoran entities identified above – "or its partners," and who "facilitate[s] the transfer
of ownership or control of the various companies to third parties" without the authorization of the
cash auditor, may be held liable for committing either of two crimes.[209]  The opinion makes no
attempt to explain why transferring shares in the apparent parent company of the two Salvadoran
entities from one group of shareholders to another somehow would interfere with the auditor's
management of the day-to-day banking operations of those Salvadoran entities.  It implies – again
using vagaries – that the "potential liability" of a director of the "Continental Towers corporate
group" would be "particularly relevant" if "the companies involved underwent structural changes

---

[206]

>> *Id.* at 1, 3-4.

[207]

>> *Id.* at 4.

[208]

>> *See* Dkt 497-1 at 5; *see also* Dkt 295 at 51.

[209]

>> Dkt 549-9 at 6.

44

in their operational or shareholding control that could affect, hinder, or jeopardize the victims' ability to obtain effective representation."[210]   No explanation is given, however, as to why compliance with the Turnover Order (the details of which are never actually discussed by the opinion) would somehow put at risk the rights of any alleged victim.

Amazingly, these are the two opinions that Respondents argue "reach concrete conclusions as to the conflict between the Turnover Order and proceedings in El Salvador and Guatemala."[211]   They of course do nothing of the sort.

### Discussion

"In order to prevail on a civil contempt motion, the moving party must establish that (1) the court order with which the alleged contemnor failed to comply was clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the alleged contemnor has not diligently attempted to comply in a reasonable manner."[212]   An order is clear and unambiguous if it "leaves no uncertainty in the minds of those to whom it is addressed."[213]

---

[210]   *Id.* at 7.

[211]   Dkt 547 at 7.

[212]   *Chevron Corp. v. Donziger*, 384 F. Supp. 3d 465, 488-89 (S.D.N.Y. 2019), *aff'd in relevant part*, 990 F.3d 191 (2d Cir. 2021).

[213]   *Hess v. N.J. Transit Rail Operations, Inc.*, 846 F.2d 114, 116 (2d Cir. 1988).

45

Respondents have been given notice of Petitioners' motions and an opportunity to be heard, and they have not requested a live hearing.[214]  The matter is ripe for adjudication.

## I.  Civil Contempt of the 1stPFA

### A.  Terra

The Court's judgment confirming the 1stPFA requires Terra to participate in a sale of the Company "pursuant to Section 5.04(b) of the SHA as construed in this Partial Final Award."[215]  Petitioners have shown by clear and convincing evidence that Terra violated its clear and unambiguous obligations under the 1stPFA by rejecting the Leading NBO and inviting Santander to terminate its engagement.  The current record – especially but not necessarily read in light of Terra's history of obstructing or otherwise attempting to undermine the sale process – demonstrates, and the Court finds, that these actions were taken not in good faith but rather were deliberately intended to thwart a sale.

The contemporaneous justifications Terra offered for rejecting the Leading NBO were facially pretextual and nonsensical.  Terra argued that only a sale of 100 percent of the Company would satisfy the Board's mandate to Santander.  But the June 2025 Board resolution provided that Santander would "facilitate the sale of the Company pursuant to Section 5.04(b) of

---

[214]

No such hearing was required in these circumstances.  *See* Local Civil Rule 83.6(b) (requiring the taking of oral evidence "upon demand"); *In re Rosahn*, 671 F.2d 690, 695 (2d Cir. 1982) (holding civil contempt order entered without a "full adversary hearing" comported with due process, noting among other things that contemnor's counsel "was not precluded from asserting any colorable grounds for opposition to the proposed contempt order"); *cf. Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 256 (2d Cir. 1989) (party waived right to evidentiary hearing before issuance of preliminary injunction by not requesting one).

[215]

1stPFA at ¶ 72(iii).

46

the Shareholders Agreement."[216]  Section 5.04(b) requires a sale of "all *or substantially all* of the

Company's assets or all *or substantially all* of the Shares in the Company (in one or more

transactions)."[217]

Nor did Santander's written engagement letter, incorporated by reference in the

Board resolution, mandate a sale of 100 percent of the Company.  The engagement letter defined

a sale to include the disposition of "all *or substantially all* (measured by fair market value)" of the

Company's equity or assets and even included a specific provision detailing how the bank's fee

would be calculated "[i]f less than all of the assets or equity securities of the Company [we]re

acquired."[218]  The letter contemplated further that a sale of the Company might take place in one

transaction or in "a series of transactions."[219]  It was and remains absurd to suggest that Santander

was acting in contravention of these promises by advising the shareholders to move forward with

the Leading NBO while searching for a separate buyer for the Colombian assets.

In its emails, Terra cited Santander's cover email to prospective buyers, which

apparently said that Santander had been engaged "with regards to the sale of a 100% equity interest

in a regional independent private TowerCo."[220]  That 100 percent of the Company was *offered for

sale* says nothing, of course, about whether a sale of less than 100 percent of the Company would

---

[216]     Dkt 371-1 at 1.

[217]     Dkt 497-1 at 29 (emphasis added).

[218]     Dkt 371-1 at 6 (emphasis added).

[219]     *Id.*

[220]     Dkt 497-11 at 4.

47

violate any mandate of the June 2025 Board resolution or express promise of Santander.

In sum, neither Santander's engagement letter nor the SHA nor the June 2025 Board resolution rigidly required a sale only of 100 percent of the Company or its operations. Terra's unjustifiable insistence to the contrary betrays that obstruction of the sale process mandated by the 1stFPA was Terra's deliberate aim. Terra never even claimed that the Leading NBO would not constitute a sale of "substantially all" of the Company within the meaning of the SHA.[221] Rather, Terra adopted a wholly unsupported hard line in favor of a 100 percent sale. And Terra did so (1) notwithstanding that Santander had offered a clear path towards achieving the very outcome Terra was demanding through a combination of the Leading NBO and a local Colombian buyer and (2) at a relatively early stage in the process where the only decision on the table was whether to allow a prospective buyer to conduct due diligence ahead of submitting a revised offer.[222] Ironically, but clearly by design, Terra is the one responsible for "perpetuat[ing] a relationship that all shareholders agree must end" – not Petitioners, Santander, or the buyer who offered to purchase most of the Company.[223]

Nor is there any question that Terra's conduct was the proximate cause of Santander's resignation. Terra told Santander in no uncertain terms that, in its view, the bank's

---

[221] Dkt 497-11 at 1 (Terra stating that its objection to the Leading NOB was "not a matter of the relative economic value of the Colombian [total cash flow]" but rather "one of principle and compliance").

[222] Terra and Peppertree apparently agreed that the Leading NBO was too low, but Santander was "confident" the bidder would "be better positioned to revise their valuation upward" if the bidder were allowed to move forward with due diligence. Dkt 497-11 at 6.

[223] *Id.* at 5.

48

engagement with the Company could "no longer continue" and should be terminated.[224]  Santander later explained its withdrawal as being necessitated by the fact that the shareholders could not agree on the viability of any of the non-binding offers the Company received, which was true only because of Terra's pretextual rejection of the Leading NBO.  Santander concluded further that there was little to no hope of receiving any new offers capable of meeting the expectations of both shareholders, demonstrating the hollowness of Terra's suggestion that it would have been willing to move forward with the sale process if two recently identified bidders had been capable of submitting viable bids.

For all the reasons stated above, the Court finds that the 1stPFA is clear and unambiguous, that noncompliance has been proven by clear and convincing evidence, and that Terra has not diligently attempted to comply in a reasonable manner.[225]

## B.    Hernandez

Hernandez was not a party to the Court's confirmation of the 1stPFA.[226]  However, a nonparty may be held in contempt if the nonparty "is legally identified with" the party against

---

[224]

*Id.* at 2.

[225]

In their proposed order, Dkt 495-1, Petitioners invite the Court to hold Terra and the other Respondents in contempt of the Court's decision entered on April 22, 2025.  Yet Petitioners' memorandum of law in support of their motion does not explain how Respondents are in contempt of the April 22 order, which directed Terra and Hernandez to cause the Company to hire an investment bank or else pay coercive monetary penalties.  *See* Dkt 414 at 11 (explaining that Terra and Hernandez had complied with the clear and unambiguous provisions of the April 22 order by approving the retention of Santander).  Accordingly, the Court does not find any of the Respondents to be in contempt of the April 22 order.

[226]

Dkts 7, 124.

49

whom an injunction was entered.[227]  In July 2025, the Court held Hernandez in contempt of the 1stPFA on the ground that "Hernandez retains control of Respondents such that 'as a practical matter,' Respondents and Hernandez are 'one and the same.'"[228]

To be sure, Hernandez had submitted affidavits prior to July 2025 decision stating that he had never owned, and does not control, Terra or DTH.[229]  He made similar comments in a deposition, insisting that Terra and DTH are owned by a family trust, the beneficiaries of which are family "elders" whom he declined to name.[230]  According to Hernandez, those elders "kicked [him] out of everything related to Telecom" in early 2023 and "people [would] have to die" before he gets "a chance to have an ownership of" of Respondents.[231]  The Court rejected these self-serving assertions that were without any documentary or other evidentiary support.[232]

Hernandez's claims of last year were also directly at odds with the Tribunal's factual findings.  From the outset of those proceedings Terra "[d]enied that Hernandez 'own[s] or control[s]' Terra or DTH,"[233] and when Hernandez's personal liability was at issue later on, his counsel argued that Hernandez had admitted only that Terra and DTH were owned by his family,

---

[227]

*Spectacular Venture, L.P. v. World Star Int'l, Inc.*, 927 F. Supp. 683, 684 (S.D.N.Y. 1996); *see New York ex rel. Barco v. Operation Rescue Nat'l*, 80 F.3d 64, 70 (2d Cir. 1996).

[228]

Dkt 414 at 8 (quoting *Spectacular Venture*, 927 F. Supp. at 685).

[229]

*E.g.*, Dkts 338-1, 371-2.

[230]

Dkt 369-48 at 22:22-23:14, 38:16-41:9.

[231]

*Id.* at 22:6-22:7, 41:6-41:7.

[232]

Dkt 414 at 9.

[233]

*E.g.*, Dkt 9-6 at 3.

50

not by "him personally."[234]   Yet the Tribunal consistently found that Hernandez was the "sole

shareholder" of, and had "sole control" over Terra and DTH – and therefore was responsible for the

actions taken by Terra and DTH in this case.[235]   Hernandez challenged those factual findings in

urging vacatur of the 5thPFA, but this Court nevertheless confirmed the award in August 2025.[236]

Hernandez's claim that he never has owned Terra Towers or TBS is flatly contradicted by those

findings, which he already had a fully and fair opportunity to contest.  But the record is yet strongly

for Petitioners on this point.

Hernandez's claims never to have owned and no longer to control Terra are

significantly undermined by the record even putting aside the Tribunal's findings and this Court's

prior judgments.  In a June 2025 declaration, Hernandez said that he never had owned shares of TBS

and that he had owned shares of Terra Towers only "for the benefit of" an unnamed "True Beneficial

Owner."[237]   Yet the SHA – which Hernandez himself signed – includes a provision that refers to "the

transfer by Jorge Hernandez of *his shares* in either of the Initial A Shareholders" (meaning Terra

Towers and TBS).[238]   The SHA even mentions the need to reach agreement with Hernandez's

---

[234]   Dkt 276-23 at 1875-76.

[235]   5thPFA at ¶¶ 165, 174, 191; *see also* 2dPFA at ¶ 8 n.1; 3dPFA at ¶¶ 2-3.

[236]   Dkt 429 at 22.

[237]   Dkt 403-1 at 3.

[238]   Dkt 497-1 at 28-29 (emphasis added); *see also id.* at 26 ("[T]he parties agree and acknowledge that Jorge Hernandez may transfer his shares in the Initial A Shareholders [Terra Towers and TBS] to a Permitted Transferee at any time . . . .").

51

"heirs" regarding the continued operations of the Company in the event of his death,[239] a provision that would have made little sense if Hernandez had no shares to bequeath to such heirs.  Along the same lines, Terra argued to the Tribunal in December 2021 that ordering specific performance of the SHA would leave Terra defenseless against "a sham squeeze-out merger" that would maximize Petitioners' profit while "*cheating Mr. Hernandez out of his share of a business he has spent a lifetime building*."[240]  Terra's counsel made similar comments at a hearing before the Tribunal the same month, complaining about "Mr. Hernandez . . . being forced to sell his shares."[241]  Yet on Hernandez's telling, he never owned any such share or shares.

As to control, the record shows that Hernandez continued to direct Terra's conduct even after February 2023, when he purported to resign from the Company's Board at the supposed direction of his family.[242]  Specifically, in June 2023, Hernandez met with a representative of Citibank and "made clear . . . that Terra would not accept an escrow of its sale proceeds,"[243] a position in which Terra persisted until after this Court's April 2025 decision holding Terra and Hernandez in contempt.  As the Court explained in that decision, "the factual record before the Court" demonstrated that "Hernandez prevented the engagement of Citibank and did so to cause

---

[239]  *Id.* at 29.

[240]  Dkt 402-1 at 1 (emphasis added).

[241]  Dkt 32-26 at 264.

[242]  5thPFA at ¶¶ 17, 190-91; *see also* Dkt 369-48 at 83:5-83:7, 86:1-86:25, 87:25-89:11.

[243]  5thPFA at ¶ 17.

52

Terra not to comply with the [1stPFA]"[244] – again, conduct that took place after Hernandez claims to have been stripped of control by his family.

The parties seem to agree that Terra Towers and TBS are formally owned by the British Virgin Islands entity Telecom Construction Panamerica Limited.[245]  The directors of this entity, according to public records submitted by Petitioners,[246] are Kristha Pineda, the DTH employee who "was unilaterally installed by Mr. Hernandez to carry out the functions of Company CEO" after Hernandez's purported firing of Gaitán,[247] and John Francisco Quisquinay, the Company CFO who "spends the Company's money as directed by Mr. Hernandez."[248]  Hernandez's claim to have no ability to control these longtime agents of his lacks credulity in light of the record.

In sum, the Tribunal consistently found that Hernandez was the sole owner and controlling person behind Terra and DTH,[249] and even Hernandez concedes that he was at one point "in charge" of Respondents.[250]  But when faced with significant personal liability relating to Respondents' conduct in this case, he claimed that never he had owned Terra or DTH and that

---

[244]  Dkt 295 at 39 n.176; *see* Dkt 414 at 7-8 (reaffirming that finding).

[245]  Dkt 511 at 4-5; Dkt 550 at 6-7; Dkt 551 at 3. The parties refer to the company as Telecom Construction *Panamerican* Limited, but a BVI Financial Services Commission record submitted by Petitioners lists the company as Telecom Construction *Panamerica* Limited. Dkt 551-1 at 2.

[246]  Dkt 551-1.

[247]  3dPFA at ¶ 43.

[248]  5thPFA at ¶ 73.

[249]  *See* 2dPFA at ¶ 8 n.1; 3dPFA at ¶¶ 2-3; 5thPFA at ¶ 3.

[250]  Dkt 369-48 at 39:1-39:3.

53

unnamed members of his family had the sole authority to control those entities.  He refused to say who, if not he, was calling the shots.  He failed to provide documentation to support his claims.  He made some assertions that simply are not credible in light of the record.

These tactics are nothing new for Hernandez.  Like the Tribunal, the Court is "strongly influenced to disbelieve perfunctory denials of involvement in malign activity by Parties like Mr. Hernandez,"[251] who repeatedly and brazenly has acted in bad faith throughout this process.  As Peppertree's counsel once asked rhetorically, "If it wasn't Mr. Hernandez who did all this, then who did?"[252]

The record therefore reveals no reason to depart from the Court's July 2025 finding.  Hernandez again has offered no documentary evidence proving that he does not retain beneficial ownership and control of Terra regardless of how many degrees of separation or even informality might exist between him and that interest and power.  More importantly, Hernandez offers no new evidence demonstrating that he does not continue to control or at least have the ability to control Terra, which even on his telling is run entirely by his family.  In fact, Hernandez offered no evidence at all – not even an updated affidavit – in response to Petitioners' invocation of the Court's July 2025 finding in connection with the pending contempt motions.

Accordingly, the Court continues to find based on the record in this case that Hernandez (1) is legally identified with Terra and therefore is bound by the 1stPFA, and (2) is responsible for Terra's actions during the 2025 sale process because he retains control over Terra

---

[251]     5thPFA at ¶ 275.

[252]     Dkt 276-23 at 1731.

such that he and Terra are one and the same.[253]    In other words, Terra's actions are Hernandez's actions, and Hernandez is in contempt of the 1stPFA for either directing or willfully failing to prevent Terra's conduct during the 2025 sale process.

### C.    DTH

Petitioners provide no evidence or argument that DTH directed or otherwise aided and abetted Terra's conduct during the 2025 sale process.  Accordingly, the Court does not find DTH in contempt of the 1stPFA.

## II.    Civil Contempt of the Turnover Order

### A.    Terra

The Turnover Order required Terra to transfer its shares in the Company to Petitioners within a certain period of time, but the shares have not been transferred.  In other words, the Turnover Order left no uncertainty as to what it required and it certainly has been violated.  Terra does not dispute these points.

Terra nonetheless argues that it diligently has attempted to comply with the Turnover Order in a reasonable manner.  But that would not be true even if one accepted all of Terra's excuses.  Terra's directors chose to resign rather than transfer the shares.  That is the opposite of attempting to comply.  The directors effectively chose *not* to comply and, by resigning, manufactured the circumstances in which Terra now claims an inability to comply.  Even if the

---

[253]    *See Spectacular Venture*, 927 F. Supp. at 685 (holding party's president and principal in contempt); *Absolute Nev., LLC v. Grand Majestic Riverboat Co.*, No. 19-cv-11479, 2021 WL 4894556, at *1 (S.D.N.Y. Sept. 17, 2021) (discussing order holding party's "President, sole member, sole director, and 'sole proprietor'" in contempt).

55

directors had reasonable grounds to fear criminal prosecution in El Salvador or Guatemala, which they do not, resigning would not have been a step toward compliance with the Turnover Order.

In any event, the record demonstrates that Terra's proffered excuses for noncompliance are nothing more than a pretext for the willful disregard of the Court's directives. The legal opinions are so lacking in facts and analysis that they do not come close to reasonably supporting Terra's position. The Guatemala Opinion speaks only in generalities without identifying a single Guatemalan court order. The El Salvador Opinion contends that a Salvadoran criminal court effectively has frozen the assets of two Salvadoran companies but does not explain the relationship between those entities and the Company, fails to describe the Turnover Order in any detail, and provides only conclusory and vague analysis. Even on its own terms, the El Salvador Opinion seems to suggest that a transfer of shares would be problematic only if it would jeopardize a victim's ability to recover restitution in the criminal case. Yet the opinion does not even begin to explain why complying with the Turnover Order would pose that risk. The Court need not resolve any issues of Guatemalan or Salvadoran law to conclude that these facial deficiencies demonstrate the pretextual nature of Terra's use of the opinions as an excuse for noncompliance with the Turnover Order.

Two other points inform are worth emphasizing. First, the Court's April 2025 opinion detailed the various criminal proceedings that then existed in El Salvador and Guatemala,[254] and the El Salvador Opinion implies that the asset freeze it discusses was put in place in May 2025.[255] Yet Terra did not raise this issue in opposing the turnover motion. Indeed, as recently as

---

[254] Dkt 295 at 10-13, 25-26; *see also* Dkt 415 at 7-8, 11-15.

[255] Dkt 549-9 at 1 (stating auditor was appointed "for a period of 24 months, expiring on May 8, 2027").

56

December 2025, Respondents represented to the Court that they "remain ready and willing to comply with" the 1stPFA, even though that too would involve transferring shares.[256]  Second, this is not the first time Terra has been accused of failing to comply with court orders or engaging in other misconduct related to the subject matter of this litigation.[257]  This context lends additional credence to the conclusion, based on the current record, that Terra concocted a pretextual excuse in an attempt to mask its calculated decision not to comply with the Turnover Order.[258]

Finally, Terra argues that "a person held in civil contempt must be able to comply with the court order at issue" and that "one charged with contempt . . . makes a complete defense by proving that he is unable to comply."[259]  Under this line of cases, however, "[t]he burden of proving 'plainly and unmistakably' that compliance is impossible rests with the contemnor."[260] Terra has not met that burden.

First, Terra has failed to demonstrate that it cannot comply because of the proceedings in El Salvador and Guatemala for the reasons already stated – and for the additional reason that even a conflicting court order from a foreign court would not make it *impossible* for

---

[256]  Dkt 509 at 8.

[257]  *See* Dkt 295 at 30-32; Dkt 369-8 at ¶¶ 9, 90-104; 3dPFA at ¶¶ 71, 99.

[258]  *See CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 100 (2d Cir. 2016) (explaining that company should have "proceed[ed] with caution" in attempting to comply with an injunction considering its "history of misreading changes in federal copyright law and being held in contempt").

[259]  Dkt 547 at 7 (quoting *Marc Rich & Co. v. United States*, 736 F.2d 864, 866 (2d Cir. 1984); *United States v. Bryan*, 339 U.S. 323, 330 (1950)).

[260]  *Marc Rich & Co.*, 736 F.3d at 866.

57

Terra to comply.[261] Terra "agreed to resolve disputes with [Petitioners] by arbitration in New York, knowing that this might present conflicts with the laws and courts in" other countries.[262] "Consequentially, it must now 'accept the consequences' for the privileges it sought from the protection of New York law."[263]

Second, Terra has failed to demonstrate that it is genuinely unable to find anyone willing to serve as a director of Terra Towers of TBS. Neither entity is incorporated in Guatemala or El Salvador. The Court is unconvinced that there are not citizens and residents of nations other than Guatemala and El Salvador who would be willing to serve as a director of the Company without fear of prosecution in those nations. Moreover, Terra has provided scant information concerning the director search process allegedly being conducted at the request of the shareholder. The person in charge of that search claims to be sharing with candidates information regarding "the legal situation of the companies arising from the arbitration and other processes."[264] The Court infers that this information includes Terra's unsupported and pretextual claim that compliance with the Turnover Order would somehow conflict with court processes in El Salvador and Guatemala. Terra has entirely failed to demonstrate that a bona fide search for directors – free from scare tactics deliberately designed to cause the search to fail – would not yield results.

---

[261] *See Telenor Mobile Commc'ns AS v. Storm LLC*, 587 F. Supp. 2d 594, 616-17 (S.D.N.Y. 2008), *aff'd*, 351 F. App'x 467 (2d Cir. 2009).

[262] *Id.* at 617.

[263] *Id.*

[264] Dkt 549-14 at 1.

58

Finally, Terra has not demonstrated that it cannot comply even without current directors in place.  Terra argues that a corporation "can only act through its directors and officers."[265] But that is just another way of saying that a corporation can act only through human beings.  The real question is whether someone acting on behalf of Terra's shareholder, or any other agent of Terra, has the authority to transfer the shares in the absence of any directors – a question on which Terra offers no evidence or argument.[266]

Terra's counsel cited Article 109(1) of the BVI Business Companies Act in an email to Petitioners counsel in early February,[267] yet Terra conspicuously fails to mention that statute here.  Perhaps that is because Terra realized that another subsection of the same article states that "[i]f at any time a company does not have a director, any person who manages, or who directs or supervises the management of, the business and affairs of the company is deemed to be a director of the company for the purposes of this Act."[268]  Someone no doubt is managing Terra Towers's affairs within the meaning of that provision – whether it be the person appointed by the shareholder to seek

---

[265]

Dkt 547 at 6 (quoting *In re Tribune Co. Fraudulent Conveyance Litig.*, 10 F.4th 147, 160 (2d Cir. 2021)).

[266]

*See Galef v. Alexander*, 615 F.2d 51, 58 (2d Cir. 1980) (nothing that under New York's choice of law rules a court should "look to the law of the state of incorporation in adjudicating a corporation's 'internal affairs'").

[267]

Dkt 537-4 at 1.

[268]

BVI Business Companies Act § 109(6); *see also* Dkt 551 at 3 (British Virgin Islands practitioner opining that the powers of the board of Terra Towers have reverted to the shareholder).

59

out new directors, the agent of the shareholder who appointed that person, or whoever is overseeing Terra's continued litigation of this case.[269]

In light of Terra's failure of proof on this question, and considering that the only foreign statute at one point cited by Terra undermines its position, the Court rejects Terra's argument that its lack of directors makes compliance with the Turnover Order impossible.

### B.    Hernandez

Hernandez is in contempt of the Turnover Order for the same reason he is in contempt of the 1stPFA. The order, which was served via ECF on Hernandez's counsel in this action, required Terra and Hernandez to take any and all actions necessary to effectuate the turnover and to take no action interfering with the turnover. Because Terra's actions are Hernandez's actions, Hernandez is bound by the Turnover Order and Terra's failure to comply with the order is attributable to Hernandez. Based on his control over Terra, Hernandez either directed Terra's noncompliance or willfully failed to prevent it.

### C.    DTH

Petitioners do not provide any evidence or argument that DTH was responsible for or otherwise aided and abetted Terra's noncompliance with the Turnover Order. Accordingly, the Court does not find DTH in contempt of that order.

---

[269]  *See, e.g.*, Dkt 529 (motion to vacate arbitration award filed on Terra's behalf on February 9, 2026).

60

III.    *Remedy*

"Ensuring compliance with a prior order is an equitable goal which a court is empowered to pursue even absent a finding of contempt."[270]  A court may draw on its "basic authority to compel compliance with its orders" by fashioning equitable remedies that take into account what is fair, necessary, and workable.[271]  Furthermore, a court has "broad discretion to design a remedy that will bring about compliance" with its orders in the face of a party's contempt.[272]  Among the factors to consider in designing a contempt remedy are the "character and magnitude of the harm threatened by continued contumacy," the "probable effectiveness of any suggested sanction in bringing about (compliance)," and the seriousness of any burden on the contemnor.[273]

In view of Terra's and Hernandez's well-documented and repeated obstruction of the Court-mandated sale process,[274] including the obstruction described herein, the Court finds that the relief granted below is necessary to effectuate the Turnover Order and the 1stPFA in light of Terra's and Hernandez's contempt.[275]  Considering the factors relevant to imposing a contempt remedy and

---

[270]

*Berger v. Heckler*, 771 F.2d 1556, 1569 (2d Cir. 1985).

[271]

*Id.* at 1569 n.19; *see id.* at 1569.

[272]

*Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 673 F.2d 53, 57 (2d Cir. 1982); *see Chevron Corp. v. Donziger*, 384 F. Supp. 3d 465, 503-04 (S.D.N.Y. 2019), *aff'd in relevant part*, 990 F.3d 191 (2d Cir. 2021).

[273]

*Id.* (quoting *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303 (1947)).

[274]

*See generally* Dkts 295, 414.

[275]

Petitioners' requests for attorneys fees, which were not briefed by Petitioners in their memorandums of law, are denied without prejudice.

61

drawing on the Court's inherent authority to effectuate its judgments, the Court finds that monetary penalties would be ineffective and that the relief provided herein is necessary to abate potentially significant and effectively irreparable harm to Petitioners should a sale of the Company become impossible or impracticable.

The relief provided herein merely makes express what already is required by the Turnover Order and the Court's prior judgments. Terra's purported excuses for noncompliance with the Turnover Order are invalid. In light of the equitable maxim that "[e]quity regards as done what ought to have been done,"[276] and pursuant to the authority conferred by Federal Rule of Civil Procedure 70(a),[277] the Clerk of the Court shall execute the transfer documents on Terra's behalf if Terra should fail to comply and, regardless, Petitioners are immediately authorized to conduct a sale as sole owners of the Company. Furthermore, Respondents may not transfer Company funds to themselves without the consent of Petitioners, or attempt to participate in, direct, or influence the sale process. In light of Respondents actions thus far in this litigation, the Court finds it fair and necessary to clarify Respondents' obligations in these regards.[278]

---

[276] *U.S. ex rel. Schuster v. Vincent*, 524 F.2d 153, 160 (2d Cir. 1975); *see Cent. Manhattan Props. v. D.A. Schulte, Inc., of N.Y.*, 91 F.2d 728, 730 (2d Cir. 1937) (L. Hand, J.); 1 JOSEPH STORY, COMMENTARIES ON EQUITY JURISPRUDENCE, AS ADMINISTERED IN ENGLAND AND AMERICA 68-69 (Melville M. Bigelow ed., Fred B. Rothman & Co. 13th ed. 1988) (1886).

[277] "If a judgment requires a party to convey land, to deliver a deed or other document, or to perform any other specific act and the party fails to comply within the time specified, the court may order the act to be done—at the disobedient party's expense—by another person appointed by the court. When done, the act has the same effect as if done by the party." Fed. R. Civ. P. 70(a).

[278] *Cf. McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949) (explaining how enjoining a defendant from violating specific statutory provisions is a type of decree that is "often necessary to prevent future violations where a proclivity for unlawful conduct has been shown").

62

### Conclusion

The foregoing constitute the Court's findings of fact and conclusions of law.

Petitioners' motions for contempt and sanctions (Dkts 495, 535) are granted to the extent set forth herein and in the accompanying Contempt and Remedial Order.

SO ORDERED.

Dated:        May 7, 2026

Lewis A. Kaplan
United States District Judge