UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TELECOM BUSINESS SOLUTION, LLC, *et al.*,

        Petitioners,

    -against-


TERRA TOWERS CORP., *et al.*,

        Respondents.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 06/17/2026

22-cv-1761 (LAK)

**MEMORANDUM OPINION CONFIRMING,
AND DENYING VACATUR OF, FINAL ARBITRATION AWARD**

Appearances:

> Gregg L. Weiner
> Andrew S. Todres
> Ethan R. Fitzgerald
> Daniel V. Ward
> ROPES & GRAY LLP
>
> *Attorneys for Petitioner AMLQ Holdings (Cay), Ltd.*
>
> Michael N. Ungar
> Ashtyn N. Saltz
> David A. Landman
> UB GREENSFELDER LLP
>
> Joon H. Kim
> Rahul Mukhi
> CLEARLY GOTTLIEB STEEN & HAMILTON LLP
>
> *Attorneys for Petitioners Telecom Business Solution,
> LLC and LATAM Towers, LLC*
>
> Lucila I. M. Hemmingsen
> SAGIANCE LLP
>
> Rodney Quinn Smith, II
> GST LLP
>
> *Attorneys for Respondents*

LEWIS A. KAPLAN, *District Judge.*

In 2015, the petitioners in this case invested a nine-figure sum into a foreign company that builds and operates telecommunications towers throughout Central and South America, Continental Towers LATAM Holdings, Ltd. (the "Company"), becoming the 45 percent minority shareholders. In doing so, they partnered with Guatemalan businessman Jorge Hernandez, the controlling person of the majority shareholders and their affiliated tower-construction firm. Although the petitioners agreed, barring unforseen events, to ride out their investment for at least five years, they bargained also for the right to force a sale of the Company to a third party after that lock-up period.

Petitioners have been attempting to exercise that right now for more than five years. Hernandez, however, seemingly has done everything in his power to prevent the sale, rendering the contracts with petitioners nothing more than pieces of paper. He not only has flouted but also has actively resisted arbitration awards and court judgments, thereby locking petitioners into an illiquid position despite their clear contractual right to force a sale. All the while, the Company has paid tens of millions of dollars to Hernandez's tower-construction firm in bald-faced defiance of the governing contracts.

The present dispute concerns whether to confirm or vacate the Final Award in the underlying arbitration. Despite being the arbitral panel's final pronouncement in this long-running dispute, the award did very little. It addressed a couple housekeeping matters – and gave neither side everything it had wanted. Nonetheless, the Hernandez-controlled parties argue that the Final Award should be vacated based on the "evident partiality" of the chairman of the arbitral panel.

3

That contention is nothing new. Since before the panel even had issued its first partial award, the Hernandez entities began complaining of alleged bias, starting with the alleged partiality of their own hand-picked arbitrator. They later went so far as to orchestrate the publication of an article falsely claiming that the tribunal chairman had accepted a bribe from the parent company of one of the petitioners – and then repeatedly attempted to use the fallout from those allegations to recuse the entire panel, which by that point had issued multiple rulings in petitioners' favor. That bid failed, as did every one of their other attempts to force the panel's recusal. The current claim will meet the same fate, for the reasons that follow.

**Facts**[1]

The Court assumes the reader's familiarity with the facts and procedural history of this years-long dispute, which most recently were chronicled in this Court's opinion of May 7, 2026.[2] Petitioners and respondents were involved between 2021 and 2025 in an arbitration before a three-arbitrator panel in New York (the "Tribunal") that resulted in five partial final awards – each of which the Court already has confirmed – and the Final Award now before the Court.

As noted, petitioners are the minority shareholders of Continental Towers LATAM Holdings, Ltd., which builds and operates telecommunications towers in Central and South

---

[1] Citations to page numbers in this opinion refer to the original, continuous pagination of the cited document if such pagination exists, and to the ECF page number in the document header if no such pagination exists.

[2] *Telecom Bus. Sol., LLC v. Terra Towers Corp.*, No. 22-cv-1761 (LAK), 2026 WL 1257290 (May 7, 2026); Dkt 569.

4

America.[3]  The majority shareholders are Terra Towers Corp. and TBS Management, S.R.L. (collectively, "Terra").[4]  For more than five years, Terra – at the direction of Jorge Hernandez – has opposed, and actively obstructed, the contractually mandated, court-ordered sale of the Company. In the meantime, Hernandez effectively has seized control of the Company and caused it to misappropriate tens of millions of dollars for the benefit of another entity under his sole control, DT Holdings, Inc. ("DTH," and collectively with Terra and Hernandez, "Respondents"),[5] which the Company pays to build towers and manage its back-office operations.[6]

The dispute has spawned also extensive civil and criminal litigation in foreign countries where the Company operates.  After losing before the Tribunal, Respondents launched a foreign litigation campaign that sought to undermine the Tribunal's orders and prevent a Company sale.[7]  This Court issued anti-suit injunctions against four civil actions and held Respondents in contempt for pursuing three of them.[8]  Respondents and their proxies instigated also criminal

---

[3] *Id.* at *2.  "Petitioners" are Telecom Business Solution, LLC and LATAM Towers, LLC (collectively, "Peppertree"), and AMLQ Holdings (Cay), Ltd. ("AMLQ").  Peppertree is controlled by the Ohio-based private equity firm Peppertree Capital Management, Inc., and AMLQ is an affiliate of Goldman Sachs.  *Id.*

[4] *Id.*

[5] *Id.* at *8 (discussing the Tribunal's finding that Respondents had spent more than $55 million building unauthorized tower sites and had likely put some portion of DTH's $480,000-per-month fee "to uses the Respondents wish to conceal because they are not bona fide Company [selling, general and administrative costs]" (quoting Dkt 497-2 at ¶ 91)).

[6] Dkt 124 at 3-4; Dkt 497-2 at ¶ 5.

[7] *See Telecom Bus. Sol., LLC.*, 2026 WL 1257290, at *6-7.

[8] *Id.* at *6.

complaints in El Salvador and Guatemala against the Company CEO, whom Hernandez unilaterally removed from his post for having been insufficiently supportive of Respondents in the arbitration.[9] According to the Final Award, issued in November 2025, "[t]here are multiple civil and criminal litigation proceedings pending in Central America, all or most of them initiated by Respondents or their proxies, some of them targeting Company Management as alleged criminals, and at least one of them involving an alleged confiscation of tower assets of the Company . . . by the Guatemalan Government."[10]

Most recently, this Court held Terra and Hernandez in contempt of a judgment requiring the sale of the Company and a separate order requiring Terra to turn over its shares in the Company to Petitioners in satisfaction or partial satisfaction of more than $300 million in damages owed to Petitioners.[11]  In light of Terra's refusal to comply with the turnover order, the Court authorized the Clerk of the Court to execute the transfer documents on Terra's behalf.[12]

This opinion addresses the parties' dueling petitions to confirm and vacate the Final Award under the New York Convention[13] and the Federal Arbitration Act ("FAA"), respectively. The Final Award effectively did no more than maintain the *status quo*, while refusing a request by Petitioners that the Tribunal remain constituted to potentially award more damages to them.  Yet

---

[9] *Id.* at *5, *7; *see also* Dkt 295 at 10-13, 25-26; Dkt 415 at 7-8, 11-15.

[10] Dkt 531-16 at ¶ 2 (footnote omitted).

[11] *See generally Telecom Bus. Sol., LLC*, 2026 WL 1257290.

[12] *Id.* at *23.

[13] Convention on the Recognition and Enforcement of Foreign Arbitration Awards, June 10, 1958, 21 U.S.T. 2517 [hereinafter "New York Convention"].

6

Respondents argue that the Final Award should be vacated because the Tribunal's chairman was "evident[ly] partial[]" against them.  The following facts and procedural history are necessary to put that accusation in context.

## I.    *The Tribunal's Formation*

Under a shareholders agreement ("SHA") that Petitioners executed with Terra in 2015, Peppertree obtained the right to force a sale of the Company to a third party following a five-year lockup period.[14]   In late 2020, Peppertree attempted to initiate the sale process, but Terra refused to adhere to the promises it had made in the SHA.[15]   Respondents have persisted in that obstruction for more than five years, locking Petitioners into an illiquid minority position in the Company.

The SHA includes an arbitration clause that requires all unresolvable disputes to be submitted to binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA").[16]   The clause designates New York City as the seat of arbitration, gives each party the right to appoint one arbitrator, and provides that the two party-selected arbitrators shall select a third arbitrator to act as chairperson of the panel.[17]   The parties in 2015 executed also other contracts governing the operations of the Company that either incorporated

---

[14]    Dkt 558-1 at 28-29.

[15]    Dkt 124 at 4.

[16]    Dkt 558-1 at 49.

[17]    *Id.*

7

the SHA's forum-selection clause by reference or contained a substantively identical arbitration provision.[18]

In February 2021, after Terra breached its contractual promise to support a sale of the Company, Peppertree initiated an arbitration against Terra, DTH, Hernandez, and the person who then was serving, along with Hernandez, as one of the two Terra-appointed members of the Company's board.[19]  The arbitration was commenced before the AAA's International Centre for Dispute Resolution ("ICDR").[20]

Peppertree named Richard F. Ziegler as its arbitrator,[21] and AMLQ later joined in that designation after filing its own claims against Terra.[22]  Terra named Mélida Hodgson as their arbitrator, to which the other respondents raised no objection.[23]  Arbitrators Ziegler and Hodgson ultimately appointed Marc J. Goldstein as the Tribunal's third arbitrator and chairman.[24]

---

[18] Dkt 94-2 at 5; Dkt 272-3 at 9-10.

[19] Dkt 9-4.

[20] *Id.*

[21] *Id.* at ¶ 161.

[22] Dkt 9-9 at ¶ 44.

[23] Dkt 9-7.

[24] Dkt 9-14.

8

## II.    *The Partial Final Awards*

The Tribunal issued five partial final awards, each of which was unanimous, each of which found against Respondents and in favor of Petitioners, and each of which this Court confirmed as a judgment.  Before the first of those awards had even been issued, Respondents began complaining of alleged bias among the arbitrators.

In the SHA, the parties agreed to abide by the AAA's Commercial Arbitration Rules, including Rule 18(c), which provides that the ICDR shall rule on any objections to the partiality of the arbitrators and that its decisions "shall be conclusive."[25]  During the course of the arbitration, Terra and DTH lodged multiple bias complaints with the ICDR, each of which was rejected.

Respondents renewed many of those complaints before this Court, notwithstanding that they had agreed the ICDR's decisions would be conclusive.  This Court has rejected every such claim of bias put before it, as has the Second Circuit.

### A.    *Arbitration Proceedings*

#### 1.    *January 2022 – ICDR Complaint*

Respondents first alleged bias during the pendency of the proceedings that culminated in the issuance of the First Partial Final Award ("1stPFA").  In January 2022, Terra and DTH objected to the continued service of Arbitrator Hodgson – whom Terra itself had appointed – based on Arbitrator Hodgson (1) allegedly having failed to disclose that she had been  nominated by a party bringing claims against DTH to serve as an arbitrator in an unrelated arbitration (even though she ultimately did not serve as an arbitrator in that case) and (2) having moved to a new law

---

[25]    Dkt 124 at 17 (quoting AAA Commercial Rule 18(c)).

firm that had ongoing and past relationships with Goldman Sachs.[26]  The ICDR reviewed the issue

with briefing from the parties and denied the challenge of bias.[27]

### 2.    *February 2022 – First Partial Final Award*

In February 2022, the Tribunal issued its 1stPFA holding that Terra had breached the

SHA by obstructing a sale.[28]  The Tribunal ordered specific performance of the sale requirement,

and this Court later confirmed the award as a judgment.[29]  Terra and Hernandez now twice have

been held in contempt of that judgment for repeatedly raising obstacles to the required sale.[30]

### 3.    *May 2022 – ICDR Complaint*

On or about March 15, 2022, shortly following the issuance of the 1stPFA, a website

called "wallstreetwhistleblower.org" ("WSW") published an article titled, "Exclusive:

Whistleblower Exposes Alleged Goldman Sachs Bribery Scheme."[31]  The article alleged that an

unidentified "whistleblower" from inside Goldman Sachs had reported to WSW that the bank had

paid $250,000 into an account belonging to Chairman Goldstein and that the money had been

---

[26]    Dkt 106-30 at 1-2.

[27]    Dkt 32-44.

[28]    *Telecom Bus. Sol., LLC.*, 2026 WL 1257290, at *5.

[29]    *Id.*

[30]    *Id.* at *10, *18, *20.

[31]    Dkt 497-2 at ¶ 227.

withdrawn in June 2021, the same month in which Chairman Goldstein was appointed as an arbitrator in this matter.[32]  The whistleblower reportedly implied that the payment was likely a "bribe."[33]    The article included also the last four digits of Chairman Goldstein's social security number.[34]

As explained in more detail below, the Tribunal determined years later that this baseless bribery accusation against Chairman Goldstein was false and that its publication was "a willful and wanton act" orchestrated by Respondents – specifically by Hernandez – to forestall or prevent a Company sale.[35]  Unsurprisingly, Terra and DTH attempted to use this article to their advantage in the arbitration.

In April 2022, the parties exchanged letters in which Petitioners accused Respondents of being behind the bribery allegations.[36]  After that correspondence was shared with the Tribunal at its request in early May, Terra and DTH filed new complaints with the ICDR.[37]  They ultimately argued that the Tribunal could not fairly adjudicate the dispute in light of Petitioners' having

---

[32]

*Id.*

[33]

*Id.*

[34]

*Id.* at ¶ 227 n.59.

[35]

*Id.* at ¶ 240.

[36]

*Id.* at ¶¶ 228-29.

[37]

*Terra Towers Corp. v. Telcom Business Solution, LLC*, No. 22-cv-7301 (S.D.N.Y. dismissed Feb. 21, 2024) [hereinafter "Disqualification Action"], Dkt 28-22 at 1.

claimed that Respondents were responsible for the article's publication.[38]  They complained also about a June 2022 disclosure by Chairman Goldstein that he had a second cousin (who was also a friend) who had retired from Goldman Sachs prior to the commencement of the arbitration and had no knowledge of or connection to the subject matter of the parties' dispute.[39]  After full briefing, the ICDR rejected both bias claims and reaffirmed the Tribunal in June 2022.[40]

### 4.    August 12, 2022 – Second Partial Final Award

The Second Partial Final Award ("2dPFA"), issued on August 12, 2022, addressed Respondents' ouster of the Company's legitimate CEO, Jorge Gaitán, and COO, Carol Echeverría, during the pendency of the arbitration.  In short, the Tribunal found that Hernandez had removed those executives from their posts for having been insufficiently supportive of Respondents in the arbitration and subsequently caused false criminal complaints to be filed against them in Guatemala.[41]  Respondents failed to comply with the Tribunal's interim orders requiring that Gaitán and Echeverría be restored to their positions.  In an attempt to justify that defiance, Respondents misled the law firm Morrison & Foerster, from which it had concealed numerous material facts, into producing a legal opinion ostensibly supporting their position.[42]  As a sanction for this misconduct,

---

[38]    Disqualification Action, Dkts 28-32, 28-36.

[39]    Disqualification Action, Dkt 28-36 at 3.

[40]    Disqualification Action, Dkt 28-39.

[41]    Dkt 173-53 at ¶¶ 9, 78(1), 85.

[42]    *Telecom Bus. Sol., LLC*, 2026 WL 1257290, at *6.

12

the 2dPFA stayed Terra's counterclaims in the arbitration until such time as Respondents complied with those interim orders and with the 1stPFA.[43]

In the 2ndPFA, the Tribunal considered, and rejected, the possibility that it should resign in light of the circumstances surrounding bribery allegations against Chairman Goldstein. "If the unease naturally felt in response to such allegations or the post-refutation request to investigate them could justify unseating one or all members of a sitting tribunal," the Tribunal reasoned, "some parties in arbitrations would be inclined to commit provocative acts to bring this about, and the institution of arbitration would be compromised."[44] The Tribunal later reaffirmed that decision in a procedural order in 2024, explaining that "false and misleading *ad hominem* attacks on arbitrators do not warrant disqualification, impel recusal, or justify vacatur of the arbitrators' awards."[45]

### 5.    *August 19, 2022 – Disqualification Action*

The week after the issuance of the 2dPFA, on August 19, 2022, Terra and DTH sued Petitioners in New York state court seeking an order disqualifying the entire Tribunal based on alleged bias (the "Disqualification Action").[46] Petitioners promptly removed the action to federal court and it was assigned to this Court.

---

[43] Dkt 173-53 at Award ¶¶ 1-5.

[44] *Id.* at ¶ 34 n.8.

[45] Dkt 245-12 at ¶ 4.

[46] Disqualification Action, Dkt 1 at ¶ 24.

13

In the Disqualification Action, Terra and DTH repeated the same allegations they already had raised unsuccessfully with the ICDR – namely, that Chairman Goldstein could not be impartial in light of Petitioners' allegations that Respondents were responsible for the false bribery allegation levied against him and that the other arbitrators had "shed their own impartiality" by coming to Chairman Goldstein's defense.[47]  They further complained, among other things, that the 2dPFA was "gratuitous and overreaching"[48]  and later attempted to amend their petition to allege that the Third Partial Final Award ("3dPFA") was "based on mischaracterization, misdirection, and inference – not evidence."[49]

Petitioners opposed the relief sought.  They argued that the ICDR's rejection of the same claims was conclusive and binding against Respondents.[50]  They argued also that Respondents' claims of bias in any case were entirely speculative and not based on established facts.[51]  The Court denied leave to amend and dismissed the action substantially for the reasons stated in Petitioners' opposition papers.[52]  Respondents later filed a motion to reconsider, in which they raised additional claims of bias that, like their earlier claims, already had been conclusively rejected by the ICDR.[53]

---

[47] Disqualification Act, Dkt 15 at ¶ 127

[48] *Id.* at ¶ 130.

[49] Disqualification Action, Dkt 46-2 at ¶ 211.

[50] Disqualification Action, Dkt 27 at 15-16.

[51] *Id.* at 20-25.

[52] Disqualification Action, Dkt 59.

[53] Disqualification Action, Dkt 61 at 5-6.

That motion too was was denied.[54]  Respondents filed a notice of appeal, but they abandoned any challenge to the dismissal of the Disqualification Action after that appeal was consolidated with other pending appeals,[55] leading to an affirmance.[56]

### 6.    February 2023 – Third Partial Final Award

In the Third Partial Final Award ("3dPFA"), issued in February 2023, the Tribunal found that Respondents had "supported, if not instigated," improper foreign arbitrations in Peru and Guatemala that were likely to "harm[] both the prospects of a sale, and the price obtainable, in ways that cannot be adequately measured."[57]  The award ordered Respondents to stop pursuing such lawsuits, which Respondents failed to do.  This Court issued anti-suit injunctions in February 2024 and April 2025 against, collectively, four civil actions.[58]  In the latter opinion, the Court held Respondents in contempt for pursuing three of the actions.[59]

---

[54] Disqualification Action, Dkt 73.

[55] Reply Brief for Respondents-Appellants and Appellant at 24 n.2, *Telecom Bus. Sol., LLC v. Terra Towers Corp.*, Nos. 23-7312, 24-513, 24-722, 24-749, 2025 WL 1177768 (2d Cir. Apr. 23, 2025).

[56] Disqualification Action, Dkt 75.

[57] Dkt 272-27 at ¶¶ 71, 99.

[58] *Telecom Bus. Sol., LLC.*, 2026 WL 1257290, at *6.

[59] Dkt 295 at 47-48.

15

### 7.    *April 2023 – Fourth Partial Final Award*

The Fourth Partial Final Award ("4thPFA"), issued in April 2023, awarded Petitioners certain attorneys fees and costs.[60]

### 8.    *December 2023 – ICDR Complaint*

In December 2023, Terra and DTH again objected before the ICDR to the continued service of the Tribunal.[61]  They complained about alleged steps the Tribunal had taken to avoid further dissemination of the defamatory claim – later determined to have been a Hernandez ruse – that Chairman Goldstein had accepted a bribe from Goldman Sachs.[62]  They complained also about posts on Chairman Goldstein's personal website that discussed enforcement mechanisms available to courts and arbitral panels in hypothetical situations that Respondents alleged were not hypothetical but rather were references to this case.[63]  The ICDR rejected the complaint and reaffirmed the Tribunal.[64]

---

[60] Dkt 272-28.

[61] Disqualification Action, Dkt 67-1 at 56-64, Dkt 67-3 at 4.

[62] Disqualification Action, Dkt 67-3 at 1-3.

[63] *Id.* at 4; Disqualification Action, Dkt 67-1 at 56-63.

[64] Disqualification Action, Dkt 67-5.

9.    *March 2025 – Fifth Partial Final Award*

In the Fifth Partial Final Award ("5thFPA"), issued in March 2025 and confirmed as a judgment in August 2025,[65] the Tribunal held Respondents jointly and severally liable to Petitioners for slightly more than $300 million in damages, plus compound interest.[66]  The award separately directed Respondents to deposit nearly $54 million – and to cause the Company to deposit another $480,000 monthly – into escrow accounts as an equitable remedy for other contractual breaches, including building tower sites that had not been authorized by Petitioners, and likely misappropriating some portion of the monthly fee that the Company pays to DTH.[67]

The damages award included $25 million in punitive damages, which were awarded on the basis of the Tribunal's finding that Hernandez, acting for Respondents, had engaged in "flagrantly improper conduct" throughout the arbitration.[68]  His conduct included orchestrating the publication of numerous online articles anonymously attacking the Tribunal and Petitioners.  The Tribunal found that the publication of these articles and others were willful and wanton acts that were fraudulently orchestrated by Hernandez, on behalf of Respondents, with the intention of "forestall[ing] or prevent[ing] entirely the contractually-required Company Sale" and undermining

---

[65]   Dkt 429.

[66]   Dkt 497-2 at Award ¶¶ 3-7, 10-13, 18.

[67]   *Id.* at ¶¶ 76-107, Award ¶ 8.

[68]   *Id.* at ¶ 202.

Petitioners' ability to enforce the Tribunal's orders in the foreign countries in which the Company operates.[69]

The Tribunal spent roughly 40 pages detailing Respondents' disinformation campaign.[70] The following are just some of the malicious internet posts for which Respondents were found responsible.

In February 2022, days after the issuance of the 1stPFA, an article on a website called "www.newszoom.click" ("NewsZoom") reported that an anonymous "whistleblower" – alleged to have been a former employee of Peppertree – had accused Peppertree, Gaitán and Echeverría of having been involved in a corruption scheme in Guatemala, possibly in violation of the Foreign Corrupt Practices Act.[71] The post parroted false allegations of misconduct against Company executives that Respondents had been advancing for months, disclosed confidential information of which Respondents had knowledge, and referenced the Morrison & Foerster memo that recently had been deceitfully obtained by Respondents.[72] In light of these facts and others, the Tribunal concluded that the article's publication had been orchestrated by Hernandez to send a message to Petitioners that the 1stPFA "would not end this dispute but would only be a step in a highly personal

---

[69] Id. at ¶¶ 240, 255; see also id. at Preamble ¶ 8.

[70] Id. at ¶¶ 218-71.

[71] Id. at ¶ 218.

[72] Id. at ¶¶ 220-22.

18

fight that would be waged indiscriminately with accusations of corruption and potential criminality lodged against [Petitioners] directly, without any regard for the truth or falsity of the accusations."[73]

In March 2022, shortly after Petitioners had sought to confirm the 1stPFA in this Court, the article accusing Chairman Goldstein of having accepted a bribe from Goldman Sachs was published on WSW.[74] The article was posted to a website that "itself only first appeared on the internet at the time of" the article and that, like NewsZoom, consisted almost if not entirely of "summaries generated from new stories originally published elsewhere" rather than original content.[75] Despite having "significant self-protective reasons . . . to build a record exonerating themselves," Respondents initially "did the very opposite" and engaged a firm called GreyList Trace Limited, supposedly in an attempt to corroborate alleged contacts between Chairman Goldstein and Goldman Sachs.[76] Respondents subsequently attempted to use the post to disqualify the Tribunal, including through "the attempted generation of animus/antagonism as a source of bias."[77]

In March 2024, the Tribunal discovered an article on a website called "ArbitrationMonitor.com," dated February 28, 2024 and titled, "Marc Goldstein and the Problem of the Sua Sponte Arbitrator"[78] The article cited to the Hernandez-concocted bribery allegations,

---

[73] *Id.* at ¶ 225.

[74] *Id.* at ¶ 227.

[75] *Id.* at ¶ 230, 232.

[76] *Id.* at ¶ 236-37.

[77] *Id.* at ¶ 238.

[78] *Id.* at ¶ 242.

19

accused Chairman Goldstein of being a "*sua sponte*" arbitrator, and referred to "Goldstein's strange insistence that it was within the authority of the panel to issue judgments overriding foreign criminal prosecutions."[79]  The Arbitration Monitor website was cut from the same mold as WSW and NewsZoom, containing a universe of content recycled from other websites with the only seemingly original content being articles about this case that plainly "aligned with positions advocated by Respondents."[80]  Twelve days prior to the article's publication date, for instance, the Tribunal "received a submission from Respondents' then - co-counsel Juan Rodriguez that used the term '*sua sponte*' with reference to the conduct of the Tribunal in this case *six times*."[81]

In April 2024, Arbitration Monitor published an article that reported, seemingly as fact, that Chairman Goldstein had "concealed a critical conflict of interest" and that the Tribunal had issued "orders interfering with foreign law enforcement proceedings."[82]  The article included a link to a reply brief filed by Terra in this Court, even though the brief had been filed under seal and therefore was not available on the public docket.[83]  The Tribunal explained that it could see two reasons for the publication of an article like this.  One was to impel some or all of the arbitrators to withdraw from the case.[84]  The other was to "use the narrative of tribunal bias before foreign arbitral

---

[79]     *Id.*

[80]     *Id.* at ¶ 244-45.

[81]     *Id.* at ¶ 246.

[82]     *Id.* at ¶ 251.

[83]     *Id.* at ¶ 252.

[84]     *Id.* at ¶ 255.

20

tribunals and courts, to explain why these fora should make *de novo* decisions directly opposite of rulings this Tribunal has already made."[85]

### B.    Confirmation Proceedings

As mentioned, the Court has confirmed each of the partial final awards. Respondents argued that each of the first four awards should have been vacated on the ground of evident partiality among the arbitrators – the same ground on which they now seek to vacate the Final Award. This Court rejected those claims, and the Second Circuit has affirmed the confirmation of the first four partial final awards.[86]

### 1.    1stPFA Confirmation

In seeking to vacate the 1stPFA, Respondents initially rejected the allegations of bias against Arbitrator Hodgson that they already had raised to the ICDR in January 2022.[87] This Court explained that Terra had agreed that the decision of the ICDR rejecting that claim would be conclusive, which was "alone . . . sufficient to reject Respondents' arguments regarding the partiality of their handpicked arbitrator."[88] Even considering the issue *de novo*, the Court concluded that Arbitrator Hodgson's employment with her new law firm and mere nomination (without actual

---

[85]    *Id.*

[86]    Respondents' appeal from the judgment confirming the 5thPFA is pending.

[87]    Dkt 124 at 17.

[88]    *Id.*

appointment) as an arbitrator by an unrelated party in an unrelated proceeding was insufficient to establish evident partiality.[89]

Respondents sought to amend their petition to vacate to complain about Chairman Goldstein's June 2022 disclosure that his second cousin was a retired Goldman Sachs partner with no knowledge of the dispute.[90]  This claim too had already been rejected by the ICDR, but even considering it, the Court explained that Respondents had "failed to meet their burden of establishing objective facts that are inconsistent with impartiality."[91]

### 2.    2dPFA, 3dPFA, and 4thPFA Confirmations

Respondents sought to vacate the 2dPFA based on the allege evident partiality of the panel.  They argued such bias was demonstrated by various rulings of the Tribunal that Respondents believed to have been unfair or beyond the Tribunal's authority.[92]  They complained also about the disclosures by Chairman Goldstein and Arbitrator Hodgson that the Court already had considered – and rejected as a basis for vacatur – in confirming the 1stPFA.[93]  And they argued that the Tribunal "allowed itself to be inflamed by allegations that the Chair took a bribe and accusations that

---

[89]     *Id.* at 17-18.

[90]     *Id.* at 18.

[91]     *Id.*

[92]     Dkt 109 at 18-21, 24-27.

[93]     *Id.* at 23-24.

Terra/DTH manufactured those allegations"[94] – the same claim that by then already had been rejected by the ICDR.  In opposition, Petitioners argued that the Tribunal's rulings were entirely proper and that Respondents' claims were based on impermissible speculation and did not rise to the level of demonstrating evident partiality.[95]

Respondents later incorporated the above arguments into their motions to vacate the 3dPFA and the 4thPFA.[96]  In confirming the 3dPFA in September 2023, this Court explained that the claims failed for the reasons already stated in its opinion confirming the 1stPFA, including that the ICDR had already rejected the same claims, and added that "Respondents have failed to set forth any objective facts that are inconsistent with the Tribunal's impartiality."[97]  The Court later confirmed the 2dPFA and 4thPFA for substantially the reasons stated in Petitioners' papers in opposition and in its prior rulings.[98]

### 3.  Second Circuit Decisions

Second Circuit has affirmed this Court's confirmation of the first four partial final awards.[99]  Although Respondents did not press the bias issue in their appeal of the 1stPFA's

---

[94]  *Id.* at 21.

[95]  *See generally* Dkt 112.

[96]  Dkt 141 at ¶ 130; Dkt 161 at ¶ 18.

[97]  Dkt 182 at 13-14, 14 n.57.

[98]  Dkts 202, 207.

[99]  *Telecom Bus. Sol., LLC v. Terra Towers Corp.*, No. 23-144, 2024 WL 446016 (2d Cir. Feb. 6, 2024); *Telecom Bus. Sol., LLC v. Terra Towers Corp.*, Nos. 23-7312, 24-513, 24-722,

23

conformation, they did raise evident partiality as a ground for reversing this Court's confirmation of the 2ndPFA, 3rdPFA, and 4thPFA. The Second Circuit rejected that argument in the consolidated appeal of those judgments, holding that Respondents had failed to show the Tribunal was biased under the relevant standard.[100]

### 4.    5thPFA Confirmation

Respondents did not raise evident partiality as a basis upon which to vacate the 5thPFA, which this Court confirmed.[101]

## III.    The Final Award

### A.    Proceedings

In April 2025, one month after the issuance of the 5thPFA, the Tribunal asked the parties to submit reports stating what additional relief either party was seeking prior to the issuance of a final award ending the arbitration.[102] As explained in more detail below, the parties submissions teed up essentially two issues: (1) what to do about Terra's counterclaims against Petitioners, which had been stayed in the 2dPFA, and (2) whether the Tribunal should remain constituted to potentially assess additional damages against Respondents for ongoing contract breaches.

---

[100] 24-749, 2025 WL 1177768 (2d Cir. Apr. 23, 2025).

[101] *Telecom Bus. Sol., LLC*, 2025 WL 1177768, at *1.

[102] Dkt 429.

Dkt 558-4.

### 1.    *Rewcastle Brown Emails*

Respondents asked the Tribunal to address Terra's previously stayed counterclaims on the merits before concluding the arbitration.[103]   But on September 15, 2025, the Tribunal informed the parties that it was prepared to issue a Final Award and that "it may make sense to convert that stay into a permanent injunction that could be terminated upon the same conditions presently applicable to the stay."[104]

One week later, on September 22, 2025, a person identifying herself as Clare Rewcastle Brown, who claimed to run "a website called Sarawak Report," emailed Chairman Goldstein to say that she was preparing to publish a report concerning "the various allegations involving Goldman Sachs which spun into accusations against yourself and your conduct of the arbitration, attacked as failing to be impartial by the defendants."[105]   Among other things, she claimed to have obtained a "yet unpublicised" report from "the Grey List" – apparently the firm once hired by Respondents[106] – indicating that Chairman Goldstein had been in communication with "a member of the current management committee of" Goldman Sachs.[107]   Rewcastle Brown appeared to reference also the Grey List report that Respondents had submitted to the Tribunal in 2022, stating that her article would "refer to the Grey List report indicating email traffic, after which

---

[103]    Dkt 558-7 at 6.

[104]    Dkt 558-16.

[105]    Dkt 531-1.

[106]    In 2022, as noted above, an investigator hired by Terra retained a company called Greylist Trace Limited in an attempt to substantiate the bribery allegations that Respondents themselves had concocted.  Dkt 497-2 at ¶ 237.

[107]    Dkt 531-1.

you clarified and amended the oath you had made to the arbitration panel, referring to your unnamed second cousin who had previously worked at Goldman Sachs."[108]

The same day, the Tribunal issued an urgent order addressing the matter. The order, to which the email was annexed, explained that this purported journalist claimed to be "in possession of information, evidently provided to her by persons aligned with the Respondents in the arbitration, raising anew the baseless allegations that were made and published initially in 2022 that Mr. Goldstein had been bribed at the time of his appointment."[109] Chairman Goldstein, through the order, declared under penalties of perjury that he "does not have and never has had any relationship or communication with" the Goldman Sachs employee identified in the email and that he never had accepted any form of payment from Goldman Sachs other than arbitrator fees and expenses.[110] The Tribunal explained that it was concerned that Respondents might attempt to use the allegations contained in the email as the basis for seeking relief from this Court and that "publication on the docket of these falsehoods before their falsity can be established in the proceedings would cause further irreparable harm to Mr. Goldstein's professional reputation."[111] The Tribunal therefore ordered at least one party to transmit the order to this Court,[112] which Petitioners promptly did.[113]

---

[108] *Id.*

[109] Dkt 531-3 at 1.

[110] *Id.*

[111] *Id.* at 2.

[112] *Id.*

[113] Dkt 455.

26

Chairman Goldstein sent Rewcastle Brown its order by email, copying the parties.[114] Two days later, on September 24, she sent an email to representatives of Goldman Sachs, copying Chairman Goldstein, in which she again raised the bogus 2022 bribery accusations as well as her newfound accusations that Chairman Goldstein had been in contact with an executive at the bank (citing "the reputable Grey List email tracking company").[115]  Chairman Goldstein forwarded this email to the parties on September 25.[116]

### 2.    *Correspondence from purported media organizations*

On October 14, 2025, the Tribunal notified the parties that the arbitrators had received inquiries from "MINUTO 60 Panama" and "The Global Times / International Herald Tribune."[117]   Despite purportedly being sent by two different organizations, the inquiries asked similarly pointed questions that parroted narratives long promoted by Respondents through anonymous online fora – namely, that the Tribunal was biased, that multiple arbitrators had conflicts of interest, and that the Tribunal interfered with foreign criminal prosecutions against Company executives (most of if not all of which had been instigated by Respondents).

MINUTO 60 Panama separately emailed lists of questions to Arbitrators Ziegler and Hodgson.  In each, the organization said that it was following up on a recent report published by Rewcastle Brown's Sarawak Report.  Based on the URL cited in the emails, the referenced

---

[114]    Dkt 531-2.

[115]    Dkt 531-6 at 2-7.

[116]    *Id.* at 1.

[117]    Dkt 558-20.

publication appeared to be a September 2025 post titled "Goldman's Lone Rogue Banker Narrative Comes Under Siege in Latin America."[118]  The emails from MINUTO 60 Panama were not signed by any named individual.

The questions posed to Arbitrator Hodgson by MINUTO 60 Panama included:[119]

- "What authority do you have to acquit or condemn a natural person residing in Latin America?"

- "Do arbitrators of the American Arbitration Association have the legal power to absolve individuals who may be facing criminal charges in Latin America?"

- "Why did you choose not to recuse yourself from the case despite the evident ethical and professional conflict concerning the claimants?"

- "What reasons motivated you to continue participating in a case with such a high level of ethical concern?"

The questions posed to Arbitrator Ziegler by MINUTO 60 Panama included:[120]

- "Several observers have noted that your writings display a tone that is unusually harsh or confrontational, atypical in international arbitration proceedings.  How do you explain this perception, and what is your rationale behind this writing style?"

---

[118]    Dkt 558-20 at 3.

[119]    *Id.* at 5-6.

[120]    *Id.* at 3.

28

- "In light of the allegations of corruption and personal interest made against you, why did you choose not to recuse yourself from the case?"

- "On what basis do you believe an arbitrator has the authority to issue value judgments about Latin American countries, labeling them as 'corrupt'?"

- "In this tribunal, all three arbitrators have been cited for potential conflicts of interest with the claimants.  How can the independence and legitimacy of your decisions by ensured under such circumstances?"

- "Finally, if it were proven that individuals exonerated in your awards are currently facing criminal proceedings in Latin America, what would be the legal and ethical validity of those decisions?"

The inquiry Chairman Goldstein received from The Global Times / International Herald Tribune asked the same questions, almost verbatim, that had been put to Arbitrator Ziegler.[121] Like the MINUTO 60 Panama inquiries, the Global Times email was unsigned and referenced a publication by the Sarawak Report.[122]  The group said that it "consider[ed] it essential to raise" such questions "for the clarity of the legal community and the global public," "[g]iven the international scope of the case and its impact on the credibility of arbitral proceedings."[123]

---

[121] *Id.* at 8-9.

[122] *Id.*

[123] *Id.* at 8.

29

### 3. *Correspondence from the International Research Group*

On November 10, 2025, the Tribunal notified the parities of yet another correspondence, this time from the "International Research Group," which represented itself as a group of more than 92 media outlets and press agencies across Latin America.[124] The group apparently wrote to the AAA to express "deep concern" with "the alleged conflicts of interest that affected the impartiality of the arbitral panel."[125] The case "has aroused great interest due to the multiple anomalies it presents," the group wrote, "especially considering that the arbitral tribunal declared innocent a criminal structure, whose members are currently deprived of liberty in Guatemala and El Salvador."[126]

The group asserted that Chairman Goldstein "ha[d] been singled out for maintaining links with actors related to the shareholder of AMLQ," that Arbitrator Hodgson had "acknowledged a conflict of interest by belonging to a law firm whose main client has a direct relationship with AMLQ," and that Arbitrator Ziegler had "participated in decisions that transcend the commercial sphere to aspects of a criminal nature," showing, together with the other arbitrators, "the lack of neutrality that tarnished the development of this arbitration."[127] In light of those purported "facts," the group (signing off anonymously) asked for the AAA "to carry out an exhaustive and independent

---

[124] Dkt 558-21.

[125] *Id.* at 7.

[126] *Id.*

[127] *Id.* at 7-8 (emphases omitted).

review of the aforementioned arbitration process, in order to guarantee the justice, truth and transparency that characterizes its institution."[128]

### 4.    Additional Rewcastle Brown Correspondence

On November 29, 2025, Rewcastle Brown sent another email to Chairman Goldstein in which she asked whether he was associated with a New York-based Charles Schwab account, the account number of which she identified.[129]  She sought also to "assure" Chairman Goldstein that she was not a "proxy of" nor "aligned to" the Respondents.[130]  Chairman Goldstein forward this email to the parties and the rest of the Tribunal on December 2.[131]

### B.    The Award

The Tribunal issued its Final Award on November 11, 2025.  The Award addressed (1) what to do about Terra's previously stayed counterclaims and (2) whether the Tribunal should remain constituted to consider additional claims of damages from Petitioners.

Terra argued that the Tribunal should address its counterclaims on the merits before declaring the arbitration complete.[132]  Petitioners argued, over Terra's objection, that the

---

[128]  *Id.* at 8 (emphasis omitted).

[129]  Dkt 531-13 at 2.

[130]  *Id.*

[131]  *Id.* at 1.

[132]  Dkt 531-16 at ¶ 23.

31

counterclaims should be dismissed with prejudice.[133]  Concerned that a dismissal would be procedurally improper, the Tribunal asked the parties to comment on whether the stay instead should be converted into a permanent injunction subject to termination on the same conditions applicable to lifting the stay.[134]  Respondents ultimately did not object to this approach,[135] which the Tribunal adopted.[136]

Petitioners had asked the Tribunal to remain constituted to consider requests for additional damages related to claims that had been adjudicated in the 5thPFA.[137]  The Tribunal previously had postponed a ruling on those damages because Respondents had not yet had an opportunity to cross examine Petitioners' expert regarding their calculation.[138]  By the time of the Final Award, however, more than seven months had elapsed without Petitioners having asked for a hearing to determine those damages.[139]  It made sense that Petitioners had not yet made such a request, the Tribunal said, because the damages were continuing to accumulate as a result of Respondents' ongoing contractual breaches.[140]  But the Tribunal ultimately determined that it would

---

[133]    *Id.* at ¶ 28.

[134]    *Id.* at ¶¶ 26-28.

[135]    *Id.* at ¶ 28.

[136]    *Id.* at Award ¶ 1.

[137]    *Id.* at ¶ 4.

[138]    *Id.* at ¶ 37.

[139]    *Id.* at ¶ 38.

[140]    *Id.*

not "remain constituted to wait indefinitely for [Petitioners] to decide that the time is ripe for a further assessment" of those damages.[141]  It dismissed the claims without prejudice.[142]

Petitioners had argued that it might be impossible to fill a new arbitral panel because "candidates for appointment will be unwilling to subject themselves to defamatory Internet abuse akin to what this Tribunal has experienced."[143]  The Tribunal "s[aw] the situation somewhat differently," explaining that the arbitrators had "been targets of groundless accusations of bias by the Respondents and their Internet 'journalist' proxies since early 2022" and that if the Tribunal were to wait and rule again in Petitioners favor "it is predicable that Respondents will attack the outcome as one based on bias."[144]  For that reason, the Tribunal though it best to leave the adjudication of the unassessed damages to a new panel.[145]  In a footnote, the Tribunal made a record of the inquiries from Rewcastle Brown and the other purported media outlets that "s[ought] to have the Tribunal members answer tendentious questions plainly aligned with Respondents' contentions of Tribunal bias."[146]

---

[141] *Id.* at ¶ 39.

[142] *Id.* at Award ¶ 2.

[143] *Id.* at ¶ 5.

[144] *Id.* at ¶ 40.

[145] *Id.*

[146] *Id.* at ¶ 40 n.14.

33

Because there was "no clearly prevailing party as to the matters resolved by this Final Award," the Tribunal decreed that each party would bear its own fees and costs.[147]

## IV.    *Chairman Goldstein's Blog Posts*

Chairman Goldstein has a personal website on which he has posted multiple times about this case.  Respondents complain about posts he made to that website around and after the conclusion of the arbitration.

### A.    *November 10 Post*

On November 10,[148] the day before the Final Award, Chairman Goldstein posted a note entitled, "Note of November 10, 2025: Re Criminal Justice in Central America," which appeared under a heading reading, "Personal Notes About the Terra Towers Case."[149]  The post began:

> "This will be the first in a series of reports concerning defamatory falsehoods published and perpetuated by the Respondents and/or persons who are their agents or supporters, in relation to an arbitration before the American Arbitration Association's International Centre for Dispute Resolution, Telecom Business Solution et al. v. Terra Towers Corp., et. al. I was the Chair of the Arbitral Tribunal in this case. My report on my own website is unusual, as it may appear to some readers to be inconsistent with an arbitrator's ethical duty of confidentiality. But

---

[147]

*Id.* at Award ¶ 3.

[148]

Respondents submitted a screenshot of the homepage of Chairman Goldstein's website as visited on February 4, 2026.  Dkt 531 at 3.  The Court assumes for the sake of decision that the November 10 post was indeed posted on November 10, the day before the issuance of the Final Award, because Respondents fail to demonstrate how that timing somehow demonstrates bias.  *See infra* note 180.

[149]

Dkt 531-14 at 4.

having examined this question closely, I have concluded that the arbitrator's duty of confidentiality is not so absolute that it prevents the arbitrator from speaking the truth about false accusations that have been and are being made, not only on the Internet for the venal and vengeful purpose of inflicting damage to the arbitrator's career and standing, but evidently also to advance Respondents' resistance to the enforceability of our Awards in jurisdictions in Latin America where they have been or may be brought for recognition and enforcement."[150]

Chairman Goldstein went on to explain that the post was being made in response to "false and malicious Internet-published reports" that the Tribunal had required the Company to "employ an accused criminal as its CEO, thereby intruding on the autonomy of the criminal justice systems in Guatemala and El Salvador, where that person stands accused of crimes based upon the Respondents' submissions to the prosecutors and courts."[151]  The post then recounted the 2dPFA's findings and the procedural orders that preceded it.  It closed by noting that the Company CEO had been incarcerated in a Guatemalan prison since March 2025 and that the Tribunal "has not held proceedings concerning the legality of that incarceration" and had no plans to do so.[152]

### B.    November 11 Post

The next day, Chairman Goldstein issued another post, entitled, "The Facts about the Alleged Corruption of Arbitrator Marc J. Goldstein."[153]  It began:

"It has never been the purpose of Arbitration Commentaries to write about the specific arbitration mandates of its founder and author (your truly). But every rule has its exception. Today I write about a specific case, by name, and with detail,

---

[150] *Id.* at 4-5.

[151] *Id.* at 5.

[152] *Id.* at 6.

[153] Dkt 531-11 at 1.

in the exercise of a self-defense exception to the arbitrator's duty of confidentiality. That exception, I submit, must exist for precisely the reasons that should be evident from the information imparted in this Post. I grant that most of you have no immediate need for the information in this Post, but ChatGPT and its counterparts consume voraciously and sometimes without judgment scandalous and defamatory material that they find on the Internet, and these Judgment-resistant LLM tools have assumed a critical niche in the assessment of candidates for arbitral appointments. They too must be fully informed.

. . .

3. What motivates this Post is that my integrity, my reputation, indeed my ability to continue to pursue my career as an arbitrator and mediator, continue to be attacked publicly by (or on behalf of) the losing parties in the Terra Towers arbitration, evidently in service of their efforts to resist enforcement of the Tribunal's Awards (or the US judgments confirming them) in the courts of countries in which they do business or are domiciled, such as Guatemala, El Salvador, Honduras, Peru and Panama."[154]

The post then provided an overview of the 2022 bribery allegation against Chairman Goldstein and Respondents' attempt to exploit those allegations for their benefit. It explained also how "another ostensibly journalistic website contacted me in September 2025 to seek information about the bribery allegations, and stated in the inquiry email that this website's journalist had seen new evidence that the bribery allegations were true."[155] The post concluded:

"15. So why is it that in 2024 and with evidently intensifying force in recent months in 2025, persons aligned with the Respondents and posing as investigative journalists are crusading, in dark corners of the Internet, and through never-before-heard-of ListServ emails, for a deeper inquiry into the bribery allegations, suggesting that truth was suppressed in the arbitral and judicial proceedings in the United States? Could it be that these activities are coordinated with efforts by the Respondents to resist enforcement of the Tribunal's Awards in the courts of places like Guatemala, El Salvador, Honduras, Peru and Panama where concepts of the rule of law and due process may be different form what prevails in the SDNY Court and the Second Circuit?

---

[154] *Id.* at 1.

[155] *Id.* at 2-3.

. . .

16. Whether justice will ultimately be done in regard to the Terra Towers arbitration remains to be seen because of the Respondents' efforts to prevent and resist enforcement of the Awards in Latin America and execution upon the SDNY Judgments anywhere. But the injustice of an ongoing defamation campaign against this arbitrator, although it cannot be effectively halted without prohibitive legal expense, should not effectively mislead a sophisticated arbitration community (or its Algorithmic Followers). That community is capable of sorting and separating, based on sufficient truthful information, those who may have engaged in serious misconduct from those who have not committed a violation of any law, rule or ethical precept."[156]

C.   *December 12 Post*

On December 12, Chairman Goldstein posted another statement, entitled, "Note of

December 12: Re The Continuing Defamation Campaign."[157]  The post read in full:

"As the Internet defamation campaign aligned with Respondents' resistance to enforcement of the Tribunal's Awards is continuing, I share one interesting new development. On November 29, 2025, I received an email inquiry from one of the profusion of Internet website rapporteurs of Respondents' false allegations of corruption and bias. In this email, I was asked if I was the owner of a particular account, at a financial services firm that in fact hosts my retirement and investment accounts. The purported account was in the name of a Trust bearing (I) a similarity of name to my own, and (ii) the last three digits (of an eight-digit account number) identical to the last three digits of my 401(K) account. I did not reply to the sender, but did forward the email to the Parties, my co-arbitrators and the administering institution. Inquiry to the financial institution revealed that there exists no such Trust account. Alas, it appears that the Respondents-supporting investigator, whether knowingly or otherwise, was put to the task of trying to validate (or secure my denial of or silence in the face of) purported new evidence in support of the fictitious 2022 accusation that I was paid a bribe by one of the Claimants and that this was done through a covert electronic funds transfer from an account of mine at the Co-Claimant (which never existed) to a different account of mine at another institution. To make this defamatory falsehood appear capable of being true, a non-existent proxy for this supposed transferee account has been contrived. Not to

---

[156]   *Id.* at 4

[157]   Dkt 531-14 at 4.

37

be obscured is the alarming fact that sophisticated cyber-hackers have evidently been deployed to gain unauthorized access to confidential information about my own retirement investment account."[158]

D.    *January 10 Post*

A January 10 post was titled, "Note of January 10, 2026: Re The Continuing Defamation Campaign."[159]  It read in full:

"Today I received an email from a person who identifies as a journalist in Medellin, Colombia, and who states that the 'Investigation Group' of his media organization is 'finalizing a journalistic investigation into the case of the Continental Towers....'  The email seeks detailed answers to specific questions and states that '[i]f you do not respond, we will publish, expressly registering that your version was requested, with date and time, and that it was not provided.' I have not responded and will not respond. However, I record here, as a follow-up to my note below of December 12, 2025: A person falsely claiming my identity contacted the bank that holds my investment and retirement accounts, and based on several types of identifying information that had come into the possession of this person without my knowledge or consent, including my drivers' license number and Social Security number, succeeded to be validated by the bank, and posed certain questions about deposits made to my accounts. My understanding of the report that I obtained via the bank's fraud investigation unit, in the context of the inquiry I received from a different journalist as reported below on December 12, 2025, is that this impostor sought (and failed to obtain) information about deposits to one or more of my accounts that might corroborate a hypothesis that an account of mine at the bank was the transferee account of an alleged bribe – that is, the alleged bribe that persons aligned with the Respondents in the Terra Towers (Continental Towers) case – the non-prevailing parties in each of the six Awards that were issued by the Tribunal – have been promoting on selected Internet websites since March 2022. Readers of these Personal Notes will appreciate (i) the well-documented falsity of the bribery allegations, and (ii) that the identify theft and misuse herein described may well have constituted serious crimes under the laws of the United States."[160]

---

[158]    *Id.*

[159]    *Id.*

[160]    *Id.*

38

**Discussion**

Suffice to say that this is far from the first attempt by Respondents to impugn the arbitrators that repeatedly saw through their machinations in this unfortunate case.  Like all of their previous cries of bias, Respondents' current contentions are wholly without merit.  Accordingly, the Final Award will be confirmed.

I.      *Motion to Vacate*

   A.      *Legal Background*

Under the FAA, a court may vacate an arbitration award "where there was evident partiality . . . in the arbitrators, or either of them."[161]  Unlike a judge, "who can be disqualified 'in any proceeding in which his impartiality *might* reasonably be questioned,'"[162] an arbitrator is disqualified "only when a reasonable person, considering all the circumstances, would *have* to conclude that an arbitrator was partial to one side."[163]  Such a conclusion may be inferred "from objective facts inconsistent with impartiality," but "may not be based simply on speculation."[164]  A

---

[161]  9 U.S.C. § 10(a)(2).

[162]  *Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.*, 492 F.3d 132, 137 (2d Cir. 2007) (quoting *Apple v. Jewish Hosp. & Med. Ctr.*, 829 F.2d 326, 332-33 (2d Cir. 1987)).

[163]  *Scandinavian Reinsurance Co. v. St. Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 72 (2d Cir. 2012) (quoting *Applied Indus.*, 492 F.3d at 137).

[164]  *Id.* (first quoting *Pitta v. Hotel Ass'n of N.Y.C., Inc.*, 806 F.2d 419, 423 n.2 (2d Cir. 1986); and then quoting *United States v. Int'l Bhd. of Teamsters*, 170 F.3d 136, 147 (2d Cir. 1999)).

party seeking to vacate an award based on evident partiality must prove that claim by clear and convincing evidence.[165]

Respondents premise their bias claim on public statements made about them by Chairman Goldstein. In that regard, "[i]t is to be expected that after a judge or an arbitrator has heard considerable testimony, he will have some view of the case."[166] "As long as that view is one which arises from the evidence and the conduct of the parities," however, "it cannot be fairly claimed that some expression of that view amounts to bias."[167] As the Supreme Court has observed in an analogous context, "opinions formed by the judge" on the basis of the record in the case "do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible."[168] An opinion or disposition towards one side that is "properly and necessarily acquired in the course of the proceedings" must be distinguished from an opinion or disposition "that is somehow *wrongful* or *inappropriate*."[169] Indeed, "[t]he judge who presides at a trial may, upon the completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person," but that judge "is not thereby recusable for bias or prejudice."[170]

---

[165]

    *Certain Underwriting Members of Lloyds of London v. State of Florida*, *Dep't of Fin. Servs.*, 892 F.3d 501, 505 (2d Cir. 2018).

[166]

    *Ballantine Books, Inc. v. Cap. Distributing Co.*, 302 F.2d 17, 21 (2d Cir. 1962).

[167]

    *Id.*

[168]

    *Liteky v. United States*, 510 U.S. 540, 555 (1994).

[169]

    *Id.* at 550-51.

[170]

    *Id.* at 550-51.

B.      *Analysis*

Respondents contend that Chairman Goldstein was so biased against them that this Court should vacate the Final Award – an arbitral award in which there was "no clearly prevailing party" because of how evenhandedly the Tribunal addressed the parties' competing arguments.[171] They premise that contention on the posts that appeared on Chairman Goldstein's blog on and after November 10, 2025.

By the time Chairman Goldstein published those posts, of course, the five partial final awards already had been confirmed by this Court, the Tribunal's integrity repeatedly had been upheld by the ICDR, this Court, and the Second Circuit, and the Tribunal clearly already had decided all matters of substance addressed in the Final Award.  The arbitration was over.

Respondents nevertheless argue, essentially, that the blog posts demonstrate Chairman Goldstein's partiality because the posts (1) unfairly "attack[]" and "criticize" Respondents and (2) allegedly were made in breach of AAA rules on confidentiality and the appearance of bias.[172] But read with a full understanding of the history of this litigation, and focusing on the fact that the posts were made after the arbitration effectively had ended, the posts fall far short of providing clear and convincing evidence of bias.

To start, Respondents arguments are nothing more than the latest in a series of a attempts to use their own misconduct to force Chairman Goldstein to recuse himself.  Regardless of whether they ever were in direct communication with Rewcastle Brown and the other purported journalists and investigators who have been harassing Chairman Goldstein and the Tribunal,

---

[171]

Dkt 531-16 at Award ¶ 3.

[172]

Dkt 530 at 11-12; Dkt 566 at 6.

Respondents bear at least indirect responsibility for those inquiries. Rewcastle Brown and the others were merely repeating the same narratives that Hernandez concocted on behalf of the Respondents years ago – namely, that the American arbitrators, particularly Chairman Goldstein, are corrupt and hellbent on unlawfully interfering with foreign criminal proceedings. Having started a rumor, Respondents now seek to disclaim responsibility for the fact that people are still spreading it. In analogous contexts, courts have rejected parties' attempts "to create the basis for recusal by their own deliberate actions."[173] It would undermine the integrity of the FAA and the New York Convention to allow Respondents to attack the Final Award on the ground that the smear campaign they launched against Chairman Goldstein became so pernicious that he ultimately felt compelled to defend himself publicly.

Even putting that aside, nothing in the posts demonstrate evident partiality. Respondents alleged that the posts attack and criticize them. But the posts generally do nothing more than restate the Tribunal's factual findings. Respondents' responsibility for perpetrating a disinformation campaign targeting Chairman Goldstein and the entire Tribunal is a matter of public record based on the facts found in the 5thPFA. And the inquiries the Tribunal received from Rewcastle Brown and other supposed media organizations were, as the Tribunal itself observed,[174] plainly aligned with the anti-Tribunal narratives long promulgated by Respondents. It does not demonstrate evident partiality that Chairman Goldstein drew the sensible inference that the

---

[173]   *United States v. Owens*, 902 F.2d 1154, 1156 (4th Cir. 1990) (collecting cases).

[174]   Dkt 531-16 at ¶ 40 n.14; Dkt 531-3 at 1.

purported journalists and investigators behind those inquires likely were supportive of, if not acting on behalf of, the Respondents.[175]

Furthermore, even assuming the posts could be read to attack or criticize the Respondents, the mere fact that an arbitrator may have formed an opinion about a party after years of litigation does not demonstrate evident partiality. It is well settled that judges – who are held to a higher standard that arbitrators – may express opinions based on "the evidence and the conduct of the parties" without impugning their impartiality.[176] Chairman Goldstein had a first-row seat to Respondents' bad-faith conduct throughout this litigation. "[C]onsidering all the circumstances,"[177] nothing in the posts suggests that Chairman Goldstein has some sort of *"wrongful* or *inappropriate"* antagonism that "would make fair judgment impossible."[178]

Finally, Respondents argue that the blog posts were published in violation of AAA guidelines concerning an arbitrator's duties to avoid the appearance of bias and maintain the confidentiality of the proceedings. Even assuming, *arguendo*, that the posts somehow were inconsistent with the AAA guidelines cited by Respondents, that fact alone would not justify vacatur of the Final Award.[179] The guidelines may be a relevant factor to consider in the totality of the circumstances. But here, the alleged breaches add little, if anything, to the analysis in light of the

---

[175] *Cf. In re Cooper*, 821 F.2d 833, 841 (1st Cir. 1987) (per curiam) ("Nor do we address whether the subsidiary findings were clearly erroneous, for the mere fact that a judge errs or makes clearly erroneous findings would not be indicative of bias.").

[176] *Ballantine Books*, 302 F.2d at 21.

[177] *Scandinavian Reinsurance Co.*, 668 F.3d at 72 (quoting *Applied Indus.*, 492 F.3d at 137).

[178] *Liteky*, 510 U.S. at 550, 555.

[179] *See Certain Underwriting Members of Lloyds of London*, 892 F.3d at 506 n.2.

43

context already described above.  Nor have Respondents identified anything prejudicial that the posts reveal about the arbitration that was not already in the public domain.  Furthermore, it was perfectly reasonably in the circumstances for Chairman Goldstein to publicly defend his professional reputation, in a measured way, around and after the conclusion of this fraught and, in many ways, highly unusual arbitration.[180]  As the Second Circuit has explained, "[i]mpartiality is not gullibility," and "[d]isinterestedness does not mean child-like innocence."[181]


## II.    *Motion to Confirm*

Judicial confirmation of an arbitration award is "a summary proceeding that merely makes what is already a final arbitration award a judgment of the court."[182]  Under the New York Convention, which applies here because among other things the arbitration agreements at issue included mostly non-U.S. signatories,[183] a court "shall confirm" an award "unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said

---

[180]

Respondents' arguments that Chairman Goldstein deliberately timed his posts to prevent Respondents from having time to challenge him before the ICDR and intended to "use[] the power of confidentiality to his benefit," Dkt 566 at 10, are "based simply on speculation," *Scandinavian Reinsurance Co.*, 668 F.3d at 73 (quoting *Int'l Bhd. of Teamsters*, 170 F.3d at 147).

[181]

*In re J.P. Linahan, Inc.*, 138 F.2d 650, 654 (2d Cir. 1943).

[182]

*D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) (quoting *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984)).

[183]

*See Molecular Dynamics, Ltd. v. Spectrum Dynamics Med. Ltd.*, 143 F.4th 70, 82 (2d Cir. 2025); 9 U.S.C. § 202.

44

Convention."[184]   Because the arbitration was held in the United States, those grounds for refusal include the bases for vacating an award specified in Chapter 1 of the FAA.[185]

Respondents first argue that "[t]he composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties"[186] because the AAA's Commercial Arbitration Rules require that "[a]ny arbitrator shall be impartial and independent and shall perform his or her duties with diligence and in good faith, and shall be subject to disqualification."[187]   But the Court holds that Respondents have failed to show that Chairman Goldstein was not impartial and independent or that he failed to perform his duties with diligence and in good faith.  Respondents next argue that the award should not be confirmed because it instead should be vacated under 9 U.S.C. § 10(a)(2) on the basis of evident partiality, a contention the Court already has rejected. Accordingly, the award will be confirmed.

---

[184]   9 U.S.C. § 207.

[185]   *See Scandinavian Reinsurance Co.*, 668 F.3d at 71.

[186]   New York Convention art. V(1)(d).

[187]   Dkt 567-1 at 18.

45

## Conclusion

For the foregoing reasons, the petition to confirm the Final Award (Dkt 556) is GRANTED and the motion to vacate the Final Award (Dkt 529) is DENIED. The Clerk shall enter judgment accordingly.

SO ORDERED.

Dated:    June 17, 2026

Lewis A. Kaplan
United States District Judge